EXHIBIT

1

tabbies

# REVOLVING CREDIT AND SECURITY AGREEMENT

between

**SA-LAKELAND, LLC
SA-CLEWISTON, LLC
SA-ST. PETERSBURG, LLC
CHC-SPC OPERATOR, INC.
CHC-CLP OPERATOR HOLDING, LLC**

and

**CAPITALSOURCE BANK**

Dated as of
November 25, 2008

# TABLE OF CONTENTS

Page

1. DEFINITIONS .......................................................................................................... 1
    1.1. General Terms .........................................................................................1
    1.2. Definitions ...............................................................................................2

2. ADVANCES, PAYMENT AND INTEREST.......................................................... 15
    2.1. The Revolving Facility ..........................................................................15
    2.2. The Revolving Loans; Maturity ............................................................16
    2.3. Revolving Facility Disbursements; Requirement to Deliver
          Borrowing Certificate ............................................................................16
    2.4. Promise to Pay; Manner of Payment .....................................................16
    2.5. Repayment of Excess Advances............................................................17
    2.6. Payments by Lender ..............................................................................17
    2.7. Evidence of Loans .................................................................................17

3. INTEREST AND FEES ......................................................................................... 18
    3.1. Interest on the Revolving Facility .........................................................18
    3.2. Commitment Fee ...................................................................................18
    3.3. Unused Line Fee ...................................................................................18
    3.4. Collateral Management Fee....................................................................18
    3.5. Computation of Fees; Lawful Limits.....................................................18
    3.6. Default Rate of Interest.........................................................................19

4. GRANT OF SECURITY INTERESTS................................................................... 19
    4.1. Security Interest; Collateral ..................................................................19
    4.2. Power of Attorney ................................................................................20
    4.3. Further Assurances ...............................................................................20

5. ADMINISTRATION AND MAINTENANCE OF COLLATERAL...................... 21
    5.1. Revolving Facility Collections; Repayment; Borrowing
          Availability and Lockbox ......................................................................21
    5.2. Accounts ...............................................................................................22
    5.3. Healthcare .............................................................................................22
    5.4. Medicare and Medicaid Account Debtors and Third-Party
          Payor Information..................................................................................23
    5.5. Collateral Administration .....................................................................23

6. CONDITIONS PRECEDENT................................................................................. 24
    6.1. Conditions to Initial Advance and Closing............................................24
    6.2. Conditions to Each Advance .................................................................26

7. REPRESENTATIONS AND WARRANTIES ........................................................ 27
    7.1. Organization and Authority...................................................................27
    7.2. Loan Documents....................................................................................27
    7.3. Subsidiaries, Capitalization and Ownership Interests ...........................28
    7.4. Properties...............................................................................................28
    7.5. Other Agreements..................................................................................28

i

| | 7.6. | Litigation | 29 |
|---|---|---|---|
| | 7.7. | Environmental Matters | 29 |
| | 7.8. | Potential Tax Liability; Tax Returns; Governmental Reports | 30 |
| | 7.9. | Financial Statements and Reports | 30 |
| | 7.10. | Compliance with Law | 30 |
| | 7.11. | Intellectual Property | 31 |
| | 7.12. | Licenses and Permits; Labor | 31 |
| | 7.13. | No Default | 32 |
| | 7.14. | Disclosure | 32 |
| | 7.15. | Existing Indebtedness; Investments, Guarantees and Certain Contracts | 32 |
| | 7.16. | Other Agreements | 32 |
| | 7.17. | Insurance | 33 |
| | 7.18. | Names; Location of Offices, Records and Collateral | 33 |
| | 7.19. | Lien Perfection and Priority | 33 |
| | 7.20. | Investment Company Act | 33 |
| | 7.21. | Regulations T, U and X | 33 |
| | 7.22. | OFAC and Anti-Terrorism Regulations | 34 |
| | 7.23. | Survival | 34 |
| 8. | | AFFIRMATIVE COVENANTS | 34 |
| | 8.1. | Financial Statements, Borrowing Certificate, Financial Reports and Other Information | 34 |
| | 8.2. | [Reserved] | 36 |
| | 8.3. | Conduct of Business and Maintenance of Existence and Assets | 36 |
| | 8.4. | Compliance with Legal and Other Obligations | 37 |
| | 8.5. | Insurance | 37 |
| | 8.6. | True Books | 37 |
| | 8.7. | Inspections; Periodic Audits and Reappraisals | 38 |
| | 8.8. | Further Assurances; Post-Closing | 38 |
| | 8.9. | Use of Proceeds | 38 |
| | 8.10. | Evidence of Proceeds | 38 |
| | 8.11. | Right of First Refusal | 39 |
| | 8.12. | Increased Costs; Capital Adequacy | 39 |
| | 8.13. | Payroll Taxes | 40 |
| | 8.14. | New Subsidiaries | 40 |
| | 8.15. | [Reserved] | 40 |
| 9. | | NEGATIVE COVENANTS | 40 |
| | 9.1. | Financial Covenants | 40 |
| | 9.2. | Permitted Indebtedness | 41 |
| | 9.3. | Permitted Liens | 41 |
| | 9.4. | Investments; New Facilities or Collateral; Subsidiaries | 41 |
| | 9.5. | Dividends; Redemptions | 41 |
| | 9.6. | Transactions with Affiliates | 41 |
| | 9.7. | Charter Documents; Fiscal Year; Dissolution; Use of Proceeds | 42 |
| | 9.8. | Truth of Statements | 42 |
| | 9.9. | IRS Form 8821 | 42 |

14-50756 - #166-1  File 09/08/14  Enter 09/10/14 10:20:44  Exhibit DIP #1 (Part 1 of 3)
Pg 3 of 34

| | | |
|---|---|---|
| 9.10. | Transfer of Assets | 42 |
| 9.11. | Payroll Accounts | 43 |
| 9.12. | Payment on Subordinated Debt | 43 |
| 10. | EVENTS OF DEFAULT | 43 |
| 11. | RIGHTS AND REMEDIES AFTER DEFAULT | 46 |
| 11.1. | Rights and Remedies | 46 |
| 11.2. | Application of Proceeds | 46 |
| 11.3. | Rights of Lender to Appoint Receiver | 47 |
| 11.4. | Rights and Remedies not Exclusive | 47 |
| 11.5. | Standards for Exercising Remedies | 47 |
| 12. | WAIVERS AND JUDICIAL PROCEEDINGS | 48 |
| 12.1. | Waivers | 48 |
| 12.2. | Delay; No Waiver of Defaults | 48 |
| 12.3. | Jury Waiver | 49 |
| 12.4. | Cooperation in Discovery and Litigation | 49 |
| 13. | EFFECTIVE DATE AND TERMINATION | 50 |
| 13.1. | Termination and Effective Date Thereof | 50 |
| 13.2. | Survival | 50 |
| 14. | [INTENTIONALLY OMITTED] | 50 |
| 15. | MISCELLANEOUS | 50 |
| 15.1. | Governing Law; Jurisdiction; Service of Process; Venue | 50 |
| 15.2. | Successors and Assigns; Participations; New Lenders | 51 |
| 15.3. | Application of Payments | 52 |
| 15.4. | Indemnity | 52 |
| 15.5. | Notice | 52 |
| 15.6. | Severability; Captions; Counterparts; Facsimile Signatures | 53 |
| 15.7. | Expenses | 53 |
| 15.8. | Entire Agreement | 53 |
| 15.9. | Lender Approvals | 54 |
| 15.10. | Confidentiality and Publicity | 54 |
| 15.11. | Release of Lender | 54 |
| 15.12. | Agent | 55 |
| 15.13. | Concerning Liability of Borrower | 55 |
| 15.14. | Agreement Controls | 57 |
| 15.15. | Taxes | 57 |
| 15.16. | Patriot Act | 58 |

## REVOLVING CREDIT AND SECURITY AGREEMENT

THIS REVOLVING CREDIT AND SECURITY AGREEMENT (the "**Agreement**") dated as of November 25, 2008, is entered into between SA-LAKELAND, LLC, a Florida limited liability company, SA-CLEWISTON, LLC, a Florida limited liability company, SA-ST. PETERSBURG, LLC, a Florida limited liability company, CHC-SPC OPERATOR, INC., a Florida corporation, and CHC-CLP OPERATOR HOLDING, LLC, a Florida liability company (individually and collectively, "**Borrower**"), and CAPITALSOURCE BANK, a California industrial bank (the "**Lender**").

WHEREAS, the Borrower has requested that Lender make available to Borrower a revolving credit facility (the "**Revolving Facility**") in a maximum principal amount at any time outstanding of up to Four Million Dollars ($4,000,000) (the "**Facility Cap**"), the proceeds of which shall be used by Borrower as a provider of healthcare services, to refinance existing indebtedness incurred in the generation of receivables, for the generation of receivables, for working capital purposes, and for any other lawful purpose permitted under this Agreement and for payments to Lender hereunder; and

WHEREAS, Lender is willing to make the Revolving Facility available to Borrower upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, and intending to be legally bound, Borrower and Lender hereby agree as follows:

## 1. DEFINITIONS

### 1.1. General Terms

In addition to the definitions above and elsewhere in this Agreement, the terms listed in Annex I hereto shall have the meanings given such terms in Annex I, which are incorporated herein and made a part hereof. All capitalized terms used which are not specifically defined herein shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein. Unless otherwise specified herein or in Annex I, any agreement, contract or instrument referred to herein or in Annex I shall mean such agreement, contract or instrument as modified, amended, restated or supplemented from time to time. Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents, all accounting terms not defined in Annex I or elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP. References herein to "**New York City Time**" shall mean eastern standard time or eastern daylight savings time as in effect on any date of determination in New York City, New York. The terms "herein," "hereof" and similar terms refer to this Agreement as a whole. In the computation of periods of time from a specified date to a later specified date in any Loan Document, the terms "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including." In any other case, the term "including" when used in any Loan Document means "including without limitation." The term "documents" means all writings, however evidenced and whether in physical or electronic form, including all documents, instruments, agreements, notices, demands, certificates, forms, financial statements, opinions and reports. The term "incur" means incur, create, make, issue, assume or otherwise become directly or indirectly liable in respect of or responsible for, in each case whether directly or indirectly, and the terms "incurrence" and "incurred" and similar derivatives shall have correlative meanings. Unless otherwise expressly indicated, the meaning of any term defined (including by reference) in any Loan Document shall be equally applicable to both the singular and plural forms of such term. In the event that any Accounting Change (as defined below) shall occur and such change results in

62601v4

a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and Lender agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made. Until such time as such an amendment shall have been executed and delivered by Borrower and Lender, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

## 1.2. Definitions

"Acceptance Notice" shall have the meaning given such term in Section 8.11.

