```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE WESTERN DISTRICT OF LOUISIANA
 2                           LAFAYETTE DIVISION

 3
        IN RE:                              CHAPTER 11
 4
        NEW LOUISIANA HOLDINGS, LLC, et al.,  Case No. 14-50756
 5
                                       (Jointly Administered)
 6

 7                  DEBTORS.
        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /
 8

 9
                         STATUS CONFERENCES,
10          MOTION TO RECONSIDER FINANCING ORDERS,
          DEBTORS' SUPPLEMENTAL MOTION FOR FINAL ORDER,
11     AMENDED MOTION TO EXTEND TIME OR LIMIT THE EXCLUSIVITY
             PERIOD, MOTION FOR ORDER FIXING BAR DATE,
12  MOTION FOR ADMINISTRATIVE ORDER ESTABLISHING PROCEDURES FOR
             INTERIM COMPENSATION AND REIMBURSEMENT
13                           -and-
             HEARING REGARDING PATIENT CARE OMBUDSMAN
14

15      BEFORE:               HONORABLE ROBERT SUMMERHAYS
                              United States Chief Bankruptcy Judge
16

17      DATE:                 January 27, 2015

18

19      PLACE:                U.S. Courthouse
                              214 Jefferson Street, Suite 100
20                            Lafayette, Louisiana

21

22      TRANSCRIBED BY:       COURTNEY N. LANGHOFF, RPR
                              Notary Public, State of
23                            Florida at Large

24
                              Pages 1 to 54
25
```

**Michael Musetta & Associates, Inc. (813) 221-3171**

```
 1   APPEARANCES:

 2        JAN M. HAYDEN, ESQUIRE
          Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
 3        201 St. Charles Avenue, Suite 3600
          New Orleans, Louisiana 70170
 4        (504) 566-5200
               -and-
 5        PATRICK J. NELIGAN, JR., ESQUIRE
          Neligan Foley, LLP
 6        325 North St. Paul Street, Suite 3600
          Dallas, Texas 75201
 7        (214) 840-5300
               Attorneys for the Debtors
 8
          WILLIAM H. PATRICK, ESQUIRE
 9        Heller, Draper, Hayden, Patrick & Horn, LLC
          650 Poydras Street, Suite 2500
10        New Orleans, Louisiana 70130
          (504) 299-3300
11             Attorney for the Debtor in Possession

12        FRANCIS J. LAWALL, ESQUIRE
          Pepper Hamilton, LLP
13        3000 Two Logan Square
          Philadelphia, Pennsylvania 19103
14        (215) 981-4481
               -and-
15        RUDY J. CERONE, ESQUIRE
          McGlinchey Stafford, PLLC
16        601 Poydras Street, 12th Floor
          New Orleans, Louisiana 70130
17        (504) 596-1200
               Attorneys for the Committee
18
          GAIL B. McCULLOCH
19        Office of U.S. Trustee
          300 Fannin Street, Suite 3196
20        Shreveport, Louisiana 71101
          (318) 676-3456
21             Attorney for the U.S. Trustee's Office

22
                         * * * * *
23

24

25
```

INDEX

                                                    PAGE

PROCEEDINGS                                           4

STATUS CONFERENCES                                    5

MOTIONS                                              33

REPORTER'S CERTIFICATE                               54

UNOFFICIAL

```
1                    P R O C E E D I N G S
2            THE COURT:  And I think that just leaves the
3       New Louisiana Holdings cases.
4            MS. McCULLOCH:  I'll go get everybody.
5            THE COURT:  Are you-all ready to --
6            MS. McCULLOCH:  I think we are.  Give me one sec.
7       I think they were --
8            THE COURT:  Okay.
9            MS. McCULLOCH:  Let me double-check.
10           (Pause in the proceedings.)
11           MS. McCULLOCH:  Your Honor, we thought it might be
12      useful, since we're supposed to have status conferences
13      in this case, to start with the status conference --
14           THE COURT:  Okay.
15           MS. McCULLOCH:  -- and then come back to the
16      motions, if that would be agreeable to the Court.
17           THE COURT:  That is agreeable, because we
18      have three categories:  We have the overarching case
19      where we have the motions, the DIP motions, and
20      exclusivity; we have the status conference cases; and
21      then we have the ombudsman cases.
22           And so let's start with the status conference
23      cases.
24           MS. McCULLOCH:  I'm going to turn that over to
25      Mr. Neligan.
```

**Michael Musetta & Associates, Inc. (813) 221-3171**

1          THE COURT:  The first status conference case is on

2     page 2, and it's 14-50796, Jackson Manor 1691 Tenant,

3     LLC, through page 4 of the calendar, 14-51056,

4     Cypress Health Care Holdings, LLC.

5          And then on page 5 of the calendar, 14-51104,

6     CHC-CLP Operator Holding, and 14-41106,

7     CHC-SPC Operator, Inc.

8          Counsel will make appearances on the status

9     conference.

10          MS. McCULLOCH:  Gail McCulloch, the U.S. Trustee.

11          MR. NELIGAN:  Your Honor, Pat Neligan on behalf of

12     the debtors.

13          MR. LAWALL:  Good morning, Your Honor.

14          Fran Lawall and Rudy Cerone for the committee.

15          MR. PATRICK:  Your Honor, William Patrick for

16     SA MEZ, which is the debtor in possession financing the

17     lender.

18          THE COURT:  Okay.

19          MS. HAYDEN:  Jan Hayden, also on behalf of the

20     debtors.

21          THE COURT:  Counsel, you may proceed on the status

22     conference.

23          MR. LAWALL:  Do you want to go first?  Okay.

24          MR. NELIGAN:  Your Honor, I think we have, of

25     course, the various status conferences to go over today.

1          THE COURT:  Uh-huh.  (Indicates affirmatively.)

2          MR. NELIGAN:  And in going through the Court's

3     calendar, it appears that we have all of the entities

4     under "New Louisiana Holdings."

5          THE COURT:  Uh-huh.  (Indicates affirmatively.)

6          MR. NELIGAN:  And for purposes of this case, we

7     have referred to the different entities as "silos."

8          And so you have New Louisiana Holdings, which is

9     the parent of a group of debtors in Louisiana.  We have

10    Palm Garden, and those are formerly-operating facilities

11    that are located in Florida.

12         In addition to the Palm Garden former-operating

13    entities, there are entities that would either be the

14    parent or were servicing some of those operating

15    entities and are, at this point, dormant.  And you will

16    note that the Palm Garden entities all start out

17    "SA-PG," for "Palm Garden" --

18         THE COURT:  Uh-huh.  (Indicates affirmatively.)

19         MR. NELIGAN:  -- whereas with the Louisiana

20    entities, you have like Jackson Manor, Fountain View,

21    and the various other entities, and it just lists the

22    location of that particular entity.

23         With respect to Palm Terrace, there are two

24    operating entities -- or three operating entities and

25    then two entities that previously were the parent and

**Michael Musetta & Associates, Inc. (813) 221-3171**

1    one of the servicing entities and, at this point, are

2    dormant, and those would include Cypress Health Care

3    Management, Cypress Health Care Holdings.

4         And then I don't see on this list but for purposes

5    of, I guess, full disclosure should be included are the

6    Georgia entities, which, again, are not on this list,

7    but I guess will soon pop up on a status conference.

8         THE COURT:  Uh-huh.  (Indicates affirmatively.)

9         MR. NELIGAN:  And those facilities were, again,

10   operating entities which were in the facilities, and the

11   operations were transferred prior to bankruptcy.

12        THE COURT:  Yes.

13        MR. NELIGAN:  And so those entities were recently

14   filed.

15        THE COURT:  Yes.  That's a --

16        MR. NELIGAN:  Let me start out --

17        THE COURT:  We like to do the status conferences,

18   and we try to do them together, but when we have

19   staggered filings, it makes it --

20        MR. NELIGAN:  It is a little difficult.

21        THE COURT:  -- it makes it more difficult to manage

22   those, as far as having one status conference, but I'm

23   glad.  I think we've got the bulk of them here.

24        MR. NELIGAN:  And let me also -- in the interest of

25   trying to make this as complicated as possible, there

1    will be -- I'm teasing, but we will be filing the final

2    silo, which is known as the "encore silo."

3          THE COURT:  Uh-huh.  (Indicates affirmatively.)

4          MR. NELIGAN:  And with respect to the encore silo,

5    there is one operating entity, Citrus Garden in

6    Fort Myers, Florida.  There were a number of other

7    entities that are not operating.  Those entities were

8    located in -- three in Illinois; one in San Antonio,

9    Texas; I think one in Kansas, and we will be filing

10   those in the next couple of weeks.

11         THE COURT:  Okay.

12         MR. NELIGAN:  Let me -- and in addition to the

13   Louisiana entities, there is one operating entity,

14   Regency.

15         THE COURT:  Uh-huh.  (Indicates affirmatively.)

16         MR. NELIGAN:  Let me step back for a moment, and

17   first let me address the Palm Terrace entities, which

18   are the three operating entities:  One in Clewiston,

19   Florida; one in Lakeland, Florida; and one in

20   St. Petersburg, Florida.  And those entities are, you

21   know, currently operating.  They are certainly currently

22   cash-flow positive.

23         With respect to those entities, as I announced in

24   the first-day hearing, we intend to sell those three

25   facilities.  We have recently filed a big procedures

1    motion.  We have a broker, Senior Living Investment

2    Properties.  We will be filing an application to employ

3    that broker.

4        I know, having spoken with the committee, there are

5    some issues that the committee wants to work through, in

6    terms of deadlines.  And when the bids come in, we all

7    want to make sure that parties have enough -- have an

8    ability to do sufficient due diligence to get the

9    maximum price.  And I can certainly say that I have

10   received a number of calls from parties, from lawyers

11   whose clients are interested in purchasing these

12   facilities.

13       These facilities lease their actual operating --

14   their actual building from a landlord, and while there

15   is a -- I guess there are certain beneficiaries of

16   certain family trusts, Schwartzberg family trust, that

17   own indirectly Cypress, which owns these silos, and

18   thus -- and have an ownership interest in the landlord

19   for Palm Terrace.  They're not a controlling interest.

20       THE COURT:  Uh-huh.  (Indicates affirmatively.)

21       MR. NELIGAN:  And nonetheless, we have discussed

22   with the owner of the real estate a sale that would

23   allow buyers to either buy the operations or to buy the

24   real estate and the operations.

25       From what the broker says and from what I've heard

**Michael Musetta & Associates, Inc. (813) 221-3171**

1        from different lawyers whose clients are interested in
2        buying these properties, if we're going to maximize the
3        recoveries for the estate, we should go down the track
4        of trying to sell both and hopefully reserve allocation
5        between the owner of the real estate and the estate, if
6        we don't have an agreement up front on how the purchase
7        price will be allocated.

8            With respect to the other entities, we had drafted
9        a plan that, you know, provides for essentially a
10       liquidating trust for the trade creditors, as well as a
11       separate trust for the tort claimants.

12           As the Court is aware -- and I think we've talked
13       about it at other hearings -- with a committee in place,
14       the committee is going to need to and is performing due
15       diligence.  We have made an offer to the committee, a
16       commitment for a substantial amount of cash.  The
17       committee, I think correctly, is going to need to do
18       their own due diligence.

19           We have endeavored to cooperate with the committee
20       and to provide them with whatever documentation they're
21       going to need to complete that due diligence.  That
22       said -- and we have, you know, had discussions even
23       today about the timing.

24           THE COURT:  Uh-huh.  (Indicates affirmatively.)
25           MR. NELIGAN:  We certainly don't want to jam the

**Michael Musetta & Associates, Inc. (813) 221-3171**

1       committee, but at the same time, we need to push these
2       cases forward.  What I would suggest is that we come
3       back to Court -- we're going to be back here on the
4       10th -- and hopefully we have an agreement on everything
5       from exclusivity to be able to give you a time frame for
6       filing the plan.
7           My goal would be to have a consensual plan.
8       Obviously, if we can't, we will move forward, but we're
9       certainly trying to move this process along in as
10      consensual a manner as possible.
11          THE COURT:  Uh-huh.  (Indicates affirmatively.)
12          MR. NELIGAN:  With respect to Regency, there is
13      going to be an issue with the landlord, and we're going
14      to deal with that from the tenant.  There is a dispute
15      over the amount of the rent and outstanding litigation
16      there, but, you know, worst case scenario, we can do a
17      separate plan for Regency.
18          THE COURT:  Uh-huh.  (Indicates affirmatively.)
19          MR. NELIGAN:  Where we stand right now, I think it
20      is -- you know, we could certainly file a plan within
21      the next month.  The committee will not have completed
22      its due diligence.
23          And, again, it's something we're going to work with
24      the committee on because, at the end of the day, if
25      we're going to do this sufficiently -- hopefully we can

**Michael Musetta & Associates, Inc. (813) 221-3171**

1          do it with the committee's support and cooperation.

2              THE COURT:  Uh-huh.  (Indicates affirmatively.)

3              MR. NELIGAN:  I don't know if you have specific

4          questions.

5              THE COURT:  And you'll have a better sense of this,

6          in your view, by February 10th --

7              MR. NELIGAN:  I think so, Your Honor.

8              THE COURT:  -- as to how it's going to --

9              MR. NELIGAN:  I think so.

10             THE COURT:  And as far as February 10th, what I'm

11         hearing is that, other than exclusivity, these other

12         matters that have teed up in the DIP financing, you want

13         to do some additional negotiation on that.

14             You want to --

15             MR. NELIGAN:  Well, we're going to need to do

16         additional negotiation under their financing.

17             THE COURT:  Okay.

18             MR. NELIGAN:  We have a motion to allow monthly

19         payments and that the monthly payments would be the

20         traditional 80 percent of the fees, 20 percent holdback,

21         100 percent of the expenses.

22             THE COURT:  That's an interim -- your interim

23         compensation, correct?

24             MR. NELIGAN:  Yes, Your Honor.

25             THE COURT:  Okay.

**Michael Musetta & Associates, Inc. (813) 221-3171**

1        MR. NELIGAN:  We had put in a budget which,

2    unfortunately, I don't think is going to work with the

3    cash flow.

4        So we're going to need to come back once we work

5    through those issues.

6        And obviously if we cannot reach agreement, the DIP

7    lender is going to want to go forward on our motion for

8    final order, and we can have that heard on the 10th.

9        One thing I didn't think we were going to

10   accomplish today is getting the bar date and the notice.

11   We've set the bar date for March 16 --

12       THE COURT:  Uh-huh.  (Indicates affirmatively.)

13       MR. NELIGAN:  -- which is in line with at least our

14   thoughts on pushing the cases forward.

15       THE COURT:  Yes.

16       MR. NELIGAN:  Ms. Hayden will handle that hearing,

17   and so I can turn the podium over to her now to go

18   through that with you, or if you have any questions

19   about any of the other issues.

20       THE COURT:  Let me see if anybody else has anything

21   on just the general status conference, as far as what

22   has been outlined with counsel as the road map going

23   forward.

