```
- - - - - - - - - - - - - - - - - - - - -X
IN RE OF THE ARBITRATION:

THE ESTATE OF JOSEPH G. BUSH, by
and through SANDRA SUE KENNEDY,
Personal Representative,


                              Plaintiff,

          -against-
                              Case No.
                              10-0228

SA-PG-SUN CITY CENTER, LLC; SA-PG
OPERATOR HOLDINGS, LLC f/k/a NEW ROCHELLE
ADMINISTRATORS, LLC; NEW SURFSIDE ADMINISTRATORS,
LLC d/b/a CYPRESS HEALTHCARE MANAGEMENT; SA-MASTER
OPERATOR HOLDINGS, LLC; HARRIS SCHWARTZBERG;
SCHWARTZBERG DESCENDENTS TRUST; STEVEN
SCHWARTZBERG TRUST; HARRIS SCHWARTZBERG TRUST;
JUDITH SCHWARTZBERG TRUST; MAXWELL STOLZBERG;
SHERILL CUMMINGS; ANDREW JO CORNWELL a/k/a ANDREW
CORNWALL (as to PALM GARDEN OF SUN CITY),

                              Defendants.
- - - - - - - - - - - - - - - - - - - - -X
                              May 14, 2013

                              1:07 p.m.
```

DEPOSITION of HARRIS SCHWARTZBERG, a Defendant

herein, taken pursuant to Notice, and held at the

offices of DALCO Reporting, Inc., 170 Hamilton

Avenue, White Plains, New York, before Ashley L.

Principe, RPR, a Court Reporter and Notary Public

of the State of New York.

```
1  A P P E A R A N C E S :

2


3  WILKES & MCHUGH, P.A.
         Attorneys for Plaintiff
4        One North Dale Mabry Highway
         Tampa, Florida 33609
5  BY:  KATHLEEN CLARK KNIGHT, ESQ.


6


7  QUINTAIROS PRIETO WOOD & BOYER, P.C.
         Attorneys for Defendants
8        4905 West Laurel Street, 2nd Floor
         Tampa, Florida 33607
9  BY:  JAMES B. MORRISON, ESQ.


10


11 MCCUMBER DANIELS BUNTZ HARTIG & PUIG, P.A.
         Attorneys for Defendants
12       204 South Hoover Boulevard
         Suite 130
13       Tampa, Florida 33609
   BY:  E. PATRICK BUNTZ, ESQ.
14       (Via telephone)


15


16 ALSO PRESENT:

17 TREY BLALOCK, ESQ.,
   GENERAL COUNSEL, HEALTH CARE NAVIGATOR
18


19


20


21


22


23


24
```

1    HARRIS SCHWARTZBERG,

2    having first been duly sworn by the Notary Public

3    (Ashley Principe), was examined and testified as

4    follows:

5    EXAMINATION

6    BY MS. KNIGHT:

7         Q.    Sir, would you please state your name for

8    the record.

9         A.    Harris Schwartzberg.

10        Q.    Mr. Schwartzberg, I'm Kathleen Knight.  I

11   introduced myself before we started.  I know you've

12   been deposed before; is that right?

13        A.    Yes.

14        Q.    Okay.  Just a reminder, first, if you need

15   a break at any time, please just say so; we'll take

16   a break.  Okay?  Another is just a reminder that we

17   need verbal responses.  So if I get something other

18   than a verbal response, which we do with each other

19   every day during normal communication, I will say

20   does that mean yes or does that mean no, not to

21   correct you, but just to make sure we have a clear

22   record.  Okay?

23        A.    Okay.

24        Q.    To remind me, hopefully as much as you, we

1    need to try not to talk on top of each other.  Try

2    to let me finish my question before you start to

3    answer, and I will try really hard to let you finish

4    your answer before I start to ask another question.

5          A.    Okay.

6          Q.    If I start to talk and you weren't

7    finished, let me know that; I'll stop immediately.

8    Okay?

9          A.    Yep.

10         Q.    All right.  One more thing.  If you can't

11   remember something early in the deposition, it

12   happens a lot with either dates or people's last

13   names, that sort of thing, but you remember later

14   while we're still here, would you please stop me,

15   and we'll fill in the blank and then move forward.

16         A.    Sure.

17         Q.    Thank you.  Let's get your office address.

18   What's your business address?

19         A.    4 West Red Oak Lane in White Plains.

20         Q.    Is there a suite number?

21         A.    201.

22         Q.    Okay.  And what's your home address?

23         A.    12 Wrights Mill Road.

24         Q.    Okay.  Is that White Plains also?

1      A.      Armonk.

2      Q.      Thank you.  And how are you currently

3  employed?

4      A.      How am I currently employed?

5      Q.      Yes, sir.

6      A.      The Schwartzberg Companies, I believe.

7      Q.      Okay.  You're actually an employee of the

8  Schwartzberg Companies?

9      A.      I'm not sure what my -- I don't -- I

10  really don't -- don't know the structure we have,

11  who I'm technically an employee of.

12      Q.      Do you know whether you're technically an

13  employee of a company?

14          MR. MORRISON:  Form.  But go ahead, if you

15      know.

16      A.      I'm not -- again, I'm not sure of who I'm

17  an employee of.

18      Q.      All right.  Do you have, for example,

19  health insurance benefits?

20      A.      I do.

21      Q.      Do you know which company the benefits are

22  provided through?

23      A.      No, I don't.

24      Q.      All right.  What does the Schwartzberg

1  Companies do?

2        A.    Just an investor.

3        Q.    Investor in what?

4        A.    Everything from oil companies to real

5  estate to long-term care.

6        Q.    Are you familiar with Mr. Bush, the fact

7  that you're here for a deposition in Mr. Bush's

8  case?

9        A.    Just from what we've --

10       Q.    From talking to counsel?

11       A.    -- very little I discussed.  Yeah.

12       Q.    Okay.  And I'm not going to ask you at any

13  point what you've discussed with counsel.  So if

14  your answer needs to be that it came from counsel,

15  just tell me that, and we'll move on to the next

16  question.  Okay?

17       A.    Sure.

18       Q.    Did you review the complaint in the Joseph

19  Bush matter?

20       A.    No.

21       Q.    Do you know what the allegations are about

22  what the Bush estate is saying happened to Mr. Bush?

23       A.    No.

24       Q.    Okay.  Are you aware that the time frame

1    that Mr. Bush was in the nursing home was the 2007

2    to 2008 time frame?

3         A.    Again, just from counsel.

4         Q.    Okay.  Many of my questions are going to

5    be about that time frame.  Mr. Bush entered Palm

6    Gardens of Sun City around -- let me get the dates

7    right instead of saying around -- November 19th of

8    2007.  And other than a hospitalization in between,

9    he left May 10th of 2008.  Okay?

10        A.    Okay.

11        Q.    Are you familiar with Palm Garden of Sun

12   City?

13        A.    Yes.

14        Q.    And that's a long-term care facility;

15   right?

16        A.    Yes.

17        Q.    Now, back in the -- in November of 2007, I

18   know there was a restructuring of companies around

19   that time.  Do you know whether that restructuring

20   had been completed by November of 2007?

21        A.    No idea.

22        Q.    Okay.  Who is the right person to ask

23   about that?

24             MR. MORRISON:  Object to the form.  Go

1    ahead, if you know.

2        A.   I really have no idea.

3        Q.   If you had to ask somebody, who would you

4   start with?

5        A.   Trey.

6        Q.   Okay.  Mr. Blalock?

7        A.   Yes.

8        Q.   All right.  And Mr. Blalock, I understand

9   from my conversation with him, is general counsel;

10  is that correct?

11       A.   Yes.

12       Q.   All right.  Are you generally familiar

13  with the fact that there was a restructuring of the

14  companies at least in Florida?

15            MR. MORRISON:  Form.  Go ahead.

16       A.   I don't have many specifics and don't know

17  any details.

18       Q.   Do you know that it occurred, that the

19  restructuring occurred?

20       A.   Not -- I really don't actually know

21  exactly.

22       Q.   Okay.  Are you aware or do you know the

23  company New Rochelle Administrators?

24       A.   I know the name.  Again, I don't know

 1  structure, where it fits into anything.

 2      Q.    Okay.  Were you the managing member of New

 3  Rochelle Administrators?

 4          MR. MORRISON:  Object to the form.  But go

 5      ahead.

 6      A.    I have no idea.

 7      Q.    Are you familiar with New Surfside

 8  Administrators?

 9      A.    Again, I just -- the name sounds familiar.

10  I don't have specifics.

11      Q.    Okay.  Are you familiar with SA-PG-Sun

12  City Center?

13      A.    Same -- excuse me.  Same answer:  Again,

14  I've heard the name.

15      Q.    The Schwartzberg Companies, the long-term

16  care companies that you talked about they invested

17  in, are a number of those in Florida?

18      A.    I believe so, yeah.

19      Q.    You believe so or they are?

20      A.    Yeah.

21      Q.    Okay.  Is there a separate company that

22  manages or oversees the nursing homes in Florida?

23      A.    I have no -- our job at Schwartzberg

24  Companies, my job, is strictly as an investor.

1      Q.   Okay.

2      A.   So I don't know the structure of managers

3 and --

4      Q.   Are you familiar with generally the

5 structure of an LLC?  I mean, generally how that

6 works.

7      A.   The concept of an LLC?

8      Q.   Yes, sir.

9      A.   Just I know it's a corporate structure.

10 That's about all I know.

11      Q.   Okay.  Are you aware that LLCs are

12 operated by managing members or managers?

13      A.   I don't know that.  I don't --

14      Q.   Okay.  Do you know how many nursing homes

15 there are in Florida that the Schwartzberg Companies

16 are involved in?

17      A.   No.

18      Q.   Can you give me an idea?

19          MR. MORRISON:  Form, but go ahead.

20      A.   As I said, we invest in a variety of

21 investments and forums and companies, et cetera, so

22 how to quantify what fits under a number like that,

23 I couldn't.

24      Q.   Okay.  Is the Schwartzberg Companies an

1  actual entity?

2      A.    I believe so.

3      Q.    Okay.  Not a fictitious name?

4      A.    No.

5      Q.    All right.  Are you familiar with Cypress

6  Healthcare Management?

7      A.    The name, yeah.

8      Q.    Okay.  What does that company do?

9      A.    Again, I'm -- manages nursing facilities.

10      Q.    All right.

11      A.    To what extent, I don't know.

12      Q.    Does it manage nursing facilities in the

13  State of Florida solely, or does it also manage

14  nursing homes outside the State of Florida?

15      A.    Again, I don't -- I don't know the

16  structure, so I don't know what they manage and

17  don't manage.

18      Q.    Okay.  What is Health Care Navigator?

19            MR. MORRISON:  Object to the form.  Go

20      ahead.

21      A.    Can you repeat the question.

22      Q.    Yes, sir.  What is Health Care Navigator

23  LLC?

24      A.    I think it's a consulting company.

1      Q.    Okay.  Consulting company for what?

2      A.    Again, a variety of investments.

3      Q.    Related to long-term care or oil or real

4  estate?

5      A.    I think related to a variety of things.

6      Q.    Okay.  Are you an officer of Health Care

7  Navigator?

8      A.    I don't know.  I don't believe so.

9      Q.    All right.  Were you an officer of Health

10  Care Navigator in 2011?

11      A.    I don't know.  I don't believe so.

12      Q.    Are you a partner in the company?

13      A.    I don't think so.

14      Q.    When you make campaign contributions on

15  your own behalf, not on behalf of any company that

16  you might be related to, do you handle the writing

17  of the check for the campaign contribution?

18          MR. MORRISON:  Object to the form.  I'm

19      going to instruct you not to answer.  I don't

20      see how campaign contributions by Mr.

21      Schwartzberg have anything to do with the

22      allegations of abuse and neglect in Florida,

23      but --

24          MS. KNIGHT:  I can talk to you about it

1       outside of the hearing of the witness if you'd

2       like to know why.  But if you instruct him not

3       to answer, we're coming back up here, and I'm

4       going to ask the court to have y'all pay for

5       it.

6             MR. MORRISON:  That's fine.  I mean,

7       again, if you wanted to talk to me outside, we

8       can take a break as to --

9             MS. KNIGHT:  We're going to do it on the

10      record, but I'd ask that Mr. Schwartzberg leave

11      so that I can talk to you about it without him

12      hearing our conversation.

13            MR. MORRISON:  Okay.  I'll listen to what

14      it is.  I don't see how it's relevant.  But if

15      you could just step out for a second.

16            THE WITNESS:  Sure.

17

18            (Witness exits room.)

19

20            (Witness re-enters room.)

21

22            MS. KNIGHT:  When making numerous campaign

23      contributions, Mr. Harris -- Mr. Schwartzberg

24      listed himself as a partner and an executive

1      and an officer of certain companies.  So I want

2      to know where that information came from and

3      how it was provided and when the donations were

4      made.  I don't care about the amount of the

5      donations, although it's all public record.

6      And I'm not going to talk about to whom the

7      donations were made because I don't think that

8      has anything to do with anything.

9           MR. MORRISON:  Do you have documents here

10     that I can look at?

11          MS. KNIGHT:  Sure.  It's from the

12     Internet.  You can do campaign searches on who

13     donates money to whom.

14          MR. MORRISON:  Okay.

15          MS. KNIGHT:  All right.

16          MR. MORRISON:  I'll be back.

17

18          (Recess taken.)

19

20          MR. MORRISON:  With the stipulation that

21     you're not getting the dollar amounts, you just

22     want to know how it was done, you can ask the

23     questions, and we'll see where it goes.

24   BY MS. KNIGHT:

1       Q.   Mr. Schwartzberg, prior to coming back in

2   to the room, did you have a conversation with

3   counsel just outside?

4       A.   Just a few words.

5       Q.   I'm not asking what your conversation was.

6   Did you have a conversation with him just before

7   coming back inside?

8       A.   Sure.

9            MS. KNIGHT:  Okay.  Could you read back my

10       question just before we broke, please.

11

12            (The requested testimony was read back.)

13

14            MR. MORRISON:  You can answer.

15       A.   Do I personally write the check, no.

16       Q.   And who does?

17       A.   I don't know.

18       Q.   If there's a campaign contribution from

19   you personally, you don't know who writes the check?

20            MR. MORRISON:  Form, but go ahead.

21       A.   No.

22       Q.   Who handles your personal finances for

23   you?

24            MR. MORRISON:  Object to the form.  I'm

1    instructing you not to answer the question.

2    His personal finances, we're not talking about.

3          MS. KNIGHT:  Actually, we can talk about

4    his personal finances because they are punitive

5    against Mr. Schwartzberg.  But I haven't gotten

6    into that part.  I'm asking him who handles his

7    finances.

8          MR. MORRISON:  I'm instructing him not to

9    answer who handles his personal -- are you

10   talking about --

11         MS. KNIGHT:  Under what basis?

12         MR. MORRISON:  It's harassing, abusive.

13   Ask him about what -- he's here today to talk

14   about the affidavit in response to our motion

15   for summary judgment and his knowledge of these

16   general companies.

17         MS. KNIGHT:  My questions are not limited

18   to the affidavit, and we have punitives, so

19   there's no financial objection that is

20   appropriate.

21         MR. MORRISON:  Those were late filed

22   beyond discovery cutoff.  We will have

23   appropriate responses to the punitive damages

24   stuff at the appropriate time.

1        MS. KNIGHT:  Counsel, are you telling me
2    that you're going to instruct him not to answer
3    any questions about his finances?
4        MR. MORRISON:  That's correct.
5        MR. BUNTZ:  Yes.
6        MS. KNIGHT:  Under what theory?
7        MR. MORRISON:  Number one, the first
8    request wasn't until about two weeks ago, so
9    they are not due.  Our responses are not due.
10       MS. KNIGHT:  I'm not talking about written
11   discovery.  I'm allowed to take depositions
12   related to anything relevant to the case.  So
13   under what --
14       MR. MORRISON:  He's not answering any
15   questions about his finances today.  That's not
16   what the purpose of this depo was set, and if
17   we had known that beforehand, we could have
18   addressed it before now.
19       MS. KNIGHT:  Counsel, the purpose of the
20   deposition is for us to take relevant discovery
21   in this case, and part of that relevant
22   discovery is punitive damages.  Now, I don't
23   think that me asking him who handles his
24   finances has anything to do with punitive

1    damages.

2         MR. MORRISON:  And I think, as you're well

3    aware, there is a lack -- complete lack of any

4    rational basis for him to be individually named

5    in this lawsuit.  If there's any number of

6    cases on point that demonstrated doesn't have

7    minimum contacts with the state, Judge Crockett

8    Farnell should be aware of that.  Once we've

9    had the hearing on the motion for summary

10   judgment and once we've given -- we've had the

11   ability to properly respond to your discovery

12   requests, which were late filed, we'll address

13   the -- the personal finance issue.  But that's

14   not what we're here for today, and I am

15   instructing him not to answer any questions

16   regarding anything having to do with his

17   personal net worth or personal finances.  And I

18   think I made my objection.  We can go back and

19   forth, or we can move on with the stuff that we

20   can address today.

21   Q.   Sir, do you have an accountant who handles

22  your personal finances?

23        MR. MORRISON:  In general, you can answer

24   that question.  You don't have to give the

1      name.

2      A.    Yes.

3      Q.    And who is it?

4           MR. MORRISON:  I instruct you not to

5      answer.

6      Q.    Is it someone other than the accountants

7  that handle your business at the Schwartzberg

8  Companies?

9           MR. MORRISON:  You can -- in general, you

10     can answer.  You don't have to give the name.

11     A.    Can you repeat the question.

12     Q.    Yes, sir.  Is the accountant who handles

13 your personal finances someone who also handles the

14 finances for the Schwartzberg Companies?

15          MR. MORRISON:  Object to the form.  Again,

16     you don't have to give the name.

17     A.    Yes.

18     Q.    Is that the same folks who handle the

19 accounting for Cypress Healthcare Management?

20          MR. MORRISON:  Object to the form.  You

21     can answer, if you know.

22     A.    I don't think so.

23     Q.    Where are the folks that handle the

24 accounting for Cypress Healthcare Management

1  located?

2      A.   I don't know.

3      Q.   Where are the folks that handle your

4  finances located?

5          MR. MORRISON:  Object to the form.

6      Instruct you not to answer.

7      Q.   Is the accountant who handles your

8  personal finances at the 4 West Red Oak Lane

9  address?

10          MR. MORRISON:  You can answer, if you

11      know.

12      A.   No.

13      Q.   Is the accountant that handles your

14  finances at the 44 South Broadway address?

15      A.   No.

16      Q.   What is 44 South Broadway?

17      A.   That was my old office address.

18      Q.   Okay.  And are the offices that were at 44

19  South Broadway, are they now at 4 West Red Oak Lane?

20      A.   I don't know how I could make a

21  comparison.  It's a different time, different

22  company.

23      Q.   How many offices does the Schwartzberg

24  Companies have?

1            MR. MORRISON:  Object to the form.  You

2       may answer, if you know.

3       A.   I don't really know.

4       Q.   You don't know how many offices the

5  Schwartzberg Companies have?

6       A.   Not -- I'm not sure how you define that.

7       Q.   I'm not sure what you mean by that.

8       A.   Well, I'm not sure what you mean by that.

9       Q.   Where do the people that work for the

10  Schwartzberg Companies go to work other than their

11  homes?

12       A.   As I said, I work -- I'm an investor, and

13  I -- all I do is I look for investments.

14       Q.   I appreciate that.  My question was where

15  the people for the Schwartzberg Companies work other

16  than potentially working from their homes.

17       A.   I'm not sure.

18       Q.   How many people work at the 4 West Red Oak

19  Lane address for the Schwartzberg Companies?

20       A.   Again, I don't know who works for whom in

21  that office.

22       Q.   Are there offices in that building that

23  are not related to companies in -- in which you have

24  an ownership interest?

1      MR. MORRISON:  Form.  But go ahead, if you

2   know.

3   A.   Can you repeat?

4      MS. KNIGHT:  Can you read back the

5   question, please.

6

7      (The requested testimony was read back.)

8

9   A.   I believe so.

10   Q.   What are the companies that you don't have

11 an ownership interest in that are at that address?

12   A.   I'm, again, not sure.

13   Q.   Tell me the ones that you're sure about.

14      MR. MORRISON:  Object to the form.

15   A.   I don't have a list of everything that's

16 in there.

17   Q.   I'm not asking for you to have a list.

18 I'm asking:  When you go to work, what companies do

19 you see that you know you don't have an ownership

20 interest in?

21   A.   When I go to work, I work, as I said, for

22 the Schwartzberg Companies, which is generally

23 working for myself as an investor.

24   Q.   That wasn't the question.  The question

```
 1   is:  When you go into the office, whether businesses
 2   are in that building that you don't have an
 3   ownership interest in.
 4          MR. MORRISON:  Object to the form.  Rick,
 5       did we lose you?  I guess we lost Rick.
 6
 7          (Recess taken.)
 8
 9          MS. KNIGHT:  Could you read back my last
10       question, please.
11
12          (The requested testimony was read back.)
13
14       A.   And I said I don't know.
15       Q.   You don't know any single business in that
16   building that's not related to you or in which you
17   have an ownership interest?
18          MR. MORRISON:  Object to the form, but you
19       can answer, if you recognize any signs as you
20       drive into your office.  I'm not sure why
21       that's relevant.
22          MS. KNIGHT:  Counsel, please stop
23       instructing the witness.
24       A.   There's a whole litany of names in the
```

1  building, and I don't know them all.

