IN THE CIRCUIT COURT
OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR HIGHLANDS COUNTY, STATE OF FLORIDA

THE ESTATE OF TERESA E. STEIN, by and
through NANCY E. DELONG, Personal Representative,

      Plaintiff,

vs.             CASE NO.:  2012-CA-000866-GCAXMX

SF LAKE PLACID, LLC; FLORIDA FACILITIES,
LLC; GULF COAST HEALTHCARE, LLC a/k/a GULF
COAST HEALTH CARE, LLC a/k/a GULF COAST
HEALTH CARE OF DELAWARE, LLC;
GULF COAST HEALTH CARE HOLDINGS, LLC
a/k/a GULF COAST HEALTHCARE HOLDINGS, LLC;
GCH MANAGEMENT SERVICES, LLC a/k/a GULF
COAST HEALTH CARE MANAGEMENT;
PENSACOLA ADMINISTRATIVE SERVICES, LLC;
PENSACOLA ADMINISTRATIVE HOLDINGS, LLC;
GULF COAST MASTER TENANT, II, LLC;
GULF COAST MASTER TENANT HOLDINGS, LLC;
ERIC ROTH; JULIE GUTZMANN; and MITCHELL I.
STARER, JR. (as to Lake Placid Health Care Center),

      Defendants.
_____/

ORIGINAL

### DEPOSITION OF CRAIG ROBINSON

Taken on Behalf of the Plaintiff

**DATE TAKEN:**  Tuesday, July 16, 2013
**TIME:**       10:00 a.m. - 12:35 p.m.
**PLACE:**      Anchor Court Reporting
             229 South Baylen Street
             Pensacola, Florida  32502

Examination of the Witness reported by:

Linda D. Miller, Florida Professional Reporter
Notary Public, State of Florida

**ANCHOR COURT REPORTING**
229 South Baylen Street
Pensacola, Florida  32502

1                    **A P P E A R A N C E S**

2

    FOR THE PLAINTIFF:
3
                         KATHLEEN CLARK KNIGHT, ESQUIRE
4                        Wilkes & McHugh, P.A.
                         One N. Dale Mabry Highway, Suite 800
5                        Tampa, Florida  44609

6

    FOR THE DEFENDANTS:
7
                         JAMES MORRISON, ESQUIRE
8                        Quintairos, Prieto, Wood & Boyer, P.A.
                         1475 Centrepark Boulevard, Suite 130
9                        West Palm Beach, Florida  33401

10

    ALSO PRESENT:
11
                         DANTE SKOURELLOS, ESQUIRE
12                       In-house Corporate Counsel

13

    COURT REPORTER:
14
                         LINDA D. MILLER, FPR
15                       ANCHOR COURT REPORTING
                         229 South Baylen Street
16                       Pensacola, Florida  32502
                         (850)432-2511
17                       1-800-563-6409
                         FAX:  (850)432-2302
18                       www.anchorreporters.com

19

20

21

22

23

24

25

## INDEX OF TRANSCRIPT

WITNESS:

### CRAIG ROBINSON

Direct Examination by Ms. Knight..............05
Cross-Examination by Mr. Morrison..........101
Redirect Examination by Ms. Knight..........104

Certificate of Oath...............................108
Certificate of Reporter..........................109
Witness Review Letter............................110
Errata Sheet (to be forwarded upon execution)......111

## PLAINTIFF'S EXHIBITS INDEX

| NO. | DESCRIPTION | PAGE NO. |
|-----|-------------|----------|
| 1 | CHOW Summary | 26 |
| 2 | List of Current Owners and Officers | 28 |
| 3 | Limited Liability Company Agreement | 54 |
| 4 | Certificate of Liability Insurance | 66 |
| 5 | Management Services Agreement | 69 |
| 6 | Gulf Coast Health Care Associate Handbook dated December 2008 | 80 |
| 7 | Gulf Coast Health Care Associate Handbook dated January 2011 | 90 |

## DEFENDANTS' EXHIBITS INDEX

| NO. | DESCRIPTION | PAGE NO. |
|-----|-------------|----------|

*****NONE*****

1

2                              **STIPULATION**

3

4          It is stipulated and agreed by Counsel for the

5          parties that the deposition is taken for the

6          purpose of discovery and/or evidence; that all

7          objections save as to the form of the question

8          are reserved to the time of trial; and that

9          the reading and signing of the deposition are

10         not waived, together with notice of the

11         original hereof.

12                         *  *  *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1  Whereupon, the Witness,

2                    **CRAIG ROBINSON**,

3  having been first duly sworn by the Court Reporter,

4  testified on his oath as follows:

5            **THE WITNESS:** I do.

6                **DIRECT EXAMINATION**

7  **BY MS. KNIGHT:**

8       Q.   Sir, would you please tell us your name?

9       A.   Craig Robinson.

10       Q.   And, Mr. Robinson, I introduced myself before

11  we started.  I'm Kathleen Knight.  Have you been deposed

12  before?

13       A.   Yes.

14       Q.   About how many times?

15       A.   Twice.

16       Q.   Okay.  When was the last time?

17       A.   Oh, about ten years ago.

18       Q.   I'm sure that counsel has talked to you

19  generally about sort of the flow of the depositions, but

20  if you need a break at any time, please just let me know

21  that.  We'll stop.  I ask that if I ask a question, you

22  go ahead and answer and then we'll take our break.  You

23  don't need to tell me why, you don't need to tell me for

24  how long, just let me know you need a break, okay?

25       A.   Okay.

6

1     Q.   At some point, I will probably ask a question

2  that you're not clear about.  Just tell me that.  I'll

3  either hopefully ask the question differently in a way

4  that's clearer or I'll explain to you what I'm asking,

5  if that seems to make more sense at the time, okay?

6     A.   (Witness nodding head.)

7     Q.   If you answer the question, I'll assume that

8  you understood it; is that fair enough?

9     A.   Yes.

10     Q.   Okay.  I'm certain that we're going to look at

11  documents at some point.  Please take your time.  I will

12  give you whatever time you need to look at the documents

13  so that you're comfortable and ready to answer, okay?

14     A.   Yes.

15     Q.   And if at some point I'm asking you questions

16  and there is a document that you know is out there that

17  would be helpful to you, let me know.  If it's something

18  I have, I'll give it to you.  I've got my computer here,

19  so it might be something I can pull up.  I'm trying to

20  get accurate information so I certainly want to assist

21  you in that in any way --

22     A.   Okay.

23     Q.   -- that I'm capable of doing.  If I have the

24  records, I'm happy to share them with you, okay?

25     A.   Yes.

www.anchorreporters.com
(850) 432-2511

1     Q.   All right.  We've never met before, so let me

2     talk to you first about your background.  Tell me about

3     college forward, if you don't mind.

4     A.   I have a bachelor's degree from Southern

5     Illinois University in Health Education.  I have a

6     master's degree from LSU in Baton Rouge in Educational

7     Administration and Supervision.  I coached baseball for

8     several years, I think probably four, four or five,

9     before I got into long-term care, which was 1984, as

10    administrator in training and then a licensed

11    administrator.

12    Q.   What state is that?

13    A.   Florida.

14    Q.   What company did you work for initially?

15    A.   I started out with a small company.  Let me

16    see what the name was.  Holmes County Health Care.  It

17    was a small company.  And then I went to work for

18    Beverly Enterprises and then another company out of

19    Pensacola at that time was Averill (phonetic) Care.  And

20    then I moved to Orlando and was with a company called

21    Bat Management, B-A-T.

22         Then I became -- that's when I -- those were

23    the ones I was administrator.  Then I became a regional

24    vice-president for Health Care Properties out of

25    Nashville, and then I worked for a company out of

1  Pensacola, Emerald Health Care, for, I think, three or

2  four years, and then Delta Health Group out of Pensacola

3  in January of 2000, as the director of operations.  And

4  then I became the vice-president of operations in

5  seventy -- or not seventy -- 2006.

6      And then when Gulf Coast was sold -- or,

7  excuse me, when Delta was sold and became Gulf Coast, I

8  became the chief of operations in '08, and then, in

9  2010, the president of Gulf Coast Health Care till now.

10      Q.   Thank you, sir.  What company were you the

11  chief operating officer of beginning in 2008?

12      A.   Chief of operations.

13      Q.   Chief of operations.

14      A.   It was Gulf Coast Health Care when they were

15  sold.  I was the vice-president of Delta when it was

16  sold and then became the chief of operations to the new

17  company.

18      Q.   Thank you.  And you're currently the president

19  of Gulf Coast Health Care?

20      A.   Yes.

21      Q.   What were your duties and obligations as the

22  director of operations for Delta?

23      A.   I oversaw anywhere from seven or eight

24  facilities in Mississippi, Alabama, Florida.

25      Q.   Okay.  Was that -- what some other companies

 1   would call, like, a regional person?

 2        A.    Yeah.  Yes.  They call them regional

 3   vice-presidents, regional presidents.

 4        Q.    Okay.  And then when you became VP of

 5   operations or Delta Health Group, what was your role?

 6        A.    I was over all operations for the entire

 7   company.

 8        Q.    And how many homes was that at the time?

 9        A.    Forty-four.  Excuse me, it was 43.

10        Q.    And in 2008, when you became the chief of

11   operations for Gulf Coast Health Care, what were your

12   duties and obligations?

13        A.    Oversaw operations, the transition.  Then I

14   became -- we have a corporate office here in Pensacola,

15   sixty something people, and I oversaw the operations of

16   the office.

17        Q.    What's the address for the corporate office?

18        A.    2 North Palafox.

19        Q.    And how many homes were part of Gulf Coast

20   Health Care as of 2008?

21        A.    In 2008 we managed -- there was a split

22   conversion because we had HUD Facilities.  We couldn't

23   close those technically until 2010, January.  So we

24   managed all of them, but we -- so it was 32 we took over

25   originally and then managed the other ones for Delta --

1      Q.    Okay.

2      A.    -- until 2010.

3      Q.    And did your -- did your duties change in 2010

4   when you became the president?

5      A.    Yes.  We hired a vice-president of the

6   operations or promoted, and I turned a lot of the

7   operations over to him, transitioning to be more

8   strategic and visionary and where we're going.

9      Q.    Was that a creation, really, of a new

10  position, the vice-president of operations at the time?

11     A.    Well, in our organization, yes.

12     Q.    Okay.

13     A.    Because when I was promoted, we didn't fill

14  that until then.

15     Q.    Okay.  So for the two years or so between 2008

16  and 2010, were you really doing both -- you had both

17  duties?

18     A.    Yes, yes.

19     Q.    Okay.  And who did you promote internally?

20     A.    Jamey Richardson.

21     Q.    And is Mr. Richardson still --

22     A.    Correct.

23     Q.    -- chief of operations or vice-president?

24     A.    He's the vice-president of operations.

25     Q.    Okay.  In 2007, so before any changes actually

1   occurred, who was your supervisor or who did you report

2   to?

3       A.   The chief of operations for Delta.

4       Q.   And who was that?

5       A.   That was Dana Foster.

6       Q.   I'm sorry?

7       A.   Dana Foster.

8       Q.   How did you learn that there going to be a

9   change in 2008?

10      A.   They told me that they're looking at

11  potentially selling and so that's basically when I --

12      Q.   When you say "they," who's they?

13      A.   Well, Dana and Scott Bell, who was the

14  president/CEO.

15      Q.   Did they talk to you at the time about what

16  your role would be?

17      A.   Well, sure.  They talked about me being in the

18  chief of operations role and they'd be departing.

19      Q.   Did you learn initially who was going to be

20  coming in?

21      A.   Yes.  I went and met with them.

22      Q.   And who did you meet with?

23      A.   Harris Schwartzberg.

24      Q.   Anyone else?

25      A.   Not at that time, no.

www.anchorreporters.com
(850) 432-2511

1     Q.    Where did you meet with Mr. Schwartzberg?

2     A.    White Plains.

3     Q.    And what did Mr. Schwartzberg tell you about

4  your future at that point?

5     A.    Well, we really didn't discuss that, because

6  the deal hadn't even gotten close to -- it was just more

7  of get-to-know-one-another kind of thing, still feeling

8  out, working out all the details.  And I did meet with a

9  few of the, like, IT guys, but it wasn't a -- it was a

10  higher level kind of meet-and-greet type of thing.

11     Q.    Okay.

12     A.    Not real detailed.

13     Q.    Approximately when was that meeting?

14     A.    April of '08 or so.

15     Q.    Were you involved in working out those details

16  of the purchase?

17     A.    No.

18     Q.    Okay.  When did you learn that the details had

19  been worked out and the sale was definitely going

20  through?

21     A.    Probably when it went through, because if

22  you're working a lot of deals, you know that they're all

23  the way to the very end.  So whenever in December of '08

24  is when we got confirmation.

25     Q.    Okay.  At some point between April and

1  December, did you talk to Mr. Schwartzberg about where

2  you fit into the sale?

3      A.   Well, later on there, when it was getting

4  closer, they came down to visit, but, again, it wasn't a

5  whole lot of -- it was understood that I was going to

6  step into the role and transition, so...

7      Q.   Okay.  You obviously had to agree to that,

8  correct?

9      A.   Yes.

10      Q.   Was there at some point when someone said to

11  you:  We're selling or we're buying from one of the

12  sides.  Are you interested in staying on?

13      A.   Not really, because it was more of -- yeah, I

14  guess they asked me, but, I mean, it was more of a given

15  that I was going to do it.  So it wasn't -- it wasn't

16  that kind of -- it was just more or less, if we do it,

17  when we're going to do it, this is what's going to

18  happen and so on.  You know, it was something I wanted

19  to do, so it was not a -- it wasn't an asking type

20  situation, so...

21      Q.   Okay.  Did you keep your staff?

22      A.   Yes.

23      Q.   Did you have any say in how the structure of

24  the companies would work?

25      A.   Could you be more specific?

1      Q.   When you -- when a new company is started or

2    new companies are started, somebody has to make the

3    determination of what companies are going to be created

4    and how those companies are going to relate to one

5    another, who's going to manage which LLCs, that sort of

6    thing.  Were you involved in that?

7      A.   No.

8      Q.   Okay.  Do you know who was making those

9    decisions?

10     A.   Well, there was probably Eric Roth and at that

11   time -- yeah, Eric was one of the main guys, so...

12     Q.   Do you know what company he was from or what

13   his title was?

14     A.   Well, in 2008, when they took over, he was the

15   president of Gulf Coast Health Care.

16     Q.   Before Gulf Coast Health Care was created, do

17   you know what company he was with?

18     A.   No.

19     Q.   Did you meet Mr. Roth prior to December of

20   2008?

21     A.   Yes.  Let's see, when did I meet him?  I may

22   not have.  I'm trying to think.  Yeah, I'm sure I met

23   him some time.  Yeah, I did.  He did come down that

24   time.

25     Q.   He came down when you talked about the folks

1     coming down?

2          A.   Yes.

3          Q.   Okay.  And is it your understanding that he

4     was in the White Plains office as well?

5          A.   Yes.

6          Q.   Did you have any understanding of his

7     involvement in the companies out of White Plains?

8          A.   Explain -- go a little deeper.

9          Q.   I'll ask a different question.

10         A.   Yes.

11         Q.   What was your understanding of Mr. Roth's

12    relationship, if any, to Mr. Schwartzberg?

13         A.   Other than the fact he was out of White Plains

14    and he was with him, I mean, they didn't delineate any

15    -- whose company he was with.  They didn't pass out

16    business cards or anything like that, so...

17         Q.   Okay.  Okay.  Have you -- are you familiar

18    with the name The Schwartzberg Companies?

19         A.   Yes.

20         Q.   And what is that?

21              MR. MORRISON:  Form, but go ahead.

22         Q.   (By Ms. Knight)  What's your understanding?

23         A.   Well, it's the parent company, I suppose.  I

24    don't know what other holdings they have or what they

25    do.

1    Q.    Okay.  Would you consider The Schwartzberg

2  Companies the parent company of Gulf Coast Health Care?

3         MR. MORRISON:  Form, but go ahead.

4    A.    (By The Witness)  Um, I suppose.

5    Q.    (By Ms. Knight)  Okay.  In 2010, when you

6  became the president of Gulf Coast Health Care, other

7  than hiring Mr. Richardson and creating the

8  vice-president of operations position, was there any

9  other restructuring at that time?

10    A.    From the operations standpoint, no.

11    Q.    Tell me what you mean.  It sounds like there

12  was in some respects of operations.

13    A.    In my world, no, there wasn't any

14  restructuring or anything.  Eric was -- Eric Roth at

15  that time was the president, and then I became the

16  president, and Mandy Garnier is my CFO.  We became the

17  officers of Gulf Coast Health Care.

18    Q.    Okay.  Prior to Ms. Garnier becoming the --

19  I'm sorry, what's her title?

20    A.    CFO.

21    Q.    CFO?

22    A.    CFO.

23    Q.    Prior to her becoming the CFO, who was the CFO

24  of Gulf Coast Health Care?

25    A.    Well, she was the CFO at that time.

1    Q.    Okay.  Had Julie Gutzmann been the CFO at any

2    point?

3    A.    No, she was an officer of Gulf Coast Health

4    Care.

5    Q.    Do you know what title?

6    A.    No.

7    Q.    Okay.  Did she remain an officer of Gulf Coast

8    Health Care once you became the president?

9    A.    No.  Mandy was the CFO.  She became an officer

10   with me at that time --

11   Q.    Okay.

12   A.    -- when that transpired.

13   Q.    What led to that change in 2010?

14   A.    Asset sale, the HUDs, once they sold those.

15   Q.    And who -- you said once they sold those.

16   Who's "they"?

17   A.    Once the HUD sale went through.  Remember,

18   they were hung up about eleven months in the original

19   transaction until they could be closed.  So a lot of

20   details with HUD financing.

21   Q.    Were any of the HUD homes in Florida?

22   A.    Yes.

23   Q.    I do have some documents that will help with

24   that.  Tell me about your current, then,

25   responsibilities as the president of Gulf Coast Health

1    Care?

2         A.    I oversee the operations of the company, so...

3         Q.    What does Gulf Coast Health Care do?

4         A.    They manage skilled nursing facilities.

5         Q.    Okay.  Do they also manage assisted living

6    facilities?

7         A.    We have three within the organization.

8         Q.    Okay.  And all of the other facilities, other

9    than those three, all of the other managed facilities

10   are skilled nursing facilities?

11        A.    Yes.

12        Q.    For the facilities that Gulf Coast Health Care

13   manages, are there management contracts in place?

14        A.    Yes.

15        Q.    And are the management contracts directly

16   between the licensee and Gulf Coast Health Care?

17        A.    They're between the SNF, LLC, and Florida

18   Facilities.

19        Q.    What's Florida Facilities?

20        A.    That's the managing member for Florida -- for

21   SNF, and they own 100 percent of the licensees.

22        Q.    So how is Florida Facilities related to Gulf

23   Coast Health Care?

24        A.    Gulf Coast Health Care owns 95 percent of

25   Florida Facilities.

1        Q.    Okay.  Who owns the other five percent?

2        A.    Gulf Coast Health Care Management.

3        Q.    Is that the GCH --

4        A.    Gulf Coast -- Gulf Coast Health Management.

5        Q.    Is that GCH Management that I've seen?

6        A.    Yes.

7        Q.    Okay.  And what is GCH Management?

8        A.    It's a holding company.  It's for tax and

9  business purposes.

10        Q.    Are you an officer or an owner or manager of

11  GCH Management?

12        A.    I'm not an owner or officer, no.

13        Q.    Are you a manager?

14        A.    No.

15        Q.    Okay.  Do you know who is an officer or a

16  manager of GCH Management?

17        A.    Eric Roth, Julie Gutzmann, and I think

18  Mitchell Starer.

19        Q.    Okay.  I need to take you back because we

20  have -- I want to talk to you about just prior to the

21  sale.  So 2006/2007 time frame to start with, okay?

22  Tell me, when you were with Delta, did Delta Health

23  Group contract directly with the nursing homes to

24  provide management services?

25        A.    I couldn't answer that.

WWW.anchorreporters.com
(850) 432-2511

1        Q.    Tell me what your responsibilities were at

2   that time.

3        A.    In '07, was the vice-president of operations.

4        Q.    So tell me as it related to any particular --

5   strike that.  As VP of operations, then, were you

6   overseeing the regional folks?

7        A.    Yes.

8        Q.    Okay.  And did you have -- why don't you tell

9   me what departments you had regional folks for.

10       A.    Director of operations, which is -- we have

11  six regions and we have a director of operations in each

12  one, and under the director of operations we have nurse

13  consultants, dietary consultant, financial consultant,

14  and regional maintenance.

15       Q.    And then do each of the departments within the

16  nursing home fall under one of those categories; would

17  that be fair to say?

18       A.    Well, maybe not all of them but most of them.

19  Yeah, probably pretty comprehensive.

20       Q.    Can you think of any department in a nursing

21  home that would not have a consultant?

22       A.    No.  I don't think so, no.

23       Q.    Okay.  So it's fair to say that the nursing is

24  the clinical issues --

25       A.    Correct.

1          Q.    -- would that be fair?  Okay.  Dietary, I

2    think is self-explanatory.  Maintenance, I think is

3    self-explanatory.  Who would fall under financial?

4          A.    The business office.

5          Q.    Anything other than the business office?

6          A.    Payroll.  Well, they're all in the business

7    office.

8          Q.    Okay.  Where would medical records fall?

9          A.    Probably under the clinical.

10         Q.    Okay.  How about admissions?

11         A.    A little bit of the business but more of the

12    director of operations would be more involved with that.

13         Q.    What would be the title of the regional nurse?

14         A.    Nurse consultant.

15         Q.    Okay.  Were the consultants employees of Gulf

16    Coast Health Care?

17         A.    Yes.  No, it was Delta.

18         Q.    Well, prior it would have been Delta Health

19    Group, correct?

20         A.    Right.

21         Q.    Okay.  Now, once in 2008, when there was a

22    change, did the breakdown work essentially the same.

23         A.    Yes.

24         Q.    Okay.  So internally you didn't restructure

25    how your folks worked?

1     A.   No.

2     Q.   Okay.  Now, obviously, who you were reporting

3 to changed once the sale went through, correct?

4     A.   Right.

5     Q.   Who did you deal with prior to the sale?

6     A.   Dana Foster was the chief operating officer.

7     Q.   So you would have dealt with Dana Foster most

8 frequently?

9     A.   Yes.

10     Q.   And would you have also dealt with Mr. Bell?

11     A.   Yes.  Not much, though.

12     Q.   Okay.  Now, once the sale went through, who

13 did you deal with?

14     A.   Eric Roth.

15     Q.   Anyone else?

16     A.   Well, different people that would come around,

17 but it was -- mainly he was my direct report.

18     Q.   Okay.  Where was Mr. Roth located?

19     A.   White Plains.

20     Q.   How did you usually communicate with Mr. Roth?

21     A.   Phone, e-mail, visits.

22     Q.   What -- has your e-mail address for business

23 obviously changed since the 2008 sale?

24     A.   Yes.

25     Q.   What was your e-mail address just after the

1  sale?

2      A.    It's the same as it is now.

3      Q.    Oh, okay.

4      A.    *CraigCRobinson@GulfCoastHealthCare.com.*  We've

5  since gone to GCHC.  We bought the domain.

6      Q.    Everything was spelled out initially?

7      A.    Yeah.

8      Q.    Okay.

9      A.    For some reason somebody had that and we had

10  to buy the domain.

11      Q.    I think people just go out and buy domains.

12      A.    Yeah.

13      Q.    Okay.  Now, once you became the president, who

14  became your direct report?  Who did you directly report

15  to for that?

16      A.    I report to board of directors.  Excuse me,

17  not board of directors -- investors.

18      Q.    And who was the board of investors?

19          MR. MORRISON:  Form.  Go ahead.  You can

20      answer.

21      A.    (By The Witness)  What I do is have monthly

22  calls with a representative from the investors, and

23  Julie Gutzmann, who's a financial consultant for us, and

24  my CFO is Mandy Garnier.

25      Q.    (By Ms. Knight)  And who is the representative

www.anchorreporters.com
(850) 432-2511

1    for the investors?

2        A.    Steve Lebowitz.

3        Q.    Can you please spell Mr. Lebowitz's last name

4    for us?

5        A.    I will take a shot. L-E-B-O-W-I-T-Z.

6        Q.    Do you know who or what are the investors?

7        A.    I know Harris Schwartzberg, but Steve was the

8    one I deal with as far as on a regular basis.

9        Q.    And how often do you communicate with Steve?

10       A.    We have a monthly call.

11       Q.    Do you communicate with him more frequently

12   than that or is it usually --

13       A.    No, just monthly.

14       Q.    And what do y'all talk about at the monthly

15   calls?

16       A.    The overall status of their investment, the

17   financials, the direction we're taking the company,

18   capital appropriations, anything of significance that

19   may or may not have happened.

20       Q.    Is there a report on the financials that's

21   sent to the folks who are going to participate in the

22   monthly call?

23       A.    Yes.

24       Q.    And who sends the financials?

25       A.    My CFO, Mandy.

1      Q.    Okay.  Would Mandy e-mail it to everybody?

2      A.    Yeah, it's an attachment.  Yeah.

3      Q.    And what information is on the financials?

4      A.    Just the monthly status of revenue, profit,

5  loss, changes from the month before, census, anything of

6  significance that may have been the difference from the

7  month before to now.

8      Q.    When you say "anything of significance," tell

9  me what you mean.

10     A.    Well, anything that would happen that would

11 be, you know, an impact on their investment, such as a

12 major roof repair, you know, anything that had a

13 negative context, surveys, or any of those things.

14     Q.    Is the format of the report the same every

15 month?

16     A.    Pretty much.

17     Q.    Okay.  And is it Ms. Garnier or folks in her

18 office that put that together?

19     A.    Right.

20     Q.    You may have answered this earlier and if you

21 did I apologize.  About how many folks work -- are

22 employed by Gulf Coast Health Care?

23     A.    The whole entire organization is around 6,600,

24 full and part-time.

25     Q.    Okay.  And would that be including the folks

1    who work in the nursing homes?

2         A.    Yes, that's everybody.

3         Q.    Okay.  Are the CNAs and the nurses who work in

4    the facilities employees of Gulf Coast Health Care?

5         A.    Yes.

6         Q.    Are you aware of any planned or potential

7    changes in the structure of Gulf Coast Health Care in

8    the future?

9         A.    In what context, in the structure of --

10        Q.    Of the company.  The ownership structure, the

11   management structure?

12        A.    Not now, no.

13        Q.    Okay.  Rather than bring the change of

14   ownership documents for all of the nursing homes,

15   because we're here in the Stein matter, I brought the

16   Lake Placid facility's documents.  If you need documents

17   from a different facility to answer questions, let me

18   know that.  We can always pull them up, okay?

19             MS. KNIGHT:  Can you mark this as Exhibit 1,

20        please.

21             (Plaintiff's Exhibit No. 1 was marked for

22        identification.)

23        Q.    (By Ms. Knight)  Mr. Robinson, you've been

24   handed Exhibit No. 1.  This is a page from -- when I

25   asked the State of Florida for a copy of the change of

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 Page 4 of 27  Exhibit F Pg 26 of 244
www.anchorreporters.com
(850) 432-2511

1   ownership documents for Lake Placid from the 2008

2   change, there were 300 plus pages of documents that were

3   provided, and this is one of the pages out of those

4   documents.

5              If you require the whole -- if you want to see

6   all 300 plus, I'm happy to pull those up for you.  But I

7   felt like this would be easier.  Do you recognize

8   Exhibit No. 1?

9        A.   No.

10       Q.   Okay.  Do you -- it purports to show the old

11  ownership structure and the proposed ownership structure

12  for Lake Placid.  In looking at what it says is the old

13  structure, does that appear to be accurate?

14            MR. MORRISON:  Form.  But go ahead.

15       A.   (By The Witness)  Previous operator you mean?

16       Q.   (By Ms. Knight)  Yes, sir.

17       A.   Delta Health Group, yes.

18       Q.   Okay.  And then there is a -- I think they

19  call it proposed ownership or a new ownership.

20       A.   New owner?

21       Q.   New operator or new owner.  Under new

22  operator, are those companies all part of or were

23  related to Lake Placid?

24            MR. MORRISON:  Object to the form, but go

25       ahead.

www.anchorreporters.com
(850) 432-2511

1       A.    (By The Witness)   I don't know that it's a HUD

2   facility.   That's --

3       Q.    (By Ms. Knight)   Are those three separate --

4   under new operator, are those three separate ownerships?

5            MR. MORRISON:   Form, but go ahead.

6       A.    (By The Witness)   Gulf Coast Health Care is

7   the management company.

8       Q.    (By Ms. Knight)   Okay.

9       A.    Florida Facilities, as I said earlier, owns

10   the licensing.

11            MS. KNIGHT:   Can you mark this as Exhibit 2?

12            (Plaintiff's Exhibit No. 2 was marked for

13        identification.)

14       Q.    (By Ms. Knight)   Sir, you've been handed

15   Exhibit No. 2.   Please take your time and take a look at

16   that, and then I'll have some questions for you about

17   it.

18       A.    (Witness complying.)

19       Q.    Okay.   Have you seen this page before --

20       A.    No.

21       Q.    -- exhibit No. 2?   Do you mind if I walk over

22   there just for a second?

23       A.    Sure.

24       Q.    Do you see in Exhibit 2 it lists three

25   different owners or officers and it identifies either

1  C, D and E as the officer or the owner for each of the

2  facilities?

3      A.   Okay.

4      Q.   Do you see that?

5      A.   It is the same people in each one of those.

6      Q.   Right.  But there's HUD Facilities, Gulf Coast

7  Facilities and Florida Facilities; do you see that?

8      A.   Yes.

9      Q.   Okay.  Now, as part of the sale of Delta to

10  Gulf Coast Health Care, were the facilities that were

11  sold part of one of those three owners or operators,

12  either Gulf Coast Facilities, HUD Facilities or Florida

13  Facilities?

14      A.   Say that again, please.

15      Q.   Yes, sir.  Why don't I do it this way.  Can

16  you tell me what HUD Facilities, Gulf Coast Facilities

17  and Florida Facilities are?

18      A.   As I said, Gulf Coast Health Care is a

19  management.  They own 95 percent of the Florida

20  Facilities.  Florida Facilities owns 100 percent of the

21  leases.

22      THE WITNESS:  HUD Facilities, was that one of

23      the facilities that we were --

24      MR. MORRISON:  No.

25      Q.   (By Ms. Knight)  If you'll take a look, the

1   key over here tells, at least according to this document

2   that was filed with the State of Florida, identifies

3   which facilities were HUD Facilities versus Gulf Coast

4   Facilities versus Florida Facilities.

5       A.   Okay.

6       Q.   So understanding the relationship between

7   Florida Facilities and Gulf Coast Health Care, what was

8   the relationship between HUD Facilities and Gulf Coast

9   Health Care?

10         MR. MORRISON:  Form, but go ahead.

11       A.   (By The Witness)  One, I didn't understand

12   that I would be representing HUD Facilities as part of

13   this depo.

14       Q.   (By Ms. Knight)  Okay.  Can you tell me what

15   the relationship is or do you not know?

16       A.   I know HUD Financing, but I don't know how

17   that LLC is structured.

18       Q.   Okay.  Can you tell me about the Gulf Coast

19   Facilities?  How Gulf Coast Facilities is related to

20   Gulf Coast Health Care?

21       A.   Is that Gulf Coast Manage -- is that Gulf

22   Coast Holdings Company?

23       Q.   I'm looking right here at Gulf Coast

24   Facilities, LLC.

25       A.   That's the management company, right?  Gulf

1  Coast Health Care is the manager.

2           MR. MORRISON:  Form.

3       Q.   (By Ms. Knight)  According to the document,

4  and I could be misreading it, so you tell me if I'm

5  wrong.  But according to this key, the owner -- the

6  officer and owner of, for example, Nursing Pavilion at

7  Chipola Retirement Center would be Gulf Coast

8  Facilities, LLC.  Do you see that?

9       A.   Yes.

10      Q.   Okay.  Is that accurate?

11           MR. MORRISON:  Form.  If you know, you know;

12      if you don't, you don't.

13      A.   (By The Witness)  I'm not sure how that's

14  related to that.

15      Q.   (By Ms. Knight)  Okay.  Do you understand

16  that -- well, strike that.  Is Florida Facilities

17  related to Nursing Pavilion at Chipola?

18      A.   Florida Facilities owns all the licensees.

19      Q.   Okay.  Do you know whether that's been true

20  since the sale?  Has that always been true since the

21  sale in 2008?

22      A.   To my knowledge.

23      Q.   Okay.  So it's fair to say that you would not

24  be able to explain the key that's on that page as it

25  relates to those facilities, fair to say?

14-50756 - #500-6  File 02/06/15  Enter 02/06/15  Pg 31 of 244    Exhibit F Pg 31 of 244
www.anchorreporters.com
(850) 432-2511

1          A.    As it relates to the HUD Facilities and --

2          Q.    Or Gulf Coast Facilities, LLC, correct?

3          A.    Correct.

4          Q.    Okay.

5              MR. MORRISON:  I don't think either HUD or

6          Gulf Coast was listed on the letters.  That's one

7          of the problems we're having.

8          Q.    (By Ms. Knight)  What I'm trying to clear up

9    is I understood -- and I believe this is what you're

10   telling me -- is that your understanding is that Florida

11   Facilities, LLC, is the 95 percent -- or, I'm sorry, is

12   the 100 percent owner of all of the licensees on that

13   page; is that correct?

14         A.    Yes, that's correct.

15         Q.    Okay.  Do you know, as you sit here, whether

16   that Exhibit 2 is incorrect or are you just not familiar

17   with it at all?

18         A.    I've never seen this before.

19         Q.    Okay.  And regardless of what that says, your

20   understanding is Florida Facilities owned all the

21   licensees for all of the homes that are listed on

22   Exhibit 2?

23         A.    Correct.

24         Q.    In Gulf Coast Health Care, LLC, is "health

25   care" one or two words?

1  A. It's two words.

2  Q. It's not on Exhibit 2.

3  A. It's two words.  Yeah, it's two words.

4  Q. Okay.  I've seen it both ways, so I was just

5 trying to clear that up.

6  A. It's two words.

7  Q. Thank you.  Did you participate in negotiating

8 the transfer of the releases or the assignment of the

9 leases or subleases?

10  A. No.

11  Q. Was the 2 north -- is it Palafox?

12  A. Yes.

13  Q. Was the 2 North Palafox address previously the

14 address for Delta Health Group?

15  A. Yes.

16  Q. Okay.  So did y'all basically stay in your

17 offices?

18  A. Yes.

19  Q. Once the sale went through in 2008 of Delta to

20 Gulf Coast Health Care, did Delta continue to provide

21 any services at all to Gulf Coast Health Care?

22  A. Well, they still had the HUD Facilities that

23 we were managing for them.

24  Q. Okay.

25  A. So they were still involved from that piece.

1   We were just managing.  They still owned it until 2010.

2        Q.    Okay.  So was this a contract between Gulf

3   Coast Health Care and Delta to provide services to those

4   facilities?

5        A.    I would assume, but I wasn't involved in that.

6        Q.    Okay.  As of 2008, once the sale went

7   through -- and that was late 2008, was it not?

8        A.    December.

9        Q.    As of December 2008, when the sale was

10  finalized, did any company other than Gulf Coast Health

11  Care provide management or back office services of any

12  sort to the nursing homes that were part of that sale?

13       A.    In 2008 -- say that again.

14       Q.    Once the sale went through --

15       A.    Okay.

16       Q.    -- was there any company other than Gulf Coast

17  Health Care that was providing management services or

18  back office services to the --

19       A.    Yes, Health Care Navigator was at that time.

20       Q.    And what is Health Care Navigator?

21       A.    They're a consulting company for purchasing,

22  legal, reimbursement, regulatory, accounting, so...

23       Q.    And did you understand from the -- well,

24  strike that.  Did Health Care Navigator provide services

25  to Delta Health Group before the sale --

1       A.   No.

2       Q.   -- was completed?

3       A.   No.

4            MS. KNIGHT:  And we're not doing a good job of

5       this.  I've done it to you too.  We need to try to

6       not talk on top of one another for her sanity.

7       I've done it to you, too.  It happens when people

8       start conversing.  It's one of those things that's

9       unusual about depositions.

10      Q.   (By Ms. Knight)  Other than -- can you tell me

11   again the services that Health Care Navigator provides

12   to Gulf Coast Health Care?

13      A.   Legal, reimbursement, accounting, purchasing.

14   What did I leave out?  Government relationships.

15      Q.   Okay.  What type of purchasing do you mean?

16      A.   Group purchasing, pricing.

17      Q.   Would that include food services for the

18   facilities and that sort of thing?

19      A.   Correct.

20      Q.   Pharmacy services?

21      A.   Correct.

22      Q.   And who is your contact, if anybody, at Health

23   Care Navigator?

24      A.   Um, I'm not sure who's actually running Health

25   Care Navigator.

1        Q.    Well, who do you talk to?

2        A.    I talk to -- the IT is Matt Horwitz; legal,

3    Trey Blalock.  Let's see, the accounting consultant --

4    but I don't think she works for Health Care Navigator --

5    Julie Gutzmann.  She's more of a consultant.

6        Q.    Do you know who Ms. Gutzmann works for?

7        A.    No.

8        Q.    Are the folks that you deal with from Health

9    Care Navigator at the White Plains office?

10        A.    Most of them, yes.

11        Q.    And does Gulf Coast Health Care have a

12    contract with Health Care Navigator?

13        A.    Yes.

14        Q.    Do you know who negotiated that contract?

15        A.    No.

16        Q.    Do you know who signed it?

17        A.    If it's Gulf Coast, I probably signed it.

18        Q.    Okay.  Would it have been you in 2008 or

19    maybe --

20        A.    No.

21        Q.    -- Mr. Roth?

22        A.    Mr. Roth, that's right.  Because it's 2008.

23        Q.    He was the president correct?

24        A.    Yes.

25        Q.    Okay.

1          MR. MORRISON:  Wait until she finishes the

2      question.  You guys are doing it again.

3      Q.    (By Ms. Knight)  Did you play any role in

4  determining how the various LLCs would be taxed?

5      A.    No.

6      Q.    Or how they would report their taxes?

7      A.    No.

8      Q.    Who handles the taxes for Gulf Coast Health

9  Care?

10     A.    Well, our business office generates most of

11  it, I'm sure.

12     Q.    Okay.  Who was the head of your business

13  office?

14     A.    Well, the CFO is Mandy Garnier.

15     Q.    So the business office would report to her?

16     A.    Yes.

17     Q.    Are you generally familiar with how a change

18  of ownership -- that the fact that a change of ownership

19  application has to be filed with the State prior to the

20  change of ownership actually occurring?

21     A.    All I know is that it has to be done.  I

22  wasn't involved in any of it.

23     Q.    Okay.  Do you know who was?

24     A.    No.

25     Q.    Are you aware that there have to be, for

1    example, proposed Medicaid cost reports that project

2    what's going to happen over the first year after the

3    change of ownership?

4         A.   Yes.

5         Q.   Do you know who prepared those proposed and

6    projected cost reports?

7         A.   Some people in the White Plains office.

8    That's all I know.  I'm not sure who they would have

9    worked for.

10        Q.   Tell me what you mean by "who they would have

11   worked for."

12        A.   Well, you'd asked me about Health Care

13   Navigator.  I'm not sure if they worked for Health Care

14   Navigator or not.

15        Q.   Okay.  But to your knowledge, somebody out of

16   the White Plains office took care of that?

17        A.   Yes.

18        Q.   Does Cypress Administrative Services provide

19   services to Gulf Coast Health Care?

20             MR. MORRISON:  Form.  You can answer.  I think

21        you already did.

22        A.   (By The Witness)  No.

23        Q.   (By Ms. Knight)  Were you familiar with the,

24   generally speaking, not the details of, but generally

25   speaking of the existence of a revolving line of credit

1   for the Delta Health Group?

2            MR. MORRISON:  Form, but go ahead.

3       A.   (By The Witness)  I'm not sure.  I don't know

4   that it was ever mentioned.

5       Q.   (By Ms. Knight)  From the documentation, it

6   appears that there was a revolving line of credit

7   between Delta Health Group and Capital Source.  Were you

8   familiar with that?

9       A.   No.

10      Q.   Or aware that it existed?

11      A.   No.

12      Q.   Okay.  Were you aware of any assignment of

13  that financing to Gulf Coast Health Care?

14      A.   No.

15      Q.   At any point in your tenure at Gulf Coast

16  Health Care, have you become aware of a revolving line

17  of credit for Gulf Coast Health Care?

18      A.   I'm not sure what you mean by a "revolving

19  line of credit."

20      Q.   Is there a line of credit for Gulf Coast

21  Health Care?

22      A.   Yes.

23      Q.   For the operations of the facilities?

24      A.   Yes.

25      Q.   Okay.  And were you aware of that in 2008 when

1   the sale occurred?

2       A.   Um, I knew that Capital Source was involved

3   and I'm sure they did some finance work.  But, like I

4   said, I wasn't very much involved in all of that.

5       Q.   Okay.  Would you have become more aware of and

6   involved with the line of credit once you became

7   president?

8       A.   Aware, but not involved.

9       Q.   Who is involved with negotiating and -- well,

10  with negotiating the line of credit for Gulf Coast

11  Health Care?

12      A.   I'm not sure who is all involved in there with

13  that.

14      Q.   Are you aware of what company or what people?

15      A.   I know Julie Gutzmann is a financial adviser

16  and I imagine Mandy Garnier would know more about that

17  than I would.

18      Q.   Okay.

19      A.   She's been involved in that.

20      Q.   Is that something that Ms. Garnier would

21  report to you?

22      A.   Not report to, just in discussions.

23      Q.   Tell me what you mean.

24      A.   Just more casual conversations as to who

25  they're working with, but nothing -- you know, a sit

1  down meeting to where -- from A to Z.

2       Q.   Is it Ms. Garnier's responsibility now to

3  ensure that there is a line of credit in place for Gulf

4  Coast Health Care?

5            MR. MORRISON:  Form, but go ahead.

6       A.   (By The Witness)  I imagine she's part of it,

7  not singularly.

8       Q.   (By Ms. Knight)  Who else would be part of

9  that?

10      A.   Julie Gutzmann would be.

11      Q.   Anyone else?

12      A.   Not that I know of.

13      Q.   Is there any company with which Gulf Coast

14  Health Care has a contract that would require that

15  company to be responsible ensuring that you have a line

16  of credit in place?

17      A.   I'm not following that question.

18      Q.   Is there anyone that Gulf Coast Health Care

19  has hired to handle negotiating and maintaining the line

20  of credit?

21      A.   I'm not aware of any.

22      Q.   Does Gulf Coast Health Care have a contract

23  with Julie Gutzmann?

24           MR. MORRISON:  Form, but go ahead.

25      A.   (By The Witness)  I'm not aware of one.

1       Q.   (By Ms. Knight)  You mentioned that she's a
2   financial adviser.  So I'm wondering how -- like, what
3   company does she work for; do you know?
4       A.   No.
5            MR. MORRISON:  Form.
6            MS. KNIGHT:  What was wrong with the question?
7            MR. MORRISON:  I think you asked that, like,
8       ten minutes ago.  He said he didn't know who --
9            THE WITNESS:  I think that was in a different
10      context, but okay.
11      Q.   (By Ms. Knight)  Are you involved in any way
12   with Gulf Coast Master Tenant I or II?
13      A.   No.
14      Q.   Are you aware that they are the sub landlord
15   for some of the nursing homes?
16      A.   I've heard the name but didn't put any context
17   to it.
18      Q.   Okay.  Have you had to sign any leases or
19   subleases for the facilities since you became president?
20      A.   Yes.
21      Q.   And when did that occur?
22      A.   Since I've been president.  Let's see, when
23   was that?  Last November, properties were sold.
24      Q.   Okay.  Which properties were sold?
25      A.   Health Care REIT II and Argent Properties,

1    Health Care Reinvestment.

2         Q.    So Healthcare Reinvestment sold their interest

3    in the facilities?

4         A.    Yes.

5         Q.    Okay.  Did the new ownership continue to lease

6    the properties to the same licensees?

7         A.    Yes.

8         Q.    Who negotiated those leases?

9         A.    I don't know.

10        Q.    Not you?

11        A.    No.

12        Q.    Was it someone at Gulf Coast Health Care?

13        A.    No.

14        Q.    Do you know what company the folks were from

15   that did those negotiations?

16             MR. MORRISON:  Form.

17        A.    (By The Witness)  No.

18        Q.    (By Ms. Knight)  Are you responsible for

19   reviewing Medicaid cost reports before they're filed

20   with the State?

21        A.    No.

22        Q.    Who does that?

23        A.    Doug Burr with Health Care Navigator.

24        Q.    Okay.

25        A.    He's the reimbursement...

1      Q.   He's the reimbursement guy?

2      A.   Yes.

3      Q.   Okay.  Are you familiar with the company,

4  Asset Navigator?

5      A.   I've heard the name.

6      Q.   Do you know what they do?

7      A.   No.

8      Q.   I think you mentioned Mitchell Starer earlier.

9  What is his role, if any?

10      A.   He's an officer in several of those LLCs.

11      Q.   Was he an officer of Gulf Coast Health Care?

12      A.   Not to my knowledge.  Oh, excuse me.  Yes, he

13  was until 2010.

14      Q.   Oh, okay.

15      A.   It was Eric, Julie, and Mitch.

16      Q.   Are you aware of any services that Asset

17  Navigator provides to Gulf Coast Health Care?

18           MR. MORRISON:  Object to the form.  You may

19      answer.

20      A.   (By The Witness)  No.

21      Q.   (By Ms. Knight)  Who handles the check writing

22  for Gulf Coast Health Care, so for the facilities?

23      A.   Such as paying bills?

24      Q.   Yes, sir.

25      A.   Our office does.

1     Q.   Gulf Coast Health Care?

2     A.   Yes.

3     Q.   So would the checks that go to the vendors,

4 for example, say Gulf Coast Health Care on them?

5     A.   Yes.

6     Q.   And are the -- are those check writing

7 services actually performed out of the Palafox office?

8     A.   Yes.

9     Q.   When money goes into, for example, the Lake

10 Placid facility, it comes in from Medicare or Medicaid

11 or private pay, is there an initial bank account that

12 the money goes into?

13     A.   Yes.

14     Q.   And then is that money swept out of the bank

15 account at some point?

16     A.   I think daily, yes.

17     Q.   And by whom?

18     A.   Couldn't tell you.

19     Q.   Would it be whoever has the line of credit?

20     A.   (No verbal response.)

21     Q.   You don't know?

22     A.   No.

23     Q.   Okay.  When you put --

24     A.   I don't know.  I don't know.

25     Q.   She will try to capture gestures, but they

1   don't always work.

2          Can you tell me -- well, ultimately, you're

3   telling me that the money ends up with Gulf Coast Health

4   Care somehow, correct?

5          A.   I'm assuming yes, paying bills.

6          Q.   Okay.  Do you know where Gulf Coast Health

7   Care gets the money to pay the bills?

8          A.   From, I'm sure, from the revenues we collect.

9          Q.   Is it Gulf Coast Health Care that's sweeping

10  the money or is it some third party that's sweeping the

11  money?

12         A.   I can't answer that.  I don't know.

13         Q.   Who would know that, Ms. Garnier?

14         A.   Yes.

15         Q.   And would you please spell her last name for

16  us, please?

17         A.   G-A-R-N-I-E-R, Garnier.

18         Q.   Do you know whether at any point the money,

19  even if it's swept out every day, does it at any point

20  end up back in the licensee's bank account?

21         A.   Again, we would have to, to be paying bills,

22  so I'm assuming it would be.

23         Q.   Okay.  But the bills --

24         A.   I don't know.  I don't understand.  I don't

25  know where the routing goes so I'm not familiar with

1    that.

2         Q.    Okay.  But you are telling me that the bills

3    for the Lake Placid, for example, the checks would

4    actually be cut by Gulf Coast Health Care?

5         A.    Correct.

6         Q.    Do you know whether Gulf Coast Health Care has

7    separate accounts for each nursing home?

8         A.    No, I don't.

9         Q.    This is my fault.  No, you don't know whether

10   there are separate accounts or, no, they're aren't?

11        A.    I'm going to assume there are, but I don't

12   know.

13        Q.    That's an assumption?

14        A.    I'm going to say no, I don't know.

15        Q.    Okay, fair enough.  Understand that I don't

16   know what you know --

17        A.    I don't know.

18        Q.    -- so I have to ask.

19        A.    I realize that.  I'm just trying -- trying to

20   answer truthfully and understand all of the questions

21   too, so...

22        Q.    Absolutely.  And if you need -- if you're

23   ready for a break --

24        A.    Yeah, let's take one.

25             MS. KNIGHT:  Okay, no problem.

1              (Whereupon, a brief recess was taken at

2         10:58 a.m., after which the deposition continued

3         at 11:05 a.m.)

4              Q.   (By Ms. Knight)  I want to take you back a

5    little bit, back to April of 2008.  I know that you told

6    me that you're -- that's basically when you met

7    Mr. Schwartzberg and that these were fairly -- and this

8    will be my word, not yours -- but more like a casual

9    introduction and meeting rather than any specifics about

10   business; is that fair to say?

11             A.   Yes.

12             Q.   Okay.  And in your mind, at that point, was it

13   clear that there was at least going to be a real attempt

14   to get that sale to go through, between Delta and Gulf

15   Coast?

16             A.   I think they were trying to feel each other

17   out at that time, whether they were going to take it

18   serious or not.

19             Q.   Do you think that they had already made the

20   decision --

21             A.   No.

22             Q.   -- about whether they were serious?

23             A.   What, what -- no.

24             MR. MORRISON:  Again, just wait until she's

25        finished the question.

1        THE WITNESS:  Quit yelling at me.

2        (laughing)

3        MR. MORRISON:  I was not yelling at you.

4        Q.    (By Ms. Knight)  Do you recall, just in your

5   mind, about how long after that meeting you realized

6   that this looked like it was serious and they were going

7   to try to make this happen?

8        A.    Within a couple of months.

9        Q.    Okay.  In June of 2008, using the Lake Placid

10  facility as an example, the LLC, SF Lake Placid, LLC,

11  was created.  In your mind, about June, did it appear to

12  be a serious thing happening?

13        A.    April or June, yes, probably.

14        Q.    Okay.  And, again, did you play any role in

15  deciding which LLCs to create or what to name them or

16  anything like that?

17        A.    No.

18        Q.    Okay.  Did you have any dealings with Todd

19  Reynolds?

20        A.    Very little.

21        Q.    What were your dealings with Mr. Reynolds?

22        A.    Just I knew who he was.  He was in White

23  Plains and he was a paralegal.

24        Q.    Okay.  Did he perform any work for Gulf Coast

25  Health Care?

1          A.    Probably doing something with the documents,

2    that's all I know.

3          Q.    Okay.  And when you say "doing something with

4    the documents," you're talking about filing --

5          A.    Yes.

6          Q.    -- records with the State and that sort of

7    thing?

8          A.    Paralegal stuff.

9          Q.    Okay.  Do you know whether Mr. Reynolds is

10   still at the White Plains office?

11         A.    He's not.

12         Q.    Okay.  Was there somebody that took his place?

13         A.    I'm sure somebody did.  I don't know who it

14   was.

15         Q.    Okay, fair enough.  If there were changes to

16   the intended structure before the sale went through,

17   would you have been aware of those?

18         A.    Could you rephrase that?

19         Q.    Yes, sir.  If the intended structure for Gulf

20   Coast Health Care was initially one thing in June or

21   July and there was a change -- and there was a decision

22   to change the structure, would you have had any role in

23   that at all or were you aware of it?

24              MR. MORRISON:  Object to the form, but go

25         ahead.

www.anchorreporters.com
(850) 432-2511

1      A.    (By The Witness)  No.

2      Q.    (By Ms. Knight)  The White Plains office that

3  we've been talking about, was that originally on South

4  Broadway?

5      A.    Yes.

6      Q.    Okay.  And did it move to Red Oak Lane?

7      A.    Yes.

8      Q.    Okay.  How frequently do you go to the White

9  Plains office?

10      A.    About once a quarter.

11      Q.    And what do you do up there once a quarter?

12      A.    Meet with various folks.

13      Q.    Like who?

14      A.    Legal department, reimbursement, purchasing,

15  talk about potential deals we're working on, growth and

16  developments, strategic planning.

17      Q.    Have there been any facilities added to Gulf

18  Coast Health Care since 2008?

19      A.    Yes.  We acquired, it's called Coastal Rehab

20  in Daytona.

21      Q.    Any others?

22      A.    No.

23      Q.    Is the growth that you're talking about adding

24  new facilities or do you mean something else by that?

25      A.    Oh, trying to add new facilities, trying to

1    purchase companies that are for sale.

2        Q.    Okay.  Just so that I'm clear, when you say

3    "purchase companies that are for sale" what do you mean

4    by that?

5        A.    Maybe that's too broad, especially when we

6    talk about all these corporations.  At times nursing

7    homes go for sale and --

8        Q.    Okay.  So you're talking about nursing home

9    facilities in particular?

10       A.    Facilities, yeah.

11       Q.    Were you aware -- were you aware at the time

12   of the sale that the PPD rates for Medicare and Medicaid

13   would increase after the change of ownership?

14       A.    Yes.

15       Q.    Can you explain that to me?  Why does that

16   happen or why did that happen?

17       A.    That's in the Medicaid rules and regulations.

18   As far as the change of ownership, they bump up the

19   Medicaid rate for a period of time.

20       Q.    Based on what?

21       A.    Based on their formulas.

22       Q.    Okay.  And is there an expectation that the

23   rate is going to come back down?

24       A.    Yes.  After it settles down, they give you a

25   certain amount of time to, you know, spend and then they

www.anchorreporters.com
(850) 432-2511

1    readjust the rates.

2         Q.   Okay.  Do you recall when the rates were

3    adjusted back down after the change of ownership?

4         A.   No.  I think because there's delayed filing

5    times and cost reports, you know, from a year and a half

6    ago, so I can't tell you exactly what dates they were.

7    But typically it's about 18 months.  I'm not sure if we

8    did that, an 18 month.

9         Q.   Would it -- would the change in rates

10   coincide in any way with the filing of the Medicaid cost

11   report?

12        A.   I can't answer that, as far as the timing is

13   concerned on that to be exact.

14        Q.   Would Ms. Garnier be the person to talk to

15   about that?

16        A.   Better than me, probably.

17        Q.   Okay.  If you needed to ask someone when the

18   rates were adjusted back down, who would you ask?

19        A.   Well, between Mandy and Doug Burr, who is our

20   reimbursement specialist with Health Care Navigator.

21        Q.   And Mr. Burr's last name, can you spell it for

22   us?

23        A.   B-U-R-R.

24        Q.   Thank you.

25             MS. KNIGHT:  Can we mark that, please?

1          (Plaintiff's Exhibit No. 3 was marked for

2     identification.)

3     Q.   (By Ms. Knight)  Okay.  Sir, you've been

4     handed Exhibit No. 3.  Have you had a chance to look at

5     that?

6     A.   Briefly.

7     Q.   Okay.  Are you familiar with that document?

8     A.   No.

9     Q.   Okay.  Are you familiar with that type of

10    document, a limited liability company agreement?

11    A.   I've seen them, but I'm not a lawyer, so...

12    Q.   Understood.  Have you, since you've been the

13    president of Gulf Coast Health Care, have you been

14    involved in changing any of the limited liability

15    agreements for the facilities?

16    A.   I'm not aware of it, but, like I said, I'm

17    not -- I sign a lot of agreements on advice of counsel

18    and go through certain things, so I may have, but I

19    can't say one way or the other right now.

20    Q.   Okay.  If you needed to know if the limited

21    liability agreement for SF Lake Placid, LLC, had changed

22    since the 2008 agreement that's in front of you, who

23    would you ask?

24    A.   Legal counsel.

25    Q.   Okay.  Mr. Morrison, sitting next to you --

1      A.   No.

2      Q.   -- or someone else?

3      A.   Somebody else in White Plains.

4      Q.   Okay.  Who would you call?

5      A.   Ray Mulry.

6      Q.   Can you spell Mr. Mulry's last name?

7      A.   M-U-L-R-Y.

8      Q.   Is he with HC Navigator?

9      A.   Yes.

10      Q.   Okay.  And is Health Care Navigator also known

11  as HC Navigator?

12      A.   I don't know.

13      Q.   Okay, fair enough.  What do you call the

14  company?

15      A.   Health Care Navigator.

16      Q.   Okay.  I don't have any more questions for you

17  on Exhibit No. 3.

18           All right.  I want to take you through some of

19  the companies and make sure I understand.

20           MR. MORRISON:  Is this part of the CHOW

21      documents?

22           MS. KNIGHT:  It was, yeah.  Yeah, everything

23      I've used up to this point has been from --

24           MR. MORRISON:  That's what I assumed.

25           MS. KNIGHT:  -- trial documents.

1      MR. MORRISON:  I just wanted to make sure
2   we're on the same page.
3      MS. KNIGHT:  Yes.  We're moving now to Sunbiz
4   documents.
5      COURT REPORTER:  What kind of documents are
6   those?
7      MS. KNIGHT:  It's capital C, capital H,
8   capital O, capital W.
9      COURT REPORTER:  Thank you.
10     MS. KNIGHT:  Change of ownership.
11     MR. MORRISON:  It's called CHOW for short.
12     Q.   (By Ms. Knight)  Sir, I've handed you the
13  public filings in the State of Florida for Florida
14  Facilities, LLC, and this is from October of 2009.  If
15  you'll turn to the very last page, it's the affidavit by
16  Foreign Limited Liability Company.  Do you see that?
17     A.   Yes.
18     Q.   It changed managers.  It lists there GCH
19  Management Services, LLC, as the manager for Florida
20  Facilities, LLC.  Is that accurate?
21     A.   Let's see.  They're the managing entity for --
22  that owns five percent of Florida Facilities.
23     Q.   Okay.  And is it your understanding that GCH
24  Management Services, LLC, also acts as the manager or
25  managing member for Florida Facilities, LLC?

1    A.   Yes.

2    Q.   Okay.  And does Florida Facilities have any

3  employees?

4    A.   No.

5    Q.   Do I understand that Florida Facilities holds

6  the licenses for the nursing homes?

7    A.   Correct.

8    Q.   Do you know if Florida Facilities has a board?

9    A.   It has officers.

10    Q.   Okay, who are the officers for Florida

11  Facilities?

12    A.   Eric Roth, Julie Gutzmann, and Mitchell

13  Starer.

14    Q.   And has that remained true since 2008?

15    A.   Yes.

16    MR. MORRISON:  Are you done with this?

17    MS. KNIGHT:  Yes.

18    Q.   (By Ms. Knight)  And do I understand that

19  you're not aware of any relationship between the Gulf

20  Coast Facilities, LLC, and the nursing homes that Gulf

21  Coast Health Care manages?

22    A.   Say that again.

23    Q.   I'm going to hand these to you so you can see

24  the name I'm talking about.  I've handed you the filings

25  for Gulf Coast Facilities, LLC, from August of 2008.

1    What is your understanding of the relationship between

2    Gulf Coast Facilities, LLC, and the nursing homes that

3    Gulf Coast Health Care manages, if there is one?

4         A.    I'm not aware of Gulf Coast Facilities, LLC.

5         Q.    Okay, fair enough.  Now, HUD Facilities, LLC,

6    was how many nursing homes?

7              MR. MORRISON:  Form.

8         Q.    (By Ms. Knight)  Well, let me ask this a

9    different way.  What is HUD Facilities, LLC?

10        A.    I didn't think I was a representative for

11   them.

12             MR. MORRISON:  Yeah, this is the issue we had.

13             This wasn't one of the entities.  Whether it was an

14             oversight, I don't -- we just didn't anticipate

15             that Gulf Coast Facilities or Florida Facilities --

16             not Florida Facilities -- Gulf Coast Facilities or

17             HUD Facilities were part of the agenda today, so...

18             MS. KNIGHT:  So we're clear, Gulf Coast

19             Facilities showed up in the structures of the

20             Florida Facilities, which is why I've been talking

21             about that.  And based on the document --

22             MR. MORRISON:  I think the best way to do it

23             is we can get you clarification on that.

24             MS. KNIGHT:  Okay, that's fine.

25             MR. MORRISON:  It is a corporate entity in the

1        related structures, but, you know -- and I think

2        that, without testifying, that the structures will

3        be very similar to what Florida Facilities does

4        based on time and this transition of HUD.  Just

5        my --

6            MS. KNIGHT:  And that's actually what I was

7        going to ask.

8        Q.   (By Ms. Knight)  Did Florida Facilities ever

9    become the holder of the licenses for the facilities

10   that were HUD Facilities?

11       A.   My understanding is they own all of the

12   licenses to all of the facilities, to all of the

13   facilities.

14       Q.   Okay.  Meaning Florida Facilities has the

15   license for all of the facilities?

16       A.   For all 44 of ours.

17       Q.   Okay.

18           MR. MORRISON:  And if that is not the case,

19       we'll look into that and we'll figure that out.

20           MS. KNIGHT:  You were clear that he wasn't

21       prepared as the corporate representative to address

22       that today.

23       Q.   (By Ms. Knight)  Okay.  What is Pensacola

24   Administrative Services?

25       A.   In two thousand -- this is, let's see,

1    Pensacola Administrative Services?

2        Q.    Yes, sir.

3        A.    In 2008, they were the back office for Gulf

4    Coast Health Care -- or, excuse me, we used them as the

5    back office.  That was a company forum for accounting,

6    IT, pretty much everybody at the corporate office.

7        Q.    Okay.  And these were people who physically

8    worked out of the Gulf Coast Health Care office?

9        A.    The county department, the IT.  That's

10   basically it.  Payroll.

11       Q.    Okay.  Did the folks who did the accounting

12   and the IT and the payroll report to the president of

13   Gulf Coast Health Care?

14       A.    Mandy Garnier was over the office there, so

15   I'm not exactly sure who she was reporting to at that

16   time.

17       Q.    Okay.  But she was an officer of Gulf Coast

18   Health Care at the time, correct?

19       A.    No.

20       Q.    Was she -- what was her role at the time?

21       A.    She was CFO.

22       Q.    Okay.  She was the chief financial officer of

23   Gulf Coast Health Care?

24       A.    No, she was -- I guess I'm confused now.  I'm

25   thinking she may have been with Pensacola Administrative

1    Services at that time.

2        Q.    Okay.  Did Gulf Coast Health Care have a

3    contract with Pensacola Administrative Services?

4        A.    I'm sure we did.

5        Q.    You mentioned that -- or you testified that

6    that was true in 2008.  At some point, was that no

7    longer the case?

8        A.    In 2010, with the asset sale, it rolled back

9    into Gulf Coast Health Care.

10       Q.    Okay.  So as of 2010, was there a Pensacola

11   Administrative Services any longer?

12       A.    It's still there, but it's for tax purposes

13   and business reasons.  It doesn't have employees.

14       Q.    Okay.  So the services that were being

15   provided by Pensacola Administrative Services as of 2009

16   were, by 2010, were being provided by Gulf Coast Health

17   Care --

18       A.    Yes.

19       Q.    -- employees?

20       A.    Yes.

21       Q.    Did Gulf Coast Health Care just hire the

22   employees of Pensacola Administrative Services?

23       A.    Yes.

24       Q.    Did Pensacola Administrative Services

25   always operate out of the --

1      A.    Pensacola?

2      Q.    -- Palafox --

3      A.    Yes.

4      Q.    -- address?

5      A.    Yes.

6            MR. MORRISON:  Is that a yes?

7            THE WITNESS:  Yes.

8            MR. MORRISON:  Just to make it clear.  I'm not

9      picking on you.

10     Q.    (By Ms. Knight)  Looking at that same

11     document -- and what I provided you was the filings for

12     Pensacola Administrative Services, LLC, from the State

13     of Florida.  And this is the application for the limited

14     liability to do business in Florida.  Do you see that --

15     yes, we're on the same page -- that the name of the

16     managing member or managers was listed as Pensacola

17     Administrative Holdings, LLC?

18     A.    Yes.

19     Q.    Are you familiar with that company?

20     A.    Yes.

21     Q.    What was that company?

22     A.    That's a holding company basically for

23     business and tax purposes.

24     Q.    Okay.  Were there any employees at Pensacola

25     Administrative Holdings?

1        A.    No.

2        Q.    If you'll look down at the bottom of that

3  page, is that Mr. Roth's signature?  Do you recognize

4  that as Mr. Roth's signature?

5        A.    I suppose.

6        Q.    If you're not sure, just tell me that.

7        A.    Well, I've seen his name down there as

8  president and there's a signature so I'm assuming that's

9  his signature.

10        Q.    I don't want you to assume.  Is Mr. Roth's

11  signature something that you saw with frequency?

12        A.    Yes.

13        Q.    Okay.  Does that look like his signature?

14        A.    Yes.

15        Q.    Okay.

16              MS. KNIGHT:  Off the record.

17              (Off-the-record comments were made.)

18        Q.    (By Ms. Knight)  Sir, I want to ask you about

19  GCH Management Services.  This is the company that you

20  told me owned five percent of Florida Facilities?

21        A.    Yes.

22        Q.    Okay.  To your knowledge, does GCH Management

23  Services have any employees?

24        A.    No.

25        Q.    Do you know who the owners of GCH Management

1    Services are?

2         A.   No.

3         Q.   Do you know who the officers of GCH Management

4    Services are?

5         A.   Yes, Eric Roth, Julie Gutzmann and Mitchell

6    Starer.

7         Q.   Okay.  Are they also the officers of Pensacola

8    Administrative Services?

9         A.   Yes.

10             MR. MORRISON:  In what year?

11        Q.   (By Ms. Knight)  Has that changed for

12   Pensacola Administrative -- in the years that it was

13   operating?

14        A.   Not to my knowledge.

15        Q.   Okay.  And we've been talking about Gulf Coast

16   Health Care, which is an LLC, correct?

17        A.   Correct.

18        Q.   Is that company also known as Gulf Coast

19   Health Care of Delaware?

20        A.   Yes.

21        Q.   Okay.  And are there officers, since 2010, are

22   there officers of Gulf Coast Health Care other than you

23   and Ms. Garnier?

24        A.   No.

25        Q.   And prior to the 2010 change, do I understand

14-50756 - #500-6  File 02/06/15  Enter 02/06/15  Pg 64 of 74  Exhibit F Pg 65 of 244
www.anchorreporters.com
(850) 432-2511

1    that the officers were Mr. Roth, Ms. Gutzmann, and

2    Mr. Starer?

3         A.   Correct.

4         Q.   Okay.  Are you familiar with Gulf Coast Health

5    Care Holdings, LLC?

6         A.   Yes.

7         Q.   And what is that company?

8         A.   It's a holding company for business and tax

9    purposes.

10        Q.   Okay.  Are there any employees in that

11   company?

12        A.   No.

13        Q.   And do you know who the officers are of Gulf

14   Coast Health Care Holdings?

15        A.   Eric Roth, Julie Gutzmann, and Mitchell

16   Starer.

17        Q.   Okay.  Who determines how much liability

18   insurance the various facilities are going to have?

19             MR. MORRISON:  Form, but go ahead.

20        A.   (By The Witness)  I don't know.

21        Q.   (By Ms. Knight)  Are you aware that Gulf Coast

22   Health Care is an insured on the liability insurance for

23   the facilities?

24        A.   You say is or isn't?

25        Q.   "Is."

1          MS. KNIGHT:  Let me do this.  Let's mark this

2    Exhibit 4.

3          (Plaintiff's Exhibit No. 4 was marked for

4    identification.)

5          MR. MORRISON:  Object to the form of the last

6    question.

7    Q.   (By Ms. Knight)  We're going to go back.  Sir,

8    I'm handing you what's been marked Exhibit No. 4.  And I

9    will tell you that when I -- when we requested a copy of

10   the license application for Lake Placid Health Care

11   Center from the State of Florida, this was the very next

12   license application after the CHOW documents, okay?

13   A.   Okay.

14   Q.   So please take a minute and look through, and

15   then I'll go back and ask some questions.

16   A.   (Witness complying.)  Okay.

17   Q.   All right, you ready?  And I will tell you,

18   these documents are in the order I received them from

19   the State.  I didn't mix them up.

20   A.   Okay.

21   Q.   So looking at the very first page, it's the

22   certificate of liability insurance for the Lake Placid

23   facility, correct?

24   A.   Correct.

25   Q.   Okay.  And it lists as insured Gulf Coast

1   Health Care, LLC, and SF Lake Placid, LLC.  Do you see

2   that?

3        A.   Yes.

4        Q.   And SF Lake Placid, LLC, is actually the

5   licensee for the Lake Placid facility, right?

6        A.   Yes.

7        Q.   So this is -- I was asking you about liability

8   insurance and if you were aware that Gulf Coast Health

9   Care was listed on the liability insurance for Lake

10  Placid.  Were you aware of that?

11       A.   Say that again.

12       Q.   Yes, sir.  Were you aware that Gulf Coast

13  Health Care was a listed insured for the Lake Placid

14  facility's insurance?

15       A.   No.  I didn't get involved in this.

16       Q.   Okay.  Who does?  Who takes care of the

17  insurance?

18       A.   Well, we had -- at this time --

19       Q.   If you'll look on the top of the first page,

20  there's a date stamp for 12/28/2010.

21       A.   That would have been, at this time, Todd

22  Ioakim, I-O-A-K-I-M.

23       Q.   Thank you.  And who does Mr. Ioakim work for

24  or did he at the time?

25       A.   He worked for Health Care Navigator at that

1    time.

2        Q.    Okay.  So Health Care Navigator would have

3    taken care of insurance for y'all at the time?

4        A.    Correct.

5        Q.    Would they also have decided how much

6    insurance to purchase?

7        A.    Yes.

8        Q.    Okay.  If you'll flip past -- there are

9    several bonds and then the FedEx cover and then there's

10   the application first page.  Who took care of preparing

11   these license applications?

12       A.    Hmm, let me see.  Let me think at this time.

13   Now, Cindy Ledford, she was with Health Care Navigator

14   as I recall.

15       Q.    Who?

16       A.    Cindy Ledford, L-E-D-F-O-R-D.

17       Q.    Just as it sounds.  And if you'll look on the

18   very first page, it has a contact person for the

19   application as Mylita Henderson.

20       A.    That was Cindy's paralegal.

21       Q.    Okay.

22       MS. KNIGHT:  And, madam court reporter,

23   M-Y-L-I-T-A.  Henderson just like it sounds.

24       Q.    (By Ms. Knight)  Okay.  Are you familiar

25   generally with the application?

1       A.   Yes, but not detail.

2       Q.   Okay.  If you'll look at three pages back from

3  the first page, do you see where it lists the individual

4  or ownership of the licensee and then the board members

5  or officers?

6       A.   Correct.

7       Q.   Okay.  And would the folks at Health Care

8  Navigator have filled in this information?

9       A.   Yes.

10      Q.   Okay.  Now, if you'll flip the page, this is

11 for the management company.  It says, "Does a company

12 other than the licensee manage the licensed provider?"

13 And "no" was checked off.  Do you know why that is?

14      A.   No.

15      Q.   And there was a contract for management

16 services for this Lake Placid nursing home with Gulf

17 Coast Health Care, correct?

18      A.   I'll assume so, yes.

19           MS. KNIGHT:  Counsel, can we mark this as an

20      exhibit?

21           MR. MORRISON:  Yep.

22           MS. KNIGHT:  Is that okay?  All right.

23           (Plaintiff's Exhibit No. 5 was marked for

24      identification.)

25      Q.   (By Ms. Knight)  I'm going to hand you what's

1   been marked Exhibit No. 5.  Counsel was kind enough to

2   bring that to the deposition for us today.  It's

3   entitled Management Services Agreement and purports to

4   be between Florida Facilities, LLC, and Gulf Coast

5   Health Care, LLC; is that right?

6       A.   Yes.

7       Q.   Do you recognize that document?  And take a

8   moment to look through it.

9       A.   (Witness complying.)  Okay.

10      Q.   Do you recognize that document?

11      A.   I've seen them before, not this particular

12   one, but I've seen that style.

13      Q.   Okay.  You've seen a management agreement?

14      A.   A management agreement, yes.

15      Q.   Okay.  Has, to your knowledge, has the

16   management agreement between Florida Facilities, LLC,

17   and Gulf Coast Health Care, LLC, been amended or changed

18   since then?

19      A.   When was this date?

20      Q.   It's on the top of the first page, I believe.

21      A.   Okay.  Yes, this was -- I think it would have

22   been because this was December 4th of 2008.

23      Q.   And you believe there have been amendments to

24   the agreement since then?

25      A.   I would think so, because -- unless there

1    would have been a place for Gulf Coast Health Care to

2    sign, and since this was signed by Julie Gutzmann, a

3    treasurer --

4         Q.   Help me understand what you're telling me.  It

5    is signed by Gulf Coast Health Care, correct?

6         A.   At that -- 2008, at that time.  You're asking

7    me about future agreements.  I'm making assumptions,

8    which I probably shouldn't.

9         Q.   I don't want you to do that.  Do you know

10   whether that agreement has been amended since then?

11        A.   Not for sure, no.

12        Q.   Okay.  Do you know whether there would be a

13   separate management agreement between HUD Facilities and

14   Gulf Coast Health Care or would those nursing homes have

15   been added to this agreement; do you know that?

16        A.   No, I don't.

17        Q.   Okay.  That would be the folks at Health Care

18   Navigator?

19        A.   Correct.

20        Q.   Okay.  Going back to Exhibit 4, which is the

21   license application.  If you'll flip back --

22             MR. MORRISON:  Is this four or five?  I'm

23        sorry.

24             MS. KNIGHT:  I believe it's four, and five is

25        the management agreement.

1          MR. MORRISON:  Got you.

2          Q.   (By Ms. Knight)  And I believe I want you to

3   flip back six pages, it's six or seven, but I've lost

4   count twice now, from where we were.  It's Section 11,

5   the affidavit section.

6          A.   (Witness complying.)

7          Q.   Okay.  Is that your signature?

8          A.   Yes.

9          Q.   And at this point in time, by 09/15/2010, you

10  were the president of what?

11         A.   Gulf Coast Health Care.

12         Q.   Okay.  Were you signing these for all of the

13  nursing homes?

14         A.   Correct.

15         Q.   Okay.  And did you rely on counsel for the

16  information in the license applications?

17         A.   Well, as I said, Cindy Ledford and her

18  department prepares them -- prepares them for my

19  signature.

20         Q.   What department was Ms. Ledford in?

21         A.   She was -- I don't know.  She prepared -- she

22  prepared the license applications.  That was one of her

23  functions.  She wasn't in legal.

24         Q.   Okay.  Is there a reason that you're aware of

25  not to report to the State that there was a management

1  agreement --

2         MR. MORRISON:  Object to form.

3     Q.   (By Ms. Knight)  -- for this nursing home?

4         MR. MORRISON:  You can answer.

5     A.   (By The Witness)  Can you rephrase it?

6     Q.   (By Ms. Knight)  We were looking a moment ago

7  at the fact it says there's no management company.  I'm

8  wondering if you know what the reason would be for that?

9     A.   No, I don't.

10    Q.   Okay.  Do you know where Ms. Ledford would get

11 the information, for example, about the number of

12 resident grievances and the type of resident grievances

13 and that type of information?

14    A.   Through, you know, through our operations'

15 folks.

16    Q.   Is that information that would be available to

17 her through a computer system or would she make a phone

18 call?  Do you know how that worked?

19    A.   Both.  I think she has access to it and some

20 of the information was reported to her.

21    Q.   Tell me what information is available to you

22 at Gulf Coast Health Care via computer about the

23 operations at the various nursing homes.

24    A.   We're linked in through all the MDSs, all the

25 clinical data, accounting, receivables, pretty much

1    anything that would be on a resident's chart.

2        Q.    Okay.  So that's all available to Gulf Coast

3    Health Care through the computer system?

4        A.    Well, certain people have access to it.

5        Q.    Okay.  Are you telling me that --

6        A.    Well, it's not wide open for everybody to look

7    at everything.  It's, you know, certain --

8        Q.    As needed?

9        A.    -- certain firewalls depending on their job

10   function.

11       Q.    Okay.  Now does Health Care Navigator, then,

12   have access to the information in the Gulf Coast Health

13   Care Computer System?

14       A.    Again, again, through certain -- their job

15   functions and duties and responsibilities.

16       Q.    Is there a name for the computer system?

17       A.    We're under Citrix.

18       Q.    Okay.  That would be the way that you access

19   the information, correct?

20       A.    Right.

21       Q.    Do you know what the software is that you use?

22       A.    There's PointClickCare is what we use for

23   clinical and our accounting information.  That's the

24   system.  As far as the software is concerned, I'm not

25   real good with that so I don't know.

75

1      Q.    Okay.  Who's in charge of IT?

2      A.    John Dossey.

3      Q.    Can you spell Mr. Dossey's last name?

4      A.    D-O-S-S-E-Y.

5      Q.    So, for example, under consumer information on

6   the application, would information about the different

7   payors that are accepted at that nursing homes be

8   available to Health Care Navigator through the computer

9   system?

10     A.    I can't answer that.

11     Q.    Okay.  Who would you ask?

12     A.    I would ask Mandy.

13     Q.    There is an affidavit of compliance with

14   background screening requirements.  There are actually

15   several of them attached to this.  There's one dated

16   09/16/2010.  Is that Ms. Garnier's signature?

17     A.    Yes.

18     Q.    And it says chief financial officer, correct?

19     A.    Correct.

20     Q.    Who is Marcy Foster?

21     A.    She was a clerk for Todd Ioakim.

22     Q.    Are Gulf Coast Health Care employees on the

23   same e-mail server as Health Care Navigator employees?

24     A.    No.  We have our own -- Health Care Navigator

25   has some access to it, again, depending on what their

1   job function is and abilities to access.

2        Q.    Has access to what?

3        A.    Whatever the job requirements or duties and

4   responsibilities are commiserate with the information

5   they need.

6        Q.    Okay.  I don't understand what you were just

7   telling me.  I was just asking if they were on the same

8   internet server.

9        A.    I can't answer that.  I don't know --

10        Q.    Okay.

11        A.    -- whether it's a server or --

12        Q.    Okay.  That's fair enough.  Do you know

13   whether the e-mail exchange is the same for Health Care

14   Navigator folks and Gulf Coast Health Care?

15        A.    They have a different e-mail.

16        Q.    Okay.  To your knowledge, was Ms. Foster ever

17   an employee of Gulf Coast Health Care?

18        A.    Yes.

19        Q.    When was --

20        A.    Hold on a second.  Let me think.

21        Q.    Sure.  Take your time.

22        A.    I'm not sure if -- she may have gone right to

23   Health Care Navigator with the change-over.  She was

24   with Delta Health Group and then -- I can't tell you

25   exactly the dates, but she was working for Health Care

1    Navigator for most of the time, so...

2         Q.   Okay.  Do you know whether Health Care

3    Navigator provides services to companies that are not

4    related to The Schwartzberg Companies?

5              MR. MORRISON:  Form, but go ahead.

6         A.   (By The Witness)  Not that I'm aware of.

7         Q.   (By Ms. Knight)  All right.  I want to switch

8    gears on you, okay?  Are you doing okay?  Do you want a

9    break?

10        A.   Go ahead.

11        Q.   Okay.  I want to talk about the nursing homes

12   in particular.  Are the policies and procedures that are

13   utilized in the nursing homes, do those come from Gulf

14   Coast Health Care?

15        A.   Yes.

16        Q.   The employee handbooks, for example, do those

17   also come from Gulf Coast Health Care?

18        A.   Yes.

19        Q.   Now, we spoke earlier about employees at the

20   facility, about all the nurses, the CNAs.  Are they

21   actually employees of Gulf Coast Health Care or are they

22   employees of the licensee?

23        A.   The licensee, the SNF.

24        Q.   Okay.  Now, the administrator, who is the

25   administrator employed by.

1        A.    The SNF.

2        Q.    Okay.

3              COURT REPORTER:  Is that --

4              MS. KNIGHT:  S-N-F, skilled nursing facility.

5        Sorry.  And it's capital S, capital N, capital F.

6        Q.    (By Ms. Knight)  The regional folks, have

7   they -- since 2008, have they always been employees of

8   Gulf Coast Health Care?

9        A.    Yes.

10       Q.    Okay.  Before 2010, was there anyone other

11  than you that was above the regional level?

12       A.    At Gulf Coast Health Care?

13       Q.    Yes, sir.

14       A.    Well, the president of Gulf Coast Health Care

15  was Eric Roth.

16       Q.    No, I'm sorry.  Between you and the regional

17  folks, was there anybody --

18       A.    No.

19       Q.    -- between you and the regional folks?

20       A.    No.

21       Q.    Okay.  And then above you would have been

22  Mr. Roth?

23       A.    Correct.

24       Q.    Okay.  Until 2010, and that's when you created

25  the extra position that we talked about earlier,

1    correct?

2         A.    Correct.

3         Q.    All right.  Does Gulf Coast Health Care

4    provide any goods or services to Cypress Health Care?

5         A.    No.

6         Q.    Does Gulf Coast Health Care provide any goods

7    or services to the nursing homes that are managed by

8    Cypress?

9         A.    No.

10        Q.    Do you know if Gulf Coast Health Care and

11   Cypress Health Group are related in any way?

12        A.    They're not related.

13        Q.    Is it fair to say that Gulf Coast Health Care

14   and Cypress Health Group are both part of The

15   Schwartzberg Companies' structure?

16             MR. MORRISON:  Form, but you may answer.

17        Answer to the best of your ability.

18        A.    (By The Witness)  I think that we're all part

19   of whatever you call them, Schwartzberg Companies.

20        Q.    (By Ms. Knight)  Well, it's not what I'm

21   calling The Schwartzberg Companies.  Is it your

22   understanding that both Gulf Coast Health Care and

23   Cypress Health Group are part of The Schwartzberg

24   Companies' structure?

25        A.    Yes.

1      Q.   Okay.  Speaking specifically about the

2  policies and procedures that are used in the nursing

3  homes, did Gulf Coast Health Care create those policies

4  and procedures or purchase them?

5      A.   We created them.

6      Q.   Okay.  And did you start with --

7      A.   Uh --

8      Q.   Yes, sir.

9      A.   If you want to say between Delta and Gulf

10  Coast.  They were with Delta and we absorbed -- we just

11  kept the same policies and procedures.

12      Q.   That's exactly where I was going next.  So

13  Gulf Coast Health Care took the Delta Health Group

14  policies and procedures and adopted them; is that fair

15  to say?

16      A.   Yes, yes.

17      Q.   Okay.  Did Gulf Coast Health Care also adopt

18  the employee handbook from Delta?

19      A.   Yes.

20           MS. KNIGHT:  This will be number six.

21           (Plaintiff's Exhibit No. 6 was marked for

22      identification.)

23      Q.   (By Ms. Knight)  I'm handing you what's been

24  marked as Exhibit No. 6.  Do you recognize this

25  document?

1     A.   Yes.

2     Q.   And was this the employee handbook for the

3  folks who worked in the nursing homes starting in 2008

4  for Gulf Coast Health Care?

5     A.   I don't see the date on here, so...

6     Q.   If you look at the very first page, it

7  says December 2008.

8     A.   December, okay, yeah.

9     Q.   And that would have been when Gulf Coast

10  Health Care took over for Delta Health Group, right?

11     A.   Correct.

12     Q.   Okay.  If you'll look at the second page; is

13  that your signature?

14     A.   Yes.

15     Q.   Is associate just another word for employee?

16     A.   Yes.

17     Q.   Okay.  Who wrote the welcome letter?  That's

18  the second page.

19     A.   It was a collaboration between myself and Eric

20  Roth.

21     Q.   And just so we're clear, at the time, he was

22  the president of Gulf Coast Health Care, correct?

23     A.   Correct.

24     Q.   Okay.  Were the -- was the disciplinary action

25  section, did that come from Delta Health Group?

1      A.    Right.

2      Q.    Now, the benefits packages for the employees

3  that qualified for them, who negotiated those, like the

4  401(k) package, the health insurance?

5      A.    We pretty much kept the same people, so it was

6  whoever we were dealing with at that time, we continued

7  on.

8      Q.    Okay.  So whoever was managing your ERISA

9  plans was managing the ERISA plans once you were Gulf

10  Coast Health Care too?

11      A.    Yes.

12      Q.    Okay.  Has that changed since then?

13      A.    Yes.

14      Q.    About when?

15      A.    Well, different parts have changed, and I

16  can't tell you exactly which dates.

17      Q.    Okay.  Can you tell me who handles the ERISA

18  plans for the associates or the employees at Gulf Coast

19  Health Care?

20      A.    I know we have people in our office that work

21  with 401(k), but when you say handle ERISA, as far as

22  being --

23      Q.    Negotiating the plans and the like.

24      A.    It is a corroboration between Health Care

25  Navigator and Gulf Coast.

1      Q.    Okay.  And who at Gulf Coast, like what

2  department would that be at Gulf Coast?

3      A.    Well, human resources.

4      Q.    And who's in charge of human resources?

5      A.    Kim Warnecke should be involved in this.

6      Q.    Can you spell her last name for us?

7      A.    W-A-R-N-E-C-K-E, Warnecke.

8      Q.    Thank you.  Has Ms. Warnecke been with Gulf

9  Coast Health Care since 2008?

10     A.    Yes.

11     Q.    And was she with Delta before that?

12     A.    Yes.

13     Q.    Okay.  I have here -- there was a new handbook

14  that is dated January 2011.  Do you recall there being

15  changes to the employee handbook?

16     A.    I'm not sure what changes would have been

17  done, but I think this is when the HUDs closed, the

18  asset transfer changed to where we were not managing the

19  HUD properties, but the assets changed.  We were

20  previously managing for Delta Health Group.  When the

21  assets were sold, we became managers of all of them.

22     Q.    Okay.  Just so that I'm clear about this, when

23  did that sale become final in 2010?

24     A.    I think it was January 1 -- or December 31st.

25  We took over January 1, so it was right at the change of

1   the year.

2       Q.   Okay, so the beginning of the year.  Prior to

3   January 1 of 2010, Gulf Coast Health Care was managing

4   the HUD Facilities but didn't have an ownership interest

5   in them, correct?

6       A.   Not to my knowledge, no.

7       Q.   Okay.  And then what I believe you're telling

8   me -- I want to make sure I understand -- is that as of

9   January 1 the sale went through and Delta was no longer

10  involved with the HUD Facilities?

11      A.   Correct.

12      Q.   Okay.  If you'll look at the second page of

13  the 2011 handbook.  Is that same letter from the 2008 --

14      A.   I'm not sure how much it changed.

15      Q.   It appeared to be.

16      A.   It looks the same, yeah.

17      Q.   You don't recall rewriting this letter?

18      A.   No.

19      Q.   Okay.  Did the policies and procedures for the

20  operations of the nursing homes change in 2011?

21      A.   Not materially, not if there's any -- if we

22  made a change, an update in a law or something like

23  that, but not --

24      Q.   But not a whole style change?

25      A.   No.

1     Q.   Okay.  If there is a change in a handbook or a

2 change in the policies or procedures, how does that

3 information reach the licensee?

4     A.   Through whatever department it may be in,

5 through director of operations or, if it's a policy

6 dealing with clinical or patient care, it's gone through

7 the nurse consultants to the facilities.

8     Q.   How many regional nurses do you have at Gulf

9 Coast Health Care?

10     A.   Six.

11     Q.   And do you have regional directors or VPs of

12 operation?

13     A.   Yes, directors of operations.

14     Q.   Okay.  And how many directors of operations do

15 you have?

16     A.   Six.

17     Q.   Are there six regions?

18     A.   Yes.

19     Q.   Do you have a name for the regions?  Is it

20 one, two, three, four or --

21     A.   Numbers.

22     Q.   Okay.  In Florida, how many regions are there?

23     A.   Five.

24     Q.   Are they divided geographically?

25     A.   Pretty much.

1    Q.   Have there been six regions since 2008?

2    A.   Yes.

3    Q.   Okay.  And have they changed substantially?

4    A.   Not substantially.

5    Q.   Meaning they've been pretty stable since 2008?

6    A.   Correct.

7    Q.   Okay.  Who determines whether to retain or

8  replace an administrator in a nursing home?

9    A.   Director of operations and the VP of

10 operations.

11   Q.   Okay.  And prior to the change in 2010, would

12 it have been the director and you?

13   A.   Correct.

14   Q.   Okay.  Who are the direct reports to you

15 since -- let's do prior to 2010?

16   A.   All the region directors of operations.  Two

17 thousand eight -- 2008, 2009?

18   Q.   Yes, sir.

19   A.   As I mentioned, Kim Warnecke.

20   Q.   You can tell me the positions.

21   A.   Human resources, IT -- excuse me, not at that

22 time, IT didn't report to me.  Human resources,

23 environmental services, clinical services.  What else?

24 I oversaw the operations of the office.  Oh, director of

25 loss control.  I'm just trying to go around the room.

1      Q.    Sure.

2      A.    Director of -- she's got a different title

3  now.  She was in charge of therapy, Medicare and

4  therapy.  Mostly this is in the office.  They didn't

5  really report to me, they had other supervisors, but I

6  oversaw the office.

7      Q.    Okay.  Would it be fair to say office

8  management, basically, you managed the office in

9  addition to --

10     A.    Yes.

11     Q.    -- your other responsibilities?  And the

12 office being the Palafox office?

13     A.    Yes.

14     Q.    So other than your office management and

15 your -- you had the directors of operation?

16     A.    Yes.

17     Q.    Your clinical folks, environmental.  And would

18 environmental be the maintenance and the --

19     A.    Yes, housekeeping, laundry, physical plant.

20     Q.    And then HR, would that include risk

21 management?

22     A.    Um, no, that would be under the clinical.

23     Q.    Okay.  What was loss --

24     A.    The risk, more so for the employee, workers'

25 comp would be under loss control.

www.anchorreporters.com
(850) 432-2511

1       Q.   Okay.

2       A.   So it would be split between clinical and

3  employee injury safety.

4       Q.   Okay.  So the employee part would be loss

5  control?

6       A.   Yes.

7       Q.   Okay.  What else fell under loss control?

8       A.   Safety, workers' compensation, OSHA.

9       Q.   Okay.  And then the therapy, Medicare, what

10  was that?

11       A.   She oversaw -- she was in Medicare

12  documentation and she was a liaison to our therapy

13  provider.

14       Q.   So did she deal with MDS or was that --

15       A.   She did -- yes, MDS.

16       Q.   And you told me earlier admissions fell under

17  operations, correct?

18       A.   Yes.

19       Q.   Now, once you became the president, who were

20  the direct reports to you?

21       A.   Same ones except clinical was moved under the

22  vice-president of operations, and then I took over IT.

23       Q.   To whom did IT report prior to 2010?

24       A.   I think it was to Eric Roth.

25       Q.   Okay.  For the folks that have been direct

1   report to you at any time at Gulf Coast Health Care,

2   have you done regular appraisals?

3       A.   Yes.

4       Q.   Okay.  And is that something that goes into

5   their employee files?

6       A.   Yes.

7       Q.   Are those done basically on an annual basis?

8       A.   Yes.

9       Q.   Is there a particular time of year you usually

10  do that?

11      A.   On their anniversary --

12      Q.   Okay.

13      A.   -- of employment, whenever their anniversary

14  is.

15      Q.   Okay.  And once you were the president, then

16  did the vice-president of operations take over the

17  clinical and the operations --

18      A.   Yes.

19      Q.   -- appraisals for the employees?

20      A.   Yes.

21      Q.   Okay.  Would the directors of operations do

22  appraisals for the administrators in the facilities?

23      A.   Yes.

24      Q.   And would your regional nurses do appraisals

25  for the directors of nursing?

1      A.    No.

2      Q.    Did the administrators do those?

3      A.    Yes.

4      MS. KNIGHT:  Let's take a couple of minutes.

5  I want to look through my paperwork, okay?

6      (Whereupon, a brief recess was taken at

7  12:06 p.m., after which the deposition continued

8  at 12:11 p.m.)

9      MS. KNIGHT:  I should go ahead and mark the

10  2011 handbook.  What are we up to, seven?

11      (Plaintiff's Exhibit No. 7 was marked for

12  identification.)

13      Q.    (By Ms. Knight)  Sir, I'm going to hand you

14  Exhibit No. 2 again.  Do you know what, if any,

15  significance there is to the first two initials of the

16  licensee names?

17      A.    Nursing facility I would -- I don't know.

18      Q.    Okay.  Some of them are SFs, some are MF.  Do

19  you know?

20      A.    I could guess what the initials mean, but I

21  don't know the significance of them.

22      Q.    Okay.  And Health Care Navigator has been

23  providing services to Gulf Coast Health Care since 2008

24  when Gulf Coast Health Care first started doing

25  business?

1      A.   Yes.  I believe, yes.

2      Q.   I know that you told me that you don't

3   negotiate the lines of credit, but do you have to sign

4   off on them as the president of Gulf Coast Health Care?

5      A.   I can't recall if I did or not.

6      Q.   Okay.

7      A.   Mandy is an officer, so I think she can --

8   that's her bailiwick, so...

9      Q.   Okay.  She would be the person to ask about

10  that, about the lines of credit?

11     A.   I would think so, yes.

12     Q.   Did I understand that any reference to Gulf

13  Coast Health Care Management is the GCH Management

14  Services Company?

15     A.   I don't know.

16     Q.   Okay.  Are you aware of any other company

17  called Gulf Coast Health Care Management?

18     A.   If that's the one we've talked about earlier,

19  Gulf Coast -- not Health Care -- Gulf Coast -- was it

20  Gulf Coast --

21     Q.   There was the GCH Management Services,

22  correct?

23     A.   Yes.

24     Q.   Now, I've seen reference to Gulf Coast Health

25  Care Management.

92

1       A.    I'm not familiar with that one.

2       Q.    Not familiar with that company or it being a

3   separate company?

4       A.    No.

5       Q.    Okay.  Does Gulf Coast Health Care Management

6   provide management services to nursing homes outside of

7   the State of Florida?

8       A.    Yes.

9       Q.    Would that include Mississippi and Alabama?

10      A.    Yes.

11      Q.    Okay.  Prior to 2010, so 2008 and 2009, did

12  Gulf Coast Health Care -- did Gulf Coast Health Care

13  provide management services to nursing homes outside of

14  the State of Florida?

15      A.    Yes.

16      Q.    Okay.  Since 2010, has Mr. Starer been an

17  officer or an agent of Gulf Coast Health Care?

18      A.    No.

19      Q.    Okay.  Same question for Ms. Gutzmann.  Since

20  2010, has she been an officer or agent of Gulf Coast

21  Health Care?

22      A.    No.

23      Q.    Mr. Roth, same question?

24      A.    No.

25      Q.    And they ceased to be officers in 2010 when

1    you became the president?

2        A.    Exactly.

3        Q.    Okay.  During your monthly telephone call with

4    folks in White Plains about the operations of Gulf Coast

5    Health Care, is part of the information that's made

6    available summaries of quality indicators?

7        A.    No.

8        Q.    You mentioned that there was clinical

9    information, and those might be my words, but I believe

10   you said there was some clinical information that was

11   part of the reporting?

12       A.    More so from the census piece and if -- as far

13   as that structure, again, there is nothing in there.  If

14   there's something outside of the normal, you know,

15   something that's out of the norm that's big enough to

16   mention, I'll just bring it up.

17       Q.    Okay.  What information is in the census

18   portion of the report?

19       A.    Census?  Overall census trending, month to

20   month, year to year.  Seeing the facilities, some that

21   are performing real well, some that aren't, compare

22   against years in the past, seasonal, things of that

23   nature.

24       Q.    Does it break down by payor?

25       A.    Yes.

94

1      Q.    So it would have Medicare versus Medicaid

2   versus private pay?

3      A.    Private insurance, Hospice.

4      Q.    Within Medicare, is it broken down by RUG

5   categories?

6      A.    No.

7      Q.    Is that information that's available to you as

8   the president of Gulf Coast Health Care?

9      A.    I can get it if I want it.

10     Q.    And how frequently do you meet with the direct

11  reports to you?  Like, is there a regular meeting?

12     A.    We have a regular Monday morning meeting.

13     Q.    Is that telephonic or in person?

14     A.    No, it's in person.

15     Q.    And what do y'all go over at your Monday

16  morning meeting?

17     A.    It's high level.  Where is everybody going to

18  be, anything of significance happening that week or if

19  it happened the week before, anything that we feel like

20  they need -- have knowledge of or need to have some

21  knowledge of.  But there's not a set structure as to

22  what we're going to go over.

23     Q.    Okay.  You don't have an agenda that you use?

24     A.    No.

25     Q.    Are there reports about the operations of the

1  nursing homes that come to you?

2      A.   Yes.

3      Q.   What reports do you get?

4      A.   A census, survey reports, five star ratings,

5  safety, workers' comp, financial, P&Ls, capital

6  appropriations.

7      Q.   Okay.  I want to make sure I wasn't

8  interrupting.  The five-star ratings for anyone that may

9  hear or see this that isn't familiar, can you explain

10  that to us?

11      A.   It's CMS, the government's ranking system

12  based on four criteria of quality measures, survey

13  results, RN staffing, and it's measured against the

14  whole United States, and it's given a one to five star,

15  five being the best.  And it's done on a monthly basis.

16      Q.   And the census information that you receive,

17  what is that information?

18      A.   Each facility, the trend, what they are that

19  month, what they were the previous, we usually do for

20  the solid year and year back.

21      Q.   Okay.  So projected against actual -- or is it

22  historical versus actual?

23      A.   Historical, yeah.

24      Q.   And you mentioned profits and losses?

25      A.   Yes.

1      Q.    Do you see the actual performance of the

2  nursing homes versus the budgeted performance of the

3  nursing homes?

4      A.    Yes.

5      Q.    And is that a separate report?

6      A.    That's in P&L.

7      Q.    Okay.  Does that include all departments?

8      A.    Yes, it's broken down.

9      Q.    And is it also broken down by facility?

10      A.    Yes.

11      Q.    Any other reports that you can think of that

12  you receive personally about the operations of the

13  nursing homes?

14      A.    There's a multitude of reports that are

15  available.  What I get anymore now from -- that I don't

16  get into weeds (phonetic) with a lot of things -- since

17  you'd asked about RUG reports, they're available, things

18  in PointClickCare, they're available, but I don't have

19  time to look at it and that's not my -- that's pretty

20  detailed.  And I'm at a more strategic and, you know, a

21  30,000-foot level type.

22      Q.    So would -- prior to 2010, were you more

23  involved with things like --

24      A.    Yes.

25      Q.    -- the breakdown of the RUG scores in the

1  nursing homes and how the quality indicators were

2  trending in the nursing homes?

3       A.   Yes, but still not at a real detailed level.

4  We have clinical people that are much more adept at that

5  than me.  I'm more of -- when we're having issues, how

6  to correct them and what we're dealing with or, you

7  know, usually you deal with the best and the worst and

8  trending and what we're trying to do to make it better.

9       Q.   Okay.  And the reports that you're talking

10  about being available to you, those are available to you

11  through the computer system we've been talking about,

12  correct?

13       A.   Well, not just sitting on a computer.

14  Somebody has to generate the reports, so...

15       Q.   Isn't it often just running a query, though,

16  to generate a report?

17       A.   I'm not sure what you mean by a query.

18       Q.   Okay.  If you wanted to know how infections,

19  for example, were trending in the nursing homes, who

20  would you ask?

21       A.   I would ask the director of clinical services.

22       Q.   Okay.  And do you know what she would do

23  to get that information for you?

24       A.   Go into PointClickCare.

25       Q.   And run a search basically.

1    A.    Well, it's by facility and the quality

2    indicators are in there, MDSs and such.

3    Q.    Could she print a summary report from that

4    information?

5    A.    I imagine.

6    Q.    Could she also print a summary report for any

7    particular nursing home?

8    A.    I would assume.

9    Q.    Without assuming, can you, if you desired,

10   could you go into the computer and look at the quality

11   indicator trends for, for example, Lake Placid?

12   A.    Me?

13   Q.    Yes, sir.

14   A.    No.

15   Q.    Okay.  Now, is that because the information is

16   not available?

17   A.    No, it's available.  I've just never done it

18   and, again, I've got folks that do that.

19   Q.    Is there any information that you go in and

20   look at that's facilities specific?

21   A.    No.

22   Q.    How about prior to becoming president?

23   A.    Not really, no.  I didn't -- reports were

24   generated and summarized.  I got executive summaries.  I

25   wasn't drilling down into things of that nature.

1    Everything was at a higher level.  You know, there was

2    no way I could have gotten into the weeds.  And I'm not

3    a clinical, so...

4        Q.    Did you look at, prior to becoming president,

5    did you look at budgeted performance versus actual

6    performance of the individual nursing homes?

7        A.    Yes.

8        Q.    Okay.  Once you became president, did you look

9    at that by nursing home?

10       A.    We still do, yes.

11       Q.    Is that something that you do on your own or

12   is that in one of your meetings?  When do you do that?

13       A.    That's on a monthly when it comes out.  I will

14   get reports and I'll review them and I'll work with

15   Jamey, the vice-president of operations, and discuss the

16   results.

17       Q.    And does that same report also go to

18   Mr. Schwartzberg for your monthly meeting?

19            MR. MORRISON:  Form.

20       Q.    (By Ms. Knight)  I'm sorry, not

21   Mr. Schwartzberg.  Who was the gentleman you told me?

22   You have a monthly meeting with someone from White

23   Plains.

24       A.    Steve Lebowitz.

25       Q.    Mr. Lebowitz.  Does that information go to

1    Mr. Lebowitz?

2        A.   I'm not sure what he's got available to him or

3    what they're sending.  All I know is a report we send

4    him on a monthly basis prior to our call.

5        Q.   Okay.  And does the report that you send him

6    on a monthly basis include actual versus budgeted

7    performance of the facilities?

8        A.   Um, yes.  I think it's broken down.  But it's

9    one line item, such.  It's not a real detailed --

10       Q.   Tell me what you mean by "one line item."

11       A.   The facility may be budgeted against actual --

12       Q.   Okay.  So what do you mean by department, for

13   example.

14       A.   No, it wouldn't be that.  It wouldn't be the

15   P&L.

16       Q.   Okay.  Do know who the bank accounts for Gulf

17   Coast Health Care were with, what bank they're with?

18       A.   Now or then?

19       Q.   Now, starting now.

20       A.   No, because we deal with so many different

21   banks.

22       Q.   Okay.  How about initially, 2008 time frame?

23       A.   I think Suntrust maybe.

24       Q.   Are you sure about that?

25       A.   No.

1    Q.    All right.  I don't have any other questions

2  for you.  I don't know if Mr. Morrison does.  Sometimes

3  it generates a couple of extra.

### CROSS-EXAMINATION

**BY MR. MORRISON:**

6    Q.    Very, very briefly.  I just want to verify a

7  few things, Mr. Robinson.  When we talked about the

8  facilities earlier on in the deposition, for example,

9  Lake Placid, who is the administrator's employer?  Is it

10 the facility?

11   A.    I understand it's the facility.

12   Q.    The DON, are they also employed by the

13 facility?

14   A.    Yes.

15   Q.    The CNAs and the nurses, are they also

16 employed by the specific facility?

17   A.    Yes.

18   Q.    Okay.  So Gulf Coast Health Care does not

19 employ the specific employees who work at the facility

20 level; is that fair?

21   A.    Yes.

22   Q.    Okay.  Now, you are an officer of Gulf Coast

23 Health Care as of 2010; is that correct?

24   A.    Right.

25   Q.    And are you also an officer as of 2010 of

1    Florida Facilities?

2         A.    Yes.

3         Q.    Are you also an officer of GCH Management

4    Services of 2010?

5         A.    Yes.

6         Q.    Is it fair to say that in 2010 the officers of

7    Florida Facilities and GCH Management Services have

8    changed?

9         A.    Yes.

10        Q.    So, in other words, Mr. Roth, Julie Gutzmann

11   and Mitchell Starer are no longer officers of those

12   three entities?

13        A.    Correct.

14        Q.    Okay.  So when you testified earlier that

15   there wasn't a change, you were just mistaken?

16        A.    Yes.

17        Q.    Is Mandy -- is it Garnier?

18        A.    Garnier.

19        Q.    Is she also an officer of these three entities

20   that we've just discussed?

21        A.    Yes.

22        Q.    And that started in 2010?

23        A.    Correct.

24              MR. MORRISON:  And the management agreement, I

25        think is Exhibit 3 or 4.

1          MS. KNIGHT:  Five.

2          MR. MORRISON:  Five, sorry.

3          MS. KNIGHT:  That's all right.

4     Q.   (By Mr. Morrison)  This management agreement

5 that I believe was dated in 2008 is between Florida

6 Facilities; is that correct --

7     A.   Yes.

8     Q.   -- and Gulf Coast Health Care?

9     A.   Yes.

10     Q.   And as you testified before, Florida

11 Facilities, it's your understanding, owns the licencees

12 that are managed by Gulf Coast Health Care?

13     A.   Correct.

14     Q.   Okay.  So this management agreement would

15 pertain, based on your understanding and your testimony,

16 to all of the facilities --

17     A.   Correct.

18     Q.   -- that are managed -- that are managed by

19 Gulf Coast Health Care?

20     A.   Correct.

21          MR. MORRISON:  Those are all of the questions

22     I have.

23          MS. KNIGHT:  I have a couple of more but give

24     me just a minute, because your testimony changed a

25     little bit, so I need to go back and fix something.

www.anchorreporters.com
(850)432-2511

1        MR. MORRISON:  Take your time.

2               **REDIRECT EXAMINATION**

3   **BY MS. KNIGHT:**

4        Q.    So now I understand, in 2010, you and

5   Ms. Garnier replaced Ms. Gutzmann, Mr. Starer, and Mr.

6   Roth as the officers for Florida Facilities, LLC, GCH

7   Management Services, LLC, and Gulf Coast Health Care,

8   LLC, correct?

9        A.    Correct.

10       Q.    Any other companies that you became an officer

11  in?

12       A.    Gulf Coast Health Care Holdings, Pensacola

13  Administrative Services, and Pensacola Administrative

14  Holdings.

15       Q.    Okay.  And that all occurred in 2010?

16       A.    Yes.

17       Q.    Did Ms. Garnier also become an officer of

18  Pensacola Administrative Services and Pensacola

19  Administrative Holdings in 2010?

20       A.    Yes.

21       Q.    Okay.  Are there -- do you and Ms. Garnier --

22  strike that.  Are there meetings, management meetings,

23  for Florida Facilities, LLC?

24       A.    No.

25       Q.    How about management meetings for GCH

1     Management Services, LLC?

2        A.   No.

3        Q.   Same question for Pensacola Administrative

4     Services, LLC?

5        A.   No.

6        Q.   And Pensacola Administrative Holdings, LLC?

7        A.   No.

8        Q.   Gulf Coast Health Care Holdings, LLC?

9        A.   No.

10       Q.   No meetings?

11       A.   No meetings.

12       Q.   Okay.  There is a management fee paid to Gulf

13    Coast Health Care to provide management services to the

14    nursing homes, correct?

15       A.   Correct.

16       Q.   Okay.  And does that payment actually come

17    from Florida Facilities, LLC, or does it come directly

18    from the nursing homes?

19       A.   I don't know.

20       Q.   Who would know that, Ms. Garnier?

21       A.   Mandy.

22       Q.   So Ms. Garnier would be the person to ask

23    about the flow of the funds between the companies?

24       A.   Correct.

25       Q.   Okay.  Other than the administrator and the

1    director of the nursing, are there any other employees

2    at the facility level, the licensee level, that are

3    salaried?

4         A.    Yes.

5         Q.    Who else?

6         A.    RNs --

7         Q.    Department heads?

8         A.    Some department heads, depending on whatever

9    the -- I'm trying to think of the legal salary structure

10   of, what is it, whatever meets the labor department's

11   criteria and structure.

12        Q.    And, I'm sorry, you were going to say RNs?

13        A.    Certain RNs.

14        Q.    Are they supervisors?

15        A.    Yeah, they'd have to meet that criteria.  Yes.

16        Q.    And the criteria that you're talking about, is

17   that --

18        A.    It's based on the labor laws.

19        Q.    Okay.

20        A.    So whatever the structure is, some are allowed

21   to based on the hours of supervision and, you know, that

22   type of thing.

23        Q.    Okay.  Are there any -- since 2010, is there

24   any decision maker for Florida Facilities, LLC, other

25   than you and Mr. Garnier?

1          A.   Not that I am aware of.

2          Q.   Okay.  And prior to 2010, it would have been

3     Mr. Roth, Mr. Starer, and Ms. Gutzmann?

4          A.   Correct.

5          Q.   Would that be true for GCH Management Services

6     as well?

7          A.   Correct.

8          Q.   And Pensacola Administrative Services?

9          A.   Yes.

10         Q.   And Pensacola Administrative Holdings?

11         A.   Correct.

12         Q.   And Gulf Coast Health Care Holdings?

13         A.   Yes.

14         Q.   And Gulf Coast Health Care?

15         A.   Yes.

16         MS. KNIGHT:  Okay.  No other questions.

17         MR. MORRISON:  We will read.

18         (Whereupon, the deposition was concluded at

19    12:35 p.m.)

20

21

22

23

24

25

www.anchorreporters.com
(850) 432-2511

## CERTIFICATE OF OATH

1

2 (STATE OF FLORIDA)

3 (COUNTY OF ESCAMBIA)

4

5     I, Linda D. Miller, Florida Professional

6 Reporter, Notary Public, State of Florida, certify

7 that **CRAIG ROBINSON** personally appeared before me on

8 the 16th day of July, 2013 and was duly sworn.

9

10     WITNESS my hand and official seal this 23rd day

11 of July, 2013.

12

13

14 _____

    LINDA D. MILLER, FLORIDA PROFESSIONAL REPORTER

15         NOTARY PUBLIC, STATE OF FLORIDA

16

17

18 Notary Public State of Florida
Linda D Miller
My Commission EE153101
Expires 02/28/2016

19

20

21

22

23

24

25

1        CERTIFICATE OF REPORTER

2

3        I, LINDA D. MILLER, Court Reporter, do hereby
certify that I was authorized to and did
4   stenographically report the foregoing deposition of
**CRAIG ROBINSON**; that a review of the transcript
5   requested; and that the foregoing transcript, pages 04
through 107, is a true and complete record of my
6   stenographic notes.

7        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
8   nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am
9   I financially interested in the action.

10

11        Dated this 23rd day of July, 2013.

12

13

14   _____
                LINDA D. MILLER
15        FLORIDA PROFESSIONAL REPORTER

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT
OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR HIGHLANDS COUNTY, STATE OF FLORIDA

_____

THE ESTATE OF TERESA E. STEIN, by and
through NANCY E. DELONG, Personal Representative,

     Plaintiff,

vs.          CASE NO.:  2012-CA-000866-GCAXMX

SF LAKE PLACID, LLC; FLORIDA FACILITIES,
LLC; et al.,

_____/

**RE:  DEPOSITION OF CRAIG ROBINSON TAKEN 07/16/2013**

DATE SENT: *7-23-13* or DATE WITNESS CONTACTED: _____

TO:

    JAMES MORRISON, ESQUIRE
    Quintairos, Prieto, Wood & Boyer, P.A.
    1475 Centrepark Boulevard, Suite 130
    West Palm Beach, Florida  33401

    The referenced transcript has been completed
and awaits reading and signing within 30 days from the
date it was transcribed unless otherwise specified or
needed on an expedited basis for trial purposes.
Please read by ____*8-22-13*_____.

    The transcript is 107 pages long.  Please have
the witness, **CRAIG ROBINSON**, read his deposition and
make any corrections on the enclosed Errata Sheet
only.  Do not write on the transcript.  Please forward
the original signed Errata Sheet to Anchor Court
Reporting, 229 South Baylen Street, Pensacola, Florida
32502.
    The original of this deposition has been
forwarded to the ordering party, and the Errata Sheet,
once received, will be forwarded to all ordering parties
for inclusion in the transcript.

_____
LINDA D. MILLER, FPR

cc:  Kathleen C. Knight, Esquire

www.anchorreporters.com
(850)432-2511

## ERRATA SHEET

**WITNESS:  CRAIG ROBINSON**

RE:     THE ESTATE OF TERESA E. STEIN vs. SF LAKE PLACID,
        LLC, et al.,
        CASE NO.:  2012-CA-000866-GCAXMX

| Page | Line | Correction/Change | Reason |
|------|------|-------------------|--------|
| 60 | 8 | 'The county department' should be 'the accounting department' | Incorr word |
| 7 | 19 | 'Adveilll (phonetic) Care' should be 'Advocare' | Incorr word |
| 8 | 5 | '2006' should be '2007' | Wrong year |
| 43 | 2 | 'Health Care Reinvestment' should be 'Health Care REIT' | Incorr word |
| 43 | 3 | 'Health Care Reinvestment' should be 'Health Care REIT' | Incorr Word |

**Under penalties of perjury, I declare that I have read the foregoing document, pages 04 through 107, and that the facts stated in it are true**

8/12/13
DATE                              CRAIG ROBINSON

*for Notary see next page.*



TRISH SMITH
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE852180
Expires 11/15/2016

*Trish Smith*
NOTARY

Date: August 12, 2013

County: Escambia, Fl.

Personally Known: Craig Robenson



RECEIVED
AUG 2 2 2013
WILKES & McHUGH

**'**

**'07 [1]** 20/3
**'08 [3]** 8/8 12/14 12/23

**.**

**......111 [1]** 3/7

**0**

**04 [2]** 109/5 111/23
**07/16/2013 [1]** 110/9
**09/15/2010 [1]** 72/9
**09/16/2010 [1]** 75/16

**1**

**1-800-563-6409 [1]** 2/17
**100 [1]** 32/12
**100 percent [2]** 18/21 29/20
**107 [3]** 109/5 110/17 111/23
**10:00 [1]** 1/19
**10:58 [1]** 48/2
**11 [1]** 72/4
**11:05 [1]** 48/3
**12/28/2010 [1]** 67/20
**12:06 [1]** 90/7
**12:11 [1]** 90/8
**12:35 [2]** 1/19 107/19
**130 [2]** 2/8 110/12
**1475 [2]** 2/8 110/12
**16 [1]** 1/19
**16th [1]** 108/8
**18 [2]** 53/7 53/8
**1984 [1]** 7/9

**2**

**2000 [1]** 8/3
**2006 [1]** 8/5
**2006/2007 [1]** 19/21
**2007 [2]** 10/25 19/21
**2008 [42]**
**2008.......................80 [1]**
3/17
**2009 [4]** 56/14 61/15 86/17
92/11
**2010 [39]**
**2011 [4]** 83/14 84/13 84/20
90/10
**2011.......................90 [1]**
3/19
**2012-CA-000866-GCAXMX [3]** 1/6
110/6 111/4
**2013 [5]** 1/19 108/8 108/11
109/11 110/9
**229 [4]** 1/20 1/25 2/15 110/19
**2302 [1]** 2/17
**23rd [2]** 108/10 109/11
**2511 [1]** 2/16

**3**

**30 [1]** 110/14
**30,000-foot [1]** 96/21
**300 [2]** 27/2 27/6
**31st [1]** 83/24
**32 [1]** 9/24
**32502 [4]** 1/21 1/25 2/16
110/20
**33401 [2]** 2/9 110/13

**4**

**401 [2]** 82/4 82/21
**43 [1]** 9/9
**432-2302 [1]** 2/17
**432-2511 [1]** 2/16
**44 [1]** 59/16

**44609 [1]** 2/5
**4th [1]** 70/22

**6**

**6,600 [1]** 25/23
**6409 [1]** 2/17

**8**

**800 [1]** 2/4
**850 [2]** 2/16 2/17

**9**

**95 [3]** 18/24 29/19 32/11

**A**

**a.m [3]** 1/19 48/2 48/3
**a/k/a [4]** 1/7 1/8 1/9 1/10
**abilities [1]** 76/1
**ability [1]** 79/17
**able [1]** 31/24
**about [67]**
**above [2]** 78/11 78/21
**Absolutely [1]** 47/22
**absorbed [1]** 80/10
**accepted [1]** 75/7
**access [7]** 73/19 74/4 74/12
74/18 75/25 76/1 76/2
**according [3]** 30/1 31/3 31/5
**account [3]** 45/11 45/15 46/20
**accounting [7]** 34/22 35/13
36/3 60/5 60/11 73/25 74/23
**accounts [3]** 47/7 47/10 100/16
**accurate [4]** 6/20 27/13 31/10
56/20
**acquired [1]** 51/19
**action [3]** 81/24 109/8 109/9
**acts [1]** 56/24
**actual [6]** 95/21 95/22 96/1
99/5 100/6 100/11
**actually [10]** 10/25 35/24
37/20 45/7 47/4 59/6 67/4
75/14 77/21 105/16
**add [1]** 51/25
**added [2]** 51/17 71/15
**adding [1]** 51/23
**addition [1]** 87/9
**address [7]** 9/17 22/22 22/25
1/13 33/14 59/21 62/4
**adept [1]** 97/4
**adjusted [2]** 53/3 53/18
**Administration [1]** 7/7
**ADMINISTRATIVE [24]** 1/11 1/11
38/18 59/24 60/1 60/25 61/3
61/11 61/15 61/22 61/24 62/12
62/17 62/25 64/8 64/12 104/13
104/13 104/18 104/19 105/3
105/6 107/8 107/10
**administrator [7]** 7/10 7/11
7/23 77/24 77/25 86/8 105/25
**administrator's [1]** 101/9
**administrators [2]** 89/22 90/2
**admissions [2]** 21/10 88/16
**adopt [1]** 80/17
**adopted [1]** 80/14
**advice [1]** 54/17
**adviser [2]** 40/15 42/2
**affidavit [3]** 56/15 72/5 75/13
**after [9]** 22/25 38/2 48/2 49/5
52/13 52/24 53/3 66/12 90/7
**again [16]** 13/4 29/14 34/13
35/11 37/2 46/21 48/24 49/14
57/22 67/11 74/14 74/14 75/25
90/14 93/13 98/18
**against [4]** 93/22 95/13 95/21

100/11
**agenda [2]** 58/17 94/23
**agent [2]** 92/17 92/20
**ago [4]** 5/17 42/8 53/6 73/6
**agree [1]** 13/7
**agreed [1]** 4/4
**agreement [16]** 54/10 54/21
54/22 70/3 70/13 70/14 70/16
70/24 71/10 71/13 71/15 71/25
73/1 102/24 103/4 103/14
**Agreement..............69 [1]**
3/16
**Agreement.........54 [1]** 3/14
**agreements [3]** 54/15 54/17
71/7
**ahead [16]** 5/22 15/21 16/3
23/19 27/14 27/25 28/5 30/10
39/2 41/5 41/24 50/25 65/19
77/5 77/10 90/9
**al [2]** 110/7 111/3
**Alabama [2]** 8/24 92/9
**all [53]**
**allowed [1]** 106/20
**already [2]** 38/21 48/19
**also [19]** 2/10 18/5 22/10
55/10 56/24 64/7 64/18 68/5
77/17 80/17 96/9 98/6 99/17
101/12 101/15 101/25 102/3
102/19 104/17
**always [5]** 26/18 31/20 46/1
61/25 78/7
**always operate [1]** 61/25
**am [3]** 107/1 109/7 109/8
109/8
**amended [2]** 70/17 71/10
**amendments [1]** 70/23
**amount [1]** 52/25
**Anchor [4]** 1/20 1/24 2/15
110/19
**and if [1]** 93/12
**and/or [1]** 4/6
**anniversary [2]** 89/11 89/13
**annual [1]** 89/7
**another [5]** 7/18 12/7 14/5
35/6 81/15
**answer [16]** 5/22 6/7 6/13
19/25 23/20 26/17 38/20 44/19
46/12 47/20 53/12 73/4 75/10
76/9 79/16 79/17
**answered [1]** 25/20
**anticipate [1]** 58/14
**any [67]**
**anybody [2]** 35/22 78/17
**anymore [1]** 96/15
**anyone [6]** 11/24 22/15 41/11
41/18 78/10 95/8
**anything [12]** 15/16 16/14 21/5
24/18 25/5 25/8 25/10 25/12
49/16 74/1 94/18 94/19
**anywhere [1]** 8/23
**apologize [1]** 25/21
**appear [2]** 27/13 49/11
**appeared [2]** 84/15 108/7
**appears [1]** 39/6
**application [9]** 37/19 62/13
66/10 66/12 68/10 68/19 68/25
71/21 75/6
**applications [3]** 68/11 72/16
72/22
**appraisals [4]** 89/2 89/19
89/22 89/24
**appropriations [2]** 24/18 95/6
**Approximately [1]** 12/13

**A**

**April [4]** 12/14 12/25 48/5 49/13
**are [111]**
**aren't [2]** 47/10 93/21
**Argent [1]** 42/25
**around [3]** 22/16 25/23 86/25
**as [70]**
**ask [19]** 5/21 5/21 6/1 6/3 15/9 47/18 53/17 53/18 54/23 58/8 59/7 63/18 66/15 75/11 75/12 91/9 97/20 97/21 105/22 42/7 96/17
**asked [5]** 13/14 26/25 38/12 42/7 96/17
**asking [6]** 6/4 6/15 13/19 67/7 71/6 76/7
**asset [5]** 17/14 44/4 44/16 61/8 83/18
**assets [2]** 83/19 83/21
**assignment [2]** 33/8 39/12
**assist [1]** 6/20
**assisted [1]** 18/5
**associate [3]** 3/17 3/18 81/15
**associates [1]** 82/18
**assume [6]** 6/7 34/5 47/11 63/10 69/18 98/8
**assumed [1]** 55/24
**assuming [4]** 46/5 46/22 63/8 98/9
**assumption [1]** 47/13
**assumptions [1]** 71/7
**attached [1]** 75/15
**attachment [1]** 25/2
**attempt [1]** 48/13
**attorney [2]** 109/7 109/8
**August [1]** 57/25
**authorized [1]** 109/3
**available [14]** 73/16 73/21 74/2 75/8 93/6 94/7 96/15 96/17 96/18 97/10 97/10 98/16 98/17 100/2
**Averill [1]** 7/19
**awaits [1]** 110/14
**aware [28]** 26/6 37/25 39/10 39/12 39/16 39/25 40/5 40/8 40/14 41/21 41/25 42/14 44/16 50/17 50/23 52/11 52/11 54/16 57/19 58/4 65/21 67/8 67/10 67/12 72/24 77/6 91/16 107/1

**B**

**B-A-T [1]** 7/21
**B-U-R-R [1]** 53/23
**bachelor's [1]** 7/4
**back [20]** 19/19 34/11 34/18 46/20 48/4 48/5 52/23 53/3 53/18 60/3 60/5 61/8 66/7 66/15 69/2 71/20 71/21 72/3 95/20 103/25
**background [2]** 7/2 75/14
**bailiwick [1]** 91/8
**bank [5]** 45/11 45/14 46/20 100/16 100/17
**banks [1]** 100/21
**baseball [1]** 7/7
**based [8]** 52/20 52/21 58/21 59/4 95/12 103/15 106/18 106/21
**basically [8]** 11/11 33/16 48/6 60/10 62/22 87/8 89/7 97/25
**basis [6]** 24/8 89/7 95/15 100/4 100/6 110/15

**Bat [1]** 7/21
**Baton [1]** 7/6
**Baylen [4]** 1/20 1/25 2/15 110/19
**be [69]**
**Beach [2]** 2/9 110/13
**became [24]** 7/22 7/23 8/4 8/7 8/8 8/16 9/4 9/10 9/14 10/4 16/6 16/15 16/16 17/8 17/9 23/13 23/14 40/6 42/19 83/21 88/19 93/1 99/8 104/10
**because [14]** 9/22 10/13 12/5 12/21 13/13 19/19 26/15 36/22 53/4 70/22 70/25 98/15 100/20 103/24
**become [5]** 39/16 40/5 59/9 83/23 104/17
**becoming [4]** 16/18 16/23 98/22 99/4
**becoming the [1]** 16/18
**been [49]**
**before [19]** 5/10 5/12 7/1 7/9 10/25 14/16 25/5 25/7 28/19 32/18 34/25 43/19 50/16 70/11 78/10 83/11 94/19 103/10 108/7
**beginning [2]** 8/11 84/2
**Behalf [1]** 1/17
**being [9]** 11/7 61/14 61/16 82/22 83/14 87/12 92/2 95/15 97/10
**believe [9]** 32/9 70/20 70/23 71/24 72/2 84/7 91/1 93/9 103/5
**Bell [2]** 11/13 22/10
**benefits [1]** 82/2
**best [4]** 58/22 79/17 95/15 97/7
**better [2]** 53/16 97/8
**between [23]** 10/15 12/25 18/16 18/17 30/6 30/8 34/2 39/7 48/14 53/19 57/19 58/1 70/4 70/16 71/13 78/16 78/19 80/9 81/19 82/24 88/2 103/5 105/23
**Beverly [1]** 7/18
**big [1]** 93/15
**bills [6]** 44/23 46/5 46/7 46/21 46/23 47/2
**bit [3]** 21/11 48/5 103/25
**Blalock [1]** 36/3
**board [5]** 23/16 23/17 23/18 57/8 69/4
**bonds [1]** 68/9
**both [6]** 10/16 10/16 33/4 73/19 79/14 79/22
**bottom [1]** 63/2
**bought [1]** 23/5
**Boulevard [2]** 2/8 110/12
**Boyer [2]** 2/8 110/12
**break [6]** 5/20 5/22 5/24 47/23 77/9 93/24
**breakdown [2]** 21/22 96/25
**brief [2]** 48/1 90/6
**briefly [2]** 54/6 101/6
**bring [3]** 26/13 70/2 93/16
**broad [2]** 52/5
**Broadway [1]** 51/4
**broken [4]** 94/4 96/8 96/9 100/8
**brought [1]** 26/15
**budgeted [4]** 96/2 99/5 100/6 100/11
**bump [1]** 52/18

**Burr [2]** 43/23 53/19
**Burr's [1]** 53/21
**business [16]** 15/16 19/9 21/4 21/5 21/6 21/11 22/22 37/10 37/12 37/15 48/10 61/13 62/14 62/23 65/8 90/25
**buy [2]** 23/10 23/11
**buying [1]** 13/11

**C**

**CA [3]** 1/6 110/6 111/4
**call [11]** 9/1 9/2 24/10 24/22 27/19 55/4 55/13 73/18 79/19 93/3 100/4
**called [4]** 7/20 51/19 56/11 91/17
**calling [1]** 79/21
**calls [2]** 23/22 24/15
**came [2]** 13/4 14/25
**can [31]** 6/19 20/20 23/19 24/3 26/18 26/19 28/11 29/15 30/14 30/18 35/10 38/20 46/2 52/15 53/21 53/25 55/6 57/23 58/23 69/19 73/4 73/5 75/3 82/17 83/6 86/20 91/7 94/9 95/9 96/11 98/9
**can't [9]** 46/12 53/6 53/12 54/19 75/10 76/9 76/24 82/16 91/5
**capable [1]** 6/23
**capital [11]** 24/18 39/7 40/2 56/7 56/7 56/8 56/8 78/5 78/5 78/5 95/5
**capture [1]** 45/25
**cards [1]** 15/16
**care [199]**
**case [5]** 1/6 59/18 61/7 110/6 111/4
**casual [2]** 40/24 48/8
**categories [2]** 20/16 94/5
**cc [1]** 110/25
**ceased [1]** 92/25
**census [7]** 25/5 93/12 93/17 93/19 93/19 95/4 95/16
**Center [3]** 1/13 31/7 66/11
**Centrepark [2]** 2/8 110/12
**CEO [1]** 11/14
**certain [8]** 6/10 52/25 54/18 74/4 74/7 74/9 74/14 106/13
**certainly [1]** 6/20
**certificate [6]** 3/6 3/6 3/15 66/22 108/1 109/1
**certify [3]** 108/6 109/3 109/7
**CFO [13]** 16/16 16/20 16/21 16/22 16/23 16/23 16/25 17/1 17/9 23/24 24/25 37/14 60/21
**chance [1]** 54/4
**change [29]** 10/3 11/9 17/13 21/22 26/13 26/25 27/2 37/17 37/18 37/20 38/3 50/21 50/22 52/13 52/18 53/3 53/9 56/10 64/25 76/23 83/25 84/20 84/22 84/24 85/1 85/2 86/11 102/15 111/5
**change-over [1]** 76/23
**changed [14]** 22/3 22/23 54/21 56/18 64/11 70/17 82/12 82/15 83/18 83/19 84/14 86/3 102/8 103/24
**changes [6]** 10/25 25/5 26/7 50/15 83/15 83/16
**changing [1]** 54/14
**charge [3]** 75/1 83/4 87/3

# C

chart [1]  74/1
check [2]  44/21 45/6
checked [1]  69/13
checks [2]  45/3 47/3
chief [12]  8/8 8/11 8/12 8/13 8/16 9/10 10/23 11/3 11/18 22/6 60/22 75/18
Chipola [2]  31/7 31/17
CHOW [4]  3/12 55/20 56/11 66/12
Cindy [3]  68/13 68/16 72/17
Cindy's [1]  68/20
CIRCUIT [4]  1/1 1/1 110/1 110/1
Citrix [1]  74/17
clarification [1]  58/23
CLARK [1]  2/3
clear [10]  6/2 32/8 33/5 48/13 52/2 58/18 59/20 62/8 81/21 83/22
clearer [1]  6/4
clerk [1]  75/21
clinical [16]  20/24 21/9 73/25 74/23 85/6 86/23 87/17 87/22 88/2 88/21 89/17 93/8 93/10 97/4 97/21 99/3
close [2]  9/23 12/6
close to [1]  12/6
closed [2]  17/19 83/17
closer [1]  13/4
CMS [1]  95/11
CNAs [3]  26/3 77/20 101/15
coached [1]  7/7
COAST [189]
Coast Health [1]  85/9
Coastal [1]  51/19
coincide [1]  53/10
collaboration [1]  81/19
collect [1]  46/8
college [1]  7/3
come [9]  14/23 22/16 52/23 77/13 77/17 81/25 95/1 105/16 105/17
comes [2]  45/10 99/13
comfortable [1]  6/13
coming [2]  11/20 15/1
comments [1]  63/17
commiserate [1]  76/4
communicate [3]  22/20 24/9 24/11
comp [2]  87/25 95/5
companies [18]  8/25 13/24 14/2 14/3 14/4 15/7 15/18 16/2 27/22 52/1 52/3 55/19 77/3 77/4 79/19 79/21 104/10 105/23
Companies' [2]  79/15 79/24
company [51]
compare [1]  93/21
compensation [1]  88/8
complete [1]  109/5
completed [2]  35/2 110/14
compliance [1]  75/13
complying [4]  28/18 66/16 70/9 72/6
comprehensive [1]  20/19
computer [10]  6/18 73/17 73/22 74/3 74/13 74/16 75/8 97/11 97/13 98/10
concerned [2]  53/13 74/24
concluded [1]  107/18

confirmation [1]  12/24
confused [1]  60/24
connected [1]  109/8
consider [1]  16/1
consultant [7]  20/13 20/13 20/21 21/14 23/23 36/3 36/5
consultants [3]  20/13 21/15 85/7
consulting [1]  34/21
consumer [1]  7/1
contact [2]  35/22 68/18
CONTACTED [1]  110/10
context [4]  25/13 26/9 42/10 42/16
continue [2]  33/20 43/5
continued [3]  48/2 82/6 90/7
contract [8]  19/23 34/2 36/12 36/14 41/14 41/22 61/3 69/15
contracts [2]  18/13 18/15
control [4]  86/25 87/25 88/5 88/7
conversations [1]  40/24
conversing [1]  35/8
conversion [1]  9/22
copy [2]  26/25 66/9
corporate [6]  2/12 9/14 9/17 58/25 59/21 60/6
corporations [1]  52/6
correct [60]
Correction [1]  111/5
Correction/Change [1]  111/5
corrections [1]  110/18
corroboration [1]  82/24
cost [5]  38/1 38/6 43/19 53/5 53/10
could [9]  13/25 17/19 31/4 50/18 90/20 90/23 98/6 98/10 99/2
couldn't [3]  9/22 19/25 45/18
counsel [10]  2/12 4/4 5/18 54/17 54/24 69/19 70/1 72/15 109/7 109/8
count [1]  72/4
county [5]  1/2 7/16 60/9 108/3 110/2
couple [4]  49/8 90/4 101/3 103/23
court [10]  1/1 1/20 1/24 2/13 2/15 5/3 68/22 109/3 110/1 110/19
cover [1]  68/9
CRAIG [10]  1/16 3/3 5/2 5/9 108/7 109/4 110/9 110/17 111/2 111/25
CraigCRobinson [1]  23/4
create [2]  49/15 80/3
created [5]  14/3 14/16 49/11 78/24 80/5
creating [1]  16/7
creation [1]  10/9
credit [13]  38/25 39/6 39/17 39/19 39/20 40/6 40/10 41/3 41/16 41/20 45/19 91/3 91/10
criteria [4]  95/12 106/11 106/15 106/16
Cross [2]  3/4 101/4
Cross-Examination [2]  3/4 101/4
current [2]  3/13 17/24
currently [1]  8/18
cut [1]  47/4
Cypress [6]  38/18 79/4 79/8 79/11 79/14 79/23

# D

D-O-S-S-E-Y [1]  75/4
daily [1]  45/16
Dale [1]  2/4
Dana [5]  11/5 11/7 11/13 22/6 22/7
DANTE [1]  2/11
data [1]  73/25
date [8]  1/19 67/20 70/19 81/5 110/10 110/10 110/15 111/25
dated [6]  3/17 3/19 75/15 83/14 103/5 109/11
dates [1]  53/6 76/25 82/16
day [4]  46/19 108/8 108/10 109/11
days [1]  110/14
Daytona [1]  51/20
deal [8]  1/6 22/5 22/13 24/8 36/8 88/14 97/7 100/20
dealing [3]  82/6 85/6 97/6
dealings [2]  49/18 49/21
deals [2]  12/22 51/15
dealt [2]  22/7 22/10
December [10]  3/17 12/23 13/1 14/19 34/8 34/9 70/22 81/7 81/8 83/24
December 2008 [1]  34/9
decided [1]  68/5
deciding [1]  49/15
decision [3]  48/20 50/21 106/24
decisions [1]  14/9
declare [1]  111/22
deeper [1]  15/8
Defendants [2]  1/14 2/6
DEFENDANTS' [1]  3/21
definitely [1]  12/19
degree [2]  7/4 7/6
DELAWARE [2]  1/8 64/19
delayed [1]  53/4
delineate [1]  15/14
DELONG [2]  1/4 110/4
Delta [31]  8/2 8/7 8/15 8/22 9/5 9/25 11/3 19/22 19/22 21/17 21/18 27/17 29/9 33/14 33/19 33/20 34/3 34/25 39/1 39/7 48/14 76/24 80/9 80/10 80/13 80/18 81/10 81/25 83/11 83/20 84/9
departing [1]  11/18
department [10]  20/20 51/14 60/9 72/18 72/20 83/2 85/4 100/12 106/7 106/8
department's [1]  106/10
departments [3]  20/9 20/15 96/7
depending [3]  74/9 75/25 106/8
depo [1]  30/13
deposed [1]  5/11
deposition [12]  1/16 4/5 4/9 48/2 70/2 90/7 101/8 107/18 109/4 110/9 110/17 110/20
depositions [2]  5/19 35/9
DESCRIPTION [2]  3/10 3/22
desired [1]  98/9
detail [1]  69/1
detailed [4]  12/12 96/20 97/3 100/9
details [5]  12/8 12/15 12/18 17/20 38/24
determination [1]  14/3
determines [2]  65/17 86/7

**D**

determining **[1]** 37/4
developments **[1]** 51/16
did **[80]**
didn't **[16]** 10/13 12/5 15/14
15/15 21/24 30/11 42/8 42/16
58/10 58/14 66/19 67/15 84/4
86/22 87/4 98/23
dietary **[2]** 20/13 21/1
difference **[1]** 25/6
different **[11]** 15/9 22/16
26/17 28/25 42/9 58/9 75/6
76/15 82/15 87/2 100/20
differently **[1]** 6/3
direct **[8]** 3/4 5/6 22/17 23/14
86/14 88/20 88/25 94/10
direction **[1]** 24/17
directly **[4]** 18/15 19/23 23/14
105/17
director **[13]** 8/3 8/22 20/10
20/11 20/12 21/12 85/5 86/9
86/12 86/24 87/2 97/21 106/1
directors **[9]** 23/16 23/17
85/11 85/13 85/14 86/16 87/15
89/21 89/25
disciplinary **[1]** 81/24
discovery **[1]** 4/6
discuss **[2]** 12/5 99/15
discussed **[1]** 102/20
discussions **[1]** 40/22
divided **[1]** 85/24
do **[119]**
document **[11]** 6/16 30/1 31/3
54/7 54/10 58/21 62/11 70/7
70/10 80/25 111/23
documentation **[2]** 39/5 88/12
documents **[17]** 6/11 6/12 17/23
26/14 26/16 26/16 27/1 27/2
27/4 50/1 50/4 55/21 55/25
56/4 56/5 66/12 66/18
does **[31]** 18/3 27/13 36/11
38/18 41/22 42/3 43/22 44/25
46/19 52/15 57/2 59/3 63/13
63/22 67/16 67/23 69/11 74/11
79/3 79/6 85/2 92/5 93/24
96/7 99/17 99/25 100/5 101/2
101/18 105/16 105/17
doesn't **[1]** 61/13
doing **[8]** 6/23 10/16 35/4 37/2
50/1 50/3 77/8 90/24
domain **[2]** 23/5 23/10
domains **[1]** 23/11
DON **[1]** 101/12
don't **[54]**
done **[9]** 35/5 35/7 37/21 57/16
83/17 89/2 89/7 95/15 98/17
Dossey **[1]** 75/2
Dossey's **[1]** 75/3
Doug **[2]** 43/23 53/19
down **[17]** 13/4 14/23 14/25
15/1 41/1 52/23 52/24 53/3
53/18 63/2 63/7 93/24 94/4
96/8 96/9 98/25 100/8
drilling **[1]** 98/25
duly **[2]** 5/3 108/8
During **[1]** 93/3
duties **[6]** 8/21 9/12 10/3
10/17 74/15 76/3

**E**

e-mail **[7]** 22/21 22/22 22/25
25/1 75/23 76/13 76/15

each **[7]** 20/11 20/15 29/1 29/5
47/7 48/16 95/18
earlier **[9]** 25/20 28/9 44/8
77/19 78/25 88/16 91/18 101/8
102/14
easier **[1]** 27/7
Education **[1]** 7/5
Educational **[1]** 7/6
eight **[2]** 8/23 86/17
either **[4]** 6/3 28/25 29/12
32/5
eleven **[1]** 17/18
else **[10]** 11/24 22/15 41/8
41/11 51/24 55/2 55/3 86/23
88/7 106/5
Emerald **[1]** 8/1
employ **[1]** 101/19
employed **[4]** 25/22 77/25
101/12 101/16
employee **[12]** 76/17 77/16
80/18 81/2 81/15 83/15 87/24
88/3 88/4 89/5 109/7 109/8
employees **[20]** 21/15 26/4 57/3
61/13 61/19 61/22 62/24 63/23
65/10 75/22 75/23 77/19 77/21
77/22 78/7 82/2 82/18 89/19
101/19 106/1
employer **[1]** 101/19
employment **[1]** 89/13
enclosed **[1]** 103/18
end **[2]** 12/23 46/20
ends **[1]** 46/3
enough **[8]** 6/8 47/15 50/15
55/13 58/5 70/1 76/12 93/15
ensure **[1]** 41/3
ensuring **[1]** 41/15
Enterprises **[1]** 7/18
entire **[2]** 9/6 25/23
entities **[3]** 58/13 102/12
102/19
entitled **[1]** 70/3
entity **[2]** 56/21 58/25
environmental **[3]** 86/23 87/17
87/18
ERIC **[14]** 1/13 14/10 14/11
16/14 16/14 19/17 22/14 44/15
57/12 64/5 65/15 78/15 81/19
92/1 92/2
ERISA **[4]** 82/8 82/9 82/17
82/21
Errata **[5]** 3/7 110/18 110/19
110/21 111/1
ESCAMBIA **[1]** 108/3
especially **[1]** 52/5
ESQUIRE **[5]** 2/3 2/7 2/11
110/11 110/25
essentially **[1]** 21/22
ESTATE **[3]** 1/3 110/3 111/3
et **[2]** 110/7 111/3
even **[2]** 12/6 46/19
ever **[3]** 39/4 59/8 76/16
every **[2]** 25/14 46/19
everybody **[5]** 25/1 26/2 60/6
74/6 94/17
everything **[4]** 23/6 55/22 74/7
99/1
evidence **[1]** 4/6
exact **[1]** 53/13
exactly **[6]** 53/6 60/15 76/25
80/12 82/16 93/2
Examination **[7]** 1/22 3/4 3/4
3/5 5/6 101/4 104/2
example **[13]** 31/6 38/1 45/4

45/9 47/3 49/10 73/11 75/5
77/16 97/19 98/11 100/13
101/8
except **[1]** 88/21
exchange **[1]** 76/13
excuse **[6]** 8/7 9/9 23/16 44/12
60/4 86/21
execution **[1]** 3/7
executive **[1]** 98/24
exhibit **[27]** 26/19 26/21 26/24
27/8 28/11 28/12 28/15 28/21
28/24 32/16 32/22 33/2 54/1
54/4 55/17 66/2 66/3 66/8
69/20 69/23 70/1 71/20 80/21
80/24 90/11 90/14 102/25
EXHIBITS **[2]** 3/9 3/21
existed **[1]** 39/10
existence **[1]** 38/25
expectation **[1]** 52/22
expedited **[1]** 110/15
explain **[5]** 6/4 15/8 31/24
52/15 95/9
explanatory **[2]** 21/2 21/3
extra **[2]** 78/25 101/3

**F**

facilities **[114]**
facility **[19]** 26/17 28/2 45/10
49/10 66/23 67/5 77/20 78/4
90/17 95/18 96/9 98/1 100/11
101/10 101/11 101/13 101/16
101/19 106/2
facility I **[1]** 90/17
facility's **[2]** 26/16 67/14
fact **[3]** 15/13 37/18 73/7
facts **[1]** 111/23
fair **[17]** 6/8 20/17 20/23 21/1
31/23 31/25 47/15 48/10 50/5
55/13 58/5 76/12 79/13 80/14
87/7 101/20 102/6
fairly **[1]** 48/7
fall **[3]** 20/16 21/3 21/8
familiar **[15]** 15/17 32/16
37/17 38/23 39/8 44/3 46/25
54/7 54/9 62/19 65/4 68/24
92/1 92/2 95/9
far **[6]** 24/8 52/18 53/12
74/24 82/21 93/12
fault **[1]** 47/9
FAX **[1]** 2/17
FedEx **[1]** 68/9
fee **[1]** 105/12
feel **[2]** 48/16 94/19
feeling **[1]** 12/7
fell **[2]** 88/7 88/16
felt **[1]** 27/7
few **[2]** 12/9 101/7
figure **[1]** 59/19
filed **[3]** 30/2 37/19 43/19
files **[1]** 89/5
filing **[3]** 50/4 53/4 53/10
filings **[3]** 56/13 57/24 62/11
fill **[1]** 10/13
filled **[1]** 69/8
final **[1]** 83/23
finalized **[1]** 34/10
finance **[1]** 40/3
financial **[8]** 20/13 21/3 23/23
40/15 42/2 60/22 75/18 95/5
financially **[1]** 109/9
financials **[4]** 24/17 24/20
24/24 25/3
financing **[3]** 17/20 30/16

## F

financing... **[1]**  39/13
fine **[1]**  58/24
finished **[1]**  48/25
finishes **[1]**  37/1
firewalls **[1]**  74/9
first **[12]**  5/3 7/2 38/2 66/21
67/19 68/10 68/18 69/3 70/20
81/6 90/15 90/24
fit **[1]**  13/2
five **[13]**  7/8 19/1 56/22 63/20
71/22 71/24 85/23 95/4 95/8
95/14 95/15 103/1 103/2
five percent **[3]**  19/1 56/22
63/20
five-star **[1]**  95/8
fix **[1]**  103/25
flip **[4]**  8/8 69/10 71/21 72/3
FLORIDA **[73]**
flow **[2]**  5/19 105/23
folks **[24]**  14/25 20/6 20/9
21/25 24/21 25/17 25/21 25/25
36/8 43/14 51/12 60/11 69/7
71/17 73/15 76/14 78/6 78/17
78/19 81/3 87/17 88/25 93/4
98/18
following **[1]**  41/17
follows **[1]**  5/4
food **[1]**  35/17
foot **[1]**  96/21
foregoing **[3]**  109/4 109/5
111/23
Foreign **[1]**  56/16
form **[25]**  4/7 15/21 16/3 23/19
27/14 27/24 28/5 30/10 31/2
31/11 38/20 39/2 41/5 41/24
42/5 43/16 44/18 50/24 58/7
65/19 66/5 73/2 77/5 79/16
99/19
format **[1]**  25/14
formulas **[1]**  52/21
Forty **[1]**  9/9
Forty-four **[1]**  9/9
forum **[1]**  60/5
forward **[2]**  7/3 110/18
forwarded **[3]**  3/7 110/21
110/21
Foster **[6]**  11/5 11/7 22/6 22/7
75/20 76/16
four **[8]**  7/8 7/8 8/2 9/9 71/22
71/24 85/20 95/12
FPR **[2]**  2/14 110/24
frame **[2]**  19/21 100/22
frequency **[1]**  63/11
frequently **[4]**  22/8 24/11 51/8
94/10
from White **[1]**  99/22
front **[1]**  54/22
full **[1]**  25/24
function **[2]**  74/10 76/1
functions **[2]**  72/23 74/15
funds **[1]**  105/23
further **[1]**  109/7
future **[3]**  12/4 26/8 71/7

## G

G-A-R-N-I-E-R **[1]**  46/17
Garnier **[20]**  16/16 16/18 23/24
25/17 37/14 40/16 40/20 46/13
46/17 53/14 60/14 64/23
102/17 102/18 104/5 104/17
104/21 105/20 105/22 106/25

Garnier's **[2]**  41/2 75/16
GCAXMX **[3]**  1/6 110/6 111/4
GCH **[19]**  1/10 19/3 19/5 19/7
19/11 19/16 56/18 56/23 63/19
63/22 63/25 64/3 91/13 91/21
102/3 102/7 104/6 104/25
107/5
GCHC **[1]**  23/5
gears **[1]**  77/8
generally **[5]**  5/19 37/17 38/24
38/24 68/25
generate **[2]**  97/14 97/16
generated **[1]**  98/24
generates **[2]**  37/10 101/3
gentleman **[1]**  99/21
geographically **[1]**  85/24
gestures **[1]**  45/25
get **[12]**  6/20 12/7 48/14 58/23
67/15 73/10 94/9 95/3 96/15
96/16 97/23 99/14
get-to-know-one-another **[1]**
12/7
gets **[1]**  46/7
getting **[1]**  13/3
give **[4]**  6/12 6/18 52/24
103/23
given **[2]**  13/14 95/14
go **[34]**  5/22 15/8 15/21 16/3
23/11 23/19 27/14 27/24 28/5
30/10 39/2 41/5 41/24 45/3
48/14 50/24 51/8 52/7 54/18
65/19 66/7 66/15 77/5 77/10
86/25 90/9 94/15 94/22 97/24
98/10 98/19 99/17 99/25
103/25
goes **[4]**  45/9 45/12 46/25 89/4
going **[31]**  6/10 10/8 11/8
11/19 12/19 13/5 13/15 13/17
13/17 14/3 14/4 14/5 24/21
38/2 47/11 47/14 48/13 48/17
49/6 52/23 57/23 59/7 65/18
66/7 69/25 71/20 80/12 90/13
94/17 94/22 106/12
gone **[3]**  23/5 76/22 85/6
good **[2]**  35/4 74/25
goods **[2]**  17/13 42/12
got **[8]**  6/18 7/9 12/24 72/1
87/2 98/18 98/24 100/2
gotten **[2]**  12/6 99/2
Government **[1]**  35/14
government's **[1]**  95/11
greet **[1]**  12/10
grievances **[2]**  73/12 73/12
Group **[18]**  8/2 9/5 19/23 21/19
27/17 33/14 34/25 35/16 39/1
39/7 76/24 79/11 79/14 79/23
80/13 81/10 81/25 83/20
growth **[2]**  51/15 51/23
guess **[3]**  13/14 60/24 90/20
GULF **[189]**
GulfCoastHealthCare.com **[1]**
23/4
GUTZMANN **[18]**  1/13 17/1 19/17
23/23 36/5 36/6 40/15 41/10
41/23 57/12 64/5 65/1 65/15
71/2 92/19 102/10 104/5 107/3
guy **[1]**  44/1
guys **[3]**  12/9 14/11 37/2

## H

had **[19]**  9/22 10/16 12/18 13/7
17/1 20/9 23/9 23/9 25/12
33/22 42/18 48/19 50/22 54/4

54/21 58/12 67/18 87/5 87/15
hadn't **[1]**  12/6
half **[1]**  53/5
hand **[4]**  57/23 69/25 90/13
108/10
handbook **[9]**  3/17 3/18 80/18
81/2 83/13 83/15 84/13 85/1
90/10
handbooks **[1]**  77/16
handed **[5]**  26/24 28/14 54/4
56/12 57/24
handing **[2]**  66/8 80/23
handle **[2]**  41/19 82/21
handles **[3]**  37/8 44/21 82/17
happen **[6]**  13/18 25/10 38/2
49/7 52/16 52/16
happened **[2]**  24/9 94/19
happening **[2]**  49/12 94/18
happens **[1]**  35/7
happy **[2]**  6/24 27/6
Harris **[2]**  11/23 24/7
has **[31]**  5/18 14/2 22/22 31/20
37/19 37/21 41/14 41/19 45/19
47/6 55/23 57/8 57/9 57/14
59/14 64/11 68/18 70/15 70/15
71/10 73/19 75/25 76/2 82/12
83/8 90/22 92/16 92/20 97/14
110/14 110/20
have **[105]**
having **[3]**  5/3 32/7 97/5
HC **[2]**  55/8 55/11
he **[24]**  14/12 14/14 14/17
14/23 14/25 15/3 15/13 15/14
15/15 22/17 36/23 42/8 42/8
44/11 44/12 49/22 49/22 49/23
49/24 55/8 59/20 67/24 67/25
81/21
he's **[6]**  10/24 43/25 44/1
44/10 50/11 100/2
head **[2]**  6/6 37/12
heads **[2]**  106/7 106/8
health **[212]**
HEALTHCARE **[3]**  1/7 1/9 43/2
hear **[1]**  95/9
heard **[2]**  42/16 44/5
help **[2]**  17/23 71/4
helpful **[1]**  6/17
Henderson **[2]**  68/19 68/23
her **[13]**  16/19 16/23 25/17
35/6 37/15 46/15 60/20 72/17
72/22 73/17 73/20 83/6 91/8
here **[8]**  6/18 9/14 26/15 30/1
30/23 32/15 81/5 83/13
hereby **[1]**  109/3
hereof **[1]**  4/11
high **[1]**  94/17
higher **[2]**  12/10 99/1
HIGHLANDS **[2]**  1/2 110/2
Highway **[1]**  2/4
him **[8]**  10/7 14/21 14/23
15/14 24/11 100/2 100/4 100/5
hire **[1]**  61/21
hired **[2]**  10/5 41/19
hiring **[1]**  16/7
his **[9]**  5/4 14/13 15/6 44/9
50/12 63/7 63/9 63/13 110/17
historical **[2]**  95/22 95/23
Hmm **[1]**  68/12
Hold **[1]**  76/20
holder **[1]**  59/9
holding **[3]**  19/8 62/22 65/8
holdings **[17]**  1/9 1/9 1/11
1/12 15/24 30/22 62/17 62/25

**H**

holdings... **[9]**  65/5 65/14
104/12 104/14 104/19 105/6
105/8 107/10 107/12
holds **[1]**  57/5
Holmes **[1]**  7/16
home **[9]**  20/16 20/21 47/7 52/8
69/16 73/3 86/8 98/7 99/9
homes **[36]**  9/8 9/19 17/21
19/23 26/1 26/14 32/21 34/12
42/15 52/7 57/6 57/20 58/2
58/6 71/14 72/13 73/23 75/7
77/11 77/13 79/7 80/3 81/3
84/20 92/6 92/13 95/1 96/2
96/3 96/13 97/1 97/2 97/19
99/6 105/14 105/18
hopefully **[1]**  6/3
Horwitz **[1]**  36/2
Hospice **[1]**  94/3
hours **[1]**  106/21
house **[1]**  2/12
housekeeping **[1]**  87/19
how **[38]**
HR **[1]**  87/20
HUD **[25]**  9/22 17/17 17/20
17/21 28/1 29/6 29/12 29/16
29/22 30/3 30/8 30/12 30/16
32/1 32/5 33/22 58/5 58/9
58/17 59/4 59/10 71/13 83/19
84/4 84/10
HUDs **[2]**  17/14 83/17
human **[4]**  83/3 83/4 86/21
86/22
hung **[1]**  17/18

**I**

I'll **[11]**  6/2 6/4 6/7 6/18
15/9 28/16 66/15 69/18 93/16
99/14 99/14
I'm **[78]**
I've **[21]**  6/18 19/5 32/18 33/4
35/5 35/7 42/16 42/22 44/5
54/11 55/23 56/12 57/24 58/20
63/7 70/11 70/12 72/3 91/24
98/17 98/18
I-O-A-K-I-M **[1]**  67/22
identification **[7]**  26/22 28/13
54/2 66/4 69/24 80/22 90/12
identifies **[2]**  28/25 30/2
II **[3]**  1/12 42/12 42/25
Illinois **[1]**  7/5
imagine **[3]**  40/16 41/6 98/5
impact **[1]**  25/11
In-house **[1]**  2/12
include **[5]**  35/17 87/20 92/9
96/7 100/6
including **[1]**  25/25
inclusion **[1]**  110/22
incorrect **[1]**  32/16
increase **[1]**  52/13
INDEX **[3]**  3/1 3/9 3/21
indicator **[1]**  98/11
indicators **[3]**  93/6 97/1 98/2
individual **[2]**  69/3 99/6
infections **[1]**  97/18
information **[28]**  6/20 25/3
69/8 72/16 73/11 73/13 73/16
73/20 73/21 74/12 74/19 74/23
93/10 93/17 94/7 95/16 95/17
97/23 98/4 98/15 98/19 99/25
initial **[1]**  45/11

**initially [5]**  7/14 11/19 23/6
50/20 100/22
initials **[2]**  90/15 90/20
injury **[1]**  88/3
insurance **[11]**  65/18 65/22
66/22 67/8 67/9 67/14 67/17
68/3 68/6 82/4 94/3
Insurance... **[16]**  1/15
insured **[3]**  65/22 66/25 67/13
intended **[2]**  50/16 50/19
interest **[2]**  43/2 84/4
interested **[2]**  13/12 109/9
internally **[2]**  10/19 21/24
internet **[1]**  76/8
interrupting **[1]**  95/8
introduced **[1]**  5/10
introduction **[1]**  48/9
investment **[2]**  24/16 25/11
investors **[5]**  23/17 23/18
23/22 24/1 24/6
involved **[19]**  12/15 14/6 21/12
33/25 34/5 37/22 40/2 40/4
40/6 40/8 40/9 40/12 40/19
42/11 54/14 67/15 83/5 84/10
96/23
involvement **[1]**  15/7
Ioakim **[3]**  67/22 67/23 75/21
is **[193]**
isn't **[3]**  65/24 95/9 97/15
issue **[1]**  58/12
issues **[2]**  20/24 97/5
it **[170]**
it's **[54]**
item **[2]**  100/9 100/10

**J**

JAMES **[2]**  2/7 110/11
Jamey **[2]**  10/20 99/15
January **[8]**  3/19 8/3 9/23
83/14 83/24 83/25 84/3 84/9
January 1 **[3]**  83/25 84/3 84/9
January 2011 **[1]**  83/14
job **[5]**  35/4 74/9 74/14 76/1
76/3
John **[1]**  75/2
JR **[1]**  1/13
JUDICIAL **[2]**  1/1 110/1
JULIE **[14]**  1/13 17/1 19/17
23/23 36/5 40/15 41/10 41/23
44/15 57/12 64/5 65/15 71/2
102/10
July **[5]**  1/19 50/21 108/8
108/11 109/11
June **[4]**  49/9 49/11 49/13
50/20
just **[44]**

**K**

KATHLEEN **[3]**  2/3 5/11 110/25
keep **[1]**  13/21
kept **[2]**  80/11 82/5
key **[3]**  30/1 31/5 31/24
Kim **[2]**  83/5 86/19
kind **[5]**  12/7 12/10 13/16 56/5
70/1
knew **[2]**  40/2 49/22
KNIGHT **[5]**  2/3 5/7 5/11 104/3
110/25
Knight............04 **[1]**  3/4
Knight.........104 **[1]**  3/5
know **[108]**
knowledge **[10]**  31/22 38/15
44/12 63/22 64/14 70/15 76/16

84/6 94/20 94/21
known **[2]**  55/10 64/18

**L**

L-E-B-O-W-I-T-Z **[1]**  24/5
L-E-D-F-O-R-D **[1]**  68/16
labor **[2]**  106/10 106/18
LAKE **[23]**  1/7 1/13 26/16 27/1
27/12 27/23 45/9 47/3 49/9
49/10 54/21 66/10 66/22 67/1
67/4 67/5 67/9 67/13 69/16
98/11 101/9 110/7 111/3
landlord **[1]**  42/14
Lane **[1]**  51/6
last **[10]**  5/16 24/3 42/23
46/15 53/21 55/6 56/15 66/5
75/3 83/6
late **[1]**  34/7
later **[1]**  13/3
laughing **[1]**  49/2
laundry **[1]**  87/19
law **[1]**  84/22
laws **[1]**  106/18
lawyer **[1]**  54/11
learn **[3]**  11/8 11/19 12/18
lease **[1]**  43/5
leases **[4]**  29/21 33/9 42/18
43/8
least **[2]**  30/1 48/13
leave **[1]**  35/14
Lebowitz **[4]**  24/2 99/24 99/25
100/1
Lebowitz's **[1]**  24/3
led **[1]**  17/13
Ledford **[5]**  68/13 68/16 72/17
72/20 73/10
legal **[7]**  34/22 35/13 36/2
51/14 54/24 72/23 106/9
less **[1]**  13/16
let **[11]**  5/20 5/24 6/17 7/1
7/15 26/17 58/8 66/1 68/12
68/12 76/20
let's **[9]**  14/21 36/3 42/22
47/24 56/21 59/25 66/1 86/15
90/4
letter **[3]**  81/17 84/13 84/17
Letter..............................
3/7
letters **[1]**  32/6
level **[9]**  12/10 78/11 94/17
96/21 97/3 99/1 101/20 106/2
106/2
liability **[12]**  3/14 3/15 54/10
54/14 54/21 56/16 62/14 65/17
65/22 66/22 67/7 67/9
liaison **[1]**  88/12
licencees **[1]**  103/11
license **[7]**  59/15 66/10 66/12
68/11 71/21 72/16 72/22
licensed **[2]**  7/10 69/12
licensee **[9]**  18/16 67/5 69/4
69/12 77/22 77/23 85/3 90/16
106/2
licensee's **[1]**  46/20
licensees **[5]**  18/21 31/18
32/12 32/21 43/6
licenses **[3]**  57/6 59/9 59/12
licensing **[1]**  28/10
like **[22]**  9/1 12/9 15/16 16/11
27/7 40/3 42/2 42/7 48/8 49/6
49/16 51/13 54/16 63/13 68/23
82/3 82/23 83/1 84/22 94/11
94/19 96/23

**L**

limited [6]  3/14 54/10 54/14
54/20 56/16 62/13
Linda [7]  1/23 2/14 108/5
108/14 109/3 109/14 110/24
line [14]  38/25 39/6 39/16
39/19 39/20 40/6 40/10 41/3
41/15 41/19 45/19 100/9
100/10 111/5
lines [2]  91/3 91/10
linked [1]  73/24
List [1]  3/13
listed [5]  32/6 32/21 62/16
67/9 67/13
lists [4]  28/24 56/18 66/25
69/3
little [5]  15/8 21/11 48/5
49/20 103/25
living [1]  18/5
LLC [57]
LLCs [4]  14/5 37/4 44/10 49/15
located [1]  22/18
long [4]  5/24 7/9 49/5 110/17
long-term [1]  7/9
longer [4]  61/7 61/11 84/9
102/11
look [24]  6/10 6/12 28/15
29/25 54/4 59/19 63/2 63/13
66/14 67/19 68/17 69/2 70/8
74/6 81/6 81/12 84/12 90/5
96/19 98/10 98/20 99/4 99/5
99/8
looked [1]  49/6
looking [6]  11/10 27/12 30/23
62/10 66/21 73/6
looks [1]  84/16
loss [6]  25/5 86/25 87/23
87/25 88/4 88/7
losses [1]  95/24
lost [1]  72/3
lot [6]  10/6 12/22 13/5 17/19
54/17 96/16
Ls [1]  95/5
LSU [1]  7/6

**M**

M-U-L-R-Y [1]  55/7
M-Y-L-I-T-A [1]  68/23
Mabry [1]  2/4
madam [1]  68/22
made [4]  48/19 63/17 84/22
93/5
mail [7]  22/21 22/22 22/25
25/1 75/23 76/13 76/15
main [1]  14/11
mainly [1]  22/17
maintaining [1]  41/19
maintenance [3]  20/14 21/2
87/18
major [1]  25/12
make [11]  6/5 14/2 49/7 55/19
56/1 62/8 73/17 84/8 95/7
97/8 110/18
maker [1]  106/24
making [2]  14/8 71/7
manage [5]  14/5 18/4 18/5
30/21 69/12
managed [9]  9/21 9/24 9/25
18/9 79/7 87/8 103/12 103/18
103/18
management [58]
manager [6]  19/10 19/13 19/16
31/1 56/19 56/24
managers [3]  56/18 62/16 83/21
manages [3]  18/13 57/21 58/3
managing [11]  18/20 33/23 34/1
56/21 56/25 62/16 82/8 82/9
83/18 83/20 84/3
Mandy [13]  16/16 17/9 23/24
24/25 25/1 37/14 40/16 53/19
60/14 75/12 91/7 102/17
105/21
many [9]  5/14 9/8 9/19 25/21
58/6 85/8 85/14 85/22 100/20
Marcy [1]  75/20
mark [6]  26/19 28/11 53/25
66/1 69/19 90/9
marked [10]  26/21 28/12 54/1
66/3 66/8 69/23 70/1 80/21
80/24 90/11
MASTER [3]  1/12 1/12 42/12
master's [1]  7/6
materially [1]  84/21
Matt [1]  36/2
matter [1]  26/15
may [13]  14/21 24/19 24/19
25/6 25/20 44/18 54/18 60/25
76/22 79/16 85/4 95/8 100/11
maybe [4]  20/18 36/19 52/5
McHugh [1]  2/4
MDS [2]  88/14 88/15
MDSs [2]  73/24 98/2
me [69]
mean [15]  13/14 15/14 16/11
25/9 27/15 35/15 38/10 39/18
40/23 51/24 52/3 90/20 97/17
100/10 100/12
Meaning [2]  59/14 86/5
measured [1]  95/13
measures [1]  95/12
Medicaid [8]  38/1 43/19 45/10
52/12 52/17 52/19 53/10 94/1
medical [1]  21/8
Medicare [7]  45/10 52/12 87/3
88/9 88/11 94/1 94/4
meet [9]  11/22 12/1 12/8 12/10
14/19 14/21 51/12 94/10
106/15
meet-and-greet [1]  12/10
meeting [9]  12/13 41/1 48/9
49/5 94/11 94/12 94/16 99/18
99/22
meetings [6]  99/12 104/22
104/22 104/25 105/10 105/11
meets [1]  106/10
member [3]  18/20 56/25 62/16
members [1]  69/4
mention [1]  93/16
mentioned [7]  39/4 42/1 44/8
61/5 86/19 93/8 95/24
met [4]  7/1 11/21 14/22 48/6
MF [1]  90/18
might [2]  6/19 93/9
Miller [7]  1/23 2/14 108/5
108/14 109/3 109/14 110/24
mind [5]  7/3 28/21 48/12 49/5
49/11
minute [2]  66/14 103/24
minutes [2]  42/8 90/4
misreading [1]  31/4
Mississippi [2]  8/24 92/9
mistaken [1]  102/15
Mitch [1]  44/15
MITCHELL [7]  1/13 19/18 44/8

57/12 64/5 65/15 102/11
mix [1]  66/19
moment [2]  70/8 73/6
Monday [2]  94/12 94/15
money [8]  45/9 45/12 45/14
46/3 46/7 46/10 46/11 46/18
month [7]  25/5 25/7 25/15 53/8
93/19 93/20 95/19
monthly [13]  23/21 24/10 24/13
24/14 24/22 25/4 93/3 95/15
99/13 99/18 99/22 100/4 100/6
months [3]  17/18 49/8 53/7
more [23]  6/5 10/7 12/6 13/13
13/14 13/16 13/25 21/11 21/12
24/11 36/5 40/5 40/16 40/24
48/8 55/16 87/24 93/12 96/20
96/22 97/4 97/5 103/23
morning [2]  94/12 94/16
MORRISON [5]  2/7 54/25 101/2
101/5 110/11
Morrison...........101 [1]  3/4
most [5]  20/18 22/7 36/10
37/10 77/1
Mostly [1]  87/4
move [1]  51/6
moved [2]  7/20 88/21
moving [1]  56/3
Mr [21]  3/4 14/19 15/11 22/18
22/20 36/21 36/22 54/25 55/6
63/3 63/4 63/10 65/1 75/3
78/22 92/23 101/2 101/5
102/10 104/5 107/3
Mr. [25]  5/10 10/21 12/1 12/3
13/1 15/12 16/7 22/10 24/3
26/23 48/7 49/21 50/9 53/21
65/2 67/23 92/16 99/18 99/21
99/25 100/1 101/7 104/5
106/25 107/3
Mr. Bell [1]  22/10
Mr. Burr's [1]  53/21
Mr. Garnier [1]  106/25
Mr. Ioakim [1]  67/23
Mr. Lebowitz [2]  99/25 100/1
Mr. Lebowitz's [1]  24/3
Mr. Reynolds [2]  49/21 50/9
Mr. Richardson [2]  10/21 16/7
Mr. Robinson [3]  5/10 26/23
101/7
Mr. Schwartzberg [7]  12/1 12/3
13/1 15/12 48/7 99/18 99/21
Mr. Starer [4]  65/2 92/16
104/5 107/3
Ms [6]  3/4 3/5 5/7 46/13
72/20 104/3
Ms. [20]  16/18 25/17 36/6
40/20 41/2 53/14 64/23 65/1
73/10 75/16 76/16 83/8 92/19
104/5 104/5 104/17 104/21
105/20 105/22 107/3
Ms. Foster [1]  76/16
Ms. Garnier [10]  16/18 25/17
40/20 53/14 64/23 104/5
104/17 104/21 105/20 105/22
Ms. Garnier's [2]  41/2 75/16
Ms. Gutzmann [5]  36/6 65/1
92/19 104/5 107/3
Ms. Ledford [1]  73/10
Ms. Warnecke [1]  83/8
much [11]  22/11 25/16 40/4
60/6 65/17 68/5 73/25 82/5
84/14 85/25 97/4
Mulry [1]  55/5
Mulry's [1]  55/6

**M**

multitude [1]  96/14
my [20]  6/18 16/13 16/16
22/17 23/24 24/25 31/22 44/12
47/9 48/8 59/5 59/11 64/14
72/18 84/6 90/5 93/9 96/19
108/10 109/5
Mylita [1]  68/19
myself [2]  5/10 81/19

**N**

name [17]  5/8 7/16 15/18 24/3
42/16 44/5 46/15 49/15 53/21
55/6 57/24 62/15 63/7 74/16
75/3 83/6 85/19
names [1]  90/16
NANCY [2]  1/4 110/4
Nashville [1]  7/25
nature [2]  93/23 98/25
Navigator [34]  34/19 34/20
34/24 35/11 35/23 35/25 36/4
36/9 36/12 38/13 38/14 43/23
44/4 44/17 53/20 55/8 55/10
55/11 55/15 67/25 68/2 68/13
69/8 71/18 74/11 75/8 75/23
75/24 76/14 76/23 77/1 77/3
82/25 90/22
need [13]  5/20 5/23 5/23 5/24
6/12 19/19 26/16 35/5 47/22
76/5 94/20 94/20 103/25
needed [4]  53/17 54/20 74/8
110/15
negative [1]  25/13
negotiate [1]  91/3
negotiated [3]  36/14 43/8 82/3
negotiating [5]  33/7 40/9
40/10 41/19 82/23
negotiations [1]  43/15
never [3]  7/1 32/18 98/17
new [14]  8/16 10/9 14/1 14/2
27/19 27/20 27/21 27/21 27/21
28/4 43/5 51/24 51/25 83/13
next [3]  54/25 66/11 80/12
no [133]
nodding [1]  6/6
NONE [1]  3/23
norm [1]  93/15
normal [1]  93/14
north [3]  9/18 33/11 33/13
not [97]
Notary [3]  1/23 108/6 108/15
notes [1]  109/6
nothing [2]  40/25 93/13
notice [1]  4/10
November [1]  42/23
now [31]  8/9 21/21 22/2 22/12
23/2 23/13 25/7 26/12 29/9
41/2 54/19 56/3 58/5 60/24
68/13 69/10 72/4 74/11 77/19
77/24 82/2 87/3 88/19 91/24
96/15 98/15 100/18 100/19
100/19 101/22 104/4
number [2]  73/11 80/20
Numbers [1]  85/21
nurse [4]  20/12 21/13 21/14
85/7
nurses [5]  26/3 77/20 85/8
89/24 101/15
nursing [50]

**O**

Oak [1]  51/6
oath [2]  5/4 108/1

Oath..........................15/23
3/6
Object [5]  27/24 44/18 50/24
66/5 73/2
objections [1]  4/7
obligations [2]  8/21 9/12
obviously [3]  13/7 22/2 22/23
occur [1]  42/21
occurred [3]  11/1 40/1 104/15
occurring [1]  37/20
October [1]  56/14
off [4]  63/16 63/17 69/13
91/4
Off-the-record [1]  63/17
office [35]  9/14 9/16 9/17
15/4 21/4 21/5 21/7 25/18
34/11 34/18 36/9 37/10 37/13
37/15 38/7 38/16 44/25 45/7
50/10 51/2 51/9 60/3 60/5
60/6 60/8 60/14 82/20 86/24
87/4 87/6 87/7 87/8 87/12
87/12 87/14
officer [24]  8/11 17/3 17/7
17/9 19/10 19/12 19/15 22/6
29/1 31/6 44/10 44/11 60/17
60/22 75/18 91/7 92/17 92/20
101/22 101/25 102/3 102/19
104/10 104/17
officers [15]  16/17 28/25 57/9
57/10 64/3 64/7 64/21 64/22
65/1 65/13 69/5 92/25 102/6
102/11 104/6
Officers.........28 [1]  3/13
offices [1]  33/17
official [1]  108/10
often [2]  24/9 97/15
Oh [6]  5/17 23/3 44/12 44/14
51/25 86/24
okay [270]
old [2]  27/10 27/12
once [19]  17/8 17/14 17/15
17/17 21/21 22/3 22/12 23/13
33/19 34/6 34/14 40/6 51/10
51/11 82/9 88/19 89/15 99/8
110/21
one [33]  2/4 12/7 13/11 14/4
14/11 20/12 20/16 24/8 27/3
29/5 29/11 29/22 30/11 32/6
32/25 35/6 35/8 41/25 47/24
50/20 54/19 58/3 58/13 70/12
72/22 75/15 85/20 91/18 92/1
95/14 99/12 100/9 100/10
ones [3]  7/23 9/25 88/21
only [1]  110/18
open [1]  74/6
operate [1]  61/25
operating [3]  8/11 22/6 64/13
operation [2]  85/12 87/15
operations [48]
operations' [1]  73/14
operator [4]  27/15 27/21 27/22
28/4
operators [1]  29/11
order [1]  66/18
ordering [2]  110/21 110/21
organization [3]  10/11 18/7
25/23
original [4]  4/11 17/18 110/19
110/20
originally [2]  9/25 51/3
Orlando [1]  7/20
OSHA [1]  88/8
other [31]  8/25 9/25 15/13

1/08 [16] /6 16/9 18/8 18/8
18/9 19/1 21/5 34/10 34/16
35/10 48/16 54/19 64/22 69/12
78/10 87/5 87/11 87/14 91/16
96/11 101/1 102/10 104/10
105/25 106/1 106/24 107/16
others [1]  51/21
otherwise [1]  110/15
our [11]  5/22 10/11 37/10
44/25 53/19 73/14 74/23 75/24
82/20 88/12 100/4
ours [1]  59/16
out [27]  6/16 7/15 7/18 7/24
7/25 8/2 12/8 12/8 12/15
12/19 15/7 15/13 15/15 23/6
23/11 27/3 35/14 38/15 45/7
45/14 46/19 48/17 59/19 60/8
61/25 93/15 99/13
outside [3]  92/6 92/13 93/14
over [15]  9/6 9/24 10/7 14/14
28/21 30/1 38/2 60/14 76/23
81/10 83/25 88/22 89/16 94/15
94/22
overall [2]  24/16 93/19
oversaw [6]  8/23 9/13 9/15
86/24 87/6 88/11
oversee [1]  18/2
overseeing [1]  20/6
oversight [1]  58/14
own [5]  18/21 29/19 59/11
75/24 99/11
owned [3]  32/20 34/1 63/20
owner [8]  19/10 19/12 27/20
27/21 29/1 31/5 31/6 32/12
owners [4]  3/13 28/25 29/11
63/25
ownership [18]  26/10 26/14
27/1 27/11 27/11 27/19 27/19
37/18 37/18 37/20 38/3 43/5
52/13 52/18 53/3 56/10 69/4
84/4
ownerships [1]  28/4
owns [7]  18/24 19/1 28/9 29/20
31/18 56/22 103/11

**P**

P.A [3]  2/4 2/8 110/12
p.m [4]  1/19 90/7 90/8 107/19
package [1]  82/4
packages [1]  82/2
page [22]  3/10 3/22 26/24
28/19 31/24 32/13 56/2 56/15
62/15 63/3 66/21 67/19 68/10
68/18 69/3 69/10 70/20 81/6
81/12 81/18 84/12 111/5
pages [7]  27/2 27/3 69/2 72/3
105/9 110/17 111/23
paid [1]  105/12
Palafox [6]  9/18 33/11 33/13
45/7 62/2 87/12
Palm [2]  2/9 110/13
paperwork [1]  90/5
paralegal [3]  49/23 50/8 68/20
parent [2]  15/23 16/2
part [17]  9/19 25/24 27/22
29/9 29/12 30/12 34/12 41/6
41/8 55/20 58/17 79/14 79/18
79/23 88/4 93/5 93/11
part-time [1]  25/24
participate [2]  24/21 33/7
particular [6]  20/4 52/9 70/11
77/12 89/9 98/7
parties [3]  4/5 109/7 110/21

**P**

parties' [1] 109/8
parts [1] 82/15
party [2] 46/10 110/21
pass [1] 15/15
past [2] 68/8 93/22
patient [1] 85/6
Pavilion [2] 31/6 31/17
pay [3] 45/11 46/7 94/2
paying [3] 44/23 46/5 46/21
payment [1] 105/16
payor [1] 93/24
payors [1] 75/7
payroll [3] 21/6 60/10 60/12
penalties [1] 111/22
PENSACOLA [32] 1/11 1/11 1/21
1/25 2/16 7/19 8/1 8/2 9/14
59/23 60/1 60/25 61/3 61/10
61/15 61/22 61/24 62/1 62/12
62/16 62/24 64/7 64/12 104/12
104/13 104/18 104/18 105/3
105/6 107/8 107/10 110/19
people [12] 9/15 22/16 23/11
29/5 35/7 38/7 40/14 60/7
74/4 82/5 82/20 97/4
percent [9] 18/21 18/24 19/1
29/19 29/20 32/11 32/12 56/22
63/20
perform [1] 49/24
performance [5] 96/1 96/2 99/5
99/6 100/7
performed [1] 45/7
performing [1] 93/21
period [1] 52/19
perjury [1] 111/22
person [7] 9/1 53/14 68/18
91/9 94/13 94/14 105/22
Personal [1] 1/4 110/4
personally [2] 96/12 108/7
pertain [1] 103/15
Pharmacy [1] 35/20
phone [2] 22/21 73/17
phonetic [2] 7/19 96/16
physical [1] 87/19
physically [1] 60/7
picking [1] 62/9
piece [2] 33/25 93/12
place [6] 1/20 18/13 41/3
41/16 50/12 71/1
PLACID [23] 1/7 1/13 26/16
27/1 27/12 27/23 45/10 47/3
49/9 49/10 54/21 66/10 66/22
67/1 67/4 67/5 67/10 67/13
69/16 98/11 101/9 110/7 111/3
Plains [15] 12/2 15/4 15/7
15/13 22/19 36/9 38/7 38/16
49/23 50/10 51/2 51/9 55/3
93/4 99/23
Plaintiff [4] 1/5 1/17 2/2
110/5
PLAINTIFF'S [8] 3/9 26/21
28/12 54/1 66/3 69/23 80/21
90/11
planned [1] 26/6
planning [1] 51/16
plans [4] 82/9 82/9 82/18
82/23
plant [1] 87/19
play [2] 37/3 49/14
please [14] 5/8 5/20 6/11 24/3
26/20 28/15 29/14 46/15 46/16
53/25 66/14 110/16 110/17

110/18
plus [2] 27/2 27/6
point [15] 6/1 6/11 6/15 12/4
12/25 13/10 17/2 39/15 45/15
46/18 46/19 48/12 55/23 61/6
72/9
PointClickCare [3] 74/22 96/18
97/24
policies [7] 77/12 80/2 80/3
80/11 80/14 84/19 85/2
policy [1] 85/5
portion [1] 93/18
position [3] 10/10 16/8 78/25
positions [1] 86/20
potential [2] 26/6 51/15
potentially [1] 11/11
PPD [1] 52/12
prepared [4] 38/5 59/21 72/21
72/22
prepares [2] 72/18 72/18
preparing [1] 68/10
PRESENT [1] 2/10
president [41]
president/CEO [1] 11/14
presidents [2] 9/3 9/3
pretty [8] 20/19 25/16 60/6
73/25 82/5 85/25 86/5 96/19
previous [2] 27/15 95/19
previously [2] 33/13 83/20
pricing [1] 35/16
Prieto [2] 2/8 110/12
print [2] 98/3 98/6
prior [18] 14/19 16/18 16/23
19/20 21/18 22/5 37/19 64/25
84/2 86/11 86/15 88/23 92/11
96/22 98/22 99/4 100/4 107/2
private [3] 45/11 94/2 94/3
probably [11] 6/1 7/8 12/21
14/10 20/19 21/9 36/17 49/13
50/1 53/16 71/8
problem [1] 47/25
problems [1] 32/7
procedures [7] 77/12 80/2 80/4
80/11 80/14 84/19 85/2
Professional [4] 1/23 108/5
108/14 109/15
profit [1] 25/4
profits [1] 95/24
project [1] 38/1
projected [2] 38/6 95/21
promote [1] 10/19
promoted [2] 10/6 10/13
properties [6] 7/24 42/23
42/24 42/25 43/6 83/19
proposed [4] 27/11 27/19 38/1
38/5
provide [11] 19/24 33/20 34/3
34/11 34/24 38/18 79/4 79/6
92/6 92/13 105/13
provided [4] 27/3 61/15 61/16
62/11
provider [2] 69/12 88/13
provides [3] 35/11 44/17 77/3
providing [2] 34/17 90/23
public [4] 1/23 56/13 108/6
108/15
pull [3] 6/19 26/18 27/6
purchase [5] 12/16 52/1 52/3
68/6 80/4
purchasing [5] 34/21 35/13
35/15 35/16 51/14
purports [2] 27/10 70/3
purpose [1] 4/6

purposes [5] 19/9 61/12 62/23
65/9 110/15
put [3] 25/18 42/16 45/23

**Q**

qualified [1] 82/3
quality [5] 93/6 95/12 97/1
98/1 98/10
quarter [2] 51/10 51/11
query [2] 97/15 97/17
question [14] 4/7 5/21 6/1 6/3
6/7 15/9 37/2 41/17 42/6
48/25 66/6 92/19 92/23 105/3
questions [9] 6/15 26/17 28/16
47/20 55/16 66/15 101/1
103/21 107/16
Quintairos [2] 2/8 110/12
Quit [1] 49/1

**R**

ranking [1] 95/11
rate [2] 52/19 52/23
rates [5] 52/12 53/1 53/2 53/9
53/18
rather [2] 26/13 48/9
ratings [2] 95/4 95/8
Ray [1] 55/5
RE [2] 110/9 111/3
reach [1] 85/3
read [4] 107/17 110/16 110/17
111/22
reading [2] 4/9 110/14
readjust [1] 53/1
ready [3] 6/13 47/23 66/17
real [6] 12/12 48/13 74/25
93/21 97/3 100/9
realize [1] 47/19
realized [1] 49/5
really [6] 10/9 10/16 12/5
13/13 87/5 98/23
reason [4] 23/9 72/24 73/8
111/5
reasons [1] 61/13
recall [6] 49/4 53/2 68/14
83/14 84/17 91/5
receivables [1] 73/25
receive [2] 95/16 96/12
received [2] 66/18 110/21
recess [2] 48/1 90/6
recognize [5] 27/7 63/3 70/7
70/10 80/24
record [3] 63/16 63/17 109/5
records [3] 6/24 21/8 50/6
Red [1] 51/6
Redirect [2] 3/5 104/2
reference [2] 91/12 91/24
referenced [1] 110/14
regardless [1] 32/19
region [1] 86/16
regional [15] 7/23 9/1 9/2 9/3
20/6 20/9 20/14 21/13 78/6
78/11 78/16 78/19 85/8 85/11
89/24
regions [5] 20/11 85/17 85/19
85/22 86/1
regular [4] 24/8 89/2 94/11
94/12
regulations [1] 52/17
regulatory [1] 34/22
Rehab [1] 51/19
reimbursement [6] 34/22 35/13
43/25 44/1 51/14 53/20
Reinvestment [2] 43/1 43/2

## R

**REIT [1]** 42/25
**relate [1]** 14/4
**related [10]** 18/22 20/4 27/23
30/19 31/14 31/17 59/1 77/4
79/11 79/12
**relates [2]** 31/25 32/1
**relationship [6]** 15/12 30/6
30/8 30/15 57/19 58/1
**relationships [1]** 35/14
**relative [2]** 109/7 109/8
**releases [1]** 33/8
**rely [1]** 72/15
**remain [1]** 17/7
**remained [1]** 57/14
**Remember [1]** 17/17
**repair [1]** 25/12
**rephrase [2]** 50/18 73/5
**replace [1]** 86/8
**replaced [1]** 104/5
**report [27]** 11/1 22/17 23/14
23/14 23/16 24/20 25/14 37/6
37/15 40/21 40/22 53/11 60/12
72/25 86/22 87/5 88/23 89/1
93/18 96/5 97/16 98/3 98/6
99/17 100/3 100/5 109/4
**reported [2]** 1/22 73/20
**reporter [9]** 1/23 2/13 5/3
68/22 108/6 108/14 109/1
109/3 109/15
**Reporter........................**
3/6

**reporting [7]** 1/20 1/24 2/15
22/2 60/15 93/11 110/19
**reports [17]** 38/1 38/6 43/19
53/5 86/14 88/20 94/11 94/25
95/3 95/4 96/11 96/14 96/17
97/9 97/14 98/23 99/14
**representative [6]** 1/4 23/22
23/25 58/10 59/21 110/4
**representing [1]** 30/12
**requested [2]** 66/9 109/5
**require [2]** 27/5 41/14
**requirements [2]** 75/14 76/3
**reserved [1]** 4/8
**resident [2]** 73/12 73/12
**resident's [1]** 74/1
**resources [4]** 83/3 83/4 86/21
86/22
**respects [1]** 16/12
**response [1]** 45/20
**responsibilities [5]** 17/25
20/1 74/15 76/4 87/11
**responsibility [1]** 41/2
**responsible [2]** 41/15 43/18
**restructure [1]** 21/24
**restructuring [2]** 16/9 16/14
**results [2]** 95/13 99/16
**retain [1]** 86/7
**Retirement [1]** 31/7
**revenue [1]** 25/4
**revenues [1]** 46/8
**review [3]** 3/7 99/14 109/4
**reviewing [1]** 43/19
**revolving [4]** 38/25 39/6 39/16
39/18
**rewriting [1]** 84/17
**Reynolds [3]** 49/19 49/21 50/9
**Richardson [3]** 10/20 10/21
16/7
**right [24]** 7/1 21/20 22/4
25/19 29/6 30/23 30/25 36/22

54/19 55/18 66/17 67/5 69/22
70/5 74/20 76/22 77/7 79/3
81/10 82/1 83/25 101/1 101/24
103/3
**risk [2]** 87/20 87/24
**RN [1]** 95/13
**RNs [3]** 106/6 106/12 106/13
**ROBINSON [13]** 1/16 3/3 5/2 5/9
5/10 26/23 101/7 108/7 109/4
110/9 110/17 111/2 111/25
**role [9]** 9/5 11/16 11/18 13/6
37/3 44/9 49/14 50/22 60/20
**rolled [1]** 61/8
**roof [1]** 25/12
**room [1]** 86/25
**ROTH [22]** 1/13 14/10 14/19
16/14 19/17 22/12 22/14 22/18 22/20
36/21 36/22 57/12 64/5 65/1
65/15 78/15 78/22 81/20 88/24
92/23 102/10 104/6 107/3
**Roth's [4]** 15/11 63/3 63/4
63/10
**Rouge [1]** 7/6
**routing [1]** 46/25
**RUG [3]** 94/4 96/17 96/25
**rules [1]** 52/17
**run [1]** 97/25
**running [2]** 35/24 97/15

## S

**S-N-F [1]** 78/4
**safety [3]** 88/3 88/8 95/5
**said [9]** 13/10 17/15 28/9
29/18 40/4 42/8 54/16 72/17
93/10
**salaried [1]** 106/3
**salary [1]** 106/9
**sale [29]** 12/19 13/2 17/14
17/17 19/21 22/3 22/5 22/12
22/23 23/1 29/9 31/20 31/21
33/19 34/6 34/9 34/12 34/14
34/25 40/1 48/14 50/16 52/1
52/3 52/7 52/12 61/8 83/23
84/9
**same [20]** 21/22 23/2 25/14
29/5 43/6 56/2 62/10 62/15
75/23 76/7 76/13 80/1 82/5
84/13 84/16 88/21 92/19 92/23
99/17 105/3
**sanity [1]** 35/6
**save [1]** 4/7
**saw [1]** 63/11
**say [25]** 11/12 13/23 20/17
20/23 25/8 29/14 31/23 31/25
34/13 45/4 47/14 48/10 50/3
52/2 54/19 57/22 65/24 67/11
79/13 80/9 80/15 82/21 87/7
102/6 106/12
**says [6]** 27/12 32/19 69/11
73/7 75/18 81/7
**says December [1]** 81/7
**Schwartzberg [16]** 11/23 12/1
12/3 13/1 15/12 15/18 16/1
24/7 48/7 77/4 79/15 79/19
79/21 79/23 99/18 99/21
**scores [1]** 96/25
**Scott [1]** 11/13
**screening [1]** 75/14
**seal [1]** 108/10
**search [1]** 97/25
**seasonal [1]** 93/22
**second [5]** 28/22 76/20 81/12
81/18 84/12

**section [3]** 72/4 72/5 81/25
**see [20]** 7/16 14/21 27/5 28/24
29/4 29/7 31/8 36/3 42/22
56/16 56/21 57/23 59/25 62/14
67/1 68/12 69/3 81/5 95/9
96/1
**Seeing [1]** 93/20
**seems [1]** 6/5
**seen [10]** 19/5 28/19 32/18
33/4 54/11 63/7 70/11 70/12
70/13 91/24
**self [2]** 21/2 21/3
**self-explanatory [2]** 21/2 21/3
**selling [2]** 11/11 13/11
**send [2]** 100/3 100/5
**sending [1]** 100/3
**sends [1]** 24/24
**sense [1]** 6/5
**sent [2]** 24/21 110/10
**separate [7]** 28/3 28/4 47/7
47/10 71/13 92/3 96/5
**serious [4]** 48/18 48/22 49/6
49/12
**server [3]** 75/23 76/8 76/11
**services [57]**
**set [1]** 94/21
**settles [1]** 52/24
**seven [3]** 8/23 72/3 90/10
**seventy [2]** 8/5 8/5
**several [4]** 7/8 44/10 68/9
75/15
**SF [7]** 1/7 49/10 54/21 67/1
67/4 110/7 111/3
**SFs [1]** 90/18
**share [1]** 6/24
**she [40]**
**she's [6]** 36/5 40/19 41/6 42/1
48/24 87/2
**Sheet [5]** 3/7 110/18 110/19
110/21 111/1
**short [1]** 56/11
**shot [1]** 24/5
**should [2]** 83/5 90/9
**shouldn't [1]** 71/8
**show [1]** 27/10
**showed [1]** 58/19
**sides [1]** 13/12
**sign [4]** 42/18 54/17 71/2 91/3
**signature [10]** 63/3 63/4 63/8
63/9 63/11 63/13 72/7 72/19
75/16 81/13
**signed [5]** 36/16 36/17 71/2
71/5 110/19
**significance [6]** 24/18 25/6
25/8 90/15 90/21 94/18
**signing [3]** 4/9 72/12 110/14
**similar [1]** 59/3
**since [26]** 22/23 23/5 31/20
31/20 42/19 42/22 51/18 54/12
54/22 57/14 64/21 70/18 70/24
71/2 71/10 78/7 82/12 83/9
86/1 86/5 86/15 90/23 92/16
92/19 96/16 106/23
**singularly [1]** 41/7
**sir [18]** 5/8 8/10 27/16 28/14
29/15 44/24 50/19 54/3 56/12
60/2 63/18 66/7 67/12 78/13
80/8 86/18 90/13 98/13
**sit [2]** 32/15 40/25
**sitting [2]** 54/25 97/13
**situation [1]** 13/20
**six [8]** 20/11 72/3 72/3 80/20
85/10 85/16 85/17 86/1

**S**

**sixty [1]** 9/15
**skilled [3]** 18/4 18/10 78/4
**SKOURELLOS [1]** 2/11
**small [2]** 7/15 7/17
**SNF [4]** 18/17 18/21 77/23
78/1
**so [100]**
**software [2]** 74/21 74/24
**sold [11]** 8/6 8/7 8/15 8/16
17/14 17/15 29/11 42/23 42/24
43/2 83/21
**solid [1]** 95/20
**some [29]** 6/1 6/11 6/15 8/25
12/25 13/10 14/23 16/12 17/23
23/9 28/16 38/7 40/3 42/15
45/15 46/10 55/18 61/6 66/15
73/19 75/25 90/18 90/18 93/10
93/20 93/21 94/20 106/8
106/20
**somebody [7]** 14/2 23/9 38/15
50/12 50/13 55/3 97/14
**somehow [1]** 46/4
**someone [5]** 13/10 43/12 53/17
55/2 99/22
**something [15]** 6/17 6/19 9/15
13/18 40/20 50/1 50/3 51/24
63/11 84/22 89/4 93/14 93/15
99/11 103/25
**Sometimes [1]** 101/2
**sorry [9]** 11/6 16/19 32/11
71/23 78/5 78/16 99/20 103/2
106/12
**sort [5]** 5/19 14/5 34/12 35/18
50/6
**sounds [3]** 16/11 68/17 68/23
**Source [2]** 39/7 40/2
**South [5]** 1/20 1/25 2/15 51/3
110/19
**Southern [1]** 7/4
**speaking [3]** 38/24 38/25 80/1
**specialist [1]** 53/20
**specific [4]** 13/25 98/20
101/16 101/19
**specifically [1]** 80/1
**specifics [1]** 48/9
**specified [1]** 110/15
**spell [6]** 24/3 46/15 53/21
55/6 75/3 83/6
**spelled [1]** 23/6
**spend [1]** 52/25
**split [2]** 9/21 88/2
**spoke [1]** 77/19
**stable [1]** 86/5
**staff [1]** 13/21
**staffing [1]** 95/13
**stamp [1]** 67/20
**standpoint [1]** 16/10
**star [3]** 95/4 95/8 95/14
**STARER [11]** 1/13 19/18 44/8
57/13 64/6 65/2 65/16 92/16
102/11 104/5 107/3
**start [3]** 19/21 35/8 80/6
**started [6]** 5/11 7/15 14/1
14/2 90/24 102/22
**starting [2]** 81/3 100/19
**state [19]** 1/2 1/23 7/12 26/25
30/2 37/19 43/20 50/6 56/13
62/12 66/11 66/19 72/25 92/7
92/14 108/2 108/6 108/15
110/2
**stated [1]** 111/23

**States [1]** 95/14
**status [2]** 24/16 25/4
**stay [1]** 33/16
**staying [1]** 13/12
**STEIN [4]** 1/3 26/15 110/3
111/3
**stenographic [1]** 109/6
**stenographically [1]** 109/4
**step [1]** 13/6
**Steve [4]** 24/2 24/7 24/9 99/24
**still [9]** 10/21 12/7 33/22
33/25 34/1 50/10 61/12 97/3
99/10
**stipulated [1]** 4/4
**STIPULATION [1]** 4/2
**stop [1]** 5/21
**strategic [3]** 10/8 51/16 96/20
**Street [4]** 1/20 1/25 2/15
110/19
**strike [4]** 20/5 31/16 34/24
104/22
**structure [18]** 13/23 26/7 26/9
26/10 26/11 27/11 27/11 27/13
50/16 50/19 50/22 79/15 79/24
93/13 94/21 106/9 106/11
106/20
**structured [1]** 30/17
**structures [3]** 58/19 59/1 59/2
**stuff [1]** 50/8
**style [2]** 70/12 84/24
**sub [1]** 42/14
**subleases [2]** 33/9 42/19
**substantially [2]** 86/3 86/4
**such [4]** 25/11 44/23 98/2
100/9
**Suite [3]** 2/4 2/8 110/12
**summaries [2]** 93/6 98/24
**summarized [1]** 98/24
**summary [2]** 98/3 98/6
**Summary..........................**
3/12
**Sunbiz [1]** 56/3
**Suntrust [1]** 100/23
**supervision [2]** 7/7 106/21
**supervisor [1]** 11/1
**supervisors [2]** 87/5 106/14
**suppose [3]** 15/23 16/4 63/5
**sure [32]** 5/18 11/17 14/22
28/23 31/13 35/24 37/11 38/8
38/13 39/3 39/18 40/3 40/12
46/8 50/13 53/7 55/19 56/1
60/15 61/4 63/6 71/11 76/21
76/22 83/16 84/8 84/14 87/1
95/7 97/17 100/2 100/24
**survey [2]** 95/4 95/12
**surveys [1]** 25/13
**sweeping [2]** 46/9 46/10
**swept [2]** 45/14 46/19
**switch [1]** 77/7
**sworn [2]** 5/3 108/8
**system [8]** 73/17 74/3 74/13
74/16 74/24 75/9 95/11 97/11

**T**

**take [17]** 5/22 6/11 19/19 24/5
28/15 28/15 29/25 47/24 48/4
48/17 55/18 66/14 70/7 76/21
89/16 90/4 104/1
**taken [7]** 1/17 1/19 4/5 48/1
68/3 90/6 110/9
**takes [1]** 67/16
**taking [1]** 24/17
**talk [12]** 7/2 11/15 13/1 19/20

24/14 35/6 36/1 36/2 51/15
52/6 53/14 77/11
**talked [6]** 5/18 11/17 14/25
78/25 91/18 101/7
**talking [10]** 50/4 51/3 51/23
52/8 57/24 58/20 64/15 97/9
97/11 106/16
**Tampa [1]** 2/5
**tax [4]** 19/8 61/12 62/23 65/8
**taxed [1]** 37/4
**taxes [2]** 37/6 37/8
**technically [1]** 9/23
**telephone [1]** 93/3
**telephonic [1]** 94/13
**tell [32]** 5/8 5/23 5/23 6/2
7/2 12/3 16/11 17/24 19/22
20/1 20/4 20/8 25/8 29/16
30/14 30/18 31/4 35/10 38/10
40/23 45/18 46/2 53/6 63/6
66/9 66/17 73/21 76/24 82/16
82/17 86/20 100/10
**telling [7]** 32/10 46/3 47/2
71/4 74/5 76/7 84/7
**tells [1]** 30/1
**ten [2]** 5/17 42/8
**TENANT [3]** 1/12 1/12 42/12
**TENTH [2]** 1/1 110/1
**tenure [1]** 39/15
**TERESA [3]** 1/3 110/3 111/3
**term [7]** 7/9
**testified [4]** 5/4 61/5 102/14
103/10
**testifying [1]** 59/2
**testimony [2]** 103/15 103/24
**than [19]** 15/13 16/7 18/9 21/5
24/12 26/13 34/10 34/16 35/10
40/17 48/9 53/16 64/22 69/12
78/11 87/14 97/5 105/25
106/25
**Thank [6] [1]** 3/10 8/18 33/7 53/24
56/9 67/23 83/8
**that [416]**
**that we [1]** 29/23
**that's [48]**
**the documents [1]** 50/4
**the GCH [1]** 19/3
**their [11]** 24/16 25/11 37/6
43/2 52/21 74/9 74/14 75/25
89/5 89/11 89/13
**them [32]** 6/24 9/2 9/24 11/21
20/18 20/18 26/18 33/23 36/10
45/4 49/15 54/11 58/11 60/4
66/18 66/19 70/11 72/18 72/18
75/15 79/19 80/4 80/5 80/14
82/3 83/21 84/5 90/18 90/21
91/4 97/6 99/14
**then [42]**
**therapy [4]** 87/3 87/4 88/9
88/12
**there [82]**
**there's [12]** 29/6 53/4 63/8
67/20 68/9 73/7 74/22 75/15
84/21 93/14 94/21 96/14
**these [8]** 48/7 52/6 57/23 60/7
66/18 68/11 72/12 102/19
**they [67]**
**they'd [2]** 11/18 106/15
**they're [14]** 11/10 12/22 18/17
21/6 34/21 40/25 43/19 47/10
56/21 79/12 96/17 96/18 100/3
100/17
**they've [1]** 86/5
**thing [8]** 12/7 12/10 14/6

**T**

thing... **[5]** 35/18 49/12 50/7
50/20 106/22
things **[9]** 25/13 35/8 54/18
93/22 96/16 96/17 96/23 98/25
101/7
things of **[1]** 98/25
think **[39]**
think because **[1]** 53/4
thinking **[1]** 60/25
third **[1]** 46/10
this **[66]**
those **[38]**
though **[2]** 22/11 97/15
thousand **[2]** 59/25 86/17
three **[11]** 8/1 18/7 18/9 28/3
28/4 28/24 29/11 69/2 85/20
102/12 102/19
through **[31]** 1/4 12/20 12/21
17/17 22/3 22/12 33/19 34/7
34/14 48/14 50/16 54/18 55/18
66/14 70/8 73/14 73/14 73/17
73/24 74/3 74/14 75/8 84/9
85/4 85/5 85/6 90/5 97/11
109/5 110/4 111/23
till **[1]** 8/9
time **[51]**
times **[3]** 5/14 52/6 53/5
timing **[1]** 53/12
title **[5]** 14/13 16/19 17/5
21/13 87/2
to get **[1]** 97/23
today **[3]** 58/17 59/22 70/2
Todd **[3]** 49/18 67/21 75/21
together **[2]** 4/10 25/18
told **[6]** 11/10 48/5 63/20
88/16 91/2 99/21
too **[5]** 35/5 35/7 47/21 52/5
82/10
took **[6]** 9/24 14/14 38/16
50/12 68/10 80/13 81/10 83/25
88/22
top **[3]** 35/6 67/19 70/20
training **[1]** 7/10
transaction **[1]** 17/19
transcribed **[1]** 110/15
transcript **[7]** 3/1 109/4 109/5
110/14 110/17 110/18 110/22
transfer **[2]** 33/8 83/18
transition **[3]** 9/13 13/6 59/4
transitioning **[1]** 10/7
transpired **[1]** 17/12
treasurer **[1]** 71/3
trend **[1]** 95/18
trending **[4]** 93/19 97/2 97/8
97/19
trends **[1]** 98/11
Trey **[1]** 36/3
trial **[3]** 4/8 55/25 110/15
true **[7]** 31/19 31/20 57/14
61/6 107/5 109/5 111/23
truthfully **[1]** 47/20
try **[3]** 35/5 45/25 49/7
trying **[12]** 6/19 14/22 32/8
33/5 47/19 47/19 48/16 51/25
51/25 86/25 97/8 106/9
Tuesday **[1]** 1/19
turn **[1]** 56/15
turned **[1]** 10/6
twice **[2]** 5/15 72/4
two **[10]** 10/15 32/25 33/1 33/3
33/3 33/6 59/25 85/20 86/16

**U**

Uh **[1]** 80/7
ultimately **[1]** 46/2
Um **[5]** 16/4 35/24 40/2 87/22
100/8
under **[14]** 20/12 20/16 21/3
21/9 27/21 28/4 74/17 75/5
87/22 87/25 88/7 88/16 88/21
111/22
understand **[16]** 30/11 31/15
34/23 46/24 47/15 47/20 55/19
57/5 57/18 64/25 71/4 76/6
84/8 91/12 101/11 104/4
understanding **[13]** 15/3 15/6
15/11 15/22 30/6 32/10 32/20
56/23 58/1 59/11 79/22 103/11
103/15
understood **[4]** 6/8 13/5 32/9
54/12
United **[1]** 95/14
University **[1]** 7/5
unless **[2]** 70/25 110/15
until **[9]** 9/23 10/2 10/14
17/19 34/1 37/1 44/13 48/24
78/24
unusual **[1]** 35/9
up **[15]** 6/19 17/18 26/18 27/6
32/8 33/5 46/3 46/20 51/11
52/18 55/23 58/19 66/19 90/10
93/16
update **[1]** 84/22
upon **[1]** 3/7
us **[8]** 5/8 23/23 24/4 46/16
53/22 70/2 83/6 95/10
use **[3]** 74/21 74/22 94/23
used **[3]** 55/23 60/4 80/2
using **[1]** 49/9
usually **[5]** 22/20 24/12 89/9
95/19 97/7
utilized **[1]** 77/13

**V**

various **[4]** 37/4 51/12 65/18
73/23
vendors **[1]** 45/3
verbal **[1]** 45/20
verify **[1]** 101/6
versus **[8]** 30/3 30/4 94/1 94/2
95/22 96/2 99/5 100/6
very **[11]** 12/23 40/4 49/20
56/15 59/3 66/11 66/21 68/18
81/6 101/6 101/6
via **[1]** 73/22
vice **[13]** 7/24 8/4 8/15 9/3
10/5 10/10 10/23 10/24 16/8
20/3 88/22 89/16 99/15
vice-president **[12]** 7/24 8/4
8/15 10/5 10/10 10/23 10/24
16/8 20/3 88/22 89/16 99/15
vice-presidents **[1]** 9/3
visionary **[1]** 10/8
visit **[1]** 13/4
visits **[2]** 22/21
VP **[3]** 9/4 20/5 86/9
VPs **[1]** 85/11

**W**

W-A-R-N-E-C-K-E **[1]** 83/7
wait **[2]** 37/1 48/24

waived **[1]** 4/10
walk **[1]** 28/21
want **[18]** 6/20 19/20 27/5 48/4
55/18 63/10 63/18 71/9 72/2
77/7 77/8 77/11 80/9 84/8
90/5 94/9 95/7 101/6
wanted **[3]** 13/18 56/1 97/18
Warnecke **[4]** 83/5 83/7 83/8
86/19
was **[208]**
wasn't **[15]** 12/9 13/4 13/15
13/15 13/19 16/13 34/5 37/22
40/4 58/13 59/20 72/23 95/7
98/25 102/15
way **[12]** 6/3 6/21 12/23 29/15
42/11 53/10 54/19 58/9 58/22
74/18 79/11 99/2
ways **[1]** 33/4
we **[69]**
we'll **[4]** 5/21 5/22 59/19
59/19
we're **[23]** 6/10 10/8 13/11
13/11 13/17 24/17 26/15 32/7
35/4 51/15 56/2 56/3 58/18
62/15 66/7 73/24 74/17 79/18
81/21 94/22 97/5 97/6 97/8
we've **[7]** 7/1 23/4 51/3 64/15
91/18 97/11 102/20
weeds **[2]** 96/16 99/2
week **[2]** 94/18 94/19
welcome **[1]** 81/17
well **[39]**
went **[11]** 7/17 11/21 12/21
17/17 22/3 22/12 33/19 34/6
34/14 50/16 84/9
were **[84]**
West **[2]** 2/9 110/13
what **[116]**
what's **[9]** 9/17 13/17 15/22
16/19 18/19 38/2 66/8 69/25
80/23
whatever **[7]** 6/12 76/3 79/19
85/4 106/8 106/10 106/20
when **[61]**
whenever **[2]** 12/23 89/13
where **[14]** 10/8 12/1 13/1 21/8
22/18 41/1 46/6 46/25 69/3
72/4 73/10 80/12 83/18 94/17
Whereupon **[4]** 5/1 48/1 90/6
107/18
whether **[15]** 31/19 32/15 46/18
47/6 47/9 48/17 48/22 50/9
58/13 71/10 71/12 76/11 76/13
77/2 86/7
which **[14]** 7/9 14/5 20/10 30/3
41/13 42/24 48/2 49/15 58/20
64/16 71/8 71/20 82/16 90/7
White **[15]** 12/2 15/4 15/7
15/13 22/19 36/9 38/7 38/16
49/22 50/10 51/2 51/8 55/3
93/4 99/22
who **[83]**
who's **[7]** 11/12 14/5 17/16
23/23 35/24 75/1 83/4
whoever **[3]** 45/19 82/6 82/8
whole **[5]** 13/5 25/23 27/5
84/24 95/14
whom **[2]** 45/17 88/23
whose **[1]** 15/15
why **[7]** 5/23 20/8 29/15 52/15
52/16 58/20 69/13
wide **[1]** 74/6
Wilkes **[1]** 2/4

## W

**will [13]**   6/1 6/11 17/23 24/5
45/25 48/8 59/2 66/9 66/17
80/20 99/13 107/17 110/21
**within [5]**   18/7 20/15 49/8
94/4 110/14
**without [2]**   59/2 98/9
**witness [14]**   1/22 3/2 3/7 5/1
5/5 6/6 28/18 66/16 70/9 72/6
108/10 110/10 110/17 111/2
**wondering [2]**   42/2 73/8
**Wood [2]**   2/8 110/12
**word [2]**   48/8 81/15
**words [7]**   32/25 33/1 33/3 33/3
33/6 93/9 102/10
**work [15]**   7/14 7/17 13/24
21/22 25/21 26/1 26/3 40/3
42/3 46/1 49/24 67/23 82/20
99/14 101/19
**worked [10]**   7/25 12/19 21/25
38/9 38/11 38/13 60/8 67/25
73/18 81/3
**workers' [3]**   87/24 88/8 95/5
**working [6]**   12/8 12/15 12/22
40/25 51/15 76/25
**works [2]**   36/4 36/6
**world [1]**   16/13
**worst [1]**   97/7
**would [104]**
**wouldn't [2]**   100/14 100/14
**write [1]**   110/18
**writing [2]**   44/21 45/6
**wrong [2]**   31/5 42/6
**wrote [1]**   81/17
**www.anchorreporters.com [1]**
2/18

## Y

**y'all [4]**   24/14 33/16 68/3
94/15
**yeah [20]**   9/2 13/13 14/11
14/22 14/23 20/19 23/7 23/12
25/2 25/2 33/3 47/24 52/10
55/22 55/22 58/12 81/8 84/16
95/23 106/15
**year [10]**   38/2 53/5 64/10 84/1
84/2 89/9 93/20 93/20 95/20
95/20
**years [6]**   5/17 7/8 8/2 10/15
64/12 93/22
**yelling [2]**   49/1 49/3
**Yep [1]**   69/21
**yes [178]**
**you [416]**
**you'd [2]**   38/12 96/17
**you'll [11]**   29/25 56/15 63/2
67/19 68/8 68/17 69/2 69/10
71/21 81/12 84/12
**you're [19]**   6/2 6/13 8/18
12/22 32/9 46/2 47/22 48/6
50/4 51/23 52/8 57/19 63/6
71/4 71/6 72/24 84/7 97/9
106/16
**you've [5]**   26/23 28/14 54/3
54/12 70/13
**your [59]**
**yours [1]**   48/8

# CHOW SUMMARY

**Contact:** _____
**Facility:** Lake Placid Health Care Center
**Type:** NRP CHOP

**A. APPLICANT: (Operator)**
  1. **Sole Proprietor:** _____

  2. **Partnership:** _____

  3. **Corporation** _____

**B. NEW HISTORY:**
  1. **New Owner** Health Care REIT, Inc.

  2. **New Operator** Gulf Coast Healthcare LLC
                                   Florida Facilities, LLC
                                   HUD Facilities, LLC

  3. **New Lessor** _____

  4. **New Lessee (Sublease)** SF Lake Placid, LLC

  5. **New Management Co.** _____

**C. OLD HISTORY:**
  1. **Previous Owner/Seller** Health Care REIT, Inc.

  2. **Previous Operator** Delta Health Group, Inc.

  3. **Previous Lessor** _____

  4. **Previous Lessee** Delta Health Group

  5. **Prev. Management Co.** _____

**D. GUARANTORS** _____

**E. LOAN/LENDER** _____

**F. RELATED PARTIES**

_____
_____
_____



**EXHIBIT**
1

| | Current Owners and Officers | | | | New Owners and Officers | | |
|---|---|---|---|---|---|---|---|
| Medicaid Prov. No. | Current Licensee | d/b/a Facility Name | Officers & Owners | | New Owners | d/b/a Facility Name | Officers & Owners |
| 212237 | Cordova Rehab, Inc. | Nursing Pavilion at Chipola Ret. Center | (A) | | NF Chipola, LLC | Nursing Pavilion at Chipola Ret. Center | (D) |
| 255840 | Cordova Rehab, Inc. | Glen Cove Nursing Pavilion | (A) | | NF Glen Cove, LLC | Glen Cove Nursing Pavilion | (D) |
| 213861 | Delta Health Group, Inc. | Bay Breeze Nursing and Retirement Center | (B) | | FL HUD Baybreeze, LLC | Baybreeze Nursing and Retirement Center | (C) |
| 213853 | Delta Health Group, Inc. | Bayside Manor | (B) | | FL HUD Bayside, LLC | Bayside Manor | (C) |
| 228915 | Delta Health Group, Inc. | Berkshire Manor | (B) | | SF Berkshire, LLC | Berkshire Manor | (E) |
| 218952 | Delta Health Group, Inc. | Boynton Health Care Center | (B) | | SF Boynton, LLC | Boynton Health Care Center | (E) |
| 253855 | Delta Health Group, Inc. | Brynwood Center | (B) | | NF Brynwood, LLC | Brynwood Center | (D) |
| 212008 | Delta Health Group, Inc. | Carnegie Gardens Nursing Center | (B) | | SF Carnegie, LLC | Carnegie Gardens Nursing Center | (E) |
| 213551 | Delta Health Group, Inc. | Debary Manor | (B) | | MF Debary, LLC | Debary Manor | (E) |
| 211621 | Delta Health Group, Inc. | Delta Health Care Center | (B) | | FL HUD Destin, LLC | Health Care Center of Destin | (C) |
| 213039 | Delta Health Group, Inc. | Delta Health Care Center of Tampa | (B) | | SF Tampa, LLC | Health Care Center of Tampa | (E) |
| 213519 | Delta Health Group, Inc. | Flagler Pines | (B) | | MF Flagler, LLC | Flagler Pines | (E) |
| 228907 | Delta Health Group, Inc. | Fountainhead Care Center | (B) | | SF Fountainhead, LLC | Fountainhead Care Center | (E) |
| 213861 | Delta Health Group, Inc. | Glen Oaks Health Care Center | (B) | | SF Glen Oaks, LLC | Glen Oaks Health Care Center | (E) |
| 214132 | Delta Health Group, Inc. | Heritage Park | (B) | | MF Heritage, LLC | Heritage Park | (E) |
| 213870 | Delta Health Group, Inc. | Lake Eustis Care Center | (B) | | MF Lake Eustis, LLC | Lake Eustis Care Center | (E) |
| 214124 | Delta Health Group, Inc. | Lake Placid Health Care Center | (B) | | SF Lake Placid, LLC | Lake Placid Health Care Center | (E) |
| 214159 | Delta Health Group, Inc. | Longwood Health Care Center | (B) | | MF Longwood, LLC | Longwood Health Care Center | (E) |
| 214167 | Delta Health Group, Inc. | The Rehabilitation Center of Winter Park | (B) | | MF Winter Park, LLC | The Rehabilitation Center of Winter Park | (E) |
| 213527 | Delta Health Group, Inc. | Manor on the Green | (B) | | NF Manor, LLC | Manor on the Green | (D) |
| 214931 | Delta Health Group, Inc. | Margate Health Care Center | (B) | | FL HUD Margate, LLC | Margate Health Care Center | (C) |
| 213497 | Delta Health Group, Inc. | Oakbrook of Labelle | (B) | | SF Oakbrook, LLC | Oakbrook of Labelle | (E) |
| 213501 | Delta Health Group, Inc. | Oaks of Kissimmee | (B) | | SF Kissimmee, LLC | Oaks of Kissimmee | (E) |
| 213543 | Delta Health Group, Inc. | Oakwood Garden of Deland | (B) | | MF Oakwood, LLC | Oakwood Garden of Deland | (E) |
| 211851 | Delta Health Group, Inc. | Panama City Nursing Center | (B) | | NF Panama, LLC | Panama City Nursing Center | (D) |
| 253413 | Delta Health Group, Inc. | RiverChase Care Center | (B) | | NF River Chase, LLC | RiverChase Care Center | (D) |
| 211842 | Delta Health Group, Inc. | Rosewood Manor | (B) | | FL HUD Rosewood, LLC | Rosewood Manor | (C) |
| 214108 | Delta Health Group, Inc. | Royal Manor | (B) | | SF Royal Manor, LLC | Royal Manor | (E) |
| 214141 | Delta Health Group, Inc. | Salerno Bay Manor | (B) | | SF Salerno, LLC | Salerno Bay Manor | (E) |
| 213926 | Delta Health Group, Inc. | Silvercrest Manor | (B) | | FL HUD Silvercrest, LLC | Silvercrest Manor | (C) |
| 213918 | Delta Health Group, Inc. | Specialty Center of Pensacola | (B) | | FL HUD Pensacola, LLC | Specialty Center of Pensacola | (C) |
| 221719 | Delta Health Group, Inc. | Suwannee Health Care Center | (B) | | NF Suwannee, LLC | Suwannee Health Care Center | (D) |
| 213888 | Delta Health Group, Inc. | Windsor Manor | (B) | | NF Windsor, LLC | Windsor Manor | (D) |

| Owners | | Officers | | | Owners | | Officers | |
|---|---|---|---|---|---|---|---|---|
| **(A):** | | | | | **(C):** | | | |
| SJB No 5 LLC | 25% | Scott J Bell | CEO/President | | HUD Facilities, LLC | 100% | Eric Roth | President |
| JJT No 4 LLC | 25% | Dana R Foster | COO/Secretary | | | | Julie Gutzmann | Treasurer |
| DLF No 6 LLC | 25% | John J Tolan | CFO/Treasurer | | | | Mitchell Storer | Secretary |
| Wet One No 4 LLC | 25% | W Edward Trehern | CAO/Vice Pres | | **(D):** | | | |
| | | | | | Gulf Coast Facilities, LLC | 100% | Eric Roth | President |
| **(B):** | | | | | | | Julie Gutzmann | Treasurer |
| SJB No 3 LLC | 25% | Scott J Bell | CEO/President | | | | Mitchell Storer | Secretary |
| JJT No 2 LLC | 25% | Dana R Foster | COO/Secretary | | **(E):** | | | |
| DLF No 4 LLC | 25% | John J Tolan | CFO/Treasurer | | Florida Facilities, LLC | 100% | Eric Roth | President |
| Wet One No 2 LLC | 25% | W Edward Trehern | CAO/Vice Pres | | | | Julie Gutzmann | Treasurer |
| | | | | | | | Mitchell Storer | Secretary |

EXHIBIT 2
RRD 800-831-8989

# LIMITED LIABILITY COMPANY AGREEMENT
## of
## SF LAKE PLACID, LLC

This Limited Liability Company Agreement (this "Agreement"), with an effective date of May 6th, 2008, is by the sole member ("Member") of SF LAKE PLACID, LLC, a Delaware limited liability company (the "Company"). Capitalized terms used but not otherwise defined in this Agreement have the meanings ascribed to them in Exhibit A.

### Recitals

*Whereas*, the Company was organized pursuant to a Certificate of Formation filed with the Delaware Secretary of State on May 6th, 2008 (the "Certificate");

*Whereas*, the Member desires that this Agreement serve as the limited liability company agreement of the Company and reflect the manner in which the Company shall be governed and operated from and after the date hereof, replacing entirely any previously existing limited liability company agreement of the Company;

*Now, therefore*, in consideration of the rights, duties, privileges, and obligations assumed or accorded under this Agreement, the Member hereby agrees as follows:

## ARTICLE 1
## MEMBER, CAPITAL CONTRIBUTION

1.1     Member. The Member and its contact information is set forth in Exhibit B.

1.2     Initial Capital Contribution; Units.

(a)     The initial capital contribution of the Member ("Initial Capital Contribution") is set forth in Exhibit C.

(b)     The Member owns the Company in the "Unit" interest set forth opposite its name in Exhibit B.

1.3     Return of Capital Contribution. Except as otherwise provided, the Member will not be personally liable for the return or payment of all or any portion of the capital contributions or profits allocable to the Member, it being expressly agreed that any such return of capital or payment of profits made pursuant to this Agreement will be made solely from the Company assets (which will not include any right of contribution from the Member).

1.4     Interest in Other Ventures. The Member may engage in and possess interests in other business ventures of every nature and description, independently or with others; and neither the Company nor the Member will have any rights by virtue of this Agreement or the existence of the Company in and to any independent ventures of the Member or to the income or profits derived therefrom.

BR\525452\3

EXHIBIT
3

1.5     Principal Place of Business.  The location of the principal office of the Company will be 2 North Palafox Street, Pensacola, Florida 32502 or at such other place as is designated by the Member.

## ARTICLE 2
## ALLOCATIONS AND DISTRIBUTIONS

2.1     Allocation of Profits, Gains and Losses.  Exhibit C will govern the allocation of Company profits, gains and losses.

2.2     Tax Status, Reports and Capital Accounts.

(a)     The Member will have a Capital Account consisting of the amount of its capital contributions, increased by (i) the fair market value of any additional capital contributions of the Member, and (ii) all allocable income and gain for federal income tax purposes as allocated in Exhibit C of this Agreement; and decreased by (x) the fair market value of distributions to the Member of cash or property, and (y) all allocable share of the Company losses and other items of deduction for federal income tax purposes as allocated in Exhibit C. The Member's Capital Account will also be reduced by the amount of the reduction and increased by the amount of the increase in the adjusted basis of the Member's interest in the Company under the applicable provisions of the Internal Revenue Code.

(b)     Notwithstanding the foregoing, for so long as there shall only be one (1) Member, this Agreement shall be construed in a manner consistent with the treatment of one member limited liability companies under applicable federal and state tax laws, which ignore the existence of the limited liability company for tax purposes only.  Consequently, for such period of time as there is only one Member of the Company, all references herein to the provisions of subchapter K of the Internal Revenue Code and applicable state tax provisions shall be ignored, and all profits, losses, deductions, credits and other tax attributes of the Company shall belong to the Member.  Notwithstanding the foregoing, the treatment of the Company for tax purposes shall in no way affect the limited liability of the Member as provided in this Agreement and under Delaware law.

2.3     Accounting.

(a)     The fiscal year of the Company will be the calendar year.  A fiscal year will include any partial calendar year at the beginning and end of the Company term.

(b)     The Member will cause to be prepared all tax returns and statements, if any, which must be filed on behalf of the Company with any taxing authority, and will make timely filing thereof.

(c)     The Company will provide the Member, on a quarterly basis accounting reports setting forth Net Profits or Net Losses for operations for the preceding quarter and projected income and expenses for the next quarter; and the Company will prepare and

- 2 -

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 131 of 244

furnish to the Member a report setting forth all information regarding the Company necessary to enable the Member to prepare its federal, state and local tax returns.

(d)       The books of account of the Company will be kept and maintained at all times at the principal office of the Company unless a different place is specified by the Member.

(e)       The Company will furnish to the Member all information regarding the Company reasonably requested by him from time to time.

(f)       The Member, at its sole cost and expense, will have the right at all reasonable times during usual business hours to audit, examine, and make copies of or extracts from the books of account and records of the Company. Such right may be exercised through any agent or employee of a Member.

2.4       Intentionally left vacant.

2.5       Intentionally left vacant.

2.6       Adjustment of Depreciation Deduction. The Company's depreciation deductions as calculated for Federal income tax purposes will be allocated to the Member in proportion to the allocation of depreciation expenses as calculated pursuant to Exhibit C for book purposes; provided, however, that depreciation deductions allowed for Federal income tax purposes (a) with respect to any asset contributed by the Member to the Company, or (b) with respect to any asset having a different gross book value than its gross basis for Federal income tax purposes, will be allocated among the Member in accordance with the principles of Section 704(c) of the Internal Revenue Code and the regulations thereunder (without affecting book capital accounts) so as to take into account the difference between adjusted basis and book value (net of accumulated depreciation) in the manner provided therein.

2.7       Adjustment of Gain or Loss Allocation. Gains and losses on the sale or other disposition of Company Assets (as allocated for federal income tax purposes) will be allocated to the Member so as to take into account all differences between the adjusted basis of the assets sold or disposed of and their book values (net of accumulated depreciation) but without crediting or debiting Capital Accounts for such differences, all in accordance with the principles of Internal Revenue Code §704(c) and the regulations thereunder.

2.8       Tax Matters Partner. The sole Member is hereby designated as the Tax Matters Partner within the meaning of Section 6231 of the United States Internal Revenue Code.

## ARTICLE 3
## RIGHTS, DUTIES AND OBLIGATIONS OF THE MEMBER

3.1       Management. The Company will be member-managed by its sole Member. The Member will have the authority to transact all business of the Company.

- 3 -

3.2     Delegation. The Member may delegate some or all of its duties and powers to other persons.

3.3     Administrator Decisions.  Subject to the provisions of this Agreement which reserve to the Member the right to make certain decisions on behalf of the Company or which require the consent of the sole Member, certain decisions of the Company shall be vested in the administrator of the Facility (the "Administrator"), who subject to the limitations hereafter set forth, shall have the right, power and authority to manage the business and affairs of the Company, to make all decisions with respect thereto and to do any and all acts, statutory or otherwise, with respect to the Company and this Agreement which would otherwise be possessed by the Member under the Act, including, without limitation, to approve, adopt and implement policies regarding patient care as well as the management and operation of the Facility and to approve the operating budget for the Facility.  In performance of the duties and responsibilities hereunder, the Administrator covenants and agrees: (a) to give prompt written notice to the Member of any litigation or governmental proceedings pending or, to the extent of the Administrator's knowledge, threatened (in writing) against the Company; (b) to cause the Company to use commercially reasonable efforts to observe, perform and satisfy, all the material terms, provisions, covenants and conditions required to be observed, performed or satisfied by the Company, as the case may be, and not to take or permit to be taken any action that would result in a violation of or otherwise be inconsistent with, any material contract to which the Company is a party or by which the Company or its assets are bound, including without limitation, any lease, sublease, or sub-sublease of the Facility or any loan agreement (collectively, "Material Contracts"); (c) to promptly deliver, or caused to be delivered, copies of all notices given or received with respect to noncompliance with any term or condition under any Material Contracts, any litigation relating to the Company, and material correspondence received from any party to the Material Contract and shall notify the Member within two (2) business days of any potential or actual "Event of Default" under a Material Contract; and (d) to give prompt notice to the Member of the receipt by the Company of any written notice related to a material violation of any legal requirements affecting the Company (collectively, "Applicable Laws") and of the commencement by any governmental authority of any proceedings or investigations which relate to compliance with Applicable Laws.

3.4     Limitations on Administrator Decisions.  Notwithstanding anything to the contrary set forth in this Agreement, the Administrator shall not take or cause or permit the Company to take, or decide not to take, any of the following actions, or expend any amount of money, make any decision or incur any obligation on behalf of the Company with respect to any matter enumerated below (each, a "Member Decision") unless such action, expenditure or other decision has been previously approved by the sole Member:

(i) enter into any agreement or option to sell, transfer, assign or otherwise dispose of, or lease all or any portion of the Company's assets (except sales, transfers and assignments and leases of items of personal property in the ordinary course of business and consistent with past practice) or acquire or lease any real or personal property or interest therein other than in the ordinary course of business and consistent with past practice;

BR\525452\3

(ii) cancel, forgive or release any material claim or indebtedness owed to the Company by any person or entity, or incur, renew, refinance, pay or otherwise discharge any indebtedness of the Company or create or permit to exist any lien upon any portion of the Company's assets, other than (x) trade payables incurred in the ordinary course of business in accordance with the Facility's operating budget and repayment of indebtedness authorized by such budget, (y) purchases or leases made in the ordinary course of business with respect to office and other equipment, and (z) purchases or leases with respect to equipment and other assets acquired by the Company and all replacements thereof, provided such purchases and leases made under subparts (y) and (z) do not exceed $300.00;

(iii) file or otherwise initiate any litigation or similar legal proceeding, or settle or agree to settle any such legal proceeding on behalf of the Company, institute proceedings on behalf of the Company for bankruptcy protection, consent to the filing of a bankruptcy proceeding against the Company, file a petition or answer or consent to seeking reorganization of the Company under the bankruptcy protection laws or any other similar applicable federal, state or foreign law, or consent to the filing of any such petition against the Company, consent to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of the Company or of its property, make an assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due;

(iv) amend the Certificate or any other organizational document of the Company, cause or permit the Company to make distributions of money or property to the sole Member, cause or permit the Company to issue additional Ownership Interests of the Company, merge or consolidate the Company with or into any other person (or engage in any other transaction having substantially the same effect), or dissolve or wind-up the Company;

(v) except as expressly set forth below, enter into, amend or terminate any contract, whether written or oral, to which the Company is a party or by which the Company or its assets are bound. Notwithstanding the foregoing, in performing his or her duties hereunder and as Administrator of the Facility, the Administrator shall have the authority to enter into and amend any contract, whether written or oral, in the ordinary course of business and consistent with past practice that is cancelable by the Company upon thirty (30) days' notice with or without cause;

(vi) declare, set aside, increase or pay any distribution (in excess of current salaries) on, or directly or indirectly combine, redeem, reclassify, purchase, or otherwise acquire, any unit or other equity interests or authorize the creation or issuance of or issue any additional units, other equity interests or options, warrants or rights to subscribe for or purchase any securities or obligations convertible into or exchangeable for any units or other equity interests;

(vii) enter any agreement concerning indemnification of the Company's managers, officers, or persons in similar positions;

BR\525452\3

(viii)   borrow any money or guarantee any indebtedness for borrowed money;

(ix)   other than in the ordinary course of business and consistent with past practice, incur any liability or obligation (whether absolute, accrued, contingent or otherwise), issue any debt securities or assume, guarantee, endorse or otherwise become responsible for, the obligations of any other person or change any assumption underlying, or methods of calculating, any bad debt, contingency or other reserve;

(x)   commit or omit to do any act, which act or omission would cause a material breach of any agreement, contract or commitment, or of any representations, warranty or covenant herein or amend any agreement other than in the ordinary course of business;

(xi)   fail, in any material respect, to comply with any Federal, state, local, foreign or other law, statute, rule, regulation or order of any court or governmental authority applicable to the Company or by which the Company or any of the Company's Assets are bound;

(xii)   fail to maintain the Company's books, accounts and records in the usual manner on a basis consistent with past practices of the Company;

(xiii)   fail to pay, or to make adequate provision for the payment of, any taxes, interest payments or penalties due and payable to any city, county/parish, state, the United States or any other taxing authority, except such taxes, interest payments and penalties being contested in good faith by appropriate proceedings and for which sufficient reserves have been established;

(xiv)   enter into any new line of business;

(xv)   hire salaried employees;

(xvi)   grant any new employee benefits;

(xvii)   grant any powers of attorney in other than the ordinary course of the Company's business with respect to tax matters;

(xviii)   enter any agreement with a term of greater than one (1) year (unless such agreement gives the Company the right to terminate at any time following 30 days advance notice) or involving aggregate (estimated) payments by the Company or to the Company in excess of $10,000.00;

(xix)   enter any agreement with any officer or employee of the Company, or member of the family of any such person, or any limited liability company, partnership, trust or other entity in which any such person, or any member of the family of any such person, has a substantial interest or is an officer, director, trustee, partner or holder of more than 5% of the outstanding equity thereof, including any contract, agreement or other arrangement providing for the employment of, furnishing of services by, rental of real or personal property from or

BR\525452\3

14-50756 - #500-6   File 02/06/15   Enter 02/06/15 16:47:27   Exhibit F   Pg 135 of 244

otherwise requiring payments to any such person or firm, other than employment-at-will arrangements in the ordinary course of business; or

(xx) engage in or enter into any transaction of any nature not expressly provided for herein, except transactions in the ordinary course of the Company's business.

3.4     Liability of the Member to Third Parties. Unless otherwise provided by the Company, the Member will not be liable under any judgment, decree, or order of a court, or in any other manner, for any debt. obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of the Administrator, Member, agent or employee of the Company.

## ARTICLE 4
## ADMISSION INTO THE COMPANY

4.1     Admission. In the event of a transfer of an interest in the Company to a Person who is not a Member, the transferee will not be recognized as a Member of the Company unless and until he is approved by the Member and amendments to this Agreement and the Certificate is executed by him or it and by the Member. No Person will be admitted into the Company as a Member unless and until he is approved by the Member and amendments to this Agreement and the Certificate is executed by the Member.

## ARTICLE 5
## WINDING UP

5.1     Liquidator. Upon dissolution of the Company, the Member shall act as liquidator of the Company ("Liquidator") in disposing of and distributing Company Assets. The liquidation of the Company shall take place out of court. Gains on the sale or other disposition of Company Assets (after taking into account the variation between the basis of property contributed to the Company and its fair market value at the time of contribution under Section 704(c) of the Internal Revenue Code) shall be allocated to the Member and credited to its Capital Account in accordance with this Agreement. Losses on the sale or other dispositions of Company Assets shall be allocated to the Member and charged against its Capital Account in the same manner in which losses are attributed as provided in Article 2.

5.2     Distributions in Kind. With respect to any Asset of the Company (other than cash) which is determined by the Liquidator to be distributed to the Member in kind, an appraisal of the fair market value shall not be required to be obtained by the Liquidator from an appraiser who is licensed to appraise property of the same nature in the locality in which it is situated unless requested by the Member.

5.3     Distributions. The Member shall receive on liquidation (within ninety (90) days after the liquidation of the Company or by the close of the Company's taxable year in which its dissolution occurs, whichever is later) cash and/or other Assets (valued at their appraised value, as determined above, net of any liabilities which encumber them at the time of distribution) in an amount equal to its positive Capital Account balance as adjusted. The

- 7 -

Member shall not receive a distribution in kind if the effect thereof is to create or increase a deficit in its Capital Account balance (after adjustment provided by this Agreement) unless it first contributes cash to the Company or unless, on a termination of the Company under Section 708(b)(1) of the Internal Revenue Code, it shall receive an amount equal to its positive Capital Account balance (adjusted by its share of unrealized appreciation or depreciation in the fair market value of the Company's Assets); provided, however, upon a termination of the Company under Internal Revenue Code Section 708(b)(1)(B), the amount to be distributed shall be deemed constructively distributed and recontributed by the Member to the Company.

## ARTICLE 6
## INDEMNIFICATION

6.1     Indemnification.  To the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, the Company shall indemnify and hold harmless any Member and the Administrator from and against any and all claims, actions, suits, damages, costs and expenses, including reasonable fees and disbursements of counsel (collectively, "Claims") asserted against or incurred by such Member or Administrator arising out of or in connection with management or in carrying out the Company's purposes; whether or not such Member or Administrator is a member of the Company when such Claims are asserted against or incurred by it; provided, however, that no Member or Administrator shall be indemnified for any liability for fraud, intentional misconduct, gross negligence, or a knowing violation of the law that was material to the cause of action.  No amendment to this Section 6.1 shall affect the rights of any Member or Administrator in existence prior to such amendment.  Any indemnification pursuant to this Section 6.1 shall only be made out of Company Assets.

## ARTICLE 7
## SINGLE PURPOSE

7.1     Purpose.  The single purpose of the Company is to engage in business related to the lease, acquisition, maintenance, management and operation of certain skilled nursing and assisted living facilities, located in the State of Florida (the "Facility"), to exclusively own assets related to or derived from, to render other facility services and do any and all things necessary, convenient or incidental to such lease, acquisition, maintenance, management and operation (the "Project").  Further, in connection with the operation of its business, the Company shall:

(a)     at all times hold itself out to the public as a legal entity separate and distinct from any other entity and the activities of its members;

(b)     not commingle the funds and other assets of the Company with any other party or its members and will maintain its books, records and bank accounts separate from other entities and persons;

(c)     not hold itself out to be responsible for the debts or obligations of any other person;

- 8 -

(d)     maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity or person;

(e)     not incur any indebtedness other than the indebtedness to lease and/ or acquire business assets for its own purposes;

(f)     at all times, conduct its own business in its own name;

(g)     at all times, maintain separate financial statements;

(h)     at all times, pay its own liabilities out of its own funds;

(i)     at all times, observe all organizational formalities;

(j)     at all times, maintain an arms-length relationship with its affiliates;

(k)     at all times, pay the salaries of its own employees;

(l)     allocate fairly and reasonably any overhead for shared office space; and

(m)     use distinct and separate stationary, invoices and checks.

## ARTICLE 8
## MISCELLANEOUS

8.1     <u>Litigation</u>. The Member will prosecute or defend actions at law or in equity as may be necessary to enforce or protect the Company's interests, including audits by and litigation with the Internal Revenue Service, the taxing authority for the State of Delaware and any other state or local taxing authority, the costs of which will be paid by the Company.

8.2     <u>Confidentiality</u>. The Company and the Member shall keep the terms and provisions of this Agreement confidential to the extent permitted by law.

8.3     <u>Captions</u>. Any section or paragraph title contained in the Certificate or this Agreement is for convenience only and will not be deemed a part of the context of the Certificate or this Agreement.

8.4     <u>Severability</u>. Each provision of this Agreement is intended to be severable. If any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity will not affect the validity or legality of the remainder of this Agreement.

8.5     <u>Gender</u>. Whenever the sense of this Agreement so requires, the use of (i) the singular number will be deemed to include the plural, (ii) the masculine gender will be deemed to include the feminine or neuter gender, and (iii) the neuter gender will be deemed to include the masculine or feminine gender.

- 9 -

8.6     Governing Law.  The Certificate and this Agreement are executed under and in conformity with the laws of the State of Delaware relating to limited liability companies and are to be construed, enforced and governed in accordance therewith.  All parties to the Certificate and this Agreement, their heirs, assigns, and successors in interest hereby agree that any action arising out of or in connection with the Certificate or this Agreement or any matter relating thereto will be brought only in the courts of the State of Delaware, which courts will have exclusive jurisdiction over any and all said actions; and all such parties, their heirs, assigns, and successors in interest hereby consent to and confer personal jurisdiction over themselves by the courts of the State of Delaware for any and all said actions, by personal service of process upon themselves or their agents or representatives in accordance with the laws of the State of Delaware.

8.7     Amendments.  Except as otherwise provided, this Agreement may not be amended, changed or modified in any respect without the affirmative vote of Members holding not less than two-thirds (2/3) of the Ownership Interests.

-signatures on following page-

BR\525452\3

This Agreement is executed on this 6th day of May, 2008 by the undersigned duly authorized representatives of the parties hereto.

**FLORIDA FACILITIES, LLC, sole member**

By: GCH Management Services, LLC,
    its manager

By: _____
Name: Eric Roth
Title: President

BR\52545Z\3

- 11 -

## Exhibit A
## Definitions

"Act" means the Delaware Limited Liability Company Act, as the same may be amended from time to time hereafter.

"Capital Account" means, with respect to any Member, the Capital Account maintained for the Member in accordance with the following provisions: (i) to each Member's Capital Account there will be credited the Member's capital contribution, his or its share of the Company profits and any additional capital contributions made by such Member to the Company; and (ii) to each Member's Capital Account there will be debited such Member's share of the Company distributions and his or its distributive share of the Company losses.

"Company Expenses" means all expenses of the Company necessary to carry on the business of the Company, including but not limited to (i) the amount of principal, payment, interest, and other charges and expenses paid under any mortgages, loans or other security interests affecting the Company; (ii) all operating expenses and cash expenditures incurred incident to the normal operation of the Company; and (iii) amounts expended to supervise, direct, manage and control certain property or entities in furtherance of the purpose of the Company. Company Expenses will be determined in accordance with sound cash basis accounting principles consistently applied.

"Company Property" or "Company Assets" or "Property" or "Assets" means all property and assets of the Company, of whatever kind and nature, and wherever situated, and however acquired, movable and immovable, tangible and intangible, owned by the Company.

"Member" means any person or entity set forth in Exhibit B (as amended from time to time as provided in this Agreement), any substituted Member and any permitted successors and assigns of a Member.

"Net Capital Contributions" means an amount equal to the capital contributions paid or transferred into the Company by the Members, less all amounts distributed by the Company to the Members from the sale or refinancing of the Company Property, or as Net Cash Flow.

"Net Cash Flow" means the sum of the amounts calculated according to sub paragraphs (a) and (b) below, less the aggregate amount from sub paragraph (c) below. The components of Net Cash Flow are determined as follows:

(a)     The gross income of the Company computed in accordance with sound cash basis accounting principles, including all income received from all sources whatever as a direct or indirect result of the ownership of the Company Property or the operation of the Company, such as, but without limitation: (i) the gross amount of all cash payments received whether as income, rent, additional rent, fee charges or otherwise; (ii) sundry income; (iii) interest on deposits; (iv) the net amount of any refund of impositions of taxes applicable to any the Company Property during the existence of this the Company; (v) the proceeds from the sale of the Company

- 12 -

Property used in the Company's trade or business or held for investment or any other property including securities, notes or other obligations in lieu of or in addition to such cash payments; (vi) the amount of any other consideration, tangible or intangible, received in relation to or in connection with the Company Property; (vii) proceeds of insurance received and used, or to be used, for restoration of the Company Property in the event of damage or destruction thereof; and (viii) proceeds of any sale, assignment, transfer, or mortgage as permitted herein, of the whole or any part of the interest of a party hereto received by the Company, any of the Members, or any other person on behalf of the Company.

(b)     The amount of (i) any capital contributions of the Members, and (ii) any proceeds received from the mortgaging of the Company Property or the Refinancing (to the extent that the proceeds exceed the amount of the mortgage being refinanced) of any mortgage on the Company Property.

(c)     The amount of Company Expenses. In computing Net Cash Flow, no deduction will be made for depreciation or amortization as such terms are used for purposes of the Internal Revenue Code.

"Net Profits", "Net Gains" and "Net Losses" means, with respect to each taxable period, the Company's net taxable income capital or Internal Revenue Code §1231 gains or net taxable losses, capital or Internal Revenue Code §1231 losses respectively, as determined for federal income tax purposes (as adjusted by nontaxable income and nondeductible expenditures), but computed by calculating depreciation expense for book purposes on the basis of its gross book value on the Company's books, using the depreciation method and useful life used by the Company for federal income tax purposes unless the context in which those terms are used otherwise indicates. However, for purposes of allocating gains or losses on sales of property contributed to the Company by any Member, the provisions of section 704(c) of the Internal Revenue Code will be taken into account by allocating the portion of the taxable gain or loss equal to the difference between fair market value and adjusted basis at date of contribution to the Company or to the contributing Member without crediting or debiting his or its capital account therefor. Each Member's share of Net Profits and Net Losses, except to the extent provided in the preceding sentence, will be credited or debited, respectively, to the Member's Capital Account.

"Ownership Interest" means the percentage interest in the Company owned by each Member as set forth in Exhibit B, represented by a fraction, the numerator of which is the number of Units owned by the Member, and the denominator of which is equal to the total number of Units outstanding.

"Person" means an individual, corporation, trust, partnership, joint venture, unincorporated organization, government agency or any agency or political subdivision thereof, or other entity.

"Refinancing" means any transaction in which the Company will receive a loan of funds and secure the Company's obligation to repay such loan by granting to the lender a mortgage on any Property of the Company, which transaction produces net funds after the satisfaction of all creditors as may be necessary to effect such transaction.

- 13 -

"Regulations" means except where the context indicates otherwise, the permanent, temporary, proposed, or proposed and temporary regulations of Department of the Treasury under the Internal Revenue Code as such regulations may be lawfully changed from time to time.

BR\525452\3

## Exhibit B
## Member and Address / Units; Ownership Interest

| Member | Number of Units Owned | Ownership Interest |
|---|---|---|
| FLORIDA FACILITIES, LLC<br>2 North Palafox Street<br>Pensacola, Florida 32502 | 100 | 100% |
| Total | 100 | 100% |

BR\525452\3

- 15 -

**Exhibit C**
**Initial Capital Contributions**

| Member | Initial Capital Contribution | Value |
|---|---|---|
| Florida Facilities, LLC | $100.00 | $100.00 |

BR\525452\3

**Exhibit D**
**Allocations**

1.     <u>Definitions</u>.  Capitalized terms used but not defined in this <u>Exhibit C</u> have the meanings ascribed to them in <u>Exhibit A</u>.  In addition, the following words have the following meanings:

"<u>Company Liability</u>" means any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

"<u>Company Minimum Gain</u>" means an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains.  The amount of the Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument; only to the extent a Member is allocated a share of that minimum gain.  For any taxable year, the net increase or decrease in the Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding taxable year with the Company Minimum Gain on the last day of the current taxable year. Notwithstanding any provision to the contrary contained herein, the Company Minimum Gain and increases and decreases in the Company Minimum Gain are intended to be computed in accordance with §704 of the Internal Revenue Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.  A Member's share of the Company Minimum Gain at the end of any taxable year equals:  the sum of Nonrecourse Deductions allocated to that Member (and to that Member's predecessor in interest) up to that time and the distributions made to that Member (and to that Member's predecessors in interest) up to that time of proceeds of a Nonrecourse Liability allocable to an increase in the Company Minimum Gain minus the sum of that Member's (and that Member's predecessors' in interest) aggregate share of the net decreases in the Company Minimum Gain plus their aggregate share of decreases resulting from revaluations of the Company Property subject to one or more the Company Nonrecourse Liabilities.

"<u>Company Nonrecourse Liability</u>" means the Company liability to the extent that no Member or Related Person bears the economic risk of loss (as defined in §1.752 2 of the Regulations) with respect to the liability.

"<u>Member Minimum Gain</u>" means an Amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains.  The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain.  For any taxable year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding taxable year with the Minimum Gain on the last day of the current taxable year.  Notwithstanding any provisions to the contrary contained herein, Member Minimum Gain and increases and decreases in Member

BR\525452\3

Minimum Gain are intended to be computed in accordance with Internal Revenue Code §704 and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

"Member Nonrecourse Liability" means any Company liability to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under §1.752 2 of the Internal Revenue Code because, for example, the Member or Related Person is the creditor or a guarantor.

"Offsettable Decrease" means any allocation that unexpectedly causes or increases a deficit in the Member's Capital Account as of the end of the taxable year to which the allocation relates attributable to depletion allowances under §1.704(b)(2)(iv)(k) of the Regulations, allocations of loss and deductions under §704(e)(2) or 706 of the Internal Revenue Code or under §1.751 1 of the Regulations, or distributions that, as of the end of the year are reasonably expected to be made to the extent they exceed the offsetting increases to such Member's Capital Account that reasonably are expected to occur during or (prior to) the taxable years in which the such distributions are expected to be made (other than increases pursuant to a Minimum Gain Chargeback).

2.      Allocations.

        a.      Each item of the Company's income, gain, loss, deduction, credit, or profit, including, but not limited to, Net Profits, Net Gains and Net Losses for each year, except as otherwise provided in this Paragraph 2, will be attributed to the Member, as adjusted by Section 2.6 of the Agreement (Adjustment of Depreciation Deduction) and Section 2.7 of the Agreement (Adjustment of Gain or Loss Allocation).

        b.      Notwithstanding the provisions of paragraph 2(a):

                i.      Company Minimum Gain Chargeback. If there is a net decrease in the Company Minimum Gain for a taxable year, the Member must be allocated items of income and gain for that taxable year equal to the net decrease in the Company Minimum Gain. The amount of the net decrease in the Company Minimum Gain is the amount of the total net decrease multiplied by the Company Minimum Gain at the end of the immediately preceding taxable year. The amount of any decrease in the Company Minimum Gain resulting from a revaluation of the Company Property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in minimum gain is caused by the revaluation. The Member is not subject to the Company Minimum Gain Chargeback Requirement to the extent the net decrease in the Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a Recourse Liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of §1.752 2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed liability. The Member is not subject to the Company Minimum Gain Chargeback Requirement to the extent a Member contributes capital to the Company that is used to increase the basis of the property subject to the nonrecourse liability, and the Member's share of the net decrease in the Company Minimum Gain results from the repayment or the increase to the property's basis.

- 18 -

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 147 of 244

ii.     Member Minimum Gain Chargeback.  If during a taxable year there is a net decrease in Member Minimum Gain, the Member is entitled to Member Minimum Gain (as determined under §1.704 2(i)(5) of the Regulations) as of the beginning of the taxable year and must be allocated items of income and gain for that taxable year (and, if necessary, for succeeding taxable years) equal to the amount of the net decrease in the Company Minimum Gain.  The amount of net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of paragraph §1.704 2(g)(2) of the Regulations.  The Member is not subject to this Member Minimum Gain Chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability.  The amount that would otherwise be subject to Member Minimum Gain Chargeback is added to the Member's share of the Company Minimum Gain.  In addition, rules consistent with those applicable to the Company Minimum Gain will be applied to determine the shares of Member Minimum Gain and Member Minimum Gain Chargeback to the extent provided under the Regulations issued pursuant to §704(b) of the Internal Revenue Code.

iii.     Qualified Income Offset.  In the event a Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of income and gain for such year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

iv.     Allocation in Excess of Minimum Gain.  No Member will be allocated any loss or deduction which would cause the deficit in such Member's Capital Account balance to exceed the Member's share of Minimum Gain as defined above, and any amount of loss or deduction which would otherwise be allocated to such Member will be allocated among all Members to the extent their deficit Capital Account balances would not thereby exceed their shares of Minimum Gain, in proportion to their interest in the Company Profits, with any amount which cannot be allocated to a Member, because of the deficit it would cause in the Member's Capital Account balance, allocated to all Members to whom it can be allocated, in proportion to their interests in the Company as among themselves; provided, however, that the first Profits and Gains recognized by the Company thereafter which otherwise would have been allocated to said Member, in an amount equal to the aggregate losses and deductions which would have otherwise been allocated to said Member but for this Section 2(b)(iv) will be allocated among those Members who are allocated said Member's share of those losses and deductions in the proportions in which they were allocated them.

v.     Waiver of Minimum Gain Chargeback Requirement.  In any taxable year in which an the Company has a net decrease in the Company Minimum Gain, if the Minimum Gain Chargeback Requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct the distortion, then the Company may request the Commissioner of Internal Revenue waive the requirement.

BR\525452\3

vi.     Compliance with Section 704(b) of the Code.  The provisions of this Section as they relate to the maintenance of Capital Accounts are intended, and will be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article 2 to have substantial economic effect under the Regulations promulgated under §704(b) of the Internal Revenue Code, in light of the distributions made pursuant to Article 2 and the Capital Contributions made.  Notwithstanding anything herein to the contrary, this Operating Agreement will not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Capital Contribution.

vii.    Pursuant to Treasury Reg. §1.752 3(a)(3), the allocation of Profits set forth in this Exhibit C will be deemed the Members' share of profits for purposes of sharing the nonrecourse liabilities of the Company.

- 20 -

BR\525452\3

REC'D 12/28/10 CSMU

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
12/09/10

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | |
|---|---|---|---|
| Hamilton Insurance Agency | 703-359-8100 | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| Alan J. Zuccari, Inc. | 703-359-8108 | E-MAIL ADDRESS: | |
| 4100 Monument Corner Dr. #500 | | PRODUCER CUSTOMER ID #: | GULFC-1 |
| Fairfax, VA 22030 | | | |
| Keith Parnell | | INSURER(S) AFFORDING COVERAGE | NAIC # |

| INSURED | Gulf Coast Health Care, LLC | INSURER A : Lexington Insurance Co. | |
|---|---|---|---|
| | SF Lake Placid, LLC | INSURER B : Chartis Specialty Insurance Co | |
| | 2 N. Palafox St. | INSURER C : | |
| | Pensacola, FL 32502 | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ 1,000,000 |
| | X COMMERCIAL GENERAL LIABILITY | | | 066823627 | 12/04/10 | 12/04/11 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | CLAIMS-MADE X OCCUR | | | | | | MED EXP (Any one person) | $ |
| | X $100,000 SIR | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | POLICY PRO-JECT LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | SCHEDULED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | HIRED AUTOS | | | | | | | $ |
| | NON-OWNED AUTOS | | | | | | | $ |
| | **UMBRELLA LIAB** OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DEDUCTIBLE | | | | | | | |
| | RETENTION $ | | | | | | | |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | | | | WC STATU-TORY LIMITS / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Professional Liab | | | 6506212 | 12/04/08 | 12/04/11 | Each Occ | 75,000 |
| | | | | | | | Aggregate | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
Location: Lake Placid Health Care Center 125 Tomoka Blvd South Lake Placid, FL 33852

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| INFORM-<br><br>For Information Purposes Only | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Keith Parnell |

© 1988-2009 ACORD CORPORATION. All rights reserved.

ACORD 25 (2009/09)    The ACORD name and logo are registered marks of ACORD

EXHIBIT

FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List    Next on List    Return To List

Events    No Name History

Entity Name Search

Submit

# Detail by Entity Name

## Foreign Limited Liability Company

SF LAKE PLACID, LLC

## Filing Information

| | |
|---|---|
| Document Number | M08000002739 |
| FEI/EIN Number | 262691469 |
| Date Filed | 06/09/2008 |
| State | DE |
| Status | ACTIVE |
| Last Event | LC AMENDMENT |
| Event Date Filed | 08/08/2008 |
| Event Effective Date | NONE |

## Principal Address

125 TOMOKA BOULEVARD SOUTH
LAKE PLACID FL 33852

Changed 04/23/2009

## Mailing Address

2 NORTH PALAFOX STREET
PENSACOLA FL 32502

Changed 04/23/2009

## Registered Agent Name & Address

CAPITOL CORPORATE SERVICES, INC.
155 OFFICE PLAZA DR., SUITE A
TALLAHASSEE FL 32301 US

Name Changed: 08/27/2010

Address Changed: 08/27/2010

## Manager/Member Detail

Name & Address

Title MGRM

FLORIDA FACILITIES, LLC
4 WEST RED OAK LN, SUITE 201
WHITE PLAINS NY 10604

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2009 | 04/23/2009 |
| 2010 | 01/26/2010 |

## Document Images

08/27/2010 -- Reg. Agent Change    View image in PDF format

01/26/2010 -- ANNUAL REPORT    View image in PDF format

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 151 of 244



FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

CHARLIE CRIST
GOVERNOR

ELIZABETH DUDEK
INTERIM SECRETARY

September 24, 2010

Certified Article Number

7160 3901 9849 1001 8175
SENDERS RECORD

ADMINISTRATOR
LAKE PLACID HEALTH CARE CENTER
125 TOMOKA BLVD S
LAKE PLACID, FL 33852

Re: Omission letter for renewal of license # 1274095

Dear Administrator:

This will acknowledge receipt of your application for renewal of your facility's license. We have reviewed your application and found it to be incomplete, therefore, pursuant to Section 120.60, Florida Statutes (F.S.) no further action will be taken on this application until we receive the following information.

The licensee information on the application, specifically the EIN#, is inconsistent with the information reported to the Florida Division of Corporations (DOC). Please have the DOC correct the EIN#.

Clearance for the level two background screening for the Financial Officer, Mandy Garnier. Please see the application instructions or go to:
http://ahca.myflorida.com/MCHQ/Long_Term_Care/Background_Screening/index.shtml
for details regarding the background screening process.

**Please forward the documentation listed above within 21 days of receipt of this letter or the request for license renewal WILL BE DENIED.**

In addition, a review of your application indicates that the current general and professional liability insurance expires on December 4, 2010. Pursuant to Section 400.141(20), F.S., nursing homes must maintain general and professional liability insurance in force at all times. Proof of coverage must be submitted to the Agency no later than December 25, 2010 or your license will be subject to revocation and fine assessment.

Pursuant to section 408.831, Florida Statutes (F.S.), any outstanding fines assessed by Final Order of AHCA or the Centers for Medicare and Medicaid Services by the licensee or a common controlling interest must be paid prior to license issuance.

If you have any questions regarding the above, please contact me at (850) 412-4303 or by email at kathleen.munn@ahca.myflorida.com. Please send all correspondence to:



2727 Mahan Drive, MS#33
Tallahassee, Florida 32308

Visit AHCA online at
ahca.myflorida.com

Agency for Health Care Administration
Long Term Care Unit
2727 Mahan Drive, MS# 33
Tallahassee, Florida 32308

Sincerely,

Kathy Munn
Health Services and Facilities Consultant
Long Term Care Unit



phone: (228) 897-6730
direct fax: (601) 607-5930
office fax: (228) 897-6711
linda.bonney@foxeverett.com

**SENT VIA OVERNIGHT UPS**

**TO:**      Agency for Health Care Administration
Attn: Kathleen Munn
Long Term Care Unit, MS 33
2727 Mahan Drive
Tallahassee, FL 32308

**FROM:**   Linda Bonney

**DATE:**   September 21, 2010

**RE:**      **Patient Trust Bond Replacements**

Enclosed please find 33 executed bonds with powers written through Great American Insurance Company. These are to replace bonds written through SureTec effective 9/1/10.

Per our phone conversations and emails, please return the original SureTec bonds to us. If at all possible, return by overnight mail charging to our UPS account number that was provided in my email to you.

Please let me know when I should expect to receive the SureTec bonds that we will be returning for flat cancellation.

Thanks for all your help.

Linda



**Linda Bonney**
Office Manager

12260 Intraplex Parkway
Gulfport, MS 39503-4642
www.foxeverett.com

direct line: (228) 897-6730
office fax: (228) 897-6711
linda.bonney@foxeverett.com



12260 Intraplex Parkway | Gulfport, MS 39503-4642
p (228) 897-6700 | f (228) 897-6711 | www.foxeverett.com



# Nursing Home
# PATIENT TRUST SURETY BOND

**FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION**
**BOND #2043235**

KNOWN TO ALL PERSONS BY THESE PRESENT THAT <u>SF Lake Placid, LLC dba Lake Placid Health Care Center</u> of <u>125 Tomoka Blvd, Lake Placid, Highlands County, FL 33852</u> as Principal and <u>Great American Insurance Company</u> a Surety Company organized under the laws of the state of <u>Ohio</u> and licensed to do business in the state of Florida as Surety, are held and firmly bound unto the Agency for Health Care Administration, the obligee, in the total penal sum of <u>NinetyThousand and NO/100</u> dollars ($90,000) lawful money of the United States of America, for which sum well and truly to be paid said Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally firmly by these present.

A. WHEREAS, The above named Principal is a nursing home as defined in Chapter 400, Part II, Florida Statutes, and as such, is a licensee under Chapter 400, Part II, Florida Statutes and

B. WHEREAS, Section 400.162(5)(b), Florida Statutes, requires each nursing home to post a surety bond, in an amount equal to twice the average monthly balance in the patient trust fund during the prior year or $5,000.00, whichever is greater.

NOW, THEREFORE, the condition of this obligation is such that is the above named Principal shall: (1) well and truly hold separately and in trust all patients' funds deposited with Principal as a nursing home and (2) shall administer said funds on behalf of said patients in the manner directed by Section 400.162, Florida Statutes, and (3) shall render true and complete accounts to the patients, the depositors and the Obligee when requested, and (4) upon termination of each such deposit , shall account for all funds received thereunder, expended and held on hand, then this obligation shall be null and void, otherwise to remain in full force and effect.
This bond is executed and accepted subject to the following conditions:

(1) The Agency for Health Care Administration or, with the written consent of the Secretary of such Agency, any aggrieved patient or depositor, may maintain in his own name, an action on this bond, to recover for Principal's alleged breaches of the contract hereof, in any Court of competent jurisdiction in the state of Florida. (2) This bond shall be effective as of 12:01 a.m. of <u>09/01/10</u>, and shall continue in full force and effect until <u>09/01/11</u>.

IN WITNESS WHEREOF, the parties hereto have affixed their hands seals this 1<u>st</u> day of <u>September</u>, 20<u>10</u>.
SF Lake Placid, LLC                                  Great American Insurance Co.

_____              _____
Principal's Representative                              Surety Company's Representative
                                                                       Deborah Neichter Attorney-in-Fact
Upon issuance of renewal, forward original to address shown below. Upon cancellation or non-renewal advise office indicated below no less than 30 days in advance giving reason for such action.

Agency for Health Care Administration
Long Term Care Unit, MS 33
2727 Mahan Drive
Tallahassee, FL 32308

AHCA Form 3110-6002, Revised May 2006
Code
Page 1 of 1
http://ahca.myflorida.com/Publications/Forms/HQA.shtml

Subsection 59A-4.103(6)(c), Florida Administrative
Form available at:



(35) App#
18109

RECEIVED 09/22/10 CMSO

# GREAT AMERICAN INSURANCE COMPANY®

### Administrative Office: 580 WALNUT STREET • CINCINNATI, OHIO 45202 • 513-369-5000 • FAX 513-723-2740

The number of persons authorized by
this power of attorney is not more than   TEN

No. 0  19962

### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the GREAT AMERICAN INSURANCE COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Ohio, does hereby nominate, constitute and appoint the person or persons named below, each individually if more than one is named, its true and lawful attorney-in-fact, for it and in its name, place and stead to execute on behalf of the said Company, as surety, any and all bonds, undertakings and contracts of suretyship, or other written obligations in the nature thereof; provided that the liability of the said Company on any such bond, undertaking or contract of suretyship executed under this authority shall not exceed the limit stated below.

| Name | | Address | Limit of Power |
|---|---|---|---|
| DEBORAH NEICHTER | MARGIE M. LOWRY | SHERYON QUINN | ALL |
| JILL KEMP | MYRTIE F. HENRY | JACKIE C. KOESTEL | $75,000,000. |
| BONNIE J. WORTHAM | SANDRA F. HARPER | ALL OF | |
| KATHY HOBBS | VIRGINIA E. WOOLRIDGE | LOUISVILLE, KENTUCKY | |

This Power of Attorney revokes all previous powers issued on behalf of the attorney(s)-in-fact named above.

IN WITNESS WHEREOF the GREAT AMERICAN INSURANCE COMPANY has caused these presents to be signed and attested by its appropriate officers and its corporate seal hereunto affixed this         5TH         day of         JANUARY         2010   .

Attest                                                    GREAT AMERICAN INSURANCE COMPANY



*Assistant Secretary*                                   *Divisional Senior Vice President*

DAVID C. KITCHIN (513-412-4602)

STATE OF OHIO, COUNTY OF HAMILTON - ss:

On this     5TH     day of     JANUARY     2010   , before me personally appeared DAVID C. KITCHIN, to me known, being duly sworn, deposes and says that he resides in Cincinnati, Ohio, that he is a Divisional Senior Vice President of the Bond Division of Great American Insurance Company, the Company described in and which executed the above instrument; that he knows the seal of the said Company; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by authority of his office under the By-Laws of said Company, and that he signed his name thereto by like authority.



**KAREN L. GROSHEIM**
**NOTARY PUBLIC, STATE OF OHIO**
**MY COMMISSION EXPIRES 02-20-11**

This Power of Attorney is granted by authority of the following resolutions adopted by the Board of Directors of Great American Insurance Company by unanimous written consent dated June 9, 2008.

*RESOLVED: That the Divisional President, the several Divisional Senior Vice Presidents, Divisional Vice Presidents and Divisional Assistant Vice Presidents, or any one of them, be and hereby is authorized, from time to time, to appoint one or more Attorneys-in-Fact to execute on behalf of the Company, as surety, any and all bonds, undertakings and contracts of suretyship, or other written obligations in the nature thereof; to prescribe their respective duties and the respective limits of their authority; and to revoke any such appointment at any time.*

*RESOLVED FURTHER: That the Company seal and the signature of any of the aforesaid officers and any Secretary or Assistant Secretary of the Company may be affixed by facsimile to any power of attorney or certificate of either given for the execution of any bond, undertaking, contract of suretyship, or other written obligation in the nature thereof, such signature and seal when so used being hereby adopted by the Company as the original signature of such officer and the original seal of the Company, to be valid and binding upon the Company with the same force and effect as though manually affixed.*

### CERTIFICATION

I, STEPHEN C. BERAHA, Assistant Secretary of Great American Insurance Company, do hereby certify that the foregoing Power of Attorney and the Resolutions of the Board of Directors of June 9, 2008 have not been revoked and are now in full force and effect.

Signed and sealed this   1ST   day of   September   2010 .



*Assistant Secretary*

S1029Y (10/08)

Extremely Urgent

This envelope is for use with the following services:

UPS Next Day Air®
UPS Worldwide Express™
UPS 2nd Day Air®

Apply shipping documents on this side.

Do not use this envelope for:

UPS Ground
UPS Standard
UPS 3 Day Select®

Visit ups.com® or call 1-800-PICK-UPS® (1-800-742-5877)
to schedule a pickup or find a drop off location near you.

**Domestic Shipments**
- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment qualifies.
- To qualify for the Letter rate, UPS Express Envelopes must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

Note: Express Envelopes are not recommended for shipments containing sensitive personal or cash equivalent.

FOR UPS SHIPPING ONLY

RECEIVED

SEP 2 2 2010

Central Systems
Management Unit

https://www.campusship.ups.com/cship/create?ActionOriginPair=print_... Receipt&POPU... 9/21/2010

BILLING: P/P

**UPS NEXT DAY AIR**

1

TRACKING #: 1Z F6V 354 01 9160 7549

FL 323 0-01

SHIP TO:
KATHLEEN MUNN
AGENCY FOR HEALTH CARE ADM
2727 MAHAN DRIVE
LONG TERM CARE UNIT, MS 33
TALLAHASSEE FL 32308-5407

LINDA BONNEY
228-897-6700
FOX EVERETT GULFPORT
12350 INTRAPLEX PARKWAY
GULFPORT MS 39503

0.0 LBS





FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

| AHCA USE ONLY: | |
|---|---|
| File #: | 62802 |
| Application #: | 18109 |
| Check #: | 48699 |
| Check Amt: | 20250.00 |
| Batch #: | 102000063 |
| | 9-19-10 |

## HEALTH CARE LICENSING APPLICATION
## NURSING HOME

Under the authority of Chapters 408 Part II and 400, Part II, Florida Statutes (F.S.), and Chapters 59A-35 and 59A-4, Florida Administrative Code (F.A.C.), an application is hereby made to operate a nursing home as indicated below:

## 1. Provider / Licensee Information

**A. Provider Information – please complete the following for the nursing home name and location.** Provider name, address and telephone number will be listed on http://www.floridahealthfinder.gov.

| License # (for renewal & change of ownership applications) SNF 1274095 | National Provider Identifier (NPI) (if applicable) 1427217637 | Medicare # (CMS CCN) 10-5455 | Medicaid # 000633900 |
|---|---|---|---|

Name of Nursing Home (if operated under a fictitious name, list that here) Lake Placid Health Care Cente

Street Address 125 Tomoka Blvd South

| City Lake Placid | County Highland | State FL | Zip 33852 |
|---|---|---|---|

| Telephone Number (863)465-7200 | Fax Number (863)465-2054 | E-mail Address lakeplacid@gulfcoasthealthcare.com | Provider Website N/A |
|---|---|---|---|

Mailing Address or ☑ Same as above (All mail will be sent to this address)

| City | State | Zip |
|---|---|---|

| Contact Person for this application Mylita Henderson | Contact Telephone Number 850-430-0294 |
|---|---|

| Contact e-mail address or ☐ Do not have e-mail mhenderson@hcnavigator.net | **NOTE:** By providing your e-mail address, you agree to accept e-mail correspondence from the Agency |
|---|---|

**B. Licensee Information – please complete the following for the entity seeking to operate the nursing home.**

| Licensee Name (maybe same as provider name above) SF Lake Placid, LLC | Federal Employer Identification Number (EIN) 26-2691469 |
|---|---|

Mailing Address or ☐ Same as above 2 North Palafox St.

| City Pensacola | State FL | Zip 32502 |
|---|---|---|

| Telephone Number 850-430-0000 | Fax Number 850-436-6766 | E-mail Address N/A |
|---|---|---|

Description of Licensee (check one):

| For Profit | Not for Profit | Public |
|---|---|---|
| ☐ Corporation | ☐ Corporation | ☐ State |
| ☑ Limited Liability Company | ☐ Religious Affiliation | ☐ City/County |
| ☐ Partnership | ☐ Limited Liability Company | ☐ Hospital District |
| ☐ Individual | ☐ Other | |
| ☐ Other | | |

## 2. Application Type and Fees

**APPLICATION TYPE:** Indicate the type of application with an "X." Applications will not be processed if applicable fees are not included. All fees are nonrefundable. Renewal and Change of Ownership applications must be received 60 days prior to the expiration of the license or the proposed effective date of the change to avoid a late fine.

☐     Initial Licensure
☑     Renewal Licensure
☐     Change of Ownership                                 Proposed Effective Date: _____
☐     Partial Inactive License (# of inactive beds: ___ )       Proposed Effective Date: _____
☐     Full Inactive pursuant to ss. 408.808(3), F.S.           Proposed Effective Date: _____
☐     Change During License Period:
        ☐    Increase/Decrease in number of licensed beds     ☐ Name change to: _____
        ☐    Reactivation of Inactive beds                          ☐ Other: (please specify) _____

| Action | Fee | TOTAL FEES |
|---|---|---|
| LICENSE FEE (Initial, Renewal and Change of Ownership): <br> ☐ License Fee Exemption = $ 0.00 <br>    (County or Municipal Government pursuant to 400.062(4), F.S.) | $112.50 per bed x <u>180</u> number of beds = <br> *(Exception – any facility with **sheltered beds** pays $100.25 per bed x number of beds).* | $ 20,250.00 |
| Change During Licensure Period/Replacement License | ($112.50 per bed x _____ number of new beds = _____ - Exception: any facility with sheltered beds pay $100.25 per bed for all beds or $25.00 for other changes | $ |
| **TOTAL FEES INCLUDED WITH APPLICATION:** | | $ 20,250.00 |

*Please make check or money order payable to the Agency for Health Care Administration (AHCA)*

## 3. Controlling Interests of Licensee

**AUTHORITY:**

Pursuant to section 408.806(1)(a) and (b), Florida Statutes, an application for licensure must include: the name, address and Social Security number of the applicant and each controlling interest, if the applicant or controlling interest is an individual; and the name, address, and federal employer identification number (EIN) of the applicant and each controlling interest, if the applicant or controlling interest is not an individual. Disclosure of Social Security number(s) is mandatory. The Agency for Health Care Administration shall use such information for purposes of securing the proper identification of persons listed on this application for licensure. However, in an effort to protect all personal information, **do not include Social Security numbers on this form. All Social Security numbers must be entered on the Health Care Licensing Application Addendum, AHCA Form 3110-1024.**

**DEFINITIONS:**

**Controlling interests,** as defined in section 408.803(7), Florida Statutes, are the applicant or licensee; a person or entity that serves as an officer of, is on the board of directors of, or has a 5-percent or greater ownership interest in the applicant or licensee; or a person or entity that serves as an officer of, is on the board of directors of, or has a 5-percent or greater ownership interest in the management company or other entity, related or unrelated, with which the applicant or licensee contracts to manage the provider. The term does not include a voluntary board member.

**Voluntary Board Member,** as defined in subsection 408.803(13), Florida Statutes, means a board member or officer of a not-for-profit corporation or organization who serves solely in a voluntary capacity, does not receive any remuneration for his or her services on the board of directors, and has no financial interest in the corporation or organization.

In Sections A and B below, provide the information for each individual or entity (corporation, partnership, association) with 5% or greater ownership interest in the licensee. Attach additional sheets if necessary.

## A. Individual and/or Entity Ownership of Licensee

| FULL NAME of INDIVIDUAL or ENTITY | PERSONAL OR BUSINESS ADDRESS | TELEPHONE NUMBER | EIN (No SSNs) | % OWNERSHIP INTEREST |
|---|---|---|---|---|
| Florida Facilities, LLC | 2 North Palafox St. Pensacola, FL 32502 | 850-430-0000 | 26-2577948 | 100 |
| | | | | |
| | | | | |
| | | | | |

## B. Board Members and Officers of Licensee

| TITLE | FULL NAME | PERSONAL OR BUSINESS ADDRESS | TELEPHONE NUMBER | % OWNERSHIP INTEREST |
|---|---|---|---|---|
| Director/CEO | N/A | | | |
| President | Craig Robinson | 2 North Palafox St. Pensacola, FL 32502 | 850-430-0000 | 0 |
| Vice | N/A | | | |
| Secretary | N/A | | | |
| Treasurer | Mandy Garnier | 2 North Palafox St. Pensacola, FL 32502 | 850-430-0000 | 0 |
| Other: | | | | |

## C. Voluntary Board Members and Officers of Licensee

If the licensee is a not-for-profit corporation/organization, provide the requested information for **each individual that serves as a voluntary board member**. Attach additional sheets if necessary.

| FULL NAME | PERSONAL OR BUSINESS ADDRESS | TELEPHONE NUMBER |
|---|---|---|
| N/A | | |
| | | |
| | | |
| | | |

## D. Administration

| TITLE | NAME | TELEHPONE NUMBER | E-MAIL | FLORIDA LICENSE NUMBER |
|---|---|---|---|---|
| Administrator | David J. Smith | (863)465-7200 | lakeplacid@gulfcoasthealthcare.com | NH 3421 |
| Chief Financial Officer | Mandy Garnier | 850-430-0000 | mgardnier@gulfcoasthealthcare.com | N/A |

## 4. Management Company Controlling Interests

**Does a company other than the licensee manage the licensed provider?**

If ☑ NO, skip to section 5 – *Required Disclosure.*

If ☐ YES, provide the following information:

| | | |
|---|---|---|
| Name of Management Company | EIN (No SSNs) | Telephone Number / Fax |
| Street Address | E-mail Address | |
| City | County | State | Zip |
| Mailing Address or ☐ Same as above | | |
| City | | State | Zip |
| Contact Person | Contact E-mail | Contact Telephone Number |

In Sections A and B below, provide the information for each individual or entity (corporation, partnership, association) with 5% or greater ownership interest in the management company.   Attach additional sheets if necessary.

### A.   Individual and/or Entity Ownership of Management Company

| FULL NAME of INDIVIDUAL or ENTITY | PERSONAL OR BUSINESS ADDRESS | TELEPHONE NUMBER | EIN (No SSNs) | % OWNERSHIP INTEREST |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### B.   Board Members and Officers of Management Company

| TITLE | FULL NAME | PERSONAL OR BUSINESS ADDRESS | TELEPHONE NUMBER | % OWNERSHIP INTEREST |
|---|---|---|---|---|
| Director/CEO | | | | |
| President | | | | |
| Vice President | | | | |
| Secretary | | | | |
| Treasurer | | | | |
| Other: | | | | |

## C. Voluntary Board Members and Officers of Management Company

If the management company is a not-for-profit corporation/organization, provide the requested information for **each individual that serves as a voluntary board member**. Attach additional sheets if necessary.

| FULL NAME | PERSONAL OR BUSINESS ADDRESS | TELEPHONE NUMBER |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# 5. Required Disclosure

## The following disclosures are required:

A.  Pursuant to subsection 408.809(1)(d), F.S., the applicant shall submit to the agency a description and explanation of any convictions of offenses prohibited by sections 435.04 and 408.809(5), F.S., for each controlling interest.

Has the applicant or any individual listed in sections 3 and 4 of this application been convicted of any level 2 offense pursuant to subsection 408.809(1)(d), Florida Statutes? (These offenses are listed on the Affidavit of Compliance with Background Screening Requirements, AHCA Form #3100-0008.)     YES ☐     NO ☑

If yes, enclose the following information:

☐ The full legal name of the individual and the position held

☐ A description/explanation of the conviction(s) - If the individual has received an exemption from disqualification for the offense, include a copy

B.  Pursuant to section 408.810(2), F.S., the applicant must provide a description and explanation of any exclusions, suspensions, or terminations from the Medicare, Medicaid, or federal Clinical Laboratory Improvement Amendment (CLIA) programs.

Has the applicant or any individual listed in Sections 3 and 4 of this application been excluded, suspended, terminated or involuntarily withdrawn from participation in Medicare or Medicaid in any state?     YES ☐     NO ☑

If yes, enclose the following information:

☐ The full legal name of the individual and the position held

☐ A description/explanation of the exclusion, suspension, termination or involuntary withdrawal.

C.  Pursuant to section 408.815(4), F.S., does the applicant or any controlling interest in an applicant have any of the following:

YES ☐   NO ☑   Convicted of, or entered a plea of guilty or nolo contendere to, regardless of adjudication, a felony under chapter 409, chapter 817, chapter 893, 21 U.S.C. ss. 801-970, or 42 U.S.C. ss. 1395-1396, within the previous 15 years prior to the date of this application;

YES ☐   NO ☑   Terminated for cause from the Florida Medicaid program pursuant to s. 409.913, and not been in good standing with the Florida Medicaid program for the most recent 5 years;

YES ☐   NO ☑   Terminated for cause, pursuant to the appeals procedures established by the state or federal government, from the federal Medicare program or from any other state Medicaid program, have not been in good standing with a state Medicaid program or the federal Medicare program for the most recent 5 years and the termination was less than 20 years prior to the date of this application.

D.     Pursuant to section 400.111, F.S.:

☑     There are no health care or resident care entities in which the applicant, controlling interest, management company and administrator of the facility have had financial or ownership interest in the past five years that meets the disclosure requirements as described in subsection 400.111, F.S.

☐     Yes there are health care or resident care entities in which the applicant, controlling interest, management company and/or administrator of the facility have had financial or ownership interest in the past five years that meets the disclosure requirements as described in subsection 400.111, F.S. Please complete the following for each individual as required. Attach additional sheets as necessary.

| Name of Individual: | | Relationship to facility: | | |
|---|---|---|---|---|
| Entity: | | Type of Action | | Date |
| Entity Type: | | | | |
| Address (Street, City, State, Zip) | | | EIN (No SSNs): | |
| Reason for above action: | | | | |
| List other adverse action by a regulatory agency including the date: | | | | |
| If no longer have financial/ownership interest in the entity, indicate last date of interest: | | | | |
| Name of Individual: | | Relationship to facility: | | |
| Entity: | | Type of Action | | Date |
| Entity Type: | | | | |
| Address (Street, City, State, Zip) | | | EIN (No SSNs): | |
| Reason for above action: | | | | |
| List other adverse action by a regulatory agency including the date: | | | | |
| If no longer have financial/ownership interest in the entity, indicate last date of interest: | | | | |

## 6. Provider Fines and Financial Information

Pursuant to subsection 408.831(1)(a), Florida Statutes, the Agency may take action against the applicant, licensee, or a licensee which shares a common controlling interest with the applicant if they have failed to pay all outstanding fines, liens, or overpayments assessed by final order of the Agency or final order of the Centers for Medicare and Medicaid Services (CMS), not subject to further appeal, unless a repayment plan is approved by the Agency.

Are there any incidences of outstanding fines, liens or overpayments as described above?   YES ☐     NO ☑

    If yes, please complete the following for each incidence (attach additional sheets if necessary):

    Amount: $ _____ assessed by:  ☐ Agency for Health Care Administration Case # _____   ☐ CMS

    Date of related inspection, application or overpayment period if applicable: _____

    Due date of payment: _____

    Is there an appeal pending from a Final Order?   YES ☐     NO ☐

*Please attach a copy of the approved repayment plan if applicable.*

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F Pg 163 of 244

## 7. Federal Certification

Does the provider participate in or intend to participate in the
Medicaid program?   YES ☑   NO ☐
Medicare program?   YES ☑   NO ☐

**If you plan to participate in Medicaid:**
Visit the Agency's website at: http://ahca.myflorida.com/Medicaid/index.shtml in order to obtain information and an application for enrollment in Medicaid.

**If you plan to participate in Medicare:**
The Medicare Provider Application (CMS Form 855) is available from the fiscal intermediary or on the Center for Medicare and Medicaid Services (CMS) website at: www.cms.hhs.gov/cmsforms. The form must be sent directly to the chosen fiscal intermediary for review.

## 8. Number of Beds

**Information below should reflect the number and description of beds requested in this application.**

Is this a request to add beds?   YES ☐   NO ☑   If yes, please indicate the total number of <u>new</u> beds: ___

Community Beds: 180 + Sheltered Beds: ___ + Inactive Beds: ___ = 180 **(must equal total licensed beds)**

*Other bed types:*
   Private Beds: 16   Semi-Private Beds: 164   Pediatric Beds: ___   Hospice Beds: ___

**Total Licensed Beds: 180**

| | YES | NO |
|---|---|---|
| Do you offer continuing care agreements as defined in Chapter 651, F.S.? *If yes, attach Certificate of Authority issued by the Department of Financial Services.* | ☐ | ☑ |
| Do you operate an Outpatient Geriatric Clinic as defined in section 59A-4.150, F.A.C.? | ☐ | ☑ |
| Do you provide Adult Day Care Services as defined in subsection. 429.901(1), F.S.? | ☐ | ☑ |
| Do you plan to participate in alternate bed placement pursuant to subsection. 400.23(2)(a), F.S.? | ☐ | ☑ |
| Do you plan to utilize licensed nurses to perform both licensed nurse and certified nursing assistant duties during the same shift as defined in subsection. 400.23(3)(a)4, F.S.? | ☐ | ☑ |

## 9. Resident Grievances

If applying for renewal of an existing license, report the following information regarding the resident grievance procedures.

A.   Reporting period (12-month period ending with last calendar quarter):
B.   Total number of grievances handled during the reporting period:
C.   Complete the chart below:

| # of Grievances | Grievance Type | Total # of Outcomes | # of Outcomes | | |
|---|---|---|---|---|---|
| | | | | | Pending |
| | Food and Nutrition | | | | |
| | Staffing | | | | |
| 43 | Personal Possessions | 43 | 35 | 3 | 5 |
| 5 | Privacy and Dignity | 5 | 5 | | |
| | Activities and Social Services | | | | |
| | Financial Issues | | | | |
| | Environmental | | | | |
| 5 | Other: | 5 | 5 | | |

14-50756 - #500-6 File 02/06/15 Enter 02/06/15 16:47:27 Exhibit F Pg 164 of 244

## 10. Consumer Information

The following information will be made available to consumers through the Nursing Home Guide. You may access the Nursing Home Guide at: http://ahcaxnet.fdhc.state.fl.us/nhcguide/.

**Daily Rate:**

Current Daily Rate ($) of Semi-Private Room for skilled nursing care for a private pay new resident: $ 205

**Payment Forms Accepted:**

| | | | |
|---|---|---|---|
| ☑ | Medicare | ☑ | Medicaid |
| ☑ | Insurance and/or HMO | ☐ | VA |
| ☑ | CHAMPUS | ☑ | Workers Compensation |

**Religious Affiliation (if any):**

| | | | |
|---|---|---|---|
| ☐ | Adventist | ☐ | Lutheran |
| ☐ | Baptist | ☐ | Methodist |
| ☐ | Catholic | ☐ | Presbyterian |
| ☐ | Jewish | ☐ | Other: Non-Denominational |

**Languages Spoken by Administrator and Staff:**

| | | | |
|---|---|---|---|
| ☑ | Creole | ☐ | Italian |
| ☑ | Filipino | ☐ | Polish |
| ☐ | French | ☑ | Sign Language |
| ☑ | German | ☑ | Spanish |
| ☐ | Hebrew | ☐ | Other: |

**Special Services** - A checked box indicates that the service is provided at this facility and staff meet the necessary requirements, if any, such as:

**Alzheimer's:** If special accommodations are made for residents with Alzheimer's or dementia, such accommodations include separate living areas and the facility has staff trained in the care of patients with Alzheimer's or dementia.

**Ventilator Dependent:** Accept residents that are ventilator dependent and have staff properly trained to care for them.

**Pet Therapy:** Pets are a regular part of therapy.

**Pediatric Care:** Accept residents under the age of 18 years and the nursing staff has been properly trained to care for pediatric residents.

| | | | | | |
|---|---|---|---|---|---|
| ☑ | 24Hr Onsite RN Coverage | ☐ | HIV Care | ☐ | Tracheotomy |
| ☐ | Adult Day Care | ☑ | Hospice | ☐ | Ventilator Dependent |
| ☑ | Alzheimer's | ☐ | Pediatric | ☐ | Water Therapy |
| ☐ | Dialysis | ☑ | Pet Therapy | ☐ | Weight Training |
| ☐ | Eden Alternative | ☑ | Respite | ☐ | Yoga |
| | | | | ☐ | Other: |

**Type of Care** - A checked box indicates that the type of care is provided at this facility and staff meet the necessary requirements, if any, such as:

**Joint Commission on Accreditation of Healthcare Organizations (JCAHO):** If accredited, without recommendations for improvement (i.e. accredited or accredited with commendation) for each of the three areas.

☐ JCAHO accredited Sub-Acute Program

☐ JCAHO accredited Dementia Special Care Unit

☐ JCAHO accredited Long Term Care Program

14-50756 - #500-6 File 02/06/15 Enter 02/06/15 16:47:27 Exhibit F Pg 165 of 244

## 11. Affidavit

I, Craig Robinson _____, hereby swear or affirm, under penalty of perjury, that the statements in this application are true and correct. As administrator or authorized representative of the above named provider/facility, I hereby attest that all employees required by law to undergo Level 2 background screening have met the minimum standards of sections 435.04, and 408.809(5), Florida Statutes (F.S.), or are awaiting screening results.

In addition, I attest that all employees subject to Level 2 screening standards have attested to meeting the requirements for qualifying for employment and agree to inform me immediately if convicted of any of the disqualifying offenses while employed here as specified in subsection 435.04(5), F.S.


_____          President _____          9/15/10
Signature of Licensee or Authorized Representative     Title                              Date


**RETURN THIS COMPLETED FORM WITH FEES AND ALL REQUIRED DOCUMENTS TO:**

AGENCY FOR HEALTH CARE ADMINISTRATION
LONG TERM CARE UNIT
2727 MAHAN DR., MS 33
TALLAHASSEE FL  32308-5407

**Questions?**  Review the information available at   http://ahca.myflorida.com  or contact the Long Term Care Unit at (850) 412-4303.

AGENCY FOR HEALTH CARE ADMINISTRATION
HEALTH QUALITY ASSURANCE
HEALTH FACILITY REGULATION

### PATIENT TRUST SURETY BOND

Bond # 3341808

KNOWN TO ALL PERSONS BY THESE PRESENT THAT

SF Lake Placid, LLC dba Lake Placid Health Care Center _____ of
(nursing home)

2 North Palafox Street _____ Escambia _____ Pensacola, FL 32502 ____ as Principal and
(nursing home street address)         (county)          (city/state/zip)

SureTec Insurance Company _____ , a Surety Company
(Surety Company)

organized under the laws of the state of _____ Texas _____ and licensed to do business in the state of Florida as Surety, are held and firmly bound unto the Agency for Health Care Administration, the obligee, in the total penal sum of Ninty Thousand and NO/100*** _____ dollars ( ___ 90,000.00*** ___ ) lawful money of the United States of America, for which sum well and truly to be paid said Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally firmly by these present.

A.      WHEREAS, The above named Principal is a nursing home as defined in Chapter 400, Part II, Florida Statutes, and as such, is a licensee under Chapter 400, Part II, Florida Statutes and

B.      WHEREAS, Section 400.162(5)(b), Florida Statutes, requires each nursing home to post a surety bond, in an amount equal to twice the average monthly balance in the patient trust fund during the prior year or $5,000.00, whichever is greater.

NOW, THEREFORE, the condition of this obligation is such that is the above named Principal shall: (1) well and truly hold separately and in trust all patients' funds deposited with Principal as a nursing home and (2) shall administer said funds on behalf of said patients in the manner directed by Section 400.162, Florida Statutes, and (3) shall render true and complete accounts to the patients, the depositors and the Obligee when requested, and (4) upon termination of each such deposit, shall account for all funds received thereunder, expended and held on hand, then this obligation shall be null and void, otherwise to remain in full force and effect.

This bond is executed and accepted subject to the following conditions:
   (1) The Agency for Health Care Administration or, with the written consent of the Secretary of such Agency, any aggrieved patient or depositor, may maintain in his own name, an action on this bond, to recover for Principal's alleged breaches of the contract hereof, in any Court of competent jurisdiction in the state of Florida.  (2) This bond shall be effective as of 12:01 a.m. of _____ 9/1/2010 _____ , and shall continue in full force and effect until _____ 9/1/2011 _____ .

IN WITNESS WHEREOF, the parties hereto have affixed their hands seals this 25th day of ___ August ___ , 2010 .

SF Lake Placid, LLC dba Lake Placid Health Care Center          SureTec Insurance Company

_____               _____
Principal's Representative                     Surety Company's Representative
                                               B. Doyle Campbell, Attorney-in-fact

Upon issuance of renewal, forward original to address shown below.  Upon cancellation or non-renewal advise office indicated below no less than 30 days in advance giving reason for such action.

Agency for Health Care Administration
Long Term Care Unit, MS 33
2727 Mahan Drive
Tallahassee, FL  32308

AHCA Form 3110-6002, Revised - July, 2001

POA #: _____3341808_____

# SureTec Insurance Company
## LIMITED POWER OF ATTORNEY

*Know All Men by These Presents,* That SURETEC INSURANCE COMPANY (the "Company"), a corporation duly organized and existing under the laws of the State of Texas, and having its principal office in Houston, Harris County, Texas, does by these presents make, constitute and appoint

B. Doyle Campbell

of      Alabama     , Texas its true and lawful Attorney-in-fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings or other instruments or contracts of suretyship to include waivers to the conditions of contracts and consents of surety for:

**Principal:** SF Lake Placid, LLC dba Lake Placid Health Care Center
**Obligee:** Agency for Health Care Administration
**Amount:** $90,000.00

and to bind the Company thereby as fully and to the same extent as if such bond were signed by the President, sealed with the corporate seal of the Company and duly attested by its Secretary, hereby ratifying and confirming all that the said Attorney-in-Fact may do in the premises. Said appointment is made under and by authority of the following resolutions of the Board of Directors of the SureTec Insurance Company:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and of behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached. *(Adopted at a meeting held on 20th of April, 1999.)*

*In Witness Whereof,* SURETEC INSURANCE COMPANY has caused these presents to be signed by its President, and its corporate seal to be hereto affixed this 20th day of June, A.D. 2005.

SURETEC INSURANCE COMPANY

By: _____
B.J. King, President

State of Texas      ss:
County of Harris

On this 20th day of June, A.D. 2005 before me personally came B.J. King, to me known, who, being by me duly sworn, did depose and say, that he resides in Houston, Texas, that he is President of SURETEC INSURANCE COMPANY, the company described in and which executed the above instrument; that he knows the seal of said Company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said Company; and that he signed his name thereto by like order.



Michelle Denny
Notary Public
State of Texas
My Commission Expires
August 27, 2008

*Michelle Denny*
Michelle Denny, Notary Public
My commission expires August 27, 2008

I, M. Brent Beaty, Assistant Secretary of SURETEC INSURANCE COMPANY, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Company, which is still in full force and effect; and furthermore, the resolutions of the Board of Directors, set out in the Power of Attorney are in full force and effect.

Given under my hand and the seal of said Company at Houston, Texas this   25th   day of    August   , 20 _10_ , A.D.

_____
M. Brent Beaty, Assistant Secretary

**Any instrument issued in excess of the penalty stated above is totally void and without any validity.**
**For verification of the authority of this power you may call (713) 812-0800 any business day between 8:00 am and 5:00 pm CST.**

# CERTIFICATE OF LIABILITY INSURANCE

| | | |
|---|---|---|
| | **OP ID BL**<br>GULFC-1 | **DATE (MM/DD/YYYY)**<br>12/08/09 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| Hamilton Insurance Agency<br>Alan J. Zuccari, Inc.<br>4100 Monument Corner Dr. #500<br>Fairfax VA 22030<br>Phone: 703-359-8100    Fax: 703-359-8108 | |

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A   Lexington Insurance Co. | |
| Gulf Coast Health Care, LLC<br>SF Lake Placid, LLC<br>2 N. Palafox St.<br>Pensacola FL 32502 | INSURER B   American Int'l Specialty Lines | |
| | INSURER C | |
| | INSURER D | |
| | INSURER E | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>　CLAIMS MADE  X OCCUR<br>X $100,000 SIR | 066823544 | 12/04/09 | 12/04/10 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | | | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>　POLICY　PRO-JECT　LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | **AUTOMOBILE LIABILITY**<br>　ANY AUTO<br>　ALL OWNED AUTOS<br>　SCHEDULED AUTOS<br>　HIRED AUTOS<br>　NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>　ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN　EA ACC<br>AUTO ONLY　　AGG | $<br>$ |
| | | **EXCESS / UMBRELLA LIABILITY**<br>　OCCUR　CLAIMS MADE<br>　DEDUCTIBLE<br>　RETENTION　$ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?　Y/N<br>(Mandatory in NH)<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS　OTHER | |
| | | | | | | E L EACH ACCIDENT | $ |
| | | | | | | E L DISEASE - EA EMPLOYEE | $ |
| | | | | | | E L DISEASE - POLICY LIMIT | $ |
| B | | **OTHER**<br>Professional Liab | 6506212 | 12/04/08 | 12/04/10 | Each Occ<br>Aggregate | $75,000<br>$2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Location: Lake Placid Health Care Center 125 Tomoka Blvd South Lake Placid,
FL 33852

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| INFORM-<br><br>For Information Purposes Only | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE<br>Keith Parnell |

ACORD 25 (2009/01)　　　　　© 1988-2009 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

This Certificate of Insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

ACORD 25 (2009/01)



**AFFIDAVIT OF COMPLIANCE WITH**
**Background Screening**
**Requirements**

FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

**Authority:** This form may be used by all employees to comply with:

- the attestation requirements of section 435.05(2), Florida Statutes, which state that every employee required to undergo Level 2 background screening must attest, subject to penalty of perjury, to meeting the requirements for qualifying for employment pursuant to this chapter and agreeing to inform the employer immediately if arrested for any of the disqualifying offenses while employed by the employer; AND

- the proof of screening within the previous 5 years, in section 408.809(2), Florida Statutes, which requires proof of compliance with level 2 screening standards submitted within the previous 5 years to meet any provider or professional licensure requirements of the Agency, the Department of Health, the Agency for Persons with Disabilities, the Department of Children and Family Services, or the Department of Financial Services for an applicant for a certificate of authority or provisional certificate of authority to operate a continuing care retirement community under chapter 651 if the person has not been unemployed for more than 90 days.

*This form must be maintained in the employee's personnel file.* If this form is used as proof of screening for an administrator or chief financial officer to satisfy the requirements of an **application for a health care provider license**, please attach a copy of the screening results and submit with the licensure application.

---

**Employee/Contractor Name:** David Smith

**Health Care Provider/ Employer Name:** SF Lake Placid, LLC d/b/a Lake Placid Health Care Center

**Address of Health Care Provider:** 125 Tomoka Blvd South; Lake Placid, FL 33852

---

I hereby attest to meeting the requirements for employment and that I have not been arrested for or been found guilty of, regardless of adjudication, or entered a plea of nolo contendere, or guilty to any offense, or have an arrest awaiting a final disposition prohibited under any of the following provisions of the Florida Statutes or under any similar statute of another jurisdiction:

**Criminal offenses found in section 435.04, F.S**

a) Section 393.135, relating to sexual misconduct with certain developmentally disabled clients and reporting of such sexual misconduct.

(b) Section 394.4593, relating to sexual misconduct with certain mental health patients and reporting of such sexual misconduct.

(c) Section 415.111, relating to adult abuse, neglect, or exploitation of aged persons or disabled adults.

(d) Section 782.04, relating to murder.

(e) Section 782.07, relating to manslaughter, aggravated manslaughter of an elderly person or disabled adult, or aggravated manslaughter of a child.

(f) Section 782.071, relating to vehicular homicide.

(g) Section 782.09, relating to killing of an unborn quick child by injury to the mother.

(h) Chapter 784, relating to assault, battery, and culpable negligence, if the offense was a felony.

(i) Section 784.011, relating to assault, if the victim of the offense was a minor.

(j) Section 784.03, relating to battery, if the victim of the offense was a minor.

(k) Section 787.01, relating to kidnapping.

(l) Section 787.02, relating to false imprisonment.

(m) Section 787.025, relating to luring or enticing a child.

---

AHCA Form # 3100-0008, August 2010
Page 1 of 3

Section 59A-35.090(3)(b)2, Florida Administrative Code
Form available at: http://ahca.myflorida.com/Publications/Forms/HQA.shtml

(n) Section 787.04(2), relating to taking, enticing, or removing a child beyond the state limits with criminal intent pending custody proceedings.

(o) Section 787.04(3), relating to carrying a child beyond the state lines with criminal intent to avoid producing a child at a custody hearing or delivering the child to the designated person.

(p) Section 790.115(1), relating to exhibiting firearms or weapons within 1,000 feet of a school.

(q) Section 790.115(2)(b), relating to possessing an electric weapon or device, destructive device, or other weapon on school property.

(r) Section 794.011, relating to sexual battery.

(s) Former s. 794.041, relating to prohibited acts of persons in familial or custodial authority.

(t) Section 794.05, relating to unlawful sexual activity with certain minors.

(u) Chapter 796, relating to prostitution.

(v) Section 798.02, relating to lewd and lascivious behavior.

(w) Chapter 800, relating to lewdness and indecent exposure.

(x) Section 806.01, relating to arson.

(y) Section 810.02, relating to burglary.

(z) Section 810.14, relating to voyeurism, if the offense is a felony.

(aa) Section 810.145, relating to video voyeurism, if the offense is a felony.

(bb) Chapter 812, relating to theft, robbery, and related crimes, if the offense is a felony.

(cc) Section 817.563, relating to fraudulent sale of controlled substances, only if the offense was a felony.

(dd) Section 825.102, relating to abuse, aggravated abuse, or neglect of an elderly person or disabled adult.

(ee) Section 825.1025, relating to lewd or lascivious offenses committed upon or in the presence of an elderly person or disabled adult.

(ff) Section 825.103, relating to exploitation of an elderly person or disabled adult, if the offense was a felony.

(gg) Section 826.04, relating to incest.

(hh) Section 827.03, relating to child abuse, aggravated child abuse, or neglect of a child.

(ii) Section 827.04, relating to contributing to the delinquency or dependency of a child.

(jj) Former s. 827.05, relating to negligent treatment of children.

(kk) Section 827.071, relating to sexual performance by a child.

(ll) Section 843.01, relating to resisting arrest with violence.

(mm) Section 843.025, relating to depriving a law enforcement, correctional, or correctional probation officer means of protection or communication.

(nn) Section 843.12, relating to aiding in an escape.

(oo) Section 843.13, relating to aiding in the escape of juvenile inmates in correctional institutions.

(pp) Chapter 847, relating to obscene literature.

(qq) Section 874.05(1), relating to encouraging or recruiting another to join a criminal gang.

(rr) Chapter 893, relating to drug abuse prevention and control, only if the offense was a felony or if any other person involved in the offense was a minor.

(ss) Section 916.1075, relating to sexual misconduct with certain forensic clients and reporting of such sexual misconduct.

(tt) Section 944.35(3), relating to inflicting cruel or inhuman treatment on an inmate resulting in great bodily harm.

(uu) Section 944.40, relating to escape.

(vv) Section 944.46, relating to harboring, concealing, or aiding an escaped prisoner.

(ww) Section 944.47, relating to introduction of contraband into a correctional facility.

(xx) Section 985.701, relating to sexual misconduct in juvenile justice programs.

(yy) Section 985.711, relating to contraband introduced into detention facilities.

(3) The security background investigations under this section must ensure that no person subject to this section has been found guilty of, regardless of adjudication, or entered a plea of nolo contendere or guilty to, any offense that constitutes domestic violence as defined in s. 741.28, whether such act was committed in this state or in another jurisdiction.

Criminal offenses found in section 408.809(4), F.S

(a) Any authorizing statutes, if the offense was a felony.

  
(b) This chapter, if the offense was a felony.

(c) Section 409.920, relating to Medicaid provider fraud.

(d) Section 409.9201, relating to Medicaid fraud.

(e) Section 741.28, relating to domestic violence.

(f) Section 817.034, relating to fraudulent acts through mail, wire, radio, electromagnetic, photoelectronic, or photooptical systems.

(g) Section 817.234, relating to false and fraudulent insurance claims.

(h) Section 817.505, relating to patient brokering.

(i) Section 817.568, relating to criminal use of personal identification information.

(j) Section 817.60, relating to obtaining a credit card through fraudulent means.

(k) Section 817.61, relating to fraudulent use of credit cards, if the offense was a felony.

(l) Section 831.01, relating to forgery.

(m) Section 831.02, relating to uttering forged instruments.

(n) Section 831.07, relating to forging bank bills, checks, drafts, or promissory notes.

(o) Section 831.09, relating to uttering forged bank bills, checks, drafts, or promissory notes.

(p) Section 831.30, relating to fraud in obtaining medicinal drugs.

(q) Section 831.31, relating to the sale, manufacture, delivery, or possession with the intent to sell, manufacture, or deliver any counterfeit controlled substance, if the offense was a felony.

---

If you are also using this form to provide evidence of prior Level 2 screening (fingerprinting) in the last 5 years <u>and</u> have not been unemployed for more than 90 days, please provide the following information. **A copy of the prior screening results must be attached.**

Purpose of Prior Screening: Nursing Home Administrator License requirement

Screened conducted by:                    Date of Prior Screening: 02/18/2010

☑ Agency for Health Care Administration
☐ Department of Health
☐ Agency for Persons with Disabilities
☐ Department of Children and Family Services
☐ Department of Financial Services

---

## Affidavit

Under penalty of perjury, I, David Smith _____, hereby swear or affirm that I meet the requirements for qualifying for employment in regards to the background screening standards set forth in Chapter 435 and section 408.809, F.S. In addition, I agree to immediately inform my employer if arrested or convicted of any of the disqualifying offenses while employed by any health care provider licensed pursuant to Chapter 408, Part II F.S.

| | | |
|---|---|---|
| _(signature)_ | Administrator | 9/7/2010 |
| Employee/Contractor Signature | Title | Date |

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 173 of 244



# AFFIDAVIT OF COMPLIANCE WITH
# Background Screening
# Requirements

FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

**Authority:** This form may be used by all employees to comply with:

- the attestation requirements of **section 435.05(2), Florida Statutes**, which state that every employee required to undergo Level 2 background screening must attest, subject to penalty of perjury, to meeting the requirements for qualifying for employment pursuant to this chapter and agreeing to inform the employer immediately if arrested for any of the disqualifying offenses while employed by the employer; **AND**

- the proof of screening within the previous 5 years in section **409.809(2), Florida Statutes** which requires proof of compliance with level 2 screening standards submitted within the previous 5 years to meet any provider or professional licensure requirements of the Agency, the Department of Health, the Agency for Persons with Disabilities, the Department of Children and Family Services, or the Department of Financial Services for an applicant for a certificate of authority or provisional certificate of authority to operate a continuing care retirement community under chapter 651 if the person has not been unemployed for more than 90 days.

*This form must be maintained in the employee's personnel file.* If this form is used as proof of screening for an administrator or chief financial officer to satisfy the requirements of an **application for a health care provider license**, please attach a copy of the screening results and submit with the licensure application.

---

| |
|---|
| **Employee/Contractor Name:** Mandy Garnier |
| **Health Care Provider/ Employer Name:** SF Lake Placid, LLC d/b/a Lake Placid Health Care Center |
| **Address of Health Care Provider:** 125 Tomoka Blvd South; Lake Placid, FL 33852 |

I hereby attest to meeting the requirements for employment and that I have not been arrested for or been found guilty of, regardless of adjudication, or entered a plea of nolo contendere, or guilty to any offense, or have an arrest awaiting a final disposition prohibited under any of the following provisions of the Florida Statutes or under any similar statute of another jurisdiction:

(f) Section 782.071, relating to vehicular homicide.

**Criminal offenses found in section 435.04, F.S**

a) Section 393.135, relating to sexual misconduct with certain developmentally disabled clients and reporting of such sexual misconduct.

(b) Section 394.4593, relating to sexual misconduct with certain mental health patients and reporting of such sexual misconduct.

(c) Section 415.111, relating to adult abuse, neglect, or exploitation of aged persons or disabled adults.

(d) Section 782.04, relating to murder.

(e) Section 782.07, relating to manslaughter, aggravated manslaughter of an elderly person or disabled adult, or aggravated manslaughter of a child.

(g) Section 782.09, relating to killing of an unborn quick child by injury to the mother.

(h) Chapter 784, relating to assault, battery, and culpable negligence, if the offense was a felony.

(i) Section 784.011, relating to assault, if the victim of the offense was a minor.

(j) Section 784.03, relating to battery, if the victim of the offense was a minor.

(k) Section 787.01, relating to kidnapping.

(l) Section 787.02, relating to false imprisonment.

(m) Section 787.025, relating to luring or enticing a child.

---

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 174 of 244

(n) Section 787.04(2), relating to taking, enticing, or removing a child beyond the state limits with criminal intent pending custody proceedings.

(o) Section 787.04(3), relating to carrying a child beyond the state lines with criminal intent to avoid producing a child at a custody hearing or delivering the child to the designated person.

(p) Section 790.115(1), relating to exhibiting firearms or weapons within 1,000 feet of a school.

(q) Section 790.115(2)(b), relating to possessing an electric weapon or device, destructive device, or other weapon on school property.

(r) Section 794.011, relating to sexual battery.

(s) Former s. 794.041, relating to prohibited acts of persons in familial or custodial authority.

(t) Section 794.05, relating to unlawful sexual activity with certain minors.

(u) Chapter 796, relating to prostitution.

(v) Section 798.02, relating to lewd and lascivious behavior.

(w) Chapter 800, relating to lewdness and indecent exposure.

(x) Section 806.01, relating to arson.

(y) Section 810.02, relating to burglary.

(z) Section 810.14, relating to voyeurism, if the offense is a felony.

(aa) Section 810.145, relating to video voyeurism, if the offense is a felony.

(bb) Chapter 812, relating to theft, robbery, and related crimes, if the offense is a felony.

(cc) Section 817.563, relating to fraudulent sale of controlled substances, only if the offense was a felony.

(dd) Section 825.102, relating to abuse, aggravated abuse, or neglect of an elderly person or disabled adult.

(ee) Section 825.1025, relating to lewd or lascivious offenses committed upon or in the presence of an elderly person or disabled adult.

(ff) Section 825.103, relating to exploitation of an elderly person or disabled adult, if the offense was a felony.

(gg) Section 826.04, relating to incest.

(hh) Section 827.03, relating to child abuse, aggravated child abuse, or neglect of a child.

(ii) Section 827.04, relating to contributing to the delinquency or dependency of a child.

(jj) Former s. 827.05, relating to negligent treatment of children.

(kk) Section 827.071, relating to sexual performance by a child.

(ll) Section 843.01, relating to resisting arrest with violence.

(mm) Section 843.025, relating to depriving a law enforcement, correctional, or correctional probation officer means of protection or communication.

(nn) Section 843.12, relating to aiding in an escape.

(oo) Section 843.13, relating to aiding in the escape of juvenile inmates in correctional institutions.

(pp) Chapter 847, relating to obscene literature.

(qq) Section 874.05(1), relating to encouraging or recruiting another to join a criminal gang.

(rr) Chapter 893, relating to drug abuse prevention and control, only if the offense was a felony or if any other person involved in the offense was a minor.

(ss) Section 916.1075, relating to sexual misconduct with certain forensic clients and reporting of such sexual misconduct.

(tt) Section 944.35(3), relating to inflicting cruel or inhuman treatment on an inmate resulting in great bodily harm.

(uu) Section 944.40, relating to escape.

(vv) Section 944.46, relating to harboring, concealing, or aiding an escaped prisoner.

(ww) Section 944.47, relating to introduction of contraband into a correctional facility.

(xx) Section 985.701, relating to sexual misconduct in juvenile justice programs.

(yy) Section 985.711, relating to contraband introduced into detention facilities.

(3) The security background investigations under this section must ensure that no person subject to this section has been found guilty of, regardless of adjudication, or entered a plea of nolo contendere or guilty to, any offense that constitutes domestic violence as defined in s. 741.28, whether such act was committed in this state or in another jurisdiction.

Criminal offenses found in section 408.809(4), F.S

(a) Any authorizing statutes, if the offense was a felony.

---

(b) This chapter, if the offense was a felony.

(c) Section 409.920, relating to Medicaid provider fraud.

(d) Section 409.9201, relating to Medicaid fraud.

(e) Section 741.28, relating to domestic violence.

(f) Section 817.034, relating to fraudulent acts through mail, wire, radio, electromagnetic, photoelectronic, or photooptical systems.

(g) Section 817.234, relating to false and fraudulent insurance claims.

(h) Section 817.505, relating to patient brokering.

(i) Section 817.568, relating to criminal use of personal identification information.

(j) Section 817.60, relating to obtaining a credit card through fraudulent means.

(k) Section 817.61, relating to fraudulent use of credit cards, if the offense was a felony.

(l) Section 831.01, relating to forgery.

(m) Section 831.02, relating to uttering forged instruments.

(n) Section 831.07, relating to forging bank bills, checks, drafts, or promissory notes.

(o) Section 831.09, relating to uttering forged bank bills, checks, drafts, or promissory notes.

(p) Section 831.30, relating to fraud in obtaining medicinal drugs.

(q) Section 831.31, relating to the sale, manufacture, delivery, or possession with the intent to sell, manufacture, or deliver any counterfeit controlled substance, if the offense was a felony.

---

If you are also using this form to provide evidence of prior Level 2 screening (fingerprinting) in the last 5 years <u>and</u> have not been unemployed for more than 90 days, please provide the following information. **A copy of the prior screening results must be attached.**

Purpose of Prior Screening: _____

Screened conducted by:                              Date of Prior Screening: _____

☐ Agency for Health Care Administration
☐ Department of Health
☐ Agency for Persons with Disabilities
☐ Department of Children and Family Services
☐ Department of Financial Services

---

## Affidavit

Under penalty of perjury, I, <u>Mandy Garnier</u>_____, hereby swear or affirm that I meet the requirements for qualifying for employment in regards to the background screening standards set forth in Chapter 435 and section 408.809, F.S. In addition, I agree to immediately inform my employer if arrested or convicted of any of the disqualifying offenses while employed by any health care provider licensed pursuant to Chapter 408, Part II F.S.

_____
Employee/Contractor Signature

Chief Financial Officer
_____
Title

9/16/2010
_____
Date



A COMPREHENSIVE HEALTH CARE COMPANY

# Gulf Coast Health Care, LLC

*Via ups overnight delivery*

September 1, 2010

Ms. Flora Austin
Long Term Care Unit
Agency for Health Care Administration
2727 Mahan Drive (Mail Stop 33)
Tallahassee, FL 32308

Re: Gulf Coast Health Care Patient Trust Surety Bonds

Dear Ms. Austin:

Please find enclosed original issue Patient Trust Surety Bonds for our Florida
facilities, effective 9-01-2010 through 9-01-2011. These bonds replace the
scanned copies sent to your attention on 09-02-2010.

Thank you and please do not hesitate to contact me at 850-430-0126 if you need
additional assistance.

Sincerely,

Marcy Foster
Administrative Assistant
mfoster@hcnavigator.net

AGENCY FOR HEALTH CARE ADMINISTRATION
HEALTH QUALITY ASSURANCE
HEALTH FACILITY REGULATION

### PATIENT TRUST SURETY BOND

Bond # 3341808

KNOWN TO ALL PERSONS BY THESE PRESENT THAT

SF Lake Placid, LLC dba Lake Placid Health Care Center _____ of
(nursing home)

2 North Palafox Street      Escambia      Pensacola, FL 32502    as Principal and
(nursing home street address)     (county)      (city/state/zip)

SureTec Insurance Company _____ , a Surety Company
(Surety Company)
organized under the laws of the state of _____ Texas _____ and licensed to do business in the state of Florida as Surety, are held and firmly bound unto the Agency for Health Care Administration, the obligee, in the total penal sum of Ninty Thousand and NO/100**** _____ dollars ( __90,000.00***__ ) lawful money of the United States of America, for which sum well and truly to be paid said Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally firmly by these present.

A.    WHEREAS, The above named Principal is a nursing home as defined in Chapter 400, Part II, Florida Statutes, and as such, is a licensee under Chapter 400, Part II, Florida Statutes and

B.    WHEREAS, Section 400.162(5)(b), Florida Statutes, requires each nursing home to post a surety bond, in an amount equal to twice the average monthly balance in the patient trust fund during the prior year or $5,000.00, whichever is greater.

NOW, THEREFORE, the condition of this obligation is such that is the above named Principal shall: (1) well and truly hold separately and in trust all patients' funds deposited with Principal as a nursing home and (2) shall administer said funds on behalf of said patients in the manner directed by Section 400.162, Florida Statutes, and (3) shall render true and complete accounts to the patients, the depositors and the Obligee when requested, and (4) upon termination of each such deposit, shall account for all funds received thereunder, expended and held on hand, then this obligation shall be null and void, otherwise to remain in full force and effect.

This bond is executed and accepted subject to the following conditions:
(1) The Agency for Health Care Administration or, with the written consent of the Secretary of such Agency, any aggrieved patient or depositor, may maintain in his own name, an action on this bond, to recover for Principal's alleged breaches of the contract hereof, in any Court of competent jurisdiction in the state of Florida. (2) This bond shall be effective as of 12:01 a.m. of _____ 9/1/2010 _____ , and shall continue in full force and effect until _____ 9/1/2011 _____ .

IN WITNESS WHEREOF, the parties hereto have affixed their hands seals this __25th__ day of __August__ , __2010__ .

SF Lake Placid, LLC dba Lake Placid Health Care Center      SureTec Insurance Company

_____      _____
Principal's Representative        Surety Company's Representative
                            B. Doyle Campbell, Attorney-in-fact

Upon issuance of renewal, forward original to address shown below. Upon cancellation or non-renewal advise office indicated below no less than 30 days in advance giving reason for such action.

Agency for Health Care Administration
Long Term Care Unit, MS 33
2727 Mahan Drive
Tallahassee, FL 32308

AHCA Form 3110-6002, Revised - July, 2001

(35) File #
6d802

POA #: 3341808

# SureTec Insurance Company
### LIMITED POWER OF ATTORNEY

**Know All Men by These Presents,** That SURETEC INSURANCE COMPANY (the "Company"), a corporation duly organized and existing under the laws of the State of Texas, and having its principal office in Houston, Harris County, Texas, does by these presents make, constitute and appoint

B. Doyle Campbell

of Alabama , Texas its true and lawful Attorney-in-fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings or other instruments or contracts of suretyship to include waivers to the conditions of contracts and consents of surety for:

**Principal:** SF Lake Placid, LLC dba Lake Placid Health Care Center
**Obligee:** Agency for Health Care Administration
**Amount:** $90,000.00

and to bind the Company thereby as fully and to the same extent as if such bond were signed by the President, sealed with the corporate seal of the Company and duly attested by its Secretary, hereby ratifying and confirming all that the said Attorney-in-Fact may do in the premises. Said appointment is made under and by authority of the following resolutions of the Board of Directors of the SureTec Insurance Company:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and of behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached. *(Adopted at a meeting held on 20th of April, 1999.)*

*In Witness Whereof,* SURETEC INSURANCE COMPANY has caused these presents to be signed by its President, and its corporate seal to be hereto affixed this 20th day of June, A.D. 2005.

SURETEC INSURANCE COMPANY

By: _____
B.J. King, President

State of Texas ss:
County of Harris

On this 20th day of June, A.D. 2005 before me personally came B.J. King, to me known, who, being by me duly sworn, did depose and say, that he resides in Houston, Texas, that he is President of SURETEC INSURANCE COMPANY, the company described in and which executed the above instrument; that he knows the seal of said Company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said Company; and that he signed his name thereto by like order.

Michelle Denny
Notary Public
State of Texas
My Commission Expires
August 27, 2008

*Michelle Denny*
Michelle Denny, Notary Public
My commission expires August 27, 2008

I, M. Brent Beaty, Assistant Secretary of SURETEC INSURANCE COMPANY, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Company, which is still in full force and effect; and furthermore, the resolutions of the Board of Directors, set out in the Power of Attorney are in full force and effect.

Given under my hand and the seal of said Company at Houston, Texas this 25th day of August , 20 10 , A.D.

_____
M. Brent Beaty, Assistant Secretary

**Any Instrument issued in excess of the penalty stated above is totally void and without any validity.**
**For verification of the authority of this power you may call (713) 812-0800 any business day between 8:00 am and 5:00 pm CST.**

**Extremely Urgent**

This envelope is for use with the following services:
**UPS Next Day Air**
**UPS Worldwide Express™**
**UPS 2nd Day Air**

Visit ups.com® or call **1-800-PICK-UPS®** (1-800-742-5877) to schedule a pickup or find a drop off location near you.

**Domestic Shipments**
To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.

To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

Apply shipping documents on this side.

Do not use this envelope for:
**UPS Ground**
**UPS Standard**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

MARCY FOSTER
850-430-0198 0198
GULF COAST HEALTH CARE
M N POLAFOX ST
PENSACOLA FL 32502

0.0 LBS    LTR    1 OF 1

SHIP TO:
FLORA AUSTIN/ MS # 33
850-430-0126
AHCA MS 33
2727 MAHAN DRIVE
TALLAHASSEE FL 32308-5407

*33*

FL 323 0-01



**UPS NEXT DAY AIR**        1

TRACKING #: 1Z F13 7Y5 01 9786 5564

BILLING:

Location:

RECEIVED
SEP 08 2010
Central Systems
Management Unit

**Austin, Flora**

| | |
|---|---|
| **From:** | Marcy Foster [MFoster@gulfcoasthealthcare.com] |
| **Sent:** | Friday, May 14, 2010 4:17 PM |
| **To:** | Austin, Flora |
| **Attachments:** | FL GL-PL Certs.pdf |

Ms. Austin,

I am sending this information in 3 different e-mails. Evidently, your (AHCA) exchange server could not receive a combined file of that size, so I am sending each separately.

Thank you so much.

Marcy Foster
Administrative Assistant
Health Care Navigator, LLC
430-0126-Direct Line
mfoster@hcnavigator.net


*** CONFIDENTIALITY NOTE ***
This message is confidential, intended only for the named recipient(s) and may contain information that is privileged or exempt from disclosure under applicable law. If you are not the intended recipient(s), you are notified that the dissemination, distribution or copying of this message is strictly prohibited. If you receive this message in error, or are not the named recipient(s), please notify the sender at the e-mail address above and discard this e-mail. Thank you.

gchc-disclaimer

1


# ACORD® CERTIFICATE OF LIABILITY INSURANCE

| OP IDBL | DATE (MM/DD/YYYY) |
|---|---|
| GULFC-1 | 12/08/09 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| Hamilton Insurance Agency<br>Alan J. Zuccari, Inc.<br>4100 Monument Corner Dr. #500<br>Fairfax VA 22030<br>Phone: 703-359-8100  Fax: 703-359-8108 | |

**INSURERS AFFORDING COVERAGE** | NAIC #

| INSURED | |
|---|---|
| Gulf Coast Health Care, LLC<br>SF Lake Placid, LLC<br>2 N. Palafox St<br>Pensacola FL 32502 | INSURER A: Lexington Insurance Co.<br>INSURER B: American Int'l Specialty Lines<br>INSURER C:<br>INSURER D:<br>INSURER E: |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>_ CLAIMS MADE  X OCCUR<br>X $100,000 SIR | 066823544 | 12/04/09 | 12/04/10 | EACH OCCURRENCE<br>DAMAGE TO RENTED PREMISES (Ea occurence)<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS - COMP/OP AGG | $ 1,000,000<br>$ 50,000<br>$<br>$ 1,000,000<br>$ 2,000,000<br>$ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY _ PRO-JECT _ LOC | | | | | |
| | | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>HIRED AUTOS<br>NON OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident)<br>BODILY INJURY (Per person)<br>BODILY INJURY (Per accident)<br>PROPERTY DAMAGE (Per accident) | $<br>$<br>$<br>$ |
| | | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT<br>OTHER THAN EA ACC<br>AUTO ONLY AGG | $<br>$<br>$ |
| | | **EXCESS / UMBRELLA LIABILITY**<br>OCCUR _ CLAIMS MADE<br>DEDUCTIBLE<br>RETENTION $ | | | | EACH OCCURRENCE<br>AGGREGATE | $<br>$<br>$<br>$ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ]<br>(Mandatory in NH)<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS OTH-ER<br>E.L. EACH ACCIDENT<br>E.L. DISEASE - EA EMPLOYEE<br>E.L. DISEASE - POLICY LIMIT | $<br>$<br>$ |
| B | | **OTHER**<br>Professional Liab | 6506212 | 12/04/08 | 12/04/10 | Each Occ<br>Aggregate | $75,000<br>$2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Location: Lake Placid Health Care Center 125 Tomoka Blvd South Lake Placid, FL 33852

**RECEIVED**
JAN 0 5 2010
Central Systems
Management Unit

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| INFORM-<br>For Information Purposes Only | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL ____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br><br>AUTHORIZED REPRESENTATIVE<br>Keith Parnell |

ACORD 25 (2009/01)                                      © 1988-2009 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**IMPORTANT**

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

**DISCLAIMER**

This Certificate of Insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon

RECEIVED

JAN 0 5 2010

Central Systems
Management Unit

ACORD 25 (2009/01)

**2. Article Number**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

7160 3901 9848 6183 8730

**3. Service Type  CERTIFIED MAIL**

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

LAKE PLACID HEALTH CARE CENTER
125 TOMOKA BLVD. SOUTH
LAKE PLACID, FL 33852

RE: 62802   SENDER: 35, 06, MS #33   ltr_p35_LiabilityIns_Expr.doc

PS Form 3811, January 2005         Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

*Michele Bonilla*   1-2-10

C. Signature

X  *Michele Bonilla*   ☐ Agent  ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

**RECEIVED**

**JAN 0 4 2010**

**Central Systems
Management Unit**

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (the "Agreement") is made as of the 4th day of December, 2008 (the "Effective Date"), by and between FLORIDA FACILITIES, LLC, a Delaware limited liability company ("Operator") and GULF COAST HEALTH CARE, LLC, a Delaware limited liability company ("Manager").

### BACKGROUND

A.     Operator operates through subsidiaries certain facilities licensed as skilled nursing and/or assisted living facilities as more fully set forth on Attachment A (individually a "Facility" and collectively, the "Facilities").

B.     Operator desires to engage Manager to provide its experience and skill to manage the Facilities on behalf of Operator under and subject to the terms of this Agreement.

C.     Manager has considerable experience and expertise in providing such management services and desires to provide such management services to the Facilities.

### AGREEMENT

In consideration of the premises and mutual promises and covenants of the parties, contained herein and for such other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     <u>Term</u>.  The term of this Agreement shall commence on the Effective Date and, unless earlier terminated earlier pursuant to a specific provision of this Agreement, shall continue in effect for a period of one (1) year (the "Initial Term").  Upon the expiration of the Initial Term, this Agreement shall automatically renew for successive one year terms (each a "Renewal Term") unless either party delivers to the other, at least ninety (90) days prior to the expiration of the Initial Term or any Renewal Term, written notice of such party's intent not to renew this Agreement.  The entire term of the Agreement, including the Initial Term and any and all Renewal Terms, is hereinafter referred to as the "Term".

2.     <u>Retention of Manager</u>.

2.1     <u>Retention</u>.  For and during the term of this Agreement, Operator does hereby engage Manager to provide to the Facilities the services described herein upon the terms and conditions hereinafter set forth, and Manager hereby accepts such engagement.

2.2     <u>Independent Contractor</u>.  The relationship of Manager to Operator and the Facilities shall be that of an independent contractor.  All acts performed by Manager shall be deemed to be performed in its capacity as an independent contractor and no act, commission or omission by Operator, a Facility, or Manager shall be construed to make or constitute the other its partner, member, principal, agent, joint venturer or associate.  No person employed in the operation or management of a Facility shall be an employee of Manager.



EXHIBIT
5

PENGAD 800-631-6989

2.3  Control Retained by Facilities. Each Facility shall own and/or hold all licenses, permits and contracts obtained with respect to such Facility. Specifically, and without limitation, each Facility shall, to the extent permitted by applicable law, own or hold or be a party to (a) a Medicare provider number, (b) the Medicare provider agreement with the Centers for Medicare and Medicaid Services ("CMS"), (c) the Medicare certification, (d) the Medicaid provider number, (e) the Medicaid provider agreement, and (f) the Medicaid certification for the Facility to the extent such Facility is participating in such programs.

3.  Duties and Obligations of Manager.

3.1  Management of Facility. During the Term and subject to the terms of this Agreement, Manager (either directly or through supervision of employees of a Facility) shall:

(a)  Employees. Provide oversight to the Operator and each Facility to select, hire, employ, lease, supervise and train, for the purpose of performing services at such Facility under the terms of this Agreement (to the extent such personnel are reasonably available in the community in which the Facility is located), a staff of nurses, technicians, nurse aides, office and other employees (each of whom may be replaced from time to time). All employees shall be employees of such Facility, and payroll shall be serviced by the "Administrator" as defined in that certain Administrative Services Agreement, dated the Effective Date, between Operator and Administrator.

(b)  Ancillary Services, Etc. Provide oversight to each Facility to administer, supervise and schedule all patient and other services of such Facility, including clinical care, the operation of food, barber/beautician and all similar ancillary services.

(c)  Collection of Monies. Use diligent, commercially reasonable efforts to collect accounts receivable and monies owed to the Facility; design and maintain accounting, billing, patient and collection records; and prepare and file insurance, Medicare, Medicaid and any and all other necessary or desirable reports and claims related to revenue production. Operator and each Facility expressly constitute Manager, to the extent permitted by applicable law, as its agent to administer, process and collect, on Operator's and/or Facilities behalf and in its name, all Medicare, Medicaid and other third party and private pay receivables. Operator and each Facility hereby grant Manager the right to enforce Operator's and/or Facility's rights as creditor under any contract or in connection with rendering any services for purposes of collecting accounts receivable and monies owed such Facility and/or the Operator.

(d)  Repairs. Order, supervise and conduct a program of regular maintenance and repair for each Facility. Manager shall make or install, or cause to be made or installed, any repairs, replacements, additions and improvements in and to each Facility and the furnishings and equipment thereof in order to keep and maintain the same in good repair, working order, and condition, and outfitted and equipped for the proper operation thereof in accordance with the terms and conditions of (i) any lease, sublease or sub-sublease (the "Applicable Lease Documents"), and (ii) each of the loan documents with respect to indebtedness of the Operator or a Facility or indebtedness that is secured by assets of the

2

Operator or a Facility, including the Operator's and a Facility's lease, sublease, or sub-sublease interest in a Facility (the "Applicable Loan Documents") with respect to each Facility provided in writing to Manager by Operator.

(e) <u>Concessions, Supplies</u>. Negotiate and enter into, in the name of and on behalf of Operator and/or Facility, such agreements, contracts and orders as Manager may deem necessary or advisable for the furnishing of services, concessions and supplies for the operation and maintenance of such Facility.

(f) <u>Food and Beverage</u>. Purchase for the account of Operator and/or each Facility food and beverages necessary for the operation and maintenance of such Facility and contract for all necessary services for the account of Operator and/or Facility.

(g) <u>Medical, Cleaning Supplies</u>. Purchase for the account of Operator and/or Facility medical, cleaning and other supplies, equipment, furniture and furnishings necessary for the operation and maintenance of the Facility.

(h) <u>Admitting and Discharging Patients</u>. Institute standards and procedures for admitting and discharging patients, for charging patients for services, and for collecting the charges from the patients or third parties.

(i) <u>Evaluate Facility Departments</u>. Make periodic evaluations of the performance of all departments of each Facility.

(j) <u>Legal and Regulatory Affairs</u>. Oversee and manage the legal and regulatory affairs for each Facility, including updating Facility policies and procedures in compliance with legal and regulatory requirements.

(k) <u>Audits</u>. Coordinate and arrange for all required annual audits for Operator and each Facility and preparation and completion of all required federal, state and local tax returns for Operator and each Facility; the cost of all of the foregoing shall be an Operator or Facility expense, as applicable.

(l) <u>Employee Retention Matters</u>. Handle and settle employee relation matters, union and nonunion.

3.2    <u>Reports to Operator; Budgets</u>.

(a) Not later than forty-five (45) days prior to the end of each calendar year, (or earlier if required by any Applicable Lease Documents and/or Applicable Loan Documents), Manager shall submit to Operator a proposed annual budget (each an "Annual Budget") covering the operations of and proposed capital expenditures to be made with respect to each Facility for the next calendar year. No later than thirty (30) days after the date of this Agreement, Manager shall submit to Operator a proposed initial budget (the "Initial Budget") covering the operations of and proposed capital expenditures to be made with respect to each Facility for the remainder of the current calendar year. Operator shall approve or disapprove the Annual Budget or Initial Budget submitted by Manager no later than thirty (30) days prior to the end of Operator's calendar year (or, in the case of the Initial Budget,

3

within fifteen (15) days of the receipt of the Initial Budget), provided, however, that Operator shall not unreasonably withhold, deny or delay such approval.

(b)    The Annual Budget and the Initial Budget shall include, in each case subject to compliance with the terms of any Applicable Lease Documents and/or Applicable Loan Documents:

(i)    an operating budget setting forth an estimate of operating revenues and expenses for such Facility for the next calendar year (or the remainder of the current calendar year, in the case of the Initial Budget), together with an explanation of anticipated changes in such Facility. Manager shall provide to Operator upon written request such other reports, including a cost comparison report, and all appropriate Medicare and Medicaid reports, as may be required under these programs, as are normally provided by Manager to the licensees of other similar facilities managed by Manager; and

(ii)    a capital budget outlining a program of capital expenditures as may be required by applicable law, by any Applicable Lease Documents and/or Applicable Loan Documents, by any lender to Operator or such Facility or in Manager's reasonable business judgment during the next calendar year (or the remainder of the current calendar year, in the case of the Initial Budget).

3.3    Legal Actions. Manager shall, with the written approval of Operator, not to be unreasonably withheld, conditioned or delayed, have the right to contest by appropriate legal proceedings, conducted in good faith in the name of Operator or any Facility, the validity or application of any law, ordinance, rule, ruling, regulation, order or requirement of any governmental agency having jurisdiction over the operation of the Facility. Operator shall fully cooperate with Manager with regard to the contest, and Manager is authorized to work with the Administrator (as defined in the Administrative Services Agreement) to pay from the Facility Depository Accounts the reasonable attorneys' fees and out-of-pocket costs and expenses incurred with regard to the contest. Counsel for any such contest shall be selected by Manager, with Operator's approval, such approval not to be unreasonably withheld, delayed or conditioned. Manager shall have the right, upon notice to Operator but without the written consent of Operator, to process all third-party claims for the services of any Facility, including, without limitation, the full right to contest to the exhaustion of all applicable administrative proceedings or procedures, adjustment and denials by governmental agencies or their fiscal intermediaries as third-party payors.

4

3.4    Access to Books, Records and Documents.

(a)    Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, Manager shall make available upon written request, to the Secretary of Health and Human Services, or upon request, to the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and all books, documents and records of Manager that are necessary to verify the nature of this Agreement for which payment may be made under the Medicare program; and

(b)    If Manager carries out any of the duties of this Agreement pursuant to a subcontract or subcontracts with an aggregate value or cost of $10,000 or more over a twelve (12) month period with a related organization, such subcontract or subcontracts shall contain a clause to the effect that, until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract or subcontracts, the related organization shall make available, upon written request, to the Secretary of Health and Human Services, or upon request, to the Comptroller General of the United States, or any of their duly authorized representatives, the subcontract or subcontracts, and all books, documents and records of such subcontractors for which payment may be made under the Medicare program.

3.5    Manager's Personnel. Authorized representatives of Manager shall visit each Facility as often as Manager deems necessary in connection with the performance of Manager's duties pursuant to this Agreement.    The time spent by such authorized representatives of Manager during all such visits and all out-of-pocket expenses arising from travel and lodging connected with such visitations shall not be charged separately to Operator. Notwithstanding the foregoing, the out-of-pocket expenses arising from travel and lodging connected with any visits of an extraordinary nature (including but not limited to visits related to capital improvements, lender inspections, training or extraordinary survey activity) may, at the option of Manager, be charged separately to a Facility as a Facility expense.

3.6    Government Regulations.    Manager agrees to operate and maintain each Facility in compliance with the requirements of all applicable statutes, ordinances, laws, rules, regulations and orders of any governmental or regulatory body having jurisdiction over the Facility and to comply with all orders and requirements of the local board of fire underwriters or any other body which may exercise similar functions; provided, however, that, unless such non-compliance is the result of Manager's fraud, willful act or omission, or gross negligence, Manager shall not be required to expend its separate funds in order to comply with any such statutes, ordinances, laws, rules, regulations or orders, and to the extent any funds are so required, it shall fulfill obligations hereunder by notifying Operator of the actions necessary in order to be in compliance therewith and expending such funds in the Facility Depository Accounts as are available for such purpose. If for any reason any term or condition of this Agreement is found to be invalid or contrary to government laws, rules, regulations or orders, Operator and Manager agree immediately and in good faith to modify such term or condition to comply with such government law, rule, regulation or order.

3.7    Quality Controls. Manager shall implement and maintain a "Quality Assurance Program" in order to provide objective measurements of the quality of healthcare

5

provided at each Facility and, in connection therewith, may utilize such techniques as patient questionnaires and interviews, physician questionnaires and interviews, and inspections, and such other techniques as Manager may reasonably deem necessary to maintain the quality of healthcare at each Facility.

3.8 <u>Performance of Services by Manager</u>. In the performance of its services hereunder, Manager shall exercise the same standards and degree of care used by reasonable and prudent managers of facilities of similar size, nature and character as the applicable Facility. Notwithstanding anything herein to the contrary, Manager shall not be deemed in violation of this Agreement if Manager is prevented from performing any of its obligations hereunder for reasons beyond its reasonable control including, without limitation, strikes, walkouts or other employee disturbances, acts of God, or the action or promulgation of any statute, rule, regulation or order by any federal, state, or local governmental or judicial agency or official, nor shall it be deemed in default hereunder or otherwise liable for any error of judgment or act or omission in the performance of its services hereunder, which is made in reasonable good faith.

3.9 <u>Maintenance of Facility</u>. Manager agrees to keep and maintain the Premises of each Facility in good appearance and working repair and condition in accordance with the relevant provisions of the Sublease, normal wear and tear excepted, and to maintain proper housekeeping to the extent sufficient revenues of such Facility are available for such purpose.

3.10 <u>Civil Money Damages</u>. Any civil money penalties which are imposed by CMS or the state in which a Facility is located as a result of the nursing care and/or treatment provided to residents of such Facility by employees of such Facility, along with all legal or other costs associated therewith, will be deemed an expense of such Facility. Manager reserves the right to appeal or waive appeal of any civil money penalty imposed by CMS, and/or any such state. Manager may retain counsel to represent the Facility in any appeal or settlement proceedings. All costs with any such appeal shall be an expense of the Facility.

3.11 <u>Changes in Method of Operation</u>. Manager shall not make substantial changes in the method of operating a Facility unless Manager first notifies Operator and Operator has given its written approval to such change, which approval shall not be unreasonably withheld. Manager acknowledges that Operator may have to obtain the approval of lendor or lessee under an Applicable Lease Documents and/or Applicable Loan Documents with respect to any such proposed change.

3.12 <u>Limitation of Pledging Operator or Facility Credit</u>. Manager shall not borrow any money or execute any promissory note, bill of exchange or other obligation, mortgage or encumbrance in the name and on behalf of Operator or a Facility or pledge the credit of Operator or a Facility without Operator's prior consent.

4. <u>Compensation</u>.

4.1 <u>Management Fee</u>. Commencing upon the Effective Date until the end of the Term, Operator shall pay to Manager from the Facility Depository Accounts, on a

6

monthly basis, an aggregate annual management fee equal to ████████████████████████████████ by Manager on behalf of the Facilities (collectively, the "Management Fee") by the 15th day of the calendar month following the month in which services were provided. "Adjusted Gross Revenue" means the consolidated net revenue of the Facilities determined in accordance with GAAP, excluding the following items: (i) federal, state and municipal excise, sales, and use taxes collected directly from residents, patients or other customers as a part of the sales prices of any goods or services; (ii) proceeds of any life or casualty insurance policies, condemnation or eminent domain; (iii) gains or losses arising from the sale or other disposition of capital assets; (iv) any reversal or accrual of any contingency or tax reserve; (v) interest income; (vi) disallowance for reimbursement claims accrued prior to the date of this Agreement; (vii) tax refunds; (viii) resident trust accounts; and (ix) miscellaneous revenue arising from dividends and refunds related to items previously expensed; provided that the proceeds of business interruption insurance or proceeds as a result of Medicare and Medicaid audits shall be included in Adjusted Gross Revenue, and funds required to be repaid as a result of Medicare and Medicaid audits shall be deducted from Adjusted Gross Revenue.

      4.2     Other Costs and Reimbursements. The Management Fee shall be in addition to any and all other reimbursements due Manager in accordance with the provisions of this Agreement.

      4.3     Overdue Invoices. Operator shall pay Manager interest on amounts due to Manager which are not paid within thirty (30) days of their due date at ████████████ ████████████████ per month on the past due balance.

      4.4     Annual Reconciliation. Within fifteen (15) days after the delivery of the annual financial statements of the Facilities (which shall be audited, if required), Operator shall arrange with Administrator to pay to Manager from the Facility Depository Accounts only, or Manager shall pay to Operator, such amount as is necessary to make the amount of the Management Fee paid with respect to the year to which the financial statements relate equal to the amount of Management Fee shown to be due by the annual financial statements.

      4.5     Non-Reimbursable Costs. Notwithstanding anything to the contrary in this Agreement, the following expenses or costs incurred by or on behalf of Manager in connection with the Facilities will be at the sole cost and expense of Manager and will not be reimbursed by Operator from the Facility Depository Accounts or otherwise, and Manager will indemnify and hold harmless Operator Parties (as hereafter defined) from all liability for the same:

      (a)     Costs attributable to gross negligence, willful misconduct or fraud on the part of Manager, Manager's Affiliates or Manager's employees or agents, or arising from Manager's willful breach under this Agreement, including theft of assets by Manager's employees, contractors or other agents; penalties or loss of discount due to delay in payment of bills or invoices; overpayment or duplicate payment of invoices arising from either fraud or error; overpayment of labor costs arising from either fraud or error; a sum equal to the value of any form of payment from purveyors of goods or services to

7

any of Manager's employees, contractors or agents arising from the purchase of goods or services relating to a Facility; and unauthorized use of facilities by Manager's employees, contractors or agents; provided, however, that Manager shall incur no such liability if any such event is the result of there being inadequate funds in the Facility Depository Accounts;

(b)     Any allocated expenses of Manager or its Affiliates for corporate overhead or any similar expenses; and

(c)     Any other expenses which are to be paid by Manager in accordance with the provisions of this Agreement.

4.6     <u>Management Fee Subordination</u>. Manager hereby agrees that the payment of Management Fees pursuant to this Agreement shall be subject and subordinate to the payment of all amounts due under any applicable Lease Documents and/or Applicable Loan Documents, including, without limitation, rent.

5.     <u>Covenants of Operator</u>.

5.1     <u>Licensing; Changes and Services</u>. Subject to the terms of this Agreement, Operator agrees to cooperate with Manager in taking or causing to be taken any and all actions necessary in order to maintain all required licenses, permits for the operation of the Facilities and the Facilities' eligibility to participate in public or private third-party medical payment programs, including keeping the Facilities in compliance with all applicable fire safety codes and other laws, regulations and orders, and to correct all structural, maintenance, procedural and staffing deficiencies as shown on the surveys and reports of governmental agencies having jurisdiction over each Facility. Operator agrees that it will not substantially change the services rendered by the Facilities during the Term without the prior written approval of Manager.

5.2     <u>Funds for Operation of the Facilities</u>. Operator agrees that it will use commercially reasonable efforts to cause sufficient funds for the operation of the Facilities to be available at all times in the Facility Depository Accounts, but if at any time sufficient funds are not available, Operator shall not have any liability to Manager or any third party and Manager shall not have any recourse against Operator whatsoever in such event. In no event shall Manager be required to advance any funds for the operation of any Facility.

5.3     <u>Cooperation</u>. Operator will cooperate with Manager in every respect to allow Manager to perform its services under this Agreement and will furnish Manager with all information required by it for the performance of its services under this Agreement. Operator will permit Manager full access to the Facilities and will allow Manager to examine and copy any data in the possession and control of Operator or any Facility affecting management and/or operation of the Facilities.

5.4     <u>Inspection of Documents</u>. Operator will examine documents submitted by Manager and render reasonable decisions pertaining thereto, when required, promptly, to avoid unreasonable delay in the progress of Manager's work. In any emergency situation (as reasonably determined by Manager), Manager shall not be required to seek or

8

obtain Operator's approval for any actions which Manager, in its sole judgment, deems necessary or appropriate to respond to such situations, provided Manager promptly thereafter reports such action to Operator in writing.

      5.5    <u>Proprietary Property</u>. Operator agrees that Manager retains all ownership and other rights in all proprietary systems, policy and other manuals, materials and other information, in whatever form, developed by Manager in the performance of its services under this Agreement. Nothing contained in this Agreement shall be construed as a license or transfer of such information either during the term of this Agreement or otherwise. Upon termination of this Agreement, or earlier upon Manager's request, Operator shall immediately return all such information to Manager.

    6.    <u>Default and Remedies; Termination</u>.

      6.1    <u>Events of Default</u>. Each of the following shall constitute an event of default under this Agreement (each, a "Default"), unless waived by the non-defaulting party hereto:

      (a)    If Operator fails to (i) make or cause to be made any payment to Manager required to be made by Operator or a Facility, including providing sufficient funds to operate the Facilities, and such failure shall continue for a period of thirty (30) days after notice thereof shall have been given by Manager to Operator, (ii) perform its obligations under this Agreement in any material respect, and such default shall continue for a period of (30) days after written notice thereof shall have been given by Manager to Operator, or (iii) make payments, or keep any covenants, owing to any third party and which would cause Operator to lose possession of a Facility or its buildings, equipment or other personal property;

      (b)    If Manager fails to (i) perform its obligations under this Agreement in any material respect, and such failure shall continue for a period of thirty (30) days after notice thereof shall have been given by Operator to Manager, or (ii) keep any covenants owing to any third party and which would cause Operator to lose possession of a Facility or its buildings, equipment or personal property;

      (c)    If, due to any act or omission of Operator or a Facility, a Facility (i) loses its Medicaid or Medicare certification, (ii) loses its license to operate for its intended purpose, or (iii) is closed, and any such event is not rescinded, vacated or stayed by action of Operator (or otherwise) within thirty (30) days of its issuance;

      (d)    If, due to any act or omission of Manager, a Facility (i) loses its Medicaid or Medicare certification, (ii) loses its license to operate for its intended purpose, or (iii) is closed, and any such event is not rescinded, vacated or stayed by action of Manager (or otherwise) within thirty (30) days of its issuance;

      (e)    If either Operator or Manager shall (i) be adjudicated bankrupt; (ii) admit in writing its inability to pay its debts generally as they become due; (iii) become insolvent in that its total assets are in the aggregate less than all of its liabilities or it is unable to pay its debts generally as they become due; (iv) make a general assignment for the benefit of

9

creditors; (v) file a petition, or admit (by answer, default or otherwise) the material allegations of any petition filed against it, in bankruptcy under the federal bankruptcy laws (as in effect on the date of this Agreement or as they may be amended from time to time), or under any other law for the relief of debtors, or for the discharge, arrangement or compromise of its debts; or (vi) consent to the appointment of a receiver, conservator, trustee or liquidator of all or part of its assets;

(f)     If a petition shall have been filed against Operator or Manager in proceedings under the federal bankruptcy laws (as in effect on the date of this Agreement, or as they may be amended from time to time), or under any other laws for the relief of debtors, or for the discharge, arrangement or compromise of its debts, or an order entered by any court of competent jurisdiction appointing a receiver, conservator, trustee or liquidator of all or part of Operator's or Manager's assets, and such petition or order is not dismissed or stayed within ninety (90) consecutive days after entry thereof; and

(g)     If Manager shall cease to engage actively in the business of operating and managing nursing homes, extended-care facilities and retirement communities. The Manager shall be deemed to have ceased to be actively engaged in the business of operating and managing nursing homes, extended-care facilities and retirement communities if it (and/or its Affiliates) shall manage, either as manager or owner, fewer than ten (10) nursing homes, extended-care facilities and retirements communities, including each of the Facilities.

6.2     Remedies Upon Default.  If any Default shall occur with respect to either party and be continuing, the other party may forthwith terminate this Agreement by giving written notice of such termination, and this Agreement shall terminate ninety (90) days after the date of such termination notice.  Neither party shall have any further obligations whatsoever under this Agreement after such termination except for (a) any liability arising out of any Default or any breach of this Agreement, (b) Manager's obligations pursuant to Section 6.4, (c) Operator's obligations pursuant to Section 6.4, if applicable, (d) Article 7 shall continue in force and effect. and (e) as otherwise specifically set forth in this Agreement.  Any termination by Manager as a result of a Default under Subsections 6.1(a), (c), (e) or (f) (where Operator is the affected party in the case of (e) and (f)) shall be without prejudice to Manager's right to receive all of the fees and reimbursements provided in this Agreement, including the Management Fee, through the end of Term.

6.3     Other Termination Events.  Operator shall also have the right to terminate this Agreement upon the loss by Operator of the right of possession or the right to collect the income from the operation of a Facility due to a termination of any lease, sublease or sub-sublease in accordance with its terms.   In such case, Operator may terminate this Agreement by giving written notice of such termination to Manager, and this Agreement shall terminate as of the termination of the lease, sublease or sub-sublease.  Neither party shall have any further obligations whatsoever under this Agreement after such termination except for (a) any liability arising out of any breach of this Agreement, (b) Manager's obligations pursuant to Section 6.4, (c) Operator's obligations pursuant to Section 6.4, if applicable, (d) Article 7 shall continue in force and effect, and (e) as otherwise specifically set forth in this Agreement.  Any termination by Operator pursuant to this Section 6.3 shall be without prejudice

10

to Manager's right to receive all of the fees and reimbursements provided in this Agreement, including the Management Fee, through the end of Term.

6.4    Cooperation.  Upon the termination or expiration of this Agreement for any reason, (a) Manager agrees to cooperate fully with Operator in effecting the orderly transition of the Facilities personnel to Operator or Operator's designee and the orderly transition of the Facilities operations to avoid any interruption in the rendering of services and, in that connection, Manager shall surrender to Operator all keys, and all books, records and reports, maintained by Manager in connection with the management and operation of the Facilities, and (b) Manager shall assign to Operator or the successor manager all contracts, agreements and commitments entered into by Manager with respect to the Facilities in accordance with and in compliance with the terms and conditions of this Agreement to the extent required and permitted by law.  The foregoing cooperation shall include an obligation by Manager to continue to provide services hereunder (and to continue to be paid the Management Fee) until such time as Operator retains a successor manager of the Facilities or Manager's services are otherwise no longer needed in compliance with applicable laws (even if such time extends beyond the end of the Term); provided, however, that Manager shall not be obligated to perform its services hereunder if it ceases to be paid the Management Fee.

7.    Exculpation; Indemnity; Limitation of Liability.

7.1    Exculpation.

(a)    Neither Operator, the Facilities, their Affiliates, nor their respective directors, officers, members, managers, employees or agents, nor any of their respective successors and assigns (individually a "Operator Party," collectively, the "Operator Parties"), shall be liable to Manager, its Affiliates, nor their respective directors, officers, members, managers, employees or agents, nor any of their respective successors and assigns (individually a "Manager Party," collectively, the "Manager Parties"), for or as a result of any act, omission or error in judgment that was taken, omitted or made by any Operator Party in the exercise of its judgment in good faith and which act, omission or error does not constitute gross negligence or willful misconduct (the parties expressly intend to exculpate Operator Parties for acts, errors or omissions constituting simple negligence). Notwithstanding anything to the contrary set forth in this Agreement, excluding any Losses (as defined in Section 7.2) incurred by any of Manager Parties as a result of the gross negligence or willful misconduct on the part of any Operator Party, the Operator Parties' liability to any person or entity pursuant to or relating to this Agreement shall be limited to the amounts deposited in the Facility Depository Accounts from time to time.

(b)    The Manager Parties shall not be liable to Operator Parties for or as a result of any act, omission or error in judgment that was taken, omitted or made by any Manager Party in the exercise of its judgment in good faith and which act, omission or error does not constitute gross negligence or willful misconduct (the parties expressly intend to exculpate Manager Parties for acts, errors or omissions constituting simple negligence). Notwithstanding anything to the contrary set forth in this Agreement, excluding any Losses incurred by any of Operator Parties as a result of gross negligence or willful misconduct on the part of any Manager Party, Manager Parties' liability to any person or entity pursuant to or

11

relating to this Agreement shall be limited to an amount equal to the Management Fee hereunder payable in the most recent calendar year in which the event giving rise to the liability occurred.

7.2    Indemnity.

(a)    Operator shall indemnify and hold each Manager Party harmless from and against any and all claims, losses, costs, damages, and liabilities, including reasonable attorneys' fees (collectively, "Losses"), incurred, caused or occasioned by, in connection with or arising out of this Agreement or the gross negligence or willful misconduct of any Operator Party, including, without limitation, Operator's violation or failure to perform, or misrepresentation with respect to, any of the terms, covenants or conditions of this Agreement, except to the extent such Losses result from the gross negligence or willful misconduct of any Manager Party.

(b)    Manager shall indemnify and hold each Operator Party harmless from and against any and all Losses incurred, caused or occasioned by, in connection with or arising out of the gross negligence or willful misconduct of any Manager Party, including, without limitation, Manager's violation or failure to perform, or misrepresentation with respect to, any of the terms, covenants or conditions of this Agreement, except to the extent such Losses result from the gross negligence or willful misconduct of any Operator Party.

7.3    Further Limitation of Liability.    In no event may any special or consequential damages be recovered against any Operator Party by any Manager Party as a result of Manager's performance of services under this Agreement, or the breach by Operator of any of its duties under this Agreement, or as a result of any matter otherwise relating in any manner to this Agreement or to the condition, or the operation, of the Facility. Similarly, in no event may any special or consequential damages be recovered against any Manager Party by any Operator Party as a result of Manager's performance of services under this Agreement or the breach by Manager of any of its duties under this Agreement, or as a result of any matter otherwise relating in any manner to this Agreement or to the condition, or the operation, of the Facility. It is further expressly understood and agreed that none of Operator Parties shall be liable to any Manager Party or any third party for any Losses which any of them may incur, directly or indirectly, as a result any errors or omissions of Manager or Operator or any of Manager Parties or Operator Parties, or as a result of complying with the terms of this Agreement or following the recommendations of, or implementing any of the plans or methods or operations determined by or utilized by Manager, whether approved pursuant to the terms of this Agreement or not.

7.4    Survival.    The provisions of this Article 7 shall survive any cancellation, termination or expiration of this Agreement and shall remain in full force and effect until the earlier to occur of three (3) years, or such earlier time as the applicable statute of limitations shall have expired for all demands, claims, actions, damages, losses, liabilities or expenses which are the subject of the provisions of this Article 7.

8.    Miscellaneous Provisions.

12

8.1 <u>Binding Agreement</u>. The terms, covenants, conditions, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

8.2 <u>Notices</u>. All notices, demands and requests contemplated hereunder by either party to the other shall be in writing, and shall be delivered by hand or by nationally recognized overnight delivery service; mailed, postage prepaid, registered, or certified mail return receipt requested; or by facsimile transmission to the following address:

(a)    to Operator:    Florida Facilities, LLC
4 West Red Oak Lane, Suite 201
White Plains, New York 10604

With a copy to:
Ari J. Markenson, Esq., Associate General Counsel
4 West Red Oak Lane, Suite 201
White Plains, New York 10604

(b)    to Manager:    Gulf Coast Health Care, LLC
2 North Palafox Street
Pensacola, Florida 32052

or to such other address or to such other person as may be designated by notice given from time to time during the Term by one party to the other. Any notice hereunder shall be deemed given five (5) days after mailing, if given by mailing in the manner provided above, or on the date delivered if given by hand, or on the next business day if delivered by overnight mail.

8.3 <u>Entire Agreement; Amendments</u>. The Agreement contains the entire agreement between the parties hereto, and no prior oral or written agreement and no contemporaneous oral representations between the parties with respect to the subject matter of this Agreement shall be of any force and effect. Any additions, amendments or modifications to this Agreement shall be of no force and effect unless in writing and signed by both Operator and Manager.

8.4 <u>Governing Law</u>. This Agreement and all the terms and provisions hereof and the rights and obligations of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State where the Facility is located, without regard to its rules of conflicts of laws.

8.5 <u>Captions and Headings</u>. The captions and headings throughout this Agreement are for convenience only and do not constitute a part hereof.

8.6 <u>Costs and Expenses</u>. Except as otherwise provided herein, all fees, costs and expenses arising out of, relating to or incurred in the operation of the Facilities, including, without limitation, the fees, costs, and expenses of Manager and outside consultants and professionals shall be payable as operating expenses of the Facilities

13

when incurred. Manager, by reason of the execution of this Agreement or the performance of its services hereunder, shall not be liable for or deemed to have assumed any liability for such fees, costs and expenses, or any other liability or debt of Operator whatsoever, arising out of or relating to the Facilities or incurred at its operation, except the salary of Manager's employees who are not retained for the purpose of performing services for the benefit of Operator under the terms of this Agreement and excepting the expenses and costs incurred at Manager's central administrative offices in performance of its obligations hereunder.

8.7 <u>Responsibility for Misconduct of Employees and Other Persons</u>. Subject to the provisions of Section 7.3 hereof, Manager shall be liable to Operator in connection with damage or loss sustained by Operator by reason of the dishonesty, willful misconduct or gross negligence of any employee based in or employee leased by the Facilities or of Manager's non-Facility–based employees with respect to their activities relating to the operation of the Facilities.

8.8 <u>Definition of Affiliate</u>. For purposes of this Agreement, the term "Affiliate" shall mean any person or entity which Manager or Operator or their respective stockholders or individual partners, directly or indirectly, through one or more intermediaries, controls, is in common control with, or is controlled by.

8.9 <u>Severability</u>. If any one or more of the provisions of this Agreement are held invalid or unenforceable, the validity and enforceability of all other provisions of this Agreement shall remain in full force and effect, unless enforcing the remainder of the provisions would not satisfy the original intentions of the parties.

8.10 <u>General Legal Compliance</u>. Each of Manager and Operator will conduct its business in compliance with all applicable statutes, regulations and policies, and the terms and conditions imposed by insurers and third party payors, including, without limitation, to the extent applicable the Medicare program, the Medicaid program and all other federal, state and municipal healthcare programs. Each of Manager and Operator shall maintain, and shall assure that all healthcare professionals employed by, or under contract with, each of them, who are involved in providing services in connection with this Agreement maintain in good standing all federal, state and local licenses, certifications and permits without restriction, required to use and to provide services, and shall comply with all applicable statutes and regulations regarding such licensure, certifications and permits.

8.11 <u>Security and Confidentiality of Transmitted Information</u>. Each of Manager and Operator shall maintain the privacy, security and confidentiality of all information transmitted or received through or maintained in connection with the contractual relationship created by this Agreement. In accordance with (a) all applicable statutes and regulations, including, without limitation, the applicable requirements of the Health Insurance Portability and Accountability Act of 1996, 104 P.L. 191, Subtitle F, and regulations and policies and advisory opinions, from time to time promulgated and published thereunder and with respect thereto as from time to time amended ("HIPAA") and (b) the protocols, rules, policies and other requirements of accrediting agencies, licensors and authorities that are applicable to the operation of Manager's and Operator's organization and business.

14

### 8.12  Privacy and Security Obligations.

(a)     Each of Manager and Operator shall be responsible to, and shall maintain the safety, security and integrity of all information created in connection with their contractual relationship, including any data or information received through their contractual relationship in their respective possessions, from unauthorized access, tampering, hacking, copying or other intrusions.  Without limitation of any other obligation set forth in this Agreement, Manager agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Operator for their contractual relationship and Operator agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Manager.

(b)     Each party to this Agreement (a "Receiving Party") does hereby assure the other party to this Agreement (the "Disclosing Party") that the Receiving Party will appropriately safeguard "protected health information," as defined from time to time under HIPAA ("Protected Information"), made available to or obtained by or accessed by such Receiving Party pursuant to this Agreement or otherwise in connection with their contractual relationship, including, without limitation, in connection with the retention of other provider's or other parties as part of or in a manner affecting their contractual relationship.  In implementation of such assurance and without limiting the obligations of either party otherwise set forth in this Agreement or imposed by applicable law, each Receiving Party hereby agrees to comply with applicable requirements of law relating to Protected Information and with respect to any task or other activity such Receiving Party performs with respect to the contractual relationship, to the extent the applicable Disclosing Party would be required to comply with such requirements.  The permitted and required uses and disclosures of such Protected Information by a Disclosing Party extend only to utilizing Protected Information within the contractual relationship and accessing and making disclosures of such Protected Information solely in connection with such Disclosing Party's operation or maintenance of the contractual relationship and in a manner consistent with the then-applicable requirements of HIPAA.

(c)     In amplification and not in limitation of the foregoing provisions of this Agreement, each Receiving Party agrees that such Receiving Party shall:

(i)     Not use or further disclose Protected Information other than as permitted or required by this Agreement and any and all other agreements between Receiving Party and Disclosing Party;

(ii)     Not use or further disclose Protected Information in a manner that would violate the requirements of applicable law, if done by Disclosing Party;

(iii)     Use appropriate safeguards to prevent use or disclosure of Protected Information other than as provided for by this Agreement;

15

(iv)   Promptly report to Disclosing Party any use or disclosure of Protected Information not provided for by this Agreement or any other agreements of which Receiving Party becomes aware;

(v)   Ensure that any subcontractors or agents to whom Receiving Party provides Protected Information received from Disclosing Party agree in writing to the same restrictions and conditions that apply to Receiving Party with respect to such Protected Information;

(vi)   Make available Protected Information in accordance with applicable law (in all events, Receiving Party shall immediately notify Disclosing Party upon receipt by Receiving Party of any such request, and shall provide Disclosing Party with copies of any such materials);

(vii)   Make Receiving Party's internal practices, books, and records relating to the use and disclosure of Protected Information received available to the Secretary of the United States Health and Human Services for purposes of determining Receiving Party's compliance with applicable law (in all events, Receiving Party shall immediately notify Disclosing Party upon receipt by Receiving Party of any such request, and shall provide Disclosing Party with copies of any such materials);

(viii)   At termination of this Agreement, return, destroy and expunge all Protected Information received from Disclosing Party, or created or received by the Receiving Party, on behalf of Disclosing Party, that Receiving Party still maintains in any form and retain no copies of such information, or, if such return or destruction is not feasible, extend the protection of this Agreement and applicable law to the Protected Information and limit further uses and disclosures of the Protected Information after termination of the Agreement to those purposes that make the return or destruction of the Protected Information feasible; and

(ix)   Incorporate any amendments or corrections to Protected Information when notified pursuant to applicable law.

(d)   Notwithstanding anything herein to the contrary, and without limiting the rights and remedies of Disclosing Party elsewhere set forth in this Agreement or available under applicable law, Disclosing Party may terminate this Agreement without penalty or recourse to Disclosing Party if Disclosing Party determines that Receiving Party has violated a material term of the provisions of this Agreement or such violation is imminent and material.

(e)   Receiving Party acknowledges that under HIPAA Disclosing Party could be deemed to be in violation of HIPAA if Disclosing Party knew of a pattern or activity or practice of Receiving Party that constitutes a material breach or violation of Receiving Party's obligation under this Agreement to maintain privacy, confidentiality and security of Protected Information, unless Disclosing Party takes reasonable steps to cure the breach or end the violation; and if such steps are unsuccessful, terminates this Agreement or reports the problem to the Secretary of Health and Human Services. Accordingly, Receiving

16

Party agrees promptly to notify Disclosing Party of any pattern of activity or practice of Receiving Party that constitutes any such material breach or violation as aforesaid.

(f)　　　Notwithstanding anything herein to the contrary, Manager acknowledges and agrees that Operator, and Operator acknowledges and agrees that Manager, may store, analyze, access and use de-identified information derived from Protected Information, provided none of such information contains individually identifiable health information, and further provided that any such use is then consistent with applicable law. The parties agree to negotiate in good faith any modification to this Agreement that may be necessary or required to ensure consistency with amendments to and changes in applicable federal and state laws and regulations, including, without limitation, regulations promulgated pursuant to HIPAA.

(g)　　　Manager shall incorporate in all agreements with subcontractors of and vendors to Manager such HIPAA compliance provisions as are substantially in the form set forth in this Agreement, *mutatis mutandis*, so that each shall be bound thereunder to the same extent as Operator and Manager, respectively, are bound hereunder. Operator or Manager, as appropriate, shall be named an intended third party beneficiary of each such subcontractor agreement with respect to the enforcement and enjoyment of the benefits of such compliance provisions.

8.13　　Assignment. Neither Manager nor Operator shall assign its rights or obligations under this Agreement without prior written consent of the other, except that Manager may at any time assign its rights and obligations under this Agreement to an Affiliate of Manager and either party may assign its rights and obligations under this Agreement to any party acquiring substantially all of its assets or ownership interests.

8.14　　Arbitration of Accounting Matters. If any controversy should arise between the parties in the performance, interpretation and application of this Agreement which involves accounting matters, either party may serve upon the other a written notice stating that such party desires to have the controversy reviewed by an arbitrator, who shall be a representative of a firm specializing in accounting in the nursing home, extended care facility and retirement community area. If the parties cannot agree within fifteen (15) days from the service of such notice, upon the selection of such an arbitrator, the arbitrator shall be selected or designated by the American Arbitration Association upon the written request of either party hereto. Arbitration of such controversy, disagreement or dispute shall be conducted in accordance with the rules then in force of the American Arbitration Association and the decision and award of the arbitrator so selected shall be binding upon Operator and Manager.

8.15　　Further Assurances. At any time and from time to time during the term of this Agreement, at either party's request, each party shall promptly execute and deliver all such further agreements, certificates, instruments and documents, including a certificate of Operator in a form reasonably satisfactory to Manager stating that this Agreement is in effect with respect to, and is binding against, Operator, and each party shall perform such further actions, as the other party may reasonably request in order to fully

17

consummate the transactions contemplated by this Agreement and carry out the purposes and intent of this Agreement.

8.16 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (delivery of which may occur by facsimile or as a PDF or similar attachment to an electronic communication), each of which when so executed and delivered shall constitute an original hereof, and it shall not be necessary in making proof of this Agreement to produce or account for more than one original counterpart hereof.

8.17 <u>Third Party Beneficiary</u>. The parties agree that this Agreement may not be modified or amended in any material respect, including, without limitation, any modification or amendment changing the amount or priority of payment of any management or other fees.

9. <u>Representations and Warranties</u>. Each of Operator and Manager make the following representations and warranties to the other party:

9.1 <u>Status</u>. The representing party is duly organized and validly existing in good standing under the laws of its state of formation, and has all necessary power to carry on its business as now being conducted, to operate its properties as now being operated, to carry on its contemplated business, to enter into this Agreement and to observe and perform its terms.

9.2 <u>Authority and Due Execution</u>. The representing party has full power and authority to execute and to deliver this Agreement and all related documents and to carry out the transactions contemplated by this Agreement. The execution of this Agreement by such party will not, with the passing of time, the giving of notice, or both, result in a default under or a breach or violation of such party's (i) organizational documents; (ii) any law, regulation, court order, injunction or decree of any court, administrative agency or governmental body; or (iii) any mortgage, note, bond, indenture, agreement, lease, license, permit or other instrument or obligation to which such party is now a party or by which such party or any of its assets may be bound or affected. This Agreement constitutes a valid and binding obligation of the representing party, enforceable against such party in accordance with its terms, except to the extent that its enforceability is limited by applicable bankruptcy, reorganization, insolvency, receivership or other laws of general application or equitable principles relating to or affecting the enforcement of creditors' rights.

9.3 <u>Litigation</u>. There is no litigation, claim, investigation, challenge or other proceeding pending or, to the knowledge of the representing party, threatened against such party, its properties or business which seeks to enjoin or prohibit it from entering into this Agreement.

9.4 <u>Program Representations</u>. With respect to any federal health care program as defined in section 1128B of the Social Security Act (42 U.S.C. 1320a-7b(f) or any State health care program as defined in section 1128B of the Social Security Act (42 U.S.C. 1320a-7b(h)) (collectively, the "Programs"), neither party, nor any individual with a direct or indirect ownership or central interest of five percent (5%) or more of such

18

party, nor any director, officer, agent or employee of such party has ever (i) been debarred, suspended or excluded from any Program; (ii) been sanctioned under any Program; or (iii) had a civil monetary penalty levied under any Program. Each party covenants to immediately notify the other in writing if this representation is no longer true.

**[SIGNATURES ON FOLLOWING PAGE.]**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement through their duly authorized representatives, as of the day and year first above written.

**OPERATOR:  FLORIDA FACILITIES, LLC**

By: _____

Name:  Eric M. Roth

Title:   President

**MANAGER: GULF COAST HEALTH CARE, LLC**

By: _____

Name:  Julie Gutzmann

Title:   Treasurer

20

# GULF COAST HEALTH CARE
## ASSOCIATE HANDBOOK
### DECEMBER 2008

Enclosed is your copy of the new Associate Handbook. It is intended to explain general policies relating to your employment with Gulf Coast Health Care. We hope you will find it helpful. Questions or comments about the handbook or policies are welcome and may be directed to the Human Resources Department.

**It is very important that you sign and return the last page of the handbook immediately to the payroll department upon receipt.**

Thank you for your attention, and we hope you will enjoy the handbook.


EXHIBIT
6
PENGAD 800-631-6989

# ASSOCIATE HANDBOOK

## WELCOME TO GULF COAST HEALTH CARE

Dear Associate:

We are very happy to welcome you to Gulf Coast Health Care. Thank you for joining us! We want you to feel that your association with Gulf Coast Health Care will be a mutually beneficial and pleasant one.

You have joined an organization that has established an outstanding reputation for quality services. Credit for this goes to every one of our associates. We hope you too, will find satisfaction and take pride in your work here.

This handbook provides answers to many of the questions you may have about Gulf Coast Health Care's benefit program, as well as the company policies and procedures we abide by - our responsibilities to you and your responsibility to Gulf Coast Health Care. If anything is unclear, please discuss the matter with your supervisor. You are responsible for reading and understanding this handbook and policy manual, and your performance evaluations will reflect your adherence to Gulf Coast Health Care policies. In addition to clarifying responsibilities, we hope this handbook also gives you an indication of Gulf Coast Health Care's interest in the welfare of all who work here.

From time to time, the information included in our policy manual may change. Every effort will be made to keep you informed through suitable lines of communication, including postings on the company bulletin boards and/or notices sent directly to you in-house.

Compensation and personal satisfaction gained from doing a job well are only some of the reasons most people work. Most likely, many other factors count among your reasons for working --- pleasant relationships and working conditions, career development, promotion opportunities and health benefits are just a few. Gulf Coast Health Care is committed to doing its part to assure you of a satisfying work experience.

I extend to you my personal best wishes for your success and happiness at Gulf Coast Health Care. Again, welcome!

Sincerely,

Craig Robinson
Chief of Operations

ii

# TABLE OF CONTENTS

## EMPLOYMENT

| | |
|---|---|
| Nature of Employment | 1 |
| Equal Employment Opportunity | 1 |
| Health Requirements | 1 |
| Introductory Period | 2 |
| Americans With Disabilities Act | 2 |
| False Claims Act | 2 |
| Employment Categories | 3 |

## BENEFITS

| | |
|---|---|
| Benefits | 3 |
| Vacation Benefits | 4 |
| Holidays | 4 |
| Sick Leave Benefits | 4 |
| Bereavement Leave | 5 |
| Jury Duty | 5 |
| Health Insurance | 5 |
| Dental Coverage | 5 |
| Life Insurance | 5 |
| 20+ Year Associates | 5 |
| Cafeteria Plan (Section 125) | 5 |
| Retirement Plan 401 (k) | 6 |
| Direct Deposit of Payroll Checks | 6 |
| Tuition Reimbursement | 6 |
| Transfer of Associates Between Locations | 6 |

## PAYROLL

| | |
|---|---|
| Pay Policy | 6 |
| Pay Increases | 6 |
| Pay Advances | 6 |
| Administrative Pay Corrections | 7 |
| Meal Periods | 7 |

iii

## LEVES

Family and Medical Leave Policy (FMLA)      7

## CONDUCT

| | |
|---|---|
| Disciplinary Action | 7 |
| Category I Offenses | 8 |
| Category II Offenses | 8 |
| Drug and Alcohol Abuse | 9 |
| Attendance | 9 |
| Excessive Absence | 9 |
| Patterned Absence | 9 |
| Unexcused Absence | 9 |
| No Call, No Show | 10 |
| Failure To Call | 10 |
| Tardiness | 10 |
| Sexual and Other Unlawful Harassment | 10 |
| Personal Appearance and Dress | 11 |
| Drug Testing | 11 |
| Problem Resolution | 12 |
| Resignation | 13 |

## ACKNOWLEDGMENT

Acknowledgment      14

# NATURE OF EMPLOYMENT

This personnel handbook is intended to provide associates with a general overview of Gulf Coast Health Care's personnel policies.

However, the handbook cannot anticipate every situation or answer every question about employment. It is not intended to create contractual obligations of any kind.

Neither the associate nor Gulf Coast Health Care is bound to continue the employment relationship if either chooses, at their will, to end the relationship at any time.

In order to retain necessary flexibility in the administration of policies and procedures, Gulf Coast Health Care reserves the right to change, revise, or eliminate any of the policies and/or benefits described in this handbook.

# EQUAL EMPLOYMENT OPPORTUNITY

Gulf Coast Health Care provides equal employment opportunity without regard to race, color, religion, sex, national origin, age, physical or mental disability, marital status, sexual orientation or preference, or veterans status. Equal employment opportunity shall apply to all matters relating to recruitment, selection, placement, transfer, training and development, promotions, compensation, benefits, disciplinary action or discharge, and in all other terms, conditions or privileges for employment.

# HEALTH REQUIREMENTS

Each associate shall be required to meet applicable health regulations, which may include a health review. When a health review is required it is to be completed after the associate has accepted the conditional job offer, prior to the first day of work and annually thereafter. Should a health review be unsatisfactory, a determination will be made if a reasonable accommodation would be appropriate as required under Americans with Disabilities Act. After an associate is hired they are responsible for providing the facility with updated health changes if the changes relate to the associate's ability to perform the essential job functions.

# INTRODUCTORY PERIOD

The introductory period is intended to give new associates the opportunity to demonstrate their ability to achieve a satisfactory level of performance and to determine whether the new position meets their expectations. Gulf Coast Health Care uses this period to evaluate associate's capabilities, work habits, and overall performance. The introductory period will be for ninety (90) days from the date of hire. The progressive discipline policy is not used during the introductory period.

# AMERICANS WITH DISABILITIES ACT

Gulf Coast Health Care is committed to complying fully with the Americans with Disabilities Act (ADA) and ensuring equal opportunity in employment for qualified persons with disabilities. All employment practices and activities are conducted on a non-discriminating basis.

# FALSE CLAIMS ACT

Gulf Coast Health Care ("Gulf Coast Health Care") will not submit or cause to be submitted false claims. Furthermore, employees can be held liable for filing or causing to be filed false claims. Gulf Coast Health Care strictly prohibits the submission or participation in the submission of false claims.

The Federal False Claims Act (FCA) outlines the liability for individuals who file or cause to be filed false or fraudulent claims. A false or fraudulent claim is basically something that is untrue. Billing twice for the same service, billing a higher level of service when a lower level was provided, unbundling of charges, billing for equipment or supplies that were never provided, providing misleading information on the MDS, etc. these are all examples of false claims. In addition, the state also has a false claims act which is very similar to the Federal FCA. Those who violate the provisions of the Federal False Claim Act and the state false claims act will face civil monetary penalties. Violators can be excluded from participating in the Medicare and Medicaid programs.

Gulf Coast Health Care has implemented policies and procedures to prevent the filing of false claims and has established a confidential disclosure program for employees to report suspected false claims directly to the Compliance Officer. If you know or suspect that false claims are being filed, you are required to report this to the Compliance Officer. All employees are required to attend mandatory compliance training upon hire and annually thereafter. Employees will be provided with more detailed information about the compliance program, the disclosure program and Gulf Coast Health Care's reporting requirements during that training.

2

The Federal and State False Claims Acts also have what is known as "whistleblower protections". Individuals with specific knowledge of false claims submissions have the right to file a claim and will be protected under both the Federal and State False Claims Act for doing so. Under Gulf Coast Health Care's Compliance Program, employees are required to report suspected or known violations to the Compliance Officer or to another member of management.

# EMPLOYMENT CATEGORIES

**Regular Full-time:** Those associates who are not in a temporary or probationary status and who are regularly scheduled to work more than thirty (30) hours per week.

**Part-time:** Those associates who are not assigned to a temporary or probationary status and who are scheduled to work less than thirty (30) hours per week.

**Probationary:** Those associates whose performance is being evaluated to determine whether further employment in a specific position or with Gulf Coast Health Care is appropriate.

**Introductory:** All new hired and rehired associates work in an introductory basis for the first ninety (90) calendar days after their date of hire.

**Casual:** An associate who is scheduled intermittently as available or as needed.

**Temporary:** An associate who is hired on a temporary basis.

# BENEFITS

Regular full-time associates at Gulf Coast Health Care are provided a wide range of benefits. A number of the programs (such as social security, workers compensation, state disability, and unemployment insurance) cover all associates in a manner prescribed by law.

The following benefit programs are available to regular full-time associates:

| | | |
|---|---|---|
| Bereavement Leave | Jury Duty | Military Leave |
| Major Medical Insurance | Discounted Meals | Personal Leave |
| Educational Financial Assistance | Life Insurance | Family Medical Leave |
| Dental Insurance | Sick Leave | Domestic Violence Leave |
| Holiday Leave | Vacation Benefits | Personal Holiday |
| Cafeteria Plan | 401(k) | Bonus for 20+ Year Associates |

3

Refer to the personnel policy manual for details on many of these programs or by consulting the Business Office for plan details.

## VACATION BENEFITS

Vacation time off with pay is available to regular full-time associates to provide opportunities for rest, relaxation, and personal pursuits. Vacations are a gratuity and not a reward for past performance, but provided to enable the associate to prepare for the next year of service. Any associate who resigns with improper notice, or who is discharged for cause, will not be paid unused vacation time.

Vacation is earned on anniversary dates according to the following schedule:

### VACATION EARNING SCHEDULE

| Years of Eligible Service | Vacation Days Each Benefit Year |
|---------------------------|---------------------------------|
| Upon initial eligibility | 0 days |
| After one (1) year | 10 days |
| After five (5) years | 15 days |
| After ten (10) years | 20 days |

## HOLIDAYS

Gulf Coast Health Care recognizes the following holidays as paid for regular full-time associates.

**New Years Day**
**Memorial Day**
**Independence Day**
**Labor Day**
**Thanksgiving Day**
**Christmas Day**

In addition, after one (1) year of service, regular full-time associates receive **one (1) personal holiday**.

## SICK LEAVE BENEFITS

Gulf Coast Health Care provides paid sick leave benefits to all regular full-time associates for periods of temporary absence due to illness or injuries.

# BEREAVEMENT LEAVE

The company provides two (2) paid days off for regular full-time associates who experience the loss of an immediate family member; the associate's spouse, parent, grandparent, child, brother or sister; the associate's spouse's parent, grandparent, child or sibling.

# JURY DUTY

Associates will be granted the necessary time off to serve on a jury panel when called to serve jury duty.

# HEALTH INSURANCE

Gulf Coast Health Care offers health insurance coverage for regular full-time associates. Additional family coverage may be purchased by the associate.

# DENTAL COVERAGE

Dental insurance for associate and family are offered at preferred group rates. Coverage includes preventative services at 100%, as well as basic and major dental repair at 80% and 50%, respectively. Please refer to the Schedule of Benefits for further information.

# LIFE INSURANCE

$15,000/Associate      Life Insurance
$15,000/Associate      Accidental Death & Dismemberment

# BONUS FOR 20+ YEAR ASSOCIATES

20+ year associates will receive a bonus based on years of service.

# CAFETERIA PLAN (Section 125)

Voluntary benefits offered once a year are Universal and Term Life Insurance, Accident Plan, Disability Income, Cancer, and Vision. Many of these plans can be payroll deducted on a pre-tax basis. Medical and dental insurance premiums are deducted pre-tax.

# RETIREMENT PLAN 401(k)

Associates are eligible to participate after six (6) months of service and 18 years of age. Pre-tax contributions from 1-15% may be made through regular payroll deductions. Several plan investments to select from.

# DIRECT DEPOSIT OF PAYROLL CHECKS

Gulf Coast Health Care offers free electronic transfer of payroll checks into any bank or credit union in the country that belongs to the Federal Reserve System.

# TUITION REIMBURSEMENT

All full-time associates after twelve (12) months of service, who desire to enroll in an accredited degree granting program related to healthcare, specifically who desire to obtain the following titles: LPN, RN, Certified Dietary Manager, and Chef are eligible to participate in the tuition reimbursement program.

# TRANSFER OF ASSOCIATES BETWEEN LOCATIONS

Associates have the opportunity to transfer from one location to another when advantageous to both the associate and the company.

# PAY POLICY

Pay day is bi-weekly on Tuesdays. In addition to the information outlined in this handbook and in the personnel policy manual, each facility has pay policies specific to their location.

# PAY INCREASES

Pay increases will be effective on the first day of the pay period following the associate's anniversary date or the first day of a pay period in the month the facility annual increase is determined.

# PAY ADVANCES

Neither pay advances nor extensions of credit on earned or unearned wages can be provided to associates. If a regular payday falls during an associate's vacation, the associate's paycheck will be available upon his or her return from vacation.

6

# ADMINISTRATIVE PAY CORRECTIONS

Gulf Coast Health Care takes all reasonable steps to assure that associates receive the correct amount of pay in each paycheck, and that associates are paid promptly on the scheduled payday. In the unlikely event that there is an error in the amount of pay, the associate should promptly bring the discrepancy to the attention of their department director so that corrections can be made as quickly as possible. Once underpayments are identified, they will be corrected in the next regular paycheck.

# MEAL PERIODS

Hourly associates that are scheduled to work more than five (5) hours are entitled to one-half (1/2) hour unpaid meal period during that shift.

# FAMILY AND MEDICAL LEAVE POLICY (FMLA)

Under this policy, an eligible associate may take FMLA qualified leave for any of the following reasons:

- Birth and care of the associate's newborn child;
- Placement of a child with the associate for adoption or foster care;
- To care for the associate's spouse, child, or parent who is incapable of self-care because of a mental or physical disability or serious health condition;
- Because of the associate's own serious health condition, which condition renders the associate unable to perform the essential functions of his or her job.

An eligible associate may request a leave of absence for any of the reasons identified for up to twelve (12) weeks in a twelve (12) month period.

# DISCIPLINARY ACTION

Gulf Coast Health Care believes that associates should be aware of the rules that are to be followed. Failure to follow rules may require disciplinary action. The company will attempt to adhere to the policy 701 to prevent misunderstandings. The company reserves the right in its sole discretion to vary from the policies.

# CATEGORY I OFFENSES

The most serious offenses are listed as Category I offenses and subject the associate to discharge. Because of the seriousness of the nature of these offenses, the associate should immediately be suspended pending investigation and if found to have committed the offense, terminated. Below are some of the Category I offenses found in policy 701 of the personnel policy manual:

- Resident abuse or neglect
- Drug abuse
- Sexual harassment, illegal harassment or discrimination
- Soliciting loans from residents, their families or vendors
- Falsification of any facility record
- Failing to report a communicable disease
- Punching another associates time card or having another associate punch your time card
- Walking off the job or leaving the facility without permission
- No call, No show (failure to call or show by the end of the scheduled shift)
- Sleeping on the premises
- Conduct that would be widely regarded as improper or inappropriate in a work group

# CATEGORY II OFFENSES

This procedure offers progressive discipline, as these offenses are less serious in nature unless the offense is reoccurring. The philosophy behind progressive discipline is that it gives the associate the opportunity to take the corrective action, in order to retain an affiliation with the facility. If three written infractions are received within a twelve (12) month period, the associate should be suspended pending investigation and may be discharged. Examples of Category II offensives are listed below:

- Stopping work before time specified for such purposes
- Violation of the tardiness or absenteeism policy
- Unauthorized overtime
- Failing to complete the health review within seven (7) calendar days of being due
- Making or receiving personal telephone calls or visitors other than emergencies
- Violation of the NO SOLICITATION / NO DISTRIBUTION policy
- Accepting gifts from a resident, family members, or vendors without authorization of the administrator
- Failure to follow departmental procedures
- Other instances of improper conduct not specifically listed

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 216 of 244

# DRUG AND ALCOHOL ABUSE

It is Gulf Coast Health Care's desire to provide a drug free, healthful, and safe workplace. To promote this goal, associates are required to report to work in appropriate mental and physical condition to perform their jobs in a satisfactory manner.

# ATTENDANCE

Attendance and punctuality affects resident care and morale in every facility. For this reason, reporting to work as scheduled and on time is an important expectation of every Gulf Coast Health Care associate.

Absence is the failure to report to work when scheduled. Excessive absenteeism, unexcused absences, and patterned absences will lead to disciplinary action up to and including termination.

# EXCESSIVE ABSENCE

Two (2) occurrences in thirty (30) days is considered excessive as are twelve (12) occurrences within twelve (12) months (the twelve (12) occurrences is inclusive of the two (2) in thirty (30) days).

An occurrence is any consecutive days absent. Excused absences (i.e., those accompanied by a note from a physician) may still be excessive as defined by the policy.

# PATTERNED ABSENCE

Absence on the same day of the week, after and /or before a weekend or scheduled day off, may be considered a patterned absence.

# UNEXCUSED ABSENCE

Failing to report to work without prior approval, one (1) occurrence may be cause for disciplinary action.

Failing to report to work on a scheduled holiday, one (1) occurrence may be cause for disciplinary action.

# NO CALL, NO SHOW

Failing to call or failing to show up for work during the scheduled shift, one (1) occurrence is considered a Category 1 offense.

# FAILURE TO CALL

Failure to call in **two (2) hours** before the start of the <u>day</u> shift; **four (4) hours** before the <u>evening and night</u> shift, one occurrence is considered unacceptable and may cause the disciplinary action policy to be implemented.

# TARDINESS

Gulf Coast Health Care expects all associates to be **at their work station at the start of their shift.**

# SEXUAL AND OTHER UNLAWFUL HARASSMENT

**Gulf Coast Health Care strictly prohibits sexual and unlawful harassment in any form.**

Any associate who feels that she or he has been subjected to harassment should <u>immediately</u> report the problem to her/his supervisor. If the supervisor is the source of the problem, or if the associate believes that for some other reason the supervisor cannot be approached, then the following people, in this order, should be notified:

(1) Administrator
(2) Director of Operations or Director of Human Resources (1-800-881-9907).

All harassment allegations will be investigated quickly and thoroughly. Any supervisor who fails to report sexual harassment will be subject to discipline up to and including discharge.

Gulf Coast Health Care also forbids retaliation for the reporting of sexual harassment or other unlawful harassment. The penalty for violating the company's harassment policy is discipline up to and including discharge.

10

# PERSONAL APPEARANCE AND DRESS

Dress, grooming, and personal cleanliness standards contribute to the morale of all associates and affect the business image Gulf Coast Health Care presents to its customers.

While on duty, associates are expected to present a clean and neat appearance and to dress according to the requirements of their positions. Associates who appear for work inappropriately dressed will be sent home and directed to return to work in proper attire. Under such circumstances, associates will not be compensated for time away from work.

Where facilities require service associates to wear uniforms, the company will provide two (2) wash and wear uniforms for each associate upon date of hire. An additional two (2) uniforms will be provided on the associate's employment anniversary date.

Consult the facility dress code policies or the Department Director for questions as to what constitutes proper attire.

# DRUG TESTING

Gulf Coast Health Care is committed to providing a **DRUG FREE WORKPLACE** for all associates. In keeping with this commitment, associates and job applicants may be asked to provide body substance samples (e.g., blood, urine) to determine the illicit use of drugs. Gulf Coast Health Care will attempt to protect the confidentiality of all drug test results.

Associates and job applicants may be tested for controlled substances and/or alcohol for the following reasons:

**Pre-employment** - any applicant, including rehires, will be screened for controlled substances.

**Associate Testing:**

**Post-Accident Testing** - any work-related accident which requires medical treatment outside the facility.
**Reasonable Suspicion Testing** - an associate may be tested for controlled substances and/or alcohol when a reasonable suspicion exists that the associate is under the influence.

**Random Testing** - the company may conduct random testing as a way of deterring drug or alcohol use in the workplace.

# PROBLEM RESOLUTION

Gulf Coast Health Care is committed to providing the best possible working conditions for its associates. Gulf Coast Health Care encourages an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from its management team members.

Gulf Coast Health Care strives to ensure fair and honest treatment of all associates. Supervisors, managers and associates are expected to treat each other with mutual respect. Associates are encouraged to offer positive and constructive criticism.

No associate will be penalized formally or informally for voicing a complaint with Gulf Coast Health Care in a reasonable, business like manner, or for using the problem resolution procedure.

If a situation occurs when an associate believes that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The associate may discontinue the procedure at any step.

1. Gulf Coast Health Care encourages informal procedure as the first step. The associate should discuss the problem with the supervisor, often problems can be solved easily and simply.

2. If the associate is dissatisfied with the supervisor's response, the associate should present the problem to the Department Director in writing within thirty (30) days after the incident occurs.

3. If the associate is dissatisfied with the Department Director's response, the problem should be presented to the Administrator by the associate with the answer from the Department Director. Once the Administrator has thoroughly investigated and has responded, if the associate is still dissatisfied with the response;

4. The associate should present the problem to the Director of Operations with the previous answers. If the associate is not satisfied with the response, the associate may, with the assistance of the Human Resource Department, present in writing, the problem to the Chief Operating Officer.

At any step, if that person is the problem, the associate may skip immediately to the next step.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can associates and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

# RESIGNATION

Gulf Coast Health Care Department Directors and exempt associates are expected to give four (4) weeks written notice of resignation. All other associates are expected to give a two (2) week written notice to allow the facility management adequate time to find a replacement.

Associates who resign with proper notice will receive all earned unused vacation and personal leave pay. Associates who resign without proper notice will forfeit all earned unused vacation and personal leave pay.

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 221 of 244

# ACKNOWLEDGEMENT

I have received a copy of the Gulf Coast Health Care Associate's Handbook* I understand my supervisor or administrator will answer any questions I have about the contents of this book.

_____

Associate Signature                      Date _____

_____

Facility Number

*The company reserves the right to revise policies and procedures as needed.



# GULF COAST HEALTH CARE
## ASSOCIATE HANDBOOK
### JANUARY 2011

Enclosed is your copy of the new Associate Handbook. It is intended to explain general policies relating to your employment with Gulf Coast Health Care. We hope you will find it helpful. Questions or comments about the handbook or policies are welcome and may be directed to the Human Resources Department.

**It is very important that you sign and return the last page of the handbook immediately to the payroll department upon receipt.**

Thank you for your attention, and we hope you will enjoy the handbook.



EXHIBIT
7
PENGAD 800-631-6989

i

# ASSOCIATE HANDBOOK

## WELCOME TO GULF COAST HEALTH CARE

Dear Associate:

We are very happy to welcome you to Gulf Coast Health Care. Thank you for joining us! We want you to feel that your association with Gulf Coast Health Care will be a mutually beneficial and pleasant one.

You have joined an organization that has established an outstanding reputation for quality services. Credit for this goes to every one of our associates. We hope you too, will find satisfaction and take pride in your work here.

This handbook provides answers to many of the questions you may have about Gulf Coast Health Care's benefit program, as well as the company policies and procedures we abide by - our responsibilities to you and your responsibility to Gulf Coast Health Care. If anything is unclear, please discuss the matter with your supervisor. You are responsible for reading and understanding this handbook and policy manual, and your performance evaluations will reflect your adherence to Gulf Coast Health Care policies. In addition to clarifying responsibilities, we hope this handbook also gives you an indication of Gulf Coast Health Care's interest in the welfare of all who work here.

From time to time, the information included in our policy manual may change. Every effort will be made to keep you informed through suitable lines of communication, including postings on the company bulletin boards and/or notices sent directly to you in-house.

Compensation and personal satisfaction gained from doing a job well are only some of the reasons most people work. Most likely, many other factors count among your reasons for working --- pleasant relationships and working conditions, career development, promotion opportunities and health benefits are just a few. Gulf Coast Health Care is committed to doing its part to assure you of a satisfying work experience.

I extend to you my personal best wishes for your success and happiness at Gulf Coast Health Care. Again, welcome!

Sincerely,

*Craig Robinson*

Craig Robinson
President

ii

# TABLE OF CONTENTS

## EMPLOYMENT

| | |
|---|---|
| Nature of Employment | 1 |
| Equal Employment Opportunity | 1 |
| Health Requirements | 1 |
| Introductory Period | 2 |
| Americans With Disabilities Act | 2 |
| False Claims Act | 2 |
| Employment Categories | 3 |

## BENEFITS

| | |
|---|---|
| Benefits | 3 |
| Vacation Benefits | 4 |
| Holidays | 4 |
| Sick Leave Benefits | 4 |
| Bereavement Leave | 5 |
| Jury Duty | 5 |
| Health Insurance | 5 |
| Dental Coverage | 5 |
| Vision Plan | 5 |
| Life Insurance | 5 |
| 20+ Year Associates | 5 |
| Workplace Voluntary Benefits | 5 |
| Retirement Plan 401 (k) | 6 |
| Direct Deposit of Payroll Checks | 6 |
| Tuition Reimbursement | 6 |
| Transfer of Associates Between Locations | 6 |

## PAYROLL

| | |
|---|---|
| Pay Policy | 6 |
| Pay Increases | 6 |
| Pay Advances | 6 |
| Administrative Pay Corrections | 7 |
| Meal Periods | 7 |

**LEAVES**

Family and Medical Leave Policy (FMLA)　　　　　7

**CONDUCT**

Disciplinary Action　　　　　7
Category I Offenses　　　　　8
Category II Offenses　　　　　8
Drug and Alcohol Abuse　　　　　9
Attendance　　　　　9
Excessive Absence　　　　　9
Patterned Absence　　　　　9
Unexcused Absence　　　　　9
No Call, No Show　　　　　10
Failure To Call　　　　　10
Tardiness　　　　　10
Sexual and Other Unlawful Harassment　　　　　10
Personal Appearance and Dress　　　　　11
Drug Testing　　　　　11
Problem Resolution　　　　　12
Resignation　　　　　13

**ACKNOWLEDGMENT**

Acknowledgment　　　　　14

# NATURE OF EMPLOYMENT

This personnel handbook is intended to provide associates with a general overview of Gulf Coast Health Care's personnel policies.

However, the handbook cannot anticipate every situation or answer every question about employment. It is not intended to create contractual obligations of any kind.

Neither the associate nor Gulf Coast Health Care is bound to continue the employment relationship if either chooses, at their will, to end the relationship at any time.

In order to retain necessary flexibility in the administration of policies and procedures, Gulf Coast Health Care reserves the right to change, revise, or eliminate any of the policies and/or benefits described in this handbook.

# EQUAL EMPLOYMENT OPPORTUNITY

Gulf Coast Health Care provides equal employment opportunity without regard to race, color, religion, sex, national origin, age, physical or mental disability, marital status, sexual orientation or preference, or veterans status. Equal employment opportunity shall apply to all matters relating to recruitment, selection, placement, transfer, training and development, promotions, compensation, benefits, disciplinary action or discharge, and in all other terms, conditions or privileges for employment.

# HEALTH REQUIREMENTS

Each associate shall be required to meet applicable health regulations, which may include a health review. When a health review is required it is to be completed after the associate has accepted the conditional job offer, prior to the first day of work and annually thereafter. Should a health review be unsatisfactory, a determination will be made if a reasonable accommodation would be appropriate as required under Americans with Disabilities Act. After an associate is hired they are responsible for providing the facility with updated health changes if the changes relate to the associate's ability to perform the essential job functions.

i

# INTRODUCTORY PERIOD

The introductory period is intended to give new associates the opportunity to demonstrate their ability to achieve a satisfactory level of performance and to determine whether the new position meets their expectations. Gulf Coast Health Care uses this period to evaluate associate's capabilities, work habits, and overall performance. The introductory period will be for ninety (90) days from the date of hire. The progressive discipline policy is not used during the introductory period.

# AMERICANS WITH DISABILITIES ACT

Gulf Coast Health Care is committed to complying fully with the Americans with Disabilities Act (ADA) and ensuring equal opportunity in employment for qualified persons with disabilities. All employment practices and activities are conducted on a non-discriminating basis.

# FALSE CLAIMS ACT

Gulf Coast Health Care ("Gulf Coast Health Care") will not submit or cause to be submitted false claims. Furthermore, employees can be held liable for filing or causing to be filed false claims. Gulf Coast Health Care strictly prohibits the submission or participation in the submission of false claims.

The Federal False Claims Act (FCA) outlines the liability for individuals who file or cause to be filed false or fraudulent claims. A false or fraudulent claim is basically something that is untrue. Billing twice for the same service, billing a higher level of service when a lower level was provided, unbundling of charges, billing for equipment or supplies that were never provided, providing misleading information on the MDS, etc. these are all examples of false claims. In addition, the state also has a false claims act which is very similar to the Federal FCA. Those who violate the provisions of the Federal False Claim Act and the state false claims act will face civil monetary penalties. Violators can be excluded from participating in the Medicare and Medicaid programs.

Gulf Coast Health Care has implemented policies and procedures to prevent the filing of false claims and has established a confidential disclosure program for employees to report suspected false claims directly to the Compliance Officer. If you know or suspect that false claims are being filed, you are required to report this to the Compliance Officer. All employees are required to attend mandatory compliance training upon hire and annually thereafter. Employees will be provided with more detailed information about the compliance program, the disclosure program and Gulf Coast Health Care's reporting requirements during that training.

2

The Federal and State False Claims Acts also have what is known as "whistleblower protections". Individuals with specific knowledge of false claims submissions have the right to file a claim and will be protected under both the Federal and State False Claims Act for doing so. Under Gulf Coast Health Care's Compliance Program, employees are required to report suspected or known violations to the Compliance Officer or to another member of management.

# EMPLOYMENT CATEGORIES

**Regular Full-time:** Those associates who are not in a temporary or probationary status and who are regularly scheduled to work more than thirty (30) hours per week.

**Part-time:** Those associates who are not assigned to a temporary or probationary status and who are scheduled to work less than thirty (30) hours per week.

**Probationary:** Those associates whose performance is being evaluated to determine whether further employment in a specific position or with Gulf Coast Health Care is appropriate.

**Introductory:** All new hired and rehired associates work in an introductory basis for the first ninety (90) calendar days after their date of hire.

**Casual:** An associate who is scheduled intermittently as available or as needed.

**Temporary:** An associate who is hired on a temporary basis.

# BENEFITS

Regular full-time associates at Gulf Coast Health Care are provided a wide range of benefits. A number of the programs (such as social security, workers compensation, state disability, and unemployment insurance) cover all associates in a manner prescribed by law.

The following benefit programs are available to regular full-time associates:

| Major Medical Insurance | Vacation Benefits | Family Medical Leave |
|---|---|---|
| Dental Insurance | Holidays | Medical Leave |
| Vision Plan | Sick Leave Benefits | Personal Leave |
| Life Insurance | Jury Duty | Military Leave |
| Workplace Voluntary Benefits | Tuition Reimbursement | Domestic Violence Leave |
| 401(k) | Personal Holiday | Bereavement Leave |
| Bonus for 20+ Year Associates | Discounted Meals | |

3

Refer to the personnel policy manual for details on many of these programs or by consulting the Business Office for plan details.

## VACATION BENEFITS

Vacation time off with pay is available to regular full-time associates to provide opportunities for rest, relaxation, and personal pursuits. Vacations are a gratuity and not a reward for past performance, but provided to enable the associate to prepare for the next year of service. Any associate who resigns with improper notice, or who is discharged for cause, will not be paid unused vacation time.

Vacation is earned on anniversary dates according to the following schedule:

| YEARS OF ELIGIBLE SERVICE | VACATION DAYS EACH BENEFIT YEAR |
|---|---|
| Upon initial eligibility | 0 days |
| After one (1) year | 10 days |
| After five (5) years | 15 days |
| After ten (10) years | 20 days |

## HOLIDAYS

Gulf Coast Health Care recognizes the following holidays as paid for regular full-time associates.

New Years Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

In addition, after one (1) year of service, regular full-time associates receive one (1) personal holiday.

## SICK LEAVE BENEFITS

Gulf Coast Health Care provides paid sick leave benefits to all regular full-time associates for periods of temporary absence due to illness or injuries.

4

# BEREAVEMENT LEAVE

The company provides two (2) paid days off for regular full-time associates who experience the loss of an immediate family member; the associate's spouse, parent, grandparent, child, brother or sister; the associate's spouse's parent, grandparent, child or sibling.

## JURY DUTY

Associates will be granted the necessary time off to serve on a jury panel when called to serve jury duty.

## HEALTH INSURANCE

Gulf Coast Health Care offers health insurance coverage for regular full-time associates. Additional family coverage may be purchased by the associate.

## DENTAL COVERAGE

Dental insurance for associate and family are offered at preferred group rates. Coverage includes preventative services at 100%, as well as basic and major dental repair at 80% and 50%, respectively. Please refer to the Schedule of Benefits for further information.

## VISION PLAN

Vision insurance for employee and family is offered at preferred group rates.

## LIFE INSURANCE

| Life Insurance | 1 x Associate Salary/Employee | NOT TO EXCEED $100,000 |
|---|---|---|
| Accidental Death & Dismemberment | 1 x Associate Salary/Employee | NOT TO EXCEED $100,000 |

## BONUS FOR 20+ YEAR ASSOCIATES

20+ year associates will receive a bonus based on years of service.

## WORKPLACE VOLUNTARY BENEFITS

Voluntary Benefits offered once a year are Interest-sensitive Whole Life Insurance, Term Life Insurance, Accident Plan, Short-term Disability and Specified Critical Illness Plans. Voluntary deductions are on a post-tax basis.

5

# RETIREMENT PLAN 401(k)

Associates are eligible to participate after six (6) months of service and 18 years of age. Pre-tax contributions from 1-15% may be made through regular payroll deductions. Several plan investments to select from.

# DIRECT DEPOSIT OF PAYROLL CHECKS

Gulf Coast Health Care offers free electronic transfer of payroll checks into any bank or credit union in the country that belongs to the Federal Reserve System.

# TUITION REIMBURSEMENT

All full-time associates after twelve (12) months of service, who desire to enroll in an accredited degree granting program related to healthcare, specifically who desire to obtain the following titles: LPN, RN, Certified Dietary Manager, and Chef are eligible to participate in the tuition reimbursement program.

# TRANSFER OF ASSOCIATES BETWEEN LOCATIONS

Associates have the opportunity to transfer from one location to another when advantageous to both the associate and the company.

# PAY POLICY

Pay day is bi-weekly on Tuesdays. In addition to the information outlined in this handbook and in the personnel policy manual, each facility has pay policies specific to their location.

# PAY INCREASES

Pay increases will be effective on the first day of the pay period following the associate's anniversary date or the first day of a pay period in the month the facility annual increase is determined.

# PAY ADVANCES

Neither pay advances nor extensions of credit on earned or unearned wages can be provided to associates. If a regular payday falls during an associate's vacation, the associate's paycheck will be available upon his or her return from vacation.

6

# ADMINISTRATIVE PAY CORRECTIONS

Gulf Coast Health Care takes all reasonable steps to assure that associates receive the correct amount of pay in each paycheck, and that associates are paid promptly on the scheduled payday. In the unlikely event that there is an error in the amount of pay, the associate should promptly bring the discrepancy to the attention of their department director so that corrections can be made as quickly as possible. Once underpayments are identified, they will be corrected in the next regular paycheck.

# MEAL PERIODS

Hourly associates that are scheduled to work more than five (5) hours are entitled to one-half (1/2) hour unpaid meal period during that shift.

# FAMILY AND MEDICAL LEAVE POLICY (FMLA)

Under this policy, an eligible associate may take FMLA qualified leave for any of the following reasons:

- Birth and care of the associate's newborn child;
- Placement of a child with the associate for adoption or foster care;
- To care for the associate's spouse, child, or parent who is incapable of self-care because of a mental or physical disability or serious health condition;
- Because of the associate's own serious health condition, which condition renders the associate unable to perform the essential functions of his or her job.

An eligible associate may request a leave of absence for any of the reasons identified for up to twelve (12) weeks in a twelve (12) month period.

# DISCIPLINARY ACTION

Gulf Coast Health Care believes that associates should be aware of the rules that are to be followed. Failure to follow rules may require disciplinary action. The company will attempt to adhere to the policy 701 to prevent misunderstandings. The company reserves the right in its sole discretion to vary from the policies.

# CATEGORY I OFFENSES

The most serious offenses are listed as Category I offenses and subject the associate to discharge. Because of the seriousness of the nature of these offenses, the associate should immediately be suspended pending investigation and if found to have committed the offense, terminated. Below are some of the Category I offenses found in policy 701 of the personnel policy manual:

- Resident abuse or neglect
- Drug abuse
- Sexual harassment, illegal harassment or discrimination
- Soliciting loans from residents, their families or vendors
- Falsification of any facility record
- Failing to report a communicable disease
- Punching another associates time card or having another associate punch your time card
- Walking off the job or leaving the facility without permission
- No call, No show (failure to call or show by the end of the scheduled shift)
- Sleeping on the premises
- Conduct that would be widely regarded as improper or inappropriate in a work group

# CATEGORY II OFFENSES

This procedure offers progressive discipline, as these offenses are less serious in nature unless the offense is reoccurring. The philosophy behind progressive discipline is that it gives the associate the opportunity to take the corrective action, in order to retain an affiliation with the facility. If three written infractions are received within a twelve (12) month period, the associate should be suspended pending investigation and may be discharged. Examples of Category II offensives are listed below:

- Stopping work before time specified for such purposes
- Violation of the tardiness or absenteeism policy
- Unauthorized overtime
- Failing to complete the health review within seven (7) calendar days of being due
- Making or receiving personal telephone calls or visitors other than emergencies
- Violation of the NO SOLICITATION / NO DISTRIBUTION policy
- Accepting gifts from a resident, family members, or vendors without authorization of the administrator
- Failure to follow departmental procedures
- Other instances of improper conduct not specifically listed

8

# DRUG AND ALCOHOL ABUSE

It is Gulf Coast Health Care's desire to provide a drug free, healthful, and safe workplace. To promote this goal, associates are required to report to work in appropriate mental and physical condition to perform their jobs in a satisfactory manner.

# ATTENDANCE

Attendance and punctuality affects resident care and morale in every facility. For this reason, reporting to work as scheduled and on time is an important expectation of every Gulf Coast Health Care associate.

Absence is the failure to report to work when scheduled. Excessive absenteeism, unexcused absences, and patterned absences will lead to disciplinary action up to and including termination.

# EXCESSIVE ABSENCE

Two (2) occurrences in thirty (30) days is considered excessive as are twelve (12) occurrences within twelve (12) months (the twelve (12) occurrences is inclusive of the two (2) in thirty (30) days).

An occurrence is any consecutive days absent. Excused absences (i.e., those accompanied by a note from a physician) may still be excessive as defined by the policy.

# PATTERNED ABSENCE

Absence on the same day of the week, after and /or before a weekend or scheduled day off, may be considered a patterned absence.

# UNEXCUSED ABSENCE

Failing to report to work without prior approval, one (1) occurrence may be cause for disciplinary action.

Failing to report to work on a scheduled holiday, one (1) occurrence may be cause for disciplinary action.

14-50756 - #500-6  File 02/06/15  Enter 02/06/15 16:47:27  Exhibit F  Pg 235 of 244

# NO CALL, NO SHOW

Failing to call or failing to show up for work during the scheduled shift, one (1) occurrence is considered a Category 1 offense.

# FAILURE TO CALL

Failure to call in two (2) hours before the start of the <u>day</u> shift; **four (4) hours** before the <u>evening and night</u> shift, one occurrence is considered unacceptable and may cause the disciplinary action policy to be implemented.

# TARDINESS

Gulf Coast Health Care expects all associates to be **at their work station at the start of their shift.**

# SEXUAL AND OTHER UNLAWFUL HARASSMENT

**Gulf Coast Health Care strictly prohibits sexual and unlawful harassment in any form.**

Any associate who feels that she or he has been subjected to harassment should <u>immediately</u> report the problem to her/his supervisor. If the supervisor is the source of the problem, or if the associate believes that for some other reason the supervisor cannot be approached, then the following people, in this order, should be notified:

(1) Administrator
(2) Director of Operations or Human Resources

All harassment allegations will be investigated quickly and thoroughly. Any supervisor who fails to report sexual harassment will be subject to discipline up to and including discharge.

Gulf Coast Health Care also forbids retaliation for the reporting of sexual harassment or other unlawful harassment. The penalty for violating the company's harassment policy is discipline up to and including discharge.

10

# PERSONAL APPEARANCE AND DRESS

Dress, grooming, and personal cleanliness standards contribute to the morale of all associates and affect the business image Gulf Coast Health Care presents to its customers.

While on duty, associates are expected to present a clean and neat appearance and to dress according to the requirements of their positions. Associates who appear for work inappropriately dressed will be sent home and directed to return to work in proper attire. Under such circumstances, associates will not be compensated for time away from work.

Where facilities require service associates to wear uniforms, the company will provide two (2) wash and wear uniforms for each associate upon date of hire. An additional two (2) uniforms will be provided on the associate's employment anniversary date.

Consult the facility dress code policies or the Department Director for questions as to what constitutes proper attire.

# DRUG TESTING

Gulf Coast Health Care is committed to providing a **DRUG FREE WORKPLACE** for all associates. In keeping with this commitment, associates and job applicants may be asked to provide body substance samples (e.g., blood, urine) to determine the illicit use of drugs. Gulf Coast Health Care will attempt to protect the confidentiality of all drug test results.

Associates and job applicants may be tested for controlled substances and/or alcohol for the following reasons:

> <u>Pre-employment</u> - any applicant, including rehires, will be screened for controlled substances.
>
> <u>Associate Testing:</u>
>
> **Post-Accident Testing** - any work-related accident which requires medical treatment outside the facility.
> **Reasonable Suspicion Testing** - an associate may be tested for controlled substances and/or alcohol when a reasonable suspicion exists that the associate is under the influence.
>
> <u>Random Testing</u> - the company may conduct random testing as a way of deterring drug or alcohol use in the workplace.

11

# PROBLEM RESOLUTION

Gulf Coast Health Care is committed to providing the best possible working conditions for its associates. Gulf Coast Health Care encourages an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from its management team members.

Gulf Coast Health Care strives to ensure fair and honest treatment of all associates. Supervisors, managers and associates are expected to treat each other with mutual respect. Associates are encouraged to offer positive and constructive criticism.

No associate will be penalized formally or informally for voicing a complaint with Gulf Coast Health Care in a reasonable, business like manner, or for using the problem resolution procedure.

If a situation occurs when an associate believes that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The associate may discontinue the procedure at any step.

1. **Gulf Coast Health Care encourages informal procedure as the first step. The associate should discuss the problem with the supervisor, often problems can be solved easily and simply.**

2. **If the associate is dissatisfied with the supervisor's response, the associate should present the problem to the Department Director in writing within thirty (30) days after the incident occurs.**

3. **If the associate is dissatisfied with the Department Director's response, the problem should be presented to the Administrator by the associate with the answer from the Department Director. Once the Administrator has thoroughly investigated and has responded, if the associate is still dissatisfied with the response;**

4. **The associate should present the problem to the Director of Operations with the previous answers. If the associate is not satisfied with the response, the associate may, with the assistance of the Human Resource Department, present in writing, the problem to the Chief Operating Officer..**

At any step, if that person is the problem, the associate may skip immediately to the next step.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can associates and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

# RESIGNATION

Gulf Coast Health Care Department Directors and exempt associates are expected to give four (4) weeks written notice of resignation. All other associates are expected to give a two (2) week written notice to allow the facility management adequate time to find a replacement.

Associates who resign with proper notice will receive all earned unused vacation and personal leave pay. Associates who resign without proper notice will forfeit all earned unused vacation and personal leave pay.

# ACKNOWLEDGEMENT

I have received a copy of the Gulf Coast Health Care Associate's Handbook* I understand my supervisor or administrator will answer any questions I have about the contents of this book.

_____     _____
Associate Signature                          Date

_____
Facility Number

*The company reserves the right to revise policies and procedures as needed.



14



RECEIVED

JUL 2 5 2013

WILKES & McHUGH

## ERRATA SHEET

**WITNESS:  CRAIG ROBINSON**

RE:    THE ESTATE OF TERESA E. STEIN vs. SF LAKE PLACID,
       LLC, et al.,
       CASE NO.:  2012-CA-000866-GCAXMX

| Page | Line | Correction/Change | Reason |
|------|------|-------------------|--------|
| 60 | 8 | 'The county department' should be 'the accounting department' | Incorr word |
| 7 | 19 | 'Adveilll (phonetic) Care' should be 'Advocare' | Incorr word |
| 8 | 5 | '2006' should be '2007' | Wrong year |
| 43 | 2 | 'Health Care Reinvestment' should be 'Health Care REIT' | Incorr word |
| 43 | 3 | 'Health Care Reinvestment' should be 'Health Care REIT' | Incorr Word |

Under penalties of perjury, I declare that I have read the
foregoing document, pages 04 through 107, and that the
facts stated in it are true

8/12/13
DATE                          CRAIG ROBINSON

*for Notary see next page.*



TRISH SMITH
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE852180
Expires 11/15/2016

_Trish Smith_
NOTARY

Date: August 12, 2013

County: Escambia, Fl.

Personally known: Craig Robenson



RECEIVED

AUG 2 2 2013

WILKES & McHUGH