IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| NEW LOUISIANA HOLDINGS, LLC, *et al.*, | § § § | CASE NO. 14-50756 |
| | § | |
| DEBTORS. | § | (Jointly Administered) |

## DECLARATION OF JAMES A. BLALOCK III

James A. Blalock III declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Designated Officer of CHG Legacy Group, LLC ("CHG") and certain of its subsidiaries and affiliates, each of which is a debtor and debtor-in-possession (collectively, the "Debtors") in the above captioned, jointly administered chapter 11 case (the "Bankruptcy Case"). I am over 18 years of age. If called as a witness, I could and would testify from my own personal knowledge with respect to the matters set forth in this Declaration, except as otherwise stated. This Declaration is based upon my personal knowledge, information provided to me by the Debtors, and records kept in the ordinary course of business by the Debtors and is true and correct to the best of my knowledge and belief.

2. I submit this Declaration in support of confirmation of the *First Amended Joint Plan of Liquidation for New Louisiana Holdings, LLC, et al., Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 1231] (as the same may be amended, modified or supplemented from time to time, the "Plan").[1] Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the

---

[1] Defined terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

relevant documents and/or my opinion based upon my experiences, knowledge and information concerning the Debtors and provided to me by the Debtors' management team and/or professionals. If I were called upon to testify, I would testify competently to the facts set forth herein.

3. I graduated from University of California, Los Angeles in 1980. Subsequently, I graduated from Tulane University Law School in 1983. I am licensed to practice law in Texas, California, Washington, D.C., and New York. I was in private practice from 1983 through 2009 and was a partner with several major national law firms. I focused on corporate, securities and transactional law during my years in private practice. I have served as general counsel to Health Care Navigator, LLC ("HCN") since 2009. As has been noted in my testimony at prior hearings, HCN currently provides all management, financial, in-house legal, regulatory and billing services to the Debtors. In my capacity as general counsel to HCN, I have had primary oversight responsibility for these Debtors' chapter 11 proceedings and accordingly, am familiar with the various issues which have arisen during the course of these bankruptcy proceedings. I was directly involved in negotiations and settlements with various counsel to over 85 parties asserting personal injury and general liability claims. I was also the primary witness on behalf of most of these Debtors at their respective 341 meetings and I was directly involved in the negotiations with the Unsecured Creditors Committee on the proposed settlement which is a cornerstone of the Plan as well as the terms of the Plan itself. I have reviewed both the Plan and the Disclosure Statement as well as the Plan Supplement documents. Although I did not practice bankruptcy law, I have worked with counsel to the Debtors closely over the last two years and have independently read a number of articles and cases in connection with chapter 11 reorganizations. Likewise, in private practice, I represented companies which were creditors in various chapter 11

2

14-50756 - #1276  File 08/23/16  Enter 08/23/16 18:41:10  Main Document  Pg 2 of 15

cases. Based on my experience with these Debtors, and my experience as a lawyer in both private practice and as general counsel of HCN, I believe I am qualified and knowledgeable to testify competently to the facts and opinions set out below.

## II. FACTUAL BACKGROUND

4. On their respective Petition Dates, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases. On October 3, 2014, the Office of the United States Trustee for the Western District of Louisiana (the "U.S. Trustee") appointed the Creditors Committee.

5. On July 25, 2016, the Court entered its *Order Approving Disclosure Statement With Respect to First Amended Joint Plan of Liquidation for New Louisiana Holdings, LLC, et al., Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Disclosure Statement Order") [Docket No. 1238]. A hearing to determine confirmation of the Plan is currently scheduled for August 24, 2016 at 10:00 a.m. (the "Confirmation Hearing").

6. Only members of Classes 4 (General Unsecured Claim), 5 (Personal Injury Claims), 6 (Chicago Health Care Leasing Claims), 8 (Insider Claims) and 9 (TCR Personal Injury Claims) (collectively, the "Voting Classes") were entitled to vote on the Plan. Holders of Claims in Class 1 (Non-Tax Priority Claims), Class 2 (Secured Tax Claims), Class 3 (Miscellaneous Secured Claims) and Class 7 (Encore Lender Claims) are Unimpaired under the Plan and, consequently, are deemed to have accepted the Plan pursuant to the Bankruptcy Code. Holders of Interests in Class 10 (Interests in the Debtors) are not entitled to receive a Distribution

3

and, consequently, are conclusively deemed to have rejected the Plan pursuant to the Bankruptcy Code.

