IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| *In re* <br><br> NEW LOUISIANA HOLDINGS, LLC, *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 14-50756 <br><br> Jointly Administered |

**DECLARATION OF BRIAN RYNIKER IN SUPPORT OF
THE FIRST AMENDED JOINT PLAN OF LIQUIDATION FOR
NEW LOUISIANA HOLDINGS, LLC, ET AL., PROPOSED BY THE DEBTORS AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

I, Brian Ryniker, declare the following to be true under penalty of perjury:

1. I am a Managing Director in the Corporate Recovery Services group at CBIZ MHM, LLC. I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor and am Certified in Financial Forensics. I am a member of the Association of Insolvency & Restructuring Advisors, the American Bankruptcy Institute, the Turnaround Management Association, the American Institute of CPAs, and the New York State Society of Certified Public Accountants.

2. I have more than fifteen years' experience in matters involving business restructurings, bankruptcy and insolvency, transaction due diligence and accounting and forensic investigations. I have been involved in many complex bankruptcies and work-out situations representing unsecured creditors, creditors' committees, debtors, and secured lenders. In the course of such engagements, I have frequently performed investigations and forensic analyses of debtors' books and records, often in conjunction with counsel, in order to analyze potential claims arising from transactions engaged in by the debtors.

3. On or about December 22, 2014, I was retained by the Official Committee of Unsecured Creditors of New Louisiana Holdings, LLC, *et al.* (the "Committee") to serve as its financial advisor.

4. I am authorized to submit this declaration on behalf of the Committee in support of the First Amended Joint Plan of Liquidation for New Louisiana Holdings, LLC, *et al.*, Proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan"),[1] and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

5. As financial advisor to the Committee, I undertook a broad investigation of the Debtors' books and records, internal documents and emails to gain an understanding of the Debtors' financials, cash management system and ownership and operational structures. In the course of my investigation, together with CBIZ employees working under my supervision and the Committee's counsel, Pepper Hamilton, I reviewed tens of thousands of pages of documents produced by the Debtors. In addition, I conducted numerous in-person and telephonic interviews of the Debtors' acting chief financial officer, Julie Gutzmann, as well as of Debtors' in-house legal staff.

6. Through my investigation, I became generally familiar with the Debtors' structure, former operations, business affairs, books, and records. I focused particularly on intercompany transfers and transactions between and among the Debtors and/or non-debtor affiliates, as well as transfers between and among the Debtors and insiders of the Debtors, in order to determine (a) whether factual bases existed for claims against the non-debtor affiliates and/or insiders for, among other things, fraudulent transfers, preferences, unjust enrichment,

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

breaches of contract, breaches of fiduciary duty or aiding and abetting breaches of fiduciary duty; and (b) whether factual bases existed for defenses to such claims.

7. Collectively, CBIZ and Pepper Hamilton spent nearly three thousand hours investigating the Debtors, their affiliates and their insiders. Based on our investigation, we jointly concluded that there was factual support for substantial claims against the Debtors' affiliates and insiders.

8. As part of settlement negotiations, Pepper Hamilton and I made detailed presentations of our findings to the Debtors' counsel and, subsequently, directly to the Debtors, over the course of multiple emails, conference calls and two in-person meetings.

9. In the course of those settlement negotiations, the Debtors raised numerous defenses to the claims identified by the CBIZ/Pepper Hamilton investigation. Our investigation confirmed that factual bases existed for a number of the defenses raised by the Debtors. In addition, I analyzed the probable costs of pursuing claims against the Debtors' affiliates and insiders, which I estimated to be at least several million dollars. Likewise, the analysis by Pepper Hamilton concluded that in light of the factual disputes and the current state of the law, pursuing the major claims against the insiders and affiliates had risks to both sides.

10. Based on the potential value of the claims identified in the CBIZ/Pepper Hamilton investigation, the potential defenses to those claims, and the probable cost of pursuing the claims, I determined, together with Pepper Hamilton, the estimated net value of the claims.

11. I have reviewed the Plan, including the provisions granting releases to the Debtors' affiliates and insiders, in light of the estimated net value of the claims being released. In my opinion, unsecured creditors will receive reasonably equivalent value under the Plan in exchange for such releases. The proposed Plan eliminates over $41 million of insider claims

against the Debtors, a portion of which was asserted to have administrative priority status. In addition, under the Plan-related settlement, the Debtors' insiders resolve and eliminate personal injury claims with a conservatively estimated settlement value of $85 million and will provide approximately $1.4 million of additional settlement funds for general unsecured creditors. Thus, because the Plan provides for all nets assets to be immediately paid to unsecured creditors, the foregoing imparts a significant increase in the return to them, avoids the dilution that otherwise would have occurred had a settlement not been reached and eliminates the long delay in distribution which extensive litigation would have caused.

12. Given the numerous benefits provided under the Plan by the Debtors' affiliates and insiders, which are predicated on the release of claims against those affiliates and insiders, it is my opinion that the Plan releases are in the best interests of the estates and their creditors.

**[remainder intentionally left blank]**

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the forgoing is true and correct to the best of my knowledge, information, and belief, after reasonable inquiry.

Executed: August 23, 2016          _____
                                                BRIAN RYNIKER

-5-

14-50756 - #1277   File 08/23/16   Enter 08/23/16 18:43:31   Main Document   Pg 5 of 5