**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **NEW LOUISIANA HOLDINGS, LLC,** | § | **CASE NO. 14-50756** |
| *et al.* | § | |
| | § | **JOINTLY ADMINISTERED** |
| **DEBTORS** | § | |

**BRIEF IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT PLAN OF
LIQUIDATION FOR NEW LOUISIANA HOLDINGS, LLC, ET AL., PROPOSED BY
THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

The Debtors, as debtors and debtors-in-possession in the above-captioned bankruptcy
case, files this brief in support of confirmation of the First Amended Joint Plan of Liquidation
Proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan")
[Docket No. 1231],[1] and in support state as follows:

## I. PRELIMINARY STATEMENT

1.      The Plan is the culmination of approximately two years of effort by the Debtors,
the Committee, and the Related Parties to liquidate the Debtors' assets and wind down their
businesses, investigate potential claims belonging to the Debtors' estates, and resolve more than
$500 million in disputed personal injury claims.  The result of those efforts is a fully consensual
Plan that incorporates a global resolution of a multitude of claims, including numerous disputed
personal injury claims, without litigation and will yield a substantial recovery to unsecured
creditors.  Considering the challenges the Debtors faced at the outset of this case, the Plan
represents a remarkable accomplishment that inures to the benefit of all parties in interest.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan and/or
Disclosure Statement, as applicable.

2.     The Settlement is the keystone feature of the Plan.  As set forth more fully in the Disclosure Statement, the Settlement embodies a compromise and resolution of various claims between the bankruptcy estates and the Released Parties.  Under the Settlement, the bankruptcy estates will release all estate claims against the Released Parties (i.e., certain of the Debtors' insiders, affiliates, and related parties) in exchange for a $2.5 million cash contribution, the withdrawal of the Insider Claims,[2] elimination of the TCR Personal Injury Claims,[3] and the subordination of the Chicago Health Care Leasing Claim.[4]  In total, the Settlement will result in the elimination or subordination of over $550 million in claims that would otherwise substantially dilute any creditor recoveries in this case.

3.     The Settlement was heavily negotiated, at arms-length, between the Debtors, the Committee, the Released Parties, and the representatives of various personal injury claimants. The Plan, which is centered on the Settlement, was unanimously accepted by the Debtors' creditors.  The Plan satisfies the requirements of Section 1129(a), is in the best interest of the Debtors, their estates, and creditors, and should therefore be approved.

## II. THE SETTLEMENT IS IN THE BEST INTEREST OF THE DEBTORS' ESTATES AND SHOULD BE APPROVED

### A.     Background and Overview of the Settlement

4.     The Settlement is the result of extensive negotiations among the Debtors, the Committee, the Released Parties, and the representatives of various personal injury claimants with total claims exceeding $550 million.  The negotiations centered around potential estate claims identified in a lengthy and detailed investigation by the Committee and its professionals. *See* Decl. of James A. Blalock III (the "Blalock Decl.") [Docket No. 1276] at ¶ 12; Decl. of

---

[2]    The term "Insider Claims" is defined in the Plan to include prepetition unsecured claims of all Insiders and administrative priority claims of Insiders.  The prepetition unsecured portion is $37,145,399.00 while the Administrative Claim portion is between $4,000,000.00 and $4,500.000.00.
[3]    The TCR Personal Injury Claims are approximately $500,000,000.00
[4]    The amount of the Chicago Health Care Leasing claim is approximately $10,166,780.00.

Brian Ryniker (the "<u>Ryniker Decl.</u>") [Docket No. 1277] at ¶ 4. Beginning in October 2014, the Debtors and their professionals devoted significant time, effort, and resources to the sharing of information with the Committee. Blalock Decl. at ¶ 13. Among other things, the Debtors produced tens of thousands of pages of documents to the Committee for review and provided detailed, substantive narrative responses to written information requests. *Id.*; Ryniker Decl. at ¶ 4. In addition, the Debtors and Committee held numerous in-person meetings and telephone conferences to discuss the Debtors' operations and financial affairs. Blalock Decl. at ¶ 13; Ryniker Decl. at ¶ 4. Ultimately, the Debtors produced sufficient information to enable the Committee to complete an in-depth analysis of the Debtors' prepetition transactions and any potential claims against insiders and related parties. Ryniker Decl. at ¶¶ 4-7.

5. In June, 2015, the Committee, through its counsel and its financial advisor, presented the results of the Committee's extensive investigation to the Debtors' management team, Debtors' counsel, and certain related parties. Blalock Decl. at ¶ 14. Those related parties were represented at this meeting (and in the negotiations) by separate counsel. *Id.* Prior to this meeting, Committee counsel and its financial advisor met with Debtors' counsel to preview the Committee's analysis. In addition to the multiple meetings at which all necessary parties attended, counsel for the various parties participated in numerous conference calls and discussions. The merits of the various potential claims and the attendant defenses were analyzed, discussed and internally evaluated by all of the affected parties. The Committee's investigation generally focused on two areas: (i) transactions related to services provided by related parties to the Debtors under written service agreements and (ii) transactions relating to the movement of cash among the Debtors and the manner in which the Debtors funded their operations. Ryniker Decl. at ¶ 5. With respect to the first category of transactions, the Committee identified potential

estate claims for allegedly avoidable transfers and various state law claims. Ryniker Decl. at ¶¶ 5-6. With respect to the second category, the Committee identified potential estate claims against the Debtors' officers, members, and owners, including claims for alleged breaches of their respective fiduciary duties. *Id*. The Committee's investigation also revealed potential defenses to the claims and examined the probable costs of pursuing such claims. *Id*.