"Accounting Change" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the U.S. Securities and Exchange Commission.

"Accounts" shall mean "accounts" as defined in Section 9-102 of the UCC (including Health Care Insurance Receivables).

"Account Debtor" shall mean "account debtor" as defined in Section 9-102 of the UCC.

"Advance" shall mean a borrowing under the Revolving Facility. Any amounts paid by Lender on behalf of Borrower under any Loan Document shall be an Advance for purposes of the Agreement.

"Affiliate" shall mean, as to any Person (a) any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) any other Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, (c) any other Person which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of five percent or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person and (d) in the case such Person is an individual, any other Person who is an immediate family member, spouse or lineal descendant of individuals of such Person or any Affiliate of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise. "Affiliate" shall include any Subsidiary. Notwithstanding anything herein to the contrary, in no event shall Lender be considered as "Affiliate" of Borrower.

"Applicable Rate" shall mean the interest rate applicable from time to time to Loans under the Agreement.

"Availability" shall mean the value, in U.S. Dollars of eighty-five percent (85%) of the Borrowing Base minus, if applicable amounts reserved pursuant to this Agreement.

"Bank Products Agreement" shall mean any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other

cash management or depositary arrangements entered into between Borrower and Lender or an Affiliate of Lender, in its separate capacity as a party to such Bank Products Agreement.

"Borrowing Base" shall mean, as of any date of determination, the net collectible Dollar value of Eligible Accounts, as determined with reference to the most recent Borrowing Certificate and otherwise in accordance with the Agreement; provided, however, that if as of such date the most recent Borrowing Certificate is of a date more than four Business Days before or after such date, the Borrowing Base shall be determined by Lender in its Permitted Discretion. For purposes hereof, the net collectible Dollar value of Eligible Accounts is the amount due to Borrower as a result of a contractual right of payment from third-party payors less deductible obligations and contractual allowances as determined and approved by Lender in its Permitted Discretion.

"Borrowing Certificate" shall mean a Borrowing Certificate substantially in the form of Exhibit A attached hereto.

"Borrowing Date" shall the mean the date requested for an Advance by Borrower pursuant to Section 2.3.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which the commercial banks in New York City are authorized or required by law to remain closed.

"Capital Expenditures" shall mean, for any Test Period, the sum (without duplication) of all expenditures (whether paid in cash or accrued as liabilities) during the Test Period that are or should be treated as capital expenditures under GAAP.

"Capital Lease" shall mean, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Capitalized Lease Obligations" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"Change in Law" shall mean a change in any applicable law or regulation or any change therein or in the interpretation or application thereof.

"Change of Control" shall mean, with respect to Borrower, the occurrence of any of the following: (i) a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions in which its stockholders, managers, partners or interest holders immediately prior to such transaction or series of transactions receive, in exchange for the stock or interests owned by them, cash, property or securities of the resulting or surviving entity or any Affiliate thereof, and, as a result thereof, Persons who, individually or in the aggregate, were holders of fifty percent or more of its voting stock, securities or equity, partnership or ownership interests immediately prior to such transaction or series of transactions hold less than fifty percent of the voting stock, securities or other equity, partnership or ownership interests of the resulting or surviving entity or such Affiliate thereof, calculated on a fully diluted basis, (ii) a direct or indirect sale, transfer or other conveyance or disposition, in any single transaction or series of transactions, of all or substantially all of

14-50756 - #166-1  File 09/08/14  Enter 09/10/14 10:20:44  Exhibit DIP #1 (Part 1 of 3)
Pg 7 of 34

its assets, (iii) the initial public offering of its securities, (iv) any "change in/of control" or "sale" or "disposition" or similar event as defined in any document governing indebtedness of such Person which gives the holder of such indebtedness the right to accelerate or otherwise require payment of such indebtedness prior to the maturity date thereof, or (v) the replacement of a majority of the board of directors of Borrower over a one-year period from the directors who constituted the board of directors of Borrower at the beginning of such period and such replacement shall not have been approved by a vote of at least a majority of the board of directors of Borrower then still in office who either are members of such board of directors at the beginning of such period or whose election as a member of such board of directors was previously so approved.

"Chattel Paper" shall mean "chattel paper" as defined in Section 9-102 of the UCC, whether tangible or electronic.

"Claims" shall mean any and all liabilities, obligations, losses, damages, penalties, claims, actions, litigation, proceedings, investigations, judgments, suits, fees, costs, expenses, charges, advances and disbursements of any kind (including, without limitation, fees, costs, expenses and charges of counsel (including in-house counsel)).

"Closing" shall mean the satisfaction, or written waiver by Lender, of all of the conditions precedent set forth in the Agreement required to be satisfied prior to the consummation of the transactions contemplated hereby.

"Closing Date" shall mean the date upon which the Closing occurs.

"Collateral" shall mean, all personal property of every kind and nature of Borrower (or, if referring to another Person, such Person), including:

(i)      Accounts;

(ii)     Documents;

(iii)    Chattel Paper;

(iv)     Commercial Tort Claims;

(v)      Deposit Accounts;

(vi)     General Intangibles (including Payment Intangibles and Software);

(vii)    Goods (including Equipment, Inventory and all accessions and attachments thereto);

(viii)   Instruments;

(ix)     Investment Property;

(x)      Letter-of-Credit Rights;

(xi)     Supporting Obligations;

4

(xii)    money, rights to the payment of money, and insurance claims (provided that with respect to insurance claims only, only such insurance claims related to the Accounts) and proceeds; and

(xiii)   all proceeds and products of the foregoing.

"Collateral Management Fee" shall mean a monthly fee to be paid by Borrower to Lender in an amount equal to 0.083% per month calculated on the basis of the daily average amount of the balances under the Revolving Facility outstanding during the preceding month.

"Commercial Tort Claims" shall mean "Commercial Tort Claims" as defined in Section 9-102 of the UCC.

"Compliance Certificate" shall mean a compliance certificate substantially in the form of Exhibit B attached hereto.

"Concentration Account" shall mean a depository account maintained by Lender or an affiliate of Lender at such bank as Lender may communicate to Borrower from time to time.

"Debtor Relief Law" shall mean, collectively, the Bankruptcy Code of the United States of America and all other applicable federal and state liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended and in effect from time to time.

"Default" shall mean any event, fact, circumstance, or condition that, with the giving of applicable notice or passage of time or both, would constitute or be or result in an Event of Default.

"Default Rate" shall mean at any time the Applicable Rate in effect at such time plus four percent per annum.

"Deposit Accounts" shall mean "deposit accounts" as defined in Section 9-102 of the UCC.

"Distribution" shall mean any direct or indirect dividend, distribution or other payment of any kind or character (whether in cash, securities, or other property) in respect of any equity interests.

"Documents" shall mean "documents" as defined in Section 9-102 of the UCC.

"Dollars" and the sign "$" each mean the lawful money of the United States of America.

"Eligible Accounts" shall mean each Account arising in the ordinary course of an individual Borrower's business from the sale or lease of goods or rendering of Services which Lender, in its Permitted Discretion, deems an Eligible Account unless:

(a)     such Account is not subject to a valid perfected first priority security interest in favor of Lender, subject to no other Lien;

(b)     such Account is not evidenced by an invoice, statement or other documentary or electronic evidence satisfactory to Lender;

(c)      such Account or any portion thereof (in which case only such portion shall not be an Eligible Account) is payable by a beneficiary, recipient or subscriber individually and not directly by a Medicaid/Medicare Account Debtor or commercial medical insurance carrier acceptable to Lender;

(d)      such Account arises out of Services rendered or a sale or lease made to, or out of any other transaction between Borrower or any of its Subsidiaries and, one or more Affiliates of Borrower;

(e)      such Account remains unpaid for longer than one hundred fifty calendar days after the applicable Services were rendered;

(f)      with respect to all Accounts owed by any particular Account Debtor (other than Accounts from Medicaid/Medicare Account Debtors) or its Affiliates, if more than fifty percent of the aggregate balance of all such Accounts owing from such Account Debtor and its Affiliates remain unpaid for longer than one hundred fifty calendar days after the applicable Services were rendered;

(g)      with respect to all Accounts owed by any particular Account Debtor or its Affiliates, fifty percent or more of all such Accounts are deemed not to be Eligible Accounts for any reason hereunder;

(h)      with respect to all Accounts owed by any particular Account Debtor or its Affiliates (other than Medicaid/Medicare Account Debtors) if such Accounts exceed twenty percent of the net collectible Dollar value of all Eligible Accounts at any one time (including Accounts from Medicaid/Medicare Account Debtors);

(i)      any covenant, agreement, representation or warranty contained in any Loan Document with respect to such Account has been breached and remains uncured;