24       MR. NELIGAN:  Okay.

25       MR. LAWALL:  Good morning again, Your Honor.

1         Fran Lawall for the committee.

2         THE COURT:  Uh-huh.  (Indicates affirmatively.)

3         MR. LAWALL:  Your Honor, as you may recall, the

4    committee got appointed somewhat late in this case, and

5    just -- while you may have heard some of this before, I

6    think it helps to set the table a little bit.

7         THE COURT:  Sure.

8         MR. LAWALL:  When we were appointed, we met with

9    the debtor in New York, and the debtor at that point had

10    begun to describe some of the economic relationships

11    that exist within this complex financial structure

12    that's been created.

13         THE COURT:  Uh-huh.  (Indicates affirmatively.)

14         MR. LAWALL:  And one of the things that was

15    indicated to us was that, as part of any plan, they

16    would like to have third-party releases obtained for

17    various service providers, administrative support,

18    equity, so on and so forth.

19         We agreed that we would certainly be willing to

20    entertain a negotiation along those lines; however, we

21    are very concerned with respect to the various

22    interrelationships that exist and, therefore, needed to

23    do the due diligence.

24         THE COURT:  Uh-huh.  (Indicates affirmatively.)

25         MR. LAWALL:  At the end of December, as Your Honor

1    may recall, we filed a retention application for CBIZ to

2    do the financial analysis, and also, I've assigned one

3    of my partners to head up, effectively, the due

4    diligence analysis.

5         So we've created a team to begin to do the due

6    diligence analysis that's necessary to be able to advise

7    the Court, the debtor, the U.S. Trustee, and the

8    committee as to how we believe -- whether releases

9    should be granted, and if so, what kind of consideration

10   might flow from that.

11        THE COURT:  Uh-huh.  (Indicates affirmatively.)

12        MR. LAWALL:  We recognize that, although these

13   cases have been around for a long time, the request and

14   order to do this plan requires significant analysis.

15        And just to give you some flavor, my folks have

16   already identified more than 200 different legal

17   entities that are tied up.  And, quite frankly, I'm

18   trying to underestimate the number of entities that need

19   to be reviewed, just to give you some flavor.

20        THE COURT:  Uh-huh.  (Indicates affirmatively.)

21        MR. LAWALL:  Looking at Palm Terrace, for example.

22   The Palm Terrace relationship is such that, as was

23   described by Mr. Neligan, there was a property owner,

24   which is owned by a special purpose vehicle in which the

25   Schwartzbergs -- who ultimately, I believe, hold most of

1    the equity for many of these entities.  That may be

2    overstated somewhat, but they are obviously a

3    significant player.

4        In between there is a master lessor; in between

5    there is a sublessor; underneath that is the operating

6    lease itself.  The operating lease is really what makes

7    up the Palm Terrace debtors.

8        Now, the economics of the underlying Palm Terrace

9    lease itself is effectively such that there is no

10   economic benefit to the operator of the debtor.

11   Everything flows north, theoretically, after payment of

12   certain expenses.

13        THE COURT:  Uh-huh.  (Indicates affirmatively.)

14        MR. LAWALL:  So even the sale of the Palm Terrace

15   operations is going to be complex based upon, what is

16   the appropriate allocation of value as between the

17   operating debtor versus the property owner?  And, again,

18   what we have are non-debtor insiders in between who have

19   some type of economic interest.

20        So at every stage of this case, there is complexity

21   with respect to the financial interrelationships.

22        Now, Your Honor also, I'm sure, is aware that not

23   only do we have the trade creditors in this case, but we

24   also have the personal injury claimants, and there have

25   been suggestions -- even requests within my group, given

1    the interrelationships -- to possibly have a trustee

2    appointed because of the various relationships that

3    exist; whether a person's in control who are non-debtors

4    who are also in control positions just because of the

5    structure of this complex relationship.

6          THE COURT:  Uh-huh.  (Indicates affirmatively.)

7          MR. LAWALL:  From the majority of the committee's

8    position, we've looked at that and said, "Moving for the

9    appointment of a trustee at the moment doesn't make

10   sense"; because, quite frankly, we need to do the due

11   diligence, which is exactly what we're doing.

12         But we're trying to do it in a structured way with

13   the debtors' cooperation in order to, as efficiently as

14   possible, get the information we need, again, to advise

15   the Court, committee, and the rest of the

16   constituencies.

17         But, again, this is incredibly complex,

18   notwithstanding the fact that there are only four

19   operating debtors.  There were over -- and I'll estimate

20   this, Your Honor -- 35 prebankruptcy dispositions of

21   homes before the cases were filed.

22         So not only do we have the four operating debtors,

23   we have 35 dispositions prebankruptcy that need to be

24   reviewed to determine whether they were appropriate and

25   whether proper consideration followed, because in each

1      one of those entities there are significant trade

2      creditors.

3          It has been estimated, although the bar date has

4      not been set, that the trade debt in this case will be

5      north of $60 million.  And I'm sure that the personal

6      injury claimants would view their claims as being worth

7      significantly more than that, but then again, of course,

8      that requires liquidation.

9          We have no idea at the moment.

10         THE COURT:  Uh-huh.  (Indicates affirmatively.)

11         MR. LAWALL:  Where we're hoping to move it to

12     ultimately here is a negotiated consensual plan that

13     provides appropriate consideration for the creditors;

14     that provides a vehicle for purposes of liquidating the

15     personal injury claims in a way that's sufficient and

16     fair to them; and, at the same time, moves this case

17     along as quickly as possible.

18         THE COURT:  Uh-huh.  (Indicates affirmatively.)

19         MR. LAWALL:  In connection with the Palm Terrace

20     financing, one of the things that has slowed this up is

21     not only the cash flow analysis that Mr. Neligan

22     referred to -- even the cash flow analysis that we had

23     in December unfortunately has changed, and that has

24     adjusted some of the negotiations that are occurring --

25     but, as you may recall, Your Honor, the lender in

1    connection with this DIP took out a third-party lender

2    cap source at the beginning of the case.

3         THE COURT:  Uh-huh.  (Indicates affirmatively.)

4         MR. LAWALL:  So we have an insider who was the DIP

5    lender to the debtor who also has some interest

6    ultimately, indirectly, into the ownership of the DRP,

7    as well as into the operator itself.

8         So it creates a number of various impacts, if I can

9    call them that, on the negotiation process.

10        And this is impacting the negotiation of the DIP

11   itself because, from the committee's standpoint, because

12   it's an insider that is issuing the DIP; and because

13   we're moving for a sale on the Palm Terrace debtors, we

14   don't want to have a situation where the DIP lender can

15   put unnecessary pressure on the sale to get to a

16   particular outcome.

17        Namely, Your Honor, if there's a termination date

18   for the DIP -- call it at the end of May -- and we end

19   up in a situation where the sale process is not quite

20   done but yet we are under the sword of a potential

21   termination of the DIP, that puts us in an impossible

22   situation.

23        So we're trying to work with the DIP lender, given

24   the transparency that they've promised us throughout the

25   case, to create enough running room to try and balance

1    out all of these various interests.

2        So at one level, Your Honor, this doesn't look like

3    a very big case; on the other, the complexity is

4    extreme.  And given that the request of the committee

5    from the beginning was that we would like these

6    third-party releases, we have no choice but to do the

7    due diligence, and this is going to take some time.

8        THE COURT:  Uh-huh.  (Indicates affirmatively.)

9        MR. LAWALL:  But we have promised -- or at least we

10   have set an internal deadline for three months --

11   Your Honor, to try and get the due diligence done at the

12   beginning of January in anticipation of what we hoped

13   would have been the final DIP having been approved

14   several weeks ago.

15       We already told CBIZ as well as folks within my own

16   firm to start with all haste to move this due diligence

17   forward, and they are doing so.  There have been

18   multiple calls.  There have been documents exchanged.

19   There are still a lot more documents that have to be

20   reviewed, as you can imagine, but this is moving ahead.

21       The committee is not sitting on their hands.  We

22   are trying to move this forward in a way that's

23   constructive, balancing out all the various constituents

24   with interest.  Personal injury claimants have their own

25   concerns.  The trade claimants have their own concerns.

1          All of them are members of my committee.

2          THE COURT:  Uh-huh.  (Indicates affirmatively.)

3          MR. LAWALL:  So we're kind of in the middle here,

4     trying to balance this out and trying to move this

5     ahead.

6          I appreciate Your Honor allowing me -- giving me

7     some time just to explain this, but I thought the flavor

8     of what is going on behind the scenes is important.

9          THE COURT:  Uh-huh.  (Indicates affirmatively.)

10         MR. LAWALL:  As committee counsel, we try and keep,

11    quite frankly, as much out from before Your Honor as

12    possible.  We like to try and resolve things without

13    having to bring the disputes in front of you unless we

14    really can't, and we're going to continue to do so.

15         THE COURT:  And I appreciate that.

16         And a lot of times at the beginning of the case, I

17    just see the tip of the iceberg, and I don't see a lot

18    of what's going on underneath the water, as far as the

19    complexity of the debtors' organization and the dynamics

20    of the negotiations that have to go on to get where

21    we're going.

22         You know, I usually, slowly but surely, as these

23    issues are litigated, get a fuller and complete

24    understanding, but that's very helpful, what you have

25    laid out, as far as giving me an additional picture of

1    what's been going on.

2         So your point is you anticipate about a three-month

3    window, as far as conducting due diligence?

4         MR. LAWALL:  That's our internal target,

5    Your Honor.

6         THE COURT:  Yes.

7         MR. LAWALL:  We have started.  We're now in the

8    third week of January.

9         THE COURT:  Uh-huh.  (Indicates affirmatively.)

10        MR. LAWALL:  We're hoping to schedule further calls

11   on Wednesday, when we get back to our respective

12   offices, to go through what the missing documents are.

13        At the same time, Your Honor, so you know we're on

14   parallel paths, we're working through the sales

15   procedures for Palm Terrace.  We're negotiating the DIP

16   as well as, you know, preliminary discussions with

17   respect to a plan.

18        So you've got multiple things going on behind the

19   scenes at the moment, and the debtors' counsel has been

20   extremely cooperative.  The debtor has promised

21   transparency and I hope will continue the transparency.

22        But everyone is saying, "We want to move these

23   cases forward quickly," and as long as that cooperation

24   is there, we will do so on our side.

25        THE COURT:  Thank you.

**Michael Musetta & Associates, Inc. (813) 221-3171**

1                MR. LAWALL:  Thank you, Your Honor.

2                THE COURT:  Mr. Neligan, a quick question.

3                You had mentioned two liquidating trusts, including

4         a liquidating trust for the tort claimants.

5                MR. NELIGAN:  Yes, sir.

6                THE COURT:  Is that the ADR-type procedure that you

7         had --

8                MR. NELIGAN:  Yes, Your Honor.

9                THE COURT:  -- outlined early in the case?

10               MR. NELIGAN:  Yes, Your Honor.

11               We had, I think, initially thought we would do a

12        motion, but what we decided to do is wrap the ADR into

13        the trust itself and have the ADR handled through the

14        trust and handled through the plan versus just a

15        separate motion.

16               THE COURT:  Okay.  Now, would this be -- this would

17        be a process where, like in a lot of these cases, it's

18        an optional ADR process --

19               MR. NELIGAN:  That is correct.

20               THE COURT:  -- and the parties can elect to take

21        their claims back to --

22               MR. NELIGAN:  To State court or, if there's federal

23        jurisdiction, they can go to federal district court or

24        whatever court.  You know, some of them, I think, are in

25        arbitration, so --

1          THE COURT:  So you envision that that will be part

2     of this liquidating trust?

3          MR. NELIGAN:  Yes, Your Honor.

4          THE COURT:  Okay.  Ms. McCulloch, did you have

5     any --

6          MR. NELIGAN:  Well, I was going to make just a

7     couple of points.  And, number one, the debtor has

8     endeavored to cooperate.

9          THE COURT:  Uh-huh.  (Indicates affirmatively.)

10          MR. NELIGAN:  You may recall we were in your

11     chambers with the landlord of Palm Garden about the

12     discovery.  And I can assure you it was painful, but,

13     you know, frankly, it was a good process to go through,

14     because it helped us jump-start responding to the

15     committee's requests.

16          And we set up a data room, and a number of

17     documents are in there, and we're putting other

18     documents in there as well.  And we've told the

19     committee and we've told everybody from the beginning

20     there will be transparency.

21          You know, I don't know about 200 entities.  I do

22     know, for instance, that, in terms of the transition or

23     sale of some of the facilities prebankruptcy -- and I'll

24     give you an example.

25          The landlord of Palm Garden, you may recall,

1   decided to take over the facilities and operate them as

2   Palm Garden entities.  And there may well be a

3   successful liability in other claims against that

4   landlord, but that, we think, can be dealt with in the

5   trust.

6       At the end of the day -- and we certainly want to

7   cooperate with the committee.  It makes no sense to turn

8   this case -- or these cases into litigation.

9       THE COURT:  Uh-huh.  (Indicates affirmatively.)

10      MR. NELIGAN:  You know, the amount of money is

11  in -- that we've started out with is in the millions of

12  dollars.

13      And that said, it has been made clear to me that,

14  you know, the goal here is to try to wrap these matters

15  up through deals with the creditors and, you know, the

16  parties going forward, given sort of where all these

17  facilities have ended up.

18      That said, at some point, you know, if we can't get

19  a deal, then I think we're going to have to -- we will

20  all have to look at other options, but I can assure you

21  that the creditors will certainly -- I don't see the

22  creditors getting any more money through litigation than

23  they will get through a consensual plan, and I'm hopeful

24  that we can get there.

25      THE COURT:  Ms. McCulloch?

1          MS. McCULLOCH:   Thank you, Your Honor.

2          I had filed status conference reports for a couple

3    of the groups, the Palm Garden group and the

4    jointly-administered group, Jackson Manor and

5    Fountain View, which are the two up for status

6    conference hearings.  In the operating report -- oh, the

7    operating entity is in Clewiston, St. Petersburg, and

8    Louisville.

9          We prepared a status conference report.

10   Ultimately, we did not file it because some of the

11   ways of -- some of the numbers we had questions about.

12         The debtors responded to us, but we ultimately

13   determined that we were not comfortable filing status

14   conference reports because of some of the -- nothing

15   sinister, but just because some of the ways they had the

16   book thing, we weren't sure that we were going to be

17   able to reflect what we believed to be an accurate

18   statement of their financial affairs in that recording

19   report.

20         THE COURT:   Uh-huh.  (Indicates affirmatively.)

21         MS. McCULLOCH:   And that was kind of one of the

22   issues that's been out there for us, as far as

23   accounting purposes.

24         They provide separate monthly operating reports on

25   these different entities, but it's always been our

1    understanding, and in accordance with what's just been

2    said, these groups are going to be put together for

3    purposes of a plan.

4        I mean, they may be separated out because Regency

5    has litigation or they're going to spin off these

6    operating entities in a sale, but there will be some

7    form of this being handled by one or more plans as a

8    global group.

9        I'm including -- and I would like to clarify that.

10       On this new silo, will that also be part of some

11   kind of global plan?