2      Q.    Are the offices related to the

3  Schwartzberg Companies limited to the Suite 201?

4      A.    Yes.

5      Q.    Okay.  Is -- are there any other offices

6  on the second floor?

7      A.    Yes.

8      Q.    Are -- do you have an ownership interest

9  in any of the other companies on the second floor?

10     A.    No.

11     Q.    Okay.  Are you familiar with SA-Master

12  Holdings LLC?

13     A.    I've heard the name.  I'm not -- I don't

14  know what it does or what it is.

15     Q.    What's your relationship to that company?

16     A.    I said I don't know.

17     Q.    Okay.  Who is Steven Schwartzberg?

18     A.    That's my brother who passed away.

19     Q.    Okay.  I'm sorry to hear that.

20     A.    Thank you very much.

21     Q.    Judy Schwartzberg?

22     A.    That's my sister.

23     Q.    Okay.  And there's an entity listed as

24  Schwartzberg Descendents.  What is that?

1      A.    Schwartzberg Descendents?

2      Q.    Yes.

3      A.    I'm not sure.

4      Q.    Do you have any other siblings?

5      A.    I don't.

6      Q.    Okay.  Are you familiar with SA -- oh, I

7   just asked you about SA-Master -- CHCCLP Operator

8   Holdings?

9      A.    No.

10     Q.    Okay.  Who is Maxwell Stolzberg?

11     A.    Max is a lawyer.

12     Q.    Okay.  And by whom is he employed?

13     A.    I don't know.

14     Q.    At -- at some point did he work for the

15  Schwartzberg Companies?

16     A.    I don't know who he worked for.  I know

17  he's done work for us.

18     Q.    Okay.  Do you know whether he was an

19  employee of one of the companies, or was he always

20  at an outside firm?

21     A.    I don't -- I don't recall.

22     Q.    Okay.  Did Mr. Stolesberg, at any time,

23  have authority to sign on your behalf?  I don't mean

24  sign your name, but was he an authorized agent for

1  you?

2       A.   Again, I'm not sure.  That was a long time

3  ago.

4       Q.   When did you stop having dealings with Mr.

5  Stolesberg?

6       A.   A couple years.

7       Q.   Did he handle corporate filings in Florida

8  for your companies?

9       A.   I'm not sure.

10      Q.   What is Medstar Consulting?

11      A.   I believe that's an old business we

12  invested in.

13      Q.   Did it provide services to the nursing

14  homes?

15      A.   No.

16      Q.   Okay.  And you say "old."  Is it --

17      A.   I don't think so.

18      Q.   Is that not -- is that company no longer

19  operating?

20      A.   I don't know what that company is doing.

21      Q.   Okay.  You are listed in the Florida

22  records as the manager of that company.

23      A.   Okay.  I wasn't aware.

24      Q.   And you don't know what it does?

1      A.    As I said, it was a company [if] a while
2  back.
3      Q.    But you -- when I asked you if it was
4  still doing business, you said you weren't sure.
5      A.    I'm not sure.  I don't think it is.  But
6  again, as I said, we make a variety of investments,
7  so I don't know everything that goes on in each one.
8      Q.    You've said you make a variety of
9  investments, but haven't you also represented even
10  to courts that you are in the business of operating
11  nursing homes in Florida?
12      A.    I said I've invested in a variety of
13  businesses.
14      Q.    I'm asking if you've ever told a court --
15      A.    I don't recall.
16      Q.    -- that you operate nursing homes.
17            MR. MORRISON:  Form.
18      A.    I don't recall.
19      Q.    Okay.  Do you know Robert Schwartzberg?
20      A.    No.
21      Q.    Okay.  What is Springdale Healthcare
22  Centers LLC?
23            MR. MORRISON:  Object to the form, but go
24      ahead.

1       A.    No idea.

2       Q.    At one point, at least during the time

3   frame when Mr. Bush was at the nursing home, SA-PG

4   Sun City Center, which I'll represent to you, based

5   on the records, is the licensee of that nursing

6   home, of the Palm Garden of Sun City, SA-PG-Sun City

7   Center was the sub-lessee from New Rochelle

8   Administrators, and New Rochelle Administrators had

9   leased the property from Springdale Health Centers

10  LLC according to the filings with the State of

11  Florida.  Okay?

12      A.    Okay.

13      Q.    Was Springdale Health Centers LLC a

14  company that you had an ownership interest in?

15      A.    No.

16      Q.    Okay.  Do you remember the circumstances

17  under which the property that's the Palm Garden of

18  Sun City Center became leased by some of these

19  companies?

20            MR. MORRISON:  Form, but go ahead, if you

21      know.

22      A.    You will have to clarify that a little

23  bit.

24      Q.    How is it that the Palm Garden of Sun City

1   Center became a company that you were invested in?

2        A.   Just another investment, I would assume.

3        Q.   Can you tell me how that --

4        A.   I've never been to Sun City.  I don't know

5   where it is.  Don't know anything about the building

6   so --

7        Q.   Are you invested in the real estate?

8        A.   No.

9        Q.   Okay.  So what you're invested in is

10  operating a nursing home; correct?

11            MR. MORRISON:  Object to the form.

12       Mischaracterization.  But go ahead.

13       A.   Again, I don't know the level of my

14  investment.

15       Q.   You're not -- what I'm asking is:  If

16  you're not invested in the real estate, the land,

17  then you're invested in the operations; correct?

18       A.   Again, I'm not sure.  There's complicated

19  investments in every industry, including long-term

20  care.

21       Q.   Okay.  And are there documents that

22  reflect exactly what your interest is?

23       A.   I'm not sure.  I have no idea.

24       Q.   You have no idea whether there's

1  documentation showing what your ownership interest

2  is in the Sun City Center Nursing Home?

3      A.   As I said, we make a lot of investments.

4  I've never been to Sun City, so I don't know how

5  things are structured or what investments were made

6  specifically in that facility.

7      Q.   You're not answering my question.  My

8  question --

9      A.   I'm answering it to the best of my

10  knowledge.

11      Q.   The question is:  Are there documents that

12  show what your investment is?

13          MR. MORRISON:  Object to the form.  Asked

14      and answered.  I think he said he doesn't know

15      if there are or there are not.

16          MS. KNIGHT:  Counsel, please stop

17      instructing the witness.

18          MR. MORRISON:  He's already said he

19      doesn't know, so --

20          MS. KNIGHT:  Counsel, you are being

21      entirely improper.  You and I don't usually

22      have these problems.

23          MR. MORRISON:  Why don't we move on to

24      another question then.

1      Q.   I want to know if there are documents that
2   reflect your ownership interest.
3           MR. MORRISON:  Object to the form.  Asked
4      and answered.  Go ahead.
5      A.   I have -- I have no idea.
6      Q.   Okay.  Do you receive a revenue stream
7   from this nursing home?
8           MR. MORRISON:  Form.
9      A.   No.
10     Q.   So how are you invested if you don't
11  receive revenue?
12     A.   I've invested in a lot of things I don't
13  receive revenue.
14     Q.   Now, how is it that you invest in a
15  company and don't receive a revenue?  One way is
16  that it fails; correct?
17     A.   Correct.
18     Q.   Okay.  This nursing home hasn't failed,
19  has it?
20     A.   I have no idea what the financial ups or
21  downs are of this facility.
22     Q.   Who do you ask to monitor your investments
23  as it relates to the nursing homes in Florida?
24     A.   When you say monitor the investments --

1      Q.   Who is supposed to look after them?  Are

2   you telling me that you don't know anything about

3   what's going on down in Florida in the nursing home?

4      A.   I'm a passive investor.  That's all I am.

5      Q.   Who is the active person?  Who is in

6   charge of making -- watching the investments and

7   making sure that they are performing well?

8      A.   No one's in charge of watching the

9   investments.  I don't know who is in charge of

10  operating the actual buildings.  That's not what I

11  do.

12     Q.   Tell me what you do do.

13     A.   I look for new investments.  I spend most

14  of my time as a mental health advocate; that's what

15  I spend 70 percent of my time doing.

16     Q.   As a mental health advocate?

17     A.   Yeah.

18     Q.   Doing what?

19     A.   Trying to help children with depression

20  and anti-suicide.

21     Q.   Okay.  How is it that you do that, through

22  a company?

23     A.   Through myself individually.

24     Q.   Okay.  That's what you do with your

```
 1   private life?
 2        A.   I do that most of the time.  It takes up
 3   most of my life.
 4        Q.   Okay.  When you decide to invest in a
 5   nursing home in particular --
 6        A.   Uh-hum.
 7        Q.   -- how do you find out about the
 8   investment?
 9        A.   A variety of ways.  Many people bring
10   various investments to my attention; I look at them.
11        Q.   And once you decide to make an
12   investment --
13        A.   Uh-hum.
14        Q.   -- who handles that investment?  Somebody
15   does.
16        A.   Again, everything's different.  Every year
17   is different.  Every investment is different.
18        Q.   Okay.  Did you know that you were coming
19   here today to talk about Sun City Center?
20        A.   Again, as I've said now a half a dozen
21   times, I've never been to Sun City.  I'm not
22   familiar with the building, and I don't know the
23   level of investment that I even have in that
24   building.
```

1    Q.   My question was:  Did you know that you

2  were coming here today to discuss Sun City Center?

3    A.   I knew they were -- I don't -- I don't

4  remember exactly which facility I knew there was a

5  facility involved.

6    Q.   When you found out that there was a

7  deposition today, what did you do to prepare for

8  this deposition?

9    A.   Not much.  Again, since I don't have

10  anything to do with these buildings --

11    Q.   Counsel [sic], I really need you to listen

12  to my question and answer my question.

13         MR. MORRISON:  Counsel?

14    Q.   The question was -- I'm sorry.  You're not

15  counsel.

16         Sir.  Mr. Schwartzberg.

17         MS. KNIGHT:  I was fussing at you

18      indirectly, I guess.  Sorry.

19    Q.   My question was what you did to prepare

20  for today.  And your answer was "not much," but I'm

21  asking what did you do.

22         MR. MORRISON:  Object to the form.  You're

23      not to answer anything that you and I have

24      discussed.  But anything you may have done

1     outside of that or outside of discussions with

2     Mr. Blalock, you can answer.

3     A.    Nothing.

4     Q.    Okay.  So you spoke to counsel?

5     A.    Uh-hum.

6     Q.    Is that yes?

7     A.    Yes.

8     Q.    Okay.  Other than speaking to counsel, did

9 you do anything else?

10     A.    No.

11     Q.    Did you look at any documents?

12     A.    No.

13     Q.    Okay.  You heard counsel tell me earlier

14 that what he expected this deposition to be limited

15 to was a discussion of what your participation in

16 these companies was.  Did you hear that?

17     A.    Yeah.

18     Q.    Okay.  And so far you're not even able to

19 tell me whether you have an interest in Sun City

20 Center, is that right, Palm Garden of Sun City?

21     A.    Yes.

22     Q.    Okay.  Are there documents forming the

23 various LLCs surrounding your investments?

24     A.    I would assume so.

1     Q.   Who do you rely on to handle that?

2     A.   Mr. Blalock.

3     Q.   Okay.  Is there anyone that works for the

4 Schwartzberg Companies that isn't either a

5 receptionist, a secretary, or a lawyer?

6     A.   I don't know.  I really don't know.

7     Q.   Are you an officer of the Schwartzberg

8 Companies?

9     A.   I believe I am.

10    Q.   What's your title?

11    A.   I guess president.

12    Q.   Okay.  Are you president of any other

13 companies related to the Schwartzberg Companies?

14    A.   I don't -- I don't know.  Again, I don't

15 know my -- any specific titles.

16    Q.   When one of the LLCs is created, is it

17 fair to say that you rely on counsel to do that for

18 you, to create the company to do the paperwork that

19 creates the company?

20    A.   Yeah.

21    Q.   Okay.  Does counsel let you know when you

22 are an officer or a managing member of one of those

23 companies?

24    A.   I don't think so.

1      Q.   Okay.  Are you aware that legally,

2  managing members have certain duties and obligations

3  to the companies that they manage?

4           MR. MORRISON:  Form.  But go ahead.

5      A.   I'm not aware of the legal ramifications.

6      Q.   Okay.  Is there someone, a person, that

7  you delegate the responsibility of management of the

8  various LLCs in Florida to?

9      A.   No.

10     Q.   Okay.  Going back to HC Navigator.

11 What -- I'm sorry, what did that company -- what

12 does that company do?

13     A.   It's some form of consulting company.

14     Q.   Tell me what you mean by "consulting."

15 People mean different things when they say that.

16     A.   Does a variety of consulting to a variety

17 of clients.  Due diligence.  Looks at potential

18 acquisitions.

19     Q.   Okay.  Are we talking about long-term care

20 specifically?

21     A.   No.

22     Q.   Okay.  It's called Health Care Navigator;

23 correct?

24     A.   Yeah.

1     Q.   What does it do outside of health care

2 work?

3     A.   Well, there's a lot of things outside of

4 health care besides long-term care, I believe.

5     Q.   Fair enough.

6     A.   So there's hospitals.  There's all sorts

7 of things.

8     Q.   All right.  Does -- HC Navigator or Health

9 Care Navigator, are those one in the same?

10     A.   Again, I don't know the corporate names of

11 all the entities.

12     Q.   What do you call --

13          MR. MORRISON:  Form.

14     Q.   -- that consulting company?

15     A.   Health Care Navigator.

16     Q.   Okay.  Does Health Care Navigator provide

17 services to health care facilities outside of the

18 State of Florida?

19     A.   Again, I don't know specifically who their

20 list of clients are.

21     Q.   Do they have clients other than companies

22 related to the Schwartzberg Companies?

23     A.   I believe so.

24     Q.   Okay.  When was Health Care Navigator

1  created?

2      A.   I don't know.

3      Q.   Can you tell me generally?

4      A.   No.  No idea.

5      Q.   Can you tell me about how many years old

6  it is?

7      A.   I really --

8           MR. MORRISON:  Form.

9      A.   I can't.

10     Q.   What's your ownership interest in Health

11  Care Navigator?

12     A.   I don't know if I have any.

13     Q.   Are you an officer of that company?

14     A.   I think I've answered this already.

15     Q.   I apologize.  I'm not --

16     A.   Yeah.

17     Q.   -- attempting to ask that again.

18     A.   I don't know.  I don't think so.

19     Q.   Okay.  Do you know who is?

20     A.   No.

21

22          (An off-the-record discussion was held.)

23

24     Q.   What services does Health Care Navigator

1   provide to Cypress Healthcare Management?

2           MR. MORRISON:   Form.

3       A.   Again, I'm not -- I'm not specifically

4   sure Health Care Navigator has a variety of services

5   they provide.  I don't know specifically what they

6   do for Cypress.

7       Q.   What does Cypress do specifically?

8       A.   Again, I don't -- I'm not sure what their

9   structure is and what services they provide.

10      Q.   Now, to be clear, I'm not asking you

11  corporate structure this moment about Cypress.  I'm

12  asking what do they do, and you're telling me you

13  don't know?

14      A.   I think they -- I think they manage

15  long-term care facilities.

16      Q.   Okay.  And Cypress is a company that you

17  do have an ownership interest in; correct?

18      A.   I'm not sure if I do or don't.

19      Q.   Do you know whether you're an officer?

20      A.   I don't believe I am.

21      Q.   Okay.  Are you -- do any of the companies

22  that are part of the Schwartzberg Company --

23  Schwartzberg Companies that are related to health

24  care, so I'm limiting to the health care issues, do

1   any of those companies have boards?

2        A.    I don't -- I don't know.

3        Q.    Do you sit on the board of any company

4   related to the Schwartzberg Companies?

5        A.    I don't -- I'm not -- I don't think so.

6        Q.    Do you attend meetings related to any of

7   the nursing homes in the State of Florida?

8             MR. MORRISON:  At the facility?

9             MS. KNIGHT:  No.  A very general question.

10       A.    What facilities are you talking about?

11       Q.    The nursing homes in Florida.

12       A.    All nursing homes in Florida or --

13            MR. MORRISON:  Let me just object to the

14       form, but go ahead.

15       Q.    The nursing homes in Florida that are

16  called either Palm Garden or Palm Terrace.

17       A.    No.

18       Q.    Okay.  Would it be fair to say that

19  generally when someone makes an investment, they

20  expect someone, either themselves or someone else,

21  to watch the investment and make sure that it

22  provides a return?

23       A.    Again, I think there's active and there's

24  passive investments, and sometimes no.  Sometimes

```
 1   you just hope you get a return at the end of the
 2   day.
 3       Q.   Do you get a return from the investments
 4   in the State of Florida, the nursing homes in
 5   Florida?
 6       A.   Again, as I've said to you a number of
 7   times, I have a variety of investments; some are in
 8   Florida, some are -- they are not discussed here.
 9   So I don't -- what -- you're talking about palm
10   gardens; do I get a --
11       Q.   My question was whether you receive a
12   return from any of the nursing homes in Florida.
13            MR. MORRISON:   Object to the form.
14       A.   I don't know specifically what buildings
15   in Florida have a return and do not have a return.
16       Q.   My question was:   Do you get a return from
17   any of the nursing homes in Florida?
18            MR. MORRISON:   Same objection.
19       A.   Well, again, I'll repeat the same
20   question -- the same answer, there are a variety of
21   investments that we make in the State of Florida.
22       Q.   Who is we?
23       A.   Me.
24       Q.   Okay.   Was that the royal we?
```

1      A.    Yeah.

2      Q.    Okay.  And I'm asking whether you receive

3  a return from any of the nursing homes that you

4  invest in in Florida.

5      A.    I don't know -- I honestly haven't looked

6  to see what the returns are or have been.

7      Q.    Okay.  Where would you look?

8      A.    I would see if I got a check.

9      Q.    Okay.  If you get a check, from whom does

10  it come?

11      A.    Whoever I would make the investment in.

12      Q.    Okay.  So if there were --

13      A.    So specifically to answer your question on

14  whatever facility you're talking specifically, I

15  have not gotten checks directly from that facility

16  ever.

17      Q.    And if you -- there is a return on your

18  investment in Florida, who does it come from other

19  than the nursing homes themselves?

20      A.    I have no idea.

21      Q.    Do you have an investment interest in

22  Cypress?  And if I asked this, I apologize.  I'm

23  trying to follow what you're telling me about how

24  you receive your returns.

1      A.    Again, I don't know what my investment is
2  in Cypress.
3      Q.    Okay.  Who has documents that would show
4  what your investment interest is in the nursing
5  homes in Florida?
6      A.    I guess Mr. Blalock.
7      Q.    Okay.  Anyone other than Mr. Blalock?
8  Anyone other than general counsel at the
9  Schwartzberg Companies?
10     A.    I don't know.
11     Q.    Is Mr. Blalock who you would ask the
12 answer to some of the questions I've been asking
13 you?
14     A.    Probably.
15     Q.    Okay.  Does Mr. Blalock work in -- at the
16 4 West Red Oak Lane address?
17     A.    Yes.
18     Q.    Okay.  Other than 4 West Red Oak Lane, do
19 you have any other business address?
20     A.    No.
21     Q.    Okay.  What's the difference between
22 Cypress Healthcare Group and Cypress Healthcare
23 Management?
24          MR. MORRISON:  Form.

1      A.    I have no idea.

2            MS. KNIGHT:  Okay.  Let's mark that.

3      Ma'am, can you mark that, please.

4

5            (Plaintiff's Exhibit 1, 2007 LIMITED

6      LIABILITY COMPANY ANNUAL REPORT, was marked for

7      identification.)

8

9      Q.    Sir, you've been handed what's marked

10     Exhibit Number 1.  I know you've had a minute to

11     look at it.

12            Do you recognize the form of this

13     document?

14     A.    No.

15     Q.    Okay.  Do you see at the top that it says

16     it's a 2007 limited liability company annual report?

17     A.    Yes.

18     Q.    And do you see the -- it says it was filed

19     with the secretary of state, next to that?

20     A.    Yes.

21     Q.    I'll represent to you, sir, that this is

22     from the State of Florida.  Okay?  All right?

23     A.    Yeah.

24     Q.    All right.  Do you see under managing

1    members that you are listed as the managing member

2    for this company?

3         A.    Yes.

4              MR. MORRISON:  Object to the form.

5         Q.    And you see that the company is New

6    Surfside Administrators; do you see that at the top?

7         A.    Yes.

8         Q.    Does reviewing this document refresh your

9    memory about what New Surfside Administrators does?

10        A.    No.

11        Q.    Do you remember attending meetings as a

12   managing member for New Surfside Administrators?

13        A.    I don't.

14        Q.    Okay.

15

16             (Plaintiff's Exhibit 2, APPLICATION FOR

17        REGISTRATION OF FICTITIOUS NAME, was marked for

18        identification.)

19

20        Q.    Sir, you've been handed what's marked

21   Exhibit Number 2, and I know you had a minute to

22   look at it.

23             Do you recognize the form of this

24   document?

1       A.    No.

2       Q.    Okay.  I will represent to you, sir, that

3  this also came from the State of Florida.

4             Do you see at the top that it says

5  application for registration of fictitious name?

6       A.    Uh-hum.

7       Q.    Is that yes?

8       A.    Yes.

9       Q.    All right.  And down in the first box, it

10 says that the fictitious name is Cypress Healthcare

11 Management; do you see that?

12      A.    Yes.

13      Q.    All right.  Are you familiar with that

14 McMullen Booth Road address, the 3480 McMullen Booth

15 Road in Clearwater?

16      A.    No.

17      Q.    Do you see down in the Section 2, it says

18 owners of fictitious name if other than individual,

19 and it lists New Surfside Administrators?