7. The Disclosure Statement Order established August 15, 2016 as the deadline for the Holders of Claims in the Voting Classes to cast their votes to accept or reject the Plan.

8. On August 23, 2016, the Balloting Agent filed the *Report and Certification Regarding Ballots on First Amended Plan of Liquidation for New Louisiana Holdings, LLC, et al., Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 1274] (the "Voting Certification"), containing a tabulation of all Ballots received and demonstrating acceptance of the Plan by the Voting Classes.

### III. COMPLIANCE WITH THE BANKRUPTCY CODE

9. Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)). I believe that the Plan complies with the following requirements of the Bankruptcy Code:

   a. Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). Article III of the Plan designates ten Classes of Claims and Interests. I am familiar with the classification of Claims and Interests in the Plan and believe that such classification system is based upon the legal nature and relative rights of such Claims and Interests, and is not proposed for any improper purposes. Each Class contains only Claims or Interests that are substantially similar to other Claims and Interests therein. Additionally, Article II of the Plan designates (but does not classify) certain Claims under sections 507(a)(2) and 507(a)(8), including Administrative Claims and Priority Tax Claims.[2]

---

[2] Intercompany Claims are also not classified under the Plan because such Claims are eliminated and cancelled as a result of the substantive consolidation of the Debtors' estates.

4

b. <u>Specified Treatment of Unimpaired Claims (11 U.S.C. §§ 1123(a)(2), (3))</u>. Article IV of the Plan specifies whether each Class of Claims and Interests is Impaired or Unimpaired under the Plan.

c. <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>. Pursuant to the Plan, the treatment of each Claim or Interest in each particular Class is afforded the same treatment as each other Claim or Interest in such Class, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such particular Claim or Interest.

d. <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>. Article VI and various other provisions of the Plan provide an adequate and proper means for the implementation of the Plan. Specifically, Article VI of the Plan provides, among other things: (i) for the settlement of (1) any Claims and Causes of Action against the Released Parties, (2) the Insider Claims, (3) the TCR Personal Injury Claims, and (4) the Chicago Health Care Leasing Claim; (ii) for an explanation of the sources of funding for the Plan and for Distributions, which include, among other things, all Cash of the Debtors on hand as of the Effective Date and the Release Payment in the amount of $2.5 million, and (iii) for the creation of the Claimants Trusts on the terms and conditions described in the Plan, with the rights and powers set forth in the Plan and the Claimants Trust Agreement(s), which were included in the Plan Supplement.

e. <u>Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6))</u>. The Plan is a liquidating plan that calls for the eventual dissolution of the Debtors pursuant to Sections 9.10 and 9.11 of the Plan. Further, no securities will be issued under the Plan. Accordingly, it is my understanding that the requirements of section 1123(a)(6) do not apply to the Plan.

f. <u>Impairment of Classes (11 U.S.C. § 1123(b)(1))</u>. Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims or Interests under the Plan.

g. <u>Treatment of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>. Pursuant to Article VII of the Plan, on the Effective Date, all Executory Contracts and unexpired leases not assumed before the Effective Date, or subject to a pending motion to assume as of the Effective Date, will be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.

h. <u>Section 1123(b)(6) of the Bankruptcy Code</u>. Pursuant to section 1123(b)(6) of the Bankruptcy Code, the Plan may include any other appropriate provision that is not inconsistent with any applicable provisions of the Bankruptcy Code. Pursuant to this section, the Plan contains release and exculpation provisions that are integral components of the Plan. As discussed in more detail below, these provisions are fair and reasonable, supported by consideration, and necessary to the realization of the Plan and the value realized thereunder. Accordingly, it is my understanding that such provisions are not inconsistent with any applicable provision of the Bankruptcy Code and should be approved.

i. <u>Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. To the best of my knowledge, the Plan Proponents, acting through their respective agents, representatives and professionals, have complied with all applicable provisions of the Bankruptcy Code in proposing the Plan and with the Disclosure Statement Order in commencing and conducting the solicitation of acceptances or rejections of the Plan.

j. <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Plan has been negotiated and proposed in good faith and for a legitimate purpose. Together with the

Committee, the Debtors propose the Plan in good faith and with the honest intention of resolving disputed claims and maximizing creditors' recoveries. To the best of my knowledge, the Plan Proponents, acting through their respective agents, representatives and professionals, have (i) proposed the Plan (a) in good faith, and (b) not by any means forbidden by law, and (ii) acted in good faith in the negotiation and formulation of the Plan.