6. Following this initial meeting, the Debtors and related parties analyzed the claims identified by the Committee, considering any potential defenses to such claims and the potential value to the affirmative claims the potential defendants might have against the Debtors. Blalock Decl. at ¶ 14. In September 2015, the Debtors, Committee and related parties met again to discuss a potential global resolution of the Debtors' cases, including the claims identified by the Committee. *Id*. Following additional negotiations that continued after the September 2015 meeting, the parties agreed to the terms of the Settlement and principal terms of the Plan. *Id*.

7. In general, the Settlement consists of the following elements. In exchange for a full release, the Released Parties will pay the Debtors $2.5 million and release the Insider Claims, which exceed $41 million in face value. *Id*. at ¶ 15. Furthermore, the Settlement will result in the release of the TCR Personal Injury Claims, with a face amount in excess of $500 million (excluding duplicates)[5] and the subordination of the Chicago Health Care Leasing Claims, with a face amount exceeding $10 million. *Id*. at ¶ 16. In short, in exchange for releasing the Released Parties (i.e., certain insiders and affiliates of the Debtors), the Debtors will receive $2.5 million in cash and eliminate or subordinate over $550 million in claims against the Debtors' estates, significantly improving creditors' recoveries. *Id*.; Ryniker Decl. at ¶ 8.

---

[5] Including duplicates, the TCR Personal Injury claims have a face amount of several billion dollars.

**B.      Legal Standard for Approval of the Settlement**

8.      The Settlement is incorporated into the Plan pursuant to Section 1123(b)(3)(A) and Bankruptcy Rule 9019.  Section 1123(b)(3) provides that a plan may provide for the settlement of any claim by *or* against debtor or its estate, *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007), and the approval of settlements in a plan is governed by Bankruptcy Rule 9019.  *U.S. v. AWECO, Inc. (In re AWECO, Inc.*), 725 F.2d 293, 297 (5th Cir. 1984).  Approval of a settlement under Bankruptcy Rule 9019 is a matter committed to the Court's discretion.  *Heritage*, 375 B.R. at 308.

9.      To be approved, a settlement contained in a plan must be fair and equitable and in the best interest of the debtor's estate.  *In re Cajun Elec. Power Coop., Inc*., 119 F.3d 349, 355 (5th Cir. 1997).  The Fifth Circuit Court of Appeals has identified four factors courts must consider in determining whether a settlement is fair and equitable:

> (i) the probability of success in litigation of the claims, with due consideration for the uncertainty in fact and law;
>
> (ii) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay;
>
> (iii) the best interests of creditors, with proper deference to their reasonable views; and
>
> (iv) the extent to which the settlement is truly the product of arms-length bargaining and not fraud or collusion.

*Id*. at 355-56; *Heritage*, 375 B.R. at 259-60.  As set forth below, each of these factors weighs heavily in favor of approval of the Settlement.

**C.      The Probability of Success in the Litigation**

10.      As set forth above, the Settlement incorporates the release of (i) claims against the Released Parties, (ii) the Insider Claims; (iii) the TCR Personal Injury Claims; and (iv) the subordination of the Chicago Health Care Leasing Claims.  In determining whether to approve

---

the Settlement, the Court must consider the Debtors' probability of success in litigating these claims. *Cajun*, 119 F.3d at 356. However, the Court is not required to conduct a mini-trial of each claim to determine the probable outcome of the litigation, but must only apprise itself "of the relevant facts and law so that [the Court may] make an informed and intelligent decision." *Id.* (quotations omitted).

11. With respect to the claims against the Released Parties, the Committee conducted a thorough investigation to identify any claims against the non-debtor affiliates and/or insiders for, among other things, fraudulent transfers, preferences, unjust enrichment, breaches of contract, breaches of fiduciary duty or aiding and abetting breaches of fiduciary duty. Ryniker Decl. at ¶ 5. The Committee also analyzed both the potential defenses to the claims and the cost of pursuing those claims and concluded that the outcome would be uncertain because there is factual support for both the claims the Committee identified and for the defenses to those claims. *Id.* at ¶¶ 6-7.