(j)      the Account Debtor for such Account has commenced a voluntary case under any Debtor Relief Law or has made an assignment for the benefit of creditors, or a decree or order for relief has been entered by a court having jurisdiction in respect of such Account Debtor in an involuntary case under any Debtor Relief Law, or any other petition or application for relief under any Debtor Relief Law has been filed against such Account Debtor, or such Account Debtor has failed, suspended business, ceased to be solvent, called a meeting of its creditors, or has consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs;

(k)      such Account arises from the sale or lease of property or Services rendered to one or more Account Debtors outside the United States (including any territory or possession of the United States that has adopted Article 9 of the UCC) or that have their principal place of business or chief executive offices outside the United States (including any territory or possession of the United States that has adopted Article 9 of the UCC);

(l)      such Account represents the sale or lease of goods or rendering of Services to an Account Debtor on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by Chattel Paper or an Instrument of any kind or has been reduced to judgment;

(m)      the applicable Account Debtor for such Account is any Governmental Authority, unless rights to payment of such Account have been assigned to Lender pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 3727, et seq. and 41 U.S.C. Section 15, et seq.), or

6

otherwise only if all applicable statutes or regulations respecting the assignment of Government Accounts have been complied with as determined by Lender in its Permitted Discretion;

(n)     such Account is subject to any offset, credit (including any resource or other income credit or offset), deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim, or is contingent in any respect or for any reason, but only to the extent of such offset, credit (including any resource or other income credit or offset), deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim;

(o)     there is any agreement with an Account Debtor for any deduction from such Account, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each invoice related thereto, such that only the discounted amount of such Account after giving effect to such discounts and allowances shall be considered an Eligible Account;

(p)     any return, rejection or repossession of goods or Services related to it has occurred, but only to the extent of any return, rejection or repossession;

(q)     such Account is not payable to Borrower (including via assignment only if all applicable statutes or regulations respecting the assignment of Government Accounts have been complied with as determined by Lender in its Permitted Discretion);

(r)     Borrower has agreed to accept or has accepted any non-cash payment for such Account;

(s)     with respect to any Account arising from the sale of goods, the goods have not been shipped to the Account Debtor or its designee; or

(t)     with respect to any Account arising from the performance of Services, the Services have not been actually performed or the Services were undertaken in violation of any law.

"Environmental Laws" shall mean any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements (including, without limitation, common law) of any international authority, foreign government, the United States, or any state, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment, or protection of human health or employee health and safety (as affected by the environment or by any substance the exposure to which is reasonably suspected of causing harm to human health), as has been, is now, or may at any time hereafter be, in effect.

"Equipment" shall mean "equipment" as defined in Section 9-102 of the UCC.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" shall mean the occurrence of any event set forth in Article X.

"Excess Cash Flow" shall mean, for any fiscal year (or for such other period as may be specifically provided for herein), as calculated for Borrower and its Subsidiaries on a consolidated basis, without duplication, an amount equal to the sum of (a) Net Income (as defined in Annex I) for such period, plus (b) an amount equal to the amount of depreciation expenses, amortization expense (including

7

the amortization of goodwill), accrued non-cash interest expense and all other non-cash charges deducted in arriving at such Net Income, plus (c) an amount equal to the aggregate Net Cash Proceeds of the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent not required to be applied to mandatory prepayments or payments on the Loans, plus (d) an amount equal to the net loss on the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent deducted in arriving at such Net Income, plus (e) an amount equal to any tax refunds or credits received by Borrower during such period, plus (f) any management fee accrued but not paid in cash, less (g) an amount equal to the permitted Capital Expenditures (as defined in Annex I) of Borrower for such period, less (h) an amount equal to the sum of all regularly scheduled payments and optional and mandatory prepayments of principal on Indebtedness for money borrowed of Borrower actually made during such period to the extent permitted hereunder, less (i) an amount equal to the net gain on the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent included in arriving at such Net Income.

"Facility Cap" shall have the meaning given the term in the Recitals of this Agreement.

"Federal Reserve" shall mean the Federal Reserve Bank of the United States.

"GAAP" shall mean generally accepted accounting principles in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"General Intangibles" shall mean "general intangibles" as defined in Section 9-102 of the UCC.

"Goods" shall mean "goods" as defined in Section 9-102 of the UCC.

"Government Account" shall mean all Accounts arising out of or with respect to any Government Contract.

"Government Contract" shall mean all contracts with any Governmental Authority.

"Governmental Authority" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"Hazardous Substances" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances or related materials as defined in or subject to any applicable Environmental Law.

"Healthcare Laws" shall mean all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to regulatory matters primarily relating to patient healthcare, healthcare providers and healthcare services (including without limitation Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. Section 1320a-7(b) (Criminal Penalties Involving

Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," and the Social Security Act, as amended, Section 1877, 42 U.S.C. Section 1395nn (Prohibition Against Certain Referrals), commonly referred to as "Stark Statute"), and 31 U.S.C. Section 3279 et seq. (the False Claims Act).

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated thereunder.

"HUD Application" shall have the meaning given such term in Section 8.11.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit or bankers acceptances, (c) all Capitalized Lease Obligations, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and not outstanding more than ninety calendar days after the date such payable was created), (f) all net obligations owing to counterparties under hedging agreements, (g) all obligations with respect to redeemable Capital Stock or repurchase obligations under any Capital Stock issued by such Person, (h) the present value of future rental payments under all synthetic leases and (i) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above.

"Indemnified Person" shall have the meaning given such term in Section 15.4.

"Initial Advance" shall mean the initial Advance.

"Instrument" shall mean "instrument" as defined in Section 9-102 of the UCC.

"Insured Event" shall have the meaning given such term in Section 15.4.

"Insurer" shall mean a Person that insures another Person against any costs incurred in the receipt by such other Person of Services, or that has an agreement with Borrower to compensate it for providing Services to such Person.

"Intellectual Property" shall mean all patents, patent applications, trademarks, trademark applications, service marks, registered copyrights, copyright applications, copyrights, trade names, trade secrets and software and all rights in the foregoing.

"Inventory" shall mean "inventory" as defined in Section 9-102 of the UCC.

"Investment Property" shall mean "investment property" as defined in Section 9-102 of the UCC.

"Landlord Waiver and Consent" shall mean a waiver/consent from the owner/lessor/mortgagee of any premises either owned or occupied by Borrower at which any of the Collateral is now or hereafter located for the purpose of providing Lender access to such Collateral, in each case as such may be modified, amended or supplemented from time to time.

9

"**Letter of Credit Rights**" shall mean "letter of credit rights" as defined in Section 9-102 of the UCC, whether or not the letter of credit is evidenced by a writing.

"**Liability Event**" shall mean any event, fact, condition or circumstance or series thereof (i) in or for which Borrower becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with Borrower or any provider owned by Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority after the failure of any such provider to pay any such amount when owed or owing, (ii) in which Medicaid or Medicare payments to Borrower is lawfully set-off against payments to Borrower to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by a provider under common ownership with Borrower or any provider owned by Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority referenced in clauses (i) and (ii) above or successor provisions thereto.

"**LIBOR Rate**" shall mean a variable per annum percentage rate, as of any date of determination (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to (a) the rate of interest which is identified and normally published by Bloomberg Professional Service Page BBAM 1 as the offered rate for loans in United States dollars for the period of one (1) month under the caption British Bankers Association LIBOR Rates as of 11:00 a.m. (London time) as adjusted on a daily basis; *divided by* (b) the sum of one *minus* the daily average during the preceding month of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein). If Bloomberg Professional Service (or another nationally-recognized rate reporting source acceptable to Lender) no longer reports the LIBOR or Lender determines in good faith that the rate so reported no longer accurately reflects the rate available to Lender in the London Interbank Market or if such index no longer exists or if Page BBAM 1 no longer exists or accurately reflects the rate available to Lender in the London Interbank Market, Lender may select a replacement index or replacement page, as the case may be.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

"**Liquidity Factors**" shall mean percentages which Lender, in its credit judgment, may apply to Eligible Accounts by payor class based upon Borrower's actual recent collection history for each such payor class (i.e. Medicare, Medicaid, commercial insurance, etc.) in a manner consistent with Lender's underwriting practices and procedures, including, without limitation, Lender's review and analysis of, among other things, Borrower's historical returns, rebates, discounts, credits and allowances, to adjust the Availability. The Liquidity Factors as of the Closing Date are set forth on Annex II; provided, however, that Lender may further adjust the Liquidity Factors in accordance with Section 2.1(b).

"**Loan**" or "**Loans**" shall mean, individually and collectively, all Advances.

"**Loan Documents**" shall mean, collectively and each individually, this Agreement and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to, or on behalf of, Lender in connection with this Agreement or the Loans, as the same may be amended, modified or supplemented from time to time.

10

"Lockbox Accounts" shall mean, collectively and each individually, the Deposit Accounts maintained by Borrower at the Lockbox Banks into which all collections or payments on Borrower's Accounts and other Collateral are paid and which Accounts and other Collateral are subject to Lender's security interest granted by Borrower.

"Lockbox Agreement" shall mean an agreement among Lender, Borrower who has granted a security interest in a Deposit Account and any of the Lockbox Banks governing the Lockbox Accounts, in form and substance satisfactory to Lender.

"Lockbox Banks" shall mean, collectively and each individually, the federally insured banks acceptable to Lender where Borrower who has granted security interests in a Lockbox Account shall maintain the Lockbox Accounts.

"Management Fees Subordination Agreement" shall mean that certain Management Fees Subordination Agreement between Lender, Cypress Health Care Management Care Region III, LLC, and Borrower executed in connection herewith, as the same may be amended, modified, restated or supplemented from time to time.