12       MR. NELIGAN:  Yes.  Yes, it will.

13       MS. McCULLOCH:  Yes.  So at the end of the day, I

14   don't think we're looking at whether or not any single

15   entity made money or didn't make money.

16       THE COURT:  Right.

17       MS. McCULLOCH:  We're going to have people infusing

18   cash globally into all the silos and trying to get that

19   taken care of.

20       So that's just by way of explanation on the status

21   conference reports.

22       THE COURT:  Uh-huh.  (Indicates affirmatively.)

23       MS. McCULLOCH:  One thing that we've run into and

24   done in the past is -- because status conference reports

25   are set based on a filing date that's generated at some

1    point in the future, we will periodically come up with

2    like two or three cases here and two or three cases

3    here.

4         And we appreciate what the Court has done, and

5    we've always basically carried these forward so we at

6    least had a fairly large group of cases to deal with.

7         THE COURT:  Uh-huh.  (Indicates affirmatively.)

8         MS. McCULLOCH:  I don't think it does anybody

9    really any good to have a status conference on three of

10   the cases.

11        So I wanted to request from the Court -- and I've

12   not had the chance to discuss this with the other

13   litigants -- that perhaps going forward, since we're

14   going to have status conferences coming up probably in

15   the Georgia cases and the new silo cases, that we just

16   kind of agree to have a single date for status

17   conferences where we discuss everything, because I think

18   any discussion on a status conference is going to need

19   to be of a global nature because of how these plans are.

20        THE COURT:  Uh-huh.  (Indicates affirmatively.)

21        MS. McCULLOCH:  But because of the way status

22   conferences are set, I think we're going to probably

23   have random status conference dates generated just by

24   the dates of the filings.

25        THE COURT:  Uh-huh.  (Indicates affirmatively.)

 1          MS. McCULLOCH:  So that's more of a housekeeping
 2      matter, but just so that we're not having to scramble
 3      every time some show up on your docket and request that
 4      they be continued.
 5          But if we could do that, I think it'd be easier for
 6      the Court and the litigants to have it when we have
 7      litigation.
 8          THE CLERK:  If you-all are going to be
 9      consolidating, you can tell the Court once one's set
10      that there's additional ones that need to be set.
11          THE COURT:  Yes.  On this case, since we have
12      staggered filings, I think that that's the appropriate
13      course.
14          What I'll do is I'll order the clerk's office not
15      to set any further status conferences on the newly-filed
16      cases until further order, and then we can actually take
17      manual control of when we set these status conferences.
18          MS. McCULLOCH:  Uh-huh.  (Indicates affirmatively.)
19          THE COURT:  Anything else, Ms. McCulloch?
20          MS. McCULLOCH:  No, Your Honor.  Other than I'd
21      echo the sentiments that have already been expressed.
22          I've really -- everybody's worked together, whether
23      we needed information from -- the debtors have always
24      been good to provide information.  I think the
25      creditor's committee has been a real asset to the case,

1   as far as making things and the flow of information go

2   by more smoothly.

3       But from the U.S. Trustee's standpoint, Your Honor,

4   we don't have any specific issues to raise at this

5   point.

6       THE COURT:  Okay.

7       MR. PATRICK:  Your Honor, William Patrick.

8       I represent SA MEZ, which is the DIP lender.

9       THE COURT:  Uh-huh.  (Indicates affirmatively.)

10      MR. PATRICK:  And, as Your Honor may recall, when

11  the DIP, the interim DIP, was filed and the final DIP

12  hearings were held -- Mr. Harris Schwartzberg, who is an

13  insider, is a principal in SA MEZ, which was disclosed.

14      We do have a final DIP order which approved

15  financing up to the amount of $3 million.

16      THE COURT:  Uh-huh.  (Indicates affirmatively.)

17      MR. PATRICK:  There's approximately $2.5 million

18  which is due on the DIP loan as of the last time I

19  checked, which was a few days ago.

20      We are considering requests from the debtor and the

21  UCC and are in negotiations with them to expand the use

22  of the proceeds of our collateral to pay administrative

23  expenses of not only these estates, our borrowers, but

24  also other administrative expenses which are part of

25  what's included in the supplemental motion to amend the

1    DIP order.

2         THE COURT:  Uh-huh.  (Indicates affirmatively.)

3         MR. PATRICK:  We're involved in discussions

4    regarding the maturity date of our loan and to provide

5    some additional funding.

6         There is no agreement yet on all of those issues,

7    which is why we don't have an order and documents to

8    present to Your Honor today, whenever we get to the

9    hearing on that, but I think there's at least an

10   agreement to give a good effort to see if we can get

11   there.

12        The situation that I want to prevent as the lawyer

13   for the DIP lender is to make sure that I don't release

14   so much collateral that I imperil the repayment of the

15   DIP loan.

16        THE COURT:  Uh-huh.  (Indicates affirmatively.)

17        MR. PATRICK:  Obviously our collateral consists of

18   the receivables and the cash and the business, and, you

19   know, we're happy to help facilitate the reorganization,

20   but not to the point of imperiling the DIP loan.

21        So we have been in negotiations with the debtor and

22   with the UCC, the creditor's committee, about all of

23   this.

24        At this point, we've not agreed to a budget.  We've

25   not agreed to a carve-out.  We've not agreed to

1    expanding the use of proceeds.  We've not agreed to the

2    things that are anticipated in the supplemental motion

3    to amend the DIP loan.

4         We have an agreement with the committee that, if we

5    don't reach an agreement, then presumably the debtor

6    would pull down that motion, and then Mr. Lawall would

7    bring on his motion for reconsideration of the final

8    order under which we've loaned $2.5 million.

9         I would point out this also; that, had this DIP

10   lender not paid off Pac West approximately $2 million at

11   the start of the case, there would be no discussions

12   about doing any of these things that we're negotiating

13   to do, because Pac West had given a very clear

14   indication that they were going to be a very, very

15   reluctant and aggressive participant in this bankruptcy

16   case.

17        Having said that, we hope to get to a subsequent

18   agreement dealing with DIP financing that'll facilitate

19   the structure that everybody would like to see

20   accomplished in this case.

21        Thank you.

22        THE COURT:  Thank you, Mr. Patrick.

23        Anybody else wish to be heard?

24        Yes.  I'm satisfied with the progress of this case

25   going forward.  I appreciate the efforts of counsel in

1  preparing their presentations and providing the Court

2  with an overview of the case.

3      Mr. Neligan, the matters that are up, what I'm

4  hearing is the motion to reconsider, we're going to

5  continue that to February 10th to see if we can get some

6  final determination of whether or not you're going to be

7  able to come to an agreement with the committee.

8      And in default, you know, we'll go forward with the

9  motion for reconsideration.  That --

10      MR. NELIGAN:  That is correct.  The --

11      MR. PATRICK:  No.

12      MR. NELIGAN:  Well --

13      MR. PATRICK:  Excuse me, Pat.  I'm sorry.

14  No, Your Honor.

15      THE COURT:  Okay.

16      MR. PATRICK:  Mr. Lawall, it's his motion to

17  reconsider.

18      THE COURT:  Right.

19      MR. PATRICK:  I had the final DIP order protecting

20  us.

21      THE COURT:  Right.

22      MR. PATRICK:  Mr. Lawall, on behalf of the

23  committee, filed a motion to reconsider the DIP order.

24      THE COURT:  The parties are in there trying to

25  negotiate to --

**Michael Musetta & Associates, Inc. (813) 221-3171**

1      MR. PATRICK:  Right.

2      THE COURT:  -- avoid having to have --

3      MR. LAWALL:  Yes.

4      MR. PATRICK:  Right.  What we're trying to

5  negotiate at this point is we're trying to negotiate --

6  not because, frankly, I'm concerned about the motion,

7  but because the case needs some -- we need to

8  renegotiate to help facilitate the structure.

9      THE COURT:  Okay.

10     MR. PATRICK:  But what will be continued or what

11 Your Honor may resolve today is the motion to -- the

12 supplemental motion to amend the DIP order, and so

13 that's what we're focused on.  We're not focused on the

14 motion for reconsideration.

15     We have agreed that if we don't get to an agreement

16 on a motion for amendment of the DIP order for the

17 supplemental DIP order, then Mr. Lawall will schedule a

18 hearing on his motion for reconsideration.  We'll file

19 responsive pleadings, and then we can have a hearing on

20 his motion.

21     THE COURT:  So we're going to continue the motion

22 for -- the committee's motion for reconsideration

23 without date?

24     MR. PATRICK:  Yes.

25     MR. LAWALL:  Yes, Judge.

```
1              THE COURT:  Okay.
2              MR. LAWALL:  Or, Your Honor, the other way you
3         could do it is that 2/10 will be a status conference on
4         it; either way.
5              But I agree completely with Mr. Patrick.  We will
6         not -- we're not attempting to, if I can say it this
7         way, jam him up.
8              THE COURT:  Sure.
9              MR. LAWALL:  If it looks like this hearing is going
10        to have to be held, we will give him sufficient time to
11        prepare and file an answer.
12             THE COURT:  Uh-huh.  (Indicates affirmatively.)
13             MR. LAWALL:  And so if we continue it without date
14        or continue it on 2/10 and let everything trail, we will
15        not try this on February 10 regardless, because we're
16        still working out these negotiations.
17             THE COURT:  Okay.  Now, why don't we go ahead and
18        continue it to 2/10.  Since we have other matters we
19        have on 2/10, we can keep it on the calendar.
20             I don't like continuing matters without date, but
21        we can continue it for purposes of the status
22        conference.
23             MR. PATRICK:  Yes, that would be great.  As long as
24        it's a status conference, because you'll notice we never
25        filed a response to the motion.
```

**Michael Musetta & Associates, Inc. (813) 221-3171**

```
 1              THE COURT:  Yes.
 2              MR. PATRICK:  Because, you know, I think we've kind
 3      of agreed we'd rather --
 4              THE COURT:  Yes.
 5              MR. PATRICK:  -- we'd rather focus on the
 6      solution --
 7              THE COURT:  Yes.
 8              MR. PATRICK:  -- rather than just getting in
 9      litigation over it.  And so --
10              THE COURT:  That's a valid point.  The motion for
11      reconsideration, I'll reschedule it for a status
12      conference on February 10th.
13              MR. PATRICK:  Perfect.
14              THE COURT:  We won't hear the merits --
15              MR. PATRICK:  Right.
16              THE COURT:  -- of that motion on February 10.
17              MR. PATRICK:  And if Your Honor doesn't mind, I'm
18      not going to file any pleadings prior to that.
19              THE COURT:  No.
20              MR. PATRICK:  Okay.
21              THE COURT:  You're released from having to file
22      anything.  In the anticipation that that motion has to
23      get litigated, we'll reset it and give you a time period
24      to file a response.
25              MR. PATRICK:  That would be perfect.
```

**Michael Musetta & Associates, Inc. (813) 221-3171**

1          Thank you, Your Honor.

2          THE COURT:  Uh-huh.  (Indicates affirmatively.)

3          MR. LAWALL:  Your Honor, there is one threshold

4    issue, though, that will affect both these gentlemen's

5    clients, and that is on the motion for interim payment.

6          THE COURT:  Uh-huh.  (Indicates affirmatively.)

7          MR. LAWALL:  The way that is set up is that there

8    is cash in the various silos, and what we discussed with

9    the committee and came up with a proposal on is that

10   there would be an interim budget that -- we've got to

11   work through and get the numbers on it to make sure they

12   work with the cash flow, but an interim budget that

13   would be paid from Palm Terrace and the different

14   debtors without regard to whether the time billed was

15   for a particular silo or, you know, generally for the

16   benefit of all.

17         THE COURT:  Uh-huh.  (Indicates affirmatively.)

18         MR. LAWALL:  I think, when you step back and look

19   at the work that will be done as a whole, most of the

20   work is going to be for the group as a whole.

21         As Ms. McCulloch said, there will be one plan.

22   There may be separate work done.  For instance, the

23   Palm Terrace sale.  But for the most part, the issues in

24   every one of the silos are going to overlap, and so the

25   proposed -- or at least the principle underlying the

1    proposed interim fee payments is for the various silos

2    to use their cash to pay for the fees.

3        And so to the extent that Palm Terrace is paying

4    fees of other entities or other entities are paying fees

5    for some of the work done for Palm Terrace, there will

6    be intercompany claims that can be dealt with in the

7    plan.  And I wanted to make that clear, because that is

8    one of the underlying principles behind the additional

9    debtor in possession putting up some --

10        THE COURT:  Ms. McCulloch, did you have anything on

11    the motion to pay?  This is for the interim procedure.

12        MS. McCULLOCH:  No, Your Honor.

13        THE COURT:  Okay.  The Court will grant the motion

14    on interim procedures.

15        Mr. Neligan, you'll prepare the order?

16        MR. NELIGAN:  Yes, Your Honor.  And it will be

17    subject to us reaching a final budget.

18        MR. PATRICK:  Right.  Your Honor, William Patrick

19    on behalf of the DIP lender.  Let me mention this.

20        We have no objection to the procedure --

21        THE COURT:  Uh-huh.  (Indicates affirmatively.)

22        MR. PATRICK:  -- however, we do have -- we're

23    standing on our rights under our final order and our

24    existing credit agreement at this time with respect to

25    our collateral.

1        Because underlying the motion for that procedure is

2        that the debtor plans to take the collateral of SA MEZ

3        and start paying expenses related to other entities,

4        which, in the concept of final amended supplemental

5        budget and order --

6        THE COURT:  Uh-huh.  (Indicates affirmatively.)

7        MR. PATRICK:  -- may be fine, but as for sitting

8        here today, we have not approved a budget for that or

9        approved the use of our collateral for those purposes

10       yet.

11       MR. NELIGAN:  And --

12       THE COURT:  And the approval is subject to the --

13       MR. NELIGAN:  Right.

14       THE COURT:  -- to the finalization of the budget.

15       MR. NELIGAN:  That's right.

16       MR. PATRICK:  Exactly.

17       THE COURT:  Counsel?

18       MR. LAWALL:  I think we all agree, Your Honor.

19       MR. PATRICK:  We all agree.  I just didn't want

20       to -- I didn't want my silence with respect to that

21       motion to imply some --

22       THE COURT:  Understood.

23       MR. PATRICK:  We're reserving all rights under our

24       final order in our credit agreement.

25       THE COURT:  Pending a budget that --

1          MR. NELIGAN:  Right.

2          THE COURT:  -- you will agree to.

3          MR. PATRICK:  Pending a budget and pending a

4      granting of the final --

5          MR. NELIGAN:  Right.

6          MR. PATRICK:  -- motion on the supplemental order

7      for DIP financing.

8          MR. NELIGAN:  Right.

9          THE COURT:  Okay.

10         MR. NELIGAN:  And we'll stipulate that Mr. Patrick

11     has waived nothing.