20      A.    Yes.

21      Q.    And it says care of Schwartzberg

22 Associates LLC; do you see that?

23      A.    I do.

24      Q.    What is Schwartzberg Associates LLC?

1        A.    I don't know.  I mean, it's an LLC.

2        Q.    Understood.  Do I understand you don't

3    know what Schwartzberg Associates is or what they

4    do?

5        A.    I don't.

6        Q.    Okay.  Do you recognize the signature down

7    there in Section 3?

8        A.    No.  I don't see my name on here anywhere.

9    Is it supposed to be?

10       Q.    Well, I can't tell you that; I didn't

11   complete the document.

12             Do you recall the name Cypress Healthcare

13   Management being used as a fictitious name or a

14   doing business as for some of the business in

15   Florida?

16       A.    I don't recall.

17       Q.    Okay.  Do you know who Donna Welsh [ph.]

18   is?

19       A.    No.

20             MS. KNIGHT:  Let's mark this.

21

22             (Plaintiff's Exhibit 3, LETTER FROM ARI

23        MARKENSON DATED AUGUST 3, 2007, was marked for

24        identification.)

1

2          MR. MORRISON:  Take a couple seconds to

3     look at it.

4     Q.   You've been handed what's been marked

5 Exhibit Number 3.  Sir, please take your time and

6 you let me know when you're ready.  Okay?

7     A.   Okay.

8     Q.   Okay.  Do you recognize this letter?

9     A.   No.

10    Q.   You've never seen it before?

11    A.   No.

12    Q.   Okay.  Who is Ari Markenson?

13    A.   He's a lawyer.

14    Q.   And did he used to be with general counsel

15 at the Schwartzberg Companies?

16    A.   I don't know who he worked for.  I don't

17 know what -- who he was employed by.

18    Q.   Did he do work for the Schwartzberg

19 Companies back in 2007?

20    A.   I think so.

21    Q.   Okay.  Do you see down at the bottom of

22 that first page where it's talking about, it says in

23 bold, Palm Garden facilities?

24    A.   Yes.

1  Q. Okay. And it talks about how New Rochelle
2  Administrators as of August of 2007 was the parent
3  of and owned the outstanding membership interests
4  in, and it lists 14 LLCs; do you see that?
5  A. Yes.
6  Q. All right. And on the second page, I
7  think it's fifth from the bottom, one of those is
8  SA-PG Sun City Center LLC doing business as Palm
9  Garden of Sun City; do you see that?
10  A. Yes.
11  Q. All right. Does that refresh your memory
12  about who owned the licensee for Sun City Center?
13  A. This is the first time I'm seeing this
14  letter.
15  Q. Okay. Understand. But I'm asking if that
16  refreshes your memory about who owned the licensee.
17  A. It describes a proposed ownership
18  structure.
19  Q. Actually, it describes a current ownership
20  structure and the proposed ownership structure;
21  correct?
22  A. Okay.
23  Q. Is that right?
24  A. Sure.

1      Q.   Okay.  And if you will look at Exhibit 1,

2  which it says is the current at that time, August of

3  2007, current ownership structure for the nursing

4  homes; do you see that?

5      A.   Okay.

6      Q.   Exhibit 1?

7      A.   Yes.

8      Q.   And do you see that it says on the

9  right-hand side, third down, SA-PG Sun City Center

10  is listed; correct?

11     A.   Yes.

12     Q.   All right.  And then above that is New

13  Rochelle Administrators.

14     A.   Uh-hum.

15     Q.   Do you see that?

16         MR. MORRISON:  Is that a yes?

17     Q.   Is that a yes?

18     A.   Yes.

19     Q.   Okay.  And then just above -- immediately

20  above that it says Harris Schwartzberg Trust; do you

21  see that?

22     A.   Yes.

23     Q.   All right.  And then right next to that it

24  says Harris Schwartzberg?

 1        A.    Yes.

 2        Q.    Okay.  Do you recall that you individually

 3   were an owner in the Sun City Center nursing home?

 4        A.    I don't recall.

 5        Q.    Okay.  If you will look at the second

 6   chart, to the second exhibit, this -- in the letter

 7   this is described as the proposed new corporate

 8   structure, and I know this is hard to read, but

 9   that's the way it is.

10        A.    This is the one that says confidential?

11        Q.    It is.

12        A.    Okay.

13        Q.    So that you know, it's part of the public

14   record --

15        A.    No.  No.  No.  I just asked you the

16   question.  I just asked you the question.

17        Q.    It is.  It says, in handwriting, Exhibit 2

18   at the top; are you with me on the correct page?

19        A.    Yep.

20        Q.    Okay.  And this is the proposed new

21   structure.  Do you recall the structure changing --

22        A.    No.

23        Q.    -- for these nursing homes in the State of

24   Florida?

1      A.    No.

2      Q.    Okay.  Do you know what JS Midwest Trust

3  is?

4      A.    No.

5      Q.    How about HS Midwest Trust?

6      A.    No.

7      Q.    FAM Midwest Trust?

8      A.    No.

9      Q.    All right.  And over on the right-hand

10  side, there's a Schwartzberg 2004 defendant's trust.

11  Are you familiar with that?

12      A.    No.

13      Q.    How about right next to that to the left,

14  Schwartzberg family, and it's a trust it says

15  underneath?

16      A.    It's a trust.  I don't know what the trust

17  is.

18      Q.    Okay.  I'm looking right here.

19      A.    Yeah, I see it.

20      Q.    Okay.

21      A.    I said --

22      Q.    And you don't know what that trust is?

23      A.    No.

24      Q.    Were you the trustee for any of the family

1   member's trusts that had an ownership interest in

2   this nursing home?

3        A.   I don't know.

4        Q.   Are you the trustee for any family

5   member's trusts?

6        A.   I believe I am.

7        Q.   Who handles the documentation for you as

8   the trustee of the trusts?

9        A.   What do you mean by "the documentation"?

10       Q.   As a trustee, you have certain

11  responsibilities and obligations to the trust; is

12  that fair to say?

13       A.   Yes.

14       Q.   Okay.  Who handles that paperwork?

15       A.   I believe the accountants.

16       Q.   Okay.  And then -- and you rely on the

17  accountants to handle your obligations as a trustee?

18       A.   Yeah.

19       Q.   Are those the same accountants that handle

20  your personal finances?

21       A.   Yeah.

22       Q.   Okay.  And are those the same accountants

23  that were involved with the Schwartzberg Companies?

24       A.   To a certain degree.

1      Q.   Okay.  Has the individual that you deal

2   with, and I understand -- I want to know who that

3   is, and I know counsel has instructed you not to

4   answer, so I will just deal with that later, but is

5   that -- has that individual changed over time?

6           MR. MORRISON:  Form.

7      A.   No.

8      Q.   Okay.  So you've used the same person for

9   many years?

10     A.   Yes.

11     Q.   Okay.  I don't have any more questions for

12   you on that document at the moment.

13          MR. MORRISON:  I just object to the form

14      of the inclusion of that document.  His

15      signature is not on it.  He didn't authorize

16      it, and he has no personal or direct knowledge

17      of it.

18          MS. KNIGHT:  Let's mark that.

19

20          (Plaintiff's Exhibit 4, LICENSE

21      APPLICATION FOR PALM GARDEN OF SUN CITY, was

22      marked for identification.)

23

24          MR. MORRISON:  That's the application?

1            MS. KNIGHT:  Yes.  In exactly the form we

2        received it in the state.

3            MR. MORRISON:  Okay.

4            MS. KNIGHT:  Okay.

5        Q.   Sir, you've been handed what's marked

6    Exhibit Number 4, and I will represent to you that

7    when we asked the State of Florida for the license

8    application for S -- for Palm Garden of Sun City,

9    these were the documents that the state provided to

10   us.  Okay?

11       A.   Okay.

12       Q.   All right.  If you can flip a few pages

13   in, maybe six or eight pages in, there's a page that

14   looks like this, it says AHCA in the upper

15   right-hand corner.  There we go.  Same page.

16            All right.  And do you see that under

17   facility identification it says Palm Garden of Sun

18   City?  Do you see that typed in in the second box?

19       A.   Yeah.

20       Q.   Okay.  And this is the one -- there's a

21   received date at the top of April of 26 of 2007; do

22   you see that?

23       A.   I do.

24       Q.   All right.  If you will flip the page,

1  this is referenced throughout the application.  For

2  example, if you look at the very next page after

3  that, you will see that at the top it's the names of

4  the entities with an interest, and it says "see

5  attached."

6      A.    Yeah.

7      Q.    Okay.  Looking at that page that the top

8  says controlling interest information for nursing

9  homes, do you see that?

10     A.    I do.

11     Q.    Okay.  It says licensee, and it lists the

12 licensee as SA-PG Sun City Center; correct?

13     A.    Yeah.

14     Q.    All right.  And then there's the New

15 Rochelle Administrators we've been talking about

16 underneath it; is that right?

17     A.    Right.

18     Q.    If you go down to management company, do

19 you see that in the next line down?

20     A.    Yeah.

21     Q.    It lists New Surfside Administrators LLC

22 is the management company; do you see that?

23     A.    I do.

24     Q.    Do you recall being the managing member of

1   the management company for nursing homes in Florida?

2      A.   I don't.

3      MR. MORRISON:  Object to the form.

4      A.   Doesn't this page say Maxwell Stolesberg

5   is the manager and sole member?

6      Q.   Not for the management company.  That's

7   for SA-PG Sun City Center LLC, and that's the

8   company that holds the license.  Okay?

9      A.   Gotcha.

10      Q.   If you look -- actually, if you will turn

11   two pages past that diagram, you will see at the

12   top, it says management company.

13      A.   Yeah.

14      Q.   New Surfside Administrators.

15      A.   Right.

16      Q.   Okay.  And then it says "see attached,"

17   and that refers us back to the diagram or the list

18   that has the management company New Surfside

19   Administrators and then lists the ownership; do you

20   see that back on this page?

21      A.   I do.

22      Q.   Okay.  And we've -- we've seen Exhibit

23   1 -- if you'll go back to Exhibit 1.

24      A.   Uh-hum.

 1      Q.    This is the document that listed you as
 2   the managing member or manager, do you see that, for
 3   New Surfside Administrators?
 4      A.    I do.
 5      Q.    Okay.  And then we have Exhibit 4 which
 6   says that New Surfside Administrators was the
 7   management company for this nursing home; is that
 8   right?
 9      A.    Yeah.
10      Q.    Okay.  Does that -- does looking at these
11   exhibits at this point refresh your memory about
12   being the managing member or manager for New
13   Surfside Administrators?
14      A.    No.
15            MR. MORRISON:  Object to the form.
16      Q.    When -- I have a general question for you.
17   Okay?
18      A.    Sure.
19      Q.    When you invest in nursing homes --
20      A.    Uh-hum.
21      Q.    -- does your company become involved in
22   getting the certificate of need and building nursing
23   homes, or are you usually acquiring a nursing home
24   that already exists?

1          MR. MORRISON:  Form.  But go ahead, if you

2     know.

3      A.   Where -- we do a variety of different

4   things.

5      Q.   Okay.  So you do both of those things?

6      A.   I don't know if we've -- we do -- we

7   invest, we invest passively.  We haven't built in

8   many years.

9      Q.   Okay.  Do you remember the last time you

10  actually built a nursing home in Florida?

11     A.   No.

12     Q.   Was it before or after 2002; do you know?

13     A.   I don't -- I don't remember.  I don't know

14  if we -- I don't even know if we've actually ever

15  built a nurse -- a skilled nursing facility in

16  Florida.

17     Q.   Okay.  Are you familiar with the -- well,

18  then I won't ask that.  That's fine.

19          We can look back at Exhibit 3 for a

20  moment.  And look on the first page over onto the

21  second page where there's a the list of the Palm

22  Garden facilities.  Do you see that?

23     A.   Yep.

24     Q.   Do you know whether you acquired an

1  interest in all of those nursing homes at the same

2  time?

3      A.   I don't recall.

4           MR. MORRISON:  Form.

5      Q.   If you will look down to the Palm Terrace

6  facility section, which is on that second page --

7      A.   Uh-hum.

8      Q.   -- there three nursing homes listed; do

9  you see that?

10     A.   Yes.

11     Q.   Were those three nursing homes acquired at

12 the same time?

13     A.   I'm not sure.

14     Q.   Who would know that?

15     A.   I don't know.  That's -- that was a while

16 back, so I'm not sure who; a lot of turnover in the

17 organization.

18     Q.   Okay.  Would you start with your counsel

19 if you needed to know an answer to that question?

20     A.   Sure.

21     Q.   Mr. Blalock?

22     A.   Yeah.

23     Q.   Okay.  Who maintains the -- and if I asked

24 this already, I apologize.  Who maintains the

1  documents that create the various LLCs?

2      A.   I'll, again, defer to Mr. Blalock.

3      Q.   Okay.  Do you know whether the nursing

4  homes in Florida are self-insured?

5          MR. MORRISON:  Form.  Go ahead, if you

6      know.

7      A.   I don't know.

8      Q.   Who handles acquiring insurance for the

9  nursing homes?

10         MR. MORRISON:  Form.

11     A.   I'm not sure who -- I don't know who is

12 responsible for that.

13     Q.   Okay.  Who would you ask to find out who

14 handles that for you for the companies?

15     A.   My friend, Mr. Blalock.

16     Q.   Okay.  He's becoming very popular.

17     A.   Always.

18     Q.   All right.  What's Cypress Administrative

19 Services?

20     A.   I don't know what they do.

21     Q.   All right.  Do you have an ownership

22 interest in that company?

23     A.   I don't believe so.

24     Q.   Do you know whether you're an officer of

1  that company?

2        A.    I don't know.

3        Q.    Okay.  How about HMS Purchasing LLC?  What

4  is that company?

5        A.    I think they do purchasing.

6        Q.    For the nursing homes?

7        A.    Again, I'm not sure specifically who their

8  clients are.

9        Q.    Are you an owner?

10       A.    I don't think so.

11       Q.    How about an officer?

12       A.    I don't think so.  I don't recall.

13       Q.    Okay.  How about Elite Rehabilitation LLC?

14             MR. MORRISON:  Object to the form.

15       Q.    Do you know that company?

16       A.    It's a rehab company.

17       Q.    And does it provide services to companies

18  other than those related to Schwartzberg Companies?

19       A.    Again, I don't know who their client list

20  is.

21       Q.    Okay.  Are you an owner, an officer of

22  Elite Rehabilitation?

23       A.    I don't know.  I don't believe so.

24       Q.    Have you ever -- strike that.

1           When is the last time you were in the

2    State of Florida?

3           A.    A few weeks ago.

4           Q.    Okay.  Your dad lives down there; is that

5    right?

6           A.    Yeah.

7           Q.    All right.  When you go down to Florida,

8    is it usually to see your dad?

9           A.    Play golf.

10          Q.    Okay.  Where do you usually go?

11                MR. MORRISON:  Form.  You may answer.

12          A.    A variety of places.  All over.

13          Q.    All right.  Have you visited any of the

14   nursing homes in which you have an ownership

15   interest while you've been --

16          A.    I have never ever been.

17          Q.    Let me finish my question.

18          A.    Sure.

19          Q.    -- when you've been in the State of

20   Florida?

21          A.    No.

22          Q.    Okay.  Who is responsible for negotiating

23   the leases on the properties in Florida, the nursing

24   homes?

1          MR. MORRISON:  Object to the form.  If you

2     know.

3     A.    Mr. Blalock.

4          MR. MORRISON:  Aren't you glad you came?

5          MS. KNIGHT:  Hey, at least he's got fair

6     warning.

7     Q.    Without telling me what you discussed with

8     Mr. Blalock, how frequently do you talk to Mr.

9     Blalock about the nursing homes in which you have an

10    interest?

11         MR. MORRISON:  Object to the form, but go

12    ahead.

13    A.    No more or less than I talk about anything

14    I'm invested in.

15    Q.    Okay.  How frequently is that?

16    A.    Weekly.  Sometimes less.  Sometimes far

17    less.

18    Q.    Okay.

19    A.    Monthly.

20    Q.    Okay.  Somewhere between weekly and

21    monthly; is that fair to say?

22    A.    Yeah.

23    Q.    Okay.  Are there times when you speak to

24    him more frequently about what's going -- about the

1    nursing homes in Florida?

2              MR. MORRISON:  Form.  But go ahead.

3        A.    No.

4        Q.    Does Mr. Blalock give you financial

5    reports about the investments in Florida in nursing

6    homes?

7        A.    No.

8        Q.    What are the kinds -- without telling me

9    what Mr. Blalock's answers are, what are the kinds

10   of questions you have for him about the nursing

11   homes in Florida?

12             MR. MORRISON:  Object to the form.  But

13        you may answer.

14       A.    Just general discussions about what's

15   going on in the State of Florida.

16       Q.    Okay.  Tell me what that means.  I don't

17   know what you mean.

18       A.    Is it a stable state, is it a non-stable

19   state.  Opportunities.  That's generally it.

20       Q.    Okay.  Do the nursing homes in Florida,

21   the Palm Gardens Nursing Homes in Florida --

22       A.    Uh-hum.

23       Q.    -- have a loan agreement with GE Financial

24   for a credit line?

1          MR. MORRISON:  Object to the form.

2     Q.   Some form of GE.

3     A.   I don't think so.

4     Q.   Did they at some point?

5     A.   I don't believe so.

6     Q.   Okay.  Do you know whether the nursing

7  homes that are Palm Gardens have a line of credit

8  with a financing company?

9          MR. MORRISON:  You talking about now or

10     back?

11         MS. KNIGHT:  We'll start now and work our

12     way back.

13    A.   I believe they have one now.

14    Q.   Do you know who the lender is?

15    A.   No.

16    Q.   Okay.  Has that lender changed over time?

17    A.   I'm not -- I'm not sure.

18    Q.   How would you have become aware that there

19  was a line of credit for the nursing homes in

20  Florida?

21    A.   I just -- it's an assumption that most

22  operators in any state have lines of credit.

23    Q.   Okay.  You're certainly aware that some of

24  the companies related to the Schwartzberg Companies

1    have a line of credit with GE; is that fair to say?

2         A.    No.

3               MR. MORRISON:  Form.

4         A.    That they currently have a line of credit

5    with GE?

6         Q.    No.  That did.

7         A.    That's not what you said.

8         Q.    Okay.  Let's go back.

9         A.    Sure.  Let's start over.

10        Q.    There was a lawsuit that you participated

11   in filing against GE; is that fair to say?

12        A.    I don't think I can comment --

13              MR. MORRISON:  Objection to form.

14        A.    -- about any lawsuit.

15        Q.    I'm just asking whether it was filed.

16        A.    I don't know who -- what the -- who the

17   plaintiffs were and who filed.

18        Q.    Okay.  Is that lawsuit still pending?

19        A.    No.

20        Q.    Okay.  And that was related to nursing

21   homes in Louisiana; correct?  I believe.

22        A.    I believe so.

23        Q.    All right.  As far as your involvement

24   goes, is there any difference in your involvement

1  between the nursing homes in Louisiana and the

2  nursing homes in Florida?

3        A.   I've never really thought about it.

4        Q.   I'm asking you to.

5        A.   Okay.  Thank you.  I've never -- I was

6  never very active or active at all, never been to

7  any of those buildings in Louisiana just like I've

8  never been to any of these buildings in Florida.

9        Q.   Okay.  Would it be fair to say that your

10  involvement with the nursing homes in Louisiana was

11  the same as your involvement in the nursing homes in

12  Florida?

13             MR. MORRISON:  Form.

14        A.   I don't -- I don't think I'd characterize

15  it that way.

16        Q.   How is it different?

17        A.   Just every investment is different.

18        Q.   What's different about your involvement in

19  the investments in Louisiana versus your involvement

20  in the investments in Florida specifically related

21  to nursing homes?

22             MR. MORRISON:  Object to the form.  I

23        don't think we're here to talk about

24        investments in Louisiana, but if you have

1          direct information, you may answer.

2          A.   In Louisiana they might have asked me more

3    questions.  Anybody involved in the state Florida I

4    have really no -- no ties and no knowledge of how

5    things are operated.

6          Q.   Tell me what you mean by questions about

7    the state.  I'm just not following what you mean.

8    What questions would have been asked of you and by

9    whom in Louisiana?

10         A.   Whoever the acquiring group was might have

11   asked me some questions about whether it's a good

12   idea, not a good idea.

13         Q.   Okay.

14         A.   That's about it.

15         Q.   So your advice about whether to invest?

16         A.   It was strictly on a financial level.

17         Q.   Okay.  So with respect to the operations

18   of the nursing homes, would your involvement in the

19   operations of the nursing homes in Louisiana be the

20   same as your involvement in the operations of the

21   nursing home in Florida?

22         A.   No.

23         Q.   What's different?

24         A.   As I said, I was probably more active in

 1    Louisiana than I would ever be in any of these in

 2    Florida.

 3         Q.    Tell me how.

 4         A.    Just people asked my input and advice on

 5    financial questions.

 6         Q.    Okay.  Are you talking about financial

 7    questions before you made the investment or after

 8    you became invested?

 9         A.    It was more relationship issues with the

10    various -- with the lenders.

11         Q.    Okay.  So you're talking about from a

12    mortgagor line of credit lender relationship?

13         A.    An investor standpoint.

14         Q.    Okay.  So was your involvement, in your

15    mind, in the Louisiana nursing homes purely from an

16    investor perspective?