    k. <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. Any payment made or to be made by the Debtors or the Claimants Trusts, for services or for costs and expenses in or in connection with these Bankruptcy Cases, or in connection with the Plan and incident to these Bankruptcy Cases, has been approved by, or is subject to the approval of, the Court as reasonable.

    l. <u>Liquidating Trustee, Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Plan is a liquidating plan that calls for the eventual dissolution of the Debtors pursuant to Section 9.10 and 9.11 of the Plan. The identity and compensation of the Unsecured Claimants Trustee proposed to serve after the Effective Date have been fully disclosed in the Plan Supplement, as amended, and at the Confirmation Hearing. Likewise, the identity and compensation of HCN proposed to provide services to the Debtors and the Unsecured Claimants Trust has been fully disclosed in the Plan Supplement, as amended, and at the Confirmation Hearing.

    m. <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for rate changes subject to the jurisdiction of any governmental regulatory agency.

    n. <u>Best Interests of Creditors Test (11 U.S.C. § 1129(a)(7))</u>. Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim either (a) accept the Plan, or (b) receive or retain property of value under the Plan that is greater than or

7

14-50756 - #1276 File 08/23/16 Enter 08/23/16 18:41:10 Main Document Pg 7 of 15

equal to the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. As set forth in the Voting Certification, one hundred percent (100%) of creditors voting on the Plan voted to accept the Plan. Furthermore, in connection with the Disclosure Statement, representatives of the Debtors worked with representative of the Creditors Committee and prepared a liquidation analysis, which was attached as Exhibit E to the Disclosure Statement (the "<u>Liquidation Analysis</u>"). The Liquidation Analysis reflects a hypothetical chapter 7 liquidation of the Debtors' assets. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation costs, that would be available to the Debtors' creditors, contains various assumptions and estimates which are described in more detail therein, and was reviewed for reasonableness by representatives of both the Debtors and the Creditors Committee. The Liquidation Analysis demonstrates that the recoveries under the Plan equal or exceed the recoveries for creditors under a liquidation under chapter 7 of the Bankruptcy Code. More specifically, under the Plan unsecured creditors are expected to receive approximately 19.6% of the allowed amount of their Claim, whereas in a chapter 7 case unsecured creditors would likely only receive approximately 4.4% of the allowed amount of their Claim. Consequently, I believe that the Plan satisfies Bankruptcy Code section 1129(a)(7).

    o.    <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8))</u>. Section 1129(a)(8) requires that, "[w]ith respect to each class of claims or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan." Classes 1, 2, 3, and 7 are unimpaired under the Plan and therefore are deemed to have accepted under Section 1126(f). As reflected in the Voting Certification, all impaired classes have unanimously voted to accept the Plan and each class has therefore accepted the Plan in accordance with Section 1126(c). Accordingly, I believe the Plan satisfies the requirements of Section 1129(a)(8).

p. <u>Treatment of Administrative and Tax Claims (11 U.S.C. § 1129(a)(9))</u>. Pursuant to Section 2.01 of the Plan, except to the extent that a holder entitled to payment of an Allowed Administrative Claim (which includes Fee Claims) agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive Cash in an amount equal to such Allowed Administrative Claim within ten (10) Business Days after the later of (i) the Effective Date, or (ii) the Allowance Date with respect to such Allowed Claim. Further, pursuant to Section 2.02 of the Plan, each Holder of an Allowed Priority Tax Claim, if any, shall receive in full satisfaction of such Allowed Priority Tax Claim (a) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the Effective Date or within ten (10) Business Days after such Allowed Priority Tax Claim becomes an Allowed Claim, whichever is later, or as soon thereafter as is practicable; or (b) Cash in an amount agreed to by the Debtors, the Committee, the Unsecured Claimants Trust, as appropriate, and such holder.

q. <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10))</u>. As set forth in the Voting Certification, more than a majority in number and two-thirds in dollar amount of the non-insider creditors voting in Class 4 (General Unsecured Claims) and Class 5 (Personal Injury Claims), among others, have voted to accept the Plan. Therefore, section 1129(a)(10) of the Bankruptcy Code is satisfied.