12. In contrast to the uncertainty of litigation, the Settlement permits the Debtors to avoid any litigation risk while realizing substantial value in exchange for the released claims. In exchange for releasing these potential claims against the Released Parties, the Settlement will result in the elimination of the Insider Claims, the TCR Personal Injury Claims, and the subordination of the Chicago Health Care Leasing Claims. The Debtors, along with the Committee, examined the merits of these claims as well and conservatively estimate that the TCR Personal Injury Claims alone have a settlement value of $75 million, which, unless released, would significantly dilute the remaining unsecured creditors' recoveries. Ryniker Decl. at ¶ 8; Blalock Decl. at ¶ 16. The same is true of the elimination of the Insider Claims and the subordination of the Chicago Health Care Leasing Claim. Blalock Decl. at ¶ 16. Thus, the

Settlement confers substantial value to non-Insider creditors while eliminating considerable litigation risk.

13.     Having reviewed the merits of the underlying claims and the terms of the Settlement itself, both the Debtors and the Committee believe the bankruptcy estates (and their respective creditors) are receiving reasonably equivalent value under the Plan in exchange for the claims released in the Settlement.  Blalock Decl. at ¶ 17; Ryniker Decl. at ¶ 8.  Accordingly, the Debtors submit that this factor weighs in favor of Settlement.  *See In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 43 (Bankr. E.D.N.Y. 2014) (approving settlement that avoided risk and cost of litigating uncertain claims and delivered substantial value to estate in form of cash payment plus withdrawal of claims).

## D.     Complexity, Expense and Delay

14.     The complexity, expense, and delay associated with litigating each of the claims released in the Settlement also weighs heavily in favor of approval.  Most importantly, the Settlement will result in the immediate resolution of the TCR Personal Injury Claims, which consist of approximately 50 claims with a face value in excess of $500,000,000.  Absent approval of the Settlement, each of the TCR Personal Injury Claims would have to be litigated individually, potentially before a jury in the United States District Court.  *See* 28 U.S.C. § 157(b)(5) (providing that personal injury claims must be tried in district court).  Assuming that each claim cost the Debtors $200,000 to $300,000 to litigate,[6] the litigation costs alone would exceed $10 million, effectively nullifying any potential distribution to creditors.  *See* Blalock Decl. at ¶ 16.  In addition to the cost, litigation of TCR Personal Injury Claims to conclusion would likely take several years and severely delay distributions to creditors.  Avoiding these

---

[6]    The estimated cost per trial is based on the Debtors' pre-bankruptcy actual litigation costs.  These estimates are at the low end of the actual costs incurred by the Debtors to try a personal injury lawsuit.

costs and this delay is a crucial and valuable component of the Settlement and is one of many reasons the Settlement should be approved. *See Cajun*, 119 F.3d at 357 (approving settlement that would save "millions of dollars [in legal fees] and years of delay").

15.     The same argument holds true with respect to the claims against the Released Parties, the Insider Claims, and the Chicago Health Care Leasing Claim.  As an initial matter, the elimination of the Insider Claims and subordination of the Chicago Health Care Leasing Claim resolves more than $50 million in claims against the Debtors' estates without any litigation. Blalock Decl. at ¶ 15.  Further, litigation of potential estate claims against the Released Parties would be complex, expensive, and lengthy.  Any estate claims against the Released Parties would likely be disputed, and common law claims such as breach of fiduciary duty are unlikely to be resolved on summary judgment.  As a result, any litigation of those claims would likely require extensive discovery, a trial on the merits, and protracted appeals. *See Heritage*, 375 B.R. at 262 (approving settlement where claims would survive a motion for summary judgment, require problematic discovery, a trial on the merits, and appeals).  Indeed, the Committee estimates that litigation of claims against the Released Parties would cost several million dollars at the least.  Ryniker Decl. at ¶ 7.  Under any informed analysis, the Settlement enables the Debtors to avoid significant expenses and delay.  Therefore, this factor supports approval of the Settlement.

**E.     Best Interest of Creditors**

16.     With respect to the third factor, courts should consider the interests of creditors, with proper deference to their reasonable views. *Cajun*, 119 F.3d at 356.  As an initial matter, the Settlement is based upon the Committee's independent investigation of potential estate claims and was fully negotiated by the Committee.  Blalock Decl. at ¶ 12; Ryniker Decl. at ¶ 5. Accordingly, creditors' interests were at all times represented in the negotiation of the

14-50756 - #1278  File 08/23/16  Enter 08/23/16 18:45:53  Main Document  Pg 8 of 23

Settlement. Further, the Settlement will substantially increase distributions to creditors. Ryniker Decl. at ¶ 8. Unsurprisingly, the Settlement is overwhelmingly supported by the Debtors' creditors. Under the circumstances, the Court should defer to creditors' widespread support of the Settlement. *See In re Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995) (bankruptcy courts should "consider the amount of creditor support for a compromise settlement" in determining whether to approve it).