"Management or Service Fee" shall mean any management, service or related or similar fee paid by Borrower to any Person with respect to any facility owned, operated or leased by Borrower.

"Material Adverse Change" shall mean any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has, had or would reasonably be likely to have any adverse effect upon or change in the validity or enforceability of any Loan Document, (ii) has been or would reasonably be expected to be adverse to the value of any material portion of the Collateral, or to the priority of Lender's security interest in any portion of the Collateral, (iii) has been or would reasonably be expected to be materially adverse to the business, operations, prospects, properties, assets, liabilities or financial condition of Borrower, either individually or taken as a whole, or (iv) has impaired or would reasonably be likely to materially impair the ability of Borrower to pay any portion of the Obligations or otherwise perform the Obligations or to consummate the transactions under the Loan Documents executed by such Person.

"Materials of Environmental Concern" shall mean any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other substances or forces of any kind, whether or not any such substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or would reasonably be expected to give rise to liability under any Environmental Law.

"Medicaid/Medicare Account Debtor" shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state health care program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

"Minimum Termination Fee" shall mean (for the time period indicated) the amount equal to (i) three percent (3%) of the Facility Cap, if the Revolver Termination is after the Closing Date but before the first anniversary of the Closing Date, (ii) two percent (2%) of the Facility Cap, if the Revolver Termination is on or after the first anniversary of the Closing Date but before the second anniversary of

the Closing Date; and (ii) one percent (1%) of the Facility Cap, if the Revolver Termination is on or after the second anniversary of the Closing Date.

"Net Cash Proceeds" shall mean, with respect to any sale, lease, transfer or other disposition of assets by any Person, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person in connection therewith after deducting therefrom (A) the amount of any Permitted Indebtedness secured by any Permitted Lien on such property which is required to be, and is, repaid in connection with such disposition, (B) reasonable expenses related thereto incurred by such Person in connection therewith, (C) transfer taxes paid to any taxing authorities by such Person in connection therewith, (D) net income taxes to be paid in connection with such disposition and (E) with respect to any lease, the cost of any tenant improvements paid by Borrower in connection therewith.

"New Lending Office" shall have the meaning given such term in Section 15.15(f).

"Non-Compliance Fee" shall mean a daily fee payable by Borrower equal to the greater of (i) $500, or (ii) five one-hundredths of one percent of the outstanding principal balance of the Obligations as of any date of determination.

"Note" or "Notes" shall mean any promissory note or notes issued pursuant to Section 2.7.

"Obligations" shall mean all present and future obligations, Indebtedness and liabilities of Borrower to Lender at any time and from time to time of every kind, nature and description, including, without limitation, with respect to any Loan, Letter-of-Credit Rights or Bank Products Agreement, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, (whether or not evidenced by a Note), including, without limitation, all principal, interest, applicable fees, charges and expenses and all amounts paid or advanced by Lender on behalf of or for the benefit of Borrower for any reason at any time, including in each case obligations of performance as well as obligations of payment and interest that accrue after the commencement of any proceeding under any Debtor Relief Law by or against any such Person.

"OFAC" shall mean the U.S. Department of Treasury's Office of Foreign Assets Control.

"Offer" shall mean an offer, term sheet, commitment or similar proposal received from third party to provide any type of accounts receivable financing to Borrower or any Affiliate of Borrower.

"Option Period" shall have the meaning given such term in Section 8.11.

"Organizational and Good Standing Documents" shall mean, for any Person (i) a copy of the certificate of incorporation or formation (or other like organizational document) certified as of a date satisfactory to Lender before the Closing Date by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Person, (ii) a copy of the bylaws or similar organizational documents of certified as of a date satisfactory to Lender before the Closing Date by the corporate secretary or assistant secretary of such Person, (iii) an original certificate of good standing as of a date acceptable to Lender issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Person and of every other jurisdiction in which such Person has an office or conducts business or is otherwise required to be in good standing, and (iv) copies of the resolutions of the board of directors or managers (or other applicable governing body) and, if required, stockholders, members or other equity owners authorizing the execution, delivery and performance of the

Loan Documents to which such Person is a party, certified by an authorized officer of such Person as of the Closing Date.

"Other Taxes" shall have the meaning given such term in Section 15.15(b).

"Paid in Full" and "Payment in Full" mean, with respect to the Obligations, all amounts owing with respect thereto (including any interest accruing thereon after the commencement of any proceeding under any Debtor Relief Law by or against Borrower, whether or not allowed as a claim against Borrower in such proceeding, but excluding as yet unasserted contingent obligations), have been fully, finally and completely paid in cash.

"Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"Payment Intangible" shall mean "payment intangible" as defined in Section 9-102 of the UCC.

"Payment Office" shall mean initially the address set forth beneath Lender's name on the signature page of the Agreement, and thereafter, such other office of Lender, if any, which it may designate by notice to Borrower to be the Payment Office.

"Permit" shall mean collectively all licenses, leases, powers, permits, franchises, certificates, authorizations, approvals, certificates of need, provider numbers and other rights.

"Permitted Discretion" shall mean a determination or judgment made by Lender in good faith in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Indebtedness" shall mean any of the following: (i) Indebtedness under the Loan Documents, (ii) any Indebtedness set forth on Schedule 9.2, (iii) Capitalized Lease Obligations incurred after the Closing Date and Indebtedness incurred to purchase Goods and secured by purchase money Liens constituting Permitted Liens, provided that the aggregate amount thereof outstanding at any time shall not exceed $250,000, (iv) accounts payable to trade creditors and current operating expenses (other than for borrowed money) which are not aged more than one hundred twenty calendar days from the billing date or more than 30 days from the due date, in each case incurred in the ordinary course of business and paid within such time period, unless the same are being contested in good faith and by appropriate and lawful proceedings and such reserves, if any, with respect thereto as are required by GAAP and deemed adequate by Borrower's independent accountants shall have been reserved, (v) borrowings incurred in the ordinary course of business and not otherwise provided for in subclauses (i) through (iv) above and not exceeding $150,000 individually or in the aggregate outstanding at any one time, provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of Lender's rights and in form and substance satisfactory to Lender; and (vi) Permitted Subordinated Debt.

"Permitted Liens" shall mean any of the following: (i) Liens under the Loan Documents or otherwise arising in favor of Lender, (ii) Liens imposed by law for taxes (other than payroll taxes), assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Lender in its Permitted Discretion, (iii) (A) statutory Liens of landlords (provided that any such landlord has executed a Landlord Waiver and Consent in form and substance satisfactory to Lender) and of carriers, warehousemen, mechanics, materialmen, and (B) other Liens imposed by law or that arise by

13

operation of law in the ordinary course of business from the date of creation thereof, in each case only for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Lender in its Permitted Discretion, (iv) Liens (A) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations, or (B) arising as a result of progress payments under government contracts, (v) purchase money Liens (A) securing the type of Permitted Indebtedness set forth under clause (iii) of the definition of "Permitted Indebtedness", or (B) in connection with the purchase by such Person of equipment in the normal course of business, provided that such payables shall not exceed any limits on Indebtedness provided for herein and shall otherwise be Permitted Indebtedness hereunder; (vi) Liens pursuant to Permitted Subordinated Debt; and (vii) Liens disclosed on Schedule 7.4B and Schedule 9.3.

"Permitted Subordinated Debt" shall mean indebtedness incurred by Borrower that is subordinated to the Obligations owed to Lender pursuant to a written agreement approved by Lender in writing.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

"Receipt" shall have the meaning given such term in Section 15.5.

"Released Parties" shall have the meaning given such term in Section 15.11.

"Releasing Parties" shall have the meaning given such term in Section 15.11.

"Revolver Termination" shall mean the termination of the Revolving Facility for any reason whatsoever.

"Revolving Loan Obligations" shall mean all of the Obligations related to the Revolving Facility.

"Services" shall mean medical and health care services provided to a Person, including, but not limited to, medical and health care services which are covered by a policy of insurance issued by an Insurer, physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services.

"Software" shall mean "software" as defined in Section 9-102 of the UCC.

"Solvency Certificate" shall mean a Solvency Certificate substantially in the form of Exhibit C attached hereto.

"Standing Wire Instruction Letter" shall mean the letter(s) delivered by Borrower to Key Bank directing Key Bank to transfer on each Business Day all items, collections and remittances in all of Borrower's accounts to the Concentration Account, which letter(s) shall be in form and substance satisfactory to Lender in its sole discretion.

"Subordination Agreement" shall mean, collectively and each individually, the Management Fees Subordination Agreement and any other subordination agreements to which Lender and other service providers or creditors of Borrower is a party.

"Subsidiary" shall mean, (i) as to Borrower, any Person in which more than fifty percent of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower or one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than fifty percent of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person or by one or more of such Person's Subsidiaries.

"Supporting Obligations" shall mean "supporting obligations" as defined in Section 9-102 of the UCC.

"Taxes" shall have the meaning given such term in Section 15.15(a).

"Term" shall mean the period commencing on the Closing Date and ending on November 25, 2011.

"Termination Date" shall mean the date of termination of this Agreement set forth in any notice of termination delivered by Borrower in accordance with Section 13.1(a).

"Transaction" shall have the meaning given such term in Section 8.11.

"Transferee" shall have the meaning given such term in Section 15.2.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unused Line Fee" shall mean a fee to be paid by Borrower to Lender on a monthly basis in an amount equal to 0.05% (per month) of the difference derived by subtracting (i) the daily average amount of the balances under the Revolving Facility outstanding during the preceding month, from (ii) the Facility Cap.