12         MR. PATRICK:  Thank you.

13         THE COURT:  All right.  We have exclusivity.

14         We have the original motion.

15         MR. LAWALL:  Yes.

16         THE COURT:  We've got an amended motion that

17     requests exclusivity through March 31st for filing and

18     May 29th for the period to solicit acceptances.

19         MR. NELIGAN:  Yes, that is true.

20         And we were going push that off to 10th.

21         MR. LAWALL:  The 10th.  Right.

22         THE COURT:  To the 10th of February?

23         MR. NELIGAN:  Yes, Your Honor.

24         THE COURT:  The amended motion to extend

25     exclusivity, we'll continue that to February 10th.

1          MR. NELIGAN:  Your Honor, I think that leaves us

2     with the motion to set a bar date and to approve notice

3     procedures --

4          THE COURT:  Uh-huh.  (Indicates affirmatively.)

5          MR. NELIGAN:  -- and I propose that Ms. Hayden

6     handle that.

7          THE COURT:  Okay.  Ms. Hayden?

8          MS. HAYDEN:  Your Honor, I apologize.  We're not

9     going to take a position in the motion that's about to

10    come up before the Court, and I would like to go conduct

11    a 341 meeting that we had set, if that's acceptable to

12    the Court.

13         THE COURT:  I'll waive your further appearance so

14    you can attend the 341 meeting.

15         MS. HAYDEN:  Thank you.

16         MR. AGUILLARD:  Your Honor, I'm in her 341, and I

17    have a hearing right after this, so --

18         THE COURT:  Oh, that is on Cajun Electric?

19         MR. AGUILLARD:  Yes.

20         THE COURT:  Okay.  Who else?  Is anybody else here

21    for that, or --

22         MR. AGUILLARD:  No, sir.

23         MS. McCULLOCH:  Do you want to interrupt us and

24    take his Cajun Electric?

25         You have to have a real hearing?

1          THE COURT:  Well, Ms. McCulloch, you're not

2     involved in Cajun Electric.

3          MS. McCULLOCH:  I'm not.  And, Your Honor, I'm fine

4     doing it however possible.

5          I just didn't want Mr. Aguillard's client --

6          THE COURT:  Uh-huh.  (Indicates affirmatively.)

7          MS. McCULLOCH:  I was not thinking in terms of

8     Cajun Electric.

9          THE COURT:  Uh-huh.  (Indicates affirmatively.)

10         MS. McCULLOCH:  I'm happy to do whatever the

11    litigants want to do.  I'm here and available.

12         MR. AGUILLARD:  We can go downstairs and then come

13    back.

14         THE COURT:  Yes.  Why don't we do that.  I don't

15    want to -- I want to get this one over with so we can

16    send everybody on their way.

17         Mr. Aguillard, when you're done, just let Alice

18    know, and we'll take up Cajun Electric at that time.

19         MR. AGUILLARD:  Thank you.

20         MS. McCULLOCH:  Thank you, Your Honor.

21         THE COURT:  Thank you.  Ms. Hayden?

22         MS. HAYDEN:  Hi.  All right.  We're here for --

23    I've got the motion for authority to fix the bar dates.

24         We had asked for March 16th, which at this point

25    will turn into slightly more than 30 days' notice.

```
1              THE COURT:  Uh-huh.  (Indicates affirmatively.)
2              MS. HAYDEN:  Honestly, if you're slightly
3     uncomfortable with that, I don't think it would cause us
4     any problem to substitute April 1 into these dates.
5              What we're doing is we intend to give written
6     notice by mailing out to everybody on the matrix,
7     everybody we've identified as a creditor or potential
8     creditor.
9              THE COURT:  Uh-huh.  (Indicates affirmatively.)
10             MS. HAYDEN:  We also have identified -- we've
11    listed a number of categories of folks from the
12    different homes:  Employees, residents and their
13    personal representatives, to the extent that we know who
14    they are.  We were going to give them notice for what we
15    understand to be the prescription period.
16             In Louisiana, we currently understand that to be
17    three years for preemptive.
18             THE COURT:  Uh-huh.  (Indicates affirmatively.)
19             MS. HAYDEN:  For the other states, we understand it
20    to be six years.  The committee's asked me to
21    double-check that, and I will before I submit the order.
22             THE COURT:  Uh-huh.  (Indicates affirmatively.)
23             MS. HAYDEN:  We also -- and really mainly for the
24    issue of tort claimants, but we also believe that we'd
25    like to notify unknown creditors, and so we are
```

**Michael Musetta & Associates, Inc. (813) 221-3171**

1    proposing a publication system.

2        We have gone in and looked and identified in

3    Georgia, the Atlanta Journal-Constitution; in Florida,

4    the Miami Harold, The Tampa Tribune, the

5    Florida Times-Union, Orlando Sentinel; and for the NHL

6    debtors, the Advocate -- both Advocates, because

7    apparently there's a New Orleans and a

8    Baton Rouge/Acadian; and Panola County newspaper in

9    Carthage, Texas.

10        THE COURT:  Uh-huh.  (Indicates affirmatively.)

11        MS. HAYDEN:  We have determined that those papers

12   are in every county or parish that one of the homes is

13   located in.

14        So we suggest to the Court that publishing that on

15   a Sunday should be sufficient notice to unknown

16   creditors to bar the -- to have them bound by the bar

17   date.

18        THE COURT:  Uh-huh.  (Indicates affirmatively.)

19        MS. HAYDEN:  And so I'd ask that the Court -- I'm

20   going to run this past the committee, who's been active

21   in trying to make sure we do a good job noticing, but

22   with that, I'd ask the Court to approve our notice and

23   to approve our period of time and to approve that this

24   notice program is, in fact, designed to reach those

25   unknown creditors; being tort claimants, we suspect, as

1      a general rule, which are going to be individuals who

2      have stayed in the home or employees who have worked at

3      the home who may not have asserted a claim.

4              THE COURT:  Uh-huh.  (Indicates affirmatively.)

5              MS. HAYDEN:  Quite honestly, if you look, if you go

6      through when you get the order, you'll see, but in

7      Louisiana, most of these homes have been closed.

8              We actually don't even have to give notice under

9      the three-year period, but many of these homes have

10     been -- for instance, the Palm Garden.  Most of those

11     were closed in 2013.  It's probably, as a practical

12     matter, unlikely that there are too many folks out

13     there.

14             THE COURT:  Uh-huh.  (Indicates affirmatively.)

15             MS. HAYDEN:  So it's not a huge group of people

16     we're trying to reach, but it looks like we'd have to go

17     back several years to catch that preemptive or

18     prescription period.

19             With that, I think that's a notice that's designed

20     to get to those folks, and we'd ask this Court to

21     approve that notice procedure.

22             THE COURT:  Counsel?

23             MR. LAWALL:  Your Honor, if I may.  Again,

24     Fran Lawall for the committee.  Just a couple of

25     clarifications.

1          One, there was a concern raised with respect to

2     residents who may be incompetent or unable to understand

3     the nature of the notice itself; and, therefore, the

4     debtor is going to send notice to any next of kin, as

5     well as if there is a formal guardian appointed to that

6     person.

7          So that notice is --

8          MS. HAYDEN:  To the extent we know that.

9          MR. LAWALL:  Right.

10         MS. HAYDEN:  I mean, we may not know that.

11         If that information was provided to us, we will

12    give that notice to whoever we were told that person

13    was.

14         MR. LAWALL:  And second, Your Honor, there was an

15    issue with respect to the 503(b)9 claims.

16         As you know, they're a bit of a strange claim,

17    because it is a prepetition unsecured claim which is not

18    affirmatively addressed in the notice.

19         THE COURT:  Uh-huh.  (Indicates affirmatively.)

20         MR. LAWALL:  I've spoken with debtors' counsel and

21    suggested that we simply make it, as done in many

22    jurisdictions, a box on the proof of claim which says,

23    "To the extent that this is an unsecured claim"; but for

24    administrative, that's what's being asserted, as opposed

25    to requiring an application for administrative expense

**Michael Musetta & Associates, Inc. (813) 221-3171**

```
1        and, you know, quite frankly, jamming up your docket.
2             THE COURT:  Uh-huh.  (Indicates affirmatively.)
3             MR. LAWALL:  So I think that was acceptable.
4             MR. NELIGAN:  Yes.  I think --
5             THE COURT:  Uh-huh.  (Indicates affirmatively.)
6             MR. NELIGAN:  Well, I think we can deal with the
7        administrative claims in the plan.  And I'm not sure we
8        were intending to go the 503(b)9 claimants, just
9        covering the prepetition claimants on this one.
10            We may do a separate notice for various
11       administrative claimants later.
12            MR. LAWALL:  And, Your Honor, this is not an issue
13       I would fight with the debtor on.  Just simply then
14       within --
15            THE COURT:  Uh-huh.  (Indicates affirmatively.)
16            MR. LAWALL:  Because of the way the bar date notice
17       is structured, it's ambiguous as to whether this
18       includes (b)9 claims or not, because it's all
19       prepetition claims.
20            THE COURT:  Uh-huh.  (Indicates affirmatively.)
21            MR. LAWALL:  And so whether there has to be
22       something in here that says, "This is not for 503(b)9
23       claims," because otherwise it creates this ambiguity.
24            That's all.
25            THE COURT:  Yes.
```

**Michael Musetta & Associates, Inc. (813) 221-3171**

1           MR. LAWALL:  My preference would be to just get it

2      all done administratively, but if the debtors are not

3      inclined to do it, then at least make clear this is not

4      for (b)9 claims.

5           THE COURT:  Mr. Neligan?

6           MR. NELIGAN:  Yes.  We can --

7           THE COURT:  I don't have a preference.

8           MR. NELIGAN:  I was going to suggest, you know, on

9      the one hand, we want to sort of get everybody and give

10     them notice, but I think there will be other

11     administrative claimants who we're going to need to give

12     notice to.

13          And I have an administrative order date within the

14     plan, and I was intending to send it out at that point.

15          THE COURT:  So you're opting for making some

16     clarification in --

17          MR. NELIGAN:  Absolutely.

18          THE COURT:  -- this that we're not dealing with the

19     503(b)9 claims?

20          MR. NELIGAN:  With the administrative claims or

21     503(b)9 claims.

22          MR. LAWALL:  And I can live with that, Your Honor.

23          THE COURT:  Okay.

24          MS. McCULLOCH:  And, Your Honor, I'll run that past

25     the committee to make sure they're agreeable when I

```
 1        change the language, so you'll know.
 2              THE COURT:  Let's do April 1st --
 3              MS. McCULLOCH:  Yes, Your Honor.
 4              MR. NELIGAN:  That makes sense.
 5              THE COURT:  -- just so we have sufficient time.
 6              There'll be a clarification that this doesn't
 7        involve 503(b)9 claims.
 8              MR. NELIGAN:  It's April 1st.
 9              THE COURT:  Mr. Neligan, anything else?
10              MR. NELIGAN:  I was only asking, is April 1st a
11        weekday?
12              MS. McCULLOCH:  I will make sure it's a weekday,
13        Your Honor.
14              MR. NELIGAN:  Whether --
15              MS. McCULLOCH:  Well, also, Mr. Neligan did point
16        out that it was April Fool's Day.  Perhaps --
17              THE COURT:  It is April Fool's Day, but it's a
18        Wednesday.
19              MR. NELIGAN:  Oh, got it.
20              THE COURT:  So it's a real day.
21              MS. McCULLOCH:  Would you prefer April 2nd so that
22        we don't make fools out of anybody?
23              MR. NELIGAN:  No, no.  No, that's fine.
24              MS. McCULLOCH:  I think April 1st is a better date.
25              THE COURT:  Yes.
```

1          MR. NELIGAN:  I think for any bankruptcy case

2      April 1 is a good date.

3          THE COURT:  Yes.  Yes.  I mean, if you get past

4      April 1, April 3rd is Good Friday, which around here is

5      a holiday.

6          MS. McCULLOCH:  Right.  So let's --

7          THE COURT:  So it's --

8          MR. NELIGAN:  And in most places, it is.

9          The only correction is that, as I understand it,

10     we're going to do the hearing for the state, you know,

11     depending on their statute of limitations.

12         MS. McCULLOCH:  Uh-huh.  (Indicates affirmatively.)

13         MR. NELIGAN:  And I don't know if those are six

14     years, or I think some are two years or four years.  And

15     so we've looked at that, and we'll just follow up on a

16     state-by-state basis.

17         THE COURT:  Okay.

18         MR. NELIGAN:  Just --

19         THE COURT:  All right.  The Court grants the motion

20     and will set April 1st.

21         It will not cover 503(b)9 claims.

22         Ms. Hayden, you may submit the order.

23         MR. NELIGAN:  Thank you.

24         MS. HAYDEN:  Thank you, Your Honor.

25         MR. LAWALL:  Thank you, Your Honor.

1          THE COURT:  All right.  I think we are left with

2     the ombudsman matters, and those cases are starting on

3     page 4 of the calendar.

4          14-51101 SA-St. Petersburg, LLC.

5          MR. NELIGAN:  Your Honor -- oh, go ahead.

6          THE COURT:  14-51102, SA-Clewiston, LLC; and

7     14-51103, SA-Lakeland, LLC.

8          MR. NELIGAN:  Your Honor, I know that Mr. Muenker

9     has handled this, and he and Mr. Lawall have been

10     discussing the best procedure.

11          As we pointed out, there is an ombudsman program in

12     Florida.  We've been communicating with their ombudsman

13     program.  Each of those facilities has their own

14     ombudsman who are making inspections and, you know,

15     reporting back, and we've forwarded those reports to

16     Mr. Lawall.

17          I know that the committee had requested that we

18     provide or have the ombudsman provide certain reports

19     which we would share with the committee --

20          THE COURT:  Uh-huh.  (Indicates affirmatively.)

21          MR. NELIGAN:  -- and my understanding is that

22     there's a general agreement on -- from the ombudsman's

23     office to provide those reports.

24          I am not sure that we have agreed exactly on the

25     form that will be used, but certainly, from our

1    standpoint, we're doing everything we can to cooperate

2    with the committee, but it is clear to us that the

3    ombudsman program in Florida is working and is an

4    ongoing process.

5         THE COURT:  And there was an objection that was

6    filed.

7         MR. LAWALL:  There was, Your Honor, and I thought

8    that this matter was going to get moved to the 10th.

9         THE COURT:  Okay.

10        MR. LAWALL:  There have been some ongoing

11   communications between myself and Mr. Muenker.  I

12   actually didn't -- it has not been conveyed to me that

13   the ombudsman office would be able to use the general

14   form of report I've seen in many jurisdictions as a

15   reporting.

16        THE COURT:  Uh-huh.  (Indicates affirmatively.)

17        MR. LAWALL:  So that may well be the case.

18        I don't know.  I know that there are other folks

19   who have suggested having an independent nurse come

20   through and review on a periodic basis.

21        THE COURT:  Uh-huh.  (Indicates affirmatively.)

22        MR. LAWALL:  That source I had asked to come

23   forward and said, "Can they do the report, and what

24   would be the cost?"  The information has not come in

25   complete to me yet.  My only suggestion is that, if the

1          debtors believe that this is working from their side,

2          then just continue this until the 10th, and let's see if

3          I can get some additional information and if I can also

4          get some further clarification.