17         A.    Again, it might have been a little bit

18    more involved than in Florida.

19         Q.    Okay.  I need you to tell me how.

20         A.    They --

21              MR. MORRISON:  Object to the form.

22         A.    They ran into problems and just asked me

23    questions.

24         Q.    They ran into problems.  Who is they?

1      A.   Whoever the operating folks were.

2      Q.   Okay.  And what kind of problems did they

3   run into?

4      A.   With the lenders.

5      Q.   Okay.  Are you talking about -- just so

6   that I understand, are the issues that you're

7   talking about the issues that were the subject of

8   the lawsuit?

9      A.   What I'm talking about is the operations

10  and the financing of the facility which was tied to

11  one another.

12     Q.   All right.  And Cypress provided --

13  perhaps provides, but certainly provided management

14  services to the nursing homes in Louisiana; correct?

15     A.   I believe so.

16     Q.   And that's the same Cypress that provides

17  management services to the nursing homes Florida;

18  correct?

19     A.   I don't know if it's the same.  I think

20  it's separate management companies.

21     Q.   Okay.  Have you seen the Cypress Web site?

22     A.   No.

23     Q.   All right.  I will represent to you that

24  when you click on locations, when you go into

1   Cypress Healthcare, it lists several states.

2        A.    Okay.

3        Q.    Okay.  Louisiana and Florida being two of

4   the states that are listed.

5        A.    Okay.

6        Q.    Okay?  Is it your understanding that it's

7   not the same company that's providing services --

8        A.    I've never been on the Web site.

9             MR. MORRISON:  Objection.

10       Q.    -- under Cypress Health Group to the

11  nursing homes in Louisiana and Florida?

12       A.    I have --

13            MR. MORRISON:  Object to the form.

14       A.    I really have no idea.

15       Q.    Okay.  Do you have an e-mail address that

16  you use for work, not your private life?

17       A.    Yes.

18       Q.    What is that e-mail address?

19       A.    Hschwartzberg@sallc.net.

20       Q.    S-A-L-L-C?

21       A.    Yeah.

22       Q.    What does that stand for?

23       A.    I have no idea.

24       Q.    And I'm sorry, was it.com or.net?

1       A.    .net.

2       Q.    Okay.  Thank you.  When did you first

3    start using that e-mail for work?

4       A.    I don't recall.

5       Q.    Many years ago?

6       A.    I have absolutely no idea.

7       Q.    Okay.  Fair enough.

8             Do you recall your business e-mail

9    changing in the past several years?

10      A.    No.

11      Q.    If you're having trouble with your

12   computer, work-related computer, what's the name of

13   the person you ask to fix it; who do you give it to

14   and say fix this?

15      A.    Nobody.  I fix my own.

16      Q.    Okay.  Do you know who is in charge of

17   your IT department -- strike that.

18            Is there someone that is in charge of the

19   IT department at the Red Oak Lane address?

20      A.    Yeah.  I think it's Matt Horowitz.

21      Q.    How long has Matt Horowitz been with

22   Schwartzberg Companies?

23      A.    I don't -- I don't know.

24      Q.    Several years, just a couple years, about

1   how long?

2       A.   A couple years.

3       Q.   Who was there before Mr. Horowitz?

4       A.   I don't know.

5       Q.   Was there someone before Mr. Horowitz who

6   was in charge of the IT department?

7       A.   I don't recall.

8       Q.   Okay.  Are the IT -- is the IT department

9   in the Suite 201?

10      A.   I think so.

11      Q.   Do you have an assistant?

12      A.   I do.

13      Q.   Who is that?

14      A.   Susan Whitney.

15      Q.   How long has Ms. Whitney been with you?

16           MR. MORRISON:  Form, but go ahead.

17      A.   Many years.

18      Q.   Okay.  At least prior to 2007?

19      A.   Yeah.

20      Q.   Okay.  Do you have any other assistants

21  for your business for work-related stuff?

22      A.   Not directly.

23      Q.   Okay.  Who -- who does tour the facilities

24  in the State of Florida for the investors?

1          A.   I don't know if anybody does.

2          Q.   Okay.  The real estate that you talked

3    about, that Schwartzberg Companies invests in, is

4    that real estate health care-related?

5          A.   It's everything.

6          Q.   Okay.  So it's not limited to health care?

7          A.   No.

8          Q.   Who is Mitchell Starer?

9          A.   My brother-in-law.

10         Q.   Okay.  And does he work for or with the

11   Schwartzberg Companies?

12         A.   Yes.

13         Q.   What's his position?

14         A.   I don't know what his title is.

15         Q.   Okay.  What's he do?

16         A.   All sorts of things.

17         Q.   Like what?

18         A.   You could ask him.  I actually don't have

19   much to do with him on a daily basis.

20         Q.   I'm asking you what he does for the

21   companies.

22              MR. MORRISON:  Object to the form.

23         A.   A variety of things.  I don't actually

24   know.

1     Q.   Do you know who he reports to?

2     A.   No idea.

3     Q.   Was there any area or specialty of his?

4  You have lots of investments; was he concentrated on

5  any one or the other?

6     A.   No.

7     Q.   Does he have any health care background,

8  clinical background?

9     A.   No.

10    Q.   Do you know what his background is?

11    A.   Computers.

12    Q.   Okay.  And I didn't ask you, what is

13  your -- do you have a college degree?

14    A.   Yes.

15    Q.   What was that in?

16    A.   Economics.

17    Q.   All right.  From where?

18    A.   Michigan.

19    Q.   Any post-graduate study?

20    A.   Law school.

21    Q.   All right.  When was that?  When did you

22  graduate from law school?

23    A.   '92.

24    Q.   And what law school?

1      A.    Fordham.

2      Q.    Did you actually practice?

3      A.    No.

4      Q.    When you graduated from law school, what

5    did you start doing for a living?

6      A.    I worked in the senate.

7      Q.    Doing what?

8      A.    I worked for Max Baucus.

9      Q.    What did you do next?

10     A.    Some real estate development.

11     Q.    Was that through the Schwartzberg

12   Companies?

13     A.    I don't know who the entity was.

14     Q.    Okay.  Okay.  Have you ever been employed

15   by anyone other than Mr. Baucus or a company that

16   you were dealing with your personal investments in?

17     A.    Repeat that.

18     Q.    Sure.  I want to know if you've been

19   employed by -- and let me back up and say I

20   understand that you told me earlier that you're not

21   sure who you're technically employed by at the

22   moment and who you would receive your benefits

23   through; is that true?

24     A.    Yes.

```
 1        Q.    Okay.   Was the last person you were
 2   employed by or company that you were employed by Mr.
 3   Baucus?
 4        A.    Technically, I don't know if Mr. Baucus
 5   was my employer.
 6        Q.    Whoever the employer was when you were
 7   working for Mr. Baucus.
 8        A.    I'm not sure.  I worked for other people
 9   after that.  I don't know who.
10        Q.    Who --
11        A.    I mean, I honestly don't remember.  It was
12   20 years ago.
13        Q.    Tell me what you did.
14        A.    I did real estate development for some
15   folks.
16        Q.    Anything other than real estate
17   development?
18        A.    Not really.
19        Q.    What's that mean, "not really"?
20        A.    I don't think so.
21        Q.    Have you done anything but real estate
22   development?
23        A.    No.
24        Q.    Okay.  Now, at some point, you started
```

1    managing investments; correct?

2         A.    Uh-hum.

3         Q.    Other than real estate; correct?

4         A.    Yes.

5         Q.    All right.  When was the -- when did you

6    become involved with owning, operating, managing a

7    nursing home for the very first time?

8              MR. MORRISON:  Form, but go ahead.

9         A.    Built a -- built some facilities in

10   Nevada.

11        Q.    And were those the very first time you've

12   been involved in any way with a nursing home?

13        A.    Yeah -- well, as an investor.

14        Q.    As an investor.  How else had you been

15   involved with nursing?

16        A.    No, I'm -- that's my first real

17   involvement.  I've been involved in a nursing home

18   as an employee when I was in high school.

19        Q.    What did you do?

20        A.    Maintenance.

21        Q.    Okay.  What year did you build the

22   facilities in Nevada?

23        A.    Pre-2000.

24        Q.    Okay.  So mid to late '90s?

1      A.    Yeah.

2      Q.    All right.  What was the name of the

3    company that was involved in building those nursing

4    homes in Nevada?

5      A.    I don't remember.

6      Q.    Okay.  Were you living in New York at the

7    time?

8      A.    Yes.

9      Q.    I was asking you earlier about receiving

10   revenues from your investments in Florida.

11     A.    Uh-hum.

12     Q.    If there are revenues to be distributed to

13   the owners, do you receive a separate check or

14   payment from each of the companies, or do you

15   receive one payment for the revenues?

16           MR. MORRISON:  Form, but go ahead.

17     A.    I certainly don't receive a check from any

18   entity -- any specific facility.

19     Q.    Okay.  So there would -- there would not

20   be separate payments for each nursing home for which

21   there was a revenue distribution?

22     A.    No.

23     Q.    Okay.  Can you tell me, related to the

24   nursing homes, not any other investments that you

1  might have in Florida, whether you receive revenue

2  payments from one or more companies?

3      A.    Could you be more specific?

4      Q.    I'm trying to understand as it relates to

5  the nursing homes, whether you receive distributions

6  from one or more companies related to the nursing

7  homes in Florida.

8      A.    I really don't even know.

9      Q.    Okay.  Would that be a question for your

10  accountant?

11     A.    Yep.

12     Q.    To be named later?

13     A.    Yep.

14     Q.    Okay.

15         MS. KNIGHT:  Let's take a couple-minute

16     break so you don't have to sit there and watch

17     me flip through pages.

18         THE WITNESS:  You bet.

19         MS. KNIGHT:  Okay.

20

21         (Recess taken.)

22

23  BY MS. KNIGHT:

24     Q.    Who, other than general counsel, reports

 1  to you about the nursing homes in Florida?

 2     A.    Nobody really reports to me.

 3     Q.    How would you find out about the goings-on

 4  in Florida other than through your general counsel?

 5     A.    What do you mean by "goings-on"?

 6     Q.    Any -- anything you're going to learn

 7  about the nursing homes in Florida other than

 8  general counsel, how do you learn about it?

 9     A.    Again, I'm trying to answer and figure out

10  what kinds of things you're talking about.

11     Q.    Anything you learn about the nursing homes

12  in Florida, I understand from your earlier testimony

13  that for the most part you learn about whatever

14  you're going to learn about in Florida from Mr.

15  Blalock; correct?

16     A.    Uh-hum.

17     Q.    Is that a yes?

18     A.    Yes.

19     Q.    Okay.  Anyone other than Mr. Blalock or

20  your general counsel at the time?

21     A.    Just maybe any of the folks that you

22  mentioned at Health Care Navigator.

23     Q.    Okay.  I didn't mention anybody at Health

24  Care Navigator.

1       A.     The entity Health Care Navigator.

2       Q.     Who at Health Care Navigator do you

3   communicate with?

4       A.     Again, I don't know who -- who works for

5   Health Care Navigator specifically.

6       Q.     Who were you talking about the other folks

7   that you would learn about Florida from?

8       A.     I'm trying to think.  As I said, we have a

9   variety of investments.

10      Q.     Right.

11      A.     At a high level.  So when you're talking

12  about Florida, I actually -- there's not a whole lot

13  that I get involved with even asking these

14  particular facilities.

15      Q.     Anyone in particular from Health Care

16  Navigator?

17      A.     Not in particular, no.

18      Q.     Okay.  Is there anyone at Health Care

19  Navigator that you have more contact with than

20  others?

21      A.     No.

22      Q.     Who do you communicate with at Health Care

23  Navigator if you're going to talk to somebody over

24  there?

1      A.    I think Eric Roth.

2      Q.    Now, does Health Care Navigator work out

3  of the 4 West Road Oak Lane office?

4      A.    Yeah.

5      Q.    Same suite, 201?

6      A.    Yeah.

7      Q.    Okay.  Anyone other than Eric Roth?

8      A.    No.

9      Q.    Okay.  How many --

10      A.    Then again, I don't know if he's even

11  Health Care Navigator technically.  I don't know who

12  he's employed by.

13      Q.    Okay.  How many people, estimate, if you

14  don't know exactly, work out of the Suite 201 at the

15  4 West Red Oak Lane address?

16          MR. MORRISON:  Form.  Answer, if you know.

17      A.    30 or 40.

18      Q.    Does Cypress Health Group also work out of

19  that address?

20      A.    I don't believe so.  I'm not sure.

21      Q.    Does Cypress Administrative Services work

22  out of that address?

23      A.    I'm not sure.

24      Q.    Okay.  Cypress Administrative Services is

1   one of the companies that listed the 44 South

2   Broadway address as its principal business address.

3        A.   Okay.

4        Q.   Okay?  Would it have moved to the 4 West

5   Red Oak Lane address when you moved?

6        A.   I don't know.

7        Q.   When did you move?

8        A.   A couple years ago.

9        Q.   Did you maintain the space at South

10  Broadway?

11       A.   No.  There might have been a short time.

12       Q.   Okay.  Other than transition?

13       A.   Yeah.

14       Q.   Okay.  Do you receive the surveys -- well,

15  first, do you know what a survey is in a nursing

16  home?

17       A.   I do.

18       Q.   All right.  Do you receive the surveys for

19  the nursing homes in Florida?

20       A.   No.

21       Q.   Have you ever asked to review a survey for

22  a nursing home in Florida?

23       A.   I don't recall.

24       Q.   Does anyone tell you if a resident is

1  killed in a nursing home in Florida?

2         MR. MORRISON:  Form.

3     A.   Anyone?

4     Q.   Yes, sir.

5     A.   Generally --

6     Q.   Yes, sir.

7     A.   -- or in buildings that I'm potentially

8  invested in?  I mean, we're very active in the State

9  of Florida, so we hear about a lot of different

10 things.

11    Q.   Okay.  Tell me about what you hear.

12    A.   Just hear generally what goes on in the

13 state.

14    Q.   Okay.  And is that from Mr. Blalock or Mr.

15 Roth?

16    A.   Read in the paper.

17    Q.   Okay.  I'm not asking about what you read

18 in the paper.  I'm asking whether anyone tells

19 you --

20    A.   No.

21    Q.   Let me finish my question.

22    A.   Sure.

23    Q.   -- anyone tells you when a resident is

24 killed in a nursing home in Florida.

1           MR. MORRISON:  Form.

2      A.   No.

3      Q.   Okay.  Is that something that you would

4  want to know?

5      A.   Again, I'm not sure what you mean.  For

6  what reason?

7      Q.   Well, there are nursing homes that you

8  have an investment in; correct?

9      A.   Well, again, I think it's probably a good

10  point to clarify, when you keep talking about me

11  investing in a nursing home, I'm investing actually

12  at a level where I'm not -- I don't specifically

13  know what's going on in any of the buildings.  So,

14  therefore, why would I know what -- whether somebody

15  killed or if somebody new was hired.

16      Q.   Sir, according to what the company's

17  reported to the State of Florida, you were the

18  managing member of the management company of this

19  nursing home while Mr. Bush was there.  So that's

20  not exactly the 10,000-foot looking down that you're

21  referencing.  I mean, that's the managing member of

22  the management company for the nursing home who was

23  responsible for managing the day-to-day operations

24  of that nursing home.

1          MR. MORRISON:  Object to the form.

2     Q.    So I'm asking if you are told --

3     A.    No.

4     Q.    -- when one of the residents is killed in

5 one of the nursing homes that this company that you

6 were managing managed.

7          MR. MORRISON:  Object to the form.

8     A.    No.

9     Q.    Okay.  Is that information that you would

10 want to have?

11    A.    If I was actively involved in running a

12 business, that's absolutely something I would want

13 to know.

14    Q.    Who in your mind is -- are the folks that

15 are actively involved in managing these nursing

16 homes in Florida, the Palm Gardens nursing homes?

17    A.    The administrators.

18    Q.    And is it your testimony that the

19 administrators are the only people operating those

20 nursing homes?

21    A.    Administrators are in charge of running

22 any nursing home that I've ever been involved in.

23    Q.    Okay.  So then do you communicate with the

24 administrators of the Palm Gardens nursing homes?

1      A.    Never met them.

2      Q.    All right.  So how do you know whether the

3  nursing homes are being run well?

4      A.    That's a great question.  I don't.

5      Q.    Not something you concern yourself with?

6      A.    Well, I would concern myself with anything

7  that I'm actively involved with.  There's a lot of

8  things we invest in that I can't have day-to-day

9  control over how they run their business.

10      Q.    Okay.

11      A.    I don't check computer to see how they are

12  making their computers either.

13      Q.    You would certainly agree with me that

14  there's a difference between making computers and

15  taking care of the elderly and infirm; would you

16  agree?

17      A.    Absolutely.

18      Q.    Okay.  So would you agree that it's

19  important for there to be strict oversight of the

20  operations of nursing homes where the elderly and

21  infirm are being -- are paying to be cared for?

22          MR. MORRISON:  Object to the form.  But go

23      ahead.

24      A.    Can you repeat that again.

1     Q.   Yes, sir.  Would you agree with me that

2     there should be strict oversight of the operations

3     of the nursing homes where people are paying to be

4     cared for, elderly and infirm people are paying to

5     be cared for?

6     A.   I think those standards are set by the

7     state.

8     Q.   My question was:  Would you agree with me

9     that there should be strict oversight of those

10    nursing homes?

11    A.   I would agree with whatever the standards

12    are that are set by the State of Florida.

13    Q.   Is it your testimony that whatever the

14    standards are the State of Florida sets are the only

15    standards by which those nursing homes should

16    operate?

17         MR. MORRISON:  Object to the form.

18    A.   The state are the experts, so I would

19    defer to them to set the proper standards.

20    Q.   Okay.  So who is it that in your mind is

21    making sure that the nursing homes in the State of

22    Florida meet the state standards other than the

23    administrators?

24         MR. MORRISON:  Form.

1      A.   Again, the administrators are the CEOs of

2  those buildings.  They are in charge of running the

3  buildings.  If there are outside people that assist

4  them, I'm sure there's professionals that should be

5  helping each one of the buildings.

6      Q.   Who are those folks?

7      A.   I'm not specifically sure.

8      Q.   Okay.  Should there be someone supervising

9  the administrators to make sure they are doing a

10 good job?

11         MR. MORRISON:  Form.

12     A.   Some say yes, some say no.

13     Q.   All right.  In your experience over the

14 years, would you agree with me that administrators

15 are sometimes fired from nursing homes?

16         MR. MORRISON:  Form.

17     A.   Yeah.

18     Q.   Okay.  And would you agree with me that in

19 your nursing -- in the Palm Garden and Palm Terrace

20 nursing homes in the State of Florida administrators

21 have been fired over the years?

22     A.   I would assume so.

23     Q.   Okay.

24     A.   I don't have any knowledge of

1    administrators that have or have not been fired in
2    any of those buildings.
3        Q.    Who is it that would have that knowledge?
4        A.    Again, I'm not sure who is responsible for
5    actually operating those buildings.
6        Q.    Do you not wake up in the morning
7    wondering if the folks down there are being taken
8    care of?
9            MR. MORRISON:    Form.
10       A.    Again, I'm a financial investor, and I
11   would assume that if they weren't, that the State of
12   Florida would be making sure that they were.
13       Q.    Well, the State of Florida actually does
14   the surveys that tell you exactly what's going wrong
15   in your nursing homes; is that fair to say?
16           MR. MORRISON:    Form.
17       A.    You keep characterizing them as my nursing
18   homes.
19       Q.    Okay.
20       A.    I don't think that's --
21       Q.    The Palm Garden and Palm Terrace nursing
22   homes.  The State of Florida tells you, at least,
23   some of the things that are going wrong in those
24   nursing homes; right?

1            MR. MORRISON:  Objection to form.

2       A.   When you say they tell me, I don't

3    understand.

4       Q.   They survey the properties; correct?

5       A.   They do.

6       Q.   And they survey the operations of the

7    nursing home; correct?

8       A.   Right.  Correct.

9       Q.   And they cite those nursing homes for

10   deficiencies in their care; correct?

11      A.   Correct.

12      Q.   Tell me why you don't look at those to see

13   how the nursing homes are doing.

14           MR. MORRISON:  Form.

15      A.   It's not my job.

16      Q.   Whose job is it?

17      A.   I don't know.  Again, I think the way the

18   State of Florida works, it's the job of the

19   administrator.

20      Q.   Okay.  Do you have family relatives in any

21   of the nursing homes?

22      A.   No.

23      Q.   Okay.  Did you?

24      A.   No.

1      Q.    So testimony that one of your relatives

2  was in a Palm Garden or a Palm Terrace nursing home

3  is erroneous?

4      A.    I have never had, besides my dad, somebody

5  live down in Florida.  I had a family member live in

6  a facility up here in New York.

7      Q.    Okay.  And your dad has never been a

8  resident of one of the nursing homes in Florida;

9  correct?

10         MR. MORRISON:  Form.

11     A.    Correct.

12     Q.    Okay.  If I asked you this already, I

13  apologize.  Do you know what Mr. Roth's -- Eric

14  Roth's title is?

15     A.    No.

16     Q.    Okay.  Do you know what his background is?

17  Is he an attorney, an accountant, a compute guy; do

18  you know?

19     A.    Attorney.

20     Q.    Okay.  Is there anybody that works out of

21  the Suite 201 at West Red Oak Lane that has a

22  clinical background?