r. <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>. The Plan calls for the liquidation of the Debtors, and I believe that there are sufficient funds available to the Debtors and the Claimants Trusts to meet all the obligations under the Plan. As set forth in the Liquidation Analysis, the Debtors project that, as of the Effective Date, the Debtors will have approximately $12,257,600 in Cash on hand. Additionally, on the Effective Date of the Plan, the Released Parties will pay $2.5 million, a portion of which will be used to fund payments to holders of

9

Allowed Personal Injury Claims, and a portion of which will be paid to the Unsecured Claimants Trust, on the terms and conditions set forth in the Plan. The Plan provides for the payment in full of all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and any other Secured Claims. I have reviewed the estimates for such claims and believe that there will be sufficient funds to meet all required payments under the Plan. Therefore, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) section 1129(a)(11) of the Bankruptcy Code.

    s. <u>Payment of Fees (11 U.S.C. § 1129(a)(12))</u>. All fees under 28 U.S.C. § 1930 presented to date have been paid or provided for. Moreover, as set forth in Section 2.03 of the Plan, after the Effective Date, the Claimants Trusts shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.

    t. <u>Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>. The Debtors provide no "retiree benefits" as such term is defined in section 1114 of the Bankruptcy Code. Therefore, 11 U.S.C. § 1129(a)(13) is inapplicable.

    u. <u>Domestic Support Obligation (11 U.S.C. § 1129(a)(14))</u>. As the Debtors are not required to pay any domestic support obligations, 11 U.S.C. § 1129(a)(14) is inapplicable.

    v. <u>Individual Debtor Requirements (11 U.S.C. § 1129(a)(15))</u>. As the Debtors are not individuals, 11 U.S.C. § 1129(a)(15) is inapplicable.

w. <u>Identification of Plan Proponents (Fed. R. Bankr. P. 3016(a))</u>. As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors and the Committee as the proponents of the Plan.

x. <u>Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b))</u>. The Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8). All of the Voting Classes have voted to accept the Plan. Class 10 (Equity Interests) is not receiving a Distribution or retaining any property under the Plan and, consequently, is deemed to have rejected the Plan. Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may still be confirmed, notwithstanding that not all impaired Classes have voted to accept the Plan, if the Plan is fair and equitable with respect to, and does not unfairly discriminate against, such Classes. Here, no holders of Claims or Interests that are subordinate to the Interests in Class 10 will receive a Distribution or retain any property under the Plan. Accordingly, it is my understanding that the Plan is fair and equitable with respect to such Class and does not unfairly discriminate against such Class. Therefore, the Plan complies with section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding that Class 10 was deemed to have rejected the Plan.

y. <u>Principal Purpose of Plan (11 U.S.C. § 1129(d))</u>. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

z. <u>Section 1129(c) -- Only One Plan</u>. Other than the Plan, no plan has been filed in these Bankruptcy Cases and neither the Debtors nor any other party are presently seeking confirmation of any plan other than the Plan. Therefore, the Plan complies with section 1129(c) of the Bankruptcy Code.

10. <u>Compliance with Bankruptcy Rule 3016(c)</u>. In accordance with Bankruptcy Rule 3016(c), the Plan describes in specific and conspicuous bold language all acts to be enjoined and identifies the entities that would be subject to the injunction to the extent required thereunder.

## IV. PLAN SETTLEMENT

11. The Plan contains a compromise and settlement of certain claims and controversies which are defined and described in more detail in Section 6.01 of the Plan and pages 43-45 of the Disclosure Statement. Section 9.06 of the Plan also contains a release from the Debtors and their Estates of, *inter alia*, all Causes of Action and Claims against the Released Parties, in exchange for the Release Payment ($2.5 million) and the other consideration provided under the Plan (including, without limitation, the subordination of Class 6 Claims (Chicago Health Care Leasing Claims), the release of Class 9 Claims (TCR Personal Injury Claims), and the disallowance of Class 8 Claims (Insider Claims)).

12. The Settlement was the result of extensive, protracted, arms-length negotiations between the Creditors Committee and its professionals, the Debtors and their professionals, and certain of the Released Parties and their professionals, and followed a lengthy investigation that was undertaken by the Creditors Committee early in the Bankruptcy Cases.