**F.     Settlement is the Product of Arms-Length Bargaining**

17.     Finally, the Settlement is the product of extensive arms-length negotiations between (i) the Debtors and their counsel, (ii) the Committee, its counsel and financial advisor, (iii) the Released Parties and their respective counsel, (iv) counsel for various personal injury claimants and others. Blalock Decl. at 11. As set forth above, all estate claims released in the Settlement were fully and thoroughly investigated by the Committee independently from the Debtors. Ryniker Decl. at ¶¶ 4-8. In turn, the Debtors independently analyzed the estate claims identified by the Committee and further analyzed the estate's potential liabilities with respect to the TCR Personal Injury Claims and Insider Claims. Blalock Decl. at ¶ 14. Likewise, counsel for the various related parties analyzed the claims raised by the Committee and the defenses those related parties could assert. The lawyers for the different related parties participated in all major negotiations with the Committee. The Debtors, in the exercise of their reasonable business judgment, concluded that the Settlement is in the best interest of the Debtors' estates and should be approved. Blalock Decl. at ¶ 17. The Committee, having independently analyzed the underlying claims, agreed and the Settlement was unanimously accepted by the creditors voting on the Plan. Ryniker Decl. at ¶¶ 4-9; *Report and Certification Regarding Ballots on First Amended Joint Plan of Liquidation* (the "<u>Balloting Report</u>") [Docket No. 1274]. The Debtors submit that the foregoing conclusively demonstrates that the settlement is fair and equitable and

should be approved. *See In re HII Holdings, Inc.*, 536 B.R. 61, 121 (Bankr. S.D.N.Y. 2015) (approving settlement as product of arms-length negotiations where committee supported settlement after conducting independent investigation of released claims).

### III. NOTICE OF THE PLAN WAS SUFFICIENT

18.     Due process requires that, in order to bind creditors to a plan, the creditor must be given notice of the bankruptcy case and the deadline for filing claims. *In re Waterford Energy*, 294 Fed.Appx. 900, 903 (5th Cir. 2008) (citing *Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249 (4th Cir. 2007)). "The type of notice that is reasonable or adequate for purposes of satisfying the due process requirement in this context depends on whether a particular creditor is known or unknown to the debtor." *Id*. at 904 (quoting *J.A. Jones*, 492 F.3d at 249). "Although actual notice of the bankruptcy filing and applicable bar date must be provided to known creditors, constructive notice is sufficient to pass constitutional muster for unknown creditors." *Id*. It is "well established" that publication of notice in national newspapers is sufficient constructive notice to unknown creditors. *Id*. The Debtors provided proper notice of the applicable bar dates to all known and unknown creditors.

19.     On March 20, 2015, the Court entered an order (the "First Bar Date Order") [Docket No. 578] granting the Debtors' Motion for Order Fixing Bar Date for Filing Proofs of Claim and Interest and Approving Notice Procedures [Docket No. 414]. Pursuant to the First Bar Date Order, certain of the Debtors[7] served a notice of the deadline for filing proofs of claim (the "First Bar Date Notice") on all known creditors plus (i) all parties listed on the mailing matrix in the Debtors' cases, (ii) all residents and personal representatives of residents of the Debtors' skilled nursing facilities since 2012 at their last known addresses; and (iii) all

---

[7] As set forth more fully below, the First Noticed Parties did not include creditors of the Encore Debtors and the Cypress Debtors because their bankruptcy cases were not filed until May 20, 2015 and April 25, 2016, respectively.

employees of the Debtors since 2012 (collectively the "First Noticed Parties"). *See* Docket No. 1264. Further, the Debtors published the First Bar Date Notice in the major newspapers covering the areas in which the Debtors operated, including the Atlanta Journal Constitution, Miami Herald, Tampa Tribune, Florida Times Union, Orlando Sentinel, The Advocate-New Orleans, The Advocate-Baton Rouge/Acadiana, and the Panola County News Paper in Carthage, Texas (collectively the "First Notice Publications"). *See* Certificate of Notice of Publications of Bar Date Deadline [Docket No. 676].

20.　　By order dated August 13, 2015 (the "Second Bar Date Order") [Docket No. 836], the Court granted the Encore Debtors' *Ex Parte* Motion for Order Fixing Bar Date for Filing Proofs of Claim and Interests and Approving Notice Procedures [Docket No. 832]. Pursuant to the Second Bar Date Order, the Encore Debtors served a notice of the deadline for filing proofs of claim (the "Second Bar Date Notice") (together with the First Bar Date Notice, the "Bar Date Notices") on all known creditors plus (i) all parties listed on the mailing matrix in the Encore Debtors' cases, (ii) all residents and personal representatives of residents of the Encore Debtors' skilled nursing facilities since 2012 at their last known addresses; and (iii) all employees of the Encore Debtors since 2012 (collectively the "Second Noticed Parties") (together with the First Noticed Parties, the "Noticed Parties"). *See* Docket No. 1265. Further, the Encore Debtors published the Second Bar Date Notice in the major newspapers covering the areas in which the Encore Debtors operated, including the Chicago Tribune, the Kansas City Star, the Westchester Metropolitan, the News Press, and the San Antonio Express News (collectively the "Second Notice Publications") (together with the First Notice Publications, the "Notice Publications"). *See* Certificate of Notice of Publications of Bar Date Deadline [Dcoket No. 1271].