## 2. ADVANCES, PAYMENT AND INTEREST

### 2.1. The Revolving Facility

(a)     Subject to the provisions of this Agreement, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, unless this Agreement is terminated earlier, provided that, notwithstanding any other provision of this Agreement to the contrary, the aggregate amount of all Advances at any one time outstanding under the Revolving Facility shall not exceed the lesser of (a) the Facility Cap, and (b) the Availability. The Revolving Facility is a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement. Any determination as to whether there is Availability for Advances shall be made by Lender in its Permitted Discretion and is final and binding upon Borrower. Unless otherwise permitted by Lender, each Advance shall be in an amount of at least $1,000. Subject to the provisions of this Agreement, Borrower may request Advances under the Revolving Facility up to and including the value,

in Dollars, of the Availability. Advances under the Revolving Facility shall automatically be made for the payment of interest on the Loans and other Obligations on the date when due to the extent available and as provided for herein.

(b)     Lender, in its Permitted Discretion, may further adjust the Availability and the advance rate by applying Liquidity Factors. The Liquidity Factors and the advance rate for Availability may be adjusted by Lender throughout the Term as warranted by Lender's underwriting practices and procedures in its credit judgment. Also, Lender shall have the right to establish from time to time, in its Permitted Discretion, reserves against the Borrowing Base, which reserves shall have the effect of reducing the amounts otherwise eligible to be advanced to Borrower under the Revolving Facility pursuant to this Agreement.

## 2.2.     The Revolving Loans; Maturity

All of the Revolving Loan Obligations shall be due and payable in full in cash, if not earlier in accordance with this Agreement, on the last day of the Term.

## 2.3.     Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate

So long as no Default or Event of Default shall have occurred and be continuing, Borrower may give Lender irrevocable written notice requesting an Advance under the Revolving Facility by delivering to Lender not later than 11:00 a.m. (New York City Time) at least one but not more than four Business Days before the proposed Borrowing Date of such requested Advance, a completed Borrowing Certificate and relevant supporting documentation satisfactory to Lender. Each time a request for an Advance is made, and, in any event and regardless of whether an Advance is being requested, on Thursday of each week during the Term (and more frequently if Lender shall so request) until the Obligations are Paid in Full and fully performed and this Agreement is terminated, Borrower shall deliver to Lender a Borrowing Certificate accompanied by a separate detailed aging and categorizing of Borrower's accounts receivable and such other supporting documentation as Lender shall reasonably request from time to time. On each Borrowing Date, Borrower irrevocably authorizes Lender to disburse the proceeds of the requested Advance to Borrower's account(s) as set forth on <u>Schedule 2.3</u>, in all cases for credit to Borrower (or to such other account as to which Borrower shall instruct Lender in writing) via Federal funds wire transfer no later than 4:00 p.m. (New York City Time); provided that Lender shall use good faith efforts to disburse the proceeds of the requested Advance to Borrower's account(s) via Federal funds wire transfer no later than 2:00 p.m. (New York City Time); <u>provided, further, however</u>, that Lender shall not be in default of its obligations hereunder for failure to provide such funding by 2:00 p.m. (New York City Time).

## 2.4.     Promise to Pay; Manner of Payment

Borrower absolutely and unconditionally promises to pay principal, interest and all other Obligations payable hereunder, or under any other Loan Document, without any defense, right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments made by Borrower (other than payments automatically paid through Advances under the Revolving Facility as provided herein), shall be made only by wire transfer on the date when due in Dollars, in immediately available funds to such account as may be indicated in writing by Lender to Borrower from time to time. Any such payment received after 4:00 p.m. (New York City Time) on the date when due shall be deemed received on the following Business Day. Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such

payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and fees, as the case may be.

## 2.5.    Repayment of Excess Advances

Any balance of Advances under the Revolving Facility outstanding at any time in excess of either the Facility Cap or the Availability shall be immediately due and payable by Borrower without the necessity of any demand, at the Payment Office.

## 2.6.    Payments by Lender

If Borrower fails to make any payment required under any Loan Document as and when due and within any applicable grace period, Lender may make such payment, which payment shall be an Advance as of the date such payment is due notwithstanding the Availability, and Borrower irrevocably authorizes disbursement of any such funds to Lender by way of direct payment of the relevant amount. No payment or prepayment of any amount by Lender or any other Person shall entitle any Person to be subrogated to the rights of Lender under any Loan Document unless and until all of the Obligations have been fully performed Paid in Full and this Agreement has been terminated.  Any sums expended by Lender as a result of Borrower's failure to pay, perform or comply with any Loan Document or any of the Obligations may be charged to Borrower's account as an Advance under the Revolving Facility.

## 2.7.    Evidence of Loans

(a)    Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the Indebtedness and Obligations to Lender resulting from each Loan made by Lender from time to time, including without limitation, the amounts of principal and interest payable and paid to Lender from time to time under this Agreement.

(b)    The entries made in the electronic or written records maintained pursuant to subsection (a) of this Section 2.7 (the "Register") shall be prima facie evidence of the existence and amounts of the Obligations and Indebtedness therein recorded; provided, however, that the failure of Lender to maintain such records or any error therein shall not in any manner affect the joint and several obligations of Borrower to repay the Loans or Obligations in accordance with their terms.

(c)    Lender will account to Borrower monthly with a statement of Advances under the Revolving Facility, and any charges and payments made pursuant to this Agreement, and in the absence of manifest error, such accounting rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrower in writing to the contrary within fifteen calendar days of Receipt of such accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(d)    Borrower agrees that:

(i)    upon written notice by Lender to Borrower that a Note or other evidence of Indebtedness is requested by Lender to evidence the Loans and other Obligations owing or payable to, or to be made by, Lender, Borrower shall promptly (and in any event within three Business Days of any such request) execute and deliver to Lender an appropriate Note or Notes in form and substance reasonably acceptable to Lender and Borrower;

17

   (ii)  all references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued (and not returned to the Borrower for cancellation) hereunder, as the same may be amended, modified, divided, supplemented or restated from time to time; and

   (iii)  upon Lender's written request, and in any event within three Business Days of any such request, Borrower shall execute and deliver to Lender new Notes and divide the Notes in exchange for then existing Notes in such smaller amounts or denominations as Lender shall specify in its sole and absolute discretion; provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such Notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new Notes and returned to Borrower within a reasonable period of time after Lender's receipt of the replacement Notes.

## 3.  INTEREST AND FEES

### 3.1.  Interest on the Revolving Facility

   Commencing December 1, 2008, and continuing until the later of the expiration of the Term and the Payment in Full and full performance of all of the Obligations and termination of this Agreement, interest on outstanding Advances under the Revolving Facility shall be payable monthly in arrears on the first day of each calendar month at an annual rate of LIBOR Rate plus 3.25% in accordance with the procedures provided for in Section 2.4 and Section 5.1, provided however, that, notwithstanding any provision of any Loan Document, for the purpose of calculating interest at any time hereunder, the LIBOR Rate shall be not less than 2.00%, in each case calculated on the basis of a 360-day year and for the actual number of calendar days elapsed in each interest calculation period.

### 3.2.  Commitment Fee

   On or before the Closing Date, Borrower shall pay to Lender $40,000 as a nonrefundable commitment fee which shall be fully earned on the date paid.

### 3.3.  Unused Line Fee

   Borrower shall pay Lender the Unused Line Fee monthly in arrears on the first day of each calendar month (starting with the calendar month immediately following the calendar month in which the Closing Date occurs).

### 3.4.  Collateral Management Fee

   Borrower shall pay Lender as additional interest the Collateral Management Fee. The Collateral Management Fee shall be payable monthly in arrears on the first day of each calendar month (starting with the calendar month immediately following the calendar month in which the Closing Date occurs).

### 3.5.  Computation of Fees; Lawful Limits

   All fees hereunder shall be computed on the basis of a year of three hundred and sixty days and for the actual number of days elapsed in each calculation period, as applicable. In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money

hereunder exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate. The terms and provisions of this <u>Section 3.6</u> shall control to the extent any other provision of any Loan Document is inconsistent herewith. All fees hereunder shall be non-refundable and deemed fully earned when due and payable.

### 3.6. Default Rate of Interest

Upon the occurrence and during the continuation of an Event of Default, Lender may increase the Applicable Rate of interest in effect at such time with respect to the Obligations, without notice, to the Default Rate which Default Rate shall continue post-judgment and subsequent to the date that the provisions of any applicable Debtor Relief Law are exercised by or against Borrower unless the statutory post-judgment rate of interest is higher in which case such statutory rate shall apply.

## 4. GRANT OF SECURITY INTERESTS

### 4.1. Security Interest; Collateral

(a) To secure the payment and performance in full of the Obligations, Borrower (or if referring to another Person, such Person) hereby grants to Lender a continuing security interest in and Lien upon, and pledges and assigns to Lender, all of its right, title and interest in and to the Collateral, wherever located, whether now owned or hereafter acquired or arising;

(b) The grant of the security interest contained in <u>Section 4.1(a)</u> shall not extend to, and the term "Collateral" shall not include any General Intangibles, now or hereafter held or owned by Borrower, to the extent that (i) such General Intangibles are not assignable or capable of being encumbered as a matter of law, or under the terms of the governing document applicable thereto (but solely to the extent that any such restriction shall be enforceable under applicable law) and (ii) such consent has not been obtained; <u>provided</u>, <u>however</u>, that the foregoing grant of a security interest shall extend to, and the term "Collateral" shall include each of the following: (i) any General Intangible which is in the nature of an Account or a right to the payment of money or a proceed of, or otherwise related to the enforcement or collection of, any Account or right to the payment of money, or goods which are the subject of any Account or right to the payment of money, (ii) any and all proceeds of such General Intangibles to the extent that the proceeds are not themselves General Intangibles subject to this <u>Section 4.1(b)</u> and (iii) upon obtaining the consent of any licensor or other applicable party with respect to any such otherwise excluded General Intangibles, such General Intangible as well as any and all proceeds thereof that might theretofore have been excluded from such grant of a security interest and from the term "Collateral".