5                    MR. NELIGAN:  That's fine.

6                    THE COURT:  Any objection to continuing?

7                    MR. NELIGAN:  No.  No, not at all.  In fact, we

8          will push this over to the 10th as well.

9                    THE COURT:  Okay.  The ombudsman motion in those

10         cases is continued to February 10th.  The status

11         conferences set in those cases are discharged.

12                   MR. NELIGAN:  Okay.

13                   MR. LAWALL:  Okay.  Thank you, Your Honor.

14                   MR. NELIGAN:  Thank you, Your Honor.

15                   THE COURT:  Anything else?

16                   MR. NELIGAN:  No, Your Honor.  I don't think so.

17                   THE COURT:  All right.  Have a good trip back.

18                   MR. NELIGAN:  Thank you.

19                   MR. LAWALL:  Thanks, Judge.

20                   MS. McCULLOCH:  Thank you, Your Honor.

21                   THE COURT:  Thank you.

22                   We'll take a brief recess and take up

23         Cajun Electric when they're done with the 341 meeting.

24                   (Proceedings concluded.)

25

1                        REPORTER'S CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6            I, Courtney N. Langhoff, Registered Professional
     Reporter, certify that I was authorized to and did transcribe
     the foregoing proceedings, and that the transcript is a true
7    and complete record of the audio that I was provided.

8

9            I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor am
     I a relative or employee of any of the parties' attorney or
10   counsel connected with the action, nor am I financially
     interested in the action.

11

12

13           Dated this 6th day of February, 2015.

14

15

16                  Courtney N. Langhoff, RPR

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5
            I, Courtney N. Langhoff, Registered Professional
6    Reporter, certify that I was authorized to and did transcribe
     the foregoing proceedings, and that the transcript is a true
7    and complete record of the audio that I was provided.

8
            I further certify that I am not a relative,
9    employee, attorney, or counsel of any of the parties, nor am
     I a relative or employee of any of the parties' attorney or
10   counsel connected with the action, nor am I financially
     interested in the action.

11

12
            Dated this 6th day of February, 2015.
13

14

15                    _____

16                    Courtney N. Langhoff, RPR

17

18

19

20

21

22

23

24

25

**$**

**$2 (1)**
32:10
**$2.5 (2)**
30:17;32:8
**$3 (1)**
30:15
**$60 (1)**
18:5

**A**

**ability (1)**
9:8
**able (5)**
11:5;15:6;26:17;
33:7;52:13
**Absolutely (1)**
48:17
**acceptable (2)**
41:11;47:3
**acceptances (1)**
40:18
**accomplish (1)**
13:10
**accomplished (1)**
32:20
**accordance (1)**
27:1
**accounting (1)**
26:23
**accurate (1)**
26:17
**active (1)**
44:20
**actual (2)**
9:13,14
**actually (3)**
29:16;45:8;52:12
**addition (2)**
6:12;8:12
**additional (7)**
12:13,16;21:25;
29:10;31:5;38:8;53:3
**address (1)**
8:17
**addressed (1)**
46:18
**adjusted (1)**
18:24
**administrative (10)**
14:17;30:22,24;
46:24,25;47:7,11;
48:11,13,20
**administratively (1)**
48:2
**ADR (3)**
23:12,13,18
**ADR-type (1)**
23:6
**advise (2)**

15:6;17:14
**Advocate (1)**
44:6
**Advocates (1)**
44:6
**affairs (1)**
26:18
**affect (1)**
37:4
**affirmatively (65)**
6:1,5,18;7:8;8:3,
15;9:20;10:24;11:11,
18;12:2;13:12;14:2,
13,24;15:11,20;
16:13;17:6;18:10,18;
19:3;20:8;21:2,9;
22:9;24:9;25:9;
26:20;27:22;28:7,20,
25;29:18;30:9,16;
31:2,16;35:12;37:2,6,
17;38:21;39:6;41:4;
42:6,9;43:1,9,18,22;
44:10,18;45:4,14;
46:18,19;47:2,5,15,
20;50:12;51:20;
52:16,21
**again (9)**
7:6,9;11:23;13:25;
16:17;17:14,17;18:7;
45:23
**against (1)**
25:3
**aggressive (1)**
32:15
**ago (2)**
20:14;30:19
**agree (5)**
28:16;35:5;39:18,
19;40:2
**agreeable (3)**
4:16,17;48:25
**agreed (8)**
14:19;31:24,25,25;
32:1;34:15;36:3;
51:24
**agreement (13)**
10:6;11:4;13:6;
31:6,10;32:4,5,18;
33:7;34:15;38:24;
39:24;51:22
**AGUILLARD (6)**
41:16,19,22;42:12,
17,19
**Aguillard's (1)**
42:5
**ahead (4)**
20:20;21:5;35:17;
51:5
**Alice (1)**
42:17
**allocated (1)**
10:7
**allocation (2)**

10:4;16:16
**allow (2)**
9:23;12:18
**allowing (1)**
21:6
**along (3)**
11:9;14:20;18:17
**although (2)**
15:12;18:3
**always (3)**
26:25;28:5;29:23
**ambiguity (1)**
47:23
**ambiguous (1)**
47:17
**amend (3)**
30:25;32:3;34:12
**amended (3)**
39:4;40:16,24
**amendment (1)**
34:16
**amount (4)**
10:16;11:15;25:10;
30:15
**analysis (6)**
15:2,4,6,14;18:21,
22
**announced (1)**
8:23
**anticipate (1)**
22:2
**anticipated (1)**
32:2
**anticipation (2)**
20:12;36:22
**Antonio (1)**
8:8
**apologize (1)**
41:8
**apparently (1)**
44:7
**appearance (1)**
41:13
**appearances (1)**
5:8
**appears (1)**
6:3
**application (1)**
9:2;15:1;46:25
**appointed (4)**
14:4,8;17:2;46:5
**appointment (1)**
17:9
**appreciate (4)**
21:6,15;28:4;32:25
**appropriate (4)**
16:16;17:24;18:13;
29:12
**approval (1)**
39:12
**approve (5)**
41:2;44:22,23,23;
45:21

**approved (4)**
20:13;30:14;39:8,9
**approximately (2)**
30:17;32:10
**April (12)**
43:4;49:2,8,10,16,
17,21,24;50:2,4,4,20
**arbitration (1)**
23:25
**around (2)**
15:13;50:4
**asserted (2)**
45:3;46:24
**asset (1)**
29:25
**assigned (1)**
15:2
**assure (2)**
24:12;25:20
**Atlanta (1)**
44:3
**attempting (1)**
35:6
**attend (1)**
41:14
**authority (1)**
42:23
**available (1)**
42:11
**avoid (1)**
34:2
**aware (2)**
10:12;16:22

**B**

**b9 (2)**
47:18;48:4
**back (12)**
4:15;8:16;11:3,3;
13:4;22:11;23:21;
37:18;42:13;45:17;
51:15;53:17
**balance (1)**
19:25;21:4
**balancing (1)**
20:23
**bankruptcy (3)**
7:11;32:15;50:1
**bar (8)**
13:10,11;18:3;
41:2;42:23;44:16,16;
47:16
**based (2)**
16:15;27:25
**basically (1)**
28:5
**basis (2)**
50:16;52:20
**Baton (1)**
44:8
**begin (1)**
15:5

**beginning (5)**
19:2;20:5,12;
21:16;24:19
**begun (1)**
14:10
**behalf (5)**
5:11,19;33:22;
38:19
**behind (3)**
21:8;22:18;38:8
**beneficiaries (1)**
9:15
**benefit (2)**
16:10;37:16
**best (1)**
51:10
**better (2)**
12:5;49:24
**bids (1)**
9:6
**big (2)**
8:25;20:3
**billed (1)**
37:14
**bit (2)**
14:6;46:16
**book (1)**
26:16
**borrowers (1)**
30:23
**both (2)**
10:4;37:4;44:6
**bound (1)**
44:16
**box (1)**
46:22
**brief (1)**
53:22
**bring (2)**
21:13;32:7
**broker (3)**
9:1,3,25
**budget (10)**
13:1;31:24;37:10,
12;38:17;39:5,8,14,
25;40:3
**building (1)**
9:14
**bulk (1)**
7:23
**business (1)**
31:18
**buy (2)**
9:23,23
**buyers (1)**
9:23
**buying (1)**
10:2

**C**

**Cajun (6)**
41:18,24;42:2,8,

18;53:23
**calendar (5)**
5:3,5;6:3;35:19;
51:3
**call (2)**
19:9,18
**calls (3)**
9:10;20:18;22:10
**came (1)**
37:9
**can (33)**
9:9;11:16,25;13:8,
17;19:8,14;20:20;
23:20,23;24:12;25:4,
20,24;29:9,16;31:10;
33:5;34:19;35:6,19,
21;38:6;41:14;42:12,
15;47:6;48:6,22;
52:1,23;53:3,3
**cap (1)**
19:2
**Care (4)**
5:4;7:2,3;27:19
**carried (1)**
28:5
**Carthage (1)**
44:9
**carve-out (1)**
31:25
**case (26)**
4:13,18;5:1;6:6;
11:16;14:4;16:20,23;
18:4,16;19:2,25;
20:3;21:16;23:9;
25:8;29:11,25;32:11,
16,20,24;33:2;34:7;
50:1;52:17
**cases (21)**
4:3,20,21,23;11:2;
13:14;15:13;17:21;
22:23;23:17;25:8;
28:2,2,6,10,15,15;
29:16;51:2;53:10,11
**cash (9)**
10:16;13:3;18:21,
22;27:18;31:18;37:8,
12;38:2
**cash-flow (1)**
8:22
**catch (1)**
45:17
**categories (2)**
4:18;43:11
**cause (1)**
43:3
**CBIZ (2)**
15:1;20:15
**Cerone (1)**
5:14
**certain (4)**
9:15,16;16:12;
51:18
**certainly (9)**

8:21;9:9;10:25;
11:9,20;14:19;25:6,
21;51:25
**chambers (1)**
24:11
**chance (1)**
28:12
**change (1)**
49:1
**changed (1)**
18:23
**CHC-CLP (1)**
5:6
**CHC-SPC (1)**
5:7
**checked (1)**
30:19
**choice (1)**
20:6
**Citrus (1)**
8:5
**claim (5)**
45:3;46:16,17,22,
23
**claimants (12)**
10:11;16:24;18:6;
20:24,25;23:4;43:24;
44:25;47:8,9,11;
48:11
**claims (16)**
18:6,15;23:21;
25:3;38:6;46:15;
47:7,18,19,23;48:4,
19,20,21;49:7;50:21
**clarification (3)**
48:16;49:6;53:4,4
**clarifications (1)**
45:25
**clarify (1)**
27:9
**clear (5)**
25:13;32:13;38:7;
48:3;52:2
**CLERK (1)**
29:8
**clerk's (1)**
29:14
**Clewiston (2)**
8:18;26:7
**client (1)**
42:5
**clients (3)**
9:11;10:1;37:5
**closed (2)**
45:7,11
**collateral (6)**
30:22;31:14,17;
38:25;39:2,9
**comfortable (1)**
26:13
**coming (1)**
28:14
**commitment (1)**

10:16
**committee (33)**
5:14;9:4,5;10:13,
14,15,17,19;11:1,21,
24;14:1,4;15:8;
17:15;20:4,21;21:1,
10;24:19;25:7;29:25;
31:22;32:4;33:7,23;
37:9;44:20;45:24;
48:25;51:17,19;52:2
**committee's (6)**
12:1;17:7;19:11;
24:15;34:22;43:20
**communicating (1)**
51:12
**communications (1)**
52:11
**compensation (1)**
12:23
**complete (3)**
10:21;21:23;52:25
**completed (1)**
11:21
**completely (1)**
35:5
**complex (4)**
14:11;16:15;17:5,
17
**complexity (3)**
16:20;20:3;21:19
**complicated (1)**
7:25
**concept (1)**
39:4
**concern (1)**
46:1
**concerned (2)**
14:21;34:6
**concerns (2)**
20:25,25
**concluded (1)**
53:24
**conduct (1)**
41:10
**conducting (1)**
22:3
**conference (22)**
4:13,20,22;5:1,9,
22;7:7,22;13:21;
26:2,6,9,14;27:21,24;
28:9,18,23;35:3,22,
24;36:12
**conferences (9)**
4:12;5:25;7:17;
28:14,17,22;29:15,
17;53:11
**connection (2)**
18:19;19:1
**consensual (4)**
11:7,10;18:12;
25:23
**consideration (3)**
15:9;17:25;18:13

**considering (1)**
30:20
**consists (1)**
31:17
**consolidating (1)**
29:9
**constituencies (1)**
17:16
**constituents (1)**
20:23
**constructive (1)**
20:23
**continue (10)**
21:14;22:21;33:5;
34:21;35:13,14,18,
21;40:25;53:2
**continued (3)**
29:4;34:10;53:10
**continuing (2)**
35:20;53:6
**control (3)**
17:3,4;29:17
**controlling (1)**
9:19
**conveyed (1)**
52:12
**cooperate (4)**
10:19;24:8;25:7;
52:1
**cooperation (3)**
12:1;17:13;22:23
**cooperative (1)**
22:20
**correction (1)**
50:9
**correctly (1)**
10:17
**cost (1)**
52:24
**Counsel (9)**
5:8;21:13;22;
21:10;22:19;32:25;
39:17;45:22;46:20
**County (2)**
44:8,12
**couple (4)**
8:10;24:7;26:2;
45:24
**course (3)**
5:25;18:7;29:13
**COURT (185)**
4:2,5,8,14,16,17;
5:1,18,21;6:1,5,18;
7:8,12,15,17,21;8:3,
11,15;9:20;10:12,24;
11:3,11,18;12:2,5,8,
10,17,22,25;13:12,
15,20;14:2,7,13,24;
15:7,11,20;16:13;
17:6,15;18:10,18;
19:3;20:8;21:2,9,15;
22:6,9,25;23:2,6,9,
16,20,22,23,24;24:1,

4,9;25:9,25;26:20;
27:16,22;28:4,7,11,
20,25;29:6,9,11,19;
30:6,9,16;31:2,16;
32:22;33:1,15,18,21,
24;34:2,9,21;35:1,8,
12,17;36:1,4,7,10,14,
16,19,21;37:2,6,17;
38:10,13,13,21;39:6,
12,14,17,22,25;40:2,
9,13,16,22,24;41:4,7,
10,12,13,18,20;42:1,
6,9,14,21;43:1,9,18,
22;44:10,14,18,19,
22;45:4,14,20,22;
46:19;47:2,5,15,20,
25;48:5,7,15,18,23;
49:2,5,9,17,20,25;
50:3,7,17,19,19;51:1,
6,20;52:5,9,16,21;
53:6,9,15,17,21
**Court's (1)**
6:2
**cover (1)**
50:21
**covering (1)**
47:9
**create (1)**
19:25
**created (2)**
14:12;15:5
**creates (2)**
19:8;47:23
**credit (2)**
38:24;39:24
**creditor (2)**
43:7,8
**creditors (10)**
10:10;16:23;18:2,
13;25:15,21,22;
43:25;44:16,25
**creditor's (2)**
29:25;31:22
**currently (3)**
8:21,21;43:16
**Cypress (4)**
5:4;7:2,3;9:17