23         MR. MORRISON:  Form.

24     A.    I don't believe so.

1          MS. KNIGHT:  I'll suspend the deposition
2      given the earlier instructions not to answer
3      unless either of you have any questions.
4          MR. MORRISON:  I do have some questions,
5      about five minutes' worth of questions.
6   EXAMINATION
7   BY MR. MORRISON:
8      Q.   Mr. Schwartzberg, you said repeatedly you
9   never visited Palm Garden of Sun City Center; is
10  that correct?
11         MS. KNIGHT:  Form.
12     A.   Yes.
13     Q.   Okay.  Have you ever spoken to the
14  director of nursing at Sun City Center?
15     A.   Never.
16     Q.   Have you ever discussed budget or staffing
17  decisions with either the administrator or the
18  director of nursing at Sun City Center?
19     A.   No.
20     Q.   Fair to say you've never cut the budget or
21  instructed the administrative staff to cut staff at
22  Sun City Center?
23     A.   Never.
24     Q.   You just mentioned you never reviewed

1    surveys; is that correct?

2          A.    Correct.

3          Q.    Is it fair to say you never created any

4    policies that would apply to Palm Garden of Sun City

5    Center?

6          A.    Correct.

7          Q.    I think you mentioned that your background

8    is in economics and law; is that correct?

9          A.    Yes.

10         Q.    You're not a licensed nurse?

11         A.    No.

12         Q.    Not a licensed health care provider?

13         A.    No.

14         Q.    You're not involved in -- well, strike

15    that.

16               Are you involved in ordering any supplies

17    at Palm Garden of Sun City Center?

18         A.    No.

19         Q.    Have you ever ordered any supplies for

20    residents at Sun City Center?

21         A.    No.

22         Q.    Have you ever attended any clinical

23    meetings at Sun City Center in any way, shape, or

24    form?

1    A.    Never.

2    Q.    Ever been involved in any discussions

3 about care plans or risk management meetings at Sun

4 City Center?

5    A.    Never.

6    Q.    Have you ever directed -- well, strike

7 that question.

8        Do you have any -- do you have any direct

9 knowledge whatsoever about Mr. Bush, who is the

10 plaintiff in this case?

11    A.    No.

12    Q.    Ever meet the man?

13    A.    No.

14    Q.    Ever meet his personal representative,

15 Sandra Sue Kennedy?

16    A.    Never.

17    Q.    Do you have any knowledge about his health

18 conditions that existed at the time he was a

19 resident at Palm Garden of Sun City Center?

20    A.    No.

21    Q.    Fair to say you were not at the facility

22 on May 10th of 2008?

23    A.    I have never been to the facility.

24    Q.    All right.  Would you agree you had

1  nothing to do with whatever incidents are alleged to

2  have contributed to his demise in this case?

3          MS. KNIGHT:  Form.

4      A.   Not at all.

5      Q.   Given that you've never spoken to the

6  administrators, never spoken to the director of

7  nursing, is it fair to say you don't have anything

8  to do with the daily, weekly, monthly, or yearly

9  operation -- operation or management of Palm Garden

10  of Sun City Center?

11          MS. KNIGHT:  Form.

12      A.   Yes.

13      Q.   You've mentioned several times that you're

14  a passive investor; is that correct?

15      A.   Yes.

16      Q.   Would you expect that -- early on in the

17  deposition there were questions about New Rochelle

18  Administrators and Cypress Healthcare Management; do

19  you remember those questions in general?

20      A.   Yes.

21      Q.   Would you expect that Cypress, if it was a

22  management and consulting company, that it would

23  meet whatever applicable state and federal

24  requirements are applied to nursing homes?

1       A.   Absolutely.

2       Q.   All right.  It is not in your course and

3  scope to get involved in daily, monthly, or weekly

4  operations of Palm Gardens of Sun City or of any of

5  the other Palm Garden buildings that are under the

6  umbrella that was represented to you to be New

7  Rochelle or doing business as Cypress Healthcare

8  Management back in 2008; is that fair?

9            MS. KNIGHT:  Form.

10      A.   Not at all.

11      Q.   Okay.  Those -- you were shown Exhibit 4,

12  for example.  I think it was an application.

13      A.   Yeah.

14      Q.   Were you involved in any way in the

15  preparation of that document?

16      A.   Not at all.

17      Q.   Is your signature anywhere on that

18  document?

19      A.   I don't believe so.  No.

20      Q.   So you would have no personal knowledge

21  regarding what was contained in that document?

22      A.   No.

23            MS. KNIGHT:  Form.

24      Q.   That document references a change in

1  structure among the Cypress entities; is that fair?

2       A.   Yes.

3            MS. KNIGHT:  Form.

4       Q.   That's what it states?

5       A.   Yeah.

6       Q.   And you relied -- relied upon Cypress and

7  whatever appropriate legal accounting financial

8  advice, consulting advice for the preparation of

9  those kinds of documents; is that fair?

10      A.   Yes.

11           MS. KNIGHT:  Form.

12           MR. MORRISON:  Those are all the questions

13      I have.

14           MR. BUNTZ:  This is Rick Buntz.  I have no

15      questions.

16           MS. KNIGHT:  Sir, I have some follow-up

17      questions.  That's what happens when -- with

18      these things.

19  FURTHER EXAMINATION

20  BY MS. KNIGHT:

21      Q.   Who was the director of nursing at Palm

22  Gardens of Sun City?

23      A.   I have no idea.

24      Q.   Okay.  How about the administrator?

1      A.    Don't know.

2      Q.    All right.  Are you familiar even

3  generally with the regulations in the State of

4  Florida governing nursing homes?

5      A.    Not specifically, no.

6      Q.    Generally, my question was.

7      A.    Again, I don't know what you mean by

8  "generally."  But there are regulations that exist,

9  yes.

10      Q.    Okay.  And are you familiar with the fact

11  that in Florida there is a residents' rights

12  statute?

13      A.    I think I've read that, yeah.

14      Q.    Okay.  I'm not going to quiz you about it.

15  While you were the managing member of the management

16  company for Palm Garden, what did you do to ensure

17  that -- that the state and federal regulations

18  governing Palm Garden were being met?

19          MR. MORRISON:  Object to the form, and let

20      me state for the record, [there's] completely

21      misstates the legal nature of a managing member

22      and the difference between a manager or

23      operator of a nursing facility.  But to the

24      extent you can answer, go ahead.

1    A.   I had no involvement whatsoever.

2    Q.   Okay.  So you didn't do anything as the

3  managing member of the management company to ensure

4  that the rules and regulations governing Palm Garden

5  were being met?

6        MR. MORRISON:  Object to the form.

7        Mischaracterization.  Go ahead.

8    A.   Again, I don't even -- didn't even know I

9  was a managing member.

10   Q.   Okay.  Did anyone have the authority to

11  make you managing member without speaking to you

12  first?

13        MR. MORRISON:  Form.

14   A.   Counsel.  Whether they did it by mistake,

15  I don't know.

16   Q.   Are you aware that in the State of Florida

17  during the time frame we're talking about, that you

18  had what is defined by Florida law as a controlling

19  interest in Palm Garden of Sun City?

20        MR. MORRISON:  Object to the form.

21   A.   I did not know that.

22   Q.   Okay.  You had -- are you aware that under

23  the laws in the State of Florida, you also had a

24  controlling interest in the management company?

1      A.   I wasn't aware.

2      Q.   Are you -- there's a -- a trust called

3  Harris Schwartzberg trust; are you familiar with

4  that?

5      A.   I've heard of it.

6      Q.   Okay.  Are you the trustee of your trust?

7      A.   I don't know.

8      Q.   Okay.  You were personally served with a

9  complaint in the Bush matter; do you recall that?

10      A.   I don't.

11      Q.   All right.  When you receive or are served

12  with a complaint in a nursing home case, do you do

13  anything to determine whether the allegations about

14  what happened to the resident are true?

15          MR. MORRISON:  Form.

16      A.   Again, given the complicated nature of

17  everything I invest in, there is a fair amount of

18  service litigation cases, so, no, I don't.  I don't.

19  It's not my job.

20      Q.   You don't feel like it's your job to know

21  whether the residents are literally being killed in

22  the nursing homes that you invest in?

23          MR. MORRISON:  Object to the form.

24      Argumentative.

1      A.   Well, again, I'm -- as I said, I'm a
2  passive investor, and there's not much I can do.
3      Q.   As the managing member of the management
4  company you were legally required to do certain
5  things in the State of Florida.  I don't understand
6  how you could say that there's nothing that you
7  could do to make sure that the care being provided
8  to these residents was better.
9           How is there not something you could do?
10          MR. MORRISON:  Object to the form.
11      Mischaracterization of his duty in the law.  Go
12      ahead.
13      A.   Again, I had no involvement, no control,
14  and wasn't aware of however my name was put on the
15  license.
16      Q.   Tell me -- you have used the word "passive
17  investor" today.  Tell me what you mean by that.
18      A.   I invest and hope I get a return.
19      Q.   Okay.  But when we're talking about these
20  nursing homes, Palm Gardens and Palm Terrace in
21  Florida, your investments are in the licensee of the
22  company; correct?
23      A.   Again, I don't -- I'm not aware.  I don't
24  know.

1        Q.    Okay.   You've certainly seen documents
2   here today showing that you personally had an
3   individual interest in the licensee for Palm Garden;
4   correct?
5        A.    I see that I have some level, yes.
6        Q.    Okay.   And you've seen the documents that
7   show that you're an owner and a managing member of
8   the management company of the nursing home; correct?
9        A.    As shown to me as a managing member,
10  whatever that legal definition is.
11       Q.    Okay.   And you've seen documents that show
12  that, for example, Elite Rehabilitation is a company
13  related to those companies; do you recall that?
14       A.    No, I don't.
15       Q.    Oh, I didn't show you that document.   I'll
16  show you.
17           MR. MORRISON:   Object to the form.   I
18       think this is outside of the scope, but go
19       ahead.
20       Q.    Are you familiar with, generally speaking,
21  the fact that there are Medicaid cost reports that
22  have to be filed for nursing homes?
23       A.    Yes.
24       Q.    Okay.   And are you familiar, generally,

1   with the idea that there's a section in the Medicaid

2   cost reports for related organizations?

3        A.   Generally.

4        Q.   Okay.  Were you aware -- I'll point you to

5   Schedule K.  I'm going to show it to counsel first,

6   but this is the Medicaid cost report for July '07 to

7   June '08 on SA-PG Sun City, and I'll direct you both

8   to Schedule K.

9            MR. MORRISON:  Is this the same -- did you

10       attach this previously?

11           MS. KNIGHT:  Didn't attach it.

12           MR. MORRISON:  Okay.

13       Q.   Are you on Schedule K?

14       A.   Yes.

15       Q.   All right.  Is the page that you're

16   looking at in the top right-hand corner, is that

17   page 44 of 68?

18       A.   Yes.

19       Q.   All right.  If you'll turn the page one

20   more time, so twice.  Page 46 of 68.  Do you see

21   that Elite Rehabilitation is listed as a related

22   organization?

23       A.   Yes.

24       Q.   Okay.  And do you see that HMS Purchasing

1  is listed as a related organization?

2      A.   Yes.

3      Q.   And Cypress Administrative Services as a

4  related organization; correct?

5      A.   Yes.

6      Q.   All right.  So your investments are

7  related to the therapy services, the purchasing, the

8  management company, and the operating company;

9  correct?

10     A.   Each one of these --

11          MR. MORRISON:  Form.  Go ahead.

12     A.   -- are independent investments.

13     Q.   And according to the State of Florida they

14  are all related; correct?

15     A.   I don't know what that definition is, and

16  I don't know who prepared this.

17     Q.   Okay.  Is it your testimony that these

18  companies are not related organizations?

19          MR. MORRISON:  Form.

20     A.   No, that's not what I said.

21     Q.   Okay.

22     A.   I said I don't know.

23     Q.   All right.  Are there any companies other

24  than nursing homes that you are -- participate in

1 the ownership of different facets of that business?

2     A.   I'd have to -- I don't really know.

3 Possibly.

4     Q.   Okay.  What other types of investments

5 other than nursing homes or perhaps hospitals?

6         MR. MORRISON:  Object to the form.

7     A.   Real estate.

8     Q.   What is there to participate when owning

9 real estate other than owning the real estate?

10     A.   Maintenance.

11     Q.   Okay.

12     A.   I don't really know what else.

13     Q.   Okay.  Do you own a maintenance company

14 that handles the maintenance for your real estate

15 investments?

16     A.   I might have investments in them.

17     Q.   Okay.

18         MS. KNIGHT:  I don't have any other

19     questions for you.

20         MR. MORRISON:  I do not have any further

21     questions.  Rick, do you have anything?

22         MR. BUNTZ:  No questions.  Thank you.

23

24         (Continued on next page.)

1              (Plaintiff's Exhibit 5, COST REPORTER

2        FLORIDA MEDICAID PROGRAM NURSING HOME

3        PROVIDERS, was marked for identification.)

4

5

6              (Time noted:  3:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF NEW YORK          )

2                                      ss:

3  COUNTY OF                    )

4

5

6      I, HARRIS SCHWARTZBERG, hereby certify that I

7  have read the pages of the foregoing testimony of

8  this deposition and hereby certify it to be a true

9  and correct record.

10

11

12

13          _____

14              HARRIS SCHWARTZBERG

15

16

17

18

19  Sworn to before me this

20  _____day of _____, 2013.

21

22

23  _____

24      Notary Public

```
 1              I   N   D   E   X

 2

 3   EXAMINATION BY                    PAGE    LINE

 4   MS. KNIGHT                          3       6

 5   MR. MORRISON                       96       7

 6   FURTHER EXAMINATION BY

 7   MS. KNIGHT                        101      20

 8

 9   (Plaintiff's Exhibit 1,           45       5

10   2007 LIMITED LIABILITY COMPANY

11   ANNUAL REPORT, was marked for

12   identification.)

13

14   (Plaintiff's Exhibit 2,           46      16

15   APPLICATION FOR REGISTRATION

16   OF FICTITIOUS NAME, was marked

17   for identification.)

18

19   (Plaintiff's Exhibit 3,           48      22

20   LETTER FROM ARI MARKENSON

21   DATED AUGUST 3, 2007, was

22   marked for identification.)

23

24   (Plaintiff's Exhibit 4,           55      20
```

1    LICENSE APPLICATION FOR PALM

2    GARDEN OF SUN CITY, was marked

3    for identification.)

4

5    (Plaintiff's Exhibit 5,                110      1

6    COST REPORTER FLORIDA MEDICAID

7    PROGRAM NURSING HOME PROVIDERS,

8    was marked for identification.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1            C E R T I F I C A T I O N

 2

 3   STATE OF NEW YORK          )

 4                              )   ss.

 5   COUNTY OF WESTCHESTER      )

 6              I, ASHLEY PRINCIPE, Court Reporter

 7   and Notary Public within and for the County of

 8   Westchester, State of New York, do hereby certify:

 9              That I reported the proceedings that

10   are hereinbefore set forth, and that such transcript

11   is a true and accurate record of said proceedings.

12              AND, I further certify that I am not

13   related to any of the parties to this action by blood

14   or marriage, and that I am in no way interested in the

15   outcome of this matter.

16

17              IN WITNESS WHEREOF, I have hereunto

18   set my hand.