13. Beginning in October 2014, after the Creditors Committee was formed and had retained counsel, and continuing thereafter, the Debtors' representative and their professionals devoted significant time, effort and resources to the sharing of information with the Creditors Committee. To that end, the Debtors and the Creditors Committee held numerous in-person meetings, lasting several hours each, to discuss both the Debtors' operations and financial affairs and the specific information the Creditors Committee needed to complete its analysis of the Debtors' prepetition transactions and potential claims against certain insiders and related parties. The Creditors Committee served numerous information requests to which the Debtors provided

12

14-50756 - #1276  File 08/23/16  Enter 08/23/16 18:41:10  Main Document  Pg 12 of 15

substantive narrative responses. Additionally, the Debtors established a data room into which the Debtors voluntary produced tens of thousands of pages of documents for the Creditors Committee's review. The Creditors Committee was also provided with the documents produced in the Palm Garden 2004 Exam (as that term is defined in the Disclosure Statement).

14. Following the exchange of information over a period of more than six months, representatives for the Creditors Committee, its counsel and financial advisor, representatives for the Debtors and their counsel, and separate counsel for the Released Parties attended a series of in-person meetings in June and September 2015. In addition, the Debtors also conducted an independent analysis and evaluation of all potential estate claims identified by the Creditors' Committee. Likewise, counsel for various Released Parties analyzed the potential claims and defenses. Following significant negotiations that continued after the September 2015 meeting, the participants agreed to the Settlement contained in the Plan.

15. As part of the Settlement, and conditioned on the Plan becoming effective, the Released Parties will pay $2.5 million to the Debtors. However, this cash payment, while significant, represents a small fraction of the total consideration received by the Debtors in return for the releases provided under the Plan. In addition, the holders of all Insider Claims will waive both their pre-petition and post-petition administrative claims. The Insider Claims include, without limitation, those claims identified on Exhibit D to the Disclosure Statement, among which are the following: (i) the Halcyon proof of claim in the amount of $24,122,370.00 for actual services rendered to the Debtors pre-petition; (ii) HCN's pre-petition claim in the amount of $14,022,232 for actual services rendered to the Debtors pre-petition; (iii) Gulf Coast's pre-petition claim in the approximate amount of $2.857 million for actual services rendered to the Debtors pre-petition; and (iv) HCN's and Gulf Coast's post-petition Administrative Claim for

actual services rendered to the Debtors during the pendency of the Bankruptcy Cases in the aggregate amount of approximately $4 million. The treatment of the Insider Claims under the Plan also avoids both Administrative Expenses associated with challenging any such claims, and significantly improves recoveries to holders of Allowed Claims in Classes 4 and 5.

16. Furthermore, all of the TCR Personal Injury Claims (with a face amount of approximately $500 million excluding duplicates (and several billion dollars when duplicates are counted)) will be released under the Plan, and the Chicago Health Care Leasing Claims in the approximate amount of $10,166,780 will be subordinated to the payment of all other claims under the Plan. The settlement and release of the TCR Personal Injury Claims benefits the Estates in several material ways. First, the Estates avoid the time and expense of having to litigate and liquidate approximately fifty tort claims that assert claims for wrongful death and/or substantial bodily injury. Based on the Debtors' history litigating similar claims, the Estates stand to save conservatively at least several million dollars in legal expenses that would otherwise have to be incurred litigating those claims, thereby leaving more funds available for the Claimants Trusts. Second, the TCR Personal Injury Claims will be released under the Plan, thereby substantially reducing the claims asserted against the Debtors and dramatically increasing the percentage distribution to holders of other Allowed Claims, as the balance of Estate Assets (including the $2.5 million settlement payment and the net proceeds of the asset sales) will inure to the beneficiaries of the Claimants' Trusts. Similarly, the subordination of the Chicago Health Care Leasing Claims (in the amount of $10,166,780) results in a smaller number of claims entitled to share in the assets being contributed to the Claimants Trusts, thereby improving recoveries to the beneficiaries of the Claimants Trusts.

17. The Settlement represents a compromise of the various claims, arguments and objections between the Debtors and the Released Parties and is fair and equitable and in the best interest of the Debtors' estates. As evidenced by the Declaration of Brian Ryniker in support of the Plan, the Creditors Committee negotiated the Settlement and the Creditors Committee agrees that it represents a balanced, fair and reasonable resolution of substantial disputes which prolonged the Bankruptcy Cases.

## V. CONCLUSION

Based on the foregoing, I believe that the Plan satisfies the requirements of the Bankruptcy Code and should be confirmed.

Dated: August 23, 2016  */s/ James A. Blalock III*
James A. Blalock III