21.     By serving the Bar Date Notices on all of the Debtors' known creditors plus all residents, personal representatives of residents, and all former employees that resided with or worked for the Debtors within the relevant statutes of limitations, the Debtors provided actual notice of the applicable bar dates to all known claimants and as many potential claimants as reasonably possible.  Further, by publishing the Bar Date Notice in the Notice Publications covering the areas in which the Debtors' operated, the Debtors provide constructive notice to other unknown claimants.  *Accord Waterford*, 294 Fed.Appx. at 904 (implying in *dicta* that the debtor should have published notice in newspapers likely to be read by debtor's creditors).  The Debtors submit that this notice program, which was previously approved by the Court, satisfies the constitutional requirement that all known creditors receive actual notice and unknown creditors receive constructive notice of the Debtors' bar dates.  *Id.*

## IV. THE PLAN SHOULD BE CONFIRMED

22.     Section 1129(a) sets forth the requirements for confirmation of the Plan.  As discussed more fully below, the Plan satisfies all of the requirements of Section 1129(a) and should be confirmed.

**B.     Section 1129(a)(1):  Compliance with the Bankruptcy Code**

23.     Section 1129(a)(1) requires that a plan comply with the applicable provisions of the Bankruptcy Code.  The principal objective of Section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.  *In re Couture Hotel Corp.*, 536 B.R. 712, 733 (Bankr. N.D. Tex. 2015).  Accordingly, to determine if the Plan complies with Section 1129(a)(1) the Court must look to the requirements of Sections 1122 and 1123(a).  *Id.*  Here, the Plan complies with all requirements of the Bankruptcy Code, including the requirements of Sections 1122 and 1123(a).

24. The Plan satisfies the mandatory provisions of Sections 1122 and 1123(a)(1), which address the classification of claims and interests. The Plan designates 10 classes of claims and interests. Plan at Art. 3. The Plan's classification scheme is based upon the legal nature and relative rights of the claims and is not proposed for any improper purposes. Blalock Decl. at ¶ 9.a. As required by Section 1122(a), each class contains only claims that are substantially similar to the other claims contained therein. *Id.* The Plan complies with Section 1123(a)(2) by designating classes of claims that are not impaired under the Plan. Plan at Art. 4.01 (designating classes 1, 2, 3, and 7 as unimpaired). The Plan complies with Section 1123(a)(3) by specifying the treatment of all impaired classes under the Plan. *Id.* at Art. V (specifying treatment of all classes). The Plan complies with Section 1123(a)(4) because it provides the same treatment to all members of a given class unless such member has agreed to less favorable treatment. *Id.* (describing treatment within each class).

25. The Plan generally complies with Section 1123(a)(5) by providing adequate and proper means of implementation, including the compromise and settlement of the Insider Claims, TCR Personal Injury Claims, and the Chicago Health Care Leasing Claim via the Settlement, the establishment of the Unsecured Claimants Trust (and, if necessary, the Tort Claimants Trust), the funding of each trust, and the distribution of payments to claimants. Plan at Art. 6, *passim*; *see also* Blalock Decl. at ¶ 8.d.

26. The Plan is a liquidating plan that does not provide for issuance of any securities and provides for the eventual dissolution of the Debtors. Plan at Art. 9.10-9.11. Accordingly, Section 1123(a)(6) is inapplicable. *See In re Advance Watch Co. Ltd.*, 2016 WL 323367, at *3 (Bankr. S.D.N.Y. Jan. 25, 2016) (Section 1123(a)(6) inapplicable where plan does not provide for issuance of any securities); *In re Eastern 1996D Ltd. P'ship.*, 2014 WL 7238265, at * 5

(Bankr. N.D. Tex. Dec. 17, 2014) (Section 11239a)(6) inapplicable where plan provides for dissolution of debtors).  As required by Section 1123(a)(7), the selection and appointment of the Unsecured Claimants Trustee is consistent with the interests of creditors, equity interest holders, and public policy.  *In re EBHI Holdings., Inc*., 2010 WL 3493027, at *3 (Bankr. D. Del. Mar. 18, 2010) (appointment of liquidating trustee selected by creditors' committee satisfied Section 1123(a)(7)).  Section 1123(a)(8) does not apply because the Debtors are not individuals.

### C.    Section 1129(a)(2):  Solicitation

27.    Section 1129(a)(2) requires that the proponent of a plan comply with all applicable provisions of the Bankruptcy Code.  Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Sections 1125 and 1126.  *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009); *In re Mirant Corp.*, 2007 WL 1258932, at *9 (Bankr. N.D. Tex. Apr. 27, 2007).

28.    On July 25, 2016, the Court entered an order approving the Disclosure Statement (the "Disclosure Statement Order") [Docket No. 1238].  In the Disclosure Statement Order, the Court found that the Disclosure Statement contains adequate information as required by Section 1125(a).  Disclosure Statement Order at ¶ E.  Thereafter, and in accordance with the Disclosure Statement Order, the Debtors transmitted the Court-approved Disclosure Statement to creditors in compliance with Section 1125(b) and (c).  *See* Docket No. 1244.  The Debtors solicited acceptances of the Plan from all creditors in compliance with Section 1126.  Blalock Decl. at ¶ 9.i.  Accordingly, the Debtors have satisfied the requirements of Section 1129(a)(2).  *In re Idearc Inc.*, 423 B.R. 138, 163 (Bankr. N.D. Tex. 2009); *Mirant*, 2007 WL 1258932, at *9.