(c) Borrower hereby ratifies its authorization for Lender to have filed in any UCC jurisdiction any initial financing statements or amendments thereto indicating "all assets of the debtor" or similar language as the collateral description.

(d)    If Borrower shall at any time hold or acquire a Commercial Tort Claim, Borrower shall immediately notify Lender in a writing signed by Borrower of the particulars thereof and grant to Lender in such a writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Lender.

## 4.2.    Power of Attorney

(a)    Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Lender's own name, for the purpose of carrying out the terms of this Agreement and the grant of the security interests hereunder and under the other Loan Documents, and without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of Borrower (without requiring Lender to act as such, and without notice to or assent by Borrower) to do the following: (i) upon the occurrence and during the continuance of an Event of Default, to receive, open and dispose of all mail addressed to any such Person and to endorse the name of any such Person upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to such Person and constitute collections on its or their Accounts; (ii) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is or they or are obligated to give Lender under any of the Loan Documents; and (iii) do such other and further acts and deeds in the name of such Person that Lender may deem necessary or desirable to enforce any Account or other Collateral or to perfect Lender's security interest or Lien in any Collateral. In addition, if any such Person breaches its obligation hereunder to direct payments of Accounts or the proceeds of any other Collateral to the appropriate Lockbox Account, Lender, as the irrevocably made, constituted and appointed true and lawful attorney for such Person pursuant to this paragraph, may, by the signature or other act of any of Lender's officers or authorized signatories (without requiring any of them to do so), direct any federal, state or private payor or fiscal intermediary to pay proceeds of Accounts or any other Collateral to the appropriate Lockbox Account.

(b)    To the extent permitted by law, Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

(c)    The powers conferred on Lender pursuant to this Section 4.2 are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Lender shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act, except for Lender's own gross negligence or willful misconduct.

## 4.3.    Further Assurances

Borrower agrees, upon request of Lender, to take any and all other actions as Lender may determine to be necessary or appropriate for the attachment, perfection or maintaining of the first priority security interest of, and for the ability of Lender to enforce, Lender's security interest in any and all of the Collateral, including, without limitation, (i) executing, obtaining, delivering, filing, registering and recording any and all financing statements, continuation statements, instruments and other documents, or causing the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Lender to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Lender and Lender's perfected first priority Lien on the Collateral (and Borrower irrevocably grants Lender the right, at Lender's option, to file any or all of the foregoing), (ii) immediately upon learning thereof, report to Lender any reclamation, return or repossession of goods

20

in excess of $25,000 (individually or in the aggregate), (iii) defend the Collateral and Lender's perfected first priority Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all reasonable costs and expenses (including, without limitation, allocable costs of staff counsel and diligence fees and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lender's discretion be added to the Obligations, (iv) comply with any provision of any statute, regulation or treaty of any Governmental Authority as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, Lender's security interest in such Collateral and (v) obtain governmental and other third party waivers, consents and approvals in form and substance satisfactory to Lender, including any consent of any licensor, lessor or other Person obligated on Collateral and any party or parties whose consent is required for the security interest of Lender to attach under Section 4.1.

5.  **ADMINISTRATION AND MAINTENANCE OF COLLATERAL**

    5.1.  **Revolving Facility Collections; Repayment; Borrowing Availability and Lockbox**

    Borrower shall maintain one or more Lockbox Accounts with the Lockbox Banks, and shall execute with each of the Lockbox Banks a Lockbox Agreement and such other agreements related thereto as Lender may require in its Permitted Discretion. Borrower shall ensure that all collections of its respective Accounts and all other cash payments received by Borrower are paid and delivered directly from Account Debtors and other Persons into the appropriate Lockbox Account. The Lockbox Agreements shall provide that the Lockbox Banks immediately will transfer all funds paid into the Lockbox Accounts into the Concentration Account. Notwithstanding and without limiting any other provision of any Loan Document, Lender shall apply, on a daily basis, all funds transferred into the Concentration Account pursuant to the Lockbox Agreement and this <u>Section 5.1</u> in such order and manner as determined by Lender. To the extent that any Accounts are collected by Borrower or any other cash payments received by Borrower are not sent directly to the appropriate Lockbox Account but are received by Borrower or any of its Affiliates, such collections and proceeds shall be held in trust for the benefit of Lender and immediately remitted (and in any event within two Business Days), in the form received, to the appropriate Lockbox Account for immediate transfer to the Concentration Account. Borrower acknowledges and agrees that compliance with the terms of this <u>Section 5.1</u> is an essential term of this Agreement, and that, in addition to and notwithstanding any other rights Lender may have hereunder, under any other Loan Document, under applicable law or at equity, upon each and every failure by Borrower or any of its Affiliates to comply with any such terms Lender shall be entitled to assess a non-compliance fee which shall operate to increase the Applicable Rate by two percent per annum during any period of non-compliance, provided that nothing shall prevent Lender from declaring such non-compliance to be an Event of Default and, among other remedies, to enact the Default Rate. Failure by Lender to declare an Event of Default for such non-compliance shall not be a waiver of Lender's right to do so at a later date. All funds transferred to the Concentration Account for application to the Obligations under the Revolving Facility shall be applied to reduce the Obligations under the Revolving Facility, but, for purposes of calculating interest hereunder, shall be subject to a five Business Day clearance period. If as the result of collections of Accounts and any other cash payments received by Borrower pursuant to this <u>Section 5.1</u> a credit balance exists with respect to the Concentration Account, such credit balance shall not accrue interest in favor of Borrower, but shall be available to Borrower upon Borrower's written request. If applicable, at any time prior to the execution of all or any of the Lockbox Agreements and operation of all or any of the Lockbox Accounts, Borrower and its Affiliates shall direct all collections or proceeds it receives on Accounts or from other Collateral to the Concentration Account.

### 5.2. Accounts

In determining which Accounts are Eligible Accounts, Lender may rely on all statements and representations made by Borrower with respect to any Account. Unless otherwise indicated in writing to Lender, each Account of Borrower (i) is genuine and in all respects what is purports to be and is not evidenced by a judgment, (ii) arises out of a completed, bona fide sale and delivery of goods or rendering of Services by Borrower in the ordinary course of business and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations, certificates of need and other documents relating thereto or forming a part of the contract between Borrower and the Account Debtor, (iii) is for a liquidated amount maturing as stated in a claim or invoice covering such sale of goods or rendering of Services, a copy of which has been furnished or is available to Lender, (iv) together with Lender's security interest therein, is not and will not be in the future (by voluntary act or omission by Borrower), subject to any offset, lien, deduction, defense, dispute, counterclaim or other adverse condition, is absolutely owing to Borrower and is not contingent in any respect or for any reason (except Accounts owed or owing by Medicaid/Medicare Account Debtors that may be subject to offset or deduction under applicable law), and (v) has been billed and forwarded to the Account Debtor for payment in accordance with applicable laws and is in compliance and conformance with any requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and, if due from a Medicaid/Medicare Account Debtor, is properly payable directly to Borrower.

### 5.3. Healthcare

(a) Borrower has obtained from (i) the Medicare program, approval to receive the provider numbers which will permit Borrower to bill the Medicare program with respect to covered services rendered to patients insured under the Medicare program, (ii) the applicable Medicaid programs, approval to receive the provider numbers/in-patient service contracts which will permit Borrower to bill the Medicaid program with respect to covered services rendered to patients insured under the Medicaid programs. Borrower is in compliance with the conditions of participation in the Medicare and Medicaid programs.

(b) There is no pending nor to the knowledge of Borrower, threatened, proceeding or investigation of Borrower nor are there any investigations or proceedings pending, or to the knowledge of Borrower, threatened by any Governmental Authority with respect to the Medicare or Medicaid programs with respect to the operations of Borrower, except as set forth on Schedule 5.3B hereto, which Schedule 5.3B may be updated from time to time by Borrower and which updated Schedule 5.3B shall be in form and substance satisfactory to Lender in its sole discretion. Without limiting or being limited by any other provision of any Loan Document, Borrower has timely filed or caused to be filed all cost and other reports of every kind required by law, agreement or otherwise. Except as set forth on Schedule 5.3B, which Schedule 5.3B may be updated from time to time and which updated Schedule 5.3B shall be in form and substance satisfactory to Lender in its sole discretion, and subject to the last sentence of Section 7.18, to the knowledge of Borrower, there are no claims, actions or appeals pending (and Borrower has not filed any claims or reports which could reasonably result in any such claims, actions or appeals) before any commission, board or agency or other Governmental Authority, including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of the Centers of Medicare and Medicaid Services, with respect to any state or federal Medicare or Medicaid cost reports or claims filed by Borrower, or any disallowance by any commission, board or agency or other Governmental Authority in connection with any audit of such cost reports or claims. Except as set forth on Schedule 5.3B hereto, which Schedule 5.3B may be updated from time to time by Borrower and which updated Schedule 5.3B shall be in form and substance satisfactory to Lender in its sole discretion, no validation review or program integrity review related to Borrower or the consummation of the

transactions contemplated herein or to the Collateral have been conducted by any commission, board or agency or other Governmental Authority in connection with the Medicare or Medicaid programs, and to the knowledge of Borrower, no such reviews are scheduled, pending or threatened against or affecting any of the providers, any of the Collateral or the consummation of the transactions contemplated hereby. Neither Borrower nor any of its officers, directors, or managing employees, employees or agents are, or while this Agreement shall remain in effect shall be, excluded from participation in, or sanctioned or convicted of a crime under or with respect to the Medicare or Medicaid programs, nor to the best of Borrower's knowledge, is any such exclusion threatened. Except as set forth on <u>Schedule 5.3B</u> hereto, which <u>Schedule 5.3B</u> may be updated from time to time by Borrower and which updated <u>Schedule 5.3B</u> shall be in form and substance satisfactory to Lender in its sole discretion, Borrower has not received any notice from any of the Medicare or Medicaid programs, or any other third party payor programs, of any pending or threatened investigations or reviews of Borrower, its directors, officers or managing employees, and Borrower has no actual knowledge that any such investigation or reviews are pending or threatened. Except as set forth on <u>Schedule 5.3B</u> hereto, which <u>Schedule 5.3B</u> may be updated from time to time by Borrower and which updated <u>Schedule 5.3B</u> shall be in form and substance satisfactory to Lender in its sole discretion, Borrower has not received from any Governmental Authority or any Medicare or Medicaid programs with respect to any surveys (i) any "Immediate Jeopardy" (as such term is customarily used) citation or equivalent, (ii) any imposition of a civil monetary penalty for a single deficiency citation or (iii) the imposition of a ban on admissions or a denial of payment for new admissions or equivalent.