## D

**data (1)**
24:16
**date (16)**
13:10,11;18:3;
19:17;27:25;28:16;
31:4;34:23;35:13,20;
41:2;44:17;47:16;
48:13;49:24;50:2
**dates (4)**
28:23,24;42:23;
43:4
**day (6)**
11:24;25:6;27:13;

49:16,17,20
**days (1)**
30:19
**days' (1)**
42:25
**deadline (1)**
20:10
**deadlines (1)**
9:6
**deal (4)**
11:14;25:19;28:6;
47:6
**dealing (2)**
32:18;48:18
**deals (1)**
25:15
**dealt (2)**
25:4;38:6
**debt (1)**
18:4
**debtor (16)**
5:16;14:9,9;15:7;
16:10,17;19:5;22:20;
24:7;30:20;31:21;
32:5;38:9;39:2;46:4;
47:13
**debtors (13)**
5:12,20;6:9;16:7;
17:19,22;19:13;
26:12;29:23;37:14;
44:6;48:2;53:1
**debtors' (4)**
17:13;21:19;22:19;
46:20
**December (2)**
14:25;18:23
**decided (2)**
23:12;25:1
**default (1)**
33:8
**depending (1)**
50:11
**describe (1)**
14:10
**described (1)**
15:23
**designed (2)**
44:24;45:19
**determination (1)**
33:6
**determine (1)**
17:24
**determined (2)**
26:13;44:11
**different (6)**
6:7;10:1;15:16;
26:25;37:13;43:12
**difficult (2)**
7:20,21
**diligence (13)**
9:8;10:15,18,21;
11:22;14:23;15:4,6;
17:11;20:7,11,16;

22:3
**DIP (33)**
4:19;12:12;13:6;
19:1,4,10,12,14,18,
21,23;20:13;22:15;
30:8,11,11,11,14,18;
31:1,13,15,20;32:3,9,
18;33:19,23;34:12,
16,17;38:19;40:7
**discharged (1)**
53:11
**disclosed (1)**
30:13
**disclosure (1)**
7:5
**discovery (1)**
24:12
**discuss (2)**
28:12,17
**discussed (2)**
9:21;37:8
**discussing (1)**
51:10
**discussion (1)**
28:18
**discussions (4)**
10:22;22:16;31:3;
32:11
**dispositions (2)**
17:20,23
**dispute (1)**
11:14
**disputes (1)**
21:13
**district (1)**
23:23
**docket (2)**
29:3;47:1
**documentation (1)**
10:20
**documents (6)**
20:18,19;22:12;
24:17,18;31:7
**dollars (1)**
25:12
**done (11)**
19:20;20:11;27:24;
28:4;37:19,22;38:5;
42:17;46:21;48:2;
53:23
**dormant (1)**
6:15;7:2
**double-check (2)**
4:9;43:21
**down (2)**
10:3;32:6
**downstairs (1)**
42:12
**drafted (1)**
10:8
**DRP (1)**
19:6
**due (14)**

9:8;10:14,18,21;
11:22;14:23;15:3,5;
17:10;20:7,11,16;
22:3;30:18
**dynamics (1)**
21:19

**E**

**early (1)**
23:9
**easier (1)**
29:5
**echo (1)**
29:21
**economic (3)**
14:10;16:10,19
**economics (1)**
16:8
**effectively (2)**
15:3;16:9
**efficiently (1)**
17:13
**effort (1)**
31:10
**efforts (1)**
32:25
**either (3)**
6:13;9:23;35:4
**elect (1)**
23:20
**Electric (6)**
41:18,24;42:2,8,
18;53:23
**else (7)**
13:20;29:19;32:23;
41:20,20;49:9;53:15
**employ (1)**
9:2
**Employees (2)**
43:12;45:2
**encore (1)**
8:2,4
**end (6)**
11:24;14:25;19:18,
18;25:6;27:13
**endeavored (2)**
10:19;24:8
**ended (1)**
25:17
**enough (2)**
9:7;19:25
**entertain (1)**
14:20
**entities (34)**
6:3,7,13,13,15,16,
20,21,24,24,25;7:1,6,
10,13;8:7,7,13,17,18,
20,23;10:8;15:17,18;
16:1;18:1;24:21;
25:2;26:25;27:6;
38:4,4;39:3
**entity (5)**

6:22;8:5,13;26:7;
27:15
**envision (1)**
24:1
**equity (2)**
14:18;16:1
**essentially (1)**
10:9
**estate (5)**
9:22,24;10:3,5,5
**estates (1)**
30:23
**estimate (1)**
17:19
**estimated (1)**
18:3
**even (5)**
10:22;16:14,25;
18:22;45:8
**everybody (7)**
4:4;24:19;32:19;
42:16;43:6,7;48:9
**everybody's (1)**
29:22
**everyone (1)**
22:22
**exactly (3)**
17:11;39:16;51:24
**example (1)**
15:21;24:24
**exchanged (1)**
20:18
**exclusivity (6)**
4:20;11:5;12:11;
40:13,17,25
**Excuse (1)**
33:13
**exist (3)**
14:11,22;17:3
**existing (1)**
38:24
**expand (1)**
30:21
**expanding (1)**
32:1
**expense (1)**
46:25
**expenses (5)**
12:21;16:12;30:23,
24;39:3
**explain (1)**
21:7
**explanation (1)**
27:20
**expressed (1)**
29:21
**extend (1)**
40:24
**extent (4)**
38:3;43:13;46:8,23
**extreme (1)**
20:4
**extremely (1)**

22:20

**F**

**facilitate (3)**
31:19;32:18;34:8
**facilities (10)**
6:10;7:9,10;8:25;
9:12,13;24:23;25:1,
17;51:13
**fact (3)**
17:18;44:24;53:7
**fair (1)**
18:16
**fairly (1)**
28:6
**family (2)**
9:16,16
**far (8)**
7:22;12:10;13:21;
21:18,25;22:3;26:22;
30:1
**February (2)**
12:6,10;33:5;
35:15;36:12,16;
40:22;25;53:10
**federal (2)**
23:22,23
**fee (1)**
38:1
**fees (4)**
12:20;38:2,4,4
**few (1)**
30:19
**fight (1)**
47:13
**file (7)**
11:20;26:10;34:18;
35:11;36:18,21,24
**filed (9)**
7:14;8:25;15:1;
17:21;26:2;30:11;
33:23;35:25;52:6
**filing (7)**
8:1,9;9:2;11:6;
26:13;27:25;40:17
**filings (3)**
7:19;28:24;29:12
**final (13)**
8:1;13:8;20:13;
30:11,14;32:7;33:6,
19;38:17,23;39:4,24;
40:4
**finalization (1)**
39:14
**financial (4)**
14:11;15:2;16:21;
26:18
**financing (7)**
5:16;12:12,16;
18:20;30:15;32:18;
40:7
**fine (4)**

39:7;42:3;49:23;
53:5
**firm (1)**
20:16
**first (3)**
5:1,23;8:17
**first-day (1)**
8:24
**fix (1)**
42:23
**flavor (3)**
15:15,19;21:7
**Florida (9)**
6:11;8:6,19,19,20;
44:3,5;51:12;52:3
**flow (6)**
13:3;15:10;18:21,
22;30:1;37:12
**flows (1)**
16:11
**focus (1)**
36:5
**focused (2)**
34:13,13
**folks (6)**
15:15;20:15;43:11;
45:12,20;52:18
**follow (1)**
50:15
**followed (1)**
17:25
**fools (1)**
49:22
**Fool's (2)**
49:16,17
**form (3)**
27:7;51:25;52:14
**formal (1)**
46:5
**formerly-operating (1)**
6:10
**former-operating (1)**
6:12
**Fort (1)**
8:6
**forth (1)**
14:18
**forward (14)**
11:2,8;13:7,14,23;
20:17,22;22:23;
25:16;28:5,13;32:25;
33:8;52:23
**forwarded (1)**
51:15
**Fountain (2)**
6:20;26:5
**four (3)**
17:18,22;50:14
**frame (1)**
11:5
**Fran (3)**
5:14;14:1;45:24
**frankly (6)**

15:17;17:10;21:11;
24:13;34:6;47:1
**Friday (1)**
50:4
**front (2)**
10:6;21:13
**full (1)**
7:5
**fuller (1)**
21:23
**funding (1)**
31:5
**further (5)**
22:10;29:15,16;
41:13;53:4
**future (1)**
28:1

## G

**Gail (1)**
5:10
**Garden (10)**
6:10,12,16,17;8:5;
24:11,25;25:2;26:3;
45:10
**general (4)**
13:21;45:1;51:22;
52:13
**generally (1)**
37:15
**generated (2)**
27:25;28:23
**gentlemen's (1)**
37:4
**Georgia (3)**
7:6;28:15;44:3
**given (5)**
16:25;19:23;20:4;
25:16;32:13
**giving (2)**
21:6,25
**glad (1)**
7:23
**global (3)**
27:8,11;28:19
**globally (1)**
27:18
**goal (2)**
11:7;25:14
**Good (10)**
5:13;13:25;24:13;
28:9;29:24;31:10;
44:21;50:2,4;53:17
**grant (1)**
38:13
**granted (1)**
15:9
**granting (1)**
40:4
**grants (1)**
50:19
**great (1)**

35:23
**group (8)**
6:9;16:25;26:3,4;
27:8;28:6;37:20;
45:15
**groups (2)**
26:3;27:2
**guardian (1)**
46:5
**guess (3)**
7:5,7;9:15

## H

**hand (1)**
48:9
**handle (2)**
13:16;41:6
**handled (4)**
23:13,14;27:7;51:9
**hands (1)**
20:21
**happy (2)**
31:19;42:10
**Harold (1)**
44:4
**Harris (1)**
30:12
**haste (1)**
20:16
**HAYDEN (21)**
5:19,19;13:16;
41:5,7,8,15;42:21,22;
43:2,10,19,23;44:11,
19;45:5,15;46:8,10;
50:22,24
**head (1)**
15:3
**Health (3)**
5:4;7:2,3
**hear (1)**
36:14
**heard (4)**
9:25;13:8;14:5;
32:23
**hearing (11)**
8:24;12:11;13:16;
31:9;33:4;34:18,19;
35:9;41:17,25;50:10
**hearings (3)**
10:13;26:6;30:12
**held (2)**
30:12;35:10
**help (2)**
31:19;34:8
**helped (1)**
24:14
**helpful (1)**
21:24
**helps (1)**
14:6
**Hi (1)**
42:22

**hold (1)**
15:25
**holdback (1)**
12:20
**Holding (1)**
5:6
**Holdings (5)**
4:3;5:4;6:4,8;7:3
**holiday (1)**
50:5
**home (2)**
45:2,3
**homes (5)**
17:21;43:12;44:12;
45:7,9
**Honestly (2)**
43:2;45:5
**Honor (62)**
4:11;5:11,13,15,
24;12:7,24;13:25;
14:3,25;16:22;17:20;
18:25;19:17;20:2,11;
21:6,11;22:5,13;23:1,
8,10;24:3;26:1;
29:20;30:3,7,10;
31:8;33:14;34:11;
35:2;36:17;37:1,3;
38:12,16,18;39:18;
40:23;41:1,8,16;42:3,
20;45:23;46:14;
47:12;48:22,24;49:3,
13;50:24,25;51:5,8;
52:7;53:13,14,16,20
**hope (2)**
22:21;32:17
**hoped (1)**
20:12
**hopeful (1)**
25:23
**hopefully (3)**
10:4;11:4,25
**hoping (2)**
18:11;22:10
**housekeeping (1)**
29:1
**huge (1)**
45:15

## I

**iceberg (1)**
21:17
**idea (1)**
18:9
**identified (4)**
15:16;43:7,10;44:2
**Illinois (1)**
8:8
**imagine (1)**
20:20
**impacting (1)**
19:10
**impacts (1)**

19:8
**imperil (1)**
31:14
**imperiling (1)**
31:20
**imply (1)**
39:21
**important (1)**
21:8
**impossible (1)**
19:21
**Inc (1)**
5:7
**inclined (1)**
48:3
**include (1)**
7:2
**included (2)**
7:5;30:25
**includes (1)**
47:18
**including (2)**
23:3;27:9
**incompetent (1)**
46:2
**incredibly (1)**
17:17
**independent (1)**
52:19
**indicated (1)**
14:15
**Indicates (64)**
6:1,5,18;7:8;8:3,
15;9:20;10:24;11:11,
18;12:2;13:12;14:2,
13,24;15:11,20;
16:13;17:6;18:10,18;
19:3;20:8;21:2,9;
22:9;24:9;25:9;
26:20;27:22;28:7,20,
25;29:18;30:9,16;
31:2,16;35:12;37:2,6,
17;38:21;39:6;41:4;
42:6,9;43:1,9;18,22;
44:10,18;45:4,14;
46:19;47:2,5,15,20;
50:12;51:20;52:16,
21
**indication (1)**
32:14
**indirectly (2)**
9:17;19:6
**individuals (1)**
45:1
**information (7)**
17:14;29:23,24;
30:1;46:11;52:24;
53:3
**infusing (1)**
27:17
**initially (1)**
23:11
**injury (4)**

16:24;18:6,15;
20:24
**insider (3)**
19:4,12;30:13
**insiders (1)**
16:18
**inspections (1)**
51:14
**instance (3)**
24:22;37:22;45:10
**intend (1)**
8:24;43:5
**intending (2)**
47:8;48:14
**intercompany (1)**
38:6
**interest (6)**
7:24;9:18,19;
16:19;19:5;20:24
**interested (2)**
9:11;10:1
**interests (1)**
20:1
**interim (9)**
12:22,22;30:11;
37:5,10,12;38:1,11,
14
**internal (2)**
20:10;22:4
**interrelationships (3)**
14:22;16:21;17:1
**interrupt (1)**
41:23
**into (8)**
19:6,7;23:12;25:8;
27:18,23;42:25;43:4
**Investment (1)**
9:1
**involve (1)**
49:7
**involved (2)**
31:3;42:2
**issue (5)**
11:13;37:4;43:24;
46:15;47:12
**issues (8)**
9:5;13:5,19;21:23;
26:22;30:4;31:6;
37:23
**issuing (1)**
19:12

**J**

**Jackson (3)**
5:2;6:20;26:4
**jam (2)**
10:25;35:7
**jamming (1)**
47:1
**Jan (1)**
5:19
**January (2)**

20:12;22:8
**job (1)**
44:21
**jointly-administered (1)**
26:4
**Journal-Constitution (1)**
44:3
**Judge (2)**
34:25;53:19
**jump-start (1)**
24:14
**jurisdiction (1)**
23:23
**jurisdictions (2)**
46:22;52:14

**K**

**Kansas (1)**
8:9
**keep (2)**
21:10;35:19
**kin (1)**
46:4
**kind (6)**
15:9;21:3;26:21;
27:11;28:16;36:2
**known (1)**
8:2