19

20

21                      Ashley Principe

22   _____

23              ASHLEY PRINCIPE

24              Court Reporter
```

```
1              ERRATA   SHEET
2    Deposition of: HARRIS SCHWARTZBERG
3    Re: THE ESTATE OF JOSEPH G. BUSH vs.
4         SA-PG-SUN CITY CENTER, LLC, et al.
5    Date Taken: May 14, 2013
6    Page          Line #          Correction   Reason
7    _____    _____    _____
8    _____    _____    _____
9    _____    _____    _____
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13   _____    _____    _____
14   _____    _____    _____
15   _____    _____    _____
16   _____    _____    _____
17
18                      _____
19                           HARRIS SCHWARTZBERG
20   Sworn to before me this
21   __day of_____, 2013.
22   _____
23        Notary Public
```

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

**[**

**[if] (1)**
27:1
**[ph] (1)**
48:17
**[sic] (1)**
34:11
**[there's] (1)**
102:20

**A**

**ability (1)**
18:11
**able (1)**
35:18
**above (3)**
51:12,19,20
**absolutely (4)**
74:6;89:12;90:17;
100:1
**abuse (1)**
12:22
**abusive (1)**
16:12
**according (3)**
28:10;88:16;
108:13
**accountant (6)**
18:21;19:12;20:7,
13;82:10;95:17
**accountants (5)**
19:6;54:15,17,19,
22
**accounting (3)**
19:19,24;101:7
**acquired (2)**
60:24;61:11
**acquiring (3)**
59:23;62:8;70:10
**acquisitions (1)**
37:18
**active (6)**
32:5;41:23;69:6,6;
70:24;87:8
**actively (3)**
89:11,15;90:7
**actual (2)**
11:1;32:10
**actually (14)**
5:7;8:20;16:3;
50:19;58:10;60:10,
14;76:18,23;78:2;
84:12;88:11;93:5,13
**address (22)**
4:17,18,22;18:12,
20;20:9,14,17;21:19;
22:11;44:16,19;
47:14;73:15,18;
74:19;85:15,19,22;
86:2,2,5

**addressed (1)**
17:18
**Administrative (5)**
62:18;85:21,24;
96:21;108:3
**administrator (3)**
94:19;96:17;
101:24
**Administrators (30)**
8:23;9:3,8;28:8,8;
46:6,9,12;47:19;
50:2;51:13;57:15,21;
58:14,19;59:3,6,13;
89:17,19,21,24;
91:23;92:1,9,14,20;
93:1;99:6,18
**advice (4)**
70:15;71:4;101:8,8
**advocate (2)**
32:14,16
**affidavit (2)**
16:14,18
**again (49)**
5:16;7:3;8:24;9:9,
13;11:9,15;12:2;
13:7;19:15;21:20;
22:12;26:2;27:6;
29:13,18;33:16,20;
34:9;36:14;38:10,19;
39:17;40:3,8;41:23;
42:6,19;44:1;62:2;
63:7,19;71:17;83:9;
84:4;85:10;88:5,9;
90:24;92:1;93:4,10;
94:17;102:7;103:8;
104:16;105:1,13,23
**against (2)**
16:5;68:11
**agent (1)**
25:24
**ago (6)**
17:8;26:3;64:3;
74:5;79:12;86:8
**agree (9)**
90:13,16,18;91:1,8,
11;92:14,18;98:24
**agreement (1)**
66:23
**AHCA (1)**
56:14
**ahead (27)**
5:14;8:1,15;9:5;
10:19;11:20;15:20;
22:1;27:24;28:20;
29:12;31:4;37:4;
41:14;60:1;62:5;
65:12;66:2;75:16;
80:8;81:16;90:23;
102:24;103:7;
105:12;106:19;
108:11
**al (1)**
115:4

**allegations (3)**
6:21;12:22;104:13
**alleged (1)**
99:1
**allowed (1)**
17:11
**although (1)**
14:5
**always (2)**
25:19;62:17
**among (1)**
101:1
**amount (2)**
14:4;104:17
**amounts (1)**
14:21
**ANNUAL (2)**
45:6,16
**answered (3)**
30:14;31:4;39:14
**anti-suicide (1)**
32:20
**apologize (4)**
39:15;43:22;61:24;
95:13
**applicable (1)**
99:23
**APPLICATION (7)**
46:16;47:5;55:21,
24;56:8;57:1;100:12
**applied (1)**
99:24
**apply (1)**
97:4
**appreciate (1)**
21:14
**appropriate (4)**
16:20,23,24;101:7
**April (1)**
56:21
**area (1)**
77:3
**Argumentative (1)**
104:24
**ARI (2)**
48:22;49:12
**Armonk (1)**
5:1
**around (3)**
7:6,7,18
**Ashley (1)**
3:3
**assist (1)**
92:3
**assistant (1)**
75:11
**assistants (1)**
75:20
**Associates (3)**
47:22,24;48:3
**assume (4)**
29:2;35:24;92:22;
93:11

**assumption (1)**
67:21
**attach (1)**
107:10,11
**attached (2)**
57:5;58:16
**attempting (1)**
39:17
**attend (1)**
41:6
**attended (1)**
97:22
**attending (1)**
46:11
**attention (1)**
33:10
**attorney (2)**
95:17,19
**AUGUST (3)**
48:23;50:2;51:2
**authority (2)**
25:23;103:10
**authorize (1)**
55:15
**authorized (1)**
25:24
**aware (16)**
6:24;8:22;10:11;
18:3,8;26:23;37:1,5;
67:18,23;103:16,22;
104:1;105:14,23;
107:4
**away (1)**
24:18

**B**

**back (25)**
7:17;13:3;14:16;
15:1,7,9,12;18:18;
22:4,7;23:9,12;27:2;
37:10;49:19;58:17,
20,23;60:19;61:16;
67:10,12;68:8;78:19;
100:8
**background (6)**
77:7,8,10;95:16,
22;97:7
**based (1)**
28:4
**basis (3)**
16:11;18:4;76:19
**Baucus (5)**
78:8,15;79:3,4,7
**became (3)**
28:18;29:1;71:8
**become (3)**
59:21;67:18;80:6
**becoming (1)**
62:16
**beforehand (1)**
17:17
**behalf (3)**

**12:15,15;25:23**
**benefits (3)**
5:19,21;78:22
**besides (1)**
38:4;95:4
**best (1)**
30:9
**bet (1)**
82:18
**better (1)**
105:8
**beyond (1)**
16:22
**bit (2)**
28:23;71:17
**Blalock (18)**
8:6,8;35:2;36:2;
44:6,7,11,15;61:21;
62:2,15;65:3,8,9;
66:4;83:15,19;87:14
**Blalock's (1)**
66:9
**blank (1)**
4:15
**board (1)**
41:3
**boards (1)**
41:1
**bold (1)**
49:23
**Booth (2)**
47:14,14
**both (2)**
60:5;107:7
**bottom (2)**
49:21;50:7
**box (2)**
47:9;56:18
**break (4)**
3:15,16;13:8;82:16
**bring (1)**
33:9
**Broadway (5)**
20:14,16,19;86:2,
10
**broke (1)**
15:10
**brother (1)**
24:18
**brother-in-law (1)**
76:9
**budget (2)**
96:16,20
**build (1)**
80:21
**building (9)**
21:22;23:2,16;
24:1;29:5;33:22,24;
59:22;81:3
**buildings (13)**
32:10;34:10;42:14;
69:7,8;87:7;88:13;
92:2,3,5;93:2,5;100:5

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

**built (5)**
60:7,10,15;80:9,9
**BUNTZ (4)**
17:5;101:14,14;
109:22
**Bush (11)**
6:6,19,22,22;7:1,5;
28:3;88:19;98:9;
104:9;115:3
**Bush's (1)**
6:7
**business (17)**
4:18;19:7;23:15;
26:11;27:4,10;44:19;
48:14,14;50:8;74:8;
75:21;86:2;89:12;
90:9;100:7;109:1
**businesses (2)**
23:1;27:13

## C

**call (1)**
38:12
**called (3)**
37:22;41:16;104:2
**came (4)**
6:14;14:2;47:3;
65:4
**campaign (6)**
12:14,17,20;13:22;
14:12;15:18
**Can (34)**
10:18;11:21;12:24;
13:8,11;14:10,12,22;
15:14;16:3;18:18,19,
20,23;19:9,10,11,21;
20:10;22:3,4;23:19;
29:3;35:2;39:3,5;
45:3;56:12;60:19;
68:12;81:23;90:24;
102:24;105:2
**care (45)**
6:5;7:14;9:16;
11:18,22;12:3,6,10;
14:4;29:20;37:19,22;
38:1,4,4,9,15,16,17,
24,24;47:21;76:6;
77:7;83:22,24;84:1,2,
5,15,18,22;85:2,11;
90:15;93:8;94:10;
97:12;98:3;105:7
**cared (3)**
90:21;91:4,5
**care-related (1)**
76:4
**case (6)**
6:8;17:12,21;
98:10;99:2;104:12
**cases (2)**
18:6;104:18
**Center (27)**

9:12;28:4,7,18;
29:1;30:2;33:19;
34:2;35:20;50:8,12;
51:9;52:3;57:12;
58:7;96:9,14,18,22;
97:5,17,20,23;98:4,
19;99:10;115:4
**Centers (3)**
27:22;28:9,13
**CEOs (1)**
92:1
**certain (5)**
14:1;37:2;54:10,
24;105:4
**certainly (5)**
67:23;72:13;81:17;
90:13;106:1
**certificate (1)**
59:22
**cetera (1)**
10:21
**change (1)**
100:24
**changed (2)**
55:5;67:16
**changing (2)**
52:21;74:9
**characterize (1)**
69:14
**characterizing (1)**
93:17
**charge (8)**
32:6,8,9;74:16,18;
75:6;89:21;92:2
**chart (1)**
52:6
**CHCCLP (1)**
25:7
**check (8)**
12:17;15:15,19;
43:8,9;81:13,17;
90:11
**checks (1)**
43:15
**children (1)**
32:19
**circumstances (1)**
28:16
**cite (1)**
94:9
**City (42)**
7:6,12;9:12;28:4,6,
6,18,24;29:4;30:2,4;
33:19,21;34:2;35:19,
20;50:8,9,12;51:9;
52:3;55:21;56:8,18;
57:12;58:7;96:9,14,
18,22;97:4,17,20,23;
98:4,19;99:10;100:4;
101:22;103:19;
107:7;115:4
**clarify (2)**
28:22;88:10

**clear (2)**
3:21;40:10
**Clearwater (1)**
47:15
**click (1)**
72:24
**client (1)**
63:19
**clients (4)**
37:17;38:20,21;
63:8
**clinical (3)**
77:8;95:22;97:22
**college (1)**
77:13
**coming (5)**
13:3;15:1,7;33:18;
34:2
**comment (1)**
68:12
**communicate (3)**
84:3,22;89:23
**communication (1)**
3:19
**Companies (66)**
5:6,8;6:1,4;7:18;
8:14;9:15,16,24;
10:15,21,24;14:1;
16:16;19:8,14;20:24;
21:5,10,15,19,23;
22:10,18,22;24:3,9;
25:15,19;26:8;28:19;
35:16;36:4,8,13,13,
23;37:3;38:21,22;
40:21,23;41:1,4;
44:9;49:15,19;54:23;
62:14;63:17,18;
67:24,24;72:20;
74:22;76:3,11,21;
78:12;81:14;82:2,6;
86:1;106:13;108:18,
23
**company (66)**
5:13,21;8:23;9:21;
11:8,24;12:1,12,15;
20:22;24:15;26:18,
20,22;27:1;28:14;
29:1;31:15;32:22;
36:18,19;37:11,12,
13;38:14;39:13;
40:16,22;41:3;45:6,
16;46:2,5;57:18,22;
58:1,6,8,12,18;59:7,
21;62:22;63:1,4,15,
16;67:8;73:7;78:15;
79:2;81:3;88:12;
89:5;99:22;102:16;
103:3,24;105:4,22;
106:8,12;108:8,8;
109:13
**company's (1)**
88:16
**comparison (1)**

20:21
**complaint (3)**
6:18;104:9,12
**complete (2)**
18:3;48:11
**completed (1)**
7:20
**completely (1)**
102:20
**complicated (2)**
29:18;104:16
**compute (1)**
95:17
**computer (3)**
74:12,12;90:11
**Computers (3)**
77:11;90:12,14
**concentrated (1)**
77:4
**concept (1)**
10:7
**concern (2)**
90:5,6
**conditions (1)**
98:18
**confidential (1)**
52:10
**consulting (9)**
11:24;12:1;26:10;
37:13,14,16;38:14;
99:22;101:8
**contact (1)**
84:19
**contacts (1)**
18:7
**contained (1)**
100:21
**Continued (1)**
109:24
**contributed (1)**
99:2
**contribution (2)**
12:17;15:18
**contributions (3)**
12:14,20;13:23
**control (2)**
90:9;105:13
**controlling (3)**
57:8;103:18,24
**conversation (5)**
8:9;13:12;15:2,5,6
**corner (1)**
56:15;107:16
**corporate (5)**
10:9;26:7;38:10;
40:11;52:7
**Correction (1)**
115:6
**cost (4)**
106:21;107:2,6;
110:1
**counsel (29)**
6:10,13,14;7:3;8:9;

15:3;17:1,19;23:22;
30:16,20;34:11,13,
15;35:4,8,13;36:17,
21;44:8;49:14;55:3;
61:18;82:24;83:4,8,
20;103:14;107:5
**couple (5)**
26:6;49:2;74:24;
75:2;86:8
**couple-minute (1)**
82:15
**course (1)**
100:2
**court (2)**
13:4;27:14
**courts (1)**
27:10
**create (2)**
36:18;62:1
**created (3)**
36:16;39:1;97:3
**creates (1)**
36:19
**credit (7)**
66:24;67:7,19,22;
68:1,4;71:12
**Crockett (1)**
18:7
**current (3)**
50:19;51:2,3
**currently (3)**
5:2,4;68:4
**cut (2)**
96:20,21
**cutoff (1)**
16:22
**Cypress (29)**
11:5;19:19,24;
40:1,6,7,11,16;43:22;
44:2,22,22;47:10;
48:12;62:18;72:12,
16,21;73:1,10;85:18,
21,24;99:18,21;
100:7;101:1,6;108:3

## D

**dad (4)**
64:4,8;95:4,7
**daily (3)**
76:19;99:8;100:3
**damages (3)**
16:23;17:22;18:1
**date (2)**
56:21;115:5
**DATED (1)**
48:23
**dates (2)**
4:12;7:6
**day (3)**
3:19;42:2;115:21
**day-to-day (2)**
88:23;90:8

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

**deal (2)**
55:1,4
**dealing (1)**
78:16
**dealings (1)**
26:4
**decide (2)**
33:4,11
**decisions (1)**
96:17
**defendant's (1)**
53:10
**defer (2)**
62:2;91:19
**deficiencies (1)**
94:10
**define (1)**
21:6
**defined (1)**
103:18
**definition (2)**
106:10;108:15
**degree (2)**
54:24;77:13
**delegate (1)**
37:7
**demise (1)**
99:2
**demonstrated (1)**
18:6
**department (4)**
74:17,19;75:6,8
**depo (1)**
17:16
**deposed (1)**
3:12
**deposition (9)**
4:11;6:7;17:20;
34:7,8;35:14;96:1;
99:17;115:2
**depositions (1)**
17:11
**depression (1)**
32:19
**Descendents (2)**
24:24;25:1
**described (1)**
52:7
**describes (2)**
50:17,19
**details (1)**
8:17
**determine (1)**
104:13
**development (4)**
78:10;79:14,17,22
**diagram (2)**
58:11,17
**difference (4)**
44:21;68:24;90:14;
102:22
**different (13)**
20:21,21;33:16,17,

17;37:15;60:3;69:16,
17,18;70:23;87:9;
109:1
**diligence (1)**
37:17
**direct (4)**
55:16;70:1;98:8;
107:7
**directed (1)**
98:6
**directly (2)**
43:15;75:22
**director (4)**
96:14,18;99:6;
101:21
**discovery (5)**
16:22;17:11,20,22;
18:11
**discuss (1)**
34:2
**discussed (6)**
6:11,13;34:24;
42:8;65:7;96:16
**discussion (2)**
35:15;39:22
**discussions (3)**
35:1;66:14;98:2
**distributed (1)**
81:12
**distribution (1)**
81:21
**distributions (1)**
82:5
**document (12)**
45:13;46:8,24;
48:11;55:12,14;59:1;
100:15,18,21,24;
106:15
**documentation (3)**
30:1;54:7,9
**documents (13)**
14:9;29:21;30:11;
31:1;35:11,22;44:3;
56:9;62:1;101:9;
106:1,6,11
**dollar (1)**
14:21
**donates (1)**
14:13
**donations (3)**
14:3,5,7
**done (4)**
14:22;25:17;34:24;
79:21
**Donna (1)**
48:17
**down (14)**
32:3;47:9,17;48:6;
49:21;51:9;57:18,19;
61:5;64:4,7;88:20;
93:7;95:5
**downs (1)**
31:21

**dozen (1)**
33:20
**drive (1)**
23:20
**due (3)**
17:9,9;37:17
**duly (1)**
3:2
**during (3)**
3:19;28:2;103:17
**duties (1)**
37:2
**duty (1)**
105:11

**E**

**earlier (5)**
35:13;78:20;81:9;
83:12;96:2
**early (2)**
4:11;99:16
**Economics (2)**
77:16;97:8
**eight (1)**
56:13
**either (7)**
4:12;36:4;41:16,
20;90:12;96:3,17
**elderly (3)**
90:15,20;91:4
**Elite (4)**
63:13,22;106:12;
107:21
**else (4)**
35:9;41:20;80:14;
109:12
**e-mail (4)**
73:15,18;74:3,8
**employed (10)**
5:3,4;25:12;49:17;
78:14,19,21;79:2,2;
85:12
**employee (6)**
5:7,11,13,17;
25:19;80:18
**employer (2)**
79:5,6
**end (1)**
42:1
**enough (2)**
38:5;74:7
**ensure (2)**
102:16;103:3
**entered (1)**
7:5
**entirely (1)**
30:21
**entities (3)**
38:11;57:4;101:1
**entity (5)**
11:1;24:23;78:13;
81:18;84:1

**Eric (3)**
85:1,7;95:13
**ERRATA (1)**
115:1
**erroneous (1)**
95:3
**estate (17)**
6:5,22;12:4;29:7,
16;76:2,4;78:10;
79:14,16,21;80:3;
109:7,9,9,14;115:3
**estimate (1)**
85:13
**et (2)**
10:21;115:4
**even (10)**
27:9;33:23;35:18;
60:14;82:8;84:13;
85:10;102:2;103:8,8
**everything's (1)**
33:16
**exactly (7)**
8:21;29:22;34:4;
56:1;85:14;88:20;
93:14
**EXAMINATION (3)**
3:5;96:6;101:19
**examined (1)**
3:3
**example (4)**
5:18;57:2;100:12;
106:12
**excuse (1)**
9:13
**executive (1)**
13:24
**Exhibit (18)**
45:5,10;46:16,21;
48:22;49:5;51:1,6;
52:6,17;55:20;56:6;
58:22,23;59:5;60:19;
100:11;110:1
**exhibits (1)**
59:11
**exist (1)**
102:8
**existed (1)**
98:18
**exists (1)**
59:24
**exits (1)**
13:18
**expect (3)**
41:20;99:16,21
**expected (1)**
35:14
**experience (1)**
92:13
**experts (1)**
91:18
**extent (2)**
11:11;102:24

**F**

**facets (1)**
109:1
**facilities (11)**
11:9,12;38:17;
40:15;41:10;49:23;
60:22;75:23;80:9,22;
84:14
**facility (7)**
7:14;30:6;31:21;
34:4,5;41:8;43:14,
15;56:17;60:15;61:6;
72:10;81:18;95:6;
98:21,23;102:23
**fact (4)**
6:6;8:13;102:10;
106:21
**failed (1)**
31:18
**fails (1)**
31:16
**fair (19)**
36:17;38:5;41:18;
54:12;65:5,21;68:1;
11;69:9;74:7;93:15;
96:20;97:3;98:21;
99:7;100:8;101:1,9;
104:17
**FAM (1)**
53:7
**familiar (19)**
6:6;7:11;8:12;9:7,
9,11;10:4;11:5;
24:11;25:6;33:22;
47:13;53:11;60:17;
102:2,10;104:3;
106:20,24
**family (5)**
53:14,24;54:4;
94:20;95:5
**far (3)**
35:18;65:16;68:23
**Farnell (1)**
18:8
**federal (2)**
99:23;102:17
**feel (1)**
104:20
**few (3)**
15:4;56:12;64:3
**fictitious (6)**
11:3;46:17;47:5,
10,18;48:13
**fifth (1)**
50:7
**figure (1)**
83:9
**filed (6)**
16:21;18:12;45:18;
68:15,17;106:22
**filing (1)**

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

68:11
**filings (2)**
26:7;28:10
**fill (1)**
4:15
**finance (1)**
18:13
**finances (15)**
15:22;16:2,4,7;
17:3,15,24;18:17,22;
19:13,14;20:4,8,14;
54:20
**financial (9)**
16:19;31:20;66:4,
23;70:16;71:5,6;
93:10;101:7
**financing (2)**
67:8;72:10
**find (3)**
33:7;62:13;83:3
**fine (2)**
13:6;60:18
**finish (4)**
4:2,3;64:17;87:21
**finished (1)**
4:7
**fired (3)**
92:15,21;93:1
**firm (1)**
25:20
**first (14)**
3:2,14;17:7;47:9;
49:22;50:13;60:20;
74:2;80:7,11,16;
86:15;103:12;107:5
**fits (2)**
9:1;10:22
**five (1)**
96:5
**fix (3)**
74:13,14,15
**flip (3)**
56:12,24;82:17
**floor (2)**
24:6,9
**Florida (97)**
8:14;9:17,22;
10:15;11:13,14;
12:22;26:7,21;27:11;
28:11;31:23;32:3;
37:8;38:18;41:7,11,
12,15;42:4,5,8,12,15,
17,21;43:4,18;44:5;
45:22;47:3;48:15;
52:24;56:7;58:1;
60:10,16;62:4;64:2,7,
20,23;66:1,5,11,15,
20,21;67:20;69:2,8,
12,20;70:3,21;71:2,
18;72:17;73:3,11;
75:24;81:10;82:1,7;
83:1,4,7,12,14;84:7,
12;86:19,22;87:1,9,

24;88:17;89:16;
91:12,14,22;92:20;
93:12,13,22;94:18;
95:5,8;102:4,11;
103:16,18,23;105:5,
21;108:13;110:2
**folks (10)**
19:18,23;20:3;
72:1;79:15;83:21;
84:6;89:14;92:6;93:7
**follow (1)**
43:23
**following (1)**
70:7
**follows (1)**
3:4