### D.    Section 1129(a)(3):  Good Faith

29.    Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  Courts interpret this provision as requiring that a plan be proposed with

14-50756 - #1278  File 08/23/16  Enter 08/23/16 18:45:53  Main Document  Pg 14 of 23

a legitimate and honest purpose and have a reasonable chance of success. *Cypresswood*, 409 B.R. at 425 (citing *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)). Moreover, to be proposed in good faith, a plan must achieve a result consistent with the Bankruptcy Code. *Id.* (citing *In re Block Shim Dev. Company–Irving*, 939 F.2d 289, 292 (5th Cir. 1991)). These factors should be evaluated in light of the totality of the circumstances surrounding establishment of the plan, mindful of the purposes underlying the Bankruptcy Code. *Couture Hotel*, 536 B.R. at 734 (citing *Western Real Estate Equities, EEC. v. Village at Camp Bowie I, L.P. (In re Village at Camp Bowie I, L.P.)*, 710 F.3d 239, 246 (5th Cir. 2013)).

30.     The Plan has been negotiated and proposed in good faith and for a legitimate purpose. Blalock Decl. at ¶ 9.j. The Debtors' instituted this jointly-administered bankruptcy proceeding in order to reach a global resolution of disputed tort claims, resolve unpaid trade debts, and liquidate and wind down the Debtors' businesses. The Plan is the result of over two (2) years of intensive, arms' length negotiations between the Debtors, the tort claimants, and the Committee. As set forth in the discussion of the Settlement above, the Debtors have successfully resolved numerous disputed claims and the Plan will maximize the funds available for distribution to creditors.

31.     Together with the Committee, the Debtors proposed the Plan in good faith and with the honest intention of resolving disputed claims and maximizing creditors' recoveries. Blalock Decl. at ¶ 9.j. Accordingly, the Plan satisfies the requirements of Section 1129(a)(3). *See In re W.R. Grace & Co.*, 446 B.R. 96, 103-04 (Bankr. D. Del. 2011) (heavily negotiated plan intended to pay personal injury claims and resolve massive tort liabilities was proposed in good faith within the meaning of Section 1129(a)(3)).

**E.   Section 1129(a)(4):  Payment of Professionals' Fees**

32.   Section 1129(a)(4) requires that all payments by the Debtors for services, costs, and expenses in this case or in connection with the Plan be subject to the approval of the Court as reasonable.  The Plan expressly provides that all claims for professionals' fees are subject to review and approval by the Court as a condition to being paid.  Plan at Art. 2.01.  Accordingly the Plan satisfies the requirements of Section 1129(a)(4).  *Idearc*, 423 B.R. at 164.

**F.   Section 1129(a)(5):  Identity of Officers and Directors**

33.   Section 1129(a)(5) requires the disclosure of certain information regarding individuals that will serve as officers, directors, or trustees of corporate debtors after confirmation.  The Plan does not provide for the appointment of any officer, director, or voting trustee of the Debtors.  Further, the Plan does not propose the retention or employment of an insider of the Debtors.  Accordingly, Section 1129(a)(5) does not apply.  *In re Sentinel Mgmt. Group, Inc.*, 398 B.R. 281, 308-09 (Bankr. N.D. Ill. 2008); *In re McCommas LFG Processing Partners, LP*, 2007 WL 4234139, at *16 (Bankr. N.D. Tex. Nov. 29, 2007).

34.   Nonetheless, the Debtors have disclosed the identity of the Unsecured Claimants Trustee[8] and the terms of his employment.  *See* Docket No. 1260.  The appointment of the Unsecured Claimants Trustee will facilitate the implementation of the Plan and serve the interest of creditors.  Accordingly, the appointment of the Unsecured Claimants Trustee (and, if required, the Tort Claimants Trustee) is consistent with bankruptcy and public policy and the Plan complies with the requirements of Section 1129(a)(5).  *Sentinel Mgmt.*, 398 B.R. at 308-09.

---

[8]   The Unsecured Claimants Trustee is Brian Ryniker. Mr. Ryniker' s Declaration and his resume will be placed into evidence at the Confirmation Hearing. Based on the previous negotiations between the Debtors and the various personal injury and general liability claimants, the Plan Proponents do not envision a need to establish a Tort Claimants Trust. Should the need to establish a Tort Claimants Trust arise, the Debtors will disclose the identity of the Tort Claimants Trustee to the Court.

**G.** **Section 1129(a)(6):  Regulatory Rates**

35.     Section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan. This provision is inapplicable here because the Plan does not provide for the continued operation of the Debtors or the change of any rate that is regulated by a governmental regulatory commission.  Blalock Decl. at ¶ 9.m.; *McCommas*, 2007 WL 4234139, at *16.