(c)     As of the Closing Date, Borrower has third party contracts with each of the third-party payors listed on <u>Schedule 5.3C</u> (unless noted otherwise), which constitutes (as indicated) each of the payors representing at least five percent (5%) of Borrower's historic third-party payor cash receipts for the twelve month period ended June 30, 2008.

### 5.4.     Medicare and Medicaid Account Debtors and Third-Party Payor Information

Borrower (a) shall maintain applicable Medicare and Medicaid provider numbers, and (b) to the extent Borrower shall enter into any other arrangements with non-governmental third-party payors, Borrower shall use commercially reasonable efforts to enter into agreements with such third-party payors in form and substance satisfactory to Lender.

### 5.5.     Collateral Administration

(a)     All Collateral (except Deposit Accounts) will at all times be kept by Borrower at the locations set forth on <u>Schedule 7.18B</u> hereto and shall not, without thirty calendar days prior written notice to Lender, be moved therefrom, and in any case shall not be moved outside the continental United States.

(b)     Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Lender on such periodic bases as Lender may request. In addition, if Accounts of Borrower in an aggregate face amount in excess of $50,000 become ineligible because they fall within one of the specified categories of ineligibility set forth in the definition of Eligible Accounts, Borrower shall notify Lender of such occurrence on the first Business Day following such occurrence and the Borrowing Base shall thereupon be adjusted to reflect such occurrence.

(c)     Whether or not an Event of Default has occurred, any of Lender's officers, employees, representatives or agents shall have the right, upon reasonable notice to Borrower, at any time during normal business hours, in the name of Lender, any designee of Lender or Borrower, to verify the

validity, amount or any other matter relating to any Collateral; provided, however, that if a Default or Event of Default has occurred and is continuing, Lender shall not be required to provide such notice to Borrower. Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude such verification process.

(d)     Borrower shall endeavor in the first instance to make collection of its Accounts for Lender. Lender shall have the right at all times after the occurrence and during the continuance of an Event of Default to notify (i) Account Debtors owing Accounts to Borrower other than Medicaid/Medicare Account Debtors that their Accounts have been assigned to Lender and to collect such Accounts directly in its own name and to charge collection costs and expenses, including reasonable attorney's fees, to Borrower, and (ii) Medicaid/Medicare Account Debtors that Borrower has waived any and all defenses and counterclaims they may have or could interpose in any such action or procedure brought by Lender to obtain a court order recognizing the collateral assignment or security interest and Lien of Lender in and to any Account or other Collateral and that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and Lien of Lender in and to all Accounts and other Collateral payable by Medicaid/Medicare Account Debtors.

(e)     As and when determined by Lender in its Permitted Discretion, Lender will perform the searches described in clauses (i) and (ii) below against Borrower (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), all at Borrower's expense: (i) UCC searches with the Secretary of State of the jurisdiction of organization of Borrower and, if deemed necessary by Lender, the Secretary of State and local filing offices of each jurisdiction where Borrower maintains its executive offices, a place of business or assets; and (ii) judgment, federal, state and local tax lien searches, in each jurisdiction searched under clause (i) above.

(f)     Borrower (i) shall provide prompt written notice to its current bank to transfer all items, collections and remittances to the Concentration Account, (ii) shall direct each Account Debtor to make payments to the appropriate Lockbox Account, and Borrower hereby authorizes Lender, upon any failure to send such notices and directions within ten calendar days after the Closing Date (or ten calendar days after the Person becomes an Account Debtor), to send any and all similar notices and directions to such Account Debtors, and (iii) shall do anything further that may be lawfully required by Lender to create and perfect Lender's Lien on any Collateral and effectuate the intentions of the Loan Documents. At Lender's request, Borrower shall immediately deliver to Lender all Collateral for which Lender must receive possession to obtain a perfected security interest.

## 6.     CONDITIONS PRECEDENT

### 6.1.     Conditions to Initial Advance and Closing

The obligations of Lender to consummate the transactions contemplated herein and to make the Initial Advance are subject to the satisfaction, in the sole judgment of Lender, of the following:

(a)     Lender shall have received information and responses to its due diligence requests, and completed examinations related to the Collateral, the financial statements and the books, records, business, obligations, financial condition and operational state of Borrower and any other information reasonably requested by Lender, and all such information and responses as well as the results of such examinations and Borrower shall demonstrate to Lender's satisfaction that (i) its operations comply, in all respects deemed material by Lender, in its sole judgment, with all applicable federal, state, foreign and local laws, statutes and regulations, (ii) its operations are not the subject of any governmental investigation, evaluation or any remedial action which could result in any expenditure or liability deemed

material by Lender, in its sole judgment, and (iii) it has no liability (whether contingent or otherwise) that is deemed material by Lender, in its sole judgment;

        (b)     (i) Borrower shall have delivered to Lender (A) the Loan Documents to which Borrower is a party, each duly executed by an authorized officer of Borrower and the other parties thereto, (B) a Borrowing Certificate for the Initial Advance under the Revolving Facility executed by an authorized officer of Borrower and (C) (1) audited annual consolidated and consolidating financial statements of Borrower for Borrower's most recently ended fiscal year, including notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related statements of income, retained earnings, cash flows and owner's equity for such completed fiscal year, which financial statements shall be prepared and certified without qualification by an independent certified public accounting firm reasonably satisfactory to Lender/in accordance with GAAP consistently applied with prior periods; and (2) unaudited consolidated and consolidating financial statements of Borrower consisting of a balance sheet and statements of income, retained earnings, cash flows and owner's equity for the period from the beginning of the current fiscal year through the end of the most recently ended calendar month, which financial statements shall be prepared in accordance with GAAP consistently applied with prior periods, and (ii) Borrower shall have established and maintained the Lockbox Accounts and have entered into Lockbox Agreements, all as contemplated in Section 5.1;

        (c)     all in form and substance satisfactory to Lender in its Permitted Discretion, Lender shall have received (i) a report of Uniform Commercial Code financing statement, tax and judgment lien searches performed with respect to Borrower in each jurisdiction determined by Lender in its sole discretion, and such report shall show no Liens on the Collateral (other than Permitted Liens), (ii) each document (including, without limitation, any Uniform Commercial Code financing statement) required by any Loan Document or under law or requested by Lender to be filed, registered or recorded to create in favor of Lender, a perfected first priority security interest upon the Collateral, and (iii) evidence of each such filing, registration or recordation and of the payment by Borrower of any necessary fee, tax or expense relating thereto;

        (d)     Lender shall have received (i) the Organizational and Good Standing Documents of Borrower, all in form and substance acceptable to Lender, (ii) a certificate of the corporate secretary or assistant secretary of Borrower dated the Closing Date, as to the incumbency and signature of the Persons executing the Loan Documents, in form and substance acceptable to Lender, and (iii) the written legal opinion of counsel for Borrower, in form and substance satisfactory to Lender;

        (e)     Lender shall have received (i) a Solvency Certificate executed by the chief financial officer (or, in the absence of a chief financial officer, the chief executive officer) of Borrower, in form and substance satisfactory to Lender and (ii) an officer's certificate in the form attached hereto as Exhibit D, executed the chief executive officer of Borrower;

        (f)     Lender shall have completed examinations, the results of which shall be satisfactory in form and substance to Lender, of the Collateral, the financial statements and the books, records, business, obligations, financial condition and operational state of Borrower, and Borrower shall have demonstrated to Lender's satisfaction that (i) its operations comply, in all respects deemed material by Lender, in its sole judgment, with all applicable federal, state, foreign and local laws, statutes and regulations, (ii) its operations are not the subject of any governmental investigation, evaluation or any remedial action which could result in any expenditure or liability deemed material by Lender, in its sole judgment, and (iii) it has no liability (whether contingent or otherwise) that is deemed material by Lender, in its sole judgment;

(g)     Lender shall have received all fees, charges and expenses payable to Lender on or prior to the Closing Date pursuant to the Loan Documents;

(h)     all in form and substance satisfactory to Lender in its Permitted Discretion, Lender shall have received such consents, approvals and agreements, including, without limitation, any applicable Landlord Waivers and Consents with respect to any and all leases set forth on Schedule 7.4A, from such third parties as Lender shall determine are necessary or desirable with respect to (i) the Loan Documents and the transactions contemplated thereby, and (ii) claims against Borrower or the Collateral;

(i)     Borrower shall be in compliance with Section 8.5, and Lender shall have received copies of all insurance policies or binders, original certificates of all insurance policies of Borrower confirming that they are in effect and that the premiums due and owing with respect thereto are current and endorsements of such policies issued by the applicable Insurers and in each case and naming Lender as loss payee or additional insured, as appropriate;

(j)     all corporate and other proceedings, documents, instruments and other legal matters in connection with the transactions contemplated by the Loan Documents (including, but not limited to, those relating to corporate and capital structures of Borrower) shall be satisfactory to Lender;

(k)     Lender shall have received, in form and substance satisfactory to Lender, (i) evidence of the repayment in full and termination of the indebtedness and obligations owing by Borrower to Admiral Healthcare, Inc. and all related documents, agreements and instruments and of all Liens, security interests and Uniform Commercial Code financing statements relating thereto, and (ii) release and termination of any and all Liens, security interest and Uniform Commercial Code financing statements in, on, against or with respect to any of the Collateral (other than Permitted Liens);

(l)     Lender shall have received a fully-executed Landlord Consent and Estoppel with respect to the premises located at Four West Red Oak Lane, Suite 201, White Plains, New York 10604;

(m)     Lender shall have received evidence of the Standing Wire Instruction Letter;

(n)     Lender shall have received online internet access to all of Borrower's accounts at Key Bank;

(o)     Borrower shall have executed and delivered to Lender an IRS Form 8821;

(p)     Lender shall be satisfied that there are no material defaults in any of Borrower's obligations under any contract required for the operation of its business; and

(q)     Lender shall have received such other documents, certificates, information or legal opinions as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender.