**L**

**laid (1)**
21:25
**Lakeland (1)**
8:19
**landlord (6)**
9:14,18;11:13;
24:11,25;25:4
**language (1)**
49:1
**large (1)**
28:6
**last (1)**
30:18
**late (1)**
14:4
**later (1)**
47:11
**LAWALL (58)**
5:13,14,23;13:25;
14:1,3,8,14,25;15:12,
21;16:14;17:7;18:11,
19;19:4;20:9;21:3,
10;22:4,7,10;23:1;
32:6;33:16,22;34:3,
17,25;35:2,9,13;37:3,
7,18;39:18;40:15,21;
45:23,24;46:9,14,20;
47:3,12,16,21;48:1,
22;50:25;51:9,16;
52:7,10,17,22;53:13,
19

**lawyer (1)**
31:12
**lawyers (2)**
9:10;10:1
**lease (4)**
9:13;16:6,6,9
**least (6)**
13:13;20:9;28:6;
31:9;37:25;48:3
**leaves (2)**
4:2;41:1
**left (1)**
51:1
**legal (1)**
15:16
**lender (11)**
5:17;13:7;18:25;
19:1,5,14,23;30:8;
31:13;32:10;38:19
**lessor (1)**
16:4
**level (1)**
20:2
**liability (1)**
25:3
**limitations (1)**
50:11
**line (1)**
13:13
**lines (1)**
14:20
**liquidating (5)**
10:10;18:14;23:3,
4;24:2
**liquidation (1)**
18:8
**list (2)**
7:4,6
**listed (1)**
43:11
**lists (1)**
6:21
**litigants (3)**
28:13;29:6;42:11
**litigated (2)**
21:23;36:23
**litigation (6)**
11:15;25:8,22;
27:5;29:7;36:9
**little (2)**
7:20;14:6
**live (1)**
48:22
**Living (1)**
9:1
**LLC (5)**
5:3,4;51:4,6,7
**loan (5)**
30:18;31:4,15,20;
32:3
**loaned (1)**
32:8
**located (3)**

6:11;8:8;44:13
**location (1)**
6:22
**long (3)**
15:13;22:23;35:23
**look (4)**
20:2;25:20;37:18;
45:5
**looked (3)**
17:8;44:2;50:15
**Looking (1)**
15:21;27:14
**looks (2)**
35:9;45:16
**lot (4)**
20:19;21:16,17;
23:17
**Louisiana (8)**
4:3;6:4,8,9,19;
8:13;43:16;45:7
**Louisville (1)**
26:8

**M**

**mailing (1)**
43:6
**mainly (1)**
43:23
**majority (1)**
17:7
**makes (5)**
7:19,21;16:6;25:7;
49:4
**making (3)**
30:1;48:15;51:14
**manage (1)**
7:21
**Management (1)**
7:3
**manner (1)**
11:10
**Manor (3)**
5:2;6:20;26:4
**manual (1)**
29:17
**many (5)**
16:1;45:9,12;
46:21;52:14
**map (1)**
13:22
**March (3)**
13:11;40:17;42:24
**master (1)**
16:4
**matrix (1)**
43:6
**matter (3)**
29:2;45:12;52:8
**matters (6)**
12:12;25:14;33:3;
35:18,20;51:2
**maturity (1)**

31:4
**maximize (1)**
10:2
**maximum (1)**
9:9
**may (23)**
5:21;14:3,5;15:1;
16:1;18:25;19:18;
24:10,25;25:2;27:4;
30:10;34:11;37:22;
39:7;40:18;45:3,23;
46:2,10;47:10;50:22;
52:17
**McCULLOCH (39)**
4:4,6,9,11,15,24;
5:10,10;24:4;25:25;
26:1,21;27:13,17,23;
28:8;21:29:1,18,19,
20;37:21;38:10,12;
41:23;42:1,3,7,10,20;
48:24;49:3,12,15,21,
24;50:6,12;53:20
**mean (3)**
27:4;46:10;50:3
**meeting (3)**
41:11,14;53:23
**members (1)**
21:1
**mention (1)**
38:19
**mentioned (1)**
23:3
**merits (1)**
36:14
**met (1)**
14:8
**MEZ (4)**
5:16;30:8,13;39:2
**Miami (1)**
44:4
**middle (1)**
21:3
**might (2)**
4:11;15:10
**million (5)**
18:5;30:15,17;
32:8,10
**millions (1)**
25:11
**mind (1)**
36:17
**missing (1)**
22:12
**moment (4)**
8:16;17:9;18:9;
22:19
**money (4)**
25:10,22;27:15,15
**month (1)**
11:21
**monthly (3)**
12:18,19;26:24
**months (1)**

**more (9)**
7:21;15:16;18:7;
20:19;25:22;27:7;
29:1;30:2;42:25
**morning (2)**
5:13;13:25
**most (6)**
15:25;37:19,23;
45:7,10;50:8
**motion (40)**
9:1;12:18;13:7;
23:12,15;30:25;32:2,
6,7;33:4,9,16,23;
34:6,11,12,14,16,18,
20,21,22;35:25;
36:10,16,22;37:5;
38:11,13;39:1,21;
40:6,14,16,24;41:2,9;
42:23;50:19;53:9
**motions (3)**
4:16,19,19
**move (7)**
11:8,9;18:11;
20:16,22;21:4;22:22
**moved (1)**
52:8
**moves (1)**
18:16
**Moving (3)**
17:8;19:13;20:20
**much (2)**
21:11;31:14
**Muenker (2)**
51:8;52:11
**multiple (2)**
20:18;22:18
**Myers (1)**
8:6
**myself (1)**
52:11

**N**

**Namely (1)**
19:17
**nature (2)**
28:19;46:3
**necessary (1)**
15:6
**need (14)**
10:14,17,21;11:1;
12:15;13:4;15:18;
17:10,14,23;28:18;
29:10;34:7;48:11
**needed (2)**
14:22;29:23
**needs (1)**
34:7
**negotiate (3)**
33:25;34:5,5
**negotiated (1)**
18:12

20:10
**negotiating (2)**
22:15;32:12
**negotiation (5)**
12:13,16;14:20;
19:9,10
**negotiations (5)**
18:24;21:20;30:21;
31:21;35:16
**Neligan (87)**
4:25;5:11,11,24;
6:2,6,19;7:9,13,16,
20,24;8:4,12,16;9:21;
10:25;11:12,19;12:3,
7,9,15,18,24;13:1,13,
16,24;15:23;18:21;
23:2,5,8,10,19,22;
24:3,6,10;25:10;
27:12;33:3,10,12;
38:15,16;39:11,13,
15;40:1,5,8,10,19,23;
41:1,5;47:4,6;48:5,6,
8,17,20;49:4,8,9,10,
14,15,19,23;50:1,8,
13,18,23;51:5,8,21;
53:5,7,12,14,16,18
**New (7)**
4:3;6:4,8;14:9;
27:10;28:15;44:7
**newly-filed (1)**
29:15
**newspaper (1)**
44:8
**next (3)**
8:10;11:21;46:4
**NHL (1)**
44:5
**non-debtor (1)**
16:18
**non-debtors (1)**
17:3
**nonetheless (1)**
9:21
**north (2)**
16:11;18:5
**note (1)**
6:16
**notice (21)**
13:10;35:24;41:2;
42:25;43:6,14;44:15,
22,24;45:8,19,21;
46:3,4,7,12,18;47:10,
16;48:10,12
**noticing (1)**
44:21
**notify (1)**
43:25
**notwithstanding (1)**
17:18
**number (7)**
8:6;9:10;15:18;
19:8;24:7,16;43:11
**numbers (2)**
26:11;37:11

**nurse (1)**
52:19

**O**

**objection (3)**
38:20;52:5;53:6
**obtained (1)**
14:16
**Obviously (4)**
11:8;13:6;16:2;
31:17
**occurring (1)**
18:24
**off (3)**
27:5;32:10;40:20
**offer (1)**
10:15
**office (3)**
29:14;51:23;52:13
**offices (1)**
22:12
**ombudsman (9)**
4:21;51:2,11,12,14,
18;52:3,13;53:9
**ombudsman's (1)**
51:22
**once (2)**
13:4;29:9
**one (29)**
4:6;7:1,22;8:5,8,9,
13,18,19,19;13:9;
14:14;15:2;18:1,20;
20:2;24:7;26:21;
27:7,23;37:3,21,24;
38:8;42:15;44:12;
46:1;47:9;48:9
**ones (1)**
29:10
**one's (1)**
29:9
**ongoing (2)**
52:4,10
**only (8)**
16:23;17:18,22;
18:21;30:23;49:10;
50:9;52:25
**operate (1)**
25:1
**operating (19)**
6:14,24,24;7:10;
8:5,7,13,18,21;9:13;
16:5,6,17;17:19,22;
26:6,7,24;27:6
**operations (4)**
7:11;9:23,24;16:15
**Operator (4)**
5:6,7;16:10;19:7
**opposed (1)**
46:24
**opting (1)**
48:15
**optional (1)**

23:18
**options (1)**
15:20
**order (23)**
13:8;15:14;17:13;
29:14,16;30:14;31:1,
7;32:8;33:19,23;
34:12,16,17;38:15,
23;39:5,24;40:6;
43:21;45:6;48:13;
50:22
**organization (1)**
21:19
**original (1)**
40:14
**Orlando (1)**
44:5
**Orleans (1)**
44:7
**otherwise (1)**
47:23
**out (19)**
6:16;7:16;19:1;
20:1,23;21:4,11,25;
25:11;26:22;27:4;
32:9;35:16;43:6;
45:12;48:14;49:16,
22;51:11
**outcome (1)**
19:16
**outlined (2)**
13:22;23:9
**outstanding (1)**
11:15
**over (9)**
4:24;5:25;11:15;
13:17;17:19;25:1;
36:9;42:15;53:8
**overarching (1)**
4:18
**overlap (1)**
37:24
**overstated (1)**
16:2
**overview (1)**
33:2
**own (6)**
9:17;10:18;20:15,
24,25;51:13
**owned (1)**
15:24
**owner (4)**
9:22;10:5;15:23;
16:17
**ownership (2)**
9:18;19:6
**owns (1)**
9:17

**P**

**Pac (2)**
32:10,13

**page (4)**
5:2,3,5;51:3
**paid (2)**
32:10;37:13
**painful (1)**
24:12
**Palm (24)**
6:10,12,16,17,23;
8:17;9:19;15:21,22;
16:7,8,14;18:19;
19:13;22:15;24:11,
25;25:2;26:3;37:13,
23;38:3,5;45:10
**Panola (1)**
44:8
**papers (1)**
44:11
**parallel (1)**
22:14
**parent (3)**
6:9,14,25
**parish (1)**
44:12
**part (5)**
14:15;24:1;27:10;
30:24;37:23
**participant (1)**
32:15
**particular (3)**
6:22;19:16;37:15
**parties (5)**
9:7;10;23:20;
25:16;33:24
**partners (1)**
15:3
**past (4)**
27:24;44:20;48:24;
50:3
**Pat (2)**
5:11;33:13
**paths (1)**
22:14
**PATRICK (39)**
5:15,15;30:7,7,10,
17;31:3,17;32:22;
33:11,13,16,19,22;
34:1,4,10,24;35:5,23;
36:2,5,8,13,15,17,20,
25;38:18,18,22;39:7,
16,19,23;40:3,6,10,
12
**Pause (1)**
4:10
**pay (3)**
30:22;38:2,11
**paying (1)**
38:3,4;39:3
**payment (2)**
16:11;37:5
**payments (3)**
12:19,19;38:1
**Pending (3)**
39:25;40:3,3

**people (2)**
27:17;45:15
**percent (3)**
12:20,20,21
**Perfect (2)**
36:13,25
**performing (1)**
10:14
**perhaps (2)**
28:13;49:16
**period (6)**
36:23;40:18;43:15;
44:23;45:9,18
**periodic (1)**
52:20
**periodically (1)**
28:1
**person (2)**
46:6,12
**personal (5)**
16:24;18:5,15;
20:24;43:13
**person's (1)**
17:3
**Petersburg (3)**
8:20;26:7;51:4
**picture (1)**
21:25
**place (1)**
10:13
**places (1)**
50:8
**plan (17)**
10:9;11:6,7,17,20;
14:15;15:14;18:12;
22:17;23:14;25:23;
27:3,11;37:21;38:7;
47:7;48:14
**plans (3)**
27:7;28:19;39:2
**player (1)**
16:3
**pleadings (2)**
34:19;36:18
**podium (1)**
13:17
**point (15)**
6:15;7:1;14:9;
22:2;25:18;28:1;
30:5;31:20,24;32:9;
34:5;36:10;42:24;
48:14;49:15
**pointed (1)**
51:11
**points (1)**
24:7
**pop (1)**
7:7
**position (2)**
17:8;41:9
**positions (1)**
17:4
**positive (1)**

8:22
**possession (2)**
5:16;38:9
**possible (6)**
7:25;11:10;17:14;
18:17;21:12;42:4
**possibly (1)**
17:1
**potential (2)**
19:20;43:7
**practical (1)**
45:11
**prebankruptcy (1)**
17:20,23;24:23
**preemptive (2)**
43:17;45:17
**prefer (1)**
49:21
**preference (2)**
48:1,7
**preliminary (1)**
22:16
**prepare (2)**
35:11;38:15
**prepared (1)**
26:9
**preparing (1)**
33:1
**prepetition (3)**
46:17;47:9,19
**prescription (2)**
43:15;45:18
**present (1)**
31:8
**presentations (1)**
33:1
**pressure (1)**
19:21
**presumably (1)**
32:5
**prevent (1)**
31:12
**previously (1)**
6:25
**price (2)**
9:9;10:7
**principal (1)**
30:13
**principle (1)**
37:25
**principles (1)**
38:8
**prior (2)**
7:11;36:18
**probably (3)**
28:14,22;45:11
**problem (1)**
43:4
**procedure (6)**
23:6;38:11,20;
39:1;45:21;51:10
**procedures (4)**
8:25;22:15;38:14;

41:3
**proceed (1)**
5:21
**proceedings (2)**
4:10;53:24
**proceeds (2)**
30:22;32:1
**process (7)**
11:9;19:9,19;
23:17,18;24:13;52:4
**program (4)**
44:24;51:11,13;
52:3
**progress (1)**
32:24
**promised (3)**
19:24;20:9;22:20
**proof (1)**
46:22
**proper (1)**
17:25
**Properties (2)**
9:2;10:2
**property (2)**
15:23;16:17
**proposal (1)**
37:9
**propose (1)**
41:5
**proposed (2)**
37:25;38:1
**proposing (1)**
44:1
**protecting (1)**
33:19
**provide (7)**
10:20;26:24;29:24;
31:4;51:18,18,23
**provided (1)**
46:11
**providers (1)**
14:17
**provides (3)**
10:9;18:13,14
**providing (1)**
33:1
**publication (1)**
44:1
**publishing (1)**
44:14
**pull (1)**
32:6
**purchase (1)**
10:6
**purchasing (1)**
9:11
**purpose (1)**
15:24
**purposes (7)**
6:6;7:4;18:14;
26:23;27:3;35:21;
39:9
**push (3)**