**follow-up (1)**
101:16
**Fordham (1)**
78:1
**Form (98)**
5:14;7:24;8:15;
9:4;10:19;11:19;
12:18;15:20,24;
19:15,20;20:5;21:1;
22:1,14;23:4,18;
27:17,23;28:20;
29:11;30:13;31:3,8;
34:22;37:4,13;38:13;
39:8;40:2;41:14;
42:13;44:24;45:12;
46:4,23;55:6,13;
56:1;58:3;59:15;
60:1;61:4;62:5,10;
63:14;64:11;65:1,11;
66:2,12;67:1,2;68:3,
13;69:13,22;71:21;
73:13;75:16;76:22;
80:8;81:16;85:16;
87:2;88:1;89:1,7;
90:22;91:17,24;
92:11,16;93:9,16;
94:1,14;95:10,23;
96:11;97:24;99:3,11;
100:9,23;101:3,11;
102:19;103:6,13,20;
104:15,23;105:10;
106:17;108:11,19;
109:6
**forming (1)**
35:22
**forth (1)**
18:19
**forums (1)**
10:21
**forward (1)**
4:15
**found (1)**
34:6
**frame (5)**
6:24;7:2,5;28:3;
103:17
**frequently (3)**

65:8,15,24
**friend (1)**
62:15
**FURTHER (2)**
101:19;109:20
**fussing (1)**
34:17

**G**

**Garden (26)**
7:11;28:6,17,24;
35:20;41:16;49:23;
50:9;55:21;56:8,17;
60:22;92:19;93:21;
95:2;96:9;97:4,17;
98:19;99:9;100:5;
102:16,18;103:4,19;
106:3
**Gardens (9)**
7:6;42:10;66:21;
67:7;89:16,24;100:4;
101:22;105:20
**GE (5)**
66:23;67:2;68:1,5,
11
**general (14)**
8:9;16:16;18:23;
19:9;41:9;44:8;
49:14;59:16;66:14;
82:24;83:4,8,20;
99:19
**generally (15)**
8:12;10:4,5;22:22;
39:3;41:19;66:19;
87:5,12;102:3,6,8;
106:20,24;107:3
**given (4)**
18:10;96:2;99:5;
104:16
**glad (1)**
65:4
**goes (4)**
14:23;27:7;68:24;
87:12
**goings-on (2)**
83:3,5
**golf (1)**
64:9
**good (4)**
70:11,12;88:9;
92:10
**Gotcha (1)**
58:9
**governing (3)**
102:4,18;103:4
**graduate (1)**
77:22
**graduated (1)**
78:4
**great (1)**
90:4
**Group (4)**

44:22;70:10;73:10;
85:18
**guess (4)**
23:5;34:18;36:11;
44:6
**guy (1)**
95:17

**H**

**half (1)**
33:20
**handed (4)**
45:9;46:20;49:4;
56:5
**handle (9)**
12:16;19:7,18,23;
20:3;26:7;36:1;
54:17,19
**handles (15)**
15:22;16:6,9;
17:23;18:21;19:12,
13;20:7,13;33:14;
54:7,14;62:8,14;
109:14
**handwriting (1)**
52:17
**happened (2)**
6:22;104:14
**happens (2)**
4:12;101:17
**harassing (1)**
16:12
**hard (2)**
4:3;52:8
**HARRIS (8)**
3:1,9;13:23;51:20,
24;104:3;115:2,19
**HC (2)**
37:10;38:8
**health (39)**
5:19;11:18,22;
12:6,9;28:9,13;32:14,
16;37:22;38:1,4,8,15,
16,17,24;39:10,24;
40:4,23,24;73:10;
76:4,6;77:7;83:22,
23;84:1,2,5,15,18,22;
85:2,11,18;97:12;
98:17
**Healthcare (12)**
11:6;19:19,24;
27:21;40:1;44:22,22;
47:10;48:12;73:1;
99:18;100:7
**hear (5)**
24:19;35:16;87:9,
11,12
**heard (4)**
9:14;24:13;35:13;
104:5
**hearing (3)**
13:1,12;18:9

**held (1)**
39:22
**help (1)**
32:19
**helping (1)**
92:5
**Hey (1)**
65:5
**high (2)**
80:18;84:11
**himself (1)**
13:24
**hired (1)**
88:15
**HMS (2)**
63:3;107:24
**Holdings (2)**
24:12;25:8
**holds (1)**
58:8
**home (34)**
4:22;7:1;28:3,6;
29:10;30:2;31:7,18;
32:3;33:5;52:3;54:2;
59:7,23;60:10;70:21;
80:7,12,17;81:20;
86:16,22;87:1,24;
88:11,19,22,24;
89:22;94:7;95:2;
104:12;106:8;110:2
**homes (90)**
9:22;10:14;11:14;
21:11,16;26:14;
27:11,16;31:23;41:7,
11,12,15;42:4,12,17;
43:3,19;44:5;51:4;
52:23;57:9;58:1;
59:19,23;61:1,8,11;
62:4,9;63:6;64:14,
24;65:9;66:1,6,11,20,
21;67:7,19;68:21;
69:1,2,10,11,21;
70:18,19;71:15;
72:14,17;73:11;81:4,
24;82:5,7;83:1,7,11;
86:19;88:7;89:5,16,
16,20,24;90:3,20;
91:3,10,15,21;92:15,
20;93:15,18,22;24:1;
94:9,13,21;95:8;
99:24;102:4;104:22;
105:20;106:22;
108:24;109:5
**honestly (2)**
43:5;79:11
**hope (2)**
42:1;105:18
**hopefully (1)**
3:24
**Horowitz (4)**
74:20,21;75:3,5
**hospitalization (1)**
7:8

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

hospitals (2)
  38:6;109:5
HS (1)
  53:5
Hschwartzberg@sallcnet (1)
  73:19

# I

idea (20)
  7:21;8:2;9:6;
  10:18;28:1;29:23,24;
  31:5,20;39:4;43:20;
  45:1;70:12,12;73:14,
  23;74:6;77:2;101:23;
  107:1
identification (6)
  45:7;46:18;48:24;
  55:22;56:17;110:3
immediately (2)
  4:7;51:19
important (1)
  90:19
improper (1)
  30:21
incidents (1)
  99:1
including (1)
  29:19
inclusion (1)
  55:14
independent (1)
  108:12
indirectly (1)
  34:18
individual (4)
  47:18;55:1,5;106:3
individually (3)
  18:4;32:23;52:2
industry (1)
  29:19
infirm (3)
  90:15,21;91:4
information (4)
  14:2;57:8;70:1;
  89:9
input (1)
  71:4
inside (1)
  15:7
instead (1)
  7:7
instruct (5)
  12:19;13:2;17:2;
  19:4;20:6
instructed (2)
  55:3;96:21
instructing (5)
  16:1,8;18:15;
  23:23;30:17
instructions (1)
  96:2
insurance (2)

5:19;62:8
interest (25)
  21:24;22:11,20;
  23:3,17;24:8;28:14;
  29:22;30:1;31:2;
  35:19;39:10;40:17;
  43:21;44:4;54:1;
  57:4,8;61:1;62:22;
  64:15;65:10;103:19,
  24;106:3
interests (1)
  50:3
Internet (1)
  14:12
into (8)
  9:1;16:6;23:1,20;
  71:22,24;72:3,24
introduced (1)
  3:11
invest (12)
  10:20;31:14;33:4;
  43:4;59:19;60:7,7;
  70:15;90:8;104:17,
  22;105:18
invested (13)
  9:16;26:12;27:12;
  29:1,7,9,16,17;31:10,
  12;65:14;71:8;87:8
investing (2)
  88:11,11
investment (18)
  29:2,14;30:12;
  33:8,12,14,17,23;
  41:19,21;43:11,18,
  21;44:1,4;69:17;
  71:7;88:8
investments (35)
  10:21;12:2;21:13;
  27:6,9;29:19;30:3,5;
  31:22,24;32:6,9,13;
  33:10;35:23;41:24;
  42:3,7,21;66:5;69:19,
  20,24;77:4;78:16;
  80:1;81:10,24;84:9;
  105:21;108:6,12;
  109:4,15,16
investor (14)
  6:2,3;9:24;21:12;
  22:23;32:4;71:13,16;
  80:13,14;93:10;
  99:14;105:2,17
investors (1)
  75:24
invests (1)
  76:3
involved (21)
  10:16;34:5;54:23;
  59:21;70:3;71:18;
  80:6,12,15,17;81:3;
  84:13;89:11,15,22;
  90:7;97:14,16;98:2;
  100:3,14
involvement (12)

68:23,24;69:10,11,
  18,19;70:18,20;
  71:14;80:17;103:1;
  105:13
issue (1)
  18:13
issues (4)
  40:24;71:9;72:6,7
itcom (1)
  73:24

# J

job (8)
  9:23,24;92:10;
  94:15,16,18;104:19,
  20
Joseph (2)
  6:18;115:3
JS (1)
  53:2
Judge (1)
  18:7
judgment (2)
  16:15;18:10
Judy (1)
  24:21
July (1)
  107:6
June (1)
  107:7

# K

Kathleen (1)
  3:10
keep (2)
  88:10;93:17
Kennedy (1)
  98:15
killed (5)
  87:1,24;88:15;
  89:4;104:21
kind (1)
  72:2
kinds (4)
  66:8,9;83:10;101:9
knew (2)
  34:3,4
KNIGHT (45)
  3:6,10;12:24;13:9,
  22;14:11,15,24;15:9;
  16:3,11,17;17:1,6,10,
  19;22:4;23:9,22;
  30:16,20;34:17;41:9;
  45:2;48:20;55:18;
  56:1,4;65:5;67:11;
  82:15,19,23;96:1,11;
  99:3,11;100:9,23;
  101:3,11,16,20;
  107:11;109:18
knowledge (9)
  16:15;30:10;55:16;

70:4;92:24;93:3;
  98:9,17;100:20
known (1)
  17:17

# L

lack (2)
  18:3,3
land (1)
  29:16
Lane (11)
  4:19;20:8,19;
  21:19;44:16,18;
  74:19;85:3,15;86:5;
  95:21
last (5)
  4:12;23:9;60:9;
  64:1;79:1
late (3)
  16:21;18:12;80:24
later (3)
  4:13;55:4;82:12
Law (7)
  77:20,22,24;78:4;
  97:8;103:18;105:11
laws (1)
  103:23
lawsuit (5)
  18:5;68:10,14,18;
  72:8
lawyer (3)
  25:11;36:5;49:13
learn (6)
  83:6,8,11,13,14;
  84:7
leased (2)
  28:9,18
leases (1)
  64:23
least (5)
  8:14;28:2;65:5;
  75:18;93:22
leave (1)
  13:10
left (2)
  7:9;53:13
legal (4)
  37:5;101:7;102:21;
  106:10
legally (2)
  37:1;105:4
lender (3)
  67:14,16;71:12
lenders (2)
  71:10;72:4
less (3)
  65:13,16,17
LETTER (4)
  48:22;49:8;50:14;
  52:6
level (6)
  29:13;33:23;70:16;

84:11;88:12;106:5
LIABILITY (2)
  45:6,16
LICENSE (4)
  55:20;56:7;58:8;
  105:15
licensed (2)
  97:10,12
licensee (7)
  28:5;50:12,16;
  57:11,12;105:21;
  106:3
life (3)
  33:1,3;73:16
limited (6)
  16:17;24:3;35:14;
  45:5,16;76:6
limiting (1)
  40:24
line (8)
  57:19;66:24;67:7,
  19;68:1,4;71:12;
  115:6
lines (1)
  67:22
list (6)
  22:15,17;38:20;
  58:17;60:21;63:19
listed (11)
  13:24;24:23;26:21;
  46:1;51:10;59:1;
  61:8;73:4;86:1;
  107:21;108:1
listen (2)
  13:13;34:11
lists (6)
  47:19;50:4;57:11,
  21;58:19;73:1
litany (1)
  23:24
literally (1)
  104:21
litigation (1)
  104:18
little (3)
  6:11;28:22;71:17
live (2)
  95:5,5
lives (1)
  64:4
living (2)
  78:5;81:6
LLC (16)
  10:5;7:11:23;
  24:12;27:22;28:10,
  13;47:22,24;48:1;
  50:8;57:21;58:7;
  63:3,13;115:4
LLCs (6)
  10:11;35:23;36:16;
  37:8;50:4;62:1
loan (1)
  66:23

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

**located (2)**
20:1,4
**locations (1)**
72:24
**long (4)**
26:2;74:21;75:1,15
**longer (1)**
26:18
**long-term (8)**
6:5;7:14;9:15;
12:3;29:19;37:19;
38:4;40:15
**look (18)**
14:10;21:13;32:1,
13;33:10;35:11;43:7;
45:11;46:22;49:3;
51:1;52:5;57:2;
58:10;60:19,20;61:5;
94:12
**looked (1)**
43:5
**looking (5)**
53:18;57:7;59:10;
88:20;107:16
**Looks (2)**
37:17;56:14
**lose (1)**
23:5
**lost (1)**
23:5
**lot (8)**
4:12;30:3;31:12;
38:3;61:16;84:12;
87:9;90:7
**lots (1)**
77:4
**Louisiana (14)**
68:21;69:1,7,10,19,
24;70:2,9,19;71:1,15;
72:14;73:3,11

**M**

**Ma'am (1)**
45:3
**maintain (1)**
86:9
**maintains (2)**
61:23,24
**Maintenance (4)**
80:20;109:10,13,
14
**makes (1)**
41:19
**making (7)**
13:22;32:6,7;
90:12,14;91:21;
93:12
**man (1)**
98:12
**manage (6)**
11:12,13,16,17;
37:3;40:14

**managed (1)**
89:6
**Management (31)**
11:6;19:19,24;
37:7;40:1;44:23;
47:11;48:13;57:18,
22;58:1,6,12,18;59:7;
72:13,17,20;88:18,
22;98:3;99:9,18,22;
100:8;102:15;103:3,
24;105:3;106:8;
108:8
**manager (2)**
26:22;58:5;59:2,
12;102:22
**managers (2)**
10:2,12
**manages (2)**
9:22;11:9
**managing (25)**
9:2;10:12;36:22;
37:2;45:24;46:1,12;
57:24;59:2,12;80:1,
6;88:18,21,23;89:6,
15;102:15,21;103:3,
9,11;105:13;106:7,9
**Many (14)**
7:4;8:16;10:14;
20:23;21:4,18;33:9;
39:5;55:9;60:8;74:5;
75:17;85:9,13
**mark (4)**
45:2,3;48:20;55:18
**marked (9)**
45:6,9;46:17,20;
48:23;49:4;55:22;
56:5;110:3
**MARKENSON (2)**
48:23;49:12
**Matt (2)**
74:20,21
**matter (2)**
6:19;104:9
**Max (2)**
25:11;78:8
**Maxwell (2)**
25:10;58:4
**May (8)**
7:9;21:2;34:24;
64:11;66:13;70:1;
98:22;115:5
**maybe (2)**
56:13;83:21
**McMullen (2)**
47:14,14
**mean (22)**
3:20,20;10:5;13:6;
21:7,8;25:23;37:14,
15;48:1;54:9;66:17;
70:6,7;79:11,19;
83:5;87:8;88:5,21;
102:7;105:17
**means (1)**

**66:16**
**Medicaid (4)**
106:21;107:1,6;
110:2
**Medstar (1)**
26:10
**meet (4)**
91:22;98:12,14;
99:23
**meetings (4)**
41:6;46:11;97:23;
98:3
**member (19)**
9:2;36:22;46:1,12;
57:24;58:5;59:2,12;
88:18,21;95:5;
102:15,21;103:3,9,
11;105:3;106:7,9
**members (3)**
10:12;37:2;46:1
**member's (2)**
54:1,5
**membership (1)**
50:3
**memory (4)**
46:9;50:11,16;
59:11
**mental (2)**
32:14,16
**mention (1)**
83:23
**mentioned (4)**
83:22;96:24;97:7;
99:13
**met (3)**
90:1;102:18;103:5
**Michigan (1)**
77:18
**mid (1)**
80:24
**Midwest (3)**
53:2,5,7
**might (7)**
12:16;70:2,10;
71:17;82:1;86:11;
109:16
**Mill (1)**
4:23
**mind (3)**
71:15;89:14;91:20
**minimum (1)**
18:7
**minute (2)**
45:10;46:21
**minutes' (1)**
96:5
**Mischaracterization (3)**
29:12;103:7;
105:11
**misstates (1)**
102:21
**mistake (1)**
103:14

**Mitchell (1)**
76:8
**moment (4)**
40:11;55:12;60:20;
78:22
**money (1)**
14:13
**monitor (2)**
31:22,24
**Monthly (4)**
65:19,21;99:8;
100:3
**more (13)**
4:10;55:11;65:13,
24;70:2,24;71:9,18;
82:2,3,6;84:19;
107:20
**morning (1)**
93:6
**MORRISON (121)**
5:14;7:24;8:15;
9:4;10:19;11:19;
12:18;13:6,13;14:9,
14,16,20;15:14,20,
24;16:8,12,21;17:4,7,
14;18:2,23;19:4,9,15,
20;20:5,10;21:1;
22:1,14;23:4,18;
27:17,23;28:20;
29:11;30:13,18,23;
31:3,8;34:13,22;
37:4;38:13;39:8;
40:2;41:8,13;42:13,
18;44:24;46:4;49:2;
51:16;55:6,13,24;
56:3;58:3;59:15;
60:1;61:4;62:5,10;
63:14;64:11;65:1,4,
11;66:2,12;67:1,9;
68:3,13;69:13,22;
71:21;73:9,13;75:16;
76:22;80:8;81:16;
85:16;87:2;88:1;
89:1,7;90:22;91:17,
24;92:11,16;93:9,16;
94:1,14;95:10,23;
96:4,7;101:12;
102:19;103:6,13,20;
104:15,23;105:10;
106:17;107:9,12;
108:11,19;109:6,20
**mortgagor (1)**
71:12
**most (5)**
32:13;33:2,3;
67:21;83:13
**motion (2)**
16:14;18:9
**move (5)**
4:15;6:15;18:19;
30:23;86:7
**moved (2)**
86:4,5

**much (4)**
3:24;24:20;34:9,
20;76:19;105:2
**myself (4)**
3:11;22:23;32:23;
90:6

**N**

**name (21)**
3:7;8:24;9:9,14;
11:3,7;19:1,10,16;
24:13;25:24;46:17;
47:5,10,18;48:8,12,
13;74:12;81:2;
105:14
**named (2)**
18:4;82:12
**names (4)**
4:13;23:24;38:10;
57:3
**nature (2)**
102:21;104:16
**Navigator (24)**
11:18,22;12:7,10;
37:10,22;38:8,9,15,
16,24;39:11,24;40:4;
83:22,24;84:1,2,5,16,
19,23;85:2,11
**need (6)**
3:14,17;4:1;34:11;
59:22;71:19
**needed (1)**
61:19
**needs (1)**
6:14
**neglect (1)**
12:22
**negotiating (1)**
64:22
**net (2)**
18:17;74:1
**Nevada (3)**
80:10,22;81:4
**New (26)**
8:23;9:2,7;28:7,8;
32:13;46:5,9,12;
47:19;50:1;51:12;
52:7,20;57:14,21;
58:14,18;59:3,6,12;
81:6;88:15;95:6;
99:17;100:6
**next (8)**
6:15;45:19;51:23;
53:13;57:2,19;78:9;
109:24
**Nobody (2)**
74:15;83:2
**non-stable (1)**
66:18
**normal (1)**
3:19
**Notary (2)**

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

3:2;115:23

**noted (1)**
110:6

**November (3)**
7:7,17,20

**number (10)**
4:20;9:17;10:22;
17:7;18:5;42:6;
45:10;46:21;49:5;
56:6

**numerous (1)**
13:22

**nurse (2)**
60:15;97:10

**nursing (131)**
7:1;9:22;10:14;
11:9,12,14;26:13;
27:11,16;28:3,5;
29:10;30:2;31:7,18,
23;32:3;33:5;41:7,
11,12,15;42:4,12,17;
43:3,19;44:4;51:3;
52:3,23;54:2;57:8;
58:1;59:7,19,22,23;
60:10,15;61:1,8,11;
62:3,9;63:6;64:14,
23;65:9;66:1,5,10,20,
21;67:6,19;68:20;
69:1,2,10,11,21;
70:18,19,21;71:15;
72:14,17;73:11;80:7,
12,15,17;81:3,20,24;
82:5,6;83:1,7,11;
86:15,19,22;87:1,24;
88:7,11,19,22,24;
89:5,15,16,20,22,24;
90:3,20;91:3,10,15,
21;92:15,19,20;
93:15,17,21,24;94:7,
9,13,21;95:2,8;96:14,
18;99:7,24;101:21;
102:4,23;104:12,22;
105:20;106:8,22;
108:24;109:5;110:2

**O**

**Oak (11)**
4:19;20:8,19;
21:18;44:16,18;
74:19;85:3,15;86:5;
95:21

**Object (43)**
7:24;9:4;11:19;
12:18;15:24;19:15,
20;20:5;21:1;22:14;
23:4,18;27:23;29:11;
30:13;31:3;34:22;
41:13;42:13;46:4;
55:13;58:3;59:15;
63:14;65:1,11;66:12;
67:1;69:22;71:21;
73:13;76:22;89:1,7;

90:22;91:17;102:19;
103:6,20;104:23;
105:10;106:17;109:6

**objection (6)**
16:19;18:18;42:18;
68:13;73:9;94:1

**obligations (3)**
37:2;54:11,17

**occurred (2)**
8:18,19

**of_ (1)**
115:21

**office (6)**
4:17;20:17;21:21;
23:1,20;85:3

**officer (10)**
12:6,9;14:1;36:7,
22;39:13;40:19;
62:24;63:11,21

**offices (6)**
20:18,23;21:4,22;
24:2,5

**off-the-record (1)**
39:22

**oil (2)**
6:4;12:3

**old (4)**
20:17;26:11,16;
39:5

**Once (3)**
18:8,10;33:11

**One (26)**
4:10;17:7;25:19;
27:7;28:2;31:15;
36:16,22;38:9;50:7;
52:10;56:20;67:13;
72:11;77:5;81:15;
82:2,6;86:1;89:4,5;
92:5;95:1,8;107:19;
108:10

**ones (1)**
22:13

**one's (1)**
32:8

**only (2)**
89:19;91:14

**onto (1)**
60:20

**operate (2)**
27:16;91:16

**operated (2)**
10:12;70:5

**operating (9)**
26:19;27:10;29:10;
32:10;72:1;80:6;
89:19;93:5;108:8

**operation (2)**
99:9,9

**operations (10)**
29:17;70:17,19,20;
72:9;88:23;90:20;
91:2;94:6;100:4

**Operator (2)**

25:7;102:23

**operators (1)**
67:22

**Opportunities (1)**
66:19

**ordered (1)**
97:19

**ordering (1)**
97:16

**organization (4)**
61:17;107:22;
108:1,4

**organizations (2)**
107:2;108:18

**ornet (1)**
73:24

**others (1)**
84:20

**out (11)**
13:15;33:7;34:6;
62:13;83:3,9;85:2,14,
18,22;95:20

**outside (12)**
11:14;13:1,7;15:3;
25:20;35:1,1;38:1,3,
17;92:3;106:18

**outstanding (1)**
50:3

**over (10)**
53:9;55:5;60:20;
64:12;67:16;68:9;
84:23;90:9;92:13,21

**oversees (1)**
9:22

**oversight (3)**
90:19;91:2,9

**own (3)**
12:15;74:15;
109:13

**owned (3)**
50:3,12,16

**owner (4)**
52:3;63:9,21;106:7

**owners (2)**
47:18;81:13

**ownership (20)**
21:24;22:11,19;
23:3,17;24:8;28:14;
30:1;31:2;39:10;
40:17;50:17,19,20;
51:3;54:1;58:19;
62:21;64:14;109:1

**owning (3)**
80:6;109:8,9

**P**

**page (19)**
49:22;50:6;52:18;
56:13,15,24;57:2,7;
58:4,20;60:20,21;
61:6;107:15,17,19,
20;109:24;115:6

**pages (4)**
56:12,13;58:11;
82:17

**Palm (41)**
7:5,11;28:6,17,24;
35:20;41:16,16;42:9;
49:23;50:8;55:21;
56:8,17;60:21;61:5;