**H.** **Section 1129(a)(7):  Best Interest of Creditors Test**

36.     Section 1129(a)(7), known as the "best interest of creditors test," requires that members of each impaired class of claims either accept the Plan or receive the same or more under the Plan than they would in a Chapter 7 liquidation.  *Cypresswood*, 409 B.R. at 428. Under the Plan, classes 4, 5, 6, 8, and 9 are impaired.  As reflected in the Balloting Report, all voting members of the impaired classes voted to accept the Plan.  Accordingly, the requirements of Section 1129(a)(7) are met with respect to those classes.  *Cypresswood*, 409 B.R. at 428.

37.     Regardless, creditors will undoubtedly receive more under the Plan than they would in a liquidation under Chapter 7.  As an initial matter, the Plan is a liquidating plan that follows the priority scheme set forth in Chapter 7.  Courts have recognized that "claimholders in a liquidating plan typically receive [at least] what they would if the Debtor were to liquidate under Chapter 7."  *Cypresswood*, 409 B.R. at 428; *see also In re Hendrick*, 45 B.R. 976, 987 (Bankr. M.D. La. 1985) (liquidating plan that followed Chapter 7 satisfied Section 1129(a)(7)).

38.     As reflected in the liquidation analysis attached to the Disclosure Statement as Exhibit E (the "Liquidation Analysis"), the Debtors project that members of impaired class would receive approximately 4.4% of the allowed amount of their claims in a liquidation under Chapter 7.  Blalock Decl. at 9.n.  Under the Plan, the Debtors project that members of impaired

classes will receive approximately 19.6% of the allowed amount of their claims. *Id*. Accordingly, the Liquidation Analysis demonstrates that the Plan complies with the requirements of Section 1129(a)(7). *Cypresswood*, 409 B.R. at 428.

## I.        Section 1129(a)(8):  Acceptance by Impaired Classes

39.        Section 1129(a)(8) requires that, "[w]ith respect to each class of claims or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan." Classes 1, 2, 3, and 7 are unimpaired under the Plan and therefore are deemed to have accepted. 11 U.S.C. § 1126(f); *Mirant*, 2007 WL 1258932, at *11.  Under Section 1126(c), a class of claims has accepted a plan if holders of at least two-thirds in amount and more than one half in number of allowed claims voting on the plan have voted to accept.  As reflected in the Balloting Report, all impaired classes have unanimously voted to accept the Plan and each class has therefore accepted the Plan in accordance with Section 1126(c).  Balloting Report at Exhibit 1. Accordingly, the Debtors have satisfied the requirements of Section 1129(a)(8).

## J.        Section 1129(a)(9):  Payment in Full of Administrative and Priority Tax Claims

40.        Section 1129(a)(9) generally requires that a plan provide for payment in full of all allowed administrative claims, priority non-tax claims, and priority tax claims unless the holders of such claims agree to different treatment. *Cypresswood*, 409 B.R. at 431.  The Plan provides that all such claims will be paid in full unless the holder agrees to less favorable treatment.  Plan at Arts. 2.01-03, 5.01, 5.02.  By doing so, the Plan satisfies the requirements of Section 1129(a)(9). *Id*.

## K.        Section 1129(a)(10):  Impaired Accepting Class

41.        Section 1129(a)(10) requires that "at least one class of claims that is impaired under the plan has accepted the plan . . . without including any acceptance of the plan by any insider."  As reflected in the Balloting Report, each of classes 4, 5, 6, 8, and 9, which do not

contain any insiders, have voted to accept the Plan. Accordingly, the Plan satisfies the requirements of Section 1129(a)(10). *Id*. at 432.

**L.      Section 1129(a)(11):  Feasibility**

42.      Section 1129(a)(11), commonly known as the feasibility requirement, provides that a plan may only be confirmed if it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."  Because the Plan provides for a liquidation of the Debtors' assets, the Debtors are not required to satisfy the feasibility requirement of Section 1129(a)(11).  *McCommas*, 2007 WL 4234139; *In Re Statepark Bldg. Group*, 2005 WL 6443615, at *9 (Bankr. N.D. Tex. May 19, 2005).

43.      Nonetheless, the Plan satisfies the feasibility requirement of Section 1129(a)(11). In determining whether the Plan is feasible, the Court need only find that the Plan is workable and has a reasonable likelihood of success.  *Idearc*, 423 B.R. at 168 (citing *Fin. Sec. Assurance Inc. v. T–H New Orleans Ltd., P'ship (In re T–H New Orleans Ltd. P'ship*), 116 F.3d 790, 801 (5th Cir. 1997)).  Here, the success of the Plan largely turns on the Released Parties funding the Release Payment as required under the Plan and the successful transfer of the Debtors' remaining assets to the Tort Claimants' Trust and Unsecured Claimants' Trust for administration.