6.2.    **Conditions to Each Advance**

The obligations of Lender to make any Advance, including, without limitation, the Initial Advance, (or otherwise extend credit hereunder) are subject to the satisfaction, in the sole judgment of Lender, of the following additional conditions precedent:

(a)     Borrower shall have delivered to Lender a Borrowing Certificate for the Advance executed by an authorized officer of Borrower, which shall constitute a representation and warranty by

26

Borrower as of the Borrowing Date of such Advance that the conditions contained in this <u>Section 6.2</u> have been satisfied; <u>provided however</u>, that any determination as to whether to fund Advances or extensions of credit shall be made by Lender in its Permitted Discretion;

(b)     each of the representation and warranties made by Borrower in or pursuant to this Agreement, or under the other Loan Documents or which are contained in any certificate, document or financial or other statement furnished in connection herewith, shall be true and correct, before and after giving effect to such Advance;

(c)     no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the Advance on such date;

(d)     immediately after giving effect to the requested Advance, the aggregate outstanding principal amount of Advances shall not exceed the lesser of the Availability and the Facility Cap;

(e)     at the time of making such requested Advance, no Material Adverse Change has occurred or is continuing; and

(f)     Lender shall have received all fees, charges and expenses payable to Lender on or prior to such date pursuant to the Loan Documents.

## 7.     REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as of the date hereof, the Closing Date, each Borrowing Date:

### 7.1.     Organization and Authority

Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of its state of formation. Borrower (i) has all requisite corporate or entity power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (ii) is duly qualified to conduct business in every jurisdiction in which failure so to qualify would reasonably be likely to result in a Material Adverse Change, and (iii) has all requisite power and authority (A) to execute, deliver and perform the Loan Documents to which it is a party, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the Loan Documents to which it is a party.

### 7.2.     Loan Documents

The execution, delivery and performance by Borrower of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of each such Person and have been duly executed and delivered by or on behalf of each such Person; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on any such Person or any of its respective properties, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of any such Person, or any agreement between any such Person and its respective stockholders, members, partners or equity owners or among any such stockholders, members, partners or equity owners; (iii) are not in conflict with, and do not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any

indenture, agreement or other instrument to which any such Person is a party, or by which the properties or assets of such Person are bound; (iv) except as set forth therein, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any such Person, and (v) except as set forth on Schedule 7.2, do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person. When executed and delivered, each of the Loan Documents to which Borrower is a party will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

### 7.3. Subsidiaries, Capitalization and Ownership Interests

Except as listed on Schedule 7.3, Borrower has no Subsidiaries. Schedule 7.3 states the authorized and issued capitalization of Borrower, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing). The ownership or partnership interests of Borrower that is a limited partnership or a limited liability company are not certificated, the documents relating to such interests do not expressly state that the interests are governed by Article 8 of the Uniform Commercial Code, and the interests are not held in a securities account. The outstanding equity securities and/or ownership, voting or partnership interests of Borrower has been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on Schedule 7.3 owns beneficially and of record all the equity securities and/or ownership, voting or partnership interests it is listed as owning free and clear of any Liens other than Liens created by the Loan Documents. Schedule 7.3 sets forth a complete and accurate list of the directors, members, managers and/or partners of Borrower. Except as listed on Schedule 7.3, Borrower owns no interest in, nor participates in or engages in any joint venture, partnership or similar arrangements with any Person.

### 7.4. Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens, and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound. Schedule 7.4A lists all real properties (and their locations) owned or leased by or to, and all other material assets or property that are leased or licensed by, Borrower and all warehouses, fulfillment houses or other locations at which any of Borrower's Inventory is located. Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect. Schedule 7.4B lists all Deposit Accounts and investment accounts (and their locations) owned by Borrower, and all such Deposit Accounts and investment accounts are subject to no Liens of any kind except as expressly set forth on Schedule 7.4B, all of which Liens constitute Permitted Liens.

### 7.5. Other Agreements

Borrower is not (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, if not remedied within any applicable grace or cure period would reasonably be likely to result in a Material Adverse Change, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to

28

result in a Material Adverse Change; (iii) a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, Management or Service Fee with respect to, the ownership, operation, leasing or performance of any of its business or any facility, nor is there any manager with respect to any such facility except the manager as defined in any Management Fees Subordination Agreement; or (iv) a party to any contract with any Affiliate other than as set forth on <u>Schedule 7.5</u>.

### 7.6. Litigation

There is no action, suit, proceeding or investigation pending or, to the knowledge of Borrower, threatened against Borrower (i) that challenges the validity of any of the Loan Documents, or to enjoin the right of Borrower to enter into any Loan Document or to consummate the transactions contemplated thereby, (ii) that would reasonably be likely to be or have, either individually or in the aggregate, any Material Adverse Change, or (iii) that would reasonably be likely to result in any Change of Control. Borrower is not a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority. Except as set forth on <u>Schedule 7.6</u>, there is no action, suit, proceeding or investigation initiated by Borrower currently pending.

### 7.7. Environmental Matters

Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change:

(a)     Borrower and its Subsidiaries: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased, or otherwise operated by any of them; (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their environmental Permits; and (iv) reasonably believe that: each of their environmental Permits will be timely renewed and complied with, without material expense; any additional environmental Permits that may be required of any of them will be timely obtained and complied with, without material expense; and compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)     To the knowledge of Borrower and its Subsidiaries, no Materials of Environmental Concern (i) are present at, on, under, in, or about any real property now owned, leased or operated by Borrower or any of its Subsidiaries, or (ii) were present at any formerly owned, leased or operated property during the period of such ownership, lease or operation by Borrower or its Subsidiaries or (iii) are present at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which, in the case of any of clauses (i), (ii) or (iii), would reasonably be expected to (A) give rise to liability of Borrower or any of its Subsidiaries under any applicable Environmental Law or otherwise result in costs to Borrower or any of its Subsidiaries, (B) interfere with the continued operations of Borrower or any of its Subsidiaries, or (C) impair the fair saleable value of any real property owned or leased by Borrower or any of its Subsidiaries.

(c)     There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which Borrower or any of Borrower's Subsidiaries is, or to the knowledge of Borrower or any of its Subsidiaries will be, named as a party that is pending or, to the knowledge of Borrower or any of its Subsidiaries, threatened.

29

(d)     Neither Borrower nor any of its Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern.

(e)     Neither Borrower nor any of Borrower's Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)     Neither Borrower nor any of its Subsidiaries has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Material of Environmental Concern.

### 7.8.    Potential Tax Liability; Tax Returns; Governmental Reports

(a)     Except as disclosed in Schedule 7.8, Borrower (i) has not received any oral or written communication from any taxing authority with respect to any investigation or assessment relating to Borrower directly, or relating to any consolidated tax return which was filed on behalf of Borrower, (ii) is not aware of any year which remains open pending tax examination or audit by any taxing authority, and (iii) is not aware of any information that could give rise to any tax liability or assessment.

(b)     Borrower (i) has filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by Borrower, and (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that Borrower is currently contesting in good faith with adequate reserves under GAAP, which contested items are described on Schedule 7.8.

### 7.9.    Financial Statements and Reports

All financial statements and financial information relating to Borrower that have been or may hereafter be delivered to Lender by Borrower are accurate and complete in all material respects and have been prepared in accordance with GAAP consistently applied with prior periods. Borrower has no material obligations or liabilities of any kind not disclosed in such financial information or statements, and since the date of the most recent financial statements submitted to Lender, there has not occurred any Material Adverse Change or Liability Event or, to Borrower's knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Change or Liability Event.

### 7.10.    Compliance with Law

(a)     Borrower has been and is currently in compliance, and is presently taking and will continue to take all actions necessary to assure that it shall, on or before each applicable compliance date and continuously thereafter, comply with HIPAA, except where the failure to comply could not reasonably be expected to result in a Material Adverse Change. Borrower has not received any notice from any Governmental Authority that such Governmental Authority has imposed or intends to impose any enforcement actions, fines or penalties for any failure or alleged failure to comply with HIPAA or its implementing regulations. Borrower (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to Borrower and Borrower's business, assets or operations, including, without limitation, ERISA and Healthcare Laws, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except in the case of

14-50756 - #166-1  File 09/08/14  Enter 09/10/14 10:20:44  Exhibit DIP #1 (Part 1 of 3)
Pg 34 of 34