11:1;40:20;53:8
**pushing (1)**
13:14
**put (3)**
13:1;19:15;27:2
**puts (1)**
19:21
**putting (2)**
24:17;38:9

**Q**

**quick (1)**
23:2
**quickly (2)**
18:17;22:23
**quite (6)**
15:17;17:10;19:19;
21:11;45:5;47:1

**R**

**raise (1)**
30:4
**raised (1)**
46:1
**random (1)**
28:23
**rather (3)**
36:3,5,8
**reach (4)**
13:6;32:5;44:24;
45:16
**reaching (1)**
38:17
**ready (1)**
4:5
**real (6)**
9:22,24;10:5;
29:25;41:25;49:20
**really (5)**
16:6;21:14;28:9;
29:22;43:23
**recall (6)**
14:3;15:1;18:25;
24:10,25;30:10
**receivables (1)**
31:18
**received (1)**
9:10
**recently (2)**
7:13;8:25
**recess (1)**
53:22
**recognize (1)**
15:12
**reconsider (3)**
33:4,17,23
**reconsideration (6)**
32:7;33:9;34:14,
18,22;36:11
**recording (1)**
26:18

**recoveries (1)**
10:3
**referred (1)**
6:7;18:22
**reflect (1)**
26:17
**regard (1)**
37:14
**regarding (1)**
31:4
**regardless (1)**
35:15
**Regency (3)**
8:14;11:12,17;27:4
**related (1)**
39:3
**relationship (2)**
15:22;17:5
**relationships (2)**
14:10;17:2
**release (1)**
31:13
**released (1)**
36:21
**releases (3)**
14:16;15:8;20:6
**reluctant (1)**
32:15
**renegotiate (1)**
34:8
**rent (1)**
11:15
**reorganization (1)**
31:19
**repayment (1)**
31:14
**report (5)**
26:6,9,19;52:14,23
**reporting (2)**
51:15;52:15
**reports (8)**
26:2,14,24;27:21,
24;51:15,18,23
**represent (1)**
30:8
**representatives (1)**
43:13
**request (4)**
15:13;20:4;28:11;
29:3
**requested (1)**
51:17
**requests (4)**
16:25;24:15;30:20;
40:17
**requires (2)**
15:14;18:8
**requiring (1)**
46:25
**reschedule (1)**
36:11
**reserve (1)**
10:4

14-50756 - #500-1   File 02/06/15   Enter 02/06/15 16:47:27   Exhibit A   Pg 62 of 65

**reserving (1)**
39:23
**reset (1)**
36:23
**residents (2)**
43:12;46:2
**resolve (2)**
21:12;34:11
**respect (12)**
6:23;8:4,23;10:8;
11:12;14:21;16:21;
22:17;38:24;39:20;
46:1,15
**respective (1)**
22:11
**responded (1)**
26:12
**responding (1)**
24:14
**response (2)**
35:25;36:24
**responsive (1)**
34:19
**rest (1)**
17:15
**retention (1)**
15:1
**review (1)**
52:20
**reviewed (3)**
15:19;17:24;20:20
**right (22)**
11:19;27:16;33:18,
21;34:1,4;36:15;
38:18;39:13,15;40:1,
5,8,13,21;41:17;
42:22;46:9;50:6,19;
51:1;53:17
**rights (2)**
38:23;39:23
**road (1)**
13:22
**room (2)**
19:25;24:16
**Rouge/Acadian (1)**
44:8
**Rudy (1)**
5:14
**rule (1)**
45:1
**run (3)**
27:23;44:20;48:24
**running (1)**
19:25

**S**

**SA (4)**
5:16;30:8,13;39:2
**SA-Clewiston (1)**
51:6
**SA-Lakeland (1)**
51:7

**sale (8)**
9:22;16:14;19:13,
15,19;24:23;27:6;
37:23
**sales (1)**
22:14
**same (3)**
11:1;18:16;22:13
**San (1)**
8:8
**SA-PG (1)**
6:17
**SA-St (1)**
51:4
**satisfied (1)**
32:24
**saying (1)**
22:22
**scenario (1)**
11:16
**scenes (1)**
21:8;22:19
**schedule (1)**
22:10;34:17
**Schwartzberg (2)**
9:16;30:12
**Schwartzbergs (1)**
15:25
**scramble (1)**
29:2
**sec (1)**
4:6
**second (1)**
46:14
**sell (2)**
8:24;10:4
**send (3)**
42:16;46:4;48:14
**Senior (1)**
9:1
**sense (4)**
12:5;17:10;25:7;
49:4
**sentiments (1)**
29:21
**Sentinel (1)**
44:5
**separate (6)**
10:11;11:17;23:15;
26:24;37:22;47:10
**separated (1)**
27:4
**service (1)**
14:17
**servicing (2)**
6:14;7:1
**set (16)**
13:11;14:6;18:4;
20:10;24:16;27:25;
28:22;29:9,10,15,17;
37:7;41:2,11;50:20;
53:11
**several (2)**

20:14;45:17
**share (1)**
51:19
**show (1)**
29:3
**side (2)**
22:24;53:1
**significant (3)**
15:14;16:3;18:1
**significantly (1)**
18:7
**silence (1)**
39:20
**silo (6)**
8:2,2,4;27:10;
28:15;37:15
**silos (6)**
6:7;9:17;27:18;
37:8,24;38:1
**simply (2)**
46:21;47:13
**single (2)**
27:14;28:16
**sinister (1)**
26:15
**sitting (2)**
20:21;39:7
**situation (4)**
19:14,19,22;31:12
**six (2)**
43:20;50:13
**slightly (2)**
42:25;43:2
**slowed (1)**
18:20
**slowly (1)**
21:22
**smoothly (1)**
30:2
**solicit (1)**
40:18
**solution (1)**
36:6
**somewhat (2)**
14:4;16:2
**soon (1)**
7:7
**sorry (1)**
33:13
**sort (2)**
25:16;48:9
**source (2)**
19:2;52:22
**special (1)**
15:24
**specific (2)**
12:3;30:4
**spin (1)**
27:5
**spoken (2)**
9:4;46:20
**St (2)**
8:20;26:7

**stage (1)**
16:20
**staggered (2)**
7:19;29:12
**stand (1)**
11:19
**standing (1)**
38:23
**standpoint (3)**
19:11;30:3;52:1
**start (7)**
4:13;22:6;16:7:16;
20:16;32:11;39:3
**started (2)**
22:7;25:11
**starting (1)**
51:2
**State (2)**
23:22;50:10
**state-by-state (1)**
50:16
**statement (1)**
26:18
**states (1)**
43:19
**status (31)**
4:12,13,20,22;5:1,
8,21,25;7:7,17,22;
13:21;26:2,5,9,13;
27:20,24;28:9,14,16,
18,21,23;29:15,17;
35:3,21,24;36:11;
53:10
**statute (1)**
50:11
**stayed (1)**
45:2
**step (2)**
8:16;37:18
**still (2)**
20:19;35:16
**stipulate (1)**
40:10
**strange (1)**
46:16
**structure (4)**
14:11;17:5;32:19;
34:8
**structured (2)**
17:12;47:17
**subject (2)**
38:17;39:12
**sublessor (1)**
16:5
**submit (2)**
43:21;50:22
**subsequent (1)**
32:17
**substantial (1)**
10:16
**substitute (1)**
43:4
**successful (1)**

25:3
**sufficient (5)**
9:8;18:15;35:10;
44:15;49:5
**sufficiently (1)**
11:25
**suggest (3)**
11:2;44:14;48:8
**suggested (2)**
46:21;52:19
**suggestion (1)**
52:25
**suggestions (1)**
16:25
**Sunday (1)**
44:15
**supplemental (6)**
30:25;32:2;34:12,
17;39:4;40:6
**support (2)**
12:1;14:17
**supposed (1)**
4:12
**sure (13)**
9:7;14:7;16:22;
18:5;26:16;31:13;
35:8;37:11;44:21;
47:7;48:25;49:12;
51:24
**surely (1)**
21:22
**suspect (1)**
44:25
**sword (1)**
19:20
**system (1)**
44:1

**T**

**table (1)**
14:6
**talked (1)**
10:12
**Tampa (1)**
44:4
**target (1)**
22:4
**team (1)**
15:5
**teasing (1)**
8:1
**teed (1)**
12:12
**tell (1)**
29:9
**Tenant (2)**
5:2;11:14
**termination (2)**
19:17,21
**terms (3)**
9:6;24:22;42:7
**Terrace (15)**

6:23;8:17;9:19;
15:21,22;16:7,8,14;
18:19;19:13;22:15;
37:13,23;38:3,5
**Texas (2)**
8:9;44:9
**Thanks (1)**
53:19
**that'll (1)**
32:18
**theoretically (1)**
16:11
**therefore (2)**
14:22;46:3
**There'll (1)**
49:6
**thinking (1)**
42:7
**third (1)**
22:8
**third-party (3)**
14:16;19:1;20:6
**though (1)**
37:4
**thought (4)**
4:11;21:7;23:11;
52:7
**thoughts (1)**
13:14
**three (10)**
4:18;6:24;8:8,18,
24;20:10;28:2,2,9;
43:17
**three-month (1)**
22:2
**three-year (1)**
45:9
**threshold (1)**
37:3
**throughout (1)**
19:24
**thus (1)**
9:18
**tied (1)**
15:17
**times (1)**
21:16
**Times-Union (1)**
44:5
**timing (1)**
10:23
**tip (1)**
21:17
**today (6)**
5:25;10:23;13:10;
31:8;34:11;39:8
**together (3)**
7:18;27:2;29:22
**told (4)**
20:15;24:18,19;
46:12
**took (1)**
19:1

**tort (4)**
10:11;23:4;43:24;
44:25
**track (1)**
10:3
**trade (5)**
10:10;16:23;18:1,
4;20:25
**traditional (1)**
12:20
**trail (1)**
35:14
**transferred (1)**
7:11
**transition (1)**
24:22
**transparency (4)**
19:24;22:21,21;
24:20
**Tribune (1)**
44:4
**trip (1)**
53:17
**true (1)**
40:19
**trust (8)**
9:16;10:10,11;
23:4,13,14;24:2;25:5
**Trustee (4)**
5:10;15:7;17:1,9
**Trustee's (1)**
30:3
**trusts (2)**
9:16;23:3
**try (7)**
7:18;19:25;20:11;
21:10,12;25:14;
35:15
**trying (15)**
7:25;10:4;11:9;
15:18;17:12;19:23;
20:22;21:4,4;27:18;
33:24;34:4,5;44:21;
45:16
**turn (4)**
4:24;13:17;25:7;
42:25
**two (7)**
6:23,25;23:3;26:5;
28:2,2;50:14
**type (1)**
16:19

**U**

**UCC (2)**
30:21;31:22
**ultimately (5)**
15:25;18:12;19:6;
26:10,12
**unable (1)**
46:2
**uncomfortable (1)**

43:3
**under (7)**
6:4;12:16;19:20;
32:8;38:23;39:23;
45:8
**underestimate (1)**
15:18
**underlying (4)**
16:8;37:25;38:8;
39:1
**underneath (2)**
16:5;21:18
**Understood (1)**
39:22
**unfortunately (2)**
13:2;18:23
**unknown (3)**
43:25;44:15,25
**unless (1)**
21:13
**unlikely (1)**
45:12
**unnecessary (1)**
19:15
**unsecured (2)**
46:17,23
**up (26)**
7:7;10:6;12:12;
15:3,17;16:7;18:20;
19:19;24:16;25:15,
17;26:5;28:1,14;
29:3;30:15;33:3;
35:7,37:7,9;38:9;
41:10;42:18;47:1;
50:15;53:22
**upon (1)**
16:15
**use (5)**
30:21;32:1;38:2;
39:9;52:13
**used (1)**
51:25
**useful (1)**
4:12
**usually (1)**
21:22

**V**

**valid (1)**
36:10
**value (1)**
16:16
**various (11)**
5:25;6:21;14:17,
21;17:2;19:8;20:1,
23;37:8;38:1;47:10
**vehicle (2)**
15:24;18:14
**versus (2)**
16:17;23:14
**View (4)**
6:20;12:6;18:6;

26:5

**W**

**waive (1)**
41:13
**waived (1)**
40:11
**wants (1)**
9:5
**water (1)**
21:18
**way (5)**
17:12;18:15;20:22;
27:20;28:21;35:2,4,
7;37:7;42:16;47:16
**ways (2)**
26:11,15
**Wednesday (2)**
22:11;49:18
**week (1)**
22:8
**weekday (2)**
49:11,12
**weeks (2)**
8:10;20:14
**weren't (1)**
26:16
**West (2)**
32:10,13
**what's (5)**
21:18;22:1;27:1;
30:25;46:24
**whenever (1)**
31:8
**whereas (1)**
6:19
**whole (2)**
37:19,20
**who's (1)**
44:20
**whose (2)**
9:11;10:1
**William (3)**
5:15;30:7;38:18
**willing (1)**
14:19
**window (1)**
22:3
**wish (1)**
32:23
**within (6)**
11:20;14:11;16:25;
20:15;47:14;48:13
**without (5)**
21:12;34:23;35:13,
20;37:14
**work (11)**
9:5;11:23;13:2,4;
19:23;37:11,12,19,
20,22;38:5
**worked (2)**
29:22;45:2

**working (4)**
22:14;35:16;52:3;
53:1
**worst (1)**
11:16
**worth (1)**
18:6
**wrap (2)**
23:12;25:14
**written (1)**
43:5

**Y**

**years (6)**
43:17,20;45:17;
50:14,14,14
**York (1)**
14:9
**you-all (2)**
4:5;29:8

**1**

**1 (3)**
43:4;50:2,4
**10 (2)**
35:15;36:16
**100 (1)**
12:21
**10th (14)**
11:4;12:6,10;13:8;
33:5;36:12;40:20,21,
22,25;52:8;53:2,8,10
**14-41106 (1)**
5:6
**14-50796 (1)**
5:2
**14-51056 (1)**
5:3
**14-51101 (1)**
51:4
**14-51102 (1)**
51:6
**14-51103 (1)**
51:7
**14-51104 (1)**
5:5
**16 (1)**
13:11
**1691 (1)**
5:2
**16th (1)**
42:24
**1st (5)**
49:2,8,10,24;50:20

**2**

**2 (1)**
5:2
**2/10 (4)**
35:3,14,18,19

14-50756 - #500-1  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit A Pg 64 of 65

**20 (1)**
    12:20
**200 (2)**
    15:16;24:21
**2013 (1)**
    45:11
**29th (1)**
    40:18
**2nd (1)**
    49:21

### 3

**30 (1)**
    42:25
**31st (1)**
    40:17
**341 (4)**
    41:11,14,16;53:23
**35 (2)**
    17:20,23
**3rd (1)**
    50:4

### 4

**4 (2)**
    5:3;51:3

### 5

**5 (1)**
    5:5
**503b9 (7)**
    46:15;47:8,22;
    48:19,21;49:7;50:21

### 8

**80 (1)**
    12:20

UNOFFICIAL