66:21;67:7;89:16,24;
92:19,19;93:21,21;
95:2,2;96:9;97:4,17;
98:19;99:9;100:4,5;
101:21;102:16,18;
103:4,19;105:20,20;
106:3

**paper (2)**
87:16,18

**paperwork (2)**
36:14;58:14

**parent (1)**
50:2

**part (5)**
16:6;17:21;40:22;
52:13;83:13

**participate (2)**
108:24;109:8

**participated (1)**
68:10

**participation (1)**
35:15

**particular (4)**
33:5;84:14,15,17

**partner (2)**
12:12;13:24

**passed (1)**
24:18

**passive (5)**
32:4;41:24;99:14;
105:2,16

**passively (1)**
60:7

**past (2)**
58:11;74:9

**pay (1)**
13:4

**paying (3)**
90:21;91:3,4

**payment (2)**
81:14,15

**payments (2)**
81:20;82:2

**pending (1)**
68:18

**people (12)**
21:9,15,18;33:9;
37:15;71:4;79:8;
85:13;89:19;91:3,4;
92:3

**people's (1)**
4:12

**percent (1)**
32:15

**performing (1)**

32:7

**perhaps (2)**
72:13;109:5

**person (6)**
7:22;32:5;37:6;
35:8;74:13;79:1

**personal (15)**
15:22;16:2,4,9;
18:13,17,17,22;
19:13;20:8;54:20;
55:16;78:16;98:14;
100:20

**personally (4)**
15:15,19;104:8;
106:2

**perspective (1)**
71:16

**places (1)**
64:12

**Plains (2)**
4:19,24

**plaintiff (1)**
98:10

**plaintiffs (1)**
68:17

**Plaintiff's (5)**
45:5;46:16;48:22;
55:20;110:1

**plans (1)**
98:3

**Play (1)**
64:9

**please (10)**
3:7,15;4:14;15:10;
22:5;23:10,22;30:16;
45:3;49:5

**pm (1)**
110:6

**point (9)**
6:13;18:6;25:14;
28:2;59:11;67:4;
79:24;88:10;107:4

**policies (1)**
97:4

**popular (1)**
62:16

**position (1)**
76:13

**Possibly (1)**
109:3

**post-graduate (1)**
77:19

**potential (1)**
37:17

**potentially (2)**
21:16;87:7

**practice (1)**
78:2

**Pre-2000 (1)**
80:23

**preparation (2)**
100:15;101:8

**prepare (2)**

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

34:7,19
**prepared (1)**
108:16
**president (2)**
36:11,12
**previously (1)**
107:10
**principal (1)**
86:2
**Principe (1)**
3:3
**prior (2)**
15:1;75:18
**private (2)**
33:1;73:16
**Probably (3)**
44:14;70:24;88:9
**problems (4)**
30:22;71:22,24;
72:2
**professionals (1)**
92:4
**PROGRAM (1)**
110:2
**proper (1)**
91:19
**properly (1)**
18:11
**properties (2)**
64:23;94:4
**property (2)**
28:9,17
**proposed (4)**
50:17,20;52:7,20
**provide (6)**
26:13;38:16;40:1,
5,9;63:17
**provided (6)**
5:22;14:3;56:9;
72:12,13;105:7
**provider (1)**
97:12
**PROVIDERS (1)**
110:3
**provides (3)**
41:22;72:13,16
**providing (1)**
73:7
**Public (4)**
3:2;14:5;52:13;
115:23
**punitive (4)**
16:4,23;17:22,24
**punitives (1)**
16:18
**Purchasing (4)**
63:3,5;107:24;
108:7
**purely (1)**
71:15
**purpose (2)**
17:16,19
**put (1)**

105:14

---
**Q**
---

**quantify (1)**
10:22
**quiz (1)**
102:14

---
**R**
---

**ramifications (1)**
37:5
**ran (2)**
71:22,24
**rational (1)**
18:4
**Re (1)**
115:3
**read (10)**
15:9,12;22:4,7;
23:9,12;52:8;87:16,
17;102:13
**ready (1)**
49:6
**real (17)**
6:4;12:3;29:7,16;
76:2,4;78:10;79:14,
16,21;80:3,16;109:7,
9,9,14
**really (17)**
4:3;5:10;8:2,20;
21:3;34:11;36:6;
39:7;69:3;70:4;
73:14;79:18,19;82:8;
83:2;109:2,12
**reason (2)**
88:6;115:6
**recall (17)**
25:21;27:15,18;
48:12,16;52:2,4,21;
57:24;61:3;63:12;
74:4,8;75:7;86:23;
104:9;106:13
**receive (16)**
31:6,11,13,15;
42:11;43:2,24;78:22;
81:13,15,17;82:1,5;
86:14,18;104:11
**received (2)**
56:2,21
**receiving (1)**
81:9
**receptionist (1)**
36:5
**Recess (3)**
14:18;23:7;82:21
**recognize (5)**
23:19;45:12;46:23;
48:6;49:8
**record (6)**
3:8,22;13:10;14:5;
52:14;102:20

**records (2)**
26:22;28:5
**Red (10)**
4:19;20:8,19;
21:18;44:16,18;
74:19;85:15;86:5;
95:21
**re-enters (1)**
13:20
**referenced (1)**
57:1
**references (1)**
100:24
**referencing (1)**
88:21
**refers (1)**
58:17
**reflect (1)**
29:22;31:2
**refresh (3)**
46:8;50:11;59:11
**refreshes (1)**
50:16
**regarding (2)**
18:16;100:21
**REGISTRATION (2)**
46:17;47:5
**regulations (4)**
102:3,8,17;103:4
**rehab (1)**
63:16
**Rehabilitation (4)**
63:13,22;106:12;
107:21
**Related (26)**
12:3,5,16;17:12;
21:23;23:16;24:2;
36:13;38:22;40:23;
41:4,6;63:18;67:24;
68:20;69:20;81:23;
82:6;106:13;107:2,
21;108:1,4,7,14,18
**relates (2)**
31:23;82:4
**relationship (3)**
24:15;71:9,12
**relatives (2)**
94:20;95:1
**relevant (5)**
13:14;17:12,20,21;
23:21
**relied (2)**
101:6,6
**rely (3)**
36:1,17;54:16
**remember (10)**
4:11,13;28:16;
34:4;46:11;60:9,13;
79:11;81:5;99:19
**remind (1)**
3:24
**reminder (2)**
3:14,16

**repeat (6)**
11:21;19:11;22:3;
42:19;78:17;90:24
**repeatedly (1)**
96:8
**REPORT (3)**
45:6,16;107:6
**reported (1)**
88:17
**REPORTER (1)**
110:1
**reports (6)**
66:5;77:1;82:24;
83:2;106:21;107:2
**represent (5)**
28:4;45:21;47:2;
56:6;72:23
**representative (1)**
98:14
**represented (2)**
27:9;100:6
**request (1)**
17:8
**requested (3)**
15:12;22:7;23:12
**requests (1)**
18:12
**required (1)**
105:4
**requirements (1)**
99:24
**resident (5)**
86:24;87:23;95:8;
98:19;104:14
**residents (4)**
89:4;97:20;104:21;
105:8
**residents' (1)**
102:11
**respect (1)**
70:17
**respond (1)**
18:11
**response (2)**
3:18;16:14
**responses (3)**
3:17;16:23;17:9
**responsibilities (1)**
54:11
**responsibility (1)**
37:7
**responsible (4)**
62:12;64:22;88:23;
93:4
**restructuring (4)**
7:18,19;8:13,19
**return (10)**
41:22;42:1,3,12,15,
15,16;43:3,17;105:18
**returns (2)**
43:6,24
**revenue (6)**
31:6,11,13,15;

**repeat (6)**
81:21;82:1
**revenues (3)**
81:10,12,15
**review (2)**
6:18;86:21
**reviewed (1)**
96:24
**reviewing (1)**
46:8
**Rick (4)**
23:4,5;101:14;
109:21
**right (62)**
3:12;4:10;5:18,24;
7:7,15,22;8:8,12;
11:5,10;12:9;14:15;
35:20;38:8;45:22,24;
47:9,13;50:6,11,23;
51:12,23,23;53:9,13,
18;56:12,16,24;
57:14,16,17;58:15;
59:8;62:18,21;64:5,7,
13;68:23;72:12,23;
77:17,21;80:5;81:2;
84:10;86:18;90:2;
92:13;93:24;94:8;
98:24;100:2;102:2;
104:11;107:15,19;
108:6,23
**right-hand (4)**
51:9;53:9;56:15;
107:16
**rights (1)**
102:11
**risk (1)**
98:3
**Road (4)**
4:23;47:14,15;85:3
**Robert (1)**
27:19
**Rochelle (9)**
8:23;9:3;28:7,8;
50:1;51:13;57:15;
99:17;100:7
**room (3)**
13:18,20;15:2
**Roth (3)**
85:1,7;87:15
**Roth's (2)**
95:13,14
**royal (1)**
42:24
**rules (1)**
103:4
**run (3)**
72:3;90:3,9
**running (3)**
89:11,21;92:2

---
**S**
---

**SA (1)**
25:6

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

**S-A-L-L-C (1)**
73:20
**SA-Master (1)**
24:11;25:7
**Same (20)**
9:13,13;19:18;
38:9;42:18,19,20;
54:19,22;55:8;56:15;
61:1,12;69:11;70:20;
72:16,19;73:7;85:5;
107:9
**Sandra (1)**
98:15
**SA-PG (6)**
28:3;50:8;51:9;
57:12;58:7;107:7
**SA-PG-Sun (3)**
9:11;28:6;115:4
**saying (2)**
6:22;7:7
**Schedule (3)**
107:5,8,13
**school (5)**
77:20,22,24;78:4;
80:18
**SCHWARTZBERG (59)**
3:1,9,10;5:6,8,24;
9:15,23;10:15,24;
12:21;13:10,23;15:1;
16:5;19:7,14;20:23;
21:5,10,15,19;22:22;
24:3,17,21,24;25:1,
15;27:19;34:16;36:4,
7,13;38:22;40:22,23;
41:4;44:9;47:21,24;
48:3;49:15,18;51:20,
24;53:10,14;54:23;
63:18;67:24;74:22;
76:3,11;78:11;96:8;
104:3;115:2,19
**scope (2)**
100:3;106:18
**searches (1)**
14:12
**second (9)**
13:15;24:6,9;50:6;
52:5,6;56:18;60:21;
61:6
**seconds (1)**
49:2
**secretary (2)**
36:5;45:19
**Section (4)**
47:17;48:7;61:6;
107:1
**seeing (1)**
50:13
**self-insured (1)**
62:4
**senate (1)**
78:6
**separate (4)**
9:21;72:20;81:13,

20
**served (2)**
104:8,11
**service (1)**
104:18
**services (14)**
26:13;38:17;39:24;
40:4,9;62:19;63:17;
72:14,17;73:7;85:21,
24;108:3,7
**set (4)**
17:16;91:6,12,19
**sets (1)**
91:14
**several (4)**
73:1;74:9,24;99:13
**shape (1)**
97:23
**SHEET (1)**
115:1
**short (1)**
86:11
**show (7)**
30:12;44:3;106:7,
11,15,16;107:5
**showing (2)**
30:1;106:2
**shown (2)**
100:11;106:9
**siblings (1)**
25:4
**side (2)**
51:9;53:10
**sign (2)**
25:23,24
**signature (3)**
48:6;55:15;100:17
**signs (1)**
23:19
**single (1)**
23:15
**sister (1)**
24:22
**sit (2)**
41:3;82:16
**site (2)**
72:21;73:8
**six (1)**
56:13
**skilled (1)**
60:15
**sole (1)**
58:5
**solely (1)**
11:13
**somebody (6)**
8:3;33:14;84:23;
88:14,15;95:4
**someone (9)**
19:6,13;37:6;
41:19,20,20;74:18;
75:5;92:8
**sometimes (5)**

41:24,24;65:16,16;
92:15
**Somewhere (1)**
65:20
**sorry (5)**
24:19;34:14,18;
37:11;73:24
**sort (1)**
4:13
**sorts (2)**
38:6;76:16
**sounds (1)**
9:9
**South (5)**
20:14,16,19;86:1,9
**space (1)**
86:9
**speak (1)**
65:23
**speaking (3)**
35:8;103:11;
106:20
**specialty (1)**
77:3
**specific (3)**
36:15;81:18;82:3
**specifically (15)**
30:6;37:20;38:19;
40:3,5,7;42:14;43:13,
14;63:7;69:20;84:5;
88:12;92:7;102:5
**specifics (2)**
8:16;9:10
**spend (2)**
32:13,15
**spoke (1)**
35:4
**spoken (3)**
96:13;99:5,6
**Springdale (3)**
27:21;28:9,13
**stable (1)**
66:18
**staff (2)**
96:21,21
**staffing (1)**
96:16
**stand (1)**
73:22
**standards (6)**
91:6,11,14,15,19,
22
**standpoint (1)**
71:13
**Starer (1)**
76:8
**start (9)**
4:2,4,6;8:4;61:18;
67:11;68:9;74:3;78:5
**started (2)**
3:11;79:24
**state (47)**
3:7;11:13,14;18:7;

28:10;38:18;41:7;
42:4,21;45:19,22;
47:3;52:23;56:2,7,9;
64:2,19;66:15,18,19;
67:22;70:3,7;75:24;
87:8,13;88:17;91:7,
12,14,18,21,22;
92:20;93:11,13,22;
94:18;99:23;102:3,
17,20;103:16,23;
105:5;108:13
**states (3)**
73:1,4;101:4
**statute (1)**
102:12
**step (1)**
13:15
**Steven (1)**
24:17
**still (3)**
4:14;27:4;68:18
**stipulation (1)**
14:20
**Stolesberg (3)**
25:22;26:5;58:4
**Stolzberg (1)**
25:10
**stop (5)**
4:7,14;23:22;26:4;
30:16
**stream (1)**
31:6
**strict (3)**
90:19;91:2,9
**strictly (2)**
9:24;70:16
**strike (4)**
63:24;74:17;97:14;
98:6
**structure (16)**
5:10;9:1;10:2,5,9;
11:16;40:9,11;50:18,
20,20;51:3;52:8,21,
21;101:1
**structured (1)**
30:5
**study (1)**
77:19
**stuff (3)**
16:24;18:19;75:21
**subject (1)**
72:7
**sub-lessee (1)**
28:7
**Sue (1)**
98:15
**suite (6)**
4:20;24:3;75:9;
85:5,14;95:21
**summary (2)**
16:15;18:9
**Sun (39)**
7:6,11;28:4,6,18,

24;29:4;30:2,4;
33:19,21;34:2;35:19,
20;50:8,9,12;51:9;
52:3;55:21;56:8,17;
57:12;58:7;96:9,14,
18,22;97:4,17,20,23;
98:3,19;99:10;100:4;
101:22;103:19;107:7
**supervising (1)**
92:8
**supplies (2)**
97:16,19
**supposed (2)**
32:1;48:9
**sure (51)**
3:21;4:16;5:9,16;
6:17;13:16;14:11;
15:8;21:6,7,8,17;
22:12,13;23:20;25:3;
26:2,9;27:4,5;29:18,
23;32:7;40:4,8,18;
41:21;50:24;59:18;
61:13,16,20;62:11;
63:7;64:18;67:17;
68:9;78:18,21;79:8;
85:20,23;87:22;88:5;
91:21;92:4,7,9;93:4,
12;105:7
**Surfside (11)**
9:7;46:6,9,12;
47:19;57:21;58:14,
18;59:3,6,13
**surrounding (1)**
35:23
**survey (4)**
86:15,21;94:4,6
**surveys (4)**
86:14,18;93:14;
97:1
**Susan (1)**
75:14
**suspend (1)**
96:1
**sworn (2)**
3:2;115:20

**T**

**talk (13)**
4:1,6;12:24;13:7,
11;14:6;16:3,13;
33:19;65:8,13;69:23;
84:23
**talked (2)**
9:16;76:2
**talking (22)**
6:10;16:2,10;
17:10;37:19;41:10;
42:9;43:14;49:22;
57:15;67:9;71:6,11;
72:5,7,9;83:10;84:6,
11;88:10;103:17;
105:19

THE ESTATE OF JOSEPH G. BUSH v.
SA-PG-SUN CITY CENTER, LLC, et al.

HARRIS SCHWARTZBERG
May 14, 2013

**talks (1)**
  50:1
**technically (5)**
  5:11,12;78:21;
  79:4;85:11
**telling (6)**
  17:1;32:2;40:12;
  43:23;65:7;66:8
**tells (3)**
  87:18,23;93:22
**Terrace (6)**
  41:16;61:5;92:19;
  93:21;95:2;105:20
**testified (1)**
  3:3
**testimony (8)**
  15:12;22:7;23:12;
  83:12;89:18;91:13;
  95:1;108:17
**theory (1)**
  17:6
**therapy (1)**
  108:7
**therefore (1)**
  88:14
**third (1)**
  51:9
**thought (1)**
  69:3
**three (2)**
  61:8,11
**throughout (1)**
  57:1
**tied (1)**
  72:10
**ties (1)**
  70:4
**times (4)**
  33:21;42:7;65:23;
  99:13
**title (3)**
  36:10;76:14;95:14
**titles (1)**
  36:15
**today (10)**
  16:13;17:15;18:14,
  20;33:19;34:2,7,20;
  105:17;106:2
**told (3)**
  27:14;78:20;89:2
**top (10)**
  4:1;45:15;46:6;
  47:4;52:18;56:21;
  57:3,7;58:12;107:16
**tour (1)**
  75:23
**transition (1)**
  86:12
**Trey (1)**
  8:5
**trouble (1)**
  74:11
**true (2)**
  78:23;104:14
**Trust (13)**
  51:20;53:2,5,7,10,
  14,16,16,22;54:11;
  104:2,3,6
**trustee (6)**
  53:24;54:4,8,10,
  17;104:6
**trusts (3)**
  54:1,5,8
**try (3)**
  4:1,1,3
**Trying (5)**
  32:19;43:23;82:4;
  83:9;84:8
**turn (2)**
  58:10;107:19
**turnover (1)**
  61:16
**twice (1)**
  107:20
**two (3)**
  17:8;58:11;73:3
**typed (1)**
  56:18
**types (1)**
  109:4

---

**U**

**Uh-hum (12)**
  33:6,13;35:5;47:6;
  51:14;58:24;59:20;
  61:7;66:22;80:2;
  81:11;83:16
**umbrella (1)**
  100:6
**under (10)**
  10:22;16:11;17:6,
  13;28:17;45:24;
  56:16;73:10;100:5;
  103:22
**underneath (2)**
  53:15;57:16
**Understood (1)**
  48:2
**unless (1)**
  96:3
**up (5)**
  13:3;33:2;78:19;
  93:6;95:6
**upon (1)**
  101:6
**upper (1)**
  56:14
**ups (1)**
  31:20
**use (1)**
  73:16
**used (4)**
  48:13;49:14;55:8;
  105:16
**using (1)**

**74:3**
**usually (4)**
  30:21;59:23;64:8,
  10

---

**V**

**variety (16)**
  10:20;12:2,5;27:6,
  8,12;33:9;37:16,16;
  40:4;42:7,20;60:3;
  64:12;76:23;84:9
**various (5)**
  33:10;35:23;37:8;
  62:1;71:10
**verbal (2)**
  3:17,18
**versus (1)**
  69:19
**visited (2)**
  64:13;96:9
**vs (1)**
  115:3

---

**W**

**wake (1)**
  93:6
**warning (1)**
  65:6
**watch (2)**
  41:21;82:16
**watching (2)**
  32:6,8
**way (8)**
  31:15;52:9;67:12;
  69:15;80:12;94:17;
  97:23;100:14
**ways (1)**
  33:9
**Web (2)**
  72:21;73:8
**Weekly (4)**
  65:16,20;99:8;
  100:3
**weeks (2)**
  17:8;64:3
**Welsh (1)**
  48:17
**weren't (3)**
  4:6;27:4;93:11
**West (10)**
  4:19;20:8,19;
  21:18;44:16,18;85:3,
  15;86:4;95:21
**What's (22)**
  4:18,22;24:15;
  32:3;36:10;39:10;
  44:21;45:9;46:20;
  49:4;56:5;62:18;
  65:24;66:14;69:18;
  70:23;74:12;76:13,
  15;79:19;88:13;

**93:14**
**whatsoever (2)**
  98:9;103:1
**White (2)**
  4:19,24
**Whitney (2)**
  75:14,15
**whole (2)**
  23:24;84:12
**Whose (1)**
  94:16
**without (4)**
  13:11;65:7;66:8;
  103:11
**witness (7)**
  13:1,16,18,20;
  23:23;30:17;82:18
**wondering (1)**
  93:7
**word (1)**
  105:16
**words (2)**
  15:4
**work (21)**
  21:9,10,12,15,18;
  22:18,21,21;25:14,
  17;38:2;44:15;49:18;
  67:11;73:16;74:3;
  76:10;85:2,14,18,21
**worked (5)**
  25:16;49:16;78:6,
  8;79:8
**working (3)**
  21:16;22:23;79:7
**work-related (2)**
  74:12;75:21
**works (6)**
  10:6;21:20;36:3;
  84:4;94:18;95:20
**worth (2)**
  18:17;96:5
**Wrights (1)**
  4:23
**write (1)**
  15:15
**writes (1)**
  15:19
**writing (1)**
  12:16
**written (1)**
  17:10
**wrong (2)**
  93:14,23

---

**Y**

**y'all (1)**
  13:4
**year (2)**
  33:16;80:21
**yearly (1)**
  99:8
**years (14)**

**93:14**
**whatsoever**
  (continued)

**26:6;39:5;55:9;**
  60:8;74:5,9,24,24;
  75:2,17;79:12;86:8;
  92:14,21
**Yep (5)**
  4:9;52:19;60:23;
  82:11,13
**York (2)**
  81:6;95:6

---

**0**

**07 (1)**
  107:6
**08 (1)**
  107:7

---

**1**

**1 (6)**
  45:5,10;51:1,6;
  58:23,23
**10,000-foot (1)**
  88:20
**10th (2)**
  7:9;98:22
**12 (1)**
  4:23
**14 (2)**
  50:4;115:5
**19th (1)**
  7:7

---

**2**

**2 (4)**
  46:16,21;47:17;
  52:17
**20 (1)**
  79:12
**2002 (1)**
  60:12
**2004 (1)**
  53:10
**2007 (12)**
  7:1,8,17,20;45:5,
  16;48:23;49:19;50:2;
  51:3;56:21;75:18
**2008 (4)**
  7:2,9;98:22;100:8
**201 (6)**
  4:21;24:3;75:9;
  85:5,14;95:21
**2011 (1)**
  12:10
**2013 (2)**
  115:5,21
**26 (1)**
  56:21

---

**3**

**3 (5)**

48:7,22,23;49:5;
60:19
**3:10 (1)**
110:6
**30 (1)**
85:17
**3480 (1)**
47:14

---

**4**

---

**4 (13)**
4:19;20:8,19;
21:18;44:16,18;
55:20;56:6;59:5;
85:3,15;86:4;100:11
**40 (1)**
85:17
**44 (5)**
20:14,16,18;86:1;
107:17
**46 (1)**
107:20

---

**5**

---

**5 (1)**
110:1

---

**6**

---

**68 (2)**
107:17,20

---

**7**

---

**70 (1)**
32:15

---

**9**

---

**90s (1)**
80:24
**92 (1)**
77:23