44.      There are sufficient funds available to the Debtors and the Claimants Trusts to meet all the obligations under the Plan.  Blalock Decl. at ¶ 9.r.  As set forth in the Liquidation Analysis, the Debtors project that, as of the Effective Date, the Debtors will have approximately $12,257,600 in cash on hand.  *Id.*  Additionally, on the Effective Date of the Plan, the Released Parties will pay $2.5 million, a portion of which will be used to fund payments to holders of Allowed Personal Injury Claims, and a portion of which will be paid to the Unsecured Claimants Trust, on the terms and conditions set forth in the Plan.  *Id.*  The Plan provides for the payment in

full of all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and any other Secured Claims. *Id.* The Debtors believe that there will be sufficient funds to meet all required payments under the Plan. *Id.* Therefore, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) section 1129(a)(11) of the Bankruptcy Code. *Id.*

**M.    Section 1129(a)(12):  UST Fees**

45.    Section 1129(a)(12) requires that the Plan provide for the payment of all United States Trustee fees under 28 U.S.C. § 1930 ("UST Fees"). The Debtors are current on all UST Fees owed to date. Blalock Decl. at ¶ 9.s. Further, the Plan expressly provides that the Claimants Trusts shall timely pay all UST Fees until the case is closed converted to a case under Chapter 7. Plan at Art. 2.03. Accordingly, the Plan satisfies the requirements of Section 1129(a)(12). *Cypresswood*, 409 B.R. at 433.

**N.    Section 1129(a)(13):  Continuation of Retirement Benefits**

46.    Section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to Section 1114. The Debtors do not provide "retiree benefits" as such term is defined in Section 1114. Blalock Decl. at ¶ 9.t. Therefore, Section 1129(a)(13) is inapplicable. *Cypresswood*, 409 B.R. at 433.

**O.    Section 1129(a)(14):  Domestic Support Obligations**

47.    The Debtor does not (and cannot) owe any domestic support obligations and, therefore, Section 11329(a)(14) is inapplicable. Blalock Decl. at ¶ 9.u.; *Cypresswood*, 409 B.R. at 433.

**P.    Section 1129(a)(15):  Projected Disposable Income**

48.    The Debtor is not an individual and Section 1129(a)(15) is therefore inapplicable. Blalock Decl. at ¶ 9.u.; *Cypresswood*, 409 B.R. at 433.

**Q. Section 1129(a)(16): Transfers of Property by Non-Profit Entities**

49. Section 1129(a)(16) only applies to transfers of property by "a corporation or trust that is not a moneyed, business, or commercial corporation or trust." *Cypresswood*, 409 B.R. at 433. Because the Debtors are for-profit entities, Section 1129(a)(16) does not apply. *Id.*

**R. Section 1129(b): Fair and Equitable; No Unfair Discrimination**

50. The Plan satisfies all of the applicable requirements of Section 1129(a) of the Bankruptcy Code other than Section 1129(a)(8). All of the Voting Classes have voted to accept the Plan. However, Class 10 (Equity Interests) is not receiving a Distribution or retaining any property under the Plan and, consequently, is deemed to have rejected the Plan pursuant to Section 1126(g). Pursuant to Section 1129(b)(1), the Plan may still be confirmed, notwithstanding that not all impaired Classes have voted to accept the Plan, if the Plan is fair and equitable with respect to, and does not unfairly discriminate against, such Classes. Here, no holders of Claims or Interests that are subordinate to the Interests in Class 10 will receive a Distribution or retain any property under the Plan. Accordingly, the Plan is fair and equitable with respect to such Class and does not unfairly discriminate against such Class. 11 U.S.C. § 1129(b)(2)(C)(ii). Therefore, the Plan complies with Section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding that Class 10 was deemed to have rejected the Plan. *In re Indian Nat. Finals Rodeo Inc*., 453 B.R. 387, 401 (Bankr. D. Mont. 2011).

**S. Section 1129(d): Principal Purpose of the Plan**

51. Section 1129(d) provides that the Court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. Blalock Decl. at ¶ 9.y.

## V. CONCLUSION & PRAYER

52.     For the reasons set forth above, the Debtors request the entry of an order (i) confirming the Plan and (ii) awarding the Debtors any further relief the Court deems appropriate.

Dated:  August 23, 2016                    Respectfully submitted,

                                           **NELIGAN FOLEY LLP**

                                            */s/ Patrick J. Neligan, Jr.*
                                           Patrick J. Neligan, Jr.
                                           Texas State Bar No. 14866000
                                           pneligan@neliganlaw.com
                                           James P. Muenker
                                           Texas State Bar No. 24002659
                                           jmuenker@neliganlaw.com
                                           325 N. St. Paul, Suite 3600
                                           Dallas, Texas  75201
                                           Telephone: (214) 840-5300
                                           Facsimile: (214) 840-5301

                                           **BAKER DONELSON BEARMAN
                                           CALDWELL & BERKOWITZ, PC**

                                            /s/ Jan M. Hayden
                                           Jan M. Hayden (LA #06672)
                                           jhayden@bakerdonelson.com
                                           Erin E. Pelleteri (LA #30666)
                                           epelleteri@bakerdonelson.com

                                           201 St. Charles Avenue, Suite 3600
                                           New Orleans, Louisiana  70170
                                           Telephone: (504) 566-5200
                                           Facsimile:  (504) 636-4000

                                           **COUNSEL FOR THE DEBTOR**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 23rd day of August, 2016, a true and correct copy of the foregoing was served via this Court's ECF notification system